Lulu Enterprises, Inc. v. N-F Newsite, LLC et al	Doc. 1 Att. 12

# EXHIBIT I

Dockets.Justia.com

## MediaPostPublications

HOME • CLASSIFIEDS • MANAGE SUBSCRIPTIONS • COMMUNITY • EVENTS • MEDIA KIT • HELP

### ONLINE MEDIA DAILY

SEARCH    Advanced Search    Archives

Welcome Cindy Hunt | sign-out    Tue, Sep 4, 2007

Home > Search > Thursday, Aug 30, 2007

EMAIL THIS ARTICLE    PRINT    REPLY    SUBSCRIBE    TODAY'S EDITION

## Hulu's A Lulu Of A Name
by Gavin O'Malley, Thursday, Aug 30, 2007 6:00 AM ET

WHAT'S IN A HULU? IF all goes according to plan, a slew of network shows led by News Corp. and NBC Universal. The long-awaited name for the upcoming joint venture--which means nothing in any particular language--was finally announced Wednesday to an industrywide chorus of yawns and guffaws.

"The first thing I thought of was those little plastic hula girls people put on their dashboards," said Mike McGuire, an analyst with Gartner Research.

"Come on," pleaded Forrester Research analyst James McQuivey. "It sounds like they figured that all the good company names were already taken."

Predictably, the blogosphere was no less critical. Hulu-related posts on the popular industry blog TechCrunch were remorseful at best.

"Worst domain name for a company with more than $100 million behind it," concluded magnusdopus. "Closest mental association is the Hawaiian term hula. And anything Hawaiian has an 'out

### Today's Most Read

1. When Brands Need Buddies
2. Gauging The Hype On Mortgage Meltdown's Online Ad Impact
3. Omnicom Shutters PHD St. Louis, Marks An End To A Regional Media Dynasty

MediaPost Publications - Hulu's A Lulu Of A Name - 08/30/2007

there' connotation. On a scale of 1 to 10, I give it a 4. With YouTube being a 10."

"I give this a negative infinity out of 10, with YouTube being a 10," added TechCrunch commenter Jason Moy. "Laughable."

Worse still, critics of the long-form video distribution platform--variously referred to in the past as "NewSite," "New Co.," and "Clown Co."--received more ammunition when Hulu CEO Jason Kilar said the site would miss its previously announced late-summer release date.

"Now it's October?" quipped Forrester's McQuivey. "We all knew they weren't going to make it by end of summer, but now you have to ask where else could they come up short."

Added McQuivey: "I hope they bought every URL with a variation of the spelling, because no one's going to know how to spell Hulu."

If only by name, Hulu does mesh with the endless stream of Web technology and content brands coming out of Silicon Valley, conceded some analysts who were willing to admit that the quality behind a brand is ultimately more important than its name.

"It's hard to remember," said Gartner's McGuire, "but people must have thought brands like Yahoo and Google sounded just as strange as Mahalo, Twitter, and Vuguru sound today."

*Gavin O'Malley can be reached at gavin@mediapost.com*

### Recent Online Media Daily Articles

Romney's Jumpcut Ad Contest Is Underway
A contest to create Republican Presidential candidate Mitt Romney's next TV ad got underway Aug. 29...

Newspaper Site Ad Spending Up 19.3%
Advertising on newspaper Web sites in the second quarter increased 19.3% year-over-year to $796 million, according...

Chinese Cartoon Cops To Warn Surfers of Surveillance
Authorities in Beijing announced that two virtual police officers would soon begin visible patrols on Chinese...

Local Online Ad Spending At $2.9 Billion In 2007 - eMarketer

4. Auto Insurance Study: Customer Service Outweighs Marketing

5. Lexus Gets New Marketing VP

MediaPost Publications - Hulu's A Lulu Of A Name - 08/30/2007

A new eMarketer report projects local online ad spending in the U.S. will reach $2.9 billion...

Gauging The Hype On Mortgage Meltdown's Online Ad Impact
Wall Street types are saying the sub-prime mortgage meltdown will hit the online advertising industry hard--almost...

Topical Video Magazine A Hit For Slate V
Slate's online video magazine, a cheeky blend of features ranging from politics and science to culture...

WSJ Relaunches Small Business Channel
Building up its ad-supported content offerings, *The Wall Street Journal* has relaunched its online channel for...

Dailymotion Picks Up $34 Million More
To finance its hasty U.S. invasion, Paris-based video-sharing hub Dailymotion has raised $34 million from Advent...

YouTube Reaches Royalty Agreement With U.K. Rights Group
Paving the way for the next British invasion on YouTube, the video-sharing site has reached an...

News Clips Most Popular Online Video Content: Study
News clips are the most popular form of streamed video content, according to a new study...

>> Online Media Daily Archives

ABOUT MEDIAPOST · MEDIA KIT · RSS FEEDS · PRIVACY · TERMS & CONDITIONS





©2007 MediaPost Communications. All rights reserved.
1140 Broadway, 4th Floor, New York, NY 10001
tel. 212-204-2000, fax 212-204-2038, feedback@mediapost.com



# Hulu: NBC And Fox Hope It's a Real "Lulu"
By Julia Boorstin Correspondent
cnbc.com
| 29 Aug 2007 | 04:38 PM ET

NBC Universal (owned by **GE** which is parent comapny of CNBC) and **News Corp.** are collaborating on a online video site to compete with YouTube, and today we learned its name: Hulu. **(Go to hulu.com)** to check out some of the video the on-demand service will be providing--you'll see that Fox's "24" and NBC's "My Name is Earl") are prominently featured.

This odd name is a long awaited nugget from the mystery site, until now nicknamed "NewSite" and nicknamed 'Clown Co' by skeptical Google folks. A joint venture of the two rival media conglomerates, Providence Equity Partners invested $100 million for a 10% stake giving the company a billion dollar valuation.

So what do we know about Hulu other than it's name? It's run by CEO Jason Kilar who previously worked at **Amazon.com** . He says (in a letter on the site) that they picked "hulu" because it *"strikes us as an inherently fun name, one that captures the spirit of the service we're building. Our hope is that Hulu will embody our (admittedly ambitious) never-ending mission, which is to help you find and enjoy the world's premier content when, where and how you want it."*

The site's content, which judging by the current home page, clearly includes many NBC and FOX shows, though its unclear which Universal and 20th Century Fox films will be included. The content will be available on hulu.com as well as through **AOL, MSN, MySpace, Yahoo, CNET** and **Comcast**. The two collaborating companies boasted when they announced these distributors that these five companies reach 98% of the American Internet Audience. They also announced advertisers including **General Motors, Intel, Cadbury Schweppes,** and **Cisco.**

There are still lots of looming questions--is the site launching too late? Will NBC Uni and News Corp. get other media companies on board? Do they need broader collaboration for this Hulu site to compete with YouTube? Will these two rivals really collaborate fully? Or will one TV network or the other want to keep the most popular content for their own site? Will advertising on the content be distracting and turn off viewers? or will it work?

(If you have any thoughts on these questions, e-mail me!)

The company launches a beta test in October--I signed up for an invitation to check it out, so I'll be sure to keep my blog updated with info!

*Questions? Comments?* MediaMoney@cnbc.com

© *2007 CNBC, Inc. All Rights Reserved*

URL: http://www.cnbc.com/id/20499697/

---

MSN Privacy . Legal
© 2007 CNBC.com

M] http://mashable.com/2007/08/29/hulu/

Latest Headlines  http://stores.lulu.co...

**greasyguide**  2007-08-29 11:05:56

Why does everything have to be a YouTube killer?

Reply to this comment

**jon burg**  site jburg.typepad.com/...  2007-08-29 11:10:30

I actually got through to the new Communications lead at Hulu for a brief chat a couple of minutes ago. Check it out at http://jburg.typepad.com/futu re/2007/08/clownco-is-now-.html .

Reply to this comment

**razzzmatazzz**  2007-08-29 11:30:00

this was the original name... http://youtube.com/watch?v=PtuqjFF7-N4

Reply to this comment

**Sam**  2007-08-29 11:59:16

Reminds me of Lulu (what, with only one letter differentiating it). I actually like it, but I guess we'll have to wait and see whether we go hoola for Hulu.

Reply to this comment

$0 Stock Trades No minimum balance. ze
Up to 10/Day and 40/Month. Just $3.50 Thereafter. Zecco Trading, a division of Equinox Securities, Inc. Memb

The Internet home of: FORTUNE Money BUSINESS 2.0 FORTUNE

# CNNMoney.com

GET QUOTES | SYMBOL LOOK-UP

HOME | NEWS | MARKETS | MY PORTFOLIO | TECHNOLOGY | JOBS | PERSONAL FINANCE | LUXURY | REAL ESTATE

## MEDIA BIZ
### With Paul R. La Monica

About the author

August 29, 2007

### News Corp.-NBC site has a name: Hulu

The News Corp. (NWS)-NBC Universal online video joint venture finally has a name! Hulu.

Say wha? Hulu? Won't that confuse people since it sounds like Sulu of "Star Trek" fame? George Takei rocks! It also sounds a lot like Lulu, a custom online book publisher I've written about. And to be completely infantile, if the site has any major problems, it's going to be very easy for people like to me to start writing about how Hulu is in deep doodoo.

But according to a message on Hulu from the site's CEO Jason Kilar, a former Amazon.com (AMZN) executive who joined the site in June, News Corp. and NBC decided to go with Hulu because it "is short, easy to spell, easy to pronounce, and rhymes with itself. Subjectively, Hulu strikes us as an inherently fun name, one that captures the spirit of the service we're building. Our hope is that Hulu will embody our (admittedly ambitious) never-ending mission, which is to help you find and enjoy the world's premier content when, where and how you want it."

The two media companies announced their online video distribution partnership in March and since then, they had been referring to the site simply as NewSite. But that didn't stop people from wondering what the site would eventually be called. Some, including me, jokingly referred to it as MeTooTube since News Corp. and the GE (GE) owned NBC Universal appeared to be trying to take on Google's (GOOG) insanely popular YouTube.

Hulu may seem like an odd choice for a moniker since it has nothing to do with either News Corp.'s Fox brand or the NBC name and is more than a tad wacky. Then again, the companies might be hoping that people don't treat the site as an example of "old media" companies playing catch-up in the world of online video.

And to be fair, Hulu is not really the YouTube killer that many in the media are making it out to be. The site is focusing more on the professional content from the vast libraries of News Corp. and NBC and not user-generated videos. Hulu is also just going to be one part of the broader distribution partnership as News Corp. and NBC are also syndicating content to sites such as AOL, which is owned by my parent company Time Warner (TWX), Yahoo (YHOO) and Microsoft's (MSFT) MSN.

If you are interested in checking more out about Hulu, the site is now accepting invitations to sign up for the site's beta, which will launch in October.

So what do you think of Hulu? Do you like the name? Have anything better? More importantly, will you actually use the site or do you plan on sticking with places like YouTube and other popular online video destinations like Metacafe, Dailymotion and Yahoo! Video?



**Previous posts**
- Wikipedia for sales
- Why the networks 
- Big media goes ba
- Sex, drugs and virt
- TiVo hopes to fast-
- News Corp.-NBC s
- Nokia's music store
- Google: A safe ha
- Skype rival gets $1
- Media stocks and t

**Archives**
- August 2007
- July 2007
- June 2007
- May 2007
- April 2007

SPECIAL OFFER:

Filed under News Corp, NBC, online video, YouTube, Google
Posted by Paul R. La Monica 11:34 am 5 Comments | Add a comment

really?

Posted By Jay Singapore : August 30, 2007 3:41 am

It reminds me of Nintendo's decision to name Wii, well, Wii instead of calling it Revolution. It's funny to make Wii jokes, because it's a game console, but something about a news company using a name like Hulu is just ... wrong.

Posted By Leslie Ann, Milton, VT   August 29, 2007 5:01 pm

SUBSCRIBE:

Subscribe to ou

It took them x number of months to come up with hulu? Lame.

Posted By john, durham nc : August 29, 2007 2:17 pm

This is really funny when I read this name Hulu, which means Peach in Farsi (persian / iranian). I think it is a great idea for traditional media companies to start capitalizing on their content rather than having a web 2.0 company with a software to use their content to build audience/advertiser.

Posted By Ali, Oakland / California : August 29, 2007 12:42 pm

Put Yahoo, Google, Baidu, Sohu, & YouTube in a blender and what do you get? "Hoodoo", or whatever it's called. The branding folks didn't earn their money.

Posted By Jim, New York NY : August 29, 2007 12:25 pm

Add a Comment
« Back to Blog Main

To send a letter to the editor about Media Biz, click here. ■

« Nokia's music store hits sour note                    TiVo hopes to fast-forward to profitability »

CNNMoney.com Comment Policy: CNNMoney.com encourages you to add a comment to this discussion. You may not post any unlawful, threatening, libelous, defamatory, obscene, pornographic or other material that would violate the law. Please note that CNNMoney.com may edit comments for clarity or to keep out questionable or off-topic material. All comments should be relevant to the post and remain respectful of other authors and commenters. By submitting your comment, you hereby give CNNMoney.com the right, but not the obligation, to post, air, edit, exhibit, telecast, cablecast, webcast, re-use, publish, reproduce, use, license, print, distribute or otherwise use your comment(s) and accompanying personal identifying information via all forms of media now known or hereafter devised, worldwide, in perpetuity. CNNMoney.com Privacy Statement

**More News**

GM gain puts Big 3 back on top

Subprime woes weigh on job outlook

Recession risk up - but still not likely

| The Hot List |
|---|
| Shielding your nest egg |
| The best and worst credit cards |
| You won the lottery! Now what? |

• Home • Portfolio • Calculators • Contact us • Newsletters • Podcasts • RSS • Mobile • Press Center • Site Map

• Advertise with Us • Magazine Customer Service • Download Fortune Lists • Reprints

• Career Opportunities • Special Sections • Conferences • Business Leader Council

\* Time reflects local markets trading time     † - Intraday data is at least 15-minutes delayed     • *Disclaimer*

© 2007 Cable News Network LP, LLLP  A Time Warner Company     ALL RIGHTS RESERVED
• TERMS UNDER WHICH THIS SERVICE IS PROVIDED TO YOU     • PRIVACY POLICY

Powered by WordPress.com

Westlaw Attached Printing Summary Report for PEARCE,ALEXANDER 6048544

| | |
|---|---|
| Date/Time of Request: | Wednesday, September 05, 2007 13:11:00 Central |
| Client Identifier: | 6117-1 [LULU] |
| Database: | FEDFIND |
| Citation Text: | 650 F.2d 495 |
| Lines: | 380 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

650 F.2d 495                                                                                                                          Page 1

650 F.2d 495
**(Cite as: 650 F.2d 495)**

▷
Federal Leasing, Inc. v. Underwriters at Lloyd's
C.A.Md., 1981.

United States Court of Appeals, Fourth Circuit.
FEDERAL LEASING, INC. et al., Appellees,
and The Bank of California, N.A. et al., Plaintiffs,
v.
UNDERWRITERS AT LLOYD'S et al., Appellants,
v.
SUBURBAN TRUST COMPANY, a Maryland Corporation, Appellee,
and Federal Leasing, Inc. et al., Counterdefendants.
No. 80-1363.

Argued Feb. 5, 1980.
Decided June 2, 1981.

Seller and lessor of computer equipment sought a preliminary injunction requiring insurers under policies insuring seller against certain losses to abide by terms of agreement between the parties settling the dispute which arose out of early termination of computer leases and conditional sales agreement by users of the equipment. The United States District Court for the District of Maryland, at Baltimore, 487 F.Supp. 1248, Alexander Harvey, II, J., granted the preliminary injunction, and insurers appealed. The Court of Appeals, Albert V. Bryan, Senior Circuit Judge, held that the preliminary injunction was properly granted, in that seller probably would have suffered irreparable injury if the preliminary injunction were denied, and its likelihood of ultimate success on the merits was high.

Affirmed.
West Headnotes
**Injunction 212 ⚖138.37**

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure

      212IV(A)3 Subjects of Relief
        212k138.36 Contracts
          212k138.37 k. In General. Most Cited Cases
   (Formerly 212k138.36, 212k136(3), 212k137(4))
Preliminary injunction was properly granted in favor of seller and lessor of computer equipment requiring certain insurers to comply with previous settlement agreement of parties by which insurers were to process claims for losses arising out of early termination of computer leases and conditional sales agreements by users of the equipment, in that seller probably would have suffered irreparable injury to its business if preliminary injunction were denied, and seller's likelihood of ultimate success on the merits was high.

**\*496** Eugene F. Bannigan, New York City (John D. Gordan, III, Lord, Day & Lord, New York City, John E. Sandbower, III, Robert J. Carson, Phillips P. O'Shaughnessy, Smith, Somerville & Case, Baltimore, Md., on brief), for appellants.
John Doar, New York City, Benjamin Rosenberg, Baltimore, Md. (G. Stewart Webb, Jr., Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellee Federal Leasing, Inc.
Michael Sandler, Washington, D.C. (John E. Nolan, Jr., Steptoe & Johnson, Washington, D.C., on brief), for appellee Suburban Trust Co.

Before BRYAN, Senior Circuit Judge, and PHILLIPS and ERVIN, Circuit Judges.
ALBERT V. BRYAN, Senior Circuit Judge:
Federal Leasing, Inc. (Federal), a Maryland corporation engaged in the lease and sale of computer equipment, brought this action to recover damages, compensatory and punitive, of certain underwriters at Lloyd's, London (Underwriters), and a number of British insurance companies for their alleged breach of various "computer equipment lease indemnity policies." [FN1] These policies insure Federal against losses arising from obligations incurred by it in the financing of its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

650 F.2d 495                                                                                          Page 2
650 F.2d 495
**(Cite as: 650 F.2d 495)**

transactions. The District Court entered a preliminary injunction requiring Underwriters to process claims pursuant to an agreement hereinafter treated of and previously negotiated with Federal; it is from this injunction, under which they have provisionally paid claims totalling over thirty million dollars, that Underwriters appeal.

> FN1. Jurisdiction rests on diversity of citizenship

After a hearing upon affidavits and counter-affidavits,[FN2] the District Judge, in accord with Fed.R.Civ.P. 52(a) and 65, upon findings of fact not proven clearly erroneous and upon sound conclusions of law, passed the decree of injunction in suit. Federal Leasing, Inc. v. Underwriters at Lloyd's, 487 F.Supp. 1248 (D.Md.1980). Adopting these findings and approving the legal conclusions, we affirm.

> FN2. No request for an evidentiary hearing was made. These instruments yielded a voluminous record, the fruit of extensive discovery undertaken in the nearly six months between Federal's motion for preliminary injunction and the hearing thereon.

I.

Federal purchases computers from the manufacturer and then markets them, through leases or conditional sales agreements, to commercial and government *497 users. It borrows initial purchase money from banks, insurance companies, and other institutions (investors). In the lease transactions involved here, the purchase-money loan would be evidenced by Federal's note to the investor; to amortize the loan, Federal would assign to the investor all or part of the lease payments. In conditional sales contracts, Federal would assign the agreement with its future stream of principal and interest payments to the investor at a present-value discount.[FN3]

> FN3. The leases and conditional sales agreements differed in ways that for the most part are not material to the present dispute. We therefore do not distinguish between them except when clarity of discussion requires it. We rely on the detailed exposition of the opinion below, and provide here only a simplified factual outline.

Although both types of contract typically extended over several years, each permitted the user on a specified notice to terminate without penalty after a shorter "firm" period. When a user exercised this privilege, Federal became obligated to the investor for the amount still owed under the original contract. The mechanics differed in the two types of transaction, but in each case Federal would attempt to make good its loss by placing terminated equipment with a new user, and we will refer to this operation generally as "remarketing."

Prior to March 1977, early terminations were not thought to present meaningful risks. Changes in the computer equipment market had been "evolutionary" rather than "revolutionary": improved capacity came only at significantly greater cost, and older computers retained value because of inflation, because they did not deteriorate, and because their capacity could be enhanced through "add-on" equipment. Thus, a user contemplating termination would be deterred by the higher cost of replacement equipment; moreover, in conditional sales transactions the user would be deterred by the sacrifice of equity built up in the course of payment. In these circumstances Federal generally could expect to remarket terminated equipment at a rate that would satisfy its obligations.

Nevertheless, a risk was there of an upheaval in market conditions. Federal and its potential investors realized that Federal's financial structure was not equal to the demands that such a reversal, coupled with numerous terminations, would precipitate. Seeking a device which would afford investors additional security, Federal asked a Baltimore intermediary to ascertain whether Lloyd's of London would insure against the hazard that early terminations would occasion losses not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

650 F.2d 495                                                                                                        Page 3

650 F.2d 495
**(Cite as: 650 F.2d 495)**

recoverable through remarketing. Thus it learned that such a policy had already been devised for another computer leasing concern. One Peter Nottage, manager of a Lloyd's wholesale brokerage firm, had negotiated and drafted this prototype policy in conjunction with representatives of an underwriting syndicate at Lloyd's; Nottage now acted as broker for other potential assureds seeking the same coverage. Through Nottage, Federal first obtained coverage for a single transaction, and then a "master policy" under which individual transactions could be submitted for coverage. The master policy had a one year term commencing September 1, 1974, and was renewed for additional one-year periods in 1975 and 1976. Between 1974 and 1978 Underwriters insured Federal's transactions of approximately $130 million. Prior to March 1977, only thirteen early terminations occurred, and only seven of these led to claims against Underwriters, which paid them as they were presented.

On March 25, 1977, however, International Business Machines (IBM) introduced a new generation of computer far superior to, and far less costly than, earlier models, while simultaneously discounting its existing equipment. Federal's users thus were induced to terminate in unprecedented numbers, and the reduced market for older units effectively precluded remarketing at prices that would recoup Federal's losses. As the District Judge observed, these circumstances exampled "the very risks covered by the indemnity insurance policies," 487 F.Supp. at 1257, and in the last half of 1977 Federal presented thirty-seven claims amounting to several million dollars.

*498 Notwithstanding its prior practice of paying claims as they were filed, Underwriters declined to honor these demands when presented. They now asserted that their master policy obligations matured only upon expiration of the entire term of each lease or conditional sales agreement, arguing that Federal's net loss was not ascertainable earlier.
This surprising interpretation placed Federal Leasing in a precarious financial position. Federal Leasing was obligated to pay investors for the losses sustained while being denied recovery from the insurers for the very risk insured against. As Federal Leasing correctly asserted, the basic purpose of this indemnity insurance was to provide for the immediate payment of proper claims asserted by the investors because of terminations.

487 F.Supp. at 1257.

After Federal threatened suit, Nottage met in London with Federal's officials in February 1978. He subsequently advised Underwriters to seek accommodation with Federal; buttressing his view was the opinion of Underwriters' American counsel that the policies could not be construed to support Underwriters' position. In March 1978 Nottage, Federal officials and counsel, and counsel for Underwriters met and negotiated a compromise agreement, executed March 13 (the March 13 Agreement). Its terms, as summarized by the District Judge, were as follows:
Underwriters agreed that after a claim had been filed and Underwriters had determined that the claim appeared to be valid and that Federal Leasing was complying with the due diligence clause, Underwriters would promptly advance to the investor sufficient funds to satisfy Federal Leasing's obligations. In return, Federal Leasing agreed to pay Underwriters all proceeds it collected as a result of the remarketing of the computer equipment involved in a cancellation but not more than the amount of the loss paid by Underwriters. In addition, Underwriters agreed that seventeen outstanding claims were in fact valid, and Underwriters agreed to pay those claims.

487 F.Supp. at 1258.

This accord, effective April 1, 1978, was approved by all the underwriting syndicates which had taken portions of the risks covered by the policies. Underwriters on April 6, 1978 paid $1,581,774.16 owing on the seventeen claims and, from March 1978 to January 1979, the sum of $7,095,143.83 on eighteen more claims.

In February 1979 Underwriters ceased payments under the March 13 Agreement. Their reason, found the District Judge, was not "the discovery of any previously unknown facts which would amount to a proper defense to the claims," but merely the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

650 F.2d 495    Page 4

650 F.2d 495
**(Cite as: 650 F.2d 495)**

large number of claims then being filed. Id. The next month Underwriters appointed First National Bank of Boston as claims adjuster and declared a moratorium on further payments; they did pay three claims in March and April, however, totalling $866,149.31.

Then came the crisis for Federal:
Caught between the investors' pressing demands for payment of their legitimate claims and Underwriters' refusal to pay for these losses under the insurance policies and the March 13 Agreement, Federal Leasing filed this pending action on June 12, 1979. Since this action was filed, a few claims have been paid by Underwriters. In June 1979, a claim in the amount of $1,789,412.19 was paid. On December 10, 1979, this Court approved the settlement of the claims of Barnett Leasing Company in the amount of approximately $1,765,000. No other claims by Federal Leasing have been paid or settled.
Federal Leasing's predicament has become more acute as a result of litigation in other courts against it. Several investors have sued Federal Leasing in other state or federal courts, and in one of these cases, a substantial judgment against Federal Leasing alone has been obtained by an investor. Sun Life Insurance Company of America, Union Central Life Insurance Company and Skokie *499 Trust & Savings Bank, assignees of certain claims of the Bank of California involved here, have a suit pending in the Superior Court of Baltimore City, seeking judgment against Federal Leasing and Underwriters in the amount of some $3,882,840. Oak Park Trust & Savings Bank has an action pending in the United States District Court for the Northern District of Illinois, seeking judgment in the amount of $243,525.

Id. (footnote omitted).

On September 20, 1979 Federal moved the District Court for a preliminary injunction ordering Underwriters to pay the insurance claims of Federal's investors. The Court assessed Federal's circumstances in the following grim terms:
As of March 31, 1979, Federal Leasing's net worth was $1,559,902. Underwriters are and have been well aware of the limited resources available to Federal Leasing for the payment of the large outstanding claims of the investors. The record establishes that if all the claims against Federal Leasing as to which this Court does not have jurisdiction were reduced to judgment, Federal Leasing would be rendered bankrupt.

Id. at 1259.

II.

In this circuit the standard for interlocutory injunctive relief is the "balance-of-hardship" test. Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189, 196 (4th Cir. 1977).[FN4] This test requires a "flexible interplay" among four factors: the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; the likelihood of harm to the defendant if the requested relief is granted; the likelihood that plaintiff will succeed on the merits; and the public interest.

> FN4. Accord, Telvest, Inc. v. Bradshaw, 618 F.2d 1029 (4th Cir. 1980).
> The District Court determined that Federal rather than State standards should govern the availability of preliminary injunctions in diversity actions. We need not decide this question, as we conclude that the preliminary injunction issued in this case would be equally available under Maryland law.
> State Dep't of Health & Mental Hygiene v. Baltimore County, 281 Md. 548, 383 A.2d 51 (1977), outlines a four-factor test similar to that prescribed by Blackwelder:
> "It is frequently said that a proper exercise of discretion requires the court to consider four factors: likelihood of success on the merits; the 'balance of convenience'; irreparable injury, which can include the necessity to maintain the status quo; and, where appropriate, the public interest." Id. at 554, 383 A.2d at 55. We are aware of no Maryland case that would apply these factors so strictly as to require denial of Federal's motion. Underwriters rely on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

650 F.2d 495 Page 5
650 F.2d 495
**(Cite as: 650 F.2d 495)**

Perlmutter v. Minskoff, 196 Md. 99, 75 A.2d 129 (1950), in which the Maryland Court of Appeals upheld the denial of an injunction for payment of "money due under contracts," and held injunctive relief inappropriate for the mere accelerated collection of such debts. Id. at 110-111, 75 A.2d at 134. In that case, however, the Court found that no adequate showing had been made of fraud, irreparable harm, or other basis for equitable relief; indeed, the Court concluded that under the movant's own allegations the claimed payments were not yet due. The District Court's findings in the present case, as to both the nature and strength of Federal's claims, are in marked contrast to those in Perlmutter.

Blackwelder directs the District Court to consider first the likelihood of irreparable harm to the plaintiff, as balanced against the likelihood of harm to the defendant. Id. at 196. "If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." Id. Conversely, a weaker showing of the likelihood of irreparable injury will necessitate a stronger showing of probability of success; and if irreparable injury is merely "possible," probability of success may be decisive. Id. at 195, 196.

The District Court recognized that the award of a preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought. Noted, too, was that its raison d'etre is "to preserve the status quo during the course of a litigation in order to prevent irreparable injury to the moving party and in order to preserve the ability of the court to render complete relief." 487 F.Supp. at 1259. The Court's *500 exercise of discretion was marked by careful adherence to the principles delineated by the authorities just referenced.

a. Balance of hardship.

After a painstaking canvass of a complex and voluminous record, the District Court concluded that Federal probably would suffer irreparable injury if the preliminary injunction were denied. Contrary to Underwriters' assertion, Federal does not seek, and has not received, the mere acceleration of a money debt otherwise compensable in damages. It seeks to preserve its existence and its business. In a somewhat analogous situation a disputed franchise termination in which the record included hotly disputed allegations of fraud Judge Friendly commented: " (T)he right to continue a business is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award." Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970). Even if Federal were to survive, the continuation of its present predicament endangers its relations with customers and investors, the good will built up by a heretofore successful enterprise; such damage is " incalculable not incalculably great or small, just incalculable." Blackwelder, 550 F.2d at 197.

The Court balanced the probability of the harm to Federal against the probability of harm to Underwriters, and concluded that the relief was warranted. We cannot say that this was error: the risk of harm to Underwriters is largely foreclosed by permitting them to demand of any investor-claimant an adequate refunding surety bond, and by allowing them interest on any moneys paid out should Underwriters ultimately prevail. The parties' "relative quantum and quality of likely harm," Blackwelder, 550 F.2d at 196, that is, the balance of hardship, appears in these circumstances to tip decisively in Federal's favor.

b. Probability of success

The Court found Federal's likelihood of ultimate success to be very high. While the "clearly erroneous" standard may be less appropriate when findings are entered, as here, on conflicting affidavits and depositions, the Court's close evaluation of this question merits considerable deference.

Underwriters allege numerous instances of misrepresentation and fraud which, they contend,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

650 F.2d 495 Page 6

650 F.2d 495
**(Cite as: 650 F.2d 495)**

provide a complete defense to Federal's claims. As we see these contentions to be altogether frail, we note them only to say that the District Court reviewed them in extenso and, far from contradicting itself as asserted by Underwriters, outlined several alternative theories under which it considered Federal likely to succeed. We need not agree with each of the Court's provisional findings in order to affirm its overall assessment of Federal's chances at trial. There is no error in the Court's conclusion.

III.

The payment of money was not the only obligation undertaken by the parties in the March 13 Agreement. Faced with Underwriters' surprising and untenable interpretation of the insurance policies, Federal sought to resolve the dispute and to institute procedures by which future insecurity could be avoided. To achieve these ends it gave valuable consideration. The Court acted to maintain the integrity of the compact. Any idea of imposture upon Underwriters is dispelled upon reading and weighing the Court's outline of the order it envisioned:

The preliminary injunction to be entered by the Court will not directly order Underwriters to pay any of the claims involved in this litigation. The injunction will require Underwriters to comply with the provisions of the March 13 Agreement and to process claims for payment in the same manner as it did after April 1, 1978. In so complying, Underwriters should certainly pay some of the claims without delay.

On the other hand, the processing in good faith of certain other claims may disclose that they should not be paid. For example, Underwriters contend *501 that some transactions were declared before the user agreement was executed. Such an occurrence would be a violation of terms of the Master Policies. Further investigation of the facts is necessary before a decision can be made by Underwriters concerning claims of this sort.

If sound reasons exist for declining to pay a claim, Underwriters would not be required to make the payment in question. Explicit reasons should be given by Underwriters for the non-payment of a claim. However, it would be a violation of the March 13 Agreement and of the preliminary injunction if the reasons advanced by Underwriters are clearly without foundation or designed for purposes of delay. Performance by Underwriters under the injunction should be measured by their performance of the March 13 Agreement between April 1, 1978 and February 1979. During that period, Underwriters complied with the terms of the Agreement, paying most of the claims presented and declining to pay invalid claims. The injunction to be entered herein will compel Underwriters to continue to perform in that manner during the pendency of this litigation.

487 F.Supp. at 1267 (footnote omitted). The Court prohibited Underwriters from refusing any claim in reliance on defenses already considered and rejected by it. Id. at n. 21. Of course, Underwriters still may press such defenses at trial, but the record clearly supports the District Court's conclusion that their assertion in this context would not constitute " processing in good faith." The preliminary injunction actually issued by the Court faithfully reproduces the features herein outlined. There is no abuse of discretion in its form and scope.

As we appraise the facts found by the trial judge and analyze the precedents and treatises cited by him, we think that in the climacteric circumstances the injunction was clearly demandable and warrantably awarded.

Affirmed.

C.A.Md., 1981.
Federal Leasing, Inc. v. Underwriters at Lloyd's
650 F.2d 495

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.