IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:07-cv-00347-D

LULU ENTERPRISES, INC.,

                Plaintiff,

vs.

HULU, LLC, f/k/a N-F NEWSITE, LLC,

*et al.*,

                Defendants.

**DECLARATION OF JASON KILAR**

1.      My name is Jason Kilar.  I am the Chief Executive Officer of Hulu, LLC, the defendant in this action.  I am over the age of twenty-one, I am competent to make this Declaration, and the facts set forth in this Declaration are based on my personal knowledge.

2.      This Declaration (a) describes Hulu, from before formation through development over the past year, the products and services Hulu will offer upon public launch of the beta website, and the brand image that Hulu will convey, including the look and feel of the user experience; (b) outlines how and why we chose the name "Hulu," including the complete lack of any intent to associate with any of the many companies using "lulu" or other "ulu" formatives as part of their names; and (c) sets out the significant investment before the start of this lawsuit made in our company, the Hulu brand, and the valuable business relationships that we have with distribution partners, advertising partners, technology partners, and content partners, as well as with the consuming public.

1

US2000 10366607.1

Dockets.Justia.com

3.      As I explain in detail below, our business plan is focused entirely on premium content – TV shows and feature films – via the internet.  Our business is substantially different than the business engaged in by Lulu Enterprises, such that the likelihood of confusion between Hulu's premium entertainment and Lulu's self-publishing and user-generated material is non-existent.  Moreover, the entry of a preliminary injunction barring our use of "Hulu" would cause real, immediate and irreparable harm to our company.  After months of time, money and effort, our formal public launch would be set back months and we would lose millions of dollars in sunk costs and lost revenues.  The damage to our business relationships and reputation with our distribution partners, our technology partners, our advertising partners, and our content partners would be significant and irreparable.  Because of the marketplace in which we operate, the competitive environment, the timing of the television season and other factors, a delay in our launch would substantially damage, probably irrecoverably, our reputation and goodwill with the consuming public.

**Personal Background**

4.      I graduated from the University of North Carolina at Chapel Hill in 1993 with a B.A. where I studied both Business Administration and Journalism and Mass Communications.  For the past eight years, I have served on the Board of Visitors of the UNC School of Journalism and Mass Communications.  From 1998 to 2005, I served on the Marketing Advisory Board for UNC's Kenan Flagler School of Business Administration, where I also regularly speak and give presentations on behalf of Professor Gary Armstrong.

5.      From 1993 to 1995, I worked for The Walt Disney Company in Orlando, Florida.  Specifically, I did marketing, strategy, and business development for Disney Development Corporation.

6.    In 1997, I graduated from Harvard Business School with a Masters in Business Administration.

7.    From 1997 to 2006, I worked for Amazon.com. Initially, I wrote the business plan for Amazon's entry into the video and DVD business and ultimately led that unit as General Manager and Vice President. I then became Vice President and General Manager of Amazon's North American media business, which included books and music in addition to video and DVDs. Later, I served as Senior Vice President of Amazon's Worldwide Application Software, where my focus was on a significant number of applications that are used throughout Amazon's global websites and that are central to elements of the customer experience.

8.    I left Amazon.com in early 2006 to start my own business named Market Street Ventures, which was intended to focus on structured data applications. However, very shortly into that effort I was recruited to be the CEO for what is now Hulu, LLC.

9.    On July 9, 2007, I became Chief Executive Officer of Hulu. In this role, I am ultimately responsible for all aspects of running Hulu as a successful business featuring premium video content, including the impending closed beta test and ultimate public launch. Since starting at Hulu, in consultation with Hulu's Board I have made the decisions regarding key aspects of Hulu's affairs, including the selection of "Hulu" as our company's name and mark, the type of services we will offer as a company, where and how those services will be marketed, how those services will be presented to consumers, and how we will brand the company and its services.

10.    While reviewing the company's documents in connection with this litigation, I have seen – in some cases for the first time – a series of historical documents that pre-date my arrival (i.e, July 9, 2007), and relate to the potential scope or business ideas for Hulu. These

3

early stage documents consist primarily of certain slide presentations titled "NewSite JV
Business Overview" or similar names, and they then appear in some later marketing
presentations prepared by others.  As noted above, when I was hired as CEO, a key element of
my agreement to serve was that I be able to set the direction for Hulu.  Much of the work that
pre-dated my arrival at Hulu was very valuable; we developed very significant relationships with
distribution partners, technology partners and advertising partners.  However, it also is the case
that since the creation of these "NewSite documents" the business plan for Hulu has changed –
and not just evolved but significantly focused – over the past three months.  Since starting at
Hulu, I have attempted to clarify for our board, our investors, our employees, and our
distribution and advertising partners that we will be a service offering to internet consumers
premium content when, where and how they want it.

**Hulu:  From Concept to Launch**

11.      Hulu was conceived in late 2006 as a joint venture of Fox and NBC Universal,
and the venture was publicly announced in March 2007.  A substantial amount of initial work
was done between March and June of 2007 in connection with distribution partners, technology
partners and advertising partners.  During that period, Hulu had an interim CEO, who together
with a dedicated team of others on assignment from Fox and NBC Universal ran the business.

12.      In June 2007, a Delaware limited liability company, which is jointly owned by
NBC Universal and Fox, was formed. The placeholder name was N-F Newsite, LLC, which is
now named Hulu, LLC.

13.      The name "NewSite" always was intended as a temporary name while the
company conducted a name search and prepared to launch its website.  The search for this new

4

name began even before the company was formed, and spanning about five months, concluding in late August.

14.    From the beginning, and long before this litigation was commenced, Hulu's "key message" for our business consistently has been as a "premium, active user experience."  In other words, Hulu's business is built on a foundation dedicated to making available exceptional premium video content in which consumers will be highly engaged and involved in the process of selecting, viewing and reviewing content.  That content will be distributed over the internet by Hulu on its website, and together with some of the world's leading Internet destination sites. The site will be supported through advertisements by globally known, prestigious brands, and by sophisticated but easy to use leading technology.  Each of these foundational elements is already in place and associated with Hulu.

15.    Hulu's premium video content is paramount to its business and branding.  When Hulu launches its website, it will provide internet users with a free and legal means to play thousands of hours of world-class premium video content offered by two major studios – Fox and NBC Universal – and by other content partners, including television networks and media companies.  Hulu has agreements with over a dozen well-known, nationally branded media companies to provide professional content on the Hulu.com site.   These content providers are identified in my Supplemental Declaration.

16.    These content providers agreed to work with Hulu in significant part because of our exclusive focus on premium content.  They, and additional content partners who join us, will reinforce with the consuming public our brand image for premium content.

17.    Hulu's videos consist of full length television episodes and feature films, as well as short clips from the TV shows and movies.  Hulu has a "show page" for each TV show, which

US2000 10366607.1

may include clips or "internet-only content," such as outtakes or "cut scenes" from some of the programming, cast interviews, and other TV or film-related professional content.

18.    Hulu will have premium television shows as the centerpiece of our business.  That programming will include current prime-time network TV series – e.g, The Simpsons, 24, Prison Break, The Office, 30 Rock, Las Vegas, Friday Night Lights, etc. – as well as select TV programs from the archives of our content partners.  Most of those, such as Buffy The Vampire Slayer, Dragnet, or McHale's Navy, will be television classics.

19.    Hulu also will offer full-length feature films.  Hulu will have access to feature films from the libraries of Fox, NBC Universal and other content partners.

20.    Hulu's video offerings consist only of professional content from networks and studios, and will not include user-defined or user-generated content typically found on sites like YouTube (and Lulu.com and Lulu.tv).  Hulu has no plan to offer user-generated videos, home movies, or the like, nor does Hulu presently intend that a user will be able to upload videos and post or embed them onto Hulu's website.

21.    In my deposition I was asked several questions concerning documents that used the phrase "user gen."  As I testified, some of these references refer to consideration that has been given to allowing consumers to post written reviews regarding the video content they view on Hulu.  Any such reviews would be relating directly to the shows or films offered on Hulu.  That type of "user generated content" overlaps with the kind of work that I did for Amazon.com, where the user experience/interface – such as a review or product information – is an important aspect of the look and feel of the site.

22.    In other situations, documents referencing "user gen" simply reflect obsolete thinking.  Early, preliminary planning for the Hulu business included a wide-ranging

examination of possible business plan options.  For example, our business could have entered into a distribution relationship with an established video site, like YouTube.  Alternatively, we could have combined various content, i.e., making available not only premium television content but also user-generated material.  While those options may prove viable for another business, I decided that we would not go in that direction, and instead that we would be a stand-alone business focused on premium content.

23.     Notwithstanding any early consideration or discussion to the contrary, the present business plan for Hulu contemplates only that Hulu will be a website offering first-class, universally recognizable premium video to broadband internet users.  We have no intention that users will be able to upload their video content to Hulu.com.

24.     We intend to offer the consumer a rich, engaging video experience.  Hulu will allow online consumers to view a professional product (i.e., a television show or movie) at any time they choose.  By offering its premium videos on demand, consumers will be able to engage in what is called "time-shifting" and watch a particular show or video on their own schedules. Hulu's service will be free to consumers.  The business model at launch will be to generate revenues from advertisers.  Even prior to my arrival at the company, Hulu had arrangements for advertisements on its site with some of the world's most prestigious companies.  Commercials will appear in the long-form videos as well as static online ads, collapsible ads, and "lower-third" ads which appear at the bottom of the web page.  While a program is playing on Hulu.com, an advertisement may be displayed above the program, as illustrated in my Supplemental Declaration.

25.     Although Hulu theoretically will be available to all U.S. internet users, the practical reality is that only internet users with broadband or high-speed access will be able to

enjoy the site.  These segments of internet users typically are the most savvy and sophisticated internet users, and they often use the internet to seek out quality entertainment.

26.    The private beta launch planned for later this month is yet another critical step in this enterprise, which in effect was launched months ago.  We expect that this launch will expand rapidly to include tens of thousands of users.  Launching a new internet startup company is not like turning on a light switch.  It requires planning, capital, research, and extensive expertise in internet technology, advertising, and marketing.  The efforts leading up to the start of our website launch have required an investment in the millions of dollars.  For months now, our employees have been working diligently and extensively to develop the technology behind the Hulu product, secure content for the service, secure advertising support and investors, select a name for our company and its service, and develop its logo, branding, and web design, among other things.   The Hulu product is well underway along with extensive PR and recognition among its distribution partners, advertisers, media, bloggers, and future users.

27.    The private beta launch is consistent with Hulu's emphasis on quality:  we want to ensure that our technology will work as intended, receive feedback from this initial group of users, and then incorporate that feedback to make improvements as we expand the launch to a broader audience.  Our content, distribution and advertising partners are and will be first class; we want the same to be true of the experience we offer to our users, and testing the scalability of the technology with a beta group is standard and essential to a successful launch.

## The Hulu Brand and the User Experience at Hulu.com

28.    Hulu's destination website, which will be the cornerstone of our business, is located at www.hulu.com.

8

29.     The current home page on hulu.com reflects the emphasis that we will have on premium content, specifically well-known television programming.  Our brand will be closely aligned with the premium content from day one; the image will be clear and unmistakable.  The current home page for hulu.com, which captures and reflect that message, is depicted below:



30.     The hulu.com website is a page at which consumers sign up to participate in the private beta launch of the website later this month.

31.     We also have used "Hulu" extensively in our press releases through national media outlets, as our corporate name (Hulu, LLC) and logo on communications with our owners, investors, and third parties, including distribution partners, content partners, advertising partners and technology partners.

32.    The content and functionality that we will use for hulu.com during the beta test and upon launch currently are housed in a "staging version" of hulu.com.  Several screen shots illustrating the look of our site upon launch are included in my Supplemental Declaration.

33.    Within the staging version of hulu.com are various "show pages," to which users can navigate in order to choose from a particular episode of a TV program.  A show page from one of the television shows to be offered on hulu.com is depicted in my Supplemental Declaration.

34.    As with the other screen shots from the "staging" site, the actual information in the beta will be slightly different than what appears in these "show pages."  For example, cast information could appear on certain show pages.  However, the look and feel of the website will be very similar to what appears in these shots.

35.    As noted above and repeated throughout this declaration, we do not intend to do what the video marketplace refers to as user-generated material, i.e., video clips uploaded by consumers.  Rather, the only "user gen" content that we intend to have – and it will appear shortly after launch – will be user-reviews of the program, i.e., written comments about a particular show, film or clip.

36.    Hulu has filed an application with the United States Patent and Trademark Office to register HULU as a trademark.  The description of goods and services in this application does not reflect what Hulu will offer upon launch or for the foreseeable future.  Rather, the application simply suggests a number of *potential* uses of HULU as mark.  In effect this application describes what could be, one day in the future, certain uses of HULU.  Almost of all of these possible uses, however, are simply that: possibilities.  Whether any specific use of the HULU mark – other than in connection with a premium content video site – is contingent on a number

10

of unknowns.  These contingencies include, without limitation, the success of the initial launch, consumer response, advertiser response, marketplace research, and financial and manpower constraints.

37.    Our current intent is that Hulu will not promote itself by doing any advertising. Although we are owned by two media companies who have substantial resources to provide promotional consideration, broad-based advertising would not be sufficiently focused on our target audience.

**The Name Selection Process: How Hulu Was Chosen**

38.    The selection of "Hulu" as our company name and product brand has been time consuming, expensive and thorough.  It began in April 2007 and only concluded when we announced the selection of "Hulu" on August 29, 2007.  Selecting "Hulu" required about five months and hundreds of thousands of dollars to identify, screen and select the name.

39.    Hulu retained an internationally known branding company, Interbrand, to help select and develop a name and logo.  Interbrand is a global consulting firm that works with companies to develop, evaluate, and manage their brands.  Among its numerous services, Interbrand conducts in-depth brand research and analysis to ensure that a brand fits the functional and inspirational needs of a company.  Interbrand also assists in naming and brand design to ensure that a brand achieves awareness, strength, and loyalty.

40.    Interbrand spent substantial time conducting extensive research and investigation to determine what type of name would be appropriate for our business, based on our target audience, product offering and strategic focus.  From that research and investigation, Interbrand generated lists of potential names.  From those lists, we researched and generated even more names.  We looked at over 460 potential names before selecting the name "Hulu." In our search

11

for the ideal name, we considered both names that had some significance to what we were doing (i.e., had some direct or indirect reference to television, video, etc.) and those that had no meaning whatsoever.  Originally, we saw the name "Hulu" as falling in the second category, with no identifiable meaning to English speakers.

41.     Once we identified a workable list of names for further consideration, we spent substantial time determining whether each name was available for use.  We first investigated whether domain names for each of these names was available in all of our primary geographic markets (such as .co.uk., etc.).  Ultimately, we identified a small number of names for which the domain names either were available or that we hoped could be purchased for a reasonable amount under the circumstances.

42.     Although we sought input from professionals and consultants, some of the name selection process involved efforts by myself and other key employees to come up with names. For example, two of our employees – Eric Feng and Christina Lee  -- formerly were with a business called "Mojiti."  We considered whether that name might be viable, but decided it was not.  (And, contrary to press reports, Hulu has not acquired Mojiti, nor does it have plans to do so.)

43.     In late July, I directed my team to focus on one of these names as the likely selection:  "hulu."  During that time, we obtained additional information, including commercial search reports.  Once "hulu" was identified as a name, we also proceeded to secure "hulu" domain names.  This was a difficult task.  Hulu.com was already owned by a third party, and obtaining rights to the domain name required negotiation.  We ultimately purchased the hulu.com domain name.  We also acquired the rights to approximately 60 other "hulu" domain

12

names through various owners and domain name registrars.  A list of each "hulu" domain name secured by Hulu is listed in the attached Exhibit A.

44.     In addition to Interbrand, Hulu also hired Avenue A|Razorfish, an e-commerce consultant and services company, to assist in designing the Hulu logo and website and creating the look and feel of the Hulu brand.  The Hulu logo and website design are directly tied to the "Hulu" name.  After choosing Hulu as our brand, we then explored adopting a tag line, as well as a logo.  Having gone through that process for almost a month, we likely will forego a formal, specific tagline.  After comparable development time, and review of dozens of logo designs, shapes and colors, we have chosen a distinctive logo which will be used upon launch and going forward.  The logo appears in my Supplemental Declaration

45.     In short, Hulu invested about four months to explore, select, and integrate "Hulu" as the name for the company, and another month to get a logo design and "look and feel" work done on the website.  This process required extensive research, analysis and discussion.   The company spent hundreds of thousands of dollars as part of the process of selecting the "Hulu" name as well as developing the logos and branding design for the new website.

46.     On August 29, 2007, we announced our name to the world at large.  My open letter making that announcement appeared on Hulu.com, and a screen shot of the announcement follows:

US2000 10366607.1



47.     Our announcement generated tremendous publicity in the media and business press, and among internet users.  The emails and comments I have received have been consistently positive and complimentary regarding the choice of "Hulu" as our brand.  None of these emails expressed any confusion or association between Lulu Enterprises and Hulu.

48.     Since the announcement of our selection of "Hulu" and prior to this lawsuit being filed against us, the reaction of our business partners – distribution partners, advertising partners, technology partners and content partners – and potential users has been almost universally positive and receptive to the name.  Although we have experienced a few cynics in the press, articles about our name and service have contributed to widespread interest and publicity about Hulu.

**Why Hulu was Selected,
The Lack of Intent to Trade-Off of Lulu, and
the Lack of Confusion or Association with Lulu Enterprises**

14

49.    The decision to select the name "Hulu" was ultimately mine as CEO. As described above, we wanted a name that was fun, contemporary, short, and easy to say. "Hulu" has all of these characteristics. We also viewed it as a new word to the American audience; it is not a real word in the English language, and thus had no dictionary definition or immediate meaning in our primary market. In this sense "hulu" is an "empty vessel" or blank slate with no readily associated meaning. This allows us the opportunity to shape and uniquely define Hulu as a brand for the public through our premium content, the features that deliver content to our users, the look and feel of our website, the quality of our advertisers, and our promotional efforts.

50.    As a secondary consideration, prior to my decision I also was pleased that "hulu" had several attractive connotations in Chinese (because a number of our employees are of Chinese descent and China is a dynamic and large opportunity for nearly any business). For example, one primary meaning of "hulu" in Chinese is "gourd," which I am told conveys traditional, positive images of something which holds or carries cherished items. A secondary but less common Chinese meaning of "hulu" is "interactive recording," which obviously shares some connotations with what Hulu.com will be: a premium video website offering consumers a rich, engaging experience.

51.    We did not choose "hulu" because of any similarity to the word "lulu," or in an attempt to siphon off consumers from Lulu Enterprises, Lulu.com or Lulu.tv. The name "hulu" was conceived without any knowledge of Lulu Enterprises or Lulu.com whatsoever. At the time I selected "hulu," I was aware of a variety of other marks with "lulu" or words with "ulu" formatives being used by a great many entities of one kind or another. Although I was not specifically aware of Lulu Enterprises (or "Lulu.com" or "Lulu.TV"), I was aware that "lulu" was being used, including for selling or advertising goods on the internet, by a substantial

15

number of persons or companies in a variety of ways.  It never occurred to me that Hulu could be mistaken or confused with any company named "lulu."

52.    Throughout the process of generating possible names for use, I was never aware of the Plaintiff or its use of Lulu or Lulu.com.  I first learned of Plaintiff's use of the Lulu mark at the same time that I learned of a laundry list of third-party uses of other LULU and ULU marks.  Based on what obviously was extensive third-party use of LULU, I did not believe that our HULU mark was likely to be associated, much less confused, with any one of them.

53.    I am not aware of a single instance in which any person, including but not limited to customers, potential consumers or advertisers, have confused Hulu with the plaintiff Lulu Enterprises, Inc. ("Lulu") or any of its affiliates, or confused the parties' respective goods and services.

54.    Since the naming of the company to "Hulu," neither I nor anybody else at Hulu has received any misdirected mail, phone calls, or email from people searching for Lulu or otherwise inquiring about any association or relationship between Hulu and Lulu.

55.    Hulu's business is very different from what I understand to be the business of Lulu Enterprises.  We do not offer the same products and services; to the best of my knowledge the plaintiff does not have relationships with the international advertisers, technology companies or distribution partners with which Hulu is doing business; and the scale and focus of Hulu as a company has no resemblance to that of the plaintiff.  For these and many of the other reasons set forth in this declaration, it comes as no surprise to me that there has been no confusion between Hulu and the plaintiff, nor is there likely to be.  We would not benefit from confusion and do not want any between us and Lulu Enterprises or any other entity.

16

56.     I learned that this lawsuit had been filed when I saw news of it on the internet.  I then provided the information to my board of directors.  Nobody from Lulu Enterprises contacted Hulu prior to the lawsuit being filed.  We did not receive a call, a letter or any other notice or demand.

57.     In a telephone conversation with Bob Young shortly after this lawsuit was filed, specifically on or about September 12, he told me that his company was doing "man on the street interviews" which indicated that confusion would exist between his company, Lulu, and my company, Hulu.   However, my understanding – based on a review of the non-confidential portions of the discovery response from Lulu – is that Lulu has not produced any evidence of any such interviews or surveys, nor have they identified any individuals who have expressed confusion as to an actual or purported association with the two companies or our respective goods and services.

**The Irreparable Harm to Hulu if a Preliminary Injunction is Entered**

58.     A preliminary injunction against our use of the name "Hulu" would cause significant and immediate damage.  The harm to our relationships with our distribution partners, our technology vendors, our charter advertisers, potential private investors, and consumers (especially those who have signed up for our beta launch) would be incalculable.

59.     An injunction would effectively shut down Hulu as a business and doom any further use of "Hulu" by our company.  The momentum that Hulu has built over the past three to six months would be lost. Hulu would be forced to start over in its search for a different name and again develop the identity, branding, and look and feel of the website.  It would disrupt users from visiting our site and signing up for our product.  We could not move forward with our agreements with advertising or distribution partners.  Hundreds of thousands of dollars that we

are paying to our technology partners every month would be lost because very few of the services they provide would be of use unless we launch.  We would not have a domain name. Consumers would not know how to locate us on the web.  Third parties doing business with us would not know what to call us. Entry of a preliminary injunction would cause Hulu to miss entirely the optimal window for generating advertiser and consumer interest – the Fall television season.

60.     If Hulu is not allowed to go forward in supplying content and launching the hulu.com website under the "Hulu" name, Hulu would be forced to search for an alternative name.  This would require vast amounts of effort, time, and expense to conduct the extensive research and analyses necessary to choose a new name and develop the logos, branding, and web design.  That process took 4-5 months and hundreds of thousands of dollars the first time, and could again if it had to be repeated.

61.     Specifically, Hulu would lose almost all of its investment to date in the naming, marketing, branding, and promotion of the "Hulu" name and product, and in securing the Hulu.com domain name as well as approximately 60 other "Hulu" domain names in other countries.  These investments include:

    a.     Five months of time and money generating marks, doing research and searches, and selecting the name "Hulu";

    b.     The services provided by Interbrand, and Avenue A/Razorfish, to select the "Hulu" name and develop its associated logo, branding, and look and feel of the Hulu.com website; and

    c.     The money spent to purchase the "Hulu" domain names, including Hulu.com.

18

62.    A further complicating factor in any re-naming effort is the fact that no other alternative desirable name currently exists from our original name generation effort.  Hulu considered, and rejected, hundreds of names during this naming effort.  Thus, Hulu would be required to re-start the naming process.

63.    If Hulu is not permitted to move forward with its content and website launch dates, it would suffer a tremendous amount of damage related to its various relationships with its distribution partners, advertisers, technology partners, investors, the public and the press as well as put it at a competitive disadvantage.

**Distribution Partners**

64.    In addition to Hulu.com, consumers will also be able to access Hulu's premium video content on the website of Hulu's five distribution partners: AOL, Yahoo, MySpace, Comcast, and MSN.  Hulu's distribution partners are well-established, leading internet companies.  Each distribution partner web site will have a specific web page carrying a video player branded with the "Hulu" name and offering the same premium content available on Hulu's own site.  A sample of how the Hulu video player is likely to appear on one of our distribution partner sites is included my Supplemental Declaration.  Hulu's embedded video player is scheduled to launch on our destination site, www.hulu.com, as well as on the websites of five Distribution Partners, in October, 2007.

65.    We have invested substantial time and effort into reaching agreements with each of our distribution partners and committed to a launch date during the Fall television season to capture the traffic generated at this time of the television season.  A delayed launch not only would eliminate traffic to hulu.com, it also would result in a reduction in traffic to the websites of our distribution partners.

66.    Hulu's failure to supply content to the distribution partner websites as well as launch the Hulu.com website in a timely manner would jeopardize Hulu's standing with its distribution partners.  All discussions contemplated no later than a Fall 2007 launch date.  An injunction delaying our scheduled launch date would substantially affect the ability of Hulu to attract users as well as strain relationships with its distribution partners.  If we are not permitted to launch the Hulu content for the distribution partners' websites or the Hulu.com website, we would suffer a substantial disadvantage with respect to our competitors.

67.    In my view, our "competition" for users/viewers currently consists of "piracy sites" which offer illegally obtained and distributed clips from TV shows and films.  However, the competitive environment is intense and changing.  A number of other companies have launched or are slated to launch similar products within weeks and months of Hulu's anticipated launch.  A forced delay in the launch of our product would put us at a substantial disadvantage.

68.    The competition extends not only to new destination websites, but specific efforts by others for access to our distribution partners.  Competitors will be approaching our distribution partners, particularly if we are unable to launch on time. A glitch in the timing of providing content to our distribution partners using the name Hulu and launching the Hulu.com website would undermine our relationships with these partners in a competitive and time-sensitive market, which could jeopardize our having any market position at all.

**Advertising Partners**

69.    Because our content will be free, Hulu's revenue will be generated exclusively from advertising.

70.    If Hulu is enjoined and the launch delayed, we will lose revenue and our advertisers will lose the opportunity to have advertising on Hulu.com that integrates or ties into

US2000 10366607.1

the advertising also occurring on network television promotions or elsewhere.  While difficult to quantify with precision, these tie-ins are viewed as very valuable by our advertisers, and would represent a significant lost opportunity.

71.    Timing is also critical to Hulu and its charter advertisers:  from an advertiser's perspective, the fourth quarter is the best time possible to launch a business or advertising campaign, followed by the third, first, and second quarters, respectively.  Advertisers crave exposure during the holiday retail shopping season as well as the Fall television and football seasons.  Companies often tend to spend the largest amount of advertising dollars during the fourth quarter in order to spend the remaining budget for any given year.  One advertiser has already decided not to place ads with Hulu because of a delay in our anticipated launch.

72.    Hulu's charter advertisers are national or international companies with large and sophisticated marketing groups.  These advertisers' marketing plans, specifically their online advertising plans, have been designed in part on the assumption that they will be able to advertise in the fourth quarter of 2007.  To delay Hulu's content and website launch would severely impact each of these advertisers' entire annual marketing plans.

73.    Hulu would lose significant revenue from advertisers if enjoined from launching. For each month it would be prevented from launching, Hulu would never be able to recapture the lost advertising revenues for that month.

74.    Not only would Hulu lose millions in ad revenues but I, along with the Hulu advertising sales team, would lose substantial credibility with the charter advertisers as well as any potential future advertisers.  As discussed above, a delay in Hulu's content and website launch would affect their annual marketing plans.  The advertisers would need to reposition their marketing strategy and would undoubtedly be less likely to do business with us in the future.

21

**Technology Partners**

75.     In addition to its distribution and advertising partners, Hulu has made a multi-million dollar investment in the cutting-edge technology necessary to provide consumers with easy to use access to Hulu's premium video content.  At a substantial cost (in excess of $1 million), and prior to the commencement of this litigation, Hulu has retained a number of technology service providers.  Any delay in the launch of the Hulu.com website or delivery of content to the distribution sites would cause Hulu to incur significant carrying costs without generating any revenue or value.  Hulu's contracts with some of these technology companies require it to pay significant monthly fees, all of which will continue – regardless of whether Hulu is able to launch its private beta site later this month.  In other words, we have paid for the services necessary to launch our site, and we are required to pay for those resources even if we are not using them.  Examples of these commitments with technology partners include the following:

     a.     Hulu has agreements with infrastructure and operations companies, including data center and connectivity;

     b.     Hulu has software licenses for product it would not be able to use if launch is delayed;

     c.     Hulu's player technology service provider is in place to deliver the video content to Hulu's video players.  In addition, Hulu has agreed to act as a case study for that provider.  If our service is delayed or halted, Hulu's reputation and goodwill with the content provider will suffer; and

     d.     A company is managing the metadata for all of Hulu's digital content.

US2000 10366607.1

76.    Other on-line vendors have provided services gratis to Hulu in anticipation of a revenue stream, as well as Hulu's distribution partners and advertisers.  Hulu would lose a significant amount of the goodwill and confidence we have built with these vendors if we do not launch as planned.

**Other Key Relationships**

77.    The owners of Hulu, LLC, are presently negotiating with a private equity investor to finalize agreements pursuant to which Hulu would receive an equity investment in the range of $100 million.  The parties have a binding letter of intent, but definitive agreements still are being negotiated.

78.    Not surprisingly, the issues involved in finalizing an investment of this magnitude are complex and commercially sophisticated.  The marketplace is aware of this private equity investment, and the fact of the investment has been an element contributing to the positive public perception of Hulu, a critical factor in building interest in our launch and a significant contributor to our ultimate success.

79.    The preliminary injunction requested by the Plaintiff not only would disrupt Hulu's existing business plans, including Hulu's agreements with its distribution and advertising partners, but it also could complicate or otherwise impact the negotiations with the private equity investor.  The injunction could create uncertainty or raise issues relative to the amount, timing or terms of the investment, which would be significant not only because of the amount at stake, but also to our credibility in the investor community, our industry and among the public at large.

80.    Indeed, any significant delay to a launch would undermine the credibility and reputations of all of the key players in the management of this business (including Hulu and its owners).  Part of Hulu's success to date in recruiting its exceptional charter advertisers,

23

technology partners and distribution partners rests on Hulu's and its owners' credibility in the media industry.

81.     Consumers visit the hulu.com website on a continuing basis.  The company has already announced publicly that "Hulu" is its name. It also has a website associated with the hulu.com domain name and has announced that the product will launch in October, 2007.  At this website, users can sign up for Hulu's beta service by submitting their email addresses, and to date a significant number of people have done so.  The email subscriptions are active and ongoing as we continue to receive names of users who want to use our product.

82.     If our website hulu.com is not available it certainly would harm our relationships with these visitors and the public.  No alternative or back-up site exists to which we could refer our subscribers.  Shutting down the website, even if on a temporary basis, would stop us from registering new subscribers, raise questions among our existing subscribers concerning our reliability and viability as a premium online video source, and effectively shut down our ability to grow our subscriber base.

83.     The October roll-out date for supplying the content and launching the Hulu.com website has been the subject of a great deal of press and media "buzz."  The awareness of Hulu created by the press and the interest expressed by our initial advertisers will be lost and never regained after an interrupted roll-out.  Based on my knowledge and experience, the loss of credibility and damage to reputation that will be suffered by Hulu for a website and product that has yet to demonstrate its potential will never be remedied.

84.     This declaration refers to information about Hulu's business that is not generally known, and is competitively significant.  The public disclosure of specific information about our relationships could cause us significant harm, disrupting those business relationships and

24

prejudicing us in the marketplace. I have endeavored in this Declaration to provide as much detail as possible without disclosing information that is confidential. To protect the confidentiality of that information, a Supplemental Declaration will be filed that includes certain details not included in this Declaration.

I declare under penalty of perjury that the foregoing is true and correct this _9_ day of October, 2007.

Jason Kilar

US2000 10366019.1