IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:07-cv-00347-D

LULU ENTERPRISES, INC.,

                          Plaintiff,

v.

HULU, LLC
(formerly N-F NEWSITE, LLC),

and

HULU TECH, INC.,

                          Defendants.

**DEFENDANT'S
MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

Defendant Hulu, LLC[1] ("Hulu") files this Memorandum of Law in Opposition to the

Motion for a Preliminary Injunction filed by Plaintiff Lulu Enterprises, Inc. ("Lulu").

## I.    INTRODUCTION

Plaintiff's request for a preliminary injunction represents an abstract overreaction to a

name, which happens to rhyme with Plaintiff's name, but is used with very different services in a

distinctly different business model.  The relevant marketplace factors, as well as expert research,[2]

demonstrate the lack of any likelihood of confusion, such that Plaintiff cannot carry its burden of

showing a likelihood of success on the merits, and no injunction is warranted.

---

[1] Fox and NBC Universal have been working on this collaborative venture since 2006.  N-F Newsite, LLC, was formed in June 2007, and the "NewSite" name was used as a placeholder until the entity could be re-named.  N-F Newsite, LLC now is named Hulu, LLC.   *See* Declaration of Jason Kilar ("Kilar Dec.") ¶¶ 11-12.  The other named defendant, Hulu Tech, Inc., is not affiliated with Hulu, LLC, and does not appear to be a proper party to this action.

[2] *See* Declaration of Dr. Erich Joachimstaler ("Joachimstaler Dec.") ¶ 38 ("all of the above factors overwhelm the similarity of the website names in the abstract, and thus ensure recognition of the difference between the two marks in the marketplace"); Declaration of Dr. Gerald Ford ("Ford Dec.") ¶ 26 ("the results of the surveys conducted in this matter clearly support a finding of no likelihood of confusion").

1

Dockets.Justia.com

The speculative, ill-defined harm Lulu alleges it might suffer in the absence of a preliminary injunction pales in comparison to the substantial, immediate and real injury that such an injunction would impose on Hulu. Hulu has been moving through development stages for many months. Having passed through a series of milestones prior to this suit being filed (including extensive agreements with third parties already in place), the damage to Hulu – monetary harm, the complete disruption of its business plan, and the reputational impact – caused by not moving forward promptly is overwhelming. Hulu would suffer millions (or even tens of millions) of dollars in costs and serious damage to its business relationships and goodwill.

A trademark is not a "monopoly" and the rights of a prior user are limited.[3] "To prevail in a trademark case of this sort, a plaintiff must show that 'an appreciable number of reasonable consumers' would be confused as to the source of the services offered by the parties by reason of their respective marks." *Sterling Acceptance Corp. v. Tommark, Inc*., 227 F. Supp. 454, 465 (D. Md. 2002) (Sterling Associates not likely to be confused with Sterling Acceptance Corporation).

Hulu's business is focused exclusively on premium content – television shows and films – via the internet, and it will do precisely that – *and only that* – on launch. Lulu, in contrast, offers user-generated content as the centerpiece of its self-publishing business. Because the term "lulu" is a common, laudatory term adopted by hundreds of businesses, it is conceptually weak. That conceptual weakness leads to commercial weakness, which is confirmed by the survey research of Dr. Gerald Ford showing essentially no recognition of Lulu.com or Lulu.tv. In any event, as explained by Dr. Joachimstaler's analysis, the reality of how consumers actually

---

[3] The Supreme Court explained almost a century ago, it is a "fundamental error" to suppose that "a trade-mark right is a right in gross or at large, like a statutory copyright or a patent for an invention, to either of which, in truth, it has little or no analogy. There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co*., 248 U.S. 90, 97 (1918) (citations omitted).

2

interact with these brands – specifically a high level of involvement fostered by specific associations and the internet environment – supports a finding of no likelihood of confusion.

Plaintiff erroneously advocates a monopoly-like right by repeatedly – explicitly and implicitly – urging a side-by-side comparison of the parties' marks in the abstract. It is clear error to compare marks on a side-by-side basis when that is not how they appear in the marketplace. Trademarks must be considered in the manner in which they appear in the marketplace. *See, e.g., Anheuser-Busch, Inc. v. L&L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992) ("The statutory standard for infringement does not depend on how closely a fragment of a given use duplicates the trademark, but on whether the use in its entirety creates a likelihood of confusion. In making that determination, we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer . . . as a whole as sold in the marketplace.").

Although Plaintiff cites to purported third-party evidence of confusion, the material in fact supports a finding of no likelihood of confusion. For instance, Plaintiff cites commentator Paul La Monica as being among the confused, but he subsequently expanded on his comments[4]:

> Last week, when GE's (GE) NBC Universal unit and News Corp. (NWS)-owned Fox announced that they were going to call their online video joint venture Hulu, I made fun of the moniker, saying that in addition to being a terrible name, it also might confuse people since it sounded a lot like Lulu, an online custom book publisher.
>
> I was just joking . . . .
>
> So does Lulu really have a case? That's ultimately for the lawyers to argue about and a judge to decide but **I'm not sure that too many Web users will really confuse Hulu, despite my sarcastic comments, with Lulu. Sure, both are technically online media companies. But there's a big difference between publishing books and posting online video from NBC and Fox.**
>
> And if the litmus test for trademark infringement was rhyming, then that could open up the courts to scores of somewhat frivolous lawsuits.

---

[4] *See* Declaration of Lauren L. Sullins ("Sullins Dec."), Ex. E-1 (collecting various articles).

3

Notwithstanding Plaintiff attempting to drum up publicity,[5] commentators are skeptical of confusion.[6]  In terms of anecdotal evidence, a blog titled "Lulu's Hulubulu" sums up the sentiment:

> Lessee, can you sue a company over phonetics?  I suppose you can sue anybody for anything.  But, can you PREVAIL in a lawsuit over the phonetic similarity of a company's name?  Coke - Koch?  McDonald's - Macdonald's?  Frye's - Frey's?

> Lulu's about as close to the online video business as my great grammy's website.  I can SAY I'm going to get into the online video business with a gazillion different DBA's… doesn't mean jack.

> I suppose they'll sue little old Xulu.com next because they intended to get into interdimensional entertainment too.  Nitwits!

Sullins Dec. ¶ 21, Ex. E-16.  While not elegant, the entry fairly captures a host of significant arguments:  the third-party use of similar "ulu" marks and narrow rights of Lulu, the differences between the parties' goods and services, and the ability of the relevant universe to distinguish the parties' marks.  In short, the absence of any likelihood of confusion, and, thus, the lack of entitlement to the extraordinary remedy of a preliminary injunction.

## II.    STATEMENT OF FACTS

### A.    Plaintiff Lulu Enterprises, Inc.

Lulu Enterprises is a primarily a self-publishing business.  The core business of Lulu Enterprises involves Lulu.com, which allows individuals who desire to obtain greater access for their work – whether writing, music or photography – to put that work on the internet.[7]

---

[5]  Plaintiff apparently initiated this lawsuit in part *for* publicity.  *See* Appx. A, Ex. 1 ("But PR only works if we launch the suit.  It is the suit that makes the story newsworthy.")  Documents produced by Plaintiff celebrate the media attention generated by the story.  *See id*, Ex. 2 ("Seems like this story has legs after all."); *Id*, Ex. 3 ("Legal activity garnered 110 US press hits since [the lawsuit] was released."); *Id.,* Ex. 4 ("The good news is Dan [ZDNet reporter] does exactly what we were hoping, which is to seed the confusion story . . . ").

[6]  *See* Sullins Dec. ¶¶ 5-20 (collecting press); *id.* ¶ 14, Ex. E-9 (quoting a professor at Syracuse University, as saying he "is not so sure consumers will be confused by the two names"); *id.* ¶ 10, Ex. E-5 ("But where does one draw the line?  We've had FoolU.com around for ages.  Can The Motley Fool get in on the action?  Yahoo! is a phonetic cousin, twice removed, from Hulu.  Does the search-engine star get a shot?").

The most accurate descriptions of Lulu Enterprises, and the business of Lulu.com, are those that appeared before Plaintiff filed suit.  According to a 2006 statement on Lulu.com:

> Founded in 2002, Lulu is the web's premier independent publishing marketplace for digital do-it-yourselfers. It's the only place on the web where you can publish, sell and buy any and all things digital — books, music, comics, photographs, movies and well, you get the idea. We simply provide the tools that leave control of content in the hands of the people who created the content. You see, Lulu is a technology company, not a publisher. So you can use Lulu to publish and sell any kind of digital content, and no one here is going to ask you to change anything. Ever. Your vision is entirely YOURS.

> There is no set-up fee and no minimum order to publish and sell on Lulu. We manage the online business, including printing, delivery and customer service. You set your own royalty for each piece of content, and at the end of each quarter, we'll mail you a check for the royalties your content generates. Lulu makes a small percentage from each transaction, which means that we only make money if you succeed in selling your work.

*See* Sullins Dec., Ex. H.  The central tenet of Lulu.com is "user-generated content," *i.e.*, works uploaded by the owner of the work, and the business model of Lulu.com depends on revenue from the sales of material on the site.  Lulu does not have any meaningful third-party advertising. *See* Lulu Dep. at 108: 5-6 ("if we have any [advertising] it's still at the experimental stage").

## B.    Defendant Hulu, LLC

### 1. Hulu's Business and Brand

Hulu is entirely focused on one business: distributing, via the internet, "premium content – TV shows and feature films."  Kilar Dec. ¶ 3.  People interested in accessing well-known and highly publicized programs may access and search the site to identify, watch and review video programming.  *Id.* ¶¶ 14, 15, 24.  Hulu's videos consist of full length episodes of television programs and feature films, as well as short clips from the TV shows and movies.  *Id.* ¶ 17.  Hulu has a "show page" for each TV show, which may include clips or "internet-only content," such

---

[7] *See* Appx. A, Ex. 9 ("Publishing on Lulu.com is quick and easy, allowing people to create inexpensively with high quality results on a simple-to-navigate Web site.  Lulu.com gives creators total editorial control and allows them to profit from their creations as well.").

US2000 10303199.11

as outtakes or "cut scenes" from some of the programming, cast interviews, and other TV or film-related professional content. *Id.*; *see also* Supplemental Declaration of Jason Kilar ("Supp. Kilar Dec.") ¶¶ 20-21 (lists of TV shows and movies).

Hulu's video offerings consist exclusively of professional content from networks and studios, and will not include user-defined or user-generated content typically found on sites like YouTube (and Lulu.com and Lulu.tv). *Id.* ¶ 20. Hulu has no plan to offer user-generated videos, home movies, or the like, nor does Hulu presently intend that a user will be able to upload videos and post or embed them directly onto Hulu's website. *Id.* "Notwithstanding any early consideration or discussion to the contrary, the present business plan for Hulu contemplates only that Hulu will be a website offering first-class, universally recognizable premium video to broadband internet users. We have no intention that users will be able to upload their video content to Hulu.com." *Id.* ¶ 23.

The look and feel of the Hulu.com website is described and shown in the Supplemental Declaration of Jason Kilar. *See* Supp. Kilar Dec. ¶¶ 22-25. The current "home page" at Hulu.com contains a sign up for people who wish to be part of a large, preliminary "beta test" of the service later this month. Kilar Dec. ¶ 30. Hulu has developed a "staging version," which reflects what the site will look like in the beta launch. *Id.* ¶ 32; Supp. Kilar Dec. ¶ 22. [8]

In addition to Hulu.com, consumers will also be able to access Hulu's premium video content on the website of Hulu's five distribution partners: AOL, Yahoo, MySpace, Comcast, and MSN. Kilar Dec.  ¶ 64. Hulu's distribution partners are well-established, leading internet companies. *Id.* Each distribution partner web site will have a specific web page carrying a video player branded with the "Hulu" name and offering the same premium content available on Hulu's own site. *Id.*

---

[8] Attached to the Supplemental Declaration of Jason Kilar is a DVD recording containing a demonstration showing the view and navigation within the hulu.com website.

US2000 10303199.11

Although Hulu has pending a broad intent-to-use application with the United States Patent and Trademark Office to register HULU as a trademark, "the description of goods and services in this application does not reflect what Hulu will offer upon launch or for the foreseeable future." *Id.* ¶ 36. Rather, the application simply suggests a number of *potential* uses of HULU as a mark. *Id.* Whether any specific use of the HULU mark—other than in connection with a premium content video site—develops is contingent on a number of unknowns, including, without limitation, the success of the initial launch, consumer response, advertiser response, marketplace research, and financial and manpower constraints. *Id.*

Hulu has no plans to promote itself by doing any advertising. *Id.* ¶ 37. Hulu's service will be free to consumers. *Id.* ¶ 24. Viewers will see short commercials, or video players may contain other advertising information while the video plays. *Id.* The business model on launch will be to generate revenues from advertisers, which on launch will be from "some of the world's most prestigious companies." *Id.*

### 2. Selecting The Hulu Mark

Selecting "Hulu" required about five months and hundreds of thousands of dollars to identify, screen and select the name. *Id.* ¶ 38. The effort "considered over 460 potential names before selecting the name 'Hulu.'" *Id.* ¶ 40. After establishing "a workable list of names for further consideration," substantial time was spent "determining whether each name was available for use." *Id.* ¶ 41.

In late July, Jason Kilar, Hulu's CEO, directed his team to focus on one name as the likely selection: "hulu." *Id.* ¶ 43. During that time, Hulu obtained additional information, including commercial trademark search reports. *Id.* Once "hulu" was identified, Hulu also proceeded to secure "hulu" domain names. *Id.* This was a difficult task. *Id.* Hulu.com was

already owned by a third party, and obtaining rights to the domain name required negotiation. *Id.* Hulu ultimately purchased the Hulu.com domain name, and also acquired the rights to approximately 60 other "hulu" domain names through various owners and domain name registrars. *Id.* Then, after a month of "development time, and review of dozens of logo designs, shapes and colors, [Hulu chose] a distinctive logo which will be used upon launch and going forward." *Id.* ¶ 44; Supp. Kilar Dec. ¶ 8.

Hulu did not choose "hulu" because of any similarity to the word "lulu," or in an attempt to siphon off consumers from Lulu Enterprises, Lulu.com or Lulu.tv. *Id.* ¶ 51. The name "hulu" was conceived without any knowledge of Lulu Enterprises or Lulu.com whatsoever. *Id.* Throughout the process of generating possible names for use, Mr. Kilar was never aware of the Plaintiff or its use of Lulu or Lulu.com. *Id.* ¶ 52.

By the time "hulu" was selected as the name, Mr. Kilar was aware of a variety of other marks with "lulu" or words with "ulu" formatives being used by a great many entities of one kind or another. *Id.* ¶ 51. Mr. Kilar first learned of Plaintiff's use of the Lulu mark at the same time that he learned of a laundry list of third-party uses of other LULU and ULU marks. *Id.* ¶ 52. Based on what obviously was extensive third-party use of LULU, he did not believe that the HULU mark was likely to be associated, much less confused, with any one of the LULU or ULU marks. *Id.* Although not specifically aware of Lulu Enterprises (or "Lulu.com" or "Lulu.tv"), he was aware that "lulu" was being used, including for selling or advertising goods on the internet, by a substantial number of persons or companies in a variety of ways. *Id.* ¶ 51. It never occurred to Mr. Kilar that Hulu could be mistaken or confused with any company named "lulu" (*id.* ¶ 52), nor was any confusion intended or desired.

US2000 10303199.11

**III.    Plaintiff Is Not Entitled to the Extraordinary Remedy of a Preliminary Injunction**

In the Fourth Circuit, the "hardship balancing test" outlines four factors to be decided in connection with a preliminary injunction:  (1) likelihood of irreparable harm to the plaintiff if relief is denied; (2) likelihood of harm to the defendant if the desired relief is granted; (3) the likelihood of the plaintiff's success on the merits; and (4) the public interest.  *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977).

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances . . . ."  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991) (reversing grant of preliminary injunction) (internal quotations omitted); *see also Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp.2d 646, 650 (D. Md. 2002) (denying preliminary injunction in trademark case).  Plaintiff "bears the burden of establishing that ***each*** of these factors supports the granting of the injunction" (*Direx,* 952 F.2d at 812), and that burden is "particularly heavy since the issuance of a preliminary injunction would in effect grant it a substantial part of the relief it would obtain after a trial on the merits."  *John Lemmon Films, Inc. v. Atlantic Releasing Corp.*, 617 F. Supp. 992, 995 (W.D.N.C. 1985)  (denying injunction in trademark case); *see Direx*, 952 F.2d at 812.

**A.    Plaintiff  Cannot Show – By Clear and Convincing Evidence – That It Will Suffer Actual and Imminent Irreparable Harm in the Absence of an Injunction**

"To succeed, [Lulu] must show . . . some irreparable harm" in the absence of an injunction.  *Rum Creek Coal Sales v. Caperton*, 926 F.2d 353, 360 (4th Cir. 1991).  "Moreover, the required irreparable harm must be 'neither remote nor speculative, but actual and imminent.'"  *Direx,* 952 F.2d at 812 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).  Finally, the evidence must be "clear and convincing."  *Direx*, 952 F.2d at 810 n.7, 812 ("clear showing of irreparable injury").

9

Plaintiff has presented no evidence of a single instance of actual consumer confusion, and no lost sales. Plaintiff's moving papers rely principally on weak, ill-defined references. However, as the court observed in *John Lemmon*:

Fear of confusion . . . is insufficient evidence that irreparable harm will be suffered.

The issuance of an injunction is not justified by the mere fact that irreparable harm may possibly ensue if restraint is not imposed . . . . Injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.

617 F. Supp. at 996 (citation omitted). In reality, Plaintiff faces no immediate threat of irreparable harm because there is no likelihood of confusion between the parties' marks. *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983) (denying injunctive relief where plaintiff "face[d] no immediate threat of irreparable harm"). Lulu concedes it has not been harmed by the public announcement of Hulu, the attendant widespread publicity, or the beta site sign ups. *See* Lulu Dep. at 74:21-75:1 ("Lulu is growing . . . ." Q. Has that changed any since August 29th? A. Only to the good."); Lulu Dep. at 174:20-23 ("I do not know of any benefit or damage we've received to date from Hulu's announcement of the intention to use the Hulu.com name.")

As for the potential harm to Plaintiff if an injunction is not granted, the lone evidence is "fear" that Hulu will become well-known and that confusion will occur with Plaintiff perceived as the second-comer. *See* Lulu Dep. at 170:8-19. That fear is expressly premised on the false assumption that Hulu intends to advertise in a way that would foster confusion:

Q. Your concern about Hulu becoming well known, is that predicated on them being engaged in advertising?
A. All of the above. That's predicated on them having a hundred million dollars to do everything that we currently do and that we would like to do to promote ourselves. But the biggest probable concern is --
Q. I'm sorry if my question was unclear. Is it predicated on the idea that they will be doing advertising?
[A]: Is it predicated on – not exclusively.
Q. Is part of your assumption that they will be doing advertising?
A. Yes.

Lulu Dep. at 175:1-23.  As noted above, Hulu in fact is not doing any such advertising to the public (Kilar Dec. ¶ 37), which severely undercuts Plaintiff's position.

**B.    Hulu Will Suffer Substantial Harm If the Court Issues a Preliminary Injunction**

The grant of an injunction would harm Hulu significantly more than its denial would harm the Plaintiff.  Since conceived almost a year ago, Hulu has taken extraordinary steps to reach the public stage of its launch.  While the activity to date has been largely behind the scenes, the scope and breadth of activity is astounding.  Any delay in launch also carries definite and extreme economic costs, which makes a preliminary injunction inappropriate.[9]

Hulu's embedded video player is scheduled to launch on its destination site, www.hulu.com, as well as on the websites of five Distribution Partners, in October, 2007.  *See* Kilar Dec. ¶ 64.  If forced to adopt another name, Hulu would experience significant delay – unknown months – and would lose almost all of its investment to date in the naming, marketing, and branding of the "Hulu" name and product as well as securing the Hulu.com domain name as well as approximately 60 other "Hulu" domain names around the world.  *Id.* ¶ 61.

A delayed launch not only would eliminate traffic to Hulu.com, it also would result in a reduction in traffic to the websites of Hulu distribution partners  (*id*. ¶ 65), which would jeopardize Hulu's standing (*id.* ¶ 66), and place Hulu at a "substantial disadvantage" vis-à-vis competitors.  *See id.* ¶¶ 66-68.

---

[9] *See GFC Fin. Corp. v. GFC Capital Res. Group, Inc.,* 1994 WL 30432, at *3 (S.D.N.Y. Feb. 2, 1994) (denying preliminary injunction despite finding of likelihood of success for plaintiff on the grounds that "Defendants would be forced to give up their only service mark and would lose the considerable investment they have made in it over the past year"); *see also John Lemmon*, 617 F. Supp. at 997 ("If the Defendant were ordered to refrain from advertising and releasing its film with its present title, theaters contracted to show the film would be lost, prints of the film would have to be changed, and a new advertising campaign and strategy developed at considerable delay, expense, and embarrassment").

11

If Hulu is enjoined and the launch delayed, it "will lose revenue and [its'] advertisers will lose the opportunity to have advertising on Hulu.com that integrates or ties into the advertising also occurring on network television promotions or elsewhere." *Id.* ¶ 70. Timing – with respect to TV and the 2007-08 broadcast season – is critical. To delay Hulu's launch would severely impact each of these advertisers' entire annual marketing plans. *See id.* ¶¶ 70-72. Hulu not only will lose significant revenue (*see id.* ¶¶ 75-77), but also "substantial credibility with the charter advertisers as well as any potential future advertisers." *Id.* ¶ 74.

Any delay in the launch of the Hulu.com website or delivery of content to the distribution sites would cause Hulu to incur significant carrying costs for technology without generating any revenue or value. *See id.* ¶ 75. Because of how the relationships are structured, Hulu also would lose a significant amount of the goodwill and confidence Hulu has built with these vendors if Hulu does not launch as planned. *See id.* ¶ 76.

Additionally, Hulu is incurring carrying costs for equipment and personnel. *See* Supp. Kilar Dec. ¶¶ 15-16, 18. A delayed launch also presents challenges to a $100 million private equity investment. *See* Kilar Dec. ¶¶ 77-79. If Hulu.com is not available, Hulu's relationships with beta sign-ups and the public will be harmed. *Id.* ¶ 82. No alternative or back-up site exists. *Id.* The company's reputation, and momentum, would be negatively and significantly impacted. *See id.* ¶¶ 80-82.

In addition to the monetary harm, any delay in launch will cause substantial and difficult-to-quantify injury to Hulu's reputation with its partners and in the marketplace. Borrowing from the opinion in *Chairworks Taiwan ltd. v. Bannister*, a "preliminary injunction would require [Hulu] to recreate the image it attempted to establish in the marketplace and cast a cloud on [its] reputation that may be unjustified upon final adjudication of this matter. An injunction

12

preventing [Hulu] from using its mark would delay the delivery of goods, . . . wreak untold damage to the confidence of its customers," and require modification of the website, as well as advertising at significant expense. 13 U.S.P.Q.2d 2070, 2071 (M.D.N.C. 1989) (denying preliminary injunction against use of CHAIRMAN sought by owner of CHAIRWORKS, both used with leather reclining chairs); s*ee also Tyco Indus. v. Tiny Love, Ltd*., 914 F. Supp. 1068 (D.N.J. 1996) (denying preliminary injunction motion in part because, despite financial resources of defendant Tyco, it "would be somewhat harmed in its business relationships," including the perception of being "an unreliable business partner").

        With Hulu well past launch with its commercial partners, and having built up a beta site for thousands of key users, the balance of hardships is clear.  Where the harm to the defendant was much smaller, the court in *Chairworks*, *supra*, declined to grant a preliminary injunction on a rationale applicable here:

> Plaintiff's unquantifiable injury is measured against the quite real damage defendant would suffer if this court prevented it from using its chosen mark, Chairman. This court notes that the defendant has just recently introduced its line of goods into the United States. A preliminary injunction would require defendant to recreate the image it attempted to establish in the marketplace and cast a cloud on this company's reputation that may be unjustified upon final adjudication of this matter. An injunction preventing defendant from using its mark would delay the delivery of goods and wreak untold damage to the confidence of its customers who have ordered but yet to receive goods from it. According to the declaration . . . , the defendant received approximately 2,000 orders with a value of a quarter of a million dollars. In addition, the defendant estimates that it would cost about $40,000 to repackage its products to comply with the proposed injunction. All this is added to the significant investment defendants have made to the mark, Chairman. While the plaintiff has nearly a decade of goodwill and a federally registered trademark, the failure to issue a preliminary injunction in this instance would not result in irreparable harm. It is well within the province of the court to restore any damage to the plaintiff's mark if the trier of fact finds that it is warranted. All things considered, the balance of hardships tips against issuing an injunction.

13 U.S.P.Q.2d at 2070.  In *Citrus Group, Inc. v. Cadbury Beverages, Inc*., 781 F. Supp. 386 (D. Md. 1991), the court noted plaintiff's general allegations of "irreparable injury," but found that:

> The likelihood of harm to the Defendants if the injunction should issue is both more distinct and more readily identifiable. If the injunction is granted, for example, Defendants would be required to discontinue use of their radio commercial, to forego additional print advertising, to withhold or refrain from distributing promotional items such as towels and t-shirts, and to refrain from using valuable point of sale and premium materials created for Cadbury's bottlers pending trial. They value this damage to the campaign at over $100,000.

781 F. Supp. At 389 (denying preliminary injunction involving MAIN SQUEEZE registration and use of YOUR MAIN SQUEEZE). The specific harm to Hulu would be many times higher.

Plaintiff's own experience in naming its company confirms the hurdles, costs, and difficulty of the naming process:

> A few years later when we were starting the Lulu project we were looking for a good name. And when you're doing an internet company, **as the guys at Hulu have discovered, the big challenge is to find a URL that you can build your brand around**. And so we looked at a whole bunch of URL's around what we were trying to do in creating a content for digital content. **And we couldn't find one that wasn't either 30 characters long, such as, a market for digital content dot com. That wouldn't work. But all the ones we did sort of want to consider were either not available to us or inappropriate in some way.** Until I finally said, well, I do own this Lulu.com URL.

Lulu Dep. at 167:12-168:1 (emphasis supplied). Thus, Plaintiff's suggestion that the risk of any harm to Hulu is slight is just wrong. It "would be inequitable to cause [a defendant] to lose much of its investment and suffer injury to its good will before a final decision on the merits without a stronger showing of irreparable harm by the Plaintiff." *John Lemmon*, 617 F. Supp. at 997 (refusing to enjoin use of STARCHASER in connection with a film, despite a registration of THE STAR CHASERS for same goods, even though defendant had notice of plaintiff's claim); s*ee Virginia Tech Found., Inc. v. Family Group Ltd.*, 666 F. Supp. 856, 860 (W.D Va. 1987) (denying preliminary injunction in part because if granted plaintiff "would, in effect, have prevailed on the underlying lawsuit without having had to try it would be highly unlikely that the

Defendant would or could change back to its original call letters once it had been forced to abandon them.").

## C.    The Public Interest Favors Hulu

Plaintiff seeks an injunction based on speculation and unsupported fears. It seeks an extraordinary remedy merely because it has a negative reaction to a distinct name (that happens to rhyme) for a very distinct service. Clearly this does not serve the public interest. *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) ("An injunction [should] . . . not be issued merely to allay the fears and apprehensions or to soothe the anxieties of a party.").

The public interest is instead served by allowing Hulu to launch. Allowing the launch generally supports "free competition in the marketplace." *Direx*, 952 F.2d at 814; *see also Giant Brands*, 228 F. Supp.2d at 658 ("public interest supports allowing [the defendant] to continue its business"). Expanding the availability of additional entertainment content for the public reinforces "the correlative interest of the public in enjoying the broadest possible choice of . . . programs,"[10] and is also consistent with the property rights of the copyright holders.[11] Finally, as explained elsewhere, a preliminary injunction would negatively impact the business of third parties, including Hulu's distribution partners, advertising partners and technology partners, which also mitigates against any such relief. *See Major League Baseball Props., Inc. v. Pacific Trading Cards, Inc.,* 1998 WL 241904, *4 (S.D.N.Y. May 14, 1998) (citing right of third-party distributors and sellers as basis for denying preliminary injunction), *vacated based on settlement*, 150 F.3d 149 (2d Cir. 1998).

---

[10] *Booth Am. Co. v. Commonweath Comm. Svcs.*, 5 U.S.P.Q.2d 1745, 1748 (N.D. Ohio 1987) (denying preliminary injunction in part based on public interest in receiving radio programming); *see also Pocket Books, Inc. v. Dell Publishing Co.*, 148 U.S.P.Q. 239, 242 (N.Y. Sup. Ct. 1966) (denying preliminary injunction and citing "the public interest in an unhampered flow of …information").

[11] *See* 17 U.S.C. § 106 (right to distribute copyright works).

US2000 10303199.11

**D.**    **Plaintiff Is Extremely Unlikely to Succeed on the Merits of its Claims At Trial**

To prevail on its infringement claim, Plaintiff must show that the Hulu brand and Hulu.com domain are likely to cause confusion with Plaintiff's LULU mark.  In the Fourth Circuit, courts use the following factors to determine the existence of a likelihood of confusion:

> (a) the strength or distinctiveness of the mark;
> (b) the similarity of the two marks;
> (c) the similarity of the goods/services the marks identify;
> (d) the similarity of the facilities used by the two parties use in their businesses;
> (e) the similarity of advertising used by the two parties;
> (f) the defendant's intent; and
> (g) actual confusion.

*Pizzeria Uno Corp. v . Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).  The "sophistication" or "expertise" of the "typical consumer in the relevant market" may also be taken into account. *See*, *e.g.*, *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996).

In this case, where the hardship balance "does not tip 'decidedly' or 'significantly' in favor of the Plaintiff," Lulu has the additional obligation to show a substantial likelihood of success on the merits of its case.  *Direx*, 952 F.2d at 813; *Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) ("When, as here, the balance of hardship 'does not tilt decidedly in the plaintiff's favor' then a plaintiff must demonstrate a 'strong showing of likelihood of success' or a 'substantial likelihood of success' by 'clear and convincing evidence' in order to obtain relief."); *Md. Undercoatings Co. v. Payne*, 603 F.2d 477, 481 (4th Cir. 1979) ("The need for plaintiff to show likelihood of success on the merits increases as the probability of irreparable injury to plaintiff without an injunction decreases.").  As observed in *Giant Brands*:

> In trademark cases, the Fourth Circuit has held that a plaintiff's burden may be greater such that the plaintiff must prove the probability (not mere possibility) of success on the merits; in other words, the plaintiff must have a very clear and strong case. Thus, if there is any doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.

US2000 10303199.11

228 F. Supp.2d at 651 (internal quotations and citation omitted); *see also Direx*, 952 F.2d at 813

("[T]he standard by which 'likelihood of success' on the merits must be established . . . [is] 'a

probability (not mere possibility)' of success of the ultimate trial on the merits.  Probability of

success implies that the plaintiff must have a very clear and strong case.'") (quoting 5 J. Thomas

McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 30.16 (4th ed. 2003)

("McCarthy")).  Plaintiff does not and cannot present the required "clear and strong case" of

likelihood of confusion.

The *Pizzeria Uno* factors are addressed in turn below, but the lack of a likelihood of

confusion is empirically confirmed by the research of Dr. Gerald Ford, one of the foremost

market researchers in the United States.[12]  As discussed below, he conducted "two surveys to

address the issue of the degree of awareness of the LULU internet sites for self publishing

(i.e.,LULU.COM) and video content (i.e., LULU.TV) among potential visitors to Defendant's

internet site."  Ford Dec., ¶ 2.  The surveys – using both unaided and aided approaches –

demonstrate no significant degree of awareness of LULU for self-publishing (i.e., 2 percent), and

zero awareness for video content.[13]  *Id.* ¶¶ 3-4.

If the universe of Hulu's customers is not aware of Plaintiff's services, confusion is not

likely.  As Dr. Ford concludes, "the results of the surveys conducted in this matter clearly

---

[12] Dr. Ford outlines the Survey Background – including the sample selection and survey universe – in his Declaration.  *See* Ford Dec. at ¶¶ 6-12.  The results of the survey are described in his declaration, and the underlying data collected in Exhibit A to his declaration.

[13]  "A properly conducted survey of the relevant class of prospective consumers of the goods or services at issue can be of use in deciding the likelihood of confusion." *IDV North Am., Inc. v. S & M Brands, Inc.*, 26 F.Supp.2d 815, 829 (E.D. Va. 1998); *see also* McCarthy, § 32:195 ("As the use of surveys has become more common, judges have come to expect that a survey will be introduced to aid the court in determining customers' state of mind").  The Fourth Circuit has noted "that survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent." *Sara Lee Corp.*, 81 F.3d at 467 n.15; *see also CareFirst*, 434 F.3d at 268 ("Assuming that all three of these respondents were confused, the survey only shows a confusion rate of 2 percent, hardly a sufficient showing of actual confusion.").

US2000 10303199.11

support a finding of no likelihood of confusion, based upon the lack of awareness of either the

LULU self publishing site or the LULU video content site, among the relevant users of potential

visitors to Defendant's internet site." Ford Dec. at ¶ 5; *see also id.* at ¶ 26.

>   **1.    "Lulu" Is Used Extensively By Third Parties, and Thus Only A Weak**
>   **Trademark and Entitled to Narrow Protection**

As outlined in *Pizzeria Uno*, "distinctiveness or strength" is the "first and paramount

factor." 747 F.2d at 1527. In the Fourth Circuit, the strength of a trademark "is evaluated in

terms of its conceptual strength and commercial strength." *CareFirst*, 434 F.3d at 269.

"Measuring a mark's conceptual or inherent strength focuses on the linguistic or

graphical 'peculiarity' of the mark." *Id*. As part of that analysis, "[c]onceptual strength is

determined by placing the mark on the spectrum of generic, descriptive, suggestive and

arbitrary." *Sterling Acceptance Corp.*, 227 F. Supp. at 461. The court also must evaluate other

meanings and/or laudatory connotations, as well as third-party use. As explained in

*Renassiance*:

> A mark's conceptual strength is determined in part by its placement into one of the four
> categories of distinctiveness. [T]his categorization does not end a court's evaluation of a
> marks conceptual strength, however. A court must also consider other registrations for
> the mark, because "the strength of a commonly used mark decreases the number as the
> number of third-party registrations increases."

227 Fed. Appx. at 243 (quoting *Pizzeria Uno*, 747 F.2d at 1531).

The word "lulu" is used extensively by third parties because it has a common, laudatory

meaning. Rather than being coined or arbitrary, the term is at best suggestive. As noted by the

Fourth Circuit, "[e]ven a mark held to be suggestive may be found weak under the first

likelihood of confusion factor." *Petro Stopping Ctrs. v. James River Petroleum, Inc.*, 130 F.3d

88, 93 (4th Cir. 1997) (finding no likelihood of confusion between PETRO STOPPING

CENTER or PETRO TRAVEL PLAZA and PETRO CARD). Plaintiff's formerly admitted to that commonly understood meaning and descriptive connotation on its website:[14]

> **What's In a Name?**
> For goodness sake, what is a *lulu*? Well it's not your grandmother's kitty, that's for sure. Ever hear the phrase "Boy, that's a real lulu"? Well, even if you haven't, we think of the word lulu as an old-fashioned term for a remarkable person, object or idea. And quite frankly, that's exactly what Lulu, the company, is. Think of us as an open marketplace for digital content. The web's version of a fresh air market. An on-demand publishing tool for books, e-books, music, images, movies and calendars.

*See* Sullins Dec., Ex. H; *see also* Lulu Dep. at 23:15-19 ("common dictionary definition of the word "lulu" is "[a] remarkable person, object, or idea."). Even though not entirely descriptive, it is still a weak indicator of source. *Bliss, Fabyan & Co. v. Aileen Mills, Inc.*, 25 F.2d 370, 371 (4th Cir. 1928) (holding that "neither the arbitrary and intentional use of the noun, nor the misspelling of the word, can alter or disguise the fact that the trade-mark [RIPPLETTE for ripple woven fabric] was adopted because it is descriptive of an outstanding characteristic of the merchandise.").

"The frequency of prior use of a mark's text in other marks, particularly in the same field or merchandise, illustrates the mark's lack of conceptual strength." *CareFirst*, 434 F.3d at 270. Similarly, [t]he frequency with which a term is used in other trademark registrations is indeed relevant." *Petro Stopping Ctrs.*, 130 F.3d at 93-94. Extensive third-party use of, and registration of the mark LULU, or the character string "ULU," illustrates that Plaintiff's mark is fairly weak. *See U.S. Conference of Catholic Bishops v. Media Research Ctr.*, 432 F. Supp.2d 616, 626 (E.D. Va. 2006) (CNS used by secular news service not likely to be confused with CNS for religious news service, based in part on third-party use).

Third-party use of LULU is extensive.[15] "Lulu" appears in 926 third-party trade names, of which 583 are currently active. Marti Dec. ¶¶ 34-35. In fact, 12 company names have both

---

[14] *See* Sullins Dec., Ex. H (archived version of 2006 Lulu.com website).

19

terms "Lulu" and "Enterprises." *Id.* ¶ 33.  In terms of trademark use of LULU, and variations thereof, searches reveal the following widespread uses:

- The Lulu Search Report generated **804 pages of "hits"** for third-party trademarks and other references for **LULU** formative marks, as well as variations thereof, such as **LOULOU, LU+LU** (Marti Dec. ¶ 7, Exh. 1);

- The same report discloses a total of **two hundred nine (209) third-party federal registrations or applications** for registration for **LULU** formative marks, or variations thereof, eighty-two (82) of which are federally registered, and fifty-two (52) are active and pending trademark applications (Marti Dec. ¶ 8, Exh. 1);

- Taking into account only the marks in which the letter combination **L…U…L…U** appears standing alone, without any other additional words – such as **LULU, LU+LU, LU-LUS, LU-LU,** and **LULU'S** – the Lulu Search Report discloses a total of forty-five (45) "hits" (not including Plaintiff's marks) spread across a total of thirty-five (35) different individuals and entities (Marti Dec. ¶ 9, Exh. 1);

- Taking into account only the marks in which the letter combination **L…U…L…U** appears *in combination with additional letters and/or terms* – such as, for example, **LULU-B** and **LULU PRODUCTIONS** – the Lulu Search Report reveals a total of one hundred twenty-eight (128) "hits" (not including Plaintiff's marks) spread across a total of ninety (90) different individuals and entities (Marti Dec. ¶ 10, Exh. 1);

- A second search report for trademark references comprising of a "ULU" letter combination, such as ULU, ZULU, and KULU (the "*ULU Search Report"), generated **a total of 1,116 pages of "hits"** (Marti Dec. ¶ 12, Exh. 2);

- The *ULU Search Report discloses a total of **three hundred ninety-two (392) third-party federal registrations or applications** for registration marks comprising an "*ULU" letter combination, one hundred thirty-two (132) of which are federally registered, and seventy (70) are pending applications "(Marti Dec. ¶ 13, Exh. 2);

- Taking into account only the marks in which the letter combination **U…L…U** appears with *one* additional, preceding letter – such as **JULU, RULU,** or **SULU** – the *ULU Search Report discloses a total of ninety-six (96) "hits" (not including Plaintiff's marks) spread across a total of seventy (70) different individuals and entities (Marti Dec. ¶ 14, Exh. 2).

---

[15] The Declaration of Daniel H. Marti ("Marti Dec.") attaches all of the cited search reports and provides additional evidence from third-party sources regarding the actual use of these myriad of marks in the marketplace.

US2000 10303199.11

*See also* Marti Dec. ¶¶ 36-295 (additional third-party evidence).  Such evidence of third-party use has been routinely relied on by the Fourth Circuit in challenges made to the overall strength and distinctiveness of a plaintiff's mark.  *See*, *e.g.*, *CareFirst*, 434 F.3d at 270 (referring to Thomson & Thomson search, web page printouts and investigative business reports as probative of third-party use and overall weakness of plaintiff's mark); *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 525 (4th Cir. 2002) (finding a mark "generic, or at most, descriptive" based on web page print-outs, Thomson & Thomson trademark search reports, media references, and other evidence of common usage).[16]

Put simply, many entities own federal registrations of, or otherwise use, marks containing the term LULU or the character string "ULU" (or their phonetic equivalents) for a wide variety of goods or services.  Evidence of such third-party use of a mark, even in unrelated markets, "indicates a mark's lack of conceptual strength." *Renaissance*, 227 Fed Appx. at 243.  Thus, Lulu is not a distinctive designation, but instead a weak mark entitled to only narrow protection. *Petro Stopping Ctrs.*, 130 F.3d at 93-94 ("[T]hird-party registrations are relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak.").[17]

---

[16]  See also *Petro Stopping Cts.*, 130 F.3d at 93 ("[Plaintiff] argues…that evidence of third-party registrations alone is insufficient to conclude that a mark is weak. The company maintains that only proof that third parties actually use the term PETRO would be relevant. We disagree. The frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness inquiry under the first likelihood of confusion factor. This is especially true when the number of third-party registrations is great.") (internal citation omitted).

[17]  In fact, Plaintiff already agreed that its LULU mark could co-exist without confusion with LOULOU for "providing on-line books, magazines and newsletters relating to shopping for consumer goods and fashion" and "printed publications, namely books, magazines and newsletters all relating to shopping for consumer goods and fashion." *See* Lulu Dep. at 176:18-177:3; Marti Dec. ¶¶ 75-78, Ex. 1 (p. 54), 36-38.

US2000 10303199.11

In addition to being conceptually weak, the LULU mark also is commercially weak. As described in *CareFirst*,

> The commercial-strength inquiry . . . looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise.

434 F.3d at 269. In terms of relevant facts, commercial strength may be determined by considering "third party use . . . as well . . . as advertising expenditures, consumer awareness of the source of the mark, market share and unsolicited media coverage." *Renaissance,* 277 Fed Appx. at 243.

Plaintiff has no survey or research as to the awareness of Lulu or Lulu.com. *See* Lulu Dep. at 141:1-4. As for market share, Plaintiff's papers claim 1.2 million registered users, but at least 50 percent – and probably many more – are outside of the US. *See* Lulu Dep. at 73:9-12 ("about 50 percent of them"); *see also* Sullins Dec. ¶ 22 (only 36% and 28% in US).[18] Moreover, although they claim 100,000 unique visitors per day, nothing indicates how many are other than existing registered users. *See* Lulu Dep. at 73:16-18 (Q. How many of those visitors are not already registered users? A. I don't know that offhand."). Although Plaintiff repeatedly represents to this Court, and to users and advertisers that it is a "Top 2500" website, the reality is

---

[18] The "law of trademarks rests upon territoriality"(3 *Callmann on Unfair Comp.*, § 20:26 (4th Ed. 2007)), and the scope of protection accorded to a trademark is "determined by the law of the country in which protection is sought[.]" *Id.* "The use required under United States law as the foundation of trademark rights must be use *in this country, and not abroad*[.]" *Id.* (emphasis added). A trademark therefore properly "symbolize[s] the *domestic goodwill* of the *domestic markholder* so that the consuming public may rely with an expectation of consistency on the *domestic reputation* earned for the mark by its owner[.]" *Osawa & Co. v. B & H Photo,* 589 F. Supp. 1163, 1171-72 (S.D.N.Y.1984).

Thus, the only issue is the purported trademark rights in the *United States*, and the alleged likelihood of confusion in the *United States*. Plaintiff's reliance on customers in "more than 80 countries" to populate its list of "1.2 million registered users" evidences that Plaintiff's mark and services simply are not well-known in the U.S. market. *See, e.g., Scholastic, Inc. v. Macmillan, Inc.,* 650 F.Supp. 866, 873 n.6 (S.D.N.Y. 1987) ("[Plaintiff's] extensive use of the [mark] in Canada and Australia is, of course, of no relevance to its effort to create trademark rights in the United States"); *CBS, Inc. v. Logical Games,* 719 F.2d 1237, 1239 (4th Cir. 1983) ("[W]e accept the assertion by [defendant] that trade dress use in foreign countries does not create protectible trademark rights in the United States.").

US2000 10303199.11

that Lulu.com is not in the Top 3000 (and it has been declining since mid-summer); Lulu.tv

ranks outside of the Top 60,000. *See* Sullins Dec. ¶¶ 22-23 (rankings of 3,036, and 64,761).

Although Plaintiff does modest advertising and has received media coverage, survey

research confirms its marks are virtually unknown. Based on his two sets of market research, Dr.

Ford concluded as follows:

> Additionally, it is my opinion that the results of the surveys conducted in this matter
> would also support a finding that both the LULU self publishing internet site mark and
> the LULU video content internet site mark are commercially weak marks among
> potential visitors to Defendant's internet site.

Ford Dec. at ¶ 5; *see also id.* at ¶ 26.

**2.    Notwithstanding Sharing "ULU," Which is a Common Formative Shared by
Many Other Marks, The Parties' Marks Are Markedly Different in
Appearance, Sound, and Meaning**

A comparison of the marks demonstrates their differences in appearance, sound, and

meaning. The shared use of "ULU" as a character string "does not automatically mean that two

marks are similar. Rather, in analyzing the similarities of sight, sound, and meaning between

two marks, a court must look to the **overall impression created by the marks** and not merely

compare individual features." *Gen. Mills, Inc. v. Kellogg Co*., 824 F.2d 622, 627 (8th Cir. 1987)

(denying preliminary injunction where OATMEAL RAISIN CRIP not confusingly similar to

APPLE RAISIN CRISP, both for breakfast cereal).[19]

As a starting place, Plaintiff concedes that the meanings of LULU and HULU are

distinct. *See* Lulu Dep. at 165:18-20 ("Q.   In your opinion, are the meanings of Hulu and Lulu

at all similar?  A.   No."). This difference in meaning, combined with how the marks actually

---

[19] *See also Sports Authority, Inc. v. Prime Hospitality Corp*., 89 F.3d 955, 962 (2d Cir. 1996) ("In
deciding whether the marks are similar as used, we do not look just at the typewritten and aural similarity
of the marks, but how they are presented in the marketplace.") (holding that fact questions precluded
summary judgment on owner's trademark infringement claims).

23

will be used, means that the HULU mark also presents a distinctly different commercial impression from Plaintiff's LULU mark.   From the beginning, and long before this litigation was commenced, Hulu's "key message" for its business consistently has been a "premium, active user experience."  Kilar Dec.  ¶ 14.  The high-caliber content providers will "reinforce [Hulu's] brand image for premium content with the consuming public."  *Id*.  ¶ 16.  Because Lulu has its own, distinct brand image "the Hulu.com and Lulu.com brands are markedly different." Joachimstaler Dec. ¶ 10.   The associations, or more specifically the "identity-forming brand associations," are distinct.  *See id.* ¶¶ 13-15.  This impacts this case by reducing likely confusion in two ways:

> "Hulu and Lulu will be very different sites and to the extent that they develop as brands, they will invoke very significantly different brand associations. The roles of these brands and the extent to which they enmesh into our cultural contexts and daily behaviors are very different. Hence, they will create very distinct brand identities for their respective websites over time."
>
> Moreover, the "cognitive processes of memory around brands cause the two brands to be distinct in users' minds."  Stated otherwise, "the perceptions, beliefs and experiences that users have  . . . [will] cause the two brands to be distinct in the users' minds."

*Id.* ¶¶ 10, 16, 24.

The visual differences between the parties' marks are readily apparent.  In addition to the different stylization and design elements, the "H" is a distinctly different portion of HULU.  *See Standard Brands, Inc. v. E. Shore Canning Co.*, 172 F.2d 144, 146 (4th Cir. 1949) (refusing to enjoin defendants for lack of a likelihood of confusion between V-8 and VA, both for vegetable juices, noting the "marked difference in the appearance of the labels and trademarks used by the respective parties, including their background, their coloring, and the arrangement of the printed matter").  Plaintiff uses a specific blue or orange logo (with black as an alternative if color will not work), and the mark is used with a "halo" logo.  *See* Lulu Dep. at 143:4-25 (*See* Appx. A,

24

Ex. 8).  According to Plaintiff, its distinctive name, logo and brand are readily identified by their own consumers.[20]  In terms of considering the marks as they appear in the marketplace, "Lulu Studio" is included in connection with these promotions.  *See* Lulu Dep. at 102:2-4.  The term "creating" also is prominently featured, which further defines Lulu's business to the public.  *See* Lulu Dep. at 103:4-13.  By contrast, Hulu will consistently use the stylized "hulu" logo in a green color palate.  The mark only will appear in connection with specific premium content, which Plaintiff admits is not on its site.  *See* Lulu Dep. at 147.

The significant differences in the visual depiction of the parties' respective marks reinforces that confusion is highly unlikely.  In *IDV North America*, for example, the court held that the BAILEY'S mark for cigarettes was not likely to be confused with the well-known BAILEYS liquor, and the discussion of the differences between the appearance of those marks is applicable here:

> It is correct, as IDV argues, that the letters which comprise the two marks here at issue are the same and that those letters appear in the same sequence in each mark. In that aspect, the only difference is that the senior mark has no apostrophe between the letter "Y" and the letter "S" and the junior mark has an apostrophe between those letters. The actual letters employed aside, there are **significant differences in the visual depiction of the respective marks.** For example, the BAILEYS mark is depicted in all uppercase letters in a non-stylized font; in contrast, the *Bailey's* mark is depicted in a stylized script font with an upper case initial letter followed by lowercase letters. In any event, the similarity of marks alone is not dispositive because it is necessary to assess similarity and differences in the marks, not in a vacuum, but in the actual use of the marks in the commercial context.

> When assessed, as used, and in perspective of the entirely different types of product with which they are used, **the marks at issue here are not strongly similar, notwithstanding that they are comprised of the same letters in the same order.** An examination of the advertising, the packaging and promotional materials illustrates the actual use of the marks and how they are not likely to be confused.

---

[20] Lulu Dep. at 76:15-23  ("In the field that we are in, we have a logo that we promote very broadly and we have a brand around Lulu and Lulu.com in the digital content marketplace space that causes anyone who's paying any attention to these things to, you know, **understand who Lulu is and what we do**. Q.  So from your standpoint in your marketplace Lulu would be very recognizable?  A. That's right."); *see also* Lulu Dep. at 76:25-77:9 (Lulu name and logo "distinctive to a Lulu customer").

US2000 10303199.11

26 F. Supp. At 824-25 (emphasis supplied; citations omitted).[21]

The sounds of HULU and LULU, while they rhyme, are distinct.[22]  The fact that Hulu.com and Lulu.com share the common formative "ulu" is not unique for internet domain names.  Sullins Dec. ¶¶ 2-4.  In fact, other "_ulu.com" domains exist for 20 of the 26 letters in the alphabet.  Six of those are active sites.  *Id.* ¶ 2, Ex. A.  Dozens of sites with 4 letters share the consonant-vowel-consonant-vowel sequence.  *Id.* ¶ 3, Ex. B.  Moreover, a significant number of top internet sites coexist with domain names that rhyme.  *Id.*, Ex. D.

### 3.    Although Media-Related, the Services In Fact Are Distinct and Unrelated

In trademark infringement actions, instead of focusing on the general identification of goods and/or services listed in a pending trademark application — goods and services that may be generally deleted, limited or otherwise clarified by the applicant during the registration process (*see* 37 C.F.R. §§ 2.71(a) and 2.77) — the issue before this Court is whether the **actual use** of the trademark is likely to cause confusion.  As held by the Fourth Circuit, a court must "look to how the two parties *actually use their marks in the marketplace* to determine whether the defendant's use is likely to cause confusion."  *CareFirst,* 434 F.3d at 267 (emphasis added).  In *CareFirst*, the Court expressly rejected the plaintiff's claim that the broad services listed in a filing with Trademark Office should control the likelihood of confusion analysis, noting that "[b]ecause the

---

[21]    *See Scholastic, Inc. v. Escolastica.Com*, 100 Fed. Appx. 152 (4th Cir. 2004) (affirming summary judgment that "escolastica.com" and "escolatica.net" not likely to be confused with "scholastic.com" due to "substantial differences between the websites operated by the two companies" such that "no ordinary consumer is likely to stumble upon Escolastica's websites while searching for Scholastic.com or, even if they happen to do so, to believe that they have accessed a website affiliated with Scholastic").  Hulu's stylized mark and Lulu's mark with a design element are important components supporting no likelihood of confusion.  *See also In re Electrolyte Labs.*, 929 F.2d 645, 647 (Fed. Cir. 1990) (holding marks K+ (and design) and K+EFF for competitive dietary supplements not likely to be confused).  Consequently, not only are the design portions of marks properly given weight in the likelihood of confusion analysis, they often are considered determinative.  *See, e.g., Mr. Hero Sandwich Sys., Inc. v. Roman Meal Co.*, 781 F.2d 884, 888 (Fed. Cir. 1986) (reversing Board and holding that ROMAN and Design not likely to be confused with ROMANBURGER).

[22]    *See* Sullins Dec., ¶ 5, Ex. E.

26

marketplace provides the relevant forum for comparing services, there is no merit to [plaintiff's] claim that we should conduct this analysis using the services enumerated in [plaintiff's] federal registrations." *Id.* at n. 6.

To avoid any speculative and remote allegations of harm, this Court must compare the services now offered by Plaintiff under the LULU mark with those services that Hulu will have on launch. *See* Kilar Dec. ¶¶ 14-24; *see, e.g., Direx*, 952 F.2d at 812 (irreparable harm "must be neither remote nor speculative, but actual and imminent"). As a result, Plaintiff cannot base its pending motion for injunctive relief on unsupported and/or speculative uses of the HULU mark on some unknown, future date.[23]

Plaintiff's position depends explicitly on the assumption that Hulu will launch with the full range of potential goods and services listed in its intent-to-use application. *See* Lulu Dep., at 24:24-25:2 ("where the services that Hulu proposes to offer as per your -- **as per Hulu's trademark filings** are going to cause massive confusion in the marketplace." (Emphasis supplied)).[24] Thus, Plaintiff's likelihood of confusion case depends substantially on facts that are fundamentally incorrect, namely that Hulu will be a site with user-generated content:

> Q.   So as you sit here today, you believe there's going to be confusion based on the fact that Hulu is going to have user-generated content; correct?
> A.   That is correct, as that term is commonly understood in the marketplace, yes.

---

[23]   If the alleged future expansion plans are not "actual and imminent," this Court should "not speculate as to how that likelihood [of confusion] could change in the future." *Tyco Healthcare Group LP v. Kimberly-Clark Corp.,* 463 F. Supp. 2d 127, 135, n.35 (D. Mass. 2006); *Fairway Foods v. Fairway Markets*, 227 F.2d 193, 198 (9th Cir. 1955) (noting that if or when a party chooses to expand, the facts may be "sufficiently different…as to commerce and otherwise, and as to the validity of the claimed trademark, as to present additional and different issues.").

[24]   Lulu Dep. at 33:14-21 ("When Hulu is out there promoting their great user-generated content, mashup video services, print-on-demand books, their DVD download services, create your own DVDs, when Hulu starts offering, according to your trademark application, all of products and services that Lulu is offering, you and I . . . will be confused")

US2000 10303199.11

Q.    And you believe there will be confusion because Hulu is going to do print on demand; correct?

A.    I have no idea what Hulu is going to do.  As I say, I was asked to leave during that part of the discussions.  But according to Hulu's trademark application, where Hulu talks about books and talks about things that read to me like user-generated content where users can go in and modify content, the answer is, that's correct, yes.  That's my belief.  I would be thrilled to be shown that that is not true.  But as I understand it, that is what Hulu intends to do.

Lulu Dep. at 34:11-35:4. *See also* Lulu Dep. at 40:20-22 ("If Hulu.com chooses not to do user-generated content in any way, I will accept your hypothesis that it will create less confusion").

Plaintiff purports to be in a wide-ranging business, but its revenue falls into discrete categories related to user-generated and self-publishing services.  "Books are the bulk of [the] business."  Lulu Dep. at 116:13-14.  That includes paperback books and hardcover books, as well as "distribution" (which equates to providing the customer with an ISBN number to allow them to sell the book).  *Id*. at 112:4-9.  Plaintiff also sells photo books, CDs and DVDs, and calendars.  These categories represent an overwhelming percentage of Plaintiff's business.  *See* Appx. A, Ex. 5.  In a non-litigation context, Plaintiff promotes itself as having a "business model [that] is based on bringing niche topics to the masses."[25]

Plaintiff's identification of its competitors demonstrates just how different its market is from that of Hulu:

Q.   Who are Lulu's most significant competitors?

A.   Oh, dear.  Because of Lulu's commitment to innovating on the internet, we typically don't think of ourselves as having direct competitors, although we have a variety of companies who would like to serve our customer base, and those companies range from Amazon to CafePress, to Zazzle, to Barnes & Noble, and to smaller competitors such as Blurb and -- golly.  What are their names, AuthorHouse, I guess is another smaller competitor.  One other addition to that list –

---

[25] Lulu Dep. at 158:15-23 (Exhibit 123) (Q.   Mr. Young, would it be fair as of September of 2007, to say that your business model is based on bringing niche topics to the masses? A.   It's certainly one of the major values of Lulu, yes, one of the unique values of Lulu.  It's not the exclusive business description of our business.  But yeah, it's fair to say that that's one of the more important services we provide.").

US2000 10303199.11

> Q.  Go ahead.
> A.    Okay.  Includes -- because we're in the video and DVD space as well as CD space, competitors can range from tiny companies such as CD Baby -- one of my favorite competitors.  I really like the CD Baby guys -- to very large competitors, Google.  Google's YouTube service is a competitor of Lulu.

Lulu Dep. at 144:1-24.

Plaintiff does not have any of the type of content that Hulu will be offering.  *See* Lulu Dep. at 147:11-20 (Q.   Does Lulu have any full-length network TV shows among its content? A.   As of right now, the only full-length network TV show, as I say, are these BCS football championship videos. Q.   Does it have any full-length feature studio films? A.   No.  Well, I hope not.  If you find some on Lulu, please tell us about it and we will have them taken down immediately.)[26]   In fact, Plaintiff's Lulu.tv video material is almost intentionally amateurish, featuring contests to create short videos in order to qualify for the "Order of the Digital Trebuchet," which is a "community of video creators who hang out at Lulu TV."  *See* Lulu Dep. at 151:3-5 (Exhibit 121).  With titles supplied by those that created and upload them, featured videos include the likes of "Porno Cue Cards," "Pepsi Girl:  Superburb," and "Birthday Troll Singers."  Lulu Dep. at 153:21-23.    Plaintiff, for its part, identifies other titles that might interest the viewer.  For "Porno Cue Cards," Plaintiff recommended "Business Cards" and "Dells are Great for Porn."  Lulu Dep. at 154:20-155:8 (recommendations based on "automated effort").

In contrast, Hulu's actual services are narrowly and clearly defined, and limited to offering professional-level, production-quality TV shows and films, via the internet.   As explained by Mr. Kilar, "Hulu's business is very different from what I understand to be the business of Lulu Enterprises.  We do not offer the same products and services; to the best of my knowledge the plaintiff does not have relationships with the international advertisers, technology

---

[26] The BCS videos are limited to sales of DVDs, not downloads.  *See* Lulu Dep. at 48:1-3 ("Q.  And so that's content that would be sold on a DVD or downloaded.  A.  It's currently on DVD.")

companies or distribution partners with which Hulu is doing business; and the scale and focus of Hulu as a company has no resemblance to that of the plaintiff." *Id.* ¶ 55.

Because of these differences in the parties' services, and because "[c]onsumer behavior is goal-driven" (Joachimstaler Dec. ¶ 10), "Hulu.com and Lulu.com will not be placed in the same consideration set by users." *Id*; *see id.* ¶ 32 ("[T]he nature of the consumer decision-making process is such that the Hulu.com and Lulu.com would not be placed in the same consideration set since they satisfy fundamentally different consumer goals."). As a consequence, confusion is unlikely.

### 4.    The "Facilities" Are Different

While the concept of "facilities" is not as directly applicable to internet-based businesses, the underlying rationale remains an evaluation of the channels of trade, and of purchasers and the purchasing environment. As explained in *Renaissance*:

> The fourth factor to be considered in the "likelihood of confusion" analysis is the similarity of the facilities used by the parties in their businesses. As McCarthy explains, the court is consider the class of consumers purchasing their products, and the context in which they make their purchases.

277 Fed Appx. at 244. As described above, the parties are engaged in providing very different services, and they do so with completely different business models. In the case of Hulu, professional-quality content will be provided to consumers for free on an advertiser-supported platform. In the case of Lulu, the content is "self-published" by the general public with no screening at all by Lulu; rather than advertising revenue, Lulu's business model depends on them getting a percentage of the sale of the self-published book or other material.

Plaintiff urges that since both services are on the Internet, their services and facilities overlap or are the same. This argument improperly collapses the content of the internet into a single market, a theory expressly rejected by the courts in this circuit. *See, e.g., U.S. Conference*

30

*of Catholic Bishops*, 432 F. Supp.2d at 627-28 ("comparing companies who market their services on the Internet" does not support a finding of similarity).

An important element of the purchasing environment is the "sophistication" or "expertise" of the "typical consumer in the relevant market." *Sara Lee Corp.,* 81 F.3d at 467. "If the typical consumer in the relevant market is sophisticated in the use of – or possesses an expertise regarding – a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion. *The relative sophistication of the market may trump the presence or absence of any other factor*." *Id.* (emphasis added; internal citation omitted).

The nature of Plaintiff's business is such that people involved in "self-publishing" and creating their own works are sophisticated and highly involved, which reduces the risk of any likelihood of confusion. A Lulu.com "creative brief"[27] describing "Target Segments," cites "Authors/Creators," noting: "This segment takes their work seriously and are self-reliant when it comes to the publishing and selling process. They are familiar with the internet and the online marketplace." *See* Lulu Dep. at 125:25-126:10. Other markets are described as "comfortable with self-service technology." *See* Lulu Dep. at 127:4-12, 129:12-21. Similarly, for Lulu.tv, Plaintiff's summary of potential customers provides: "This segment of the web population have demonstrated end user technophilia, and are motivated to make their presence on these networks as interesting as possible." *See* Lulu Dep. at 131:20-132:6.[28]

---

[27] The creative brief, Lulu Deposition Exhibit 117 (*see* Appx. A, Ex. 6), was for a revision of the Lulu.com website, which was "generated in order the help frame how the business would move to the 2.0 framework." Lulu Dep. at 125:18-21.

[28] *See* Appx. A, Ex. 7; *see also* Lulu Dep. at 133:16-18, 138:13-16 (The "Brand Position" is "serious indie creators." The target audience includes "Technically literate, natural and proficient consumers/users of internet channels for communication").

31

Plaintiff's CEO also testified that Lulu.com's customer base is educated and generally sophisticated.[29]    Plaintiff's marketing presentations note that "users are becoming more sophisticated."   Lulu Dep. at 162:18-21 (Exhibit 126).   The record further establishes the fact that Plaintiff's customers generally are going to be "thoroughly familiar" with the Lulu.com website (Lulu Dep. at 28:23-24), and part of a "creative community."   Lulu Dep. at 29:1-7 (noting "workshops and other vehicles, tools, in order to have them to be able to self-publish their works"); s*ee also* Lulu Dep. at 45:17-23 ("hundreds of thousands" of users participate in community forums).  This type of consumer is not likely to be confused.[30]

For Hulu, "consumers will be highly engaged and involved in the process of selecting, viewing and reviewing content." Kilar Dec.   ¶ 14.   *See* Joachimstaler Dec. ¶ 25 ("Using the Internet to visit Hulu.com and Lulu.com is a lean-forward experience because it requires the user to take an active role, as opposed to a lean-back experience, which is usually passive.")  Moreover, based on Hulu's target audience, "[t]hese segments of internet users typically are the most savvy and sophisticated internet users, and they often use the internet to seek out quality entertainment."  Kilar Dec. ¶ 25.

The indisputable fact is that "[u]sers of Hulu.com and Lulu.com are in lean-forward experiences and thus highly involved and aware of the differences between the two websites."

---

[29] *See* Lulu Dep. at 149:22-150:7. ("We would have a slight bias towards -- Well, first off, the internet itself has a bias towards a slightly more educated, slightly wealthier segment, and a slightly younger segment of our society than the general society.  And within the world of internet users, Lulu skews a little bit older than the average internet user, but then by definition a little bit younger than the population as a whole; and we probably skew a little **more educated than the average internet community as a whole**").

[30] Lulu Dep. at 15:3-10  ("So when I say we have had confusion, the bulk of it are people who care about Lulu and they're not confused in the marketplace . . . .  So the questions that we've received are very hypothetical questions, what are you going to do when Hulu launches its brand, kind of questions.")

Joachimstaler Dec. ¶ 10.  Building on the concept of brand association among internet users, Dr. Joachimstaler explains that

> In their state of leaning forward, Hulu.com and Lulu.com users are highly involved with these two websites and their offerings. [U]sing Hulu.com and Lulu.com is very involving because the experiences are highly participatory, offer a good deal of control, and present opportunities for personalization. Furthermore, Hulu.com and Lulu.com leverage the highly involving nature of the Internet to create greater impact and deeper resonance with their users.

*Id.* ¶ 26.  That both Hulu.com and Lulu.com target and cater to consumers in a highly engaged, "lean-forward experience" (*id.* ¶ 27) is a factor supporting a finding of no likelihood of confusion.

Further supporting the absence of any likelihood of confusion is the fact that consumers will not encounter HULU and LULU at the same time, even on the internet.  As Dr. Joachimstaler explains, "[n]avigation of the Internet is subject-matter driven, thus Hulu.com and Lulu.com will not be placed in the same competitive space.  *Id.* ¶ 10.  Moreover, a Google search for HULU does not yield LULU, and vice versa.  "[T]he two websites do not inhabit the same competitive space, and are unlikely to cross paths on a search engine."  *Id.* ¶ 35.[31]

### 5.    Advertising

Under the *Pizzeria Uno* test, it is necessary also to consider whether the method by which the services are advertised are similar. *Pizzeria Uno,* 747 F.2d at 1527.  If not, the risk of confusion is diminished.  *See Petro Stopping Centers,* 130 F.3d at 95.

In this case, Lulu advertises in a variety of ways, including principally key word purchases from search engines.[32]  Because Hulu does not plan to engage in advertising to the

---

[31] In describing how they operate to get the "number one ranking among self-publishing sites," Plaintiff notes: "Instead, people use keywords to search on a topic or a title, then click through on a high-ranking result.  This is where Lulu really shines."  *See* Lulu Dep. at 163:12-20, Exhibit 126.

[32] Lulu's advertising principally involves key word advertising on Google.  Lulu Dep. at 92:4-13.  Other advertising includes programs for authors, photo creation programs, trade shows, targeted e-mails, professor and dissertation programs, and creative competitions.  *See* Lulu Dep. at 85:17-93:5  Newspaper

public, this factor favors a finding of no likelihood of confusion. *See*, *e.g.*, *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 699 (E.D. Va. 2005) ("The lack of any overlap in advertising…weighs in favor of a finding of no likelihood of confusion"), *aff'd*, 227 Fed.Appx. 239, 245 (4th Cir. 2007) ("It is undisputed that [defendant] does not advertise its greeting cards line in any way….[Plaintiff] contends that the district court erred in interpreting this factor as militating against infringement, rather than assigning it neutral effect. The district court's holding on this point was supported by sound authority, however, and we find no error").

### 6.     Hulu Adopted Its Mark In Good Faith

The "lack of [a] likelihood of confusion is strengthened by the…findings that the defendant did not intend to pass off its product as that of the plaintiff[.]" *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 312 F.2d 125, 127 (2d Cir. 1963). Plaintiff's contentions of bad faith on Hulu's part are ill-conceived, since Hulu neither had nor has any intent or purpose to deceive or to attempt to pass off its goods as being those of Plaintiff.

The reality is that Hulu did not know of Plaintiff's use of LULU when it conceived of the HULU mark. Instead, the HULU mark was selected as an "empty vessel" precisely because it had no commonly understood meaning. To the extent that Hulu later became aware of scores of third-party uses of LULU and ULU marks by third-parties, no intent to trade on Plaintiff can or should be inferred, since such third-party use simply confirmed the absence of any likelihood of confusion resulting from the adoption of the mark HULU. In *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, for example, the Third Circuit noted that the district court "found that Victoria's Secret had not intended to confuse customers when it began using The Miracle Bra in conjunction with its swimwear line" since Victoria Secret's trademark search was

---

ads have been run (without much success), and Lulu has "done some experimentation with late night television advertising"). Lulu Dep. at 107:3-5.

34

interpreted as having "uncovered no confusingly similar registrations," and because of the fact that "no one at Victoria Secret Stores knew about Miraclesuit."  237 F.3d 198, 226 (3d Cir. 2000).  Based on these factors, the Court concluded that there was no error "in the District Court's *weighing of the intent factor in Victoria's Secret's favor.*"  *Id.* (emphasis added); *see also Beech-Nut Packing Co. v. P. Lorillard Co.*, 7 F.2d 967, 970-71 (3d Cir. 1925) ("The evidence… conclusively shows that both parties have acted in perfect good faith. Both have used the word 'Beech-Nut' on their respective, but very different, labels because they thought that they had the legal right to do so…Neither needed nor desired the reputation of the incompatible business of the other").  Because no evidence supports any bad-faith intent on Hulu's part, this factor weighs in Hulu's favor and "strengthens the finding of the absence of likelihood of confusion."  *King Research, Inc. v. Shulton, Inc.*, 324 F.Supp. 631, 637 (S.D.N.Y. 1971).

### 7.    Plaintiff's Putative Evidence of Actual Confusion In Fact Demonstrates That the Marks Are Readily Distinguishable

Plaintiff's putative testimony of actual confusion in reality demonstrates just the opposite:  The parties' marks are distinguishable and, in fact, are distinguished by the public.

Hulu is not aware of any instance of actual confusion, nor has any customer or potential customer inquired about an affiliation between HULU and Plaintiff's LULU operation.  In fact, Hulu is not aware of any confusion on the part of anyone, including  the general public.  Kilar Dec. ¶ 53.

Lulu has no evidence of actual confusion between the parties or their respective goods or services.[33]   Rather than actual confusion, Plaintiff has evidence only that the HULU mark

---

[33] *See* Lulu Dep. at 31:11-16 ("Q.   To your knowledge has anybody contacted Lulu to inquire about an association between them and Hulu?  A.   No.  To my knowledge, no one has done that.")  *See also* Lulu Dep., at 12:22-13:13 ("Q.   Could you name for me each person that you believe has had any actual or purported association or confusion of any type between the two parties in this case of the respective goods and services?  A:  I'm sorry?  Q.   Well, let's start with the first name that you can think

US2000 10303199.11

"sounds an awful lot like Lulu."[34]    The articles about Hulu's launch that use "lulu" in the headline are simply copy writer word play using the dictionary definition of lulu (*see* Lulu Dep. at 23:20-25); Plaintiff concedes that those headlines have nothing to do with Plaintiff or references to plaintiff.  Lulu Dep. at 21:18-23:13.[35]

Likewise, the third parties that Plaintiff expresses concerns about are not evidence of actual confusion at all, but instead queries also based on abstract possibilities.  *See* Lulu Dep. at 25:24-26:2 ("The confusion relates to how these two companies are going to deal with the confusion in the market, but it's a future.  It's a hypothetical issue . . . .")[36]

---

of. A.   First name I can think of, golly, good question.  I wasn't expecting this one."); Lulu Dep. at 15:11-20. ("Q.   Let's go all the way back to that first question. A.   Sure. Q.   What I would like is the name of an individual who has -- A.   I will supply you with lots of names, sir -- Q.   Sir -- A.   -- for that.  I don't have a name off the top of my head of a customer who has been specifically confused.).

[34] Lulu Dep. at 12:18-21 ("material on the blogisphere and in the journals about, you know, everyone from journalists going Hulu sounds an awful lot like Lulu."); *see also* Lulu Dep. at 19:25-20:7 (citing journalist noting similarity – "sounds a lot like Lulu, a customer online book publisher I've written about" – as purported actual confusion).

[35]    Because the press reports are not of customers, they have little relevance in any event to the issue of consumer confusion.  *See Renaissance,* 277 Fed. Appx. at 245 ("this small number of cases, none of which demonstrated confusion among the actual consumer public," weighs against any finding of actual confusion); *Major Pool Equip. Corp. v. Ideal Pool Corp.,* 203 U.S.P.Q. 577, 584 (N.D. Ga. 1979) (denying preliminary injunctive relief on ground that "dealer comments evidence[] no confusion over which design emanated from which source").

[36] *See also* Lulu Dep. at 27:15-21 (although Lulu has "had people inquire about the similarity of the names and what Lulu is going to do," nobody has "inquire[d] who believed [in] . . . a relationship between the two parties"); Lulu Dep. at 28:5-13 ("So the net effect is that the kind of people who are asking us about it and who are concerned about this issue are people who are aware that Hulu is a Fox and NBC-initiated project.  And as a result, **they know that Lulu is not a Fox or NBC-related project, and so their questions are a little more informed than that.**  They typically say, how are you, the two companies, going to deal with the confusion that this is going to create."); Lulu Dep. at 32:9-17 ("I can't offer examples of confusion between Lulu, a five year old, established digital media company who has been offering services to our customers for the last five years.  So our customers know Lulu.  They know Lulu well.  **They are not being confused in a direct sense today** by a company that has yet to offer a product or service. They have been **casually inquiring** of how will you manage the confusion once Hulu is up and running.").

36

The Court could ask for no better proof of the trade's awareness that LULU and HULU are two different marks than that contained in these reports. As Professor McCarthy aptly notes:

> "Confusion" means more than that the junior user's mark merely "calls to mind" the senior user's mark. As Judge Rich observed: "The very fact of calling to mind may indicate that the mind is distinguishing, rather than being confused by, the two marks. . . . Seeing a yellow traffic light immediately "calls to mind" the green that has gone and the red that is to come, or vice versa; that does not mean that confusion is being caused. As we are conditioned, it means exactly the opposite."

*McCarthy*, *supra*, § 23:9. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114 (2d Cir. 2001) ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself"); *Pennzoil Co. v. Crown Central Petroleum Corp.*, 50 F. Supp. 891, 899 (D. Md. 1943) (no likelihood of confusion when customer questions regarding relationship of parties "indicated that the inquirer was put on notice of the difference between the names"), *aff'd*, 140 F.2d 387 (4th Cir. 1944).

### 8. Lulu's Other Claims Are Without Merit[37]

"The ACPA was not enacted to give companies the right to fence off every possible combination of letters that bears any similarity to a protected mark." *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 270 (4th Cir. 2001).[38] Rather, the Fourth Circuit has

---

[37] Count II is a claim under the Anti-Cybersquatting Protection Act ("ACPA"). Counts III and IV are North Carolina statutory and common law claims. The ACPA has separate elements from a Section 43(a) claim, but "[t]he North Carolina common law of unfair competition in the context of trademarks and tradenames is similar to the federal law of trademark infringement." *Yellowbrix, Inc. v. Yellowbrick Solutions, Inc.*, 181 F. Supp. 2d 575, 583 (E.D.N.C. 2001) (denying Plaintiff's motion for preliminary injunction because there was no likelihood of consumer confusion, and therefore no trademark infringement or deceptive or unfair trade practice, so plaintiff was unlikely to succeed on claims under the Lanham Act, N.C. Gen. Stat. § 75-1.1 or North Carolina common law).

[38] Even for two concurrent uses of the *identical* mark, which is not at issue before this Court, the Fourth Circuit has held that this sort of behavior need not constitute cybersquatting, "it is simply part of legitimate competition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 240-241 (4th Cir. 2002) ("The ACPA was not designed to provide a battlefield for legitimate concurrent trademark users.").

US2000 10303199.11

observed that Congress enacted the ACPA to curb the increasing practice of cybersquatting, that is, "the practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.'" *Virtual Works, Inc. v. Volkswagen of Am., Inc.,* 238 F.3d 264, 267 (4th Cir. 2001) (*quoting* S.Rep. No. 106-140 at 5-7 (1999)); *see also Lamparello v. Falwell***,** 420 F.3d 309, 318 (4th Cir. 2005) ("The paradigmatic harm that the ACPA was enacted to eradicate is the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark.") (internal quotations omitted).  Here, it is absurd that the Fox-NBC Universal joint venture is an elaborate plan to force Lulu Enterprises to buy-back the single, dissimilar domain name hulu.com, or otherwise directed their conduct to Plaintiff.

To prevail on a cybersquatting claim, a plaintiff must show that: (1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; *and* (3) the defendant registered or used the domain name with a bad faith intent to profit from plaintiff's mark.  *See* 15 U.S.C. § 1125(d)(1)(A).  In this case, the Lulu mark is conceptually and commercially weak.  Moreover, as explained above, the hulu.com domain name is not identical or confusingly similar to Plaintiff's mark.[39]

The statutory factors delineating "bad faith" are entirely lacking in this case.[40]  No evidence suggests that Hulu is somehow seeking to divert consumers, and Plaintiff itself does not

---

[39] Plaintiff in fact concedes that its Complaint is wrong, and that Hulu is not using Plaintiff's marks at all.  *See* Lulu Dep. at 58:15-59:1 ("Q.  It indicates in paragraph 28, there's an allegation that, "Upon information and belief defendants have used Lulu's LULU marks as part of Defendants' domain name with actual knowledge of Lulu's mark, with the intent to cause confusion, and in bad faith." I have two questions that come from that. One, are you aware of any use by defendants of Lulu's LULU marks? A.  I am not aware of the defendants' use of Lulu's marks.")

[40] The ACPA provides a non-exhaustive list of factors for a court to consider for alleged "bad faith," including "the person's intent to divert consumers from the mark owner's online location;" "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain;" "the person's provision of material and misleading false contact information when

US2000 10303199.11

even claim that Hulu registered the domain with misleading false contact information, or acquired multiple domain names, each of which are identical or confusingly similar to Plaintiff's marks, so as to evidence any pattern where bad faith could reasonable be inferred.

Moreover, the ACPA provides a safe harbor, which states that bad faith "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). Given the overall differences in the parties' respective marks and the large number of third-party "lulu" formative marks, it should be readily apparent to Plaintiff, and this Court, that Hulu had reasonable grounds to believe that its conduct was and is lawful. *See, e.g.*, *Yellowbrix,* 181 F.Supp.2d at 583 (because "Defendant's product is distinct from that of Plaintiff and…is marketed to a different set of consumers…[and] [b]ecause Defendant is not a competitor of Plaintiff, it did not seek to 'siphon off' Plaintiff's customers…, Defendant had reasonable grounds to believe that the use of the domain name was fair and otherwise lawful.").

## IV.    RULE 65(C) MANDATES A SUBSTANTIAL BOND IF ANY INTERIM RELIEF IS GRANTED

In the unlikely event the Court is inclined to grant any form of preliminary injunction, Defendant requests that the Court require a substantial bond not less than $10 million.

"In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.* at 421 n.3.[41] The security must be set "in an amount that covers the potential incidental and

---

applying for the registration of the domain name;" and "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names[.]" 15 U.S.C. § 1125(d)(1)(B)(i).

[41] "No restraining order or preliminary injunction shall issue expect upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may

consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained." *Id.* (quoting 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954 (2d ed. 1995)).

Fixing the proper amount of the bond is of critical importance to Hulu because of the fact that a "party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 770 n.14 (1983). As a result, when "setting the amount of security, district courts should err on the high side" to ensure that a enjoined party has full recourse to recover its damages. *See Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th Cir. 2000). By simply establishing a $10,000,000 bond at this time, it does not mean that the Hulu would be automatically entitled to that sum; Hulu would still "have to prove its loss, converting the 'soft' numbers to hard ones" at such later proceeding. *Id.* On the other hand, an error in underestimating damages at this early stage would produce an irreparable injury to Hulu because it would have no further recourse against Plaintiff for the amount of damages suffered in excess of the bond amount.

## V.    Conclusion

For the foregoing reasons, Hulu respectfully requests that this Court deny Plaintiff's Motion for Preliminary Injunction.

---

be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). "Although the district court has discretion to set the bond amount 'in such sum as the court deems proper,' it is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) ("In view of the clear language of Rule 65(c), failure to require a bond upon issuing injunctive relief is reversible error").

This the 9th day of October, 2007.

/s/ Hayden J. Silver, III
_____

Hayden J. Silver, III
NC State Bar No. 10037
jaysilver@kilpatrickstockton.com
Betsy Cooke
NC State Bar No. 25353
bcooke@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
3737 Glenwood Avenue, Suite 400
Raleigh, NC 27612
(919) 420-1700
(919) 420-1800 (facsimile)


William H. Brewster
GA State Bar No. 080422
bbrewster@kilpatrickstockton.com
Sara Maurer
GA State Bar No. 159056
smaurer@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309
(404) 815-6500
(404) 815-6555 facsimile

Attorneys for Defendant Hulu, LLC

US2000 10303199.11

## CERTIFICATE OF SERVICE

This is to certify that on this date the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System which will send notice to the following CM/ECF participants:

>Leslie C. O'Toole
>leslie.otoole@elliswinters.com
>Thomas Hamilton Segars
>tom.segars@elliswinters.com

This the 9th day of October, 2007.


/s/ Hayden J. Silver, III
_____


KILPATRICK STOCKTON LLP
3737 Glenwood Avenue, Suite 400
Raleigh, North Carolina 27612
Telephone: (919) 420-1700

US2000 10303199.11