# APPENDIX B
# UNPUBLISHED DECISIONS

1.  *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 227 Fed Appx. 239 (4th Cir. 2007)

2.  *GFC Fin. Corp. v. GFC Capital Res. Group, Inc.*, 1994 WL 30432 (S.D.N.Y. Feb. 2, 1994)

3.  *Major League Baseball Props., Inc. v. Pacific Trading Cards, Inc.*, 1998 WL 241904 (S.D.N.Y. May 14, 1998)

4.  *Scholastic, Inc. v. Escolastica.com*, 100 Fed. Appx. 152 (4th Cir. 2004)

Westlaw.

227 Fed.Appx. 239    Page 1
227 Fed.Appx. 239
**(Cite as: 227 Fed.Appx. 239)**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,
Fourth Circuit.
RENAISSANCE GREETING CARDS, INCORPORATED, Plaintiff-Appellant,
v.
DOLLAR TREE STORES, INCORPORATED, Defendant-Appellee.
**No. 06-1131.**

Argued: Nov. 30, 2006.
Decided: March 30, 2007.

**Background:** Holder of the trademark "Renaissance," used with greeting cards, brought suit against an alleged trademark infringer selling gift bags using a mark containing that word, claiming violations of the Lanham Act's trademark infringement and false designation of origin provisions and Virginia common law of trademarks and unfair competition. The United States District Court for the Eastern District of Virginia, 405 F.Supp.2d 680, T.S. Ellis, III, J., granted a defense motion for summary judgment, and the holder appealed.

**Holdings:** The Court of Appeals, Faber, Chief District Judge for the Southern District of West Virginia, sitting by designation, held that:
(1) evidence supported district court's determination that defendant did not infringe the trademark, and
(2) exclusion of evidence relating the parties' settlement negotiations was not an abuse of discretion.
Affirmed.

West Headnotes

**[1] Trademarks ⚷1086**
382Tk1086 Most Cited Cases

**[1] Trademarks ⚷1092**
382Tk1092 Most Cited Cases

**[1] Trademarks ⚷1110**
382Tk1110 Most Cited Cases
Evidence supported district court's determination that a seller of gift bags containing the word "renaissance" did not infringe the trademark "Renaissance," used with greeting cards; the mark was weak, such that its ability to identify the source of products did not extend beyond the greeting card market, the holder of the mark did not advertise its greeting cards line in any way, and none of four instances of confusion demonstrated confusion among the actual consumer public. Lanham Act, §§ 32(1), 43(a), 15 U.S.C.A. § § 1114(1), 1125(a).

**[2] Evidence ⚷213(1)**
157k213(1) Most Cited Cases

**[2] Federal Civil Procedure ⚷1107**
170Ak1107 Most Cited Cases
District court's exclusion of evidence relating the parties' settlement negotiations in a trademark infringement suit, specifically ordering such content stricken from two paragraphs of the trademark holder's original complaint, was not an abuse of discretion; the court narrowly tailored the portions of the paragraphs at issue to be excluded, and assured the holder's counsel that it would reconsider the matter if an exception to the rule excluding such evidence were later revealed. Fed.Rules Evid.Rule 408, 28 U.S.C.A.

**[3] Evidence ⚷213(1)**
157k213(1) Most Cited Cases

**[3] Federal Civil Procedure ⚷2011**
170Ak2011 Most Cited Cases
District court's exclusion of evidence relating the parties' settlement negotiations, specifically upholding a protective order precluding witness testimony on the issue, was not an abuse of discretion in a trademark infringement suit; the trademark holder did not say what fact it wished to discover through inquiry about the negotiations. Fed.Rules Evid.Rule 408, 28 U.S.C.A.

**Trademarks ⚷1800**
382Tk1800 Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

227 Fed.Appx. 239                                                                                                                     Page 2
227 Fed.Appx. 239
**(Cite as: 227 Fed.Appx. 239)**

Renaissance.

**Trademarks ⚷1800**
382Tk1800 Most Cited Cases
Renaissance Greeting Cards.

*240 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T.S. Ellis, III, District Judge. (1:05-cv-00341-TSE).

**ARGUED:** Michael Steven Culver, Millen, White, Zelano & Branigan, P.C., Arlington, Virginia, for Appellant. Beth Hirsch Berman, Williams, Mullen, Hofheimer & Nusbaum, P.C., Norfolk, Virginia, for Appellee. **ON BRIEF:** Adam Casagrande, Williams, Mullen, Hofheimer & Nusbaum, P.C., Norfolk, Virginia, for Appellee.

Before WIDENER and WILKINSON, Circuit Judges, and DAVID A. FABER, Chief United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge FABER wrote the opinion, in which Judge WIDENER and Judge WILKINSON joined.

Unpublished opinions are not binding precedent in this circuit.

FABER, Chief District Judge:

Renaissance Greeting Cards, Inc., appeals the district court's grant of summary judgment to Dollar Tree Stores, Inc., and the court's determination of an evidentiary issue under Federal Rule of Evidence 408. For the following reasons, we affirm with regard to both issues.

I.
In connection with its greeting cards business, appellant Renaissance Greeting Cards, Inc. ("RGC"), owns three registered trademarks containing the words "Renaissance" and "Renaissance Greeting Cards." Although the marks were registered in 1992, 1996, and 2003, respectively, at least one of these marks has been in continuous use by RGC or its predecessors since 1977. The parties do not dispute that RGC's "Renaissance" mark is incontestible pursuant to 15 U.S.C. § § 1065 and 1115(b).

Although RGC operates one retail outlet store in Maine, the vast majority of RGC's sales are made on a wholesale basis to assorted retailers and to florists affiliated with RGC's parent company, Florists' Transworld Delivery, Inc. ("FTD"). Not surprisingly, RGC's advertising expenditures, which have averaged $358,000.00 in recent years, are targeted mostly at these wholesale customers. With recent annual sales averaging twelve million dollars, RGC claims approximately 0.2% of the greeting cards market. Although RGC's products at one time included a line of gift bags, gift wrap, bows, and ribbon, RGC abandoned this line in 1990, and has since confined itself to the sale of greeting cards.

Appellee Dollar Tree Stores, Inc. ("DTS"), owns and operates approximately 2,800 discount retail stores nationwide, with recent annual sales totaling in excess of $3 billion. Since 1993, DTS has sold a line of gift bags bearing a "Renaissance" or "Renaissance Gift Bags" mark. In 2002, it expanded this line to include gift wrap, boxes, bows, ribbon, and tissue paper. DTS estimates that it has sold somewhere between 250 million and 500 million units of these products since 1995. DTS also sells a line of greeting cards, but these cards, which are produced by American Greetings Corporation, are sold under the trademark "Tender Thoughts."

At the time it selected its "Renaissance" marks, DTS was unaware of RGC's trademarks. Indeed, DTS did not conduct a trademark search or consult counsel with regard to its use of the mark until 2003, when it discovered that the "Renaissance" mark was widely used by many companies. As a result of this discovery, DTS eventually *241 began marketing its line of gift products under the mark "Voila." The older "Renaissance" gift bags, however, remained available for purchase in some of DTS's stores as late as July 2005.

When RGC discovered DTS's use of the mark in 2003, it sent a letter to Betta Products, Inc., the company it believed to have produced the bags. Betta Products directed RGC to DTS, and in December 2003, counsel for RGC sent a letter to DTS seeking to discuss the issue. When this and two subsequent letters produced no response, RGC filed suit on March 29, 2005, alleging (I) infringement of a federally registered trademark under 15 U.S.C. § 1114(1); (ii) trademark infringement and a false designation of origin under 15 U.S.C. § 1125(a); and (iii) common law infringement and unfair competition under Virginia state law. On December 19, 2005, the district court granted summary judgment in favor of DTS, the parties having previously agreed to a bench trial.

RGC filed a timely notice of appeal with regard to two issues: (1) the district court's determination that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

no likelihood of confusion existed between RGC's and DTS's marks; and (2) the district court's decision to strike portions of the complaint and to preclude certain discovery pursuant to Federal Rule of Evidence 408. We have jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1291.

II.

We review *de novo* the legal determinations made by a district court in granting summary judgment. *See Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.,* 43 F.3d 922, 928 (4th Cir.1995). A district court's likelihood of confusion inquiry, however, necessarily involves factual determinations. *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco,* 329 F.3d 359, 362 (4th Cir.2003). Where, as here, the court is to be the ultimate finder of fact, the entire record is before the court at the summary judgment stage, [FN1] and only the inferences to be drawn from the underlying facts--as opposed to the facts, themselves--are in dispute, a court may properly proceed to final judgment. *See Id.*

> FN1. "The Court: 'All right. I don't need anything more. After that, the case is ready for disposition, isn't it, Mr. Hanes [Attorney for Dollar Tree], Mr. Culver [Attorney for RGC].' Attorney for Dollar Tree: 'Yes.' Attorney for RGC: 'Yes.' " (J.A. at 355.)

It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts. If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial. *Id.* at 362 (quoting *Matter of Placid Oil Co.,* 932 F.2d 394, 398 (5th Cir.1991)(internal quotations and citations omitted)). In such circumstances, we review the district court's findings for clear error. *Int'l Bancorp,* 329 F.3d at 362; *see also Petro Stopping Centers, L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 91-92 (4th Cir.1997)("This circuit reviews district court determinations regarding likelihood of confusion under a clearly erroneous standard."). Under this standard, the district court's findings may not be disturbed unless there is no evidence in the record to support them, or when, having reviewed the record ourselves, "we are left with a definite and firm conviction that a mistake has been committed." *Petro Stopping,* 130 F.3d at 92. In no case, however, will this **\*242** standard permit a district court's decision to stand where the court incorrectly applied the law. *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1526 (4th Cir.1984).

A.

[1] Actions for trademark infringement require proof of two elements: (1) that the plaintiff has a valid mark, and (2) that the similarity of the defendant's mark to the plaintiff's creates a "likelihood of confusion" in the marketplace. *See Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 124 (4th Cir.1990); 15 U.S.C. § 1114(1). Because the parties do not dispute that RGC's "Renaissance" mark is incontestible pursuant to 15 U.S.C. § § 1065 and 1115(b), the district court properly limited its inquiry to the "likelihood of confusion" element. [FN2]

> FN2. Because the "likelihood of confusion" test governs not only suits under the Lanham Act, but also Virginia common law actions for infringement and unfair competition, we analyze appellant's causes of action simultaneously. *Lamparello v. Falwell,* 420 F.3d 309, 312 n. 1 (4th Cir.2005).

Courts consider seven factors in evaluating whether a competing mark creates a likelihood of confusion:
  1) The strength or distinctiveness of the mark;
  2) The similarity of the two marks;
  3) The similarity of the goods or services the marks identify;
  4) The similarity of the facilities the two parties use in their businesses;
  5) The similarity of the advertising used by the two parties;
  6) The defendant's intent;
  7) Actual confusion.

*Pizzeria Uno,* 747 F.2d at 1527. These factors will not be of equal relevance in every case. *Lone Star,* 43 F.3d at 933. Indeed, "[c]ertain factors may not be germane to every situation," and certain factors other than those listed above may be relevant to the "likelihood of confusion" analysis in certain cases. *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 463 (4th Cir.1996). RGC contends that the district court misapplied these factors in certain respects to such an extent that it committed legal error. We will consider each element in turn.

1.

RGC contends that the district court improperly weighed the strength of the "Renaissance" mark, and that it placed too much emphasis on the "strength of the mark" element in analyzing the likelihood of confusion. The district court began its evaluation of

the mark's strength by noting our statement in *Pizzeria Uno* that the "first and paramount factor under this set of factors is the distinctiveness or strength of the two marks." *Pizzeria Uno,* 747 F.2d at 1527. It then proceeded to apply the two-factor test set forth in *CareFirst of Md., Inc. v. First Care, P.C.,* 434 F.3d 263 (4th Cir.2006). Under that test, the court considers (1) the conceptual strength of the mark, and (2) the commercial strength of the mark. *Id.* at 269.

A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Pizzeria Uno,* 747 F.2d at 1527. Suggestive and arbitrary marks are deemed strong and presumptively valid, whereas generic and descriptive marks are deemed weak, and require proof of secondary meaning within the market in order to receive trademark protection. *Id.* After considerable analysis, the district court concluded that RGC's "Renaissance" mark is suggestive, because it "does not describe any particular *243 characteristic of RGC's greeting cards, but 'requires some imagination to connect it with the goods.'" (J.A. at 353) (quoting *Retail Servs., Inc. v. Freebies Publ'g,* 364 F.3d 535, 539 (4th Cir.2004).)

This categorization does not end a court's evaluation of a mark's conceptual strength, however. A court must also consider other registrations of the mark, because "the strength of a commonly-used mark decreases as the number of third-party registrations increases." *Pizzeria Uno,* 747 F.2d at 1531. The district court therefore considered evidence of 465 federal and 203 state trademark registrations or pending applications, all for marks using the word "Renaissance." (J.A. at 358.) It then specifically considered evidence that twenty-three of these registrations, including RGC's, are for marks that fall in the same class of paper products as RGC's, PTO International Class 16. [FN3] (*Id.* at 358, 344.) As a result, the court concluded that this widespread usage of the word "Renaissance" in other trademarks significantly diminished any distinctiveness inherent in RGC's marks.

> FN3. Under the regulations of the Patent and Trademark Office, Class 16 includes the following:
> Paper, cardboard and goods made from these materials, not included in other classes; printed matter; bookbinding material; photographs; stationery; adhesives for stationery or household purposes; artists' materials; paint brushes; typewriters and office requisites (except furniture); instructional and teaching material (except apparatus); plastic materials for packaging (not included in other classes); playing cards; printers' type; printing blocks.
> International Schedule of Classes of Goods and Services, 37 C.F.R. § 6.1(16).

Citing *CareFirst,* RGC asserts that the district court erred in considering evidence that "Renaissance" is used in products outside RGC's class of paper goods. *CareFirst* does not support such an argument. In that case, we explained that "the frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service,' illustrates the mark's lack of conceptual strength." *CareFirst,* 434 F.3d at 270 (quoting *Pizzeria Uno,* 747 F.2d at 1530-31). Because in that case there was ample use of "CareFirst" and similar marks in the health care industry alone, it was unnecessary to consider use of the mark in unrelated industries. As the above passage makes clear, however, evidence of third-party use of a mark in unrelated markets--although not as persuasive as use within the same product class--indicates a mark's lack of conceptual strength. [FN4]

> FN4. RGC further argues that the district court ought not to have discounted its attempts to police the use of its mark by third-parties. The district court's opinion makes evident that it gave due consideration to RGC's efforts in this regard, but was unimpressed with the "mixed results" RGC achieved. (J.A. at 359 n. 15.)

The second step in the "strength of the mark" analysis is to consider the mark's commercial strength, a concept similar to the "secondary meaning" inquiry considered in evaluating a mark's validity. *CareFirst,* 434 F.3d at 269 n. 3. While third-party use of the mark is relevant at this stage, as well, the court also considers a number of other factors, such as advertising expenditures, consumer awareness of the source of the mark, market share, and unsolicited media coverage. *See Perini,* 915 F.2d at 125. The district court faithfully considered these and other factors, noting RGC's market share of less than one percent of the greeting cards market, its average annual advertising expenditures of less than $360,000.00, and the lack of both independent media coverage of the business and survey evidence

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

indicating an association between RGC's mark and its **\*244** product. (J.A. at 361.) Because of the ample evidence supporting the district court's decision on this point, we find no error in the court's conclusion that RGC possesses a weak mark "such that its ability to identify the source of products does not extend beyond the greeting card market." (*Id.* at 361-62.) *See Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 394 (2d Cir.1995). [FN5]

> FN5. On November 30, 2006, the day this matter was argued, this court issued its opinion in another trademark dispute, *Synergistic Int'l, LLC v. Korman,* 470 F.3d 162 (4th Cir.2006). Although RGC argues that *Synergistic* supports its position with regard to consideration of third-party registrations of a mark in unrelated industries, we must conclude otherwise. In *Synergistic,* we concluded that the appellant's mark was conceptually strong based in part on the fact that the mark's dominant word, although commonly used in other industries, was not commonly used in the appellant's industry or related industries. *Id.* at 174. By contrast, "Renaissance" is used not only by hundreds of businesses in industries unrelated to RGC's, but also by numerous businesses within RGC's PTO class of products. Furthermore, the appellant's mark in *Synergistic* was found to be commercially strong. As described above, that is not the case here.

2.

The second factor to be considered in the "likelihood of confusion" analysis is the similarity of the marks in question. In order for this factor to weigh in favor of the plaintiff, the marks need not be identical; rather, they must only be "sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." *Lone Star,* 43 F.3d at 936. For purposes of summary judgment, the district court assumed the marks to be similar in appearance. This factor thus weighs in favor of a finding of likelihood of confusion.

3.

Next, the court considers the similarity of the goods or services identified by the marks. With regard to this element, the products in question need not be identical or in direct competition with each other. Because confusion may arise even where products are merely "related," the court is to consider "whether the public is likely to attribute the products and services to a single source." *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 679 (7th Cir.2001). An important function of this "related goods" concept is to protect trademark owners' ability to expand into associated markets in the future. *Id.* at 680-81.

After considering the manner in which greeting cards and gift products are marketed in the industry, and the fact that RGC at one time marketed its own line of gift products, the district court concluded that the parties' products constituted related goods. The court then properly observed that, although the fact that goods are related weighs in favor of a finding of infringement, the similarity of the goods, alone, is not dispositive as to the likelihood of confusion. (J.A. at 364-65) (citing *Arrow Distilleries, Inc. v. Globe Brewing Co.,* 117 F.2d 347, 351 (4th Cir.1941); *Petro Stopping,* 130 F.3d at 95; 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:62 (4th ed. 2006).)

4.

The fourth factor to be considered in the "likelihood of confusion" analysis is the similarity of the facilities used by the parties in their businesses. As McCarthy explains, the court is to consider the class of consumers purchasing the products, and the context in which they make their purchases. McCarthy, *supra,* § 24:51. Although noting that DTS's products were most likely to be purchased by "value-**\*245** conscious consumers," the district court concluded that the placement of the products within the stores and their general retail availability were sufficient to tilt this factor "very modestly" in favor of a finding of infringement. (J.A. at 365-66.) We see no error in this determination.

5.

We next consider the similarity of the advertising employed by the parties. It is undisputed that DTS does not advertise its greeting cards line in any way. Moreover, although RGC does engage in some limited advertising, its efforts are targeted almost entirely at its wholesale customer base. RGC contends that the district court erred in interpreting this factor as militating against infringement, rather than assigning it neutral effect. (Brief of Appellant at 54) (citing *Carnival Brand Seafood Co. v. Carnival Brands, Inc.,* 187 F.3d 1307, 1314 (11th Cir.1999).) The district court's holding on this point was supported by sound authority, however, and we find no error. *See IDV N. Am., Inc. v. S & M Brands, Inc.,* 26 F.Supp.2d 815, 828-29 (E.D.Va.1998)(citing *Pizzeria Uno,* 747 F.2d at 1527; *Petro Stopping,* 130 F.3d at 95).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

6.

The sixth factor to be considered is the defendant's intent in adopting its mark. [FN6] As we explained in *Pizzeria Uno,* "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizzeria Uno,* 747 F.2d at 1535.

> FN6. To the extent appellant argues that the district court's decision to strike portions of the complaint and to preclude certain discovery are relevant to this factor, the court notes that the district court's ruling on those points is affirmed in Section III below.

RGC contends that DTS exhibited bad faith by failing to conduct a trademark search or to obtain advice of counsel before adopting the "Renaissance" mark for use on its gift products, and by continuing to use the mark after being contacted by RGC. RGC's first argument necessarily fails, because, as the district court reasoned, "[a]t most, the failure to conduct a search is probative of Dollar Tree's carelessness, which even if true, has little bearing on the likelihood that its allegedly infringing mark will confuse the public." (J.A. at 367 (citing McCarthy, *supra,* § 23:109).) Moreover, DTS was justified in continuing its use of the "Renaissance" mark if, as the district court concluded, DTS believed RGC's mark to be too weak to prevent DTS's use of the mark on its gift products. *See* McCarthy, *supra,* § 23:120. Accordingly, the district court committed no error in concluding that the intent factor militated against a finding of infringement.

7.

Finally, the "likelihood of confusion" analysis requires consideration of instances of actual confusion among consumers. RGC produced evidence of four instances of confusion, one involving a shop owner, two involving shop managers, and one involving an independent sales representative. The district court found that this small number of cases, none of which demonstrated confusion among the actual consumer public, weighed against RGC's position, rather than in favor. In so holding, the district court took into account the large volume of sales from which RGC's instances of confusion were taken, as well as RGC's unsuccessful efforts to uncover additional examples of actual confusion.

***246** The court also appropriately considered our statement in *Petro Stopping* that, "[a]t worst, [a] company's failure to uncover more than a few instances of actual confusion creates a 'presumption against likelihood of confusion in the future.' " *Petro Stopping,* 130 F.3d at 95 (quoting *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.1980)). In *Petro Stopping,* we determined that the appellant's evidence of actual confusion, consisting of only a few instances out of more than $2 billion in sales, was "at best *de minimis.*" *Petro Stopping,* 130 F.3d at 95. We see no error in the district court reaching the same conclusion in the instant case.

B.

Having determined that the district court committed no clear error in assessing each of the *Pizzeria Uno* factors, we turn to RGC's contention that the court erred in weighing these factors against each other. Specifically, appellant argues that the court placed excessive significance on the strength of the mark. This argument is similarly unavailing. As previously noted, these factors will be of varying relevance in every case. *Lone Star,* 43 F.3d at 933. Nonetheless, where only three of the seven *Pizzeria Uno* factors weighed in favor of a finding of likelihood of confusion, we are unable to conclude that the district court committed clear error in finding no infringement. Ample evidence supported the court's decision, and we will not disturb it.

III.

[2] The second issue RGC raises on appeal is the district court's exclusion, pursuant to Federal Rule of Evidence 408, of evidence relating the parties' settlement negotiations. [FN7] Specifically, the district court ordered such content stricken from two paragraphs of RGC's original complaint, and subsequently upheld a protective order entered by the magistrate judge precluding witness testimony on the issue. We review both decisions for an abuse of discretion. *See Seay v. TVA,* 339 F.3d 454, 480 (6th Cir.2003)( "We review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned."); *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1070 (9th Cir.2002)(reviewing ruling on motion to strike under Fed.R.Civ.P. 12(f) for abuse of discretion); *Stanbury Law Firm, P.A. v. IRS,* 221 F.3d 1059, 1063 (8th Cir.2000)(same); *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 163 (4th Cir.1992)(protective order entered under Fed.R.Civ.P. 26(c) reviewable for abuse of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

discretion).

> FN7. After a review of the record, we believe RGC made clear to the district court that it wished to introduce the disputed evidence to show DTS's intent for purposes of the "likelihood of confusion" analysis. We are thus unpersuaded by DTS's argument that RGC waived this issue below. (*See* Brief of Appellee at 32-34.)

Paragraphs 16 and 17 of RGC's original complaint detailed certain communications between the parties' attorneys made during settlement negotiations. (J.A. at 14.) In its answer to the complaint, DTS moved to strike these paragraphs pursuant to Federal Rule of Evidence 408, which provides as follows:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements **\*247** made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408. RGC contended that the passages, which included statements by counsel for DTS as to how many units of the "Renaissance" gift products remained in stock, were admissible as an exception to Rule 408 to show bad faith or willfulness.

The court took up the issue at a motions hearing on June 3, 2005, discussing the matter at length. The transcript of that hearing makes evident that the court was aware of the law governing motions to strike under Rule 12(f), and that such motions are to be granted infrequently. (J.A. at 92.) *See* Stanbury, 221 F.3d at 1063. It is equally clear that the court felt RGC's proffered exceptions to Rule 408 were impermissible under the rule, and that it did not consider the disputed information to be probative. As a result, the district court granted the motion to strike in part and directed RGC to file an amended complaint. In doing so, however, the court narrowly tailored the portions of Paragraphs 16 and 17 to be excluded, and assured counsel for RGC that it would reconsider the matter if an exception to Rule 408 were later revealed.

RGC made its argument on the basis of rather weak authority. It was able to cite no cases from this circuit in support of its position. Furthermore, one of its chief cases, Itron, Inc. v. Benghiat, No. 99-501, 2003 WL 22037710, 2003 U.S. Dist. LEXIS 15039 (D.Minn. Aug. 29, 2003), is an unpublished district court opinion from the District of Minnesota, and is therefore of questionable precedential value. Another case on which it relies actually militates against admission of the disputed paragraphs. Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc., 823 F.Supp. 1077 (S.D.N.Y.1993). In *Stern's,* the court considered statements made during settlement negotiations for purposes of showing the defendant's intent. The *Stern's* court only considered statements made by the plaintiff, however, and only to the extent they proved notice of the plaintiff's objection to the defendant's mark. *Id.* at 1088 n. 6 (adding that statements made during settlement negotiations are clearly inadmissible under Rule 408 where they may be considered admissions as to the merits of the action). Similarly, the district court here informed RGC that it would consider statements made by RGC to DTS. (J.A. at 94-96.) Because the district court's ruling on this point was reasonable and not overreaching, we find no abuse of discretion.

[3] The protective order arose from a notice of deposition issued by RGC that included a demand for the production of a witness to testify to "all factual representations made to plaintiff's counsel during negotiations with defendant's counsel in 2004 involving the mark RENAISSANCE...." (J.A. at 189.) Upon motion by DTS, the magistrate judge to whom the motion was referred concluded that, although evidence of settlement negotiations may be discoverable under some circumstances, RGC had not shown why the settlement negotiations were relevant to its "claims or defenses." (J.A. at 184.) Moreover, the magistrate judge observed that RGC did not say what fact it wished to discover through inquiry about the negotiations. (*Id.*) When RGC objected to **\*248** the magistrate judge's order, the district court considered the issue at a subsequent motions hearing. Concluding, as it had at the prior hearing on DTS's motion to strike, that the disputed information was not probative and did not meet an exception to Rule 408, the district court overruled RGC's objections to the order. The district court's decision in this regard was supported by sound policy considerations. *See* Fiberglass Insulators, Inc. v.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

227 Fed.Appx. 239 Page 8
227 Fed.Appx. 239
**(Cite as: 227 Fed.Appx. 239)**

*Dupuy,* 856 F.2d 652, 654 (4th Cir.1988)("The public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions."). Accordingly, we find no abuse of discretion.

IV.

For the foregoing reasons, we affirm the district court's rulings with regard to Federal Rule of Evidence 408, and its grant of summary judgment to Dollar Tree Stores.

*AFFIRMED.*

227 Fed.Appx. 239

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1994 WL 30432 (S.D.N.Y.)
**(Cite as: 1994 WL 30432 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
GFC FINANCIAL CORPORATION and Greyhound Financial Corporation, Plaintiffs,
v.
GFC CAPITAL RESOURCES GROUP, INC., GFC Realty Services, Inc., and GFC Mortgage Services, Inc, Defendants.
**No. 93 CIV. 8001 (PKL).**

Feb. 2, 1994.

Skadden, Arps, Slate, Meagher & Flom, New York City (Kenneth A. Plevan, Miriam L. Siroky, Steffi R. Kipperman, Bettina Elias, of counsel), for plaintiffs.

Paul Weiss, Rifkind, Wharton & Garrison, New York City (Lewis R. Clayton, Glenn C. Colton, Stephen M. Sinaiko, of counsel), for defendants.

*OPINION AND ORDER*

LEISURE, District Judge

**\*1** Plaintiffs seek a preliminary injunction barring defendants from use of plaintiffs' "GFC" service mark. For the reasons stated below, plaintiffs' application for a preliminary injunction is hereby denied.

BACKGROUND

Plaintiff GFC Financial Corporation ("GFC Financial") is a publicly traded corporation headquartered in Phoenix, Arizona. Its wholly owned subsidiary, plaintiff Greyhound Financial Corporation ("Greyhound Financial"), is a middle-market commercial finance company. Greyhound offers a variety of types of financing including real estate financing. A significant portion of its real estate financing customers are located in New York City. *See* Affirmation of Jack Fields III, dated November 16, 1993, at ¶ 11.

Defendants are engaged in a variety of business activities related to the real estate industry. These activities include acting as a commercial real estate mortgage broker. Defendants' business has grown significantly in their ten years of operation which resulted in their moving from Boro Park, Brooklyn to Wall Street. Until early 1993, defendants operated under the name Gelt Funding Corporation. Defendants contend that they changed their names because the old name had ethnic connotations they felt were inappropriate for their new address. They nonetheless adopted the initials of their old name as their new name to preserve some continuity.

Some of the plaintiffs' employees apparently became aware of defendants' use of the GFC mark in February 1993. *See* Affidavit of Gerald Kray, sworn to on January 10, 1994 at ¶ 5. The plaintiffs did not contact the defendants regarding the alleged trademark infringement, however, until June 29, 1993. After further unsuccessful efforts to resolve the dispute, plaintiffs initiated suit on November 19, 1993, and brought the instant application for preliminary relief shortly thereafter.

DISCUSSION

A preliminary injunction is an extraordinary remedy that is not granted as a routine matter. *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990). Ordinarily, the movant must establish (a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant. *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982).

The initial inquiry is whether plaintiffs' unregistered [FN1] service mark "GFC" is protectable. *Eli Lilly and Co. v. Revlon, Inc.,* 577 F.Supp. 477, 483 (S.D.N.Y.1983). This requires the Court to determine whether the mark should be classified as generic, descriptive, suggestive, or arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Defendants contend that the mark GFC is descriptive and must therefore be shown to have secondary meaning to be protectable. *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 216 (2d Cir.1985). An abbreviation of a descriptive term may itself properly be classified as descriptive if it conveys to purchasers the descriptive connotation of the original term. 1 J. Thomas McCarthy, Trademarks and Unfair Competition, § 11.13 (1992); *see Nature's Bounty, Inc. v. Basic Organics,* 432 F.Supp. 546, 552 (E.D.N.Y.1977) (B-100 found descriptive of vitamins with 100

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 30432 (S.D.N.Y.)
**(Cite as: 1994 WL 30432 (S.D.N.Y.))**

milligrams of vitamin B). However, the term Greyhound, from which the first letter of the mark is derived, is arbitrary and the mark as a whole does not convey to purchasers the descriptive terms from which it is derived. Accordingly, the mark is arbitrary and therefore protectable.

The second question for the Court is whether the defendants' use of the GFC mark is likely to cause confusion among purchasers. *Thompson,* 753 F.2d at 217-18. The Court of Appeals for the Second Circuit has identified eight factors which, though not exhaustive, should be considered in determining whether the senior user of a mark should be protected from a junior user: (1) the strength of the senior user's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) the junior user's good faith in adopting its own mark; (7) the quality of junior user's product; (8) the sophistication of the purchasers. *See Polaroid Corporation v. Polorad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961).

The plaintiff has made a strong showing with regard to two important factors. First, while the use of even similar acronyms can cause confusion, *EA Engineering, Science and Technology, Inc. v. Environmental Audit, Inc.,* 703 F.Supp. 853, 856 (C.D.Cal.1989), the marks in the instant case are essentially identical. The defendants note that the mark GFC is but a part of their respective corporate names. However, the addition of descriptive terms to a distinctive mark generally does not significantly diminish the possibility of confusion. *See Wella Corp v. California Concept Corp.,* 558 F.2d 1019, 1022-23 (CCPA 1977).

**\*2** The plaintiffs have also established that the services in question are similar. Both parties are engaged in commercial real estate financing for customers in the New York City area. The fact that defendants are mortgage brokers while plaintiffs are direct lenders will mitigate the confusion to some degree since this will help potential customers to distinguish between them. However, not all potential customers will make this distinction and, despite the distinct roles that the parties play in financing, the fact remains that a potential customer seeking a loan can obtain one by contacting either party. In addition, it appears that defendant GFC Capital Resources Group is in the process of establishing a direct lending program. *See* Affidavit of Abraham Eisner, sworn to on January 10, 1994, at Exhibit H.

Two factors favor the defendants. First, the purchasers in the instant case--businessmen seeking real estate loans--are clearly sophisticated and the care with which a customer will choose the lender of a substantial sum of money will tend to decrease the likelihood of confusion. *See Beneficial Corp. v. Beneficial Capital Corp.* 529 F.Supp. 445, 451 (S.D.N.Y.1982). Second, with regard to good faith, the defendants' very plausible explanation of their reason for changing their corporate names suggests that the defendants were not seeking to take a "free ride" on plaintiffs' service mark.

The remaining factors do not clearly favor either party. The most important of these factors is the strength of plaintiffs' mark. As discussed above, GFC is properly classified as arbitrary and is consequently an inherently strong mark. However, defendants note that GFC is a commonly used mark and consequently that its distinctiveness is undermined. *See 20th Century Wear, Inc. v. Sanmark-Stardust, Inc.,* 747 F.2d 81, 88 (2d Cir.1984), *cert. denied,* 470 U.S. 1052 (1985). In fact, plaintiffs' application for the registration of the GFC mark was rejected because of the prior registration of this mark by a company named General Finance Corporation. *See supra* at footnote 1. In addition, defendants argue that plaintiffs are not primarily known by the mark GFC but instead by the mark Greyhound. Defendants, for example, note that plaintiffs are listed by the name Greyhound at conferences and consistently use both the mark GFC and Greyhound in their advertisements.

With regard to actual confusion, the defendants have provided some instances of confusion by third parties. Not all of these instances, however, involved potential customers and consequently they must be given somewhat less weight. *See W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 574 (2d Cir.1993).

Finally, there is no evidence that defendants' products are of a particularly poor quality that would tend to cause significant damage to plaintiffs' reputation by association.

On balance, the Court believes plaintiffs have established a likelihood of success on the merits, but not a particularly strong likelihood. Accordingly, it is important to consider carefully the issue of irreparable injury. Irreparable injury may be assumed in an action for trademark infringement once the plaintiff has shown a likelihood of success on the merits. *See Home Box Office, Inc. v. Showtime/The*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 30432 (S.D.N.Y.)
**(Cite as: 1994 WL 30432 (S.D.N.Y.))**

*Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987). However, it is also appropriate for the court to consider the irreparable injury to defendants should an injunction issue, and to balance it against the injury plaintiffs would suffer should it not. *Dellwood Foods, Inc. v. Kraftco Corp,* 420 F.Supp. 424, 427 (S.D.N.Y.1976); Wright & Miller, *Federal Practice and Procedure:* Civil § 2948 at 430-31 (1973). See also *New York Pathological & X-Ray Laboratories, Inc. v. Immigration and Naturalization Service,* 523 F.2d 79, 81 (2d Cir.1975) (the "balance of hardship between the parties" is a consideration); *Sanders v. Air Line Pilots Assoc., Int'l,* 473 F.2d 244, 248 (2d Cir.1972) (moving party must make "convincing demonstration that the balance of hardships tips decidedly towards [its] favor.") [FN2]

**\*3** It is clear that granting an injunction would cause irreparable injury to defendants far greater than plaintiffs would suffer in the absence of such an injunction. Defendants would be forced to give up their only service mark and would lose the considerable investment they have made in it over the past year. By contrast, the damage to plaintiffs' business, while difficult to calculate, will nonetheless be constrained by various factors. Customer confusion will be limited primarily to the New York area, only a portion of plaintiffs' market, and will be lessened by plaintiffs' continuing use of the Greyhound service mark. [FN3] Thus, the balance of hardships tips decidedly in favor of the defendants. Accordingly, in light of both this consideration and plaintiffs' failure to make a strong showing of a likelihood of success, the Court must deny plaintiffs' application for a preliminary injunction. [FN4]

### CONCLUSION

For the reasons stated above, plaintiffs' application for a preliminary injunction is hereby denied.

SO ORDERED.

FN1. The plaintiffs sought to register the mark GFC in March of 1992. However, the Patent and Trademark Office rejected this application because a company named the General Finance Corporation had previously registered the GFC mark. Affidavit of Glenn C. Colton, sworn to January 10, 1994, at Exhibit B. Plaintiffs have introduced evidence, however, that the General Finance Corporation is no longer in business and its parent company does not use the mark. *See* Reply Affidavit of Scott Dawson Brown, dated January 17, 1994, at ¶ 10.

FN2. In recent years the Second Circuit has often stated that a party seeking an injunction must establish (a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant. *See, e.g., Citibank, N.A. v. Nyland (CF8) Ltd.,* 839 F.2d 93, 97 (2d Cir.1988); *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314-15 (2d cir. 1982); *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982). This standard may appear to preclude a consideration of the balance of hardships when the moving party establishes irreparable harm and a likelihood of success. However, this Court believes the better view is that this language establishes only the minimum requirement for preliminary relief: i.e., it defines what a party "must establish" rather than when a preliminary injunction must issue. Thus, even when the plaintiff meets the minimum standard by establishing a likelihood of success and irreparable harm, the Court may nonetheless consider whether the balance of hardships may favor the defendant. The plaintiff, after all, may obtain an injunction merely be showing that there are fair grounds for litigation and a balance of hardships tipping in his favor. It would be illogical to deny the defendant the same opportunity of showing that the hardships tip in his favor and that, though the plaintiff may have established a likelihood of success, there are nonetheless fair grounds for litigation.

FN3. The Court notes that in oral argument before this Court both parties expressed their desire to move this case forward swiftly and stated that discovery would be completed in approximately three months. The Court's assessment of the extent of irreparable harm to plaintiffs is premised in part on these representations leading to the conclusion that the case will be quickly resolved. If the parties are unable to fulfill their representations, the Court may be forced to revisit the question of preliminary relief.

FN4. In light of this Court's decision, the defendants' argument that preliminary relief

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1994 WL 30432 (S.D.N.Y.)  
**(Cite as: 1994 WL 30432 (S.D.N.Y.))**

Page 4

is barred by laches is moot.

Not Reported in F.Supp., 1994 WL 30432 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 241904 (S.D.N.Y.), 48 U.S.P.Q.2d 1944
**(Cite as: 1998 WL 241904 (S.D.N.Y.))**

Page 1

United States District Court, S.D. New York.
MAJOR LEAGUE BASEBALL PROPERTIES, INC., Plaintiff,
v.
PACIFIC TRADING CARDS, INC., Defendant.
**No. 98 CIV. 2739(JSM).**

May 14, 1998.

Charles E. Jarrett, Baker & Hostetler, Cleveland, OH, William Lee Kennally, Jr., Gibney, Anthony & Flaherty, New York, for plaintiff.

Michael E. Kipling, Stokes Lawrence, P.S., Seattle, WA, Paul R. Grand, New York, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York, for defendant.

OPINION AND ORDER

MARTIN, District J.

**\*1** For longer than most of us can remember, children have been collecting, pitching and trading baseball cards, with little thought to the identity of the licensor of the images that appear on the cards. [FN1] Yet, the licensing of baseball cards has become a major source of revenue to those involved in organized baseball. In this case, the Court is asked to decide who has the legal right to license the picture of a major league baseball player in his team uniform.

>  FN1. Indeed, for the first several decades in which cards were produced, they were distributed without a license from anyone.

Major League Baseball Properties, Inc. ("Properties"), an entity created by the owners of the major league baseball clubs, seeks to enjoin Pacific Trading Cards, Inc. ("Pacific") from distributing baseball cards depicting major league players in their team uniforms. While the Major League Players Association ("Players") has licensed Pacific to produce these cards, Properties has not. The matter is complicated by the fact that in the past Pacific has distributed baseball cards under license from both Players and Properties and in those agreements Pacific has acknowledged the validity of Properties' marks and has represented that it would not make any use of those names or logos other than as provided in those agreements.

In the present case, after obtaining a license from Players to produce a line of trading cards, Pacific was unsuccessful in obtaining a license from Properties. It nonetheless decided to produce the line of baseball cards and is now scheduled to distribute them to dealers. Properties has asked this Court to enjoin any distribution of the unlicenced cards.

A preliminary injunction should be granted where the moving party demonstrates (1) irreparable harm and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in the moving party's favor. *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992). "When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic." *Church of Scientology Int'l v. Elmira Mission,* 794 F.2d 38, 42 (2d Cir.1986).

In large measure plaintiff's argument that it is entitled to a preliminary injunction rests on its oft repeated over-confident assertion that defendant's use of the various team uniforms and logos violates Properties' trademark rights. If plaintiff was correct in this assertion, an injunction would issue. However, a careful analysis of the facts persuades the Court that plaintiff is not likely to prevail on the merits of either its trademark or contract claim and the balance of hardships does not tip in plaintiff's favor.

At the outset it is important to note that the Lanham Act precludes the use of another person's trademark if such use "is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person ...." 15 U.S.C. § 1125(a)(1)(A). As the Second Circuit has observed:

> **\*2** A trademark is a very unique type of property. "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). Therefore, a trademark is "not property in the ordinary sense," but only a word or

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1998 WL 241904 (S.D.N.Y.), 48 U.S.P.Q.2d 1944
**(Cite as: 1998 WL 241904 (S.D.N.Y.))**

symbol indicating the origin or source of a product. Industrial Rayon Corp. v. Duchess Underwear Corp., 92 F.2d 33, 35 (2d Cir.1937), cert. denied, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938). The owner of the mark acquires the right to prevent his goods from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks. "There are no rights in a trade-mark beyond these ." Id. Pirone v. McMillan, Inc., 894 F.2d 579, 581 (2d Cir.1990).

In most cases involving claims of trademark infringement the courts analyze the issue using the eight factors [FN2] set forth in Judge Friendly's opinion in Polaroid Corp. v. Polorad Elecs. Corp. 287 F.2d 492, 495 (2d Cir.1961). However, as the Second Circuit has repeatedly noted,

> FN2. The Polaroid factors are: "[1] the strength of [the owner's] mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap [between the two products], [5] actual confusion, and [6] the reciprocal of defendant's good faith in adopting its own mark, [7] the quality of defendant's product, and [8] the sophistication of the buyers." Polaroid Corp. v. Polarad Elecs., Corp., 287 F.2d 492 (2d Cir.1961). It is clear that the first four factors favor plaintiff since it has strong marks, those marks are being used by defendant in an area where plaintiff is already licensing others. The sixth factor, defendant's good faith, is in balance here since it is clear that defendant was aware of plaintiff's marks but asserts that the use it makes of the marks does not violate those rights. Here, it is the issue of confusion that controls the outcome and that issue and the related issue of the sophistication of the consumer will be discussed hereinafter.

[t]he eight-factor list is not exclusive. Bristol-Myers Squibb, 973 F.2d at 1043. Furthermore, the evaluation of the Polaroid factors is not a mechanical process "where the party with the greatest number of factors weighing in its favor wins." *Physicians Formula,* 857 F.2d at 85. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused. See Lang v. Retirement Living Publishing Co., 949 F.2d 576, 580 (2d Cir.1991)

Paddington Corp. v. Attiki Importers & Distribs., Inc., 996 F.2d 577, 584 (2d Cir.1993).

In this case the crucial *Polaroid* factor is whether an appreciable number of ordinary purchasers of Pacific's cards are likely to be confused as to the source of the goods in question. See Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir.1978).

Plaintiff asserts that defendant is marketing its cards "to unsophisticated consumers-children and non-collectors." See Plaintiff's Supplemental and Reply Memorandum p. 29. Thus, the issue the Court must address is whether the children, their parents, or other unsophisticated non-collectors who purchase Pacific's cards are likely to be confused as to whether the cards are officially sanctioned by Properties. In reality it is hard to believe that the purchasers of the cards give any thought to this significant legal issue. The consumer is, no doubt, interested in obtaining cards depicting his or her favorite players and probably cares little or nothing about whether the owner of the team has sanctioned the distribution of the card. While it is no-doubt true that the consumer would be less likely to buy a card showing Cal Ripken, Jr. in his street clothes rather than in his Orioles uniform, the reason a child may have to trade two cards of a player of lesser quality for one Cal Ripken, Jr. card is found in the differences in the players' records and has nothing to do with differences in the quality of the teams uniforms or the distinctiveness of their logos.

*3 Plaintiff has attempted to provide evidence of confusion by producing the results of a survey in which a primarily adult test group was shown Pacific's product and asked whether they thought that the company who made the cards had to get authorization to put them out and, if so, from whom? The answers to these questions are of little relevance. The fact that when asked about permission to make the cards, this random group thought that permission was necessary does not prove that a typical purchaser of these cards would, without prompting, give any thought to the issue and would spontaneously come to the conclusion that the cards were produced by Properties. Indeed those of my generation, if shown a baseball card and asked who produced it, would most likely respond: "some bubble-gum company."

As noted above, plaintiff itself asserts that defendant is marketing its cards to unsophisticated children and non-collectors. This is hardly a group that is likely to be pondering questions of licensing. It is doubtful

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 241904 (S.D.N.Y.), 48 U.S.P.Q.2d 1944
**(Cite as: 1998 WL 241904 (S.D.N.Y.))**

Page 3

that these consumers even think about whether a baseball card is sponsored by the team and, therefore, there is no reason to believe that they are confused on that issue.

Properties also has presented some evidence indicating that some of the promotional material sent to dealers by Pacific contained an implication that its cards were licensed by Properties and at least one newspaper account containing that assertion. There is, however, no reason to believe that these materials will ever come to the attention of the ultimate consumers of these cards. To the extent they might have caused some confusion among the sophisticated middlemen to whom they were directed, defendants subsequent communications, including a disclaimer that appears prominently on the box in which the cards are packaged, appears more than sufficient to dissipate any confusion that the earlier communications may have created.

There is nothing in Pacific's cards that evidence an intent to pass off its product as one endorsed by Properties. While the logos and trade dress are clearly depicted on some cards, there are others where only a knowledgeable baseball fan would be able to identify the team whose uniform the player is wearing. Whether the logo appears or not depends solely on the accident of where in the action the players image is captured. To the extent that Properties' logo or trade dress is depicted on the uniforms of the players, it is only incidental to the depiction of the player. "Because it does not implicate the source-identification function that is the purpose of the trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder." *New Kids on the Block v. New Am. Publ'g, Inc.,* 971 F.2d 303, 308 (9th Cir.1992).

Plaintiff also asserts a claim of trademark dilution against Pacific. The underlying rationale of the dilution theory is that the diminution of value of a trademark because of the use by another "constitutes an invasion of the senior user's property right in its mark [giving] rise to an independent commercial tort." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, note 5, § 24:70 (4th ed.1996); *see also Miss Universe, Inc. v. Patricelli,* 753 F.2d 235, 237 (2d Cir.1985); *Exxon Corp. v. Exxene Corp.,* 696 F.2d 544, 550 (7th Cir.1982).

**\*4** Here there is no evidence that Pacific's cards will dilute the value of plaintiff's marks. There is no contention that the pictures used portray the uniforms or marks of the baseball clubs in an inappropriate manner or that they are of poor quality. The only way in which it might be said that Pacific's cards diminish the value of Properties' marks is that it denies Properties a monopoly in the baseball card market. But competition that is not unfair is to be encouraged, not enjoined.

Finally, we must address Properties' claim that Pacific's distribution of the cards in question breaches its prior licensing agreements with Properties in which it acknowledged the validity of Properties' marks and represented that it would not "use the logos in any manner other than as licensed hereunder."

Plaintiff argues that this language should not be construed in a vacuum but must be construed against the peculiar background of Pacific's obtaining its original license from Properties. Pacific originally distributed baseball cards similar to those at issue without a license. When this practice was challenged by Properties, Pacific agreed to pay a license fee and signed a contract containing the above language. Plaintiff admits, however, that the identical language is contained in numerous other licensing agreements it has with other companies who have never engaged in the unauthorized distribution of its products. Since this language is common to all these contracts, there is no reason to construe it against Pacific in a manner different from that which would apply in any other case.

In the context of a standard licensing agreement, the meaning of the above-quoted language is far from clear. Moreover, the fact that this is standard language in numerous contracts that Properties has with other licensees militates against construing this language as prohibiting the licensee from using a logo in an otherwise perfectly legal manner after the contract had expired. Such a construction could well constitute an unlawful restraint of trade under both the Sherman Act and under New York state law. *American Institute of Chemical Engineers v. Reber-Friel Co.,* 682 F.2d 382, 386 (2d Cir.1982)(New York courts carefully scrutinize covenants not to compete before enforcing them); *Bradford v. The New York Times Co.,* 501 F.2d 51 (2d Cir.1974)(applying Sherman Act to a covenant not to compete); *Bakers Aid v. Hussmann Food Service Co.,* 730 F.Supp. 1209 (E.D.N.Y.1990); *see also Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 55-56 (2d Cir.1997).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 241904 (S.D.N.Y.), 48 U.S.P.Q.2d 1944
**(Cite as: 1998 WL 241904 (S.D.N.Y.))**

Page 4

Thus, there is clearly fair ground for litigation on the issue of whether this standard language in Properties licensing agreements was meant to preclude the type of incidental use of the logos found here. In these circumstance a balancing of the hardships tips decidedly against granting an injunction. First, if plaintiff prevails it will be much easier to calculate their damages than it would be to calculate Pacific's damages if it was wrongfully enjoined from distributing its cards. Moreover, innocent third parties who have agreed to distribute the cards would be deprived of their right to resell Pacific's cards. [Joneil Fifth Avenue Ltd. v. Ebeling & Reuss Co., 458 F.Supp. 1197, 1201 (S.D.N.Y.1978)](in balancing hardships, court weighs harm to third parties). In these circumstance, equitable considerations weigh heavily against granting the injunction plaintiff seeks.

**\*5** With respect to its breach of contract claim, Properties also contends that Pacific should be enjoined from distributing cards which use pictures taken during the period when Pacific was acting as Properties' licensee. In this regard, it argues that it gave Pacific special access to the facilities of the various clubs and to the players which made those pictures possible. Properties has failed, however, to demonstrate that without the special access Properties would not have been able to obtain similar pictures. Given the many potential sources of action pictures of baseball players and the even more readily available "official team-uniforms" there is no reason to believe that Pacific could not have easily obtained similar pictures without the special access Properties provided. It is, therefore, not unfair to permit Pacific to use the pictures it has in its inventory.

For the foregoing reason, plaintiff' application for a preliminary injunction is denied.

SO ORDERED.

Not Reported in F.Supp., 1998 WL 241904 (S.D.N.Y.), 48 U.S.P.Q.2d 1944

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



100 Fed.Appx. 152                                                   Page 1
100 Fed.Appx. 152, 71 U.S.P.Q.2d 1542
**(Cite as: 100 Fed.Appx. 152)**

C

This case was not selected for publication in the Federal Reporter.

UNPUBLISHED

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)

United States Court of Appeals,
Fourth Circuit.
SCHOLASTIC, INCORPORATED, Plaintiff-Appellant,
v.
ESCOLASTICA.COM; Escolastica.Net, Defendants-Appellees.
**No. 03-2310.**

Argued May 5, 2004.
Decided June 7, 2004.

**Background:** Seller of educational materials that offered internet-based computer service for schools on its website "Scholastic.com" brought in rem action against internet domain names "Escolastica.com" and "Escolastica.net," alleging violation of its registered trademark "Scholastic" and asserting claims for trademark infringement, false designation of origin, trademark dilution, and cyberpiracy. The United States District Court for the Eastern District of Virginia, Claude M. Hilton, Chief Judge, granted summary judgment in favor of domain names. Seller appealed.

**Holding:** The Court of Appeals held that seller failed to establish likelihood of confusion required to support its claims.

Affirmed.

West Headnotes

**Trademarks ⚘1116**
382Tk1116 Most Cited Cases
    (Formerly 382k350.1)

**Trademarks ⚘1470**
382Tk1470 Most Cited Cases
    (Formerly 382k350.1)

**Trademarks ⚘1500**
382Tk1500 Most Cited Cases
    (Formerly 382k350.1)
Ordinary consumers were not likely to stumble upon websites of Mexican owner of internet domain names "Escolastica.com" and "Escolastica.net" while searching for "Scholastic.com" or, if they did, to believe that they had accessed website of seller of educational materials that owned registered trademark "Scholastic," given differences between word "escolastica" and "scholastic" and substantial differences between websites, including that Mexican owner's websites were in Spanish and were inaccessible without password except for a few informational pages, while majority of seller's website was in English and most of site was accessible without password, and therefore seller failed to establish likelihood of confusion required, in the absence of proof of actual confusion, to support its claims of trademark infringement, false designation of origin, trademark dilution, and cyberpiracy. Lanham Trade-Mark Act, §§ 32, 43(a, c, d), 15 U.S.C.A. §§ 1114, 1125(a, c, d).

**Trademarks ⚘1800**
382Tk1800 Most Cited Cases
    (Formerly 382k736)
Scholastic.

 **\*153** Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Chief District Judge. (CA-03-199-A).

 **ARGUED:** Ronald Marc Daignault, Jones Day, New York, New York, for Appellant. Samuel Rosenthal, Curtis, Mallet-Prevost, Colt & Mosle, Washington, D.C., for Appellees. **ON BRIEF:** Jennifer A. Hamilton, Jones Day, New York, New York; Gregory M. Poehler, Pennie & Edmonds, L.L.P., New York, New York, for Appellant.

 Before WILKINSON and WILLIAMS, Circuit Judges, and BOBBY R. BALDOCK, Senior Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

 Affirmed by unpublished PER CURIAM opinion.

 Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

100 Fed.Appx. 152                                                                                                                   Page 2
100 Fed.Appx. 152, 71 U.S.P.Q.2d 1542
**(Cite as: 100 Fed.Appx. 152)**

**OPINION**

PER CURIAM.

In this trademark infringement case we must decide whether the domain names "Escolastica.com" and "Escolastica.net" are likely to be confused with the famous trademark "Scholastic." We agree with the district court that they are not.

I.

Corporacion Mexico Escolastica, S.A. de C.V. (Escolastica) is a Mexican corporation that owns the rights to the internet domain names "Escolastica.com" and "Escolastica.net." (Domain Names). Escolastica sells an internet-based computer application to private schools in Mexico. Essentially, Escolastica creates private, password-restricted web pages for schools, allowing teachers and students to communicate when they are not on school grounds. For example, teachers can post homework assignments or test results on their school's website, and students or parents can access that information from their home computer using a password. Scholastic, Inc., a leading seller of educational materials in the United States and worldwide, offers, in addition to its other product lines, a service similar to Escolastica's on its web site "Scholastic.com."

Scholastic filed suit against the Domain Names in an *in rem* proceeding, alleging that the Domain Names violate Scholastic's registered trademark, "Scholastic," in violation of 15 U.S.C.A. § § 1114 (West 1997) (trademark infringement), 1125(a) (false designation of origin), 1125(c) (trademark dilution), and 1125(d) (cyberpiracy) (West 1998 & Supp. 2004). (J.A. at 12, 25-26.) The parties moved for summary judgment. Because the case was an *in rem* proceeding, it was scheduled for a bench trial. During argument on the motions for summary judgment, the parties agreed that there was no dispute as to the underlying facts, only as to the inferences to be drawn from those facts, and agreed that case was ripe for final disposition by the district court. The district court granted summary judgment in favor of Escolastica, concluding that consumers were unlikely to be confused by the Domain Names. Scholastic now appeals.

II.
A.
We review the grant of summary judgment de novo. Canal Ins. Co. v. Distrib. Servs., Inc., 320 F.3d 488, 491 (4th Cir.2003). Summary judgment is appropriate when "the pleadings, depositions, answers ***154** to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Canal Ins. Co.,* 320 F.3d at 491-92. Here, a factual determination as to the likelihood of confusion underlay the district court's grant of summary judgment to Escolastica. The district court was within its summary judgment authority to make this determination because "the parties, having prepared for a bench trial, agreed to submit the voluminous record to the court for dispositive decision at the time of the summary judgment motions," and because "the parties did not contradict one another's proffered facts, but only disputed the inferences that a fact finder would draw from those underlying facts." *Int'l Bancorp, LLC v. Societe des Bains de Mer,* 329 F.3d 359, 362- 63 (4th Cir.2003), *cert. denied,* 540 U.S. 1106, 124 S.Ct. 1052, 157 L.Ed.2d 891 (2004). Accordingly, we review the district court's "legal determinations de novo" and "its findings of fact for clear error." *Id.*

B.
A plaintiff alleging causes of action for trademark infringement and unfair competition must prove (1) that it possesses a mark; (2) that the defendant used the mark; (3) that the defendant's use of the mark occurred "in commerce"; (4) that the defendant used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the defendant used the mark in a manner likely to confuse consumers.
People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir.2001) (hereinafter *PETA*). In the instant case, the district court concluded that Scholastic failed to produce any evidence to satisfy the final element.

"The unauthorized use of a trademark infringes the trademark holder's rights [only] if it is likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods." *PETA,* 23 F.3d at 366. To determine whether a particular use of a trademark is likely to confuse an ordinary consumer, we consider the following factors:
 a) the strength or distinctiveness of the mark;
 b) the similarity of the two marks;
 c) the similarity of the goods/services the marks identify;
 d) the similarity of the facilities the two parties use in their businesses;
 e) the similarity of the advertising used by the two

parties;
  f) the defendant's intent;
  g) actual confusion.

*Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984). We apply these factors with the caution that "[n]ot all ... are always relevant or equally emphasized in each case." *Id.* (quoting *Modular Cinemas of Am., Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 582 (S.D.N.Y.1972)). For example, "[w]here there is no evidence of actual confusion and a [fact-finder] reasonably concludes that there is no likelihood of confusion because of the differences between the marks, consideration of the remaining *Pizzeria Uno* factors is unnecessary." *Anheuser-Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316 (4th Cir.1992).

 In this case, Scholastic has submitted no proof of actual confusion, and the district court concluded that the differences between the word "escolastica" and the word "scholastic" made confusion unlikely. The district court also noted the substantial differences between the websites operated by the two companies. Most notably, except for a few informational pages, Escolastica's websites are inaccessible without **\*155** a password and all of the text on the sites is in Spanish. In contrast, the majority of the text on Scholastic's website is in English, and most of the site is accessible without a password. Given the lack of evidence of actual confusion and the patent differences among the Domain Names, the content of the websites, and Scholastic's trademark, the district court's conclusion that an ordinary consumer was unlikely to be confused was not clearly erroneous. We agree with the district court that no ordinary consumer is likely to stumble upon Escolastica's websites while searching for Scholastic.com or, even if they happen to do so, to believe that they have accessed a website affiliated with Scholastic.

III.

 For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Escolastica.

 *AFFIRMED.*

 100 Fed.Appx. 152, 71 U.S.P.Q.2d 1542

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.