IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:07-cv-00347-D

LULU ENTERPRISES, INC.,

Plaintiff,

vs.                                             **SECOND DECLARATION OF**
                                                **JASON KILAR**
HULU, LLC,

*et al.*,

Defendants.

_____

1. My name is Jason Kilar. I am the Chief Executive Officer of Hulu, LLC, the defendant in this action. I am over the age of twenty-one, I am competent to make this Declaration, and the facts set forth in this Declaration are based on my personal knowledge.

2. In the Memorandum of Law in Support of Plaintiff Lulu Enterprises, Inc.'s Motion for Preliminary Injunction ("Plaintiff's Brief"), Plaintiff makes a number of factual statements and assertions that upon my review appear either inaccurate or at best unclear. Without attempting to identify or respond to each, this second declaration references specifically those related to our adoption of the HULU mark. In particular, page 4 of Plaintiff's Brief states that "N-F's adoption of the HULU and HULU.COM marks was the culmination of a five month process," which is true, but it then goes on to say that "During that process, N-F admittedly became aware of the name and mark 'LULU,' and of Lulu Enterprises." That latter statement is ambiguous as to what we knew and when

we knew it, and this declaration attempts to make that record clear. Moreover, the assertion that we "adopted the HULU mark with the intent to confuse consumers and thereby take advantage of Lulu's reputation and goodwill" (Plaintiff's Brief, at 20), is simply wrong.

3. The process leading up to the announcement of HULU as our name and trademark involved at least three steps: (1) generating potential names; (2) selecting the name Hulu as the name we wanted to adopt, and (3) then proceeding to implement that adoption.

4. During the process of generating potential names, I was not aware of Lulu Enterprises or its use of lulu.com or lulu.tv.

5. When I decided that we wanted to proceed with the name Hulu in late July, I was not aware of Lulu Enterprises or its use of lulu.com or lulu.tv.

6. After I had identified Hulu as the preferred name for the company, we collectively engaged in a variety of activities, including, inter alia, (a) obtaining commercial search reports; and (b) working to secure rights to not only hulu.com, but also dozens of URLs in different countries and other top-level domain names.

7. To reiterate, we did not know about Lulu Enterprises when we generated the name "hulu." The name was generated for wholly independent reasons. When I selected HULU as the mark we wanted to adopt from the array of potential names, I did not know about Lulu Enterprises. The name was selected for wholly independent reasons. When we proceeded with the steps to secure the hulu.com domain name, our research indicated widespread third-party use of marks with "ulu," including "lulu," "xulu," and even "hulu" marks. Based on the myriad of third-party uses, it seemed inconceivable that any

likelihood of confusion with the "lulu" or other marks would be generated by our use of HULU.

8. In summary, the following chart sets forth the periods of time during the name selection process and whether I was aware of Lulu Enterprises:

| **Stage of Naming Process** | **Status of Knowledge or Awareness** |
|---|---|
| Generating Potential Trademarks | No knowledge of Lulu Enterprises (or lulu.com or lulu.tv) |
| Selection of HULU as the Preferred Company Name, Trademark, and Domain Name | No knowledge of Lulu Enterprises (or lulu.com or lulu.tv) |
| Process of Securing HULU Domain Name and Adoption | Knowledge of extensive third-party use of LULU and ULU marks by many other businesses, and a belief that our use of HULU was not likely to be confused with any of those uses |

9. We have no reason to attempt to trade off the goodwill of Lulu Enterprises. It would not benefit our business, which is focused on premium content – TV shows and feature films – to be associated with Lulu Enterprises or its use of lulu.com or lulu.tv.

10. Plaintiff's Brief asserts that my lack of knowledge of Lulu's business is "hardly credible given that prior to joining [Hulu, I] was a senior vice president at Amazon.com . . . ." There is no basis for that assertion, and it is untrue. At no point while I was at Amazon.com did I discuss or read about Lulu Enterprises. I do not recall ever

participating in any Amazon meeting, presentation or other forum where I heard Lulu Enterprises mentioned or discussed. If anybody at Amazon "engaged in partnership and investment opportunities with Lulu" (Plaintiff's Brief at 20), that did not include me and it was without my knowledge.

11. Plaintiff's Brief repeatedly references the fact that we purportedly have "professed [an] intent to have 'ubiquitous distribution' of the HULU mark and related services 'from day one' . . . . " (*See id.* at 2, 7). As I explained a number of times in my deposition, it is the case that our five distribution partners (AOL, Comcast, Yahoo!, MSN, and MySpace) are sufficiently successful that a significant percentage of internet users – in the order of 98% -- visit one of those sites. However, that figure is based on visits anywhere to those five sites (including the home page, news, sports, weather, etc.). The Hulu player will appear on only a limited number of these distribution partners' web pages.

12. Plaintiff's Brief also suggests that the phrase "interactive recording" as used in paragraph 50 of my October 9 Declaration must refer to a user recording material and uploading it to hulu.com or another site. That is not true: I understood and used that term because a visitor to hulu.com will be able to interact with our site by obtaining on demand the premium content that Hulu will be offering when they choose and how they choose. They are able to "interact" with our recordings.

13. Plaintiff's Brief mistakenly states on page 11 that as of August 20, 2007, before the announcement of Hulu as our name, a large number of customers had already signed up as potential beta subscribers. That statement is totally incorrect. The hulu.com website was not even live and available to the public until August 29, 2007, the same day when we announced our name. Except for the few Hulu employees who were testing the site

privately before August 29, no public internet user could have accessed hulu.com, much less enlisted as a potential beta user.

14. According to the online reporting tool, Campaign Monitor, which tracks the number of users who signed up as beta users to hulu.com on a daily basis from August 20, 2007, through September 18, 2007, prior to August 29, the date of our announcement, the total number of users was fifteen (15). All were Hulu employees merely testing the site. Within 24 hours after our announcement, the number of users had increased into the thousands. And as of September 18, the total number of users who had signed up as beta subscribers approached the number identified by Plaintiff in Exhibit I of Plaintiff's Appendix. The typed date "8/20" on Plaintiff's Exhibit I is simply incorrect: it reflects the first date we set up and began using the tool.

15. Plaintiff references a number of presentations that were produced by us in response to discovery. As I indicated in my original declaration, a number of those documents were generated before my arrival and represented obsolete or changed thinking. Most of those documents are dated March and April, which was well before my arrival. One of the documents is dated September 2007. (Exhibit F, Plaintiff's Appendix) I first saw that document the day before my deposition. Based on my review, it was plain to me that it was nothing more than a version of the presentation deck from March and April. The document has a number of places where it simply is unclear or even inconsistent with what we are actually are going to do. To the extent Plaintiff relies on this document to suggest Hulu intends to have users uploading videos to our website, it is incorrect. I was not asked any questions in my deposition about whether this document reflected our current approach, but had I been asked I would have clarified it as above.

16. Hulu's August 29 announcement included an announcement of the beta launch of Hulu.com. As described in the announcement, we invited consumers to provide an e-mail address to be part of the private beta. The use of a private beta is common in web site launches. In our case, the consumers that provided us their e-mail addresses and signed up represent important and valuable customers. Based on their express opt-in interest, they are likely to be customers who represent much of our goodwill. During the course of the beta, we will be taking e-mail addresses from the subscribers list and adding them to the beta. We also will be obtaining additional e-mail addresses, and those people will be added over time. All of that activity relating to people who already have signed up, and those we will be adding over the course of the beta, will be under the Hulu name and reflects our existing goodwill and recognition.

17. The specific timing for the transition from beta to a public launch is not yet set, but the entire point of a beta test such as what we are doing is to enable us to feel confident about the technological capacity as soon as possible, and to reach the general public in an expeditious manner. The beta component obviously is not meant to continue indefinitely, but instead to end as soon as efficiently possible. Delaying the beta launch would thus have a significant, immediate, and irreparable impact on our business and good will, and all of the relationships we have created thus far.

I declare under penalty of perjury that the foregoing is true and correct this 11 day of October, 2007.

_____
Jason Kilar

US2000 10370547.1