1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

CONFIDENTIAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Lulu Enterprises, Inc.,

          Plaintiff,

   vs.

N-F Newsite, LLC, and Hulu Tech, Inc.,

        Defendants.

Civil Action No.: 07-347

**DECLARATION OF KENT D. VAN
LIERE IN SUPPORT PLAINTIFF LULU
ENTERPRISES, INC.**

    I, Kent D. Van Liere, declare under penalty of perjury under the laws of the state of North Carolina that:

    1. Attached hereto as Exhibit A is a true and correct copy of my Expert Report in this case on matters pertaining to unfair competition, federal cyber-piracy, unfair and deceptive trade practices, and trademark infringement.

    2. I make this declaration from my personal knowledge, and am competent to testify in this matter with regard to my Report and the opinions and conclusions contained therein.

    Executed this 12th day of October 2007, at Denver, Colorado.



Kent D. Van Liere

Dockets.Justia.com

# Exhibit A

# EXPERT REPORT

## OF

## KENT D. VAN LIERE, PH.D.

**KENT D. VAN LIERE**
**VICE PRESIDENT**

**In Connection with**

*Lulu Enterprises, Inc v. N-F Newsite, LLC, and Hulu Tech, Inc.*

# NERA ECONOMIC CONSULTING

370 INTERLOCKEN BLVD., 4TH FLOOR
BROOMFIELD, CO 80021
TELEPHONE: 303 327 1467 FACSIMILE: 303 327 1499
INTERNET: HTTP://WWW NERA COM

**OCTOBER 12, 2007**

# EXPERT REPORT OF KENT D. VAN LIERE

In Connection with
*Lulu Enterprises, Inc v N-F Newsite, LLc, and Hulu Tech, Inc.*

## Table of Contents

I.     QUALIFICATIONS ........................................................................................................1

II.    INTRODUCTION AND PURPOSE...........................................................................2

III.   INFORMATION REVIEWED ....................................................................................3

IV.    SUMMARY OF MAJOR CONCLUSIONS ...............................................................3

V.     METHOLOGY ..............................................................................................................3

VI.    KEY FINDINGS ...........................................................................................................9

VII.   CONCLUSION ...........................................................................................................12

- 1 -

## I.    QUALIFICATIONS

My name is Kent D. Van Liere.  I am a Vice President at the Denver office of NERA Economic Consulting ("NERA") where I participate in the Intellectual Property, Antitrust, Product Liability, and Securities Practices.  My business address is 370 Interlocken Boulevard, 4th Floor, Broomfield, Colorado 80021.  NERA is a firm providing expert economic, financial and statistical analysis.

I have an M.A. and a Ph.D. in Sociology from Washington State University.  I specialized in social psychology and research methods and statistics, including survey research. From 1978 to 1985, I served as an Assistant then Associate Professor with tenure at the University of Tennessee where I taught classes in attitudes and opinions, survey research, research methods and statistics.  I also regularly published academic research in leading journals based on data collected using surveys.  From 1985 to 1995, I was a Principal and/or President of HBRS, Inc.  HBRS was a survey research company that conducted focus group research and surveys of consumers and businesses throughout the United States for a wide range of government, academic and business clients.  HBRS was sold to Hagler Bailly, Inc. (a management consulting firm) in 1995, and I served as a Director and Senior Vice President of Hagler Bailly, Inc. from 1995 to 2000.  During this period, I continued to direct the market analysis, market research, and survey research practice of Hagler Bailly, Inc.  From 2000 to 2002, I served as President and CEO of Primen, a joint venture of the Electric Power Research Institute (EPRI) and the Gas Research Institute (GRI).  This firm provided contract- and subscription-based information services including services based on ongoing surveys of consumers and businesses.  From 2003 to 2005, I was a Principal of Freeman Sullivan/Liability Management Systems where I provided litigation support research and consulting on the application of surveys, sampling and statistics in a variety of legal cases.  In the Spring of 2006, I joined NERA where I continue to provide strategic consulting and litigation-related research and consulting.

I have substantial experience conducting and using focus groups and surveys to measure consumer opinions regarding products and services including purchase processes, branding and

- 2 -

positioning, market segmentations, and communications strategies. During my more than 30 years of academic and commercial research I personally facilitated several hundred focus groups and I have designed hundreds of surveys. I have reviewed the application of sampling and survey research methods in litigation for a variety of matters including trademark infringement, misrepresentative/deceptive advertising, interpretation of contract terms, labor disputes and construction defects. I have provided deposition testimony and testimony at trial related to issues of sampling, focus groups, survey research, and statistical analysis.

I have lectured on survey research issues and on the use of surveys and statistics in litigation. I have published papers in peer-reviewed journals and monographs on a range of topics involving surveys. I am a member of the American Statistical Association and the American Association for Public Opinion Research. A copy of my current resume is attached as Appendix A to this report.

NERA is being compensated for my services in this matter at my usual rate of $500 per hour.

## II.    INTRODUCTION AND PURPOSE

Lulu Enterprises (Lulu) has filed a complaint against N-F Newsite, LLC and Hulu Tech, Inc. (Hulu) alleging unfair competition and trademark infringement under various Federal, state, and common law statutes.

I have been asked by counsel for Lulu to provide an initial evaluation of the likelihood of confusion between Lulu's trademarks and defendants' Hulu's trademarks. Specifically, I was asked to evaluate the likelihood of confusion between Lulu.com and Hulu.com and the names Lulu and Hulu. This report summarizes my methodology and conclusions with regard to this assignment.

- 3 -

## III.  INFORMATION REVIEWED

In the preparation of my report, I have reviewed the complaint and the associated exhibits. I have also examined the Lulu.com, Lulu.TV, and Hulu.com websites. Finally, I have relied upon the results of the focus groups described in this report.

## IV.  SUMMARY OF MAJOR CONCLUSIONS

As described in this report, I conducted a series of focus groups with current or potential users of websites offering digital content uploading, editing, and publishing services. Based on this work, my research indicates that a substantial number of these users are likely to believe that the Lulu and Hulu website names are owned by the same company, thus indicating a likelihood of confusion over the source or ownership of the trademarks. Focus group participants who believe the two sites are owned or hosted by the same company articulate a number of reasons for their belief including, the fact that the two names sound and look substantially the same and their understanding that companies often own and control a range of URLs with similar names.

My opinions and conclusions as expressed in this report are to a reasonable degree of professional certainty. My work on this is ongoing and my opinions will continue to be informed by any additional material that becomes available to me.

## V.  METHOLOGY

To address issues of consumer confusion with respect to the Lulu and Hulu trademarks, I conducted six focus groups. Focus groups are a widely used qualitative technique for exploring consumers' views, understandings, perceptions, and behavioral intentions.[1] They generally consist of recruiting five to ten participants to a common location for a semi-structured discussion about the relevant topics. The groups are led by a trained facilitator.

---

[1] Richard A. Krueger, <u>Focus Groups: A Practical Guide for Applied Research</u> (2nd ed. 1994), Sage Publications.

- 4 -

Because they involve an open-ended discussion among the group, they provide a more in-depth understanding of consumers' thought processes than that which is usually provided by typical survey evidence. Detailed evidence is important for this case as we are interested in understanding whether consumers in the target audience are likely to be confused, and what has led to that confusion.

Focus groups can be used independently or they can be used as a part of a larger research project that includes both qualitative and quantitative work (such as a survey). Given the time constraints for this project, it was not possible to conduct both a series of focus groups and then field a full quantitative survey. This report is therefore based on the qualitative focus groups alone.

Focus groups cannot be used to make a precise point estimate of the share or percent of the total population that have a particular opinion or, related to this case, are confused about the trademarks. But, focus group methods are sufficiently reliable to provide an indication of whether a substantial number of consumers in the target population may be confused, what reasons exist for the confusion and whether any confusion appears to be widespread across the types of consumers and geographies. Focus group research is more scientific than simple anecdotal evidence of confusion in that it relies on many accepted research practices (such as randomly recruiting participants from the relevant population and maintaining "double-blind" procedures in which the moderator and participants are "blind" to the purposes of the research). Although they do not measure the precise point estimate of confusion that is likely to exist in the total target population, focus groups can be used in testing whether or not the likelihood of confusion exists and in providing evidence that the potential confusion exists across different types of individuals.

### 1. Description of Relevant Universe

A key first step in assessing the likelihood of confusion is to define the relevant universe.[2] In my opinion, the relevant population for this case can be reasonably defined as the

---

[2] See J. Thomas McCarthy <u>Trademarks and Unfair Competition: Fourth Edition</u> (March 2006), Chapter 32.

- 5 -

population of current or potential users of websites offering digital content uploading, editing, and publishing services for either personal sharing or for sale. This definition is based on the following understanding of Lulu and Hulu potential target audiences.

I understand that Lulu.com is a self-publishing website which allows users to create, upload, share (for free), and sell or purchase a variety of types of digital content. The site allows users to produce text (hardback and paperback books, comic books, yearbooks, product manuals, etc.), visual material (photos and photo albums, art portfolios, calendars), and audio-visual content (CDs and DVDs).[3] These creations can be bought and sold from Lulu's site but can also be made simply for the owner's use only. Lulu's services can be appropriate both for the home user looking to design a gift for family and friends and for the corporate user looking to print high quality brochures for distribution.

I understand that Hulu is currently planning a content sharing website (Hulu.com) aimed at providing Internet users access to proprietary content (such as videos of movies, and primetime television shows) as well as a site for consumers to upload and share digital content through blogs, chat rooms, and bulletin boards.[4] This site is not fully active at this time, rather it is in a testing phase. It is possible that this site will offer additional features or services.

Based on this understanding of the Lulu and Hulu markets, I have defined the relevant population for these two trademarks as the population of current or potential users of websites offering digital content uploading, editing, and publishing services for either personal sharing or for sale.

To identify members of this population, potential respondents in three test cities (Philadelphia, Raleigh and San Francisco) were randomly called from the panels of consumers maintained by each focus group facility and asked a series of screening questions.[5] To ensure diversity of participants, I asked that each group include at least two men and two women and

---

[3] See http://www.lulu.com/en/products/ for a complete list of product and service offerings (accessed October 10, 2007).

[4] http://www.hulu.com/terms.html See section entitled "Bulletin Boards, Chat Rooms and Blogs'.

[5] Lists typically include more than 50,000 potential participants.

- 6 -

two persons between 18 and 35 and two participants 35 years or older. Facilities were instructed to recruit a minimum of six respondents for each group.[6] I also asked the focus group recruitment staffs to screen prospective participants to include those who had been involved with the creation and posting of digital content. I also asked that, to the extent feasible, at least two participants in each group be consumers in the relevant population who had designed or produced original content using the Internet with the intention of selling the content or items. These procedures were used to ensure that a broad cross section of the relevant population was included in the research. The complete screening questionnaire is attached as Appendix B.

To identify the appropriate respondents I used the following questions:

Q3. Have you ever created <u>original</u> content, in other words content made by you, that you have posted, shared or produced using the Internet? This content could include photographs or photo albums, video clips, music, artwork, books, calendars, recipes or brochures. This DOES NOT include emailing friends and family pictures, posting video clips or pictures not made by you or blogs you may have on the Internet.

Q4. Which of the following types of original content have you posted, shared or produced using the Internet?

o  Photographs or photo albums

o  Video

o  Artwork

o  Books

o  Calendars

o  Recipes

o  Brochures

o  Anything else [IF YES, "What else?"]

---

[6] Each facility recruited eight or nine respondents to ensure that on the evening of the actual group, six respondents would be in attendance.

- 7 -

Q5. Of the types of content you listed above, have you ever posted, shared or produced anything with the intent to sell it?

**2. Focus Group Procedures**

I contracted six focus groups of between six or seven participants per group in three locations, two in the Northeast (Philadelphia), two in the South (Raleigh) and two in the West (San Francisco). A moderator was hired to facilitate the discussion in each location and none of the moderators were aware of the client's name[7] or the ultimate goals of the research. Moderators and participants were told that the purpose of the research was to understand more about how consumers perceive website names and URLs and if the participants associate or relate any of the names shown to them.

The six groups included a total of 40 participants randomly selected from the facility lists and the participants represent a reasonable cross-section of the target population in this case. Individuals in the groups include a diverse range of ages, racial and ethnic backgrounds, work experience and interests on the Internet. All participants use the Internet for the creation and posting of digital content and at least some of the participants had designed, created and/or posted original content to the Internet with the intention of selling the content. The distribution of participants' age and gender is shown below in Table 1.

**Table 1: Demographics of Focus Group Participants**

|          | Between 18 and 35 | Over 35 years old |
|----------|-------------------|-------------------|
| **Male**   | 12 | 8 |
| **Female** | 12 | 8 |

Participants use the Internet in the workplace, home and school and the majority of participants use the Internet for email, to keep in contact with friends or relatives, to undertake research and for shopping. At least nine of the respondents indicated in the screener that they

---

[7] The moderators were hired by NERA and were not aware of Ellis Winters or of Lulu's involvement in the research.

- 8 -

had created digital content with the intent to sell over the Internet. Almost all of the participants had taken personal photos and posted these on the Internet and made them available to friends and family.

### 2. Focus Group Agenda

Each focus group lasted about 90 minutes. Each group followed a semi-structured discussion guide (attached as Appendix C). The group first discussed a few "warm-up" questions followed by a discussion of general issues about the Internet and use of the Internet. This portion of the discussion was used to get participants thinking about the Internet, as well as providing me with an understanding of the ways in which consumers are using the Internet. Finally they completed two exercises designed to elicit their understanding of the relationship between a number of URLs, including www.lulu.com and www.hulu.com.

The specific exercises to assess possible confusion consisted of two pages--each page listing the same six URLs in the same order (attached as Appendix D). On the first page, focus group participants were asked to draw a line between any of the URLs that they believed were OWNED or HOSTED by the same company. They were told that they did not need to draw any lines and they did not need to guess if they were unsure. After completing the first page, participants were asked to turn to the next page and were asked to again draw any lines between the URLs that they thought were ASSOCIATED with each other. Once these tasks were complete, the remainder of the time discussed respondents' perceptions of the relationships between the URLs and their perceptions of the reasons for association between the names.

The six site names used in the exercises were carefully selected to avoid an overemphasis on the similarity between Lulu and Hulu. Additionally, the list included a well known site likely to avoid making participants feel as though they were being "tested" on their knowledge of Internet sites or names. The inclusion of a well known site also acted as a control to help determine which, if any, participants were simply guessing at the relationships between some or all of the site names. Any participant that simply linked all other names to the one most familiar would likely be guessing at the relationships. The inclusion of six sites (instead of

- 9 -

simply the two at issue) also provided a further control in that it allowed me to determine which, if any, of the respondents were connecting <u>all</u> of the sites in a manner which suggested guessing.

## VI.    KEY FINDINGS

The purpose of this research was to conduct an initial assessment of the likelihood of confusion relevant to this litigation in the target population. My research shows that there is good reason to expect a substantial number of consumers would be confused between Lulu and Hulu because a substantial number of focus group participants believe that the Lulu and Hulu website names are likely to be owned by the same company.

Participants were asked to draw a line or lines between site names which they thought were owned or hosted by the same company. Each moderator, in his or her own wording, informed participants that the exercise was to reflect the participants' opinions and understandings and that they may feel that all are owned by the same company, some are owned by the same company or none are owned by the same company. Participants were told to keep their thoughts and answers to themselves until the entire group was finished with the first page (asking ownership) and the second page (asking about association). The results of this exercised showed that twenty out of the forty participants or half of all participants indicated that Lulu and Hulu were owned by the same company by connecting the site names with lines.[8] Of the twenty participants, eleven, or one quarter of all respondents associated Lulu and Hulu with each other and with no other company.[9]

The number of respondents who indicated that Lulu and Hulu were owned by the same company was consistent across gender and across age groups. In other words, similar numbers of male and female and younger and older participants thought the two site names or addresses were owned by the same company. Additionally, the belief that the URLs were owned by the

---

[8] Copies of the exercises from each group are attached as Appendix E.

[9] There were six additional respondents that I have classified as "guessers"; these individuals drew lines between or across all of the sites listed or drew lines from all of the sites to one site (eBay)

- 10 -

same company was not specific to any one of the cities where the groups were conducted. As shown in Table 2 below, similar numbers of participants in Philadelphia, Raleigh and San Francisco thought Lulu.com and Hulu.com were owned by the same company.

**Table 2: Distribution of Participants Who Thought Lulu and Hulu
Were Owned by the Same Company by City**

|  | Number Who Thought Marks Owned by the Same Company | Total Number of Participants |
|---|---|---|
| Philadelphia | 5 | 12 |
| Raleigh | 7 | 14 |
| San Francisco | 8 | 14 |
| Total | 20 | 40 |

After completion of the paper exercise, participants were asked to state which site names or addresses, if any, they thought were owned or hosted by the same company and why. Participants articulated a number of reasons why they thought Lulu and Hulu were owned or hosted by the same company. First, many argued that both the sound and look of the site addresses and names were so similar that they had to share the same owner. A number of individuals pointed out that the spelling was only, "one letter off" or that the vowels were the same. Additionally, a number of participants emphasized that the tone of the names were very similar and the sounds indicated something playful, fun or lighthearted. Participants who felt the names indicated shared ownership also cited how easy the names were to remember. Example quotes from focus group participants include:

"I had www.hulu.com and www.lulu.com. I just thought maybe, maybe they might be. They sound like they should be together." (Female, San Francisco)

"Hulu Lulu because they have the same letters, just the phonetics" (Female, San Francisco)

- 11 -

"Maybe one was a parent site or sister site." (Female, Raleigh)

"Hulu, Lulu I think everybody did it" (Female, San Francisco)

"I just did Lulu and Hulu, because of the ooooo." (Male, San Francisco)

"Lulu and Hulu, because they rhyme." (Female, Raleigh)

"I connected Lulu and Hulu for the syntax." (Male, Raleigh)

"Like a synonym…" (Male, Philadelphia)

These quotes suggest that at a very basic level, many participants find the visual and aural similarity of Hulu and Lulu obvious. This similarity led approximately half of the focus group participants to indicate that they believe that the Lulu.com name and the Hulu.com name would be owned by the same company.

Beyond the similarity of sound and the idea that the site names simply "go together" a number of participants reasoned that site owners typically purchase URLs with similar sounds or spellings to prevent cybersquatters (individuals who buy up URLs with the express purpose of selling the name to the owner of a similar sounding site) and to redirect individuals who have incorrectly typed the intended address. For example:

"It seems like whoever owns these sites created these sites to protect themselves from competitors with similar names." (Female, Philadelphia)

"Sites are buying out domain names…and what it is is that they bought out those other domain names so that somebody else couldn't use em" (Female, Philadelphia)

- 12 -

"If they aren't regular sites they've got them registered so they can capitalize on them when it's time to roll them out." (Male, San Francisco)

These results demonstrate that a substantial number of focus groups participants believe that the Lulu.com mark would be owned by the same company as the Hulu.com mark and those participants can articulate valid reasons for holding this belief.

## VII.        CONCLUSION

As described in this report, I conducted a series of focus groups with current or potential users of websites offering digital content uploading, editing, and publishing services. Based on this work, my research indicates that a substantial number of these users are likely to believe that the Lulu and Hulu URLs are owned by the same company thus leading to a likelihood of confusion over the source or ownership of the trademarks. Focus group participants who believe the two addresses are owned or hosted by the same company articulate a number of reasons for their belief including the fact that the two names sound and look substantially the same and that companies often own and control a range of website domains with similar names.

While focus groups cannot provide a reliable basis for making a point estimate of the degree of confusion in a population, the results can reliably be used to assess whether there is a likelihood that a substantial number of consumers in the population would potentially be confused. Given the fact that the 40 focus group participants were randomly drawn from the relevant population, in three different cities in very different areas of the United States, and that approximately one-half indicated a likelihood of confusion with respect to the ownership of the Lulu.com and Hulu.com website addresses, it is my opinion that a more complete quantitative study would very likely show levels of confusion which exceed those typically accepted by the courts as evidence of a likelihood of confusion.

Kent D. Van Liere  October 12, 2007

# Appendix A

**NERA**
Economic Consulting

**Kent D. Van Liere**
Vice President

National Economic Research Associates, Inc
1 Front St , Suite 2600
San Francisco, California 94111
+1 415 291 1000 Fax +1 415 291 1020
Direct dial: +1 415 291 1010
kent.van.liere@nera.com
www.nera.com

# KENT D. VAN LIERE, Ph.D.
## VICE PRESIDENT

Dr. Van Liere is a Vice President at NERA with expertise in survey research, sampling, statistics, risk analysis and market research. He has testified at trial and in deposition on the application of statistical methods, sampling, questionnaire design, and the use of surveys.

Dr. Van Liere's litigation and project experience includes sampling, survey research, design of field protocols, and statistical analysis of large data files (i.e., claims, employee records, customer data, or transactions data) in a number of areas including:

Intellectual Property
- Trademark Infringement: Design, analysis, and critique of samples and surveys used to measure consumer confusion, secondary meaning, and dilution in trademark infringement cases.

- Copyright infringement: Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

- Patent Infringement: Sample designs and surveys to establish rates at which infringing material exist in populations of products or unique use of features in product user populations.

Mass Torts and Class Actions

- Product Liability and Construction Defects: Analysis of statistical samples of products and product use to determine product performance issues, statistical evaluation of causes of product failures, and damages in product liability and construction defect class action litigation. Analysis of sales records to forecast total sales. Products have included a wide range of consumer and building products.

- Asbestos and Toxic Torts: Estimation of future claims and claim costs arising from exposures to various hazardous materials such as asbestos including modeling future liability for purposes of setting financial reserves, analysis of large claim files, insurance allocations, and insurance buybacks.

- Representations and Omissions: Many class actions focus on misleading and deceptive information or omissions of information. Design and analysis of sampling plans and surveys to measure consumers' awareness of key documents or facts, reliance on

**MMC** Marsh & McLennan Companies

representations, materiality of information for decisions, satisfaction with products, purchase processes, and analysis of choice behaviors in range of consumer and business products areas.

- Labor:  Analysis of employment records, methods for sampling records or employees, and use of surveys for purposes of estimating key facts in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Energy/Environment/Water/Infrastructure
- Customer Demand—Design and analysis of customer surveys to measure preferences for a wide range of product and rate offerings including pricing or rate options, incentive programs, information programs, new service offerings.

- Value of Service/Outage Costs—Design and analysis of value of service and outage cost studies based on surveys using lost profits and willingness to pay methodologies

- Evaluation of programs and services including customer satisfaction and program impacts

Market Definition/Market Segmentation/New Products
- Analysis of consumer choice and business decision making for purposes of measuring and evaluating market potential, market segmentation, strategy formulation, new product offerings, positioning/branding, and customer retention/switching behavior in the areas of consumer household products, automobiles, lighting and building products, energy efficiency and solar products, telecommunications services, industrial products, and information and subscription services.

Prior to joining NERA, Dr Van Liere served as a Principal of Freeman Sullivan where he directed survey research and sampling projects for litigation, President of Primen (a firm that conducted market research for the energy industry),  Senior Vice President of Hagler Bailly where he directed the survey research and market analysis practice; the President and Principal of HBRS (a highly regarded survey research firm), and Associate Professor at the University of Tennessee where he taught statistics, sampling, research methods at both the graduate and undergraduate levels.

## Education

**Washington State University**
Ph.D.   Sociology, specialization in research methods and statistics (1979).

**Washington State University**
M.A.   Sociology, (1976).

**Hamline University**
B.A.   Sociology, with Honors (1974).

## Professional Experience

|           | |
|-----------|---|
| 2006      | **NERA Economic Consulting**<br>Vice President |
| 2002-2005 | **Freeman, Sullivan & Co., San Francisco**<br>Principal |
| 2000-2002 | **Primen (a joint venture of the Electric Power Research Institute and the Gas Research Institute)**<br>President and Chief Executive Officer |
| 1995-2000 | **Hagler Bailly, Inc. (HBIX)**<br>Senior Vice President (1997-2000), Director (1995-1997) |
| 1985-1995 | **HBRS, Inc., Madison, WI**<br>President (1992-1995), Principal (1985-1992) |
| 1985      | **University of Wisconsin-Madison**<br>Visiting Associate Professor, Department of Rural Sociology (summer) |
| 1978-1985 | **University of Tennessee**<br>Associate Professor (with tenure), Department of Sociology (1984-1985), Assistant Professor, Department of Sociology (1978-1984) |
| 1983-1984 | **Tennessee Valley Authority**<br>Visiting Analyst, Strategic Planning Staff, Office of Planning and Budget |

## Expert Analysis and Testimony

<u>Federal Trade Commission vs Whole Foods Market, Inc and Wild Oats Markets, Inc., United States District Court, District of Columbia</u>--Expert rebuttal report on sampling and survey design issues in an antitrust proceeding related to a preliminary injunction to block a proposed merger of Whole Foods Markets Inc and Wild Oats (Expert Report: July 2007; Deposition: July, 2007)

<u>Javier Olguin vs Fed Ex Ground Package Systems, Superior Court of California, County of Orange</u>--Expert rebuttal declaration on sampling and survey design issues in a pre-certification labor class action (Expert Declaration: March 2007; Deposition: April, 2007)

<u>Align Technology, Inc. vs. Orthoclear, Inc. and Orthoclear Holdings, Inc., United States District Court, Northern District of California, San Francisco/Oakland Division</u>--Consulting rebuttal expert on survey design, sampling, survey implementation, and study design in trademark infringement and confusion analysis in a dental products area

<u>Confidential Client --</u> Consulting rebuttal expert on survey design, sampling, survey implementation, and study design in trademark infringement and confusion analysis in the consumer beverages markets

<u>Simpson Strong-Tie Company, Inc. vs. Pierce Gore, and The Gore Law Firm, Superior Court of California, County of Santa Clara</u>--Consulting expert on design and analysis of a survey to measure damage to brand image from advertising by other parties.

<u>Click Defense Inc. vs. Google, Inc., United States District Court, Northern District of California, San Jose Division</u>--Consulting expert on sampling strategies and survey designs to estimate confusion on contract terms regarding protection from internet fraud in point per click advertising in a pre-certification class action.

<u>Zill et. al vs Sprint Spectrum L.P. and Wireless Co. LP, Superior Court of California, County of Alameda</u>--Expert declaration on sampling, survey design, survey implementation, and the use of contingent valuation survey to estimate damages in a wireless communications class action (Expert Declaration: December, 2006 and February, 2007; Deposition: April 2007; Expert Report: June 2007).

<u>Adelphia Communications Corp vs Deloitte and Touche, LLP, Court of Common Pleas, Philadelphia, Pennsylvania</u>--Expert rebuttal report on use of surveys to estimate business process inputs to calculation of capitalizable costs for accounting restatement.    (Expert Report: December, 2006; Deposition: February 2007)

<u>Wallace et al. vs Monier Lifetile et al., Superior Court of California, County of Placer</u>--Deposition testimony and expert report on statistical and survey research, sample design, data analysis regarding issues related to representations and consumer expectations for product longevity in a pre-certification class action (Expert Report and Declarations: October/November 2005; Deposition: November 2005).

<u>Melvin Weiner, et al., vs Shake Company of California, Inc., et. al., Superior Court of California, County of Contra Costa</u>--Testifying expert on statistical analysis, sample design, causation issues, and damages regarding the prevalence of roofing failure in homes made with Cal Shake Roofing products.  (For Liability Phase Trial:  Multiple declarations and depositions in 2005, trial testimony June 2005. For Damage Phase Trial:  Expert declaration, September, 2006; Deposition: September 2006.)

<u>Kishan Chand & Eric Farley vs. Target Corporation, Superior Court of California, County of Los Angeles</u>--Consulting expert on use of survey research procedures in a pre-certification labor class action involving issues of exempt versus nonexempt activities of managers.

<u>Kaiser Aluminum Chemical Corporation vs Certain Underwriters at Lloyd's London et. al., Superior Court of California, County of San Francisco</u>--Statistical analysis related to sampling of insurance claims and allocation of liability among excess insurers for asbestos liability.

<u>Sheri Lotzer, et al. vs International Window Corporation, et al., Superior Court of California, County of Solano</u>--Consulting expert on statistical analysis for purpose of estimating sales from invoice data and design of sampling strategies for product field tests in post-certification class action

<u>Confidential client</u>--Analysis of asbestos claims, exposures by occupation, settlement costs, and future claims costs associated with a major boiler manufacturer.

Confidential Client, United States Bankruptcy Court, District of Delaware--Statistical surveying, analysis and consultation regarding the prevalence of failure in homes constructed with a specific building product.

Sherry McIlhargie, et al. vs Moulded Fiberglass Companies et al., Superior Court of California, County of San Joaquin--Consulting expert on statistical analysis, sampling design, and consultation on prevalence of construction building product defect in pre-certification class action.

Barbara Bowen-Fromm vs Terra Shake Products, et al., Superior Court of California, County of Alameda--Statistical analysis, sampling design, and consultation on prevalence of product defects in a class action lawsuit.

Bayview Hunters Point, All Hallows, Shorview and LaSalle Apartments L.P. vs Colorworks Collegiate Painters; Simonton Building Products, United States District Court, Northern District of California--Statistical analysis and sampling design for estimation of the prevalence of construction defects in windows, doors, and siding.

Laser Vision Eye Institute of California vs Nidek, Inc., Superior Court of California, County of Alameda--Expert declaration on estimation of economic damages from business interruption due to equipment availability issues (Expert Declaration, March 2003).

Nature Guard Cement Roofing Shingles Cases in Davis vs Louisiana-Pacific Corporation, Superior Court of California, County of Stanislaus--Consulting expert on statistical analysis of evidence regarding prevalence of construction defects.

People of the State of California, v. Apartment Investment and Management Company, et. al., Superior Court of California, County of San Francisco--Consulting expert on statistical analysis and sampling designs related to the prevalence of hazards and other construction and maintenance issues leading to notice of violations in buildings. (Expert report, October, 2003)

Naef, et. al. v. Masonite, Superior Court, County of Mobile, Alabama--Consulting expert on statistical surveying and analysis of the prevalence of siding failure in homes made with Masonite siding. Identification of factors contributing to failure, projection of failure rates observed during the survey to the population of homes manufactured with subject siding, calculation of expected future costs of legal settlement under the various terms and conditions.

Cinergy--Review of labor force exposure and estimation of future claims and claims cost for asbestos-related premise liability in power plants. Estimates used in negotiating insurance settlements and buyback.

Iberdrola--Analysis of the biofuels markets and market opportunities for a large European company

## Summary of Market Analysis, Survey Research and Policy Evaluation Experience

**Over the past 20 years have served as a Practice Leader, Principal Investigator, and President/CEO for companies in market analysis and customer research. Principal investigator for over 300 market assessment, customer segmentation, customer choice, consumer opinion and public policy evaluation engagements in energy, telecom,**

**environment, infrastructure, transportation, and consumer products and services industries.  Key areas have included:**

<u>Measurement of Consumer and Customer Attitudes, Opinions, and Choice Studies</u> –Directed more than 125 major projects measuring customer attitudes, customer intentions, and customer choices using broad range of survey techniques.  Research projects addressed defining markets, customer segmentation, market potential, new product forecasting, satisfaction and company image tracking, and in support of litigation related to brand awareness/image, confusion, trademark issues, and use of products.  Surveys included data collection from industrial companies, commercial companies, agricultural firms, and consumers.  Areas included telecom, financial services, energy, environment, consumer products, industrial products, water, and business services.

<u>Value of Service and Outage Cost Research</u> – Led teams that designed and implemented new methods of measuring valuing service reliability by measuring outage costs for electricity and gas service using customer surveys. These surveys measured residential, commercial, industrial, and agricultural customers' outage costs and their preferences for different scenarios of service reliability.  These projects included clients throughout the United States.  The studies involved several thousand surveys with all customer segments including residential, commercial, industrial, and agricultural customers.

<u>Design of Performance Measurement Systems</u>—Led teams that designed and implemented performance measurement systems for companies focused on financial, process and customer goals.  Projects included goal setting, identification of key performance indicators, setting performance standards, identifying data sources, and developing reporting systems.  These engagements involved working with employees on surveys of staff time usage and allocation of time to activities as well as design of customer satisfaction/expectations surveys with customers.

<u>Energy, Environment, and Transportation</u> – Led teams conducting evaluations of major energy efficiency, demand management, environmental and transportation programs including rate programs, rebate programs, information programs and load control programs for major utilities, government agencies, and research institutes.  Projects included sampling designs, survey designs, survey implementation using all modes of surveys (in-person, telephone, mail, internet), and statistical analysis of surveys of customers, and cost benefit evaluations.  Over 150 program evaluations over past 20 years.

<u>Environmental Attitudes and Behaviors</u>—Early research focused on environmental attitudes and environmental behaviors in a wide range of settings.  Co-developer of one of the most widely used environmental attitude scales (New Environmental Paradigm (NEP) scale).

## Publications

Van Liere, Kent. D. "Use of Sample Surveys in Product Liability Litigation", *The International Legal Guide to: Product Liability 2007*, forthcoming.

Lawton, Leora, Michael Sullivan, Kent D. Van Liere, Aaron Katz, and Joseph Eto "*A Framework and Review of Customer Outage Costs: Integration and Analysis of Electric Utility Outage Cost Surveys,*" Energy Storage Program, Office of Electric Transmission and Distribution, U.S. Department of Energy, LBNL-54365, 2004.

Dunlap, Riley E., Kent D. Van Liere, Angela G. Mertig, and Robert E. Jones. 2000. "Measuring Endorsement of the New Ecological Paradigm: A Revised NEP Scale." *Journal of Social Issues,* 56: 425-442.

Malloy, Ken, Jamie Wimberly, and Kent D. Van Liere. 1999. "The Customer Stewardship Program: Successfully Linking Consumer Education and Corporate Strategy," *The Electricity Journal*, August/September 1999.

The High Efficiency Laundry Metering and Marketing Analysis (THELMA) Project. EPRI, Palo Alto, CA: 1997. TR-109147-Volumes 1 to 9.

Market Tracking: Assessing Sources and Access to Appliance Sales Data, EPRI, Palo Alto, CA: 1997. TR-108928

Performance Measurement in Utilities: A Framework for Creating Effective Management Systems. EPRI, Palo Alto, CA: 1996. TR-106860 3269-34.

Van Liere, Kent D., Rick Winch, Kathleen Standen, Shel Feldman, and Dale Brugger. 1994. "The Design and Structure of a Statewide Sales Tracking System for Residential Appliances. In *Energizing the Energy Policy Process,* edited by Roberta W. Walsh and John G. Heilman, Westport, Connecticut, Quorum Books, pp. 199-216.

Van Liere, Kent D. and William Lyons. 1986. "Measuring Perceived Program Quality." In *Performance Funding in Higher Education*, edited by Trudy W. Banta, Boulder, Colorado, National Center for Higher Education Management System, pp. 85-94.

Dunlap, Riley E. and Kent D. Van Liere. 1984. "The Dominant Social Paradigm and Concern for Environmental Quality: An Empirical Analysis." *Social Science Quarterly*, 65: 1013-1028.

Hand, Carl M. and Kent D. Van Liere. 1984. "Religion, Mastery Over Nature and Environmental Concerns." *Social Forces*, 63: 555-570.

Ladd, Anthony E., Thomas C. Hood, and Kent D. Van Liere. 1983. "Ideological Themes in the Antinuclear Movement: Consensus and Diversity." *Sociological Inquiry*, 53: 252-272.

Lounsbury, John W., Kent D. Van Liere, and Gregory J. Meissen. 1983. "PsychoSocial Assessment." In *Social Impact Assessment Methods*, edited by K. Kinsterbush, L. Llewellyn, and C.P. Wolff, Beverly Hills, California, Sage, pp. 215-240.

Van Liere, Kent D. and Riley E. Dunlap. 1983. "Cognitive Integration of Social and Environmental Beliefs." *Sociological Inquiry*, 53: 333-341.

Van Liere, Kent D. and Benson H. Bronfman. 1981. "Beliefs About Social Control and Participation in a Load Management Project." *Housing and Society*, 8: 124-135.

Van Liere, Kent D. and Riley E. Dunlap. 1981. "Environmental Concern: Does it Make a Difference How It's Measured?" *Environment and Behavior*, 13: 651-676.

Van Liere, Kent D. and Frank P. Noe. 1981. "Outdoor Recreation and Environmental Attitudes: Further Examination of the Dunlap-Hefferen Thesis." *Rural Sociology*, 46: 505-513.

Van Liere, Kent D. and Riley E. Dunlap. 1980. "The Social Bases of Environmental Concern: A Review of Hypotheses, Explanations, and Empirical Evidence." *Public Opinion Quarterly*, 44: 181-197.

Tremblay, Kenneth R., Jr., Don A. Dillman, and Kent D. Van Liere. 1980. "An Examination of the Relationship Between Housing Preferences and Community Size Preferences." *Rural Sociology*, 45: 509-519.

Dunlap, Riley E. and Kent D. Van Liere. 1978. "The New Environmental Paradigm: A Proposed Measuring Instrument and Preliminary Results." *Journal of Environmental Education*, 9: 10-19.

Van Liere, Kent D. and Riley E. Dunlap. 1978. "Moral Norms and Environmental Behavior: An Application of Schwartz's Norm-Activation Model to Yard Burning." *Journal of Applied Social Psychology*, 8: 174-188.

Dunlap, Riley E. and Kent D. Van Liere. 1977. "Further Evidence of Declining Public Concern with Environmental Problems: A Research Note." *Western Sociological Review*, 8: 110-112.

Dunlap, Riley E. and Kent D. Van Liere. 1977. "Land Ethic or Golden Rule." *Journal of Social Issues*, 33: 200-207.

Dunlap, Riley E. and Kent D. Van Liere. 1977. "Response to Heberlein." *Journal of Social Issues*, 33: 211-212.

Dunlap, Riley E. and Kent D. Van Liere. 1979. "Decline in Public Concern for Environmental Quality: A Reply." *Rural Sociology*, 44: 204-212.

## Professional Associations

Member, American Association of Public Opinion Research

Member, American Statistical Association

August 2007

# Appendix B

Recruitment Screener

NERA

Hello, my name is _____ from _____. We are conducting research on the Internet and websites with user generated content. We are looking for qualified respondents to attend a discussion group at our facility located _____. The discussion will last about an hour and a half and you will be compensated _____ for your time.

Since we would like to get a mix of individuals, I'd like to ask you a few background questions.

1.  Into which of the following age brackets does your age fall? Are you between the ages of

    a.  18 and 24

    b.  25 and 35

    c.  35 and 45

    d.  45 and 55

    e.  55 and 65

    f.  Over 65

2.  [RECORD GENDER BY OBSERVATION]

    a.  Male

    b.  Female

3.  Have you ever created <u>original</u> content, in other words content made by you, that you have posted, shared or produced using the Internet? This content could include photographs or photo albums, video clips, music, artwork, books, calendars, recipes or brochures. This DOES NOT include emailing friends and family pictures, posting video clips or pictures not made by you or blogs you may have on the Internet.

    a.  Yes

    b.  No [SO. Thank respondent]

4.  Which of the following types of original content have you posted, shared or produced using the Internet?

    a.  Photographs or photo albums

    b.  Video

1

    c.  Artwork

    d.  Books

    e.  Calendars

    f.  Recipes

    g.  Brochures

    h.  Anything else [IF YES, "What else?"]

5.  Of the types of content you listed above, have you ever posted, shared or produced anything with the intent to sell it?

    a.  Yes [IF YES, "What was it?"]

    b.  No


The discussion will be held at _____ pm on _____day.

# Appendix C

NERA discussion guide

Confidential

# I.     Introduction (10 minutes)

Welcome to group. Introduce self and describe group rules

1. Is a discussion – need to hear all voices, please refrain from speaking over each other or from having side conversations.

2. Some things asked to do independently – please do not consult with neighbor and save comments on exercise until everyone is finished.

3. Group should last about an hour and half – when finished check in with the front desk to receive appreciation for your time.

4. Bathrooms and snacks

# II.     Background: (30 minutes)

1. First go around and introduce yourself. Say a little about how often you use the Internet, whether you use it at home, at work, at school or all three. And what you most frequently use the Internet for.

2. Now I'd like to talk about digital content – first, what is digital content to you? How might you define it, what are some examples?

3. What type of digital content have you produced for or using the Internet?

   a. If not mentioned or discussed in detail– have any of you ever written anything (book -- this could include recipe book, family history, pamphlet, story, poem, comic book, presentation, year book, dissertation, travel guide) for posting on the Internet?

      i. Did you produce any thing like this using the Internet? That is did you use the Internet to make the book and have it printed? Who were the materials for (self, family/friends, retail?)

      ii. Did you ever try to sell any of these materials?

      iii. How did you go about trying to sell these things? What was the process? How did you select the sites or tools used to sell?

      iv. If you have not sold, would you ever consider selling? Why or why not?

1

b. If not mentioned or discussed in detail – have you ever taken photos and posted on the Internet? Have you ever taken those photos and made them into something? What did you make? Did you ever try to sell any of these materials?

   i. How did you go about trying to sell these things? What was the process? How did you select the sites or tools used to sell?

   ii. If you have not sold, would you ever consider selling? Why or why not?

c. If not mentioned or discussed in detail – have you ever taken your artwork and posted on the Internet? Did you ever try to sell any of these materials?

   i. How did you go about trying to sell these things? What was the process? How did you select the sites or tools used to sell?

   ii. If you have not sold, would you ever consider selling? Why or why not?

d. If not mentioned or discussed in detail – have you ever created video and or audio (music) and posted on the Internet? This could include short films, animated video, instructional video, songs. Did you ever try to sell any of these materials?

   i. How did you go about trying to sell these things? What was the process? How did you select the sites or tools used to sell?

   ii. If you have not sold, would you ever consider selling? Why or why not?

e. Have you ever bought any original books/writings, photos, artwork, video or audio being sold by the owner of the content (that is the person who made the item) off of the Internet?

## III.  Names (35 - 40 minutes)

I'd now like to discuss some Internet names. Before we discuss the names of various websites and the companies that are associated with these sites, I'd like to complete an activity on paper. Please put your name on the top of this page.

On this page is a list of site names or addresses. I am going to read these out loud. While I am reading, I want you to look at the names and draw a line between any of the website addresses that you think are **owned or hosted** by the same company. If you do not think any are hosted or owned by the same company, do not do anything.

Turn to the next page, this is the same list of names. On this page please draw a line between any of the website addresses that you think are **associated with one another or are connected in some way**. If you do not think any of these are associated or connected with each other, do not do anything.

2

1. Before we discuss the associations, are any of these web addresses or names familiar to you?

    a. Which ones?

    b. Have you used any of these sites?

    c. What for?

2. For the first page, did you think that any of the sites were **owned or hosted** by the same company?

    a. If yes, which ones and why?

        i. What about the name suggests a shared ownership?

3. How about on the second page? Did you think any of these were **associated or connected** with each other?

    a. If yes, which ones and why?

4. Do you think the owners of any of these sites had to get **permission or authorization** from any other sites to use the address?

    a. Which sites?

    b. Who do you think had to provide permission or authorization?

    c. Is there a difference in your answers between permission and authorization?

5. Are any of these names particularly distinctive?

6. Are any confusingly similar? Which ones? Why?

# Appendix D

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

# Appendix E

# Raleigh
# Group 1

REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED





REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Page 1

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED





www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Page 2

REDACTED





# Raleigh

# Group 2

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com





www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Owned & husked

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Associated with

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

# Philadelphia
# Group 1

REDACTED



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1

REDACTED



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1



REDACTED



Connected in some way

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1

REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1

REDACTED





REDACTED





REDACTED



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



# Philadelphia
# Group 2

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED

1

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1

REDACTED

www.lulu.com    www.ebay.com

www.bebo.com    www.hulu.com

www.lala.com    www.dtda.com

1

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED





REDACTED





www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

1

REDACTED





www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

# San Francisco
# Group 1





REDACTED



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Page 2

www.ebay.com

www.hulu.com

www.dtda.com



www.lulu.com

www.bebo.com

www.lala.com

REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Page 2

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED



Page 1



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED



Page 1



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com





www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

# San Francisco
# Group 2

REDACTED

Page 1



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com









REDACTED



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

Page 1





REDACTED

Page 1

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



REDACTED





www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com



www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

REDACTED

www.ebay.com

www.hulu.com

www.dtda.com

www.lulu.com

www.bebo.com

www.lala.com

