# APPENDIX
# UNPUBLISHED CASES

1. *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 2003 WL 24010950 (W.D. Pa. Apr. 23, 2003)

2. *Juicy Couture, Inc. v. L'Oreal USA, Inc*., 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)

3. *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007)

4. *M.D. On-Line, Inc. v. WebMD Corp.*, 2005 U.S. Dist. LEXIS 23563 (D.N.J. Oct. 6, 2005)

5. *Prince Mfg., Inc. v. Bard Int'l Assoc., Inc.*, 1988 WL 142407 (D.N.J. Dec. 22, 1988)

6. *Procter & Gamble Co. v. Colgate-Palmolive Co.*, 1998 WL 788802 (S.D.N.Y. Nov. 9, 1998), *aff'd*, 199 F.3d 74 (2d Cir. 1999)

7. *Zimmerman v. Nat'l Ass'n of Realtors*, 2004 TTAB LEXIS 180 (Trademark Trial and Appeal Bd. 2004)

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
CITIZENS FINANCIAL GROUP, INC., Plaintiff,
v.
THE CITIZENS NATIONAL BANK OF EVANS
CITY and Citizens, Inc., Defendants.
**No. Civ.A. 01-1524.**

April 23, 2003.

**Background:** Financial group brought action against banking corporations, stemming from alleged breach of sale agreement for retail banking business. Parties cross-moved in limine to exclude certain evidence.

**Holdings:** The District Court, Ambrose, J., held that:

(1) survey regarding "reverse confusion" would be properly excluded, and

(2) evidence regarding name confusion would be properly excluded.

Motions granted in part and denied in part.

**[1] Evidence** 🗝0

157k0 k.
In action brought by financial group against banking corporations, stemming from allegedly breached agreement of sale for retail banking business, survey regarding alleged "reverse confusion" would be properly excluded from evidence at trial; problems with survey's universe were so fundamental and basic that survey was stripped of any significant probative value. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[2] Evidence** 🗝0

157k0 k.
In action brought by financial group against banking corporations, stemming from allegedly breached agreement of sale for retail banking business, expert's opinions regarding name confusion would be properly excluded from evidence at trial; opinions discussing purported name rehabilitation and causation cited to no reliable authority and were not independently verifiable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Goodwin Procter, Attn Paul F Ware Jr, Exchange PL, Boston MA, for Plaintiff's.

Thieman & Farrell, Attn Frederick W Thieman, Pittsburgh PA, for Defendant's.

*OPINION* and *ORDER OF COURT*

AMBROSE, Chief J.

*SYNOPSIS*

**\*1** CFG has filed one Omnibus Motion seeking to preclude CNBEC from offering certain expert testimony and other evidence based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. (Docket No. 134). CNBEC has also filed *Daubert* Motions. (Docket Nos. 138, 137, 148, 149). A hearing on the same was held on March 31, 2003 through April 1, 2003. Thereafter, CFG and CNBEC filed responsive briefs. In addition, CNBEC filed a Motion for Leave to File a Supplemental Memorandum in Support of its Motion to Exclude Expert Report and Testimony of Henry D. Ostberg. (Docket No. 157). After carefully considering the submissions of the parties and the evidence presented at the hearing, said Motions (Docket Nos. 134, 137, 138, 148, 149, 157) are granted and/or denied as more fully set forth below.

*OPINION*

This case arises out of CFG's agreement of sale with Mellon Bank, N.A. to acquire Mellon Bank's retail banking business. On July 27, 2001, CNBEC filed a Praecipe for Writ of Summons in the Court of Common Pleas of Butler County against, *inter alia,* CFG. On August 13, 2001, CFG filed a declaratory judgment action with this Court seeking a declaration that CFG did not infringe on CNBEC's trademark. Thereafter, on August 16, 2001, CFG filed an Amended Complaint. (Docket No. 9). CNBEC answered and filed a Counterclaim against CFG asserting trademark infringement / unfair competition and unjust enrichment. (Docket No. 13).

To prevail on its claims, CFG seeks to exclude the following evidence:
1) Guideline Research Corporation's Survey and the accompanying testimony of Robert Reitter;
2) The Report and certain testimony of Lawrence R. Werner;

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

3) The Report and certain testimony of Paul A. Adams, Esq.;

4) The Report and certain testimony of Dennis St. J. Mulvihill, Esq.;

5) The Report and certain testimony of Bryan F. DiLucente, CPA; and

6) The Report and certain testimony of Maureen Morin, Ph.D.

*See,* Docket No. 134. In a similar fashion, CNBEC seeks to exclude the following evidence:

1) Expert Report and portions of the Rebuttal Report of Dwight B. Crane and William T. Gregor;

2) Portions of the Expert Report and Rebuttal Report of Francis J. Kelly, III;

3) The Rebuttal Report of Michael J. Burke; and

4) The Expert Report and Survey of Henry D. Ostberg.

I will address each in turn, though not necessarily in the order set forth above.

ANALYSIS

A. *The* Daubert *Standard and* Rule 702

In *Daubert,* the Supreme Court held that:

[f]aced with a proffer of expert scientific testimony, ... the trial court judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*2 *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1992).* In the Third Circuit, the trial court's role as a "gatekeeper" announced in *Daubert* requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 741-42 (3d Cir.1994). Thus, pursuant to *Daubert,* the gatekeeping function requires the court to ensure that the expert testimony is both reliable and relevant. *Daubert,* 509 U.S. at 589; *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)

As to the first requirement, qualification, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more general qualifications." *Paoli,* 35 F.3d at 741. "Rule 702's liberal policy of admissibility

extends to the substantive as well as the formal qualification of experts." *Id.* Thus, an expert can qualify based on a broad range of knowledge, skills, training and experience.

The second inquiry focuses upon methodology. [FN1] The inquiry into methodology is designed to ensure that an expert's opinions are based upon " 'methods and procedures of science' rather than on subjective belief or unsupported speculation." *Id.* at 742. Reliability is assessed by determining whether: (1) the theory or technique can be tested; (2) the theory or technique has been peer reviewed; (3) there is a high rate of known or potential error; (4) there are standards of control; (5) the theory is "generally accepted"; (6) there is a sufficient relationship between the technique and methods which have been established to be reliable; (7) the expert's qualifications are sufficient; and (8) the method has been put to non-judicial uses. *See Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 593-94 (D.N.J.2002). "Some courts also consider additional factors relevant in determining reliability, including: (1) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation ...; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion ...; (iii) whether the expert has adequately accounted for alternative explanations ...; (iv) whether the expert is being as careful as he would be in his professional work outside of the litigation context ...; and (v) whether the field of expertise asserted by the expert is known to reach reliable results for the type of opinion proffered by the expert...." *Magistrini,* 180 F.Supp.2d at 594-95 (citations omitted).

FN1. Methodology has been defined as a "body of methods, rules and postulates employed by a discipline: a particular procedure [or] set of procedures." *Oddi v. Ford Motor Co.,* 234 F.3d 136, 156 n. 20 (3d Cir.2000).

Finally, *Daubert* and Rule 702 require that the expert's testimony "fits" the facts of the case. " 'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." *Id., citing, Paoli,* 35 F.3d at 743.

B. *Guideline Research Corporation's Survey and the accompanying testimony of Robert Reitter*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

**\*3** Pursuant to *Daubert,* CFG seeks to exclude CNBEC's likelihood of confusion survey and the accompanying testimony of Robert Reitter, to the extent that it is offered to demonstrate reverse confusion. [FN2] *See,* CFG's Brief in Support, at p. 1 (Docket No. 139). Counsel for CNBEC hired Guideline Research Corporation ("Guideline Research") located in New York, New York, to conduct a "study to determine what [the] likelihood of confusion between [the] banks [is], if any...." *See,* Survey at Docket No. 145, Tab 1, p. 1. Robert Reitter designed, supervised and implemented the study. *Id.* at 2. The study was conducted at two malls in Allegheny County: Ross Park Mall and Robinson Towne Center. *See,* Survey at Docket No. 145, Tab 1, p. 5. The study utilized a questionnaire which had two parts: a screener and a main questionnaire. *Id.* at 8. The purpose of the screener question was to identify and question only those individuals who belonged to the relevant universe. *Id.*

> FN2. CFG does not object to the survey or any testimony concerning the survey to the extent that it addresses "forward" or "direct" confusion. *See,* CFG's Brief in Support, p. 2, n. 2 (Docket No. 139).

The relevant factors used to access reliability and trustworthiness of a survey (its methodology) include, *inter alia:*
  1. The universe was properly chosen and defined;
  2. The sample chosen was representative of that universe;
  3. The questions asked of the interviewees were framed in a clear, precise and nonleading manner;
  4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted;
  5. The data gathered were accurately reported;
  6. The data were analyzed in accordance with accepted statistical principles; and
  7. Objectivity of the entire process was assured.
McCarthy on Trademarks and Unfair Competition, § 32:159 (4th Ed.2003); 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed.2001). CFG's main objection is that the study is conducted in an improper universe and, thus, is fatally flawed and has no probative value. *See,* CFG's Brief in Support (Docket No. 139). As set forth above, when conducting a survey in a trademark case the first crucial step is determining the proper universe. *Id.;* 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed.2001). A universe "is that segment of the population whose perceptions and state of mind are relevant to the issues in the case." McCarthy on Trademarks and Unfair Competition, § 32:159 (4th Ed.2003). Accordingly, the propriety of a survey can turn on the geographical area covered. 3A Callmann on Unfair Comp., Trademarks and Monopolies § 32:169 (4th Ed.2001); McCarthy on Trademarks and Unfair Competition, § 32:161. "A survey of the wrong 'universe' will be of little probative value in litigation." McCarthy on Trademarks and Unfair Competition, § 32:159. At the hearing, Reitter acknowledged that it is essential that the proper universe be correctly identified. "It is incumbent upon the researcher to make explicit the universe of interest prior to undertaking a research assignment." *See,* Survey at Docket No. 145, Tab 1, p. 5. The burden of proving that the universe is proper is on the proponent of the survey. *Id; see also,* 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67.

**\*4** In reverse confusion cases, like this one, the appropriate universe is the "senior user's [CNBEC's] customer base." McCarthy on Trademarks and Unfair Competition, § 32:159; 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67 (4th Ed.2001). Currently, twelve of the sixteen CNBEC branches are in Butler County, no branches are in Beaver County, only one branch is in Armstrong County and only three branches are in northern Allegheny County near the Butler County line. *See,* CNBEC's Brief in Opposition, p. 4 (Docket No. 155). For the past 108 years, CNBEC and its predecessors in interest have offered retail banking services in this area and not beyond. Thus, in this case there can be no doubt that CNBEC's customer "base" is within Butler county and extreme northern Allegheny county, rather than Allegheny county as a whole. *See,* Docket 146, Ex. 5.

To that end, CFG argues that sites chosen to conduct the surveys, Ross Park Mall and Robinson Towne Center, are outside of CNBEC's customer base of Butler county and extreme northern Allegheny county. *Id.* The closest CNBEC branches are 7 and 17 miles, respectively, away from the malls. *Id.* All of the other CNBEC branches are further away. *Id.* In response, CNBEC argues that the universe consisted of potential customers of both and, thus, was appropriate. *See,* CNBEC's Brief in Opposition, p. 8 (Docket No. 155). I disagree with CNBEC. While it is true that the appropriate universe consists of individuals who have access to both litigants and are a customer or a potential customer, when conducting a survey in a reverse confusion case, the universe is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

further limited to the senior user's "customer base." *See,* McCarthy on Trademarks and Unfair Competition, § 32:159; 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67. At the hearing Mr. Reitter testified, and counsel for CNBEC also acknowledged, that he and CNBEC would have liked to have conducted the survey at Clearview Mall in Butler County, but that Clearview Mall would not let them do a survey there. At the same time, Mr. Reitter recognized that the survey could have been anywhere else in Butler County, but that it would have just been more difficult. However, "[t]he geographical area surveyed cannot be based on mere sampling convenience rather than upon scientific or sampling grounds." McCarthy on Trademarks and Unfair Competition, § 32:161.

 CNBEC further argues that it has a marketing presence beyond Butler county and into the Pittsburgh area, such that the greater Pittsburgh area is a part of the universe. *See,* CNBEC's Brief in Opposition, pp. 8-12 (Docket No. 155). I am not persuaded by this argument because it is not supported by the facts. The scope, media type, volume, and frequency of its advertising and promotional efforts regularly focus on Butler county, not Allegheny county. *See,* Docket 146, pp. 47-48. The evidence indicates that CNBEC's advertising and marketing efforts outside of Butler County are sporadic. Moreover, even if I accept CNBEC's figures, under 8% of CNBEC's customer base is in Allegheny County.  [FN3] Thus, any customers that CNBEC obtains outside of their main customer base of Butler County and northern Allegheny county is, in the words of counsel for CNBEC, "spill over." I do not consider "spill over" to be a part of CNBEC's "customer base."

> FN3. CNBEC does not differentiate what percentage of the 8% is in northern Allegheny County Where CNBEC has three branches versus what percentage is outside of that area, such that the majority of the 8% may come from its northern Allegheny County customer base.

 **\*5** Even assuming, *arguendo,* that the study was conducted in the proper universe, the survey would have necessarily excluded those individuals that were likely to be customers or potential customers of CNBEC. As mentioned previously, the second and third relevant factors used to assess reliability and trustworthiness of a survey are whether the sample chosen was representative of that universe and whether the questions asked of the interviewees were

framed in a clear, precise and nonleading manner. McCarthy on Trademarks and Unfair Competition, § 32:159; 3A Callmann on Unfair Comp., Trademarks and Monopolies § 21:67. Here, screener question A asked the following question: "But first, do you live or work in this general area or are you just visiting?" *See,* Docket No. 146, Tab J, Exhibit C, Screener Survey. "General area" and "just visiting" were not defined by the study. This is not a clear and precise question. Furthermore, if the individual answered "just visiting," then the interview was terminated without any further questioning and the individual was excluded from the questionnaire. *Id.* Contrary to the argument of CNBEC, it is not reasonable to conclude a Butler county resident would consider himself from the "general area" when at Ross Park Mall or Robinson Towne Center given their location in Allegheny county. Thus, many of the individuals that should have been included in the proper universe (Butler county and extreme northern Allegheny county) would have been automatically excluded from the survey. Therefore, because of the location of the study and the screener question asked, few (if any) participants were likely to be part of CNBEC's customer base. Consequently, the failure to conduct the survey within CNBEC's customer base and then to exclude those individuals who may potentially come from within the customer base is fatal.

 [1] My role is as the gatekeeper with regard to expert witness testimony. *See, Kumho Tire Co., 526 U.S. at 141-42.* Thus, I must pass on the threshold question of the validity of a survey before a jury may consider it. *See, Simon Property Group v. MySimon, Inc., 104 F.Supp.2d 1033 (S.D.Ind.2000).* Although I recognize that no survey is beyond criticism and there is no perfect survey, the problems with the Guideline Research Survey are so fundamental and basic that the survey is stripped of any significant probative value. Therefore, I am convinced that the Guideline Research survey is not simply ill-tailored (so as to go to the weight), but is fatally flawed due to an irrelevant and improper universe, such that it must be excluded from evidence at trial.

 Even if I did not find that the Guideline Research survey was fatally flawed so as to exclude it under *Daubert* and Rule 702, I would still exclude the same based on Rule 403 [FN4] of the Federal Rules of Evidence. *See, Trouble v. The Wet Seal, Inc., 179 F.Supp.2d 291, 306-308 (S.D.N.Y.2001).* CFG argues that the limited probative value of the study is "greatly" outweighed by the danger of unfair prejudice that flows from the inherently flawed design. *See,* CFG's Brief in Support, at pp. 3, 16-17

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

(Docket No. 139). I agree. If the universe is skewed, then the conclusion will similarly be skewed. If an expert, a person with special knowledge and expertise, testifies as to the skewed results, a jury is likely to give special weight to the skewed conclusion. Any minimal probative value that the skewed results may have is outweighed by the unfair prejudice, confusion and waste of time that would necessarily result. As the court in *Simon* noted, "the vast majority of reported cases dealing with problematic survey evidence have involved injunction hearing or bench trials. In such cases, the safest course for the trial judge is to admit the evidence and to treat the criticisms as going to the weight of the evidence...." 104 F.Supp.2d at 1039 n. 3. In a jury trial, however, '[t]he court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time consuming ... when it offers essentially nothing of real probative value. Rule 403 was written for just this sort of case." *Id.* Like *Simon,* this case is scheduled for a jury trial. Consequently, the Guideline Research survey and any testimony regarding the same is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

> FN4. Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

### C. *Portions of the Expert Report and Rebuttal Report of Francis J. Kelly, III*

**\*6** CNBEC has raised objections, under *Daubert,* to the expert report and rebuttal report of Francis J. Kelly. (Docket No. 149). As to Kelly's main report, CNBEC's only objection is to paragraphs 51-60 wherein Kelly opines that injunctive relief should not be granted. I agree with CNBEC that this evidence is irrelevant to the jury as they are not charged with the issue of whether to grant injunctive relief. Accordingly, Kelly cannot testify as to the appropriateness of injunctive relief to the jury. However, Kelly may testify with regard to these issues to the court. Below, I will detail the logistics of the manner in which this will be dealt with at trial. See, Analysis Section L *infra.* As to Kelly's rebuttal

report, CNBEC objects to Paragraphs 21-25 claiming that Kelly lacks the qualifications to opine on trademark survey methodology. In Paragraphs 21-25 of the rebuttal report, Kelly deals solely with issues related to the Guideline Research Report prepared by Mr. Reitter. Given the fact that I am excluding this report and any testimony by Mr. Reitter in its entirety, I likewise must exclude this portion of Mr. Kelly's report as moot.

### D. *The Expert Report and Survey of Henry D. Ostberg* [FN5]

> FN5. CNBEC filed a Motion for Leave to File Supplemental Memorandum in Support of its Motion to Exclude Expert Report and Testimony of Henry D. Ostberg. (Docket No. 157). I will grant the same and consider it in my analysis.

Pursuant to *Daubert,* CNBEC seeks to exclude the expert report and survey of Henry D. Ostberg. First, CNBEC argues that the report is not a proper rebuttal. CFG claims that the report is in rebuttal to CNBEC's expert, Dr. Vikas Mittal. Dr. Mittal's report reaches the conclusion that "banking consumers in the Pittsburgh Area shorten the name of a banking institution a vast majority of the time" and that "[t]he pattern of results for Citizens Bank is very similar to the pattern of results obtained for the aggregate sample." Report of Dr. Mittal at p. 2. Accordingly, Dr. Mittal concludes that "a large majority of the consumers tend to shorten the name of Citizens Banks to 'Citizen(s)'." *Id.* Dr. Mittal reached these conclusions through the use of a consumer survey designed by Dr. Mittal that targeted consumers in Allegheny, Armstrong, Beaver and Butler counties. CFG does not assert that Dr. Ostberg's report is designed to refute the exact premise of Dr. Mittal's report. Rather, CFG argues that Dr. Ostberg's report is offered as a necessary follow-up to Dr. Mittal's report in order to explain or amplify the results thereof. CFG argues that by the Mittal survey, CNBEC would suggest to the jury that consumers conversationally refer to both CFG and CNBEC simply as CITIZENS and that consumers will likely be confused as a result. Accordingly, CFG argues that Dr. Ostberg's report is needed to demonstrate that consumers are well aware that CITIZENS refers to more than one bank. Although CNBEC claims that it does not intend to use the Mittal survey in the fashion suggested by CFG, I agree with CFG that a jury may logically draw this inference. Given that finding, Dr. Ostberg's report is a proper rebuttal and I will not exclude his report on that basis. See, *Blackstone v.*

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

*Osche,* 192 F.Supp. 174 (W.D.Pa.1961).

 **\*7** CNBEC also argues that the survey question posed by Dr. Ostberg is not reliable as it is not clear and understandable. *See,* CNBEC's Brief in Support (Docket No. 138). Under the standards cited above, a relevant factor used to assess reliability and trustworthiness of a survey is whether the questions asked of the interviewees were framed in a clear, precise and nonleading manner. McCarthy on Trademarks and Unfair Competition § 32:159 (4th Ed.2003). Specifically, CNBEC argues that the question posed to respondents is capable of various meanings rendering the question useless. In his survey, Dr. Ostberg asked respondents: "Do you think one bank *company* ... or more than one bank *company* ... has these words in its name." Ostberg Report, Exhibit A, Memorandum of Points and Authorities in Support of Defendants' Motion to Exclude the Expert Report and Survey of Ostberg at Tab B. Dr. Ostberg asked this same question using the name "First National," "Citizens," and "Wachovia." *Id.* Subsequently, Dr. Ostberg asked the following question: "Now, referring to banks *in this community,* are you aware of a bank called: Mars National Bank? Citizens Bank? PNC?" *Id.*

 Counsel for CNBEC has argued that a respondent could believe that the survey was asking about branches as opposed to companies. *See,* CNBEC's Brief in Support. However, during the *Daubert* hearings, Dr. Ostberg made it clear that the survey was designed with safeguards in place to prevent such misunderstanding on the part of respondents. Dr. Ostberg explained that he purposefully chose to use the names "First National" and "Wachovia" as controls. Further, as an individual location of a bank is called a "branch" it would not have been reasonable to expect that a respondent asked about a bank "company" would assume he is being asked about a bank "branch."

 Counsel for CNBEC seems to suggest that the Ostberg survey could have been designed in a different manner to avoid these potential issues. However, I am not convinced that the question at issue was anything other than clear and concise. In addition, I must not look to whether a survey is "perfect" but whether it is reliable:

  One must keep in mind that there is no such thing as a 'perfect' survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one ... Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed and conducted, has some

potential flaws somewhere. The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.
 The Learning Network, Inc. v. Discovery Communications, Inc., 153 F.Supp.2d 785, 789 (D. Maryland 2001). Herein, the questions posed along with the controls included secured the reliability of the Ostberg survey.

 **\*8** Lastly, CNBEC argues that the Ostberg report should be excluded under Rule 403 as any probative value of the report is outweighed by prejudice. Fed.R.Evid. 403. Pursuant to Rule 403, I must consider "the probative value of a survey in relation to the danger of unfair prejudice, confusion of the issues, misleading the jury, or waste of time." *Sears, Roebuck and Co. v. Menard, Inc.,* No. 1 C 9843, 2003 WL 168642 (N.D.Ill. Jan.24, 2003). Unlike Reitter's Report, the survey results herein are not skewed in any sense by unreliable questions. Further, I do not find the Ostberg report too complex, misleading, time-consuming or wasteful of the jury's time. *Id.* Accordingly, I do not find the Ostberg report unfairly prejudicial to CNBEC.

 E. *The Report and certain testimony of Lawrence R. Werner*

 [2] CFG takes issue with the three opinions offered by Lawrence R. Werner. *See,* CFG's Brief in Support, at p. 2 (Docket No. 141). First, Werner opines that "consumers and prospective consumers of banking services are likely to confuse the two banks due to CFG's use of the name 'Citizens." ' Docket No. 145, Tab 13, p. 4. Second, he opines that "serious damage has been inflicted upon [CNBEC] and its name due to CFG coming into [CNBEC's] market and using the same name, Citizens." *Id.* Third, he opines that even if CNBEC is "successful in litigation and ... [is] returned to its original position as the only Citizens in its market, Citzens will still be required to undertake a significant advertising, marketing and public relation campaign to rehabilitate its name...." *Id.* CFG argues that Werner's opinions should be excluded based on *Daubert* and Rule 702 of the Federal Rules of Civil Procedure. *See,* CFG's Brief in Support, at p. 2 (Docket No. 141). I will address the issues raised by CFG in reverse order.

 1. *Name rehabilitation opinion*

 CFG argues that Werner's opinion regarding name

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
(Cite as: 2003 WL 24010950 (W.D.Pa.))

rehabilitation is conclusory and not grounded in principle, methodology, fact, or other data. *See,* CFG's Brief in Support, at p. 6. As a result, CFG submits that his name rehabilitation opinion is nothing more than an *"ipse dixit"* which is insufficient to satisfy Rule 702 of the Federal Rules of Civil Procedure. *Id.* At the *Daubert* hearing, Werner testified twice and was given multiple chances to articulate what principles or methodology he relied on in making his conclusion that "the only way to save [CNBEC] is for [CNBEC] to regain its sole use of the Citizen's name, representing its brand and reputation in the marketplace. Even if that happens, Citizens will be forced to undertake an intensive and extensive rebranding and repositioning marketing campaign in an effort to restore its reputation and brand." Docket No. 145, Tab 13, p. 8. The only response from Werner was that it was based on his marketing experience. For whatever reason, he refused to elaborate on his answer. In my opinion, in his gatekeeper role, I must determine whether Werner's testimony is "more than [a] subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 509. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Without more from Werner, I agree with CFG that Werner's name rehabilitation opinion is nothing more than *ipse dixit.*

**\*9** In opposition, counsel for CNBEC argues that the Werner's report contains the basis of and methodology for his name rehabilitation opinion. *See,* CNBEC's Brief in Opposition, pp. 6-10 (Docket No. 163). As I mentioned at the *Daubert* hearing, it is interesting that the basis for Werner's opinion should be outlined by counsel for CNBEC, but not Werner. After a review of Werner's report, Werner's analysis appears to be nothing more than his instinctive reaction to the materials provided to him. He cites to no standards for his opinions, nor does he provide any explanation that could be tested or subjected to peer review as to how he reached his opinions. As a gatekeeper, I simply cannot permit Werner's *ipse dixit* name rehabilitation testimony to go to the jury.

2. *Damage opinion*

CFG argues that Werner's opinion that "serious damage has been inflicted upon [CNBEC]" is not based on any facts or other data and does not assist

the trier of fact to determine the pertinent issue of whether the supposed name confusion has *caused* the proffered damages. *See,* CFG's Brief in Support, at p. 4-5. As a result, CFG argues that the "damages" testimony should be excluded. In opposition, CNBEC argues that "Werner specifically relies upon his marketing and banking experience to explain that confusion between CFG and [CNBEC] has and will result...." *See,* CNBEC's Brief in Opposition, p. 5 (Docket No. 163). In the next paragraph CNBEC states "Werner's conclusions and methodology is rational and clearly articulated." After a review of Werner's report, I disagree with CNBEC. Werner's damage opinions, like his name rehabilitation opinion, appear to be nothing more than his instinctive reaction to the materials provided to him. He cites to no standards for his opinions, nor does he provide any explanation that could be tested or subjected to peer review as to how he reached his opinions. As a gatekeeper, I simply cannot permit Werner's *ipse dixit* damage testimony to go to the jury.

3. *Name confusion opinion*

CFG argues that Werner's opinion that name confusion is likely is unreliable. *See,* CFG's Brief in Support, at p. 2 pp. 2-4. To that end, CFG similarly submits that Werner's name confusion conclusion is not the product of reliable principles or methods applied to any facts or other data. *Id.,* at p. 3. Moreover, CFG also argues that Werner cites no factual support for this conclusion and relies on unspecified documents and interviews to support his opinions. *Id.* Further, CFG submits that Werner makes other assertions that are not based on facts or data. *Id.* For example, Werner asserts that CFG is "attempting to take on the appearance of a small, community bank" and that "both [CNBEC] and CFG advertise in media that reach throughout the Pittsburgh area," but he cites to no evidence to support this claim. *Id.* at 3-4, *citing,* Docket No. 145, Tab. 13, p. 6.

In opposition, CNBEC argues that "[i]t is clear from a review of Werner's report that his opinions regarding name confusion are well grounded in his extensive experience." *See,* CNBEC's Brief in Opposition, p. 3 (Docket No. 163). However, a review of Werner's report does not reveal the same. For example, throughout Werner's name confusion opinion, he simply makes statements without any support (e.g. "People tend to use the shortened version of company names," "blue ... and ... green ... are two of the most commonly used colors by banks

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
(Cite as: 2003 WL 24010950 (W.D.Pa.))

and are very close on the color scale," "I assume that CFG's customers ... also [reside throughout the Pittsburgh areal," "convenience has always been a prime consideration for consumers in selecting banks for all or part of their banking business," "The fact that CFG has a number of branches in Citizens' market area makes it confusing for customers of both banks, and perhaps more important, potential customers of Citizens"). *See,* Docket No. 145, Tab. 13, p. 5-6. If he does cite to support, then he relies on his experience without any further elucidation on what specifically in his experience supports that opinion. Werner simply does not cite to any reports, treatises, tests, or any other authority for making his name confusion opinions. *Id.* I cannot discern from his report or his testimony any methodology or principles he relied on in making his opinions. Consequently, as gatekeeper, I am precluding Werner from testifying at trial regarding name confusion. *See, Daubert, supra.* Therefore, Werner's testimony is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

F. *The Report and certain testimony of Maureen Morrin, Ph.D.*

**\*10** In its Brief in Support, CFG asserts that the five basic opinions of Maureen Morrin, Ph.D. regarding the likelihood of consumer confusion (*see,* Docket No. 145, Tab. 14, pp. 23-24) should be excluded because they do not satisfy the qualifications, reliability and/or fit requirements of *Daubert* and Rule 702. *See,* CFG's Brief in Support, at p. 3 (Docket No. 144). At the *Daubert* hearing, counsel for CFG submitted that it no longer objects to Dr. Morrin testifying as to her first opinion. Therefore, CFG's objection to Dr. Morrin's first opinion is denied as moot. As a result, I will only discuss opinions 2-5.

1. *Opinion 2*

CFG argues that Dr. Morrin lacks the qualifications to proffer Opinion 2. *See,* CFG's Brief in Support, at p. 5 (Docket No. 144). Dr. Morrin's Opinion 2 states:
    Loss of a unique brand name could be devastating to [CNBEC] in its future ability to compete in the marketplace due to the critical nature of brand trust in the banking industry and the lack of other differentiating factors among product offerings in the industry.
Docket No. 145, Tab 14, p. 24. In it brief, CFG argued that Dr. Morrin is not qualified to testify on the issues of brand identity and brand trust in the

banking field because she is not a "banking expert." After a review of her *curriculum vitae* and her testimony regarding her qualifications, I am satisfied that Dr. Morrin is qualified to testify regarding brand trust in the banking industry. [FN6]

>    FN6. At the *Daubert* hearing, counsel for CFG also argues that Morrin cannot testify using the term "devastating." I do not find this term so prejudicial that she should be precluded from using it. Finally, at the hearing, counsel for CFG argued that Morrin cannot testify regarding her predictions for the future. CNBEC did not address this issue in the Brief In Opposition. Regardless, I find that Morrin is qualified to make such an opinion and that CFG can adequately deal with this issue on cross examination.

2. *Opinion 3*

CFG argues that Dr. Morrin's Opinion 3 does not fit the case. *See,* CFG's Brief in Support, at p. 6 (Docket No. 144). Dr. Morrin's Opinion 3 states:
    Existence of other banks named "Citizens" in markets outside the Pittsburgh metropolitan region is not relevant to the consumer choice process in Allegheny, Armstrong, Beaver, and Butler counties, due to the critical importance of branch/ATM locations in the consumer choice process.
Docket No. 145, Tab 14, p. 24. First, CFG argues that Opinion 3 does not fit the case because it has no bearing on the issue of whether consumers are aware that "Citizens" is a common name for banks. *See,* CFG's Brief in Support, at p. 6 (Docket No. 144). CFG also argues that this is an attempt to get in a legal concept that was previously rejected. *Id.* at pp. 6-7. Thus, CFG submits that Dr. Morrin be precluded from testifying regarding her Opinion 3. *Id.*

In opposition, CNBEC argues that CFG misconstrues Dr. Morrin's Opinion 3. *See,* CNBEC's Brief in Opposition, pp. 9-11 (Docket No. 166). CNBEC argues that "Morrin opines that consumers in [CNBEC's] [m]arketplace are not likely to consider utilizing the services of geographically remote banks because ... consumer research has revealed that the convenience of branch and ATM locations is among the most important criteria that consumers use in selecting a bank." *Id.* at 10. To the extent that Dr. Morrin is attempting to testify that convenience and location is an important factor, Dr. Morrin may so testify. However, I do not find that the first part of the statement regarding the relevancy of other banks

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

named "Citizens" outside the Pittsburgh region to be necessary for her to state her basic opinion. In other words, I find the first clause of Opinion 3 to be irrelevant. Thus, Dr. Morrin would not be prejudiced by the exclusion of the same.

**\*11** Nevertheless, even if it was necessary and relevant, I would still exclude the first clause pursuant to Rule 403 of the Federal Rules of Evidence because the limited probative value is outweighed by the prejudice that may result therefrom. Specifically, other banks named "Citizens" outside the Pittsburgh region may be relevant regarding the strength of the mark. Yet, there is a likelihood that Dr. Morrin's testimony would cause significant confusion among the jurors and mislead them regarding the relevancy of the same. Consequently, I find that Dr. Morrin may not testify regarding the first part of Opinion 3 regarding the relevancy of other banks named "Citizens" outside the Pittsburgh region.

### 3. *Opinion 4*

CFG argues that Dr. Morrin's Opinion 4 should be inadmissible. *See,* CFG's Brief in Support, at p. 7 (Docket No. 144). Dr. Morrin's Opinion 4 states:

> Reported instances of confusion likely underestimate the extent of consumer confusion because the rate of reporting such instance is analogous to consumer complaint behavior, which suggest the actual incidence of customer dissatisfaction is considerably higher than indicated by the number of complaints reported to firms.

Docket No. 145, Tab 14, p. 24. Specifically, CFG argues that the rate of reporting consumer confusion is not based on any supportive facts or data. *See,* CFG's Brief in Support, at p. 7 (Docket No. 144). As a result, CFG submits that this opinion is based purely on speculation and should not be admissible. *See,* CFG's Brief in Support, at p. 7 (Docket No. 144). In response, CNBEC argues that so long as her opinion is reliable, it is admissible. *See,* CNBEC's Brief in Oppsition, pp. 12-13 (Docket No. 166). I agree with CNBEC that Dr. Morrin's opinion must be reliable to be admissible. Unfortunately, I do not find any evidence of a reliable basis for Dr. Morrin's opinion 3. She testified at the *Daubert* hearing that she was not aware of a larger universe of people who were confused and did not take any steps to make such a conclusion. Moreover, she had no basis for her opinion that customer complaints are analogous to customer confusion other than a purely theoretical basis on her part. In other words, she did not cite any authority or evidence to support her theory. Without

more, I find this opinion too speculative and prejudicial to be admissible.

### 4. *Opinion 5*

CFG does not challenge Dr. Morrin's Opinion 5 regarding the issue of likelihood of confusion *"generally",* but takes issue with two of her reasons for her conclusion that consumers are likely to confuse CNBEC and CFG. *See,* CFG's Brief in Support, at p. 8. (Docket No. 144). CFG argues that Dr. Morrin's Opinion 5a and 5h should be inadmissible. *See,* CFG's Brief in Support. (Docket No. 144). Dr. Morrin's Opinion 5a and 5h provide:

> Consumers are likely to confuse Citizens and CFG for many reasons including the following:
>
> a) For consumers, the banks possess Identical names: Citizens....
>
> **\*12** h) Blue and green are commonly used colors in the banking industry in the Pittsburgh metropolitan region, and thus are not effective at differentiating bank brands here.

Docket No. 145, Tab 14, pp. 24-25. Specifically, with regard to Morrin Opinion 5a, CFG argues that there is no factual basis that the banks possess identical names and thus the opinion is unreliable. *Id.* at 8-9. After reviewing Dr. Morrin's report and hearing her testimony, I disagree. There is sufficient evidence that Dr. Morrin's Opinion 5a is based on her research that show that consumers tend to shorten brand names. *See,* Docket No. 145, Tab 14, p. 11. I am satisfied that this issue goes to the weight/credibility of her opinion and can be adequately dealt with by CFG on cross-examination. Consequently, CFG's Motion in this regard is denied.

With regard to Opinion 5h, CFG argues that Dr. Morrin is not qualified to testify regarding the neurological process of color perception. *Id.* at 9. At the *Daubert* hearing, Dr. Morrin testified she does not have any special expertise in the neurological process of color perception, but that you do not need special expertise to know that green and blue are close on the color spectrum. Assuming this is a true statement, then there is no need to have expert testimony to help a jury understand this concept. *See,* Fed.R.Evid. 702 (the proffered opinion poses no benefit in assisting the "trier of fact to understand the evidence or to determine a fact in issue...."). On the other hand, if I find that the statement is not true, then Dr. Morrin still cannot testify to this issue because she acknowledged that she does not have the requisite qualifications. "[A]t a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman...." *Betterbox Comm.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                  Page 10
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

*Ltd. v. BB Technologies, Inc.,* 300 F.3d 325, 328(3d Cir.2002), *quoting Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998). As a result, said opinion is inadmissible at trial. Lastly, any rebuttal evidence presented with regard to the opinions of Dr. Morrin hereby excluded is necessarily inadmissible as moot.

G. *The Expert Report and portions of the Rebuttal Report of Dwight B. Crane and William T. Gregor*

CNBEC raises several objections under *Daubert* to the expert report and certain sections of the rebuttal report of Dwight B. Crane and William T. Gregor. I will address the arguments regarding the rebuttal report first and then I will address the arguments regarding the main report.

1. *Rebuttal Report*

CNBEC argues that Sections IV and VI of the rebuttal report should be excluded based on qualifications. See Memorandum of Points and Authorities in Support of CNBEC"S Motion to Exclude the Expert Report of Crane and Gregor at p. 17. Specifically, CNBEC argues that Crane and Gregor opine on issues of trademark survey methodology, branding, consumer perception, and the consumer choice process, all of which are issues outside of their respective areas of expertise. Section IV of the rebuttal deals with the report of Dr. Maureen Morrin. First, to the extent that I am excluding the report of Dr. Morrin, any corresponding rebuttal of Crane and Gregor is necessarily excluded as moot.

**\*13** In the remaining portions of Section IV of the rebuttal Crane and Gregor opine that consumers can distinguish between bank names, they address the issue of differences in banking versus consumer product purchasing decisions, and they address the ability of the elderly to distinguish among banks. Rebuttal Report of Crane and Gregor at pp. 12-20. After a review of Crane and Gregor's qualifications, and their testimony regarding same, I am satisfied that they are qualified to testify with regard to these issues.

Section VI of the rebuttal report addresses both the survey performed by Guideline Research Corporation and that performed by Dr. Mittal. As I have excluded the report of Guideline Research Corporation, the rebuttal of Crane and Gregor is necessarily excluded as moot.

As to the rebuttal of Dr. Mittal's report, Crane and Gregor do not actually opine on trademark survey methodology in as much as they comment on the meaning of the results. However, even if the report can be interpreted as opining on trademark survey methodology, Professor Crane is clearly qualified to opine on this issue. As his testimony makes clear, Professor Crane has extensive experience in conducting and evaluating surveys:

[A] significant part of my own research has involved either conducting surveys or relying on surveys of others. So, I'm familiar with surveys from that point of view. I've also been involved in evaluating surveys and survey methodology in my administrative role at the school. I've served also as a senior associate dean at Harvard Business School for eight or nine years in two different roles. One of those roles, I was the director of the research program of the school. So what I was responsible for was evaluating proposals, making funding decisions for those proposals, and many of the proposals came from the marketing faculty. Some of them had to do with branding topics. Many of them had to do with surveys.

Transcript of Proceedings at p. 23. Likewise, Gregor, with vast experience in strategic marketing for the banking industry, can certainly opine as to whether Dr. Mittal's results were skewed based on the universe selected.

Counsel for CNBEC argues that the rebuttal report as well as certain sections of the main report should be excluded because Crane and Gregor are not each, independently, experts on every topic covered in the rebuttal report and the main report. Although I agree with CNBEC that Crane and Gregor cannot testify to areas that are not within their respective expertise, I find no support for any theory that would not allow an expert report to be jointly written and submitted with the caveat that each expert would necessarily testify solely on their topic(s) of expertise. CFG insists that both Crane and Gregor are well qualified to opine as to each topic in both the report and rebuttal. Obviously, the experience of each of these experts is sufficiently diverse to suggest that this may not be the case with equal force for each aspect of the report. Nonetheless, CNBEC has not sufficiently stated their objections in this regard as to particular sections of the main report and the rebuttal. I decline to do so *sua sponte*.

2. *Main Report*

**\*14** As to the main report, CNBEC argues that Crane and Gregor should not be permitted to rely on the "apparent" judgments of the Pennsylvania

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Department of Banking to allow banks to operate under similar names in Pennsylvania as this is Irrelevant to a determination of likelihood of confusion. In their report, Crane and Gregor state as follows:

> This prevalence of similarly named financial institutions is significant for at least two reasons. First, with respect to Pennsylvania, it illustrates an apparent judgment by bank executives and the Pennsylvania Department of Banking alike that relatively subtle difference in name, such as a single word, geographic identifier, or even the spacing between words are sufficient to distinguish one bank from another. Examples are shown in Exhibit 5, including: "East Penn Bank" and "First Penn Bank," "Keystone Savings Bank" and "Keystone State Savings Bank;" "PeoplesBank" and "Peoples National Bank;" and "CommunityBanks" and "Community Bank.."

Report of Crane and Gregor at p. 9 (emphasis in original). I agree with CNBEC that the judgment of the Pennsylvania Department of Banking is irrelevant to the issue of likelihood of confusion and, therefore, does not "fit" the case. Therefore, I am excluding Crane and Gregor's report to the extent that it deals with same. Next, CNBEC argues that the Crane and Gregor report should be excluded as it relies on third party uses of the "CITIZENS" mark outside of the Citizen's marketplace and, therefore, has no relation to the "relevant customer group." As the Court of Appeals for the Third Circuit has held, third party use of a mark outside of the market at issue is relevant to an inquiry as to the strength of a mark: "Although the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, the extensive use of the term in other markets may also have a weakening effect on the strength of the mark." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 223 (3rd Cir.2000). Therefore, Crane and Gregor's considerations of such third party uses of the term CITIZENS "fits" the case and should not be excluded.

In addition, CNBEC argues that the report should be excluded because it concluded that injunctive relief should not be granted. As noted above with regard to Francis J. Kelly, I agree with CNBEC that this evidence is irrelevant to the jury as they are not charged with the issue of whether to grant injunctive relief. Accordingly, Crane and Gregor cannot testify as to the appropriateness of injunctive relief to the jury. However, Crane and Gregor may testify with regard to this issue to the court. Below, I will detail the logistics of the manner in which this will be dealt

with at trial. See, Bifurcation Section L.

Finally, CNBEC argues that the report utilizes tests for confusion that are legally incorrect. CNBEC argues that neither the Lanham Act nor judicial authority suggests that violation of the Lanham Act is only established where there is a potential for "significant economic impact" or only where there is a likelihood that confusion will "persist without corrective measures." Therefore, CNBEC argues that Crane and Gregor's conclusions regarding the likelihood of confusion, in resting upon these artificial standards, do not fit the issues of the case. Accordingly, CNBEC argues that Sections I-IV of the main report should be excluded in their entirety. In opposition, CFG argues that Crane and Gregor are merely opining as to whether the confusion evidence presented by CNBEC has meaningful effect within the marketplace. CFG cites to *Checkpointe Sys. Inc. v. Check Point Software Tech., Inc.,* 269 F.3d 270, 297 (3rd Cir.2001), for the proposition that if "confusion has little or no meaningful effect in the marketplace, it is of little or no consequence [in the] analysis." However, in *Checkpointe,* the Third Circuit declined to issue a "blanket rule," indicating that an analysis must be performed on a case-by-case basis and that "[a]s with all cases involving the likelihood of confusion under the Lanham Act, courts should employ all the relevant Lapp factors and weigh each factor to determine whether in the totality of the circumstances marketplace confusion is likely." *Checkpointe,* 269 F.3d 270, 297. In utilizing a definition of confusion that necessitates economic harm and systematic confusion, I find that Crane and Gregor's report does not analyze the relevant facts in light of the applicable legal standards. The use and application of this improper standard would not only be unhelpful to the jury but may mislead the jury and, therefore, should be excluded.

**\*15** This is not to say, however, that Sections I through IV of the main report should be excluded in their entirety. In Sections I through IV of the main report, Crane and Gregor opine, *inter alia,* that bank customers are accustomed to distinguishing among banks with similar names; customers choose among banks based upon substantive characteristics; entries in CNBEC's log can be largely explained by one-time events; and that the entries are not extraordinary in volume or content. Although Crane and Gregor cannot instruct the jury with regard to the concept of "meaningful" confusion, explain their conclusions with regard to whether the evidence presented by CNBEC is "meaningful" confusion, or imply that the confusion is not "meaningful" by use of terms such as

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
(Cite as: 2003 WL 24010950 (W.D.Pa.))

"significant confusion", they may otherwise opine on these issues. In sum, Crane and Gregor may testify with regard to each of these sections *without* comment or reliance on the definition, explanation or import of "meaningful" confusion and without opinion on whether the evidence of CNBEC constitutes "meaningful" confusion. Lastly, any rebuttal evidence regarding issues I have excluded from Crane and Gregor is necessarily inadmissible as moot.

### H. *The Report and certain testimony of Paul A. Adams, Esq.*

CFG's objection to Paul A. Adams, Esq. is not brought pursuant to *Daubert.* Rather, in support of it's Motion to Exclude the report and certain testimony of Paul A. Adams, CFG has filed a one paragraph (two sentence) argument. *See,* CFG's Brief in Support (Docket No. 136). Therein, CFG submits:

It is well established that "as a general rule, an expert's testimony on issues of law is inadmissible." *Whitmill v. City of Philadelphia,* 29 F.Supp.2d 241, 246 (E.D.Pa.1988) (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991).* As a result, while Mr. Adams may be able to testify, if qualified, regarding the process by which the Pennsylvania Banking Commission approves names, he may not testify as to the legal conclusions that may be drawn from that process.

*Id.* In his report, Adams considers the following:

[W]hether the Pennsylvania Department of Banking considers the trademark rights, registered or unregistered, regarding names used by prospective or exiting third party federally-charted banking institutions when deciding pursuant to sections 804 and 805 of the Pennsylvania Banking Code of 1965, 7 P.S. § 804, 805, whether to assent to a name reservation and approve the use of a name by a prospective or existing Pennsylvania state-chartered bank, bank and trust company, or savings bank. I also considered the relationship between a determination by the Pennsylvania Department of Banking for name approval and trademark rights under the Lanham Act, 15 U.S.C. § 1501 *et seq.* and common law.

*See,* Adams' report, attached to the Second Declaration of Neil Smith, at Tab 18, p. 3 (Docket No. 145). As I have previously noted above in addressing CNBEC's Motion to Exclude the Expert Reports of Crane and Gregor, the practices and procedures of the Pennsylvania Department of Banking are irrelevant. Therefore, I am excluding Adams' testimony and report based on the same.

### I. *The Report and certain testimony of Dennis St. J. Mulvihill, Esq.*

**\*16** CFG's objection to Dennis St. J. Mulvihill, Esq. is not brought pursuant to *Daubert.* Rather, in support of it's Motion to Exclude the report and certain testimony of Dennis St. J. Mulvihill, Esq., CFG has filed a one paragraph (two sentence) argument. *See,* CFG's Brief in Support (Docket No. 135). Therein, CFG submits:

It is well established that "as a general rule, an expert's testimony on issues of law is inadmissible." *Whitmill v. City of Philadelphia,* 29 F.Supp.2d 241, 246 (E.D.Pa.1988) (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991).* Mr. St. J. Mulvihill's testimony appears to be nothing more than a recitation of legal conclusions having little or nothing to do with the issues involved in this case.

*Id.* In opposition, CNBEC asserts that Mulvihill's report is relevant to CFG's claims of tortious interference (Counts II and III of the Amended Complaint, Docket No. 9), as well as to CFG's intent with respect to trademark infringement. *See,* CNBEC's Brief in Opposition, pp. 3-5 (Docket No. 164). To that end, I find that Mulvihill's report is relevant.

However, according to Mr. Mulvihill's report, he was contracted by CNBEC to offer his opinion on the "legal effect of filing a praecipe in Butler County" in connection with the instant case. *See,* Mulvihill's report, attached to the second Declaration of Neil Smith, at Tab 17, p. 1 (Docket No. 145). After reviewing his report, I find that it is what it purports to be, a legal conclusion on the filing of a praecipe for a writ of summons. As counsel for CNBEC acknowledges, legal conclusions are inadmissible because such matters are the exclusive province of the judge and jury. *Dunn v. HOVIC,* 1 F.3d 1362, 1369 (3d Cir.1993); *Life and Health Ins. Co. of America v. Fed. Ins. Co.,* Civ.A. No. 92-6736, 1995 WL 263551 (E.D.Pa. May 2, 1995); *Roberson v. City of Philadelphia,* Civ. A. No. 99-3574, 2001 WL 210294, *5 n. 10 (E.D.Pa. March 1, 2001). The facts that CNBEC filed a praecipe for writ of summons, the writ was never served, and the writ expired are simply that, facts of the case. The jury does not need legal expert testimony to understand said concepts. Furthermore, it is my responsibility to instruct the jury on law of the case. Consequently, I find that Mr. Mulvihill's testimony is inadmissible.

### J. *The Report and certain testimony of Bryan F. DiLucente, CPA*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

CFG takes issue with the opinions offered by Bryan F. DiLucente, CPA, CNBEC's proffered damage expert. *See,* CFG's Brief in Support (Docket No. 140). CFG argues that Dilucente's opinions should be excluded based on *Daubert* and Rule 702 of the Federal Rules of Civil Procedure. [FN7] *Id.* Specifically, CFG seeks to preclude CNBEC from presenting the testimony of DiLucente at trial because his report is unreliable, it does not "fit" the case, and/or lies outside of DiLucente's expertise. *See,* CFG's Brief in Support, at p. 2 (Docket No. 141). I will address each issue raised by CFG.

> FN7. CNBEC argues that the Motion regarding DiLucente is "more aptly characterized as a premature Motion in Limine." *See,* CNBEC's Brief in Opposition, p. 1 (Docket No. 162). Regardless of how it is characterized, I will address the issues raised by CFG in its Motion.

### 1. *Expertise*

**\*17** CFG argues that damage testimony from DiLucente should be excluded because it does not fit his expertise. *See,* Docket No. 140, p. 4. DiLucente is a Certified Public Accountant with degrees in industrial management, managerial economics, and accounting. Docket No. 145, Tab. 12. After a review of his *curriculum vitae* and his testimony regarding his qualifications, I am satisfied that DiLucente is qualified to testify regarding damages.

### 2. *Damage assumptions based on testimony of others*

CFG argues that DiLucente should be precluded from testifying regarding his damage opinions because they are not based on any reliable method or principle. *Id.,* at pp. 2-4. To the extent that DiLucente's opinions are based solely on the opinions of others that have been excluded from testifying (e.g.Werner, Morrin), DiLucente's opinions must be excluded. For example, DiLucente cannot testify as to rebranding costs if solely relying on the testimony of Werner. As CNBEC has recognized, "DiLucente's testimony [should] not be offered before a jury until the factual predicate for his opinion is established." *See,* CNBEC's Brief in Opposition, p. 4 (Docket No. 162).

### 3. *Other attacks by CFG*

a. DiLucente's opinions regarding CNBEC's financial performance

Specifically, CFG asserts that DiLucente's observations are based on budgets which are not provided and provides no information regarding how the budgets were prepared. *Id.* at 5. CFG further asserts that DiLucente's focus on growth trends are based on a "cherry picked" single asset (loans) and a single liability (deposits) instead of growth trends of assets and liabilities as a whole. *Id., citing,* Docket No. 145, Tab 12, pp. 5-7. Additionally, CFG asserts that DiLucente's report is deficient in that it does not set forth the methodology for choosing the peer group banks he selected, it uses an Insufficient number of peer group banks for comparison, and it fails to list the "economic and environmental factors and conditions" which he took into account. *See,* CFG's Brief in Support, at pp. 5-6. CFG finally argues that DiLucente's conclusions regarding CNBEC's performance are unreliable because DiLucente has not provided the entirety of the performance statements upon which the conclusion is based, he does not explain who prepared them and for what purpose they were prepared. *See,* CFG's Brief in Support, at pp. 6-7. After DiLucente's testimony at the *Daubert* hearing, I am satisfied that these issues go to the weight / credibility of his opinion and can be adequately dealt with by CFG on cross-examination.

b. *Causal link*

The last reason CFG asserts that I should exclude DiLucente's testimony is that it will not assist the trier of fact to determine whether the name confusion has caused the proffered damages. *See,* CFG's Brief in Support, at p. 7. Specifically, CFG argues that DiLucente offers nothing to substantiate his claims that CFG's use of the name Citizens caused CNBEC to abandon its advertising campaign and that CNBEC will have to rehabilitate its brand, even if successful in this litigation. *Id.* [FN8] Rather, DiLucente's opinions are based on the opinions rendered by others. *Id.* CNBEC does not specifically address the issue of causal connection. *See,* CNBEC's Brief in Opposition (Docket No. 162). After a review of DiLucente's report, the briefs and his testimony, I agree with CFG that DiLucente cannot testify as to causation. He is qualified to testify as to damages, but he has no qualifications to testify as to the causal link. For example, DiLucente may testify that deposits went down, but he may not testify that deposits went down because of customer confusion regarding the name Citizens.

> FN8. CFG further argues that even if

Not Reported in F.Supp.2d                                                                                                      Page 14
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

successful, CNBEC is not entitled to recover costs of corrective advertising, CFG's profits, or CNBEC's attorneys fees and costs because there is no credible evidence of willfulness, bad faith or exceptional circumstances and, therefore, those amounts do not "fit" this case and DiLucente should not be permitted to testify regarding the same. *See,* CFG's Brief in Support, at p. 7. I agree with CFG that pursuant to 15 U.S.C. § 1117, CNBEC must establish willfulness before DiLucente is permitted to testify as to damages regarding the same. "Though the standards for (1) awarding profits; (2) determining whether such an award should be enhanced; and (3) awarding attorneys' fees under the Lanham Act differ somewhat, the issue of willful infringement is central to each." *Securacomm Consulting, Inc., v. Securacom Inc.,* 166 F.3d 182, 187 (3d Cir.1999), *citing ALPO Petfoods, Inc. v. Raiston Purina Co.,* 913 F.2d 958, 968 (D.C.Cir.1990) ("an award based on defendant's profits requires proof that the defendant acted willfully or in bad faith"); 5 J. Thoms McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30.91 at 30-148, n 6 (4th Ed.1996) (willful infringement provides usual basis for enhancing profit award) (collecting cases); *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d Cir.1991) (showing bad faith, fraud, malice or willfulness necessary for award of attorneys' fees). "Willful infringement has a central role in the availability of ... these kinds of relief because of the relevance of equitable factors in determining their appropriateness on a given set of facts." *Securacomm,* 166 F.3d at 187, n. 1. CNBEC argues that it will present evidence at trial to establish the same. Therefore, CFG may renew its objection at trial, if appropriate, and I will rule on the issue at that time based on the evidence presented.

K. *The Rebuttal Report of Michael J. Burke*

**\*18** CNBEC objects to the rebuttal report of Michael J. Burke on several grounds. First, CNBEC claims that Burke's report does not qualify as a rebuttal. CFG offers the report of Burke in rebuttal to the opinion of Paul A. Beck. CFG claims that Beck has offered incomplete and potentially confusing opinions and that Burke's report is necessary to

explain and disprove Beck's opinion. I agree with CFG that rebuttal evidence can be offered to explain, repel, counteract or disprove an opinion. See, *Blackstone v. Osche,* 192 F.Supp. 174 (W.D.Pa.1961). Herein, Beck states that the Patent and Trademark Office ("PTO") did not compare CFG's marks with CNBEC's marks. Burke's report explains that although the PTO did not compare CFG's mark with CNBEC's mark it did compare CFG's mark to other federally registered marks. I find this to be relevant and proper rebuttal as Burke's opinion clarifies Beck's opinion and addresses any probable conclusions.

 In addition, although Burke discusses the "commercial strength" of a mark and Beck does not, this does not make the rebuttal improper as any analysis of strength must necessarily look at both inherent strength and commercial strength. See *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198 (3rd Cir.2000). Accordingly, I find that Burke's opinion is proper rebuttal and I will not exclude it on that basis.

 Next, CNBEC objects to Burke's opinion on the basis that it exceeds the permissible bounds of expert testimony by instructing the jury on the legal concept of commercial strength. Clearly, a mere recitation of legal principles is not admissible expert testimony. However, to the extent Burke explains the procedures used by the PTO, his explanations are necessary and useful in the determination of the manner in which the PTO necessarily operated herein. Accordingly, Section I of his report is not excluded on this basis. However, in Section II, Burke merely recites legal principles in an effort to support his conclusion that,

> although the term CITIZENS may be inherently distinctive as applied to banking or financial services, both marks exist in a crowded field of other CITIZENS marks for banking and financial services, and are thus weak marks deserving of a narrow scope of protection.

 Burke Report at p. 9. Thus, Section II of the Burke report should be excluded on that basis alone. However, I also agree with CNBEC that Burke has further failed to provide a foundation for this conclusory statement. Burke makes the above statement without any indication that he conducted any analysis or investigation other than a "trademark.com" search for marks that contain the name "CITIZENS." Although evidence of third party confusion within and without a senior user's market is relevant to a determination of commercial strength, an expert report must provide sufficient foundation as a basis for his conclusions. Burke does not perform

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

any required analysis other than a finding that other uses of the name CITIZENS exist. Under *Daubert,* Burke's conclusion is, therefore, no "more than [a] subjective belief" and should be excluded. Accordingly, Section II of Burke's report is excluded in its entirety.

### L. *Bifurcation*

**\*19** CNBEC has argued that the issue of injunctive relief is not proper for a jury, but rather is to be considered by me. In response, counsel for CFG suggested that I bifurcate the case. After consideration of this issue, I agree and will bifurcate the case in the following manner: On the trial days where counsel has a witness(es) that is going to testify as to injunctive relief, counsel must inform the court at the beginning of the day. Depending upon the number of injunctive relief witnesses for a particular day, I will allow for the jury to be excused early and will hear testimony from those witnesses at the end of the day. Thus, a witness may testify first thing in the morning, but be recalled in the afternoon, after the jury is excused, to testify with regard to injunctive relief.

### M. *References to Parties at Trial*

Because it would be unfair for either party to refer to itself as "Citizens" at trial and to ensure that the parties are referred to in a consistent manner during the trial, I find that it is necessary to restrict the parties to the following names at all times during the trial: Citizens National Bank of Evans City is to be referred to as CNBEC and only as CNBEC, and Citizens Financial Group is to be referred to as CFG and only CFG.

* * *

### ORDER OF COURT

And now, this 23rd day of April, 2003, after a review of the submissions of the parties, it is hereby ordered as follows:

1. CFG's Motion to Exclude Guideline Research Corporation's Survey and the accompanying testimony of Robert Reitter (Docket No. 134) is granted. Thus, any testimony regarding the same is inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

2. CFG's Motion to Exclude the Report and certain testimony of Lawrence R. Werner (Docket No. 134) is granted. Thus, any testimony regarding the same is

inadmissible. Furthermore, to that end, any rebuttal evidence regarding the same is necessarily inadmissible as moot.

3. CFG's Motion to Exclude the Report and certain testimony of Paul A. Adams, Esq. (Docket No. 134) is granted.

4. CFG's Motion to Exclude the Report and certain testimony of Dennis St. J. Mulvihill, Esq. (Docket No. 134) is granted.

5. CFG's Motion to Exclude the Report and certain testimony of Bryan F. DiLucente, CPA (Docket No. 134) is granted in part and denied in part. I find that DiLucente is qualified to testify, but to the extent that DiLucente's opinions are based solely on the opinions of others that have been excluded from testifying (e.g.Werner, Morrin), DiLucente's opinions are be excluded. Furthermore, DiLucente can testify at trial regarding his opinions of CNBEC's financial performance. Finally, DiLucente cannot testify as to causation.

6. CFG's Motion to Exclude the Report and certain testimony of Maureen Morrin, Ph.D. (Docket No. 134) is granted in part and denied in part. Morrin can testify as to her opinion numbers 1 (brand name confusion), 2 (brand trust) and 5a (identical names). Morrin cannot testify as to her opinion numbers 4 (tip of the iceberg), and 5h (color perception). Morrin may not testify regarding the first part of Opinion 3 regarding the relevancy of other banks named "Citizens" outside the Pittsburgh region, but may testify as to the remaining portion of opinion number 3.

**\*20** 7. CNBEC's Motion to Exclude the Expert Report and Portions of the Rebuttal Report of Dwight B. Crane and William T. Gregor (Docket No. 148) is granted in part and denied in part as more fully set forth in my accompanying opinion;

8. CNBEC's Motion to Exclude Portions of the Expert Report and Rebuttal Report of Francis J. Kelly, III (Docket No. 149) is granted in part and denied in part. Kelly cannot testify as to paragraphs 51-60 of his main report to the jury but may testify to the court. Paragraphs 21-25 of his rebuttal report are excluded as moot.

9. CNBEC's Motion to Exclude The Rebuttal Report of Michael J. Burke (Docket No. 137) is granted in part and denied in part. Section II of Burke's report is excluded.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)
**(Cite as: 2003 WL 24010950 (W.D.Pa.))**

Page 16

10. CNBEC's Motion to Exclude The Expert Report and Survey of Henry D. Ostberg (Docket No. 138) is denied; and

11. CNBEC's Motion for Leave to File Supplemental Memorandum in Support of its Motion to Exclude Expert Report and Testimony of Henry D. Ostberg (Docket No. 157) is granted.

The Clerk of Courts is directed to file and docket Defendants' Supplemental Memorandum of Points and Authorities in Support of Motion to Exclude Expert Report and Testimony of Henry D. Ostberg that it received on April 4, 2003.

12. The case will be bifurcated with regard to the testimony relating to injunctive relief.

13. The parties will be restrict at trial to referring to Citizens National Bank of Evans City as CNBEC and to Citizens Financial Group as CFG.

Not Reported in F.Supp.2d, 2003 WL 24010950 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
JUICY COUTURE, INC. and L.C. Licensing, Inc.,
Plaintiffs,
v.
L'OREAL USA, INC. and Luxury Products, LLC,
Defendants.
**No. 04 Civ.7203(DLC).**

April 19, 2006.
William Spatz, Keith Walter, Erica Klein, Nicholas
Koch, John Daniel, Kramer Levin Naftalis & Frankel
LLP, New York, NY, for Plaintiffs Juicy Couture,
Inc. and L.C. Licensing, Inc.

Robert Sherman, Danielle White, Eric Bensen, Paul,
Hastings, Janofsky & Walker LLP, New York, NY,
for Defendants L'Oreal USA, Inc. and Luxury
Products, LLC.

*OPINION AND ORDER*

COTE, J.

**\*1** Juicy Couture, Inc. and L.C. Licensing, Inc.
("Couture") purveyors of women's clothing and
related items, have sued L'Oreal USA, Inc. and
Luxury Products, LLC ("Lancôme"), a maker and
seller of cosmetics and fragrances, for trademark
infringement. Couture asserts rights in its registered
marks JUICY, JUICY COUTURE and CHOOSE
JUICY. It asserts common law rights in the marks
Juicy Pop Princess, Be Juicy, Wear Juicy, The Joy of
Juicy and Juicy Girls Rule. It claims that Lancôme
infringed its rights by adopting the mark Juicy Wear
as a product name, and by using the words juicy,
Juicy Pop and Juicy Gossip in advertising and
promotions in mid-2003 and mid-2004 in connection
with two in-store promotions of Lancôme products.

Couture seeks damages based on the sales of Juicy
Wear. It also seeks an injunction preventing Lancôme
from using Juicy Wear as the name or trademark for
any product; using juicy alone or in combination with
another word or phrase that means apparel or has an
apparel connotation; using juicy alone or in
combination with any word or phrase that means

bags or connotes bags; promoting, advertising or
marketing its line of Juicy products with signs,
displays, or advertising which conspicuously or
dominantly present the word juicy alone or in
combination with another word which in the
aggregate is not the trademark or name of a Lancôme
Juicy product.

This Opinion presents the findings of fact and
conclusions of law following a bench trial held
between April 4 and April 12, 2006. For the reasons
described below, judgment is entered for Lancôme.

*Procedural History*

Couture's complaint, filed on September 9, 2004,
alleged seven claims: trademark infringement, false
designation of origin and unfair competition, and
trademark dilution under the Lanham Act; deceptive
acts and practices and trademark dilution under New
York General Business Law; and trademark
infringement and unfair competition under New York
common law. The complaint based these claims on
Lancôme's sale of six products: JUICY TUBES,
JUICY ROUGE, Juicy Tubes Pop, Juicy Crayon,
Juicy Vernis, and Juicy Wear, and Lancôme's use of
Juicy and Juicy Pop to describe "a line of cosmetics
and fragrances."

On November 16, 2005, following the close of
discovery, Lancôme moved for partial summary
judgment precluding a monetary recovery, arguing
that Couture could not show that Lancôme had acted
in bad faith, an essential component of any claim for
damages. On December 1, Lancôme filed a separate
motion for summary judgment based on its
affirmative defense of laches, relying on Couture's
failure to oppose Lancôme's registration of the marks
JUICY TUBES and JUICY ROUGE and failure
generally to oppose Lancôme's development of its
line of Juicy products. On January 27, 2006,
Lancôme moved for summary judgment on the
claims of trademark dilution and deceptive acts and
practices under New York state law. On February 10,
the parties stipulated to a voluntary dismissal of those
claims, mooting Lancôme's January 27 motion.

**\*2** Oral argument on Lancôme's remaining summary
judgment motions was held on February 15. At oral
argument, Couture substantially narrowed its
remaining claims. With the exception of Juicy Wear,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

it withdrew all claims that Lancôme's individual products infringed Couture's trademarks. [FN1] While Couture maintained the position that the marketing of Lancôme's products was infringing, it narrowed those claims to focus on the Juicy Gossip and Juicy Pop promotional events in 2003 and 2004. While neither promotion was precisely identified in the complaint, some elements of the promotions were described, particularly the distribution of certain gifts with purchase during those events.

> FN1. At oral argument, Couture's counsel proffered a new theory of trademark infringement based on selling a group of individually non-infringing products as a collection. Couture abandoned this newly-minted theory in response to a Lancôme motion *in limine.*

Couture's demand for a jury trial was struck in an Opinion and Order dated March 7. *Juicy Couture v. L'Oreal, USA, Inc.,* 04 Civ. 7203(DLC), 2006 WL 559675, at *1 (S.D.N.Y. Mar. 7, 2006).* In a separate Order, also dated March 7, both of Lancôme's motions for summary judgment were denied, and the trial long scheduled to begin on April 17, was converted to a non-jury trial scheduled to begin on April 4.

*Trial Procedure*

The trial was conducted in accordance with the Court's Individual Practices and the March 7 Order. The parties filed a Joint Pretrial Order and proposed findings of fact and conclusions of law on March 23. The parties also served affidavits containing the direct testimony of all their witnesses, as well as copies of all the exhibits and deposition testimony which they intended to offer as evidence in chief at trial.

With its Pretrial Order submissions, Couture presented affidavits constituting the direct testimony of Gela Taylor ("Taylor"), Co-President and Co-Founder of Juicy Couture, Inc.; Janey Lopaty ("Lopaty"), Vice President of Public Relations for Juicy Couture, Inc.; Anita Jacobson ("Jacobson"), Director of New Business Development and formerly Director of Marketing and Licensing for Juicy Couture, Inc.; Theresa Pastor ("Pastor"), a paralegal with the law firm Kramer, Levin, Naftalis & Frankel LLP; and Milan Chromecek ("Chromecek") and Verena Bomhard ("Bomhard"), partners with the international law firm Lovells. It also offered testimony from four experts: Philip Johnson

("Johnson"), Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a market research and consulting firm; James Malackowski ("Malackowski"), President and Chief Executive Officer of Ocean Tomo, LLC, a business consulting firm; Larry Hotz ("Hotz"), President and founder of Right Angle Research, LLC, a public relations consulting firm; and Marilyn Levey ("Levey"), the principal of Levey Marketing Services, Inc., a marketing and merchandising consulting company. With the exception of Pastor, Bomhard, Chromecek and Malackowski, whom Lancôme chose not to cross-examine, and Hotz and Levey, whose testimony was struck before trial, each of these witnesses appeared at trial and was cross-examined.

Lancôme offered the testimony of Odile Roujol ("Roujol"), Deputy General Manager of Lancôme; [FN2] Louise Rosen ("Rosen"), a former Lancôme employee who served as Group Product Manager for Makeup during the development of Juicy Tubes; Austin Mathis ("Mathis"), Vice President of Accounting for L'Oreal's Luxury Products Division; Suzanne Davidowitz ("Davidowitz"), Senior Vice President Corporate Communications for L'Oreal USA, Inc.; José Monteiro ("Monteiro"), Chief Trademark Counsel of Lancôme Paris; and Jaclyn Brody ("Brody"), a paralegal at Paul, Hastings, Janofsky & Walker LLP. Lancôme offered expert testimony from Jacob Jacoby, Professor of Consumer Behavior and Retail Management at New York University's Leonard N. Stern Graduate School of Business, where he holds the Merchant's Council endowed chair; Thomas Dupont, the President of $D^2$ Research, a survey research and consulting firm; and Daniel McGavock ("McGavock"), Vice President of CRA International, a financial consulting firm. Couture chose not to cross-examine Monteiro, Brody and McGavock, and they did not appear at trial.

> FN2. Roujol was also examined by Couture as a witness in its case in chief.

**\*3** The parties also offered excerpts from the deposition testimony of the following individuals. Couture offered excerpts from the depositions of Angela Ahrendts, Senior Vice President of Liz Claiborne; Marie Cesbron, formerly the Assistant Vice President of Makeup Marketing for Lancôme USA; Dalia Chammas, Senior Vice President and General Manager of Lancôme USA; Edgar Huber, President of L'Oreal's Luxury Products Division; Elizabeth Park, formerly the Vice President of Makeup Marketing of Lancôme USA; and Nina White, Deputy General Manager and Senior Vice

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

President for Lancôme USA. Lancôme offered excerpts from the depositions of Elizabeth Harrison, owner and founder of the public relations firm Harrison & Shriftman; Jennifer Hatton, Director of Finance for L.C. Licensing, Inc.; Corey Wang, a former Marketing Coordinator at Juicy Couture, Inc.; and Art Spiro, President of Liz Claiborne Cosmetics.

Prior to trial, Lancôme moved *in limine* to strike the testimony of Couture's experts Johnson, Malackowski, Hotz, and Levey; to preclude evidence concerning foreign trademark proceedings; to preclude the introduction of settlement communications into evidence; and to preclude evidence, testimony and argument concerning a "Juicy Collection". Lancôme's motions against Hotz and Levey were granted. Its motion against Malackowski was granted in part. Couture withdrew its arguments concerning a "Juicy Collection", and the remaining motions were denied.

Couture moved *in limine* to preclude Davidowitz and Mathis for failure to disclose them during fact discovery; and to preclude Lancôme from asserting an advice of counsel defense. The latter motion was granted. Couture was given the opportunity to depose Davidowitz before trial, and the former motion was otherwise denied.

*Findings of Fact*

The following constitutes the findings of fact. [FN3] In brief, the evidence shows that Lancôme chose the name Juicy Tubes for a lip product in 1999 without any knowledge of Couture, which was named Travis Jeans at that time, or of Couture's products. Lancôme registered the marks JUICY TUBES and later JUICY ROUGE, a name for another lip product that it introduced into the marketplace in 2003, in both France and the United States without any opposition from Couture. By 2002, Couture's business was moving beyond jeans and t-shirts and becoming more successful and well-known. In 2003, while in the process of being purchased by Liz Claiborne, Couture opposed for the first time, and only in Europe, a Lancôme trademark application for the word Juicy. Couture's founders hoped that becoming part of Liz Claiborne would allow it to expand its business beyond clothing and accessories. When settlement discussions in Europe in 2004 failed, Couture filed this lawsuit and began for the first time to oppose Lancôme's trademark applications in this country.

FN3. Additional fact finding appears during

the presentation of the Conclusions of Law.

As it is presently configured, this case principally concerns events occurring in the United States in 2004, when Lancôme introduced its 6th product with a name that included the word Juicy--this time a lip product called Juicy Wear. Couture objects to that product name and objects to two promotions run by Lancôme, one in 2003 and one in 2004, for other Lancôme Juicy products. Because Lancôme adopted the word Juicy in good faith and without knowledge of Couture or its goods, the story will begin with Lancôme's decision to use that mark on its cosmetics, and its development of its line of Juicy cosmetics.

*Lancôme*

A. Lancôme's Business

**\*4** Lancôme was founded by a Frenchman and launched in 1935 at the Universal Exhibition in Brussels with the introduction of five fragrances. Its founder chose the rose as the symbol for his company, and it has remained its symbol. Over time, Lancôme added makeup and skin care products. Lancôme products were introduced to the United States in the 1950's. It now sells cosmetics in 163 countries. Lancôme is a recognized and successful cosmetics name in the Untied States. Its products are sold in better department stores such as Bloomingdale's and Nieman Marcus, and specialty stores.

Lancôme products are customarily sold in the United States within the cosmetics area of the store, either at Lancôme counters or at sections where only Lancôme products are sold. Lancôme counters are staffed by Lancôme personnel who usually wear smocks that display the Lancôme name. The counters and sections also prominently display the Lancôme name and its rose design.

Lancôme uses its name and the rose design on all of its trade dress, including the packaging for its individual products. This is true of the products at issue here. The trade dress includes silver packaging and black lettering.

B. Lancôme's Development of JUICY TUBES

In January 1999, Rosen, working in Lancôme's Paris, France headquarters, developed the concept for a high shine lip gloss in a tube. She and her team gave the project the code name: "Juicy Tubes ." She and Lancôme makeup artist Fred Farrugia proposed

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

including Juicy Tubes, a shiny and tasty lip gloss, in the Spring 2000 Pollen color collection. [FN4] The word juicy reminded Rosen of juicy fruit sweets from England, where she grew up, and she thought that the name juicy for products intended to come in the yellows and oranges of the Pollen color collection was an apt description. The tube was a small, flexible package. The company has used the word juicy for its Juicy product line to connote gloss and shine.

> FN4. Lancôme regularly markets a seasonal color collection consisting of a variety of Lancôme products from its different lines that come in the same or a complimentary shade.

### C. JUICY TUBES' Trademark Registration

Lancôme ordered a trademark search report in the United States for Juicy Tubes lip gloss on August 17, 1999. Searching cosmetics, soaps, pharmaceuticals, and other similar categories, it captured such widely disparate marks as LONDON TUBES and JUICE BAR. No records were found that contained both "juic" and "tube" and no records were uncovered that had any reference to Couture (or Travis Jeans).

The search did uncover a registration for cosmetics with the word juicy, specifically JUICY LIPS for lipstick (registered in 1996 to Pentech International). It also uncovered registrations for products with the word juice or a word derived from juice, such as JUICED UP for a body cleanser (registered in 1999 to Aramis Inc.), JUICE BAR for perfume (registered in 1998 to Parfums de Coeur, Ltd.), and THE JUICE for hair products (registered in 1985 to Larry Edward Clark). Image Laboratories had registered a series of marks with the word juice alone or in combination with another word for hair products. Applications were pending to register Jaguar Juice Lotion for tanning lotions, and Mossimo Juice for cologne. A search of domain names also failed to uncover Couture. Juicy.com, Juicy.net, and Juicy.org were all registered to other entities.

**\*5** On September 9, Lancôme applied in France for trademark rights to use JUICY TUBES for cosmetic products, namely, lip gloss. On January 25, 2000, it made an identical application with the United States Patent and Trademark Office ("PTO"). The PTO published the mark for opposition on January 16, 2001. Couture did not oppose the registration. The mark was registered on April 10, 2001.

### D. Lancôme's Marketing of JUICY TUBES

In January 2000, JUICY TUBES was included in Lancôme's Pollen color collection. In Spring 2001, JUICY TUBES was included in a second color collection, the Pinksplash color collection. After the success of these efforts, it became a permanent part of Lancôme's product line in January 2002. Beginning in June 2002, and running through 2003, Lancôme advertized JUICY TUBES in leading newspapers and women's magazines, such as *Vogue* and *Harper's Bazaar.*

### E. JUICY ROUGE Trademark Registration

Lancôme next developed the product Juicy Rouge, a shiny lipstick. Lancôme ordered a full trademark search in the United States for Juicy Rouge on June 27, 2002. Unlike the search done in 1999 in connection with JUICY TUBES, this search identified an application by Travis Jeans, specifically, two identical pending trademark applications filed on February 28, 2002, for the marks Juicy Couture and Juicy Jeans in eleven classes of goods including cosmetics.

As was true for the search done for JUICY TUBES, this search also revealed several registrations for marks that included the word Juicy or Juice [FN5] and even more applications for such marks. [FN6] In addition, and of interest to this litigation because of Lancôme's adoption of the mark Juicy Wear in 2004, the search also reflects L'Oreal's own application to register a mark with the word Wear, specifically Rouge Wear in connection with liquid lipcolor. The search results also reflect that Lancôme or its affiliate L'Oreal had applied for trademarks for Juicy Crush (filed and published for opposition in 2000); Juicy Fizz (filed and published for opposition in 2000); Juicy Fresh (filed and published for opposition in 2000); Juice Punch (filed in 2000, published for opposition in 2001); Juice Stick (filed in 2000, published for opposition in 2001); and Colour Juice (filed in 2000, published for opposition in 2001). This report demonstrates the existence of a significant interest in the marks Juicy and Juice for cosmetics long before the events at issue here.

> FN5. JUICY LIPS, JUICY LUBE, CREATIVE JUICE, and LEMON JUICE & GLYCERINE.

> FN6. Fruity Lip Juice (Avon), Genie Juice (JKA, Inc.), Juice Beauty (Juice Beauty, Inc.), Totally Juicy (PH Beauty Labs, Luckjuice (Debbie Klonk), and Juice (Juice

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

Beauty, Inc.).

Lancôme applied for PTO registration for JUICY ROUGE on December 19, 2002. It reflected a French registration date of June 21, 2002. The mark was published for opposition on November 25, 2003. Again, Couture did not oppose the registration. JUICY ROUGE was registered as a trademark for lipstick on April 19, 2005.

F. Juicy [Gossip]

Lancôme introduced JUICY ROUGE into the United States market in May 2003 through a promotion it called "Juicy [Gossip]." Lancôme runs approximately 54 promotions each year at its retailers in the United States. They include Gift-with-Purchase, Purchase-with-Purchase, and other in-store events. The cosmetics that are given away in the Gift-with-Purchase and Purchase-with-Purchase promotions are always Lancôme products. Lancôme makes approximately 40% of its sales of its luxury cosmetics during the Gift with Purchase and Purchase with Purchase promotional events.

**\*6** During Juicy Gossip a makeup artist taught consumers how to apply JUICY TUBES and JUICY ROUGE. The promotional materials for the "Juicy [Gossip]" event that were developed by Lancôme and sent by retailers to consumers through a cooperative advertising program ("co-op advertising") featured many Lancôme products, such as Star Bronzer, and Résolution. The theme of the materials was the opportunity to learn the makeup secrets of the Hollywood stars. For example, and placed in brackets to make it seem as if it were being whispered, it read, "[Try the stars' gorgeous lash trick. A magical date look.]" For JUICY ROUGE, the brochure stated, "[Which pop princess and sexy city divas think Juicy Tubes in Fling, Miracle and Summer are perfect for their pout? And to juice up those looks, try new Juicy Rouge for super-lasting shine]" [FN7]

> [FN7.] The entirety of the copy is capitalized in the brochure.

The Lancôme website described the event in this way. "Come to the Lancôme counter for the latest juicy gossip. How do those Hollywood Divas get their looks? Book your appointment today with your Lancôme makeup Artist and try the latest Juicy Look." The gift-of-fun, which came with any $25 purchase, was Lancôme products [FN8] in a striped "new Lancôme signature tote." None of the gift items was a Lancôme cosmetics item from its Juicy line.

The website described the gift in these terms: "[From the fun-damental to the fun-onemal, it's a case for taking off anytime: the new Lancôme signature tote with matching change purse, filled with beauty must haves. Make it yours.]"

> [FN8.] Lancôme gift packages always include a lipstick and mascara. This gift was no exception.

Beginning in May 2003, and continuing into 2004, Lancôme advertized JUICY ROUGE in national newspapers and leading women's magazines. An internal Lancôme analysis of sales through October 2003, indicated that JUICY ROUGE was most popular with the thirty-five to forty-five year old age group. Customers were reported to like it because "they can get a gloss-like shine."

G. Juicy Vernis, Juicy Crayon and Juicy Tubes Pop

In 2003, Lancôme developed three new products as line extensions of JUICY TUBES. Juicy Tubes Pop is a lip gloss with a tingling sensation; it was a permanent addition to the collection. Juicy Crayon, a shiny lip gloss pencil, and Juicy Vernis, a shiny nail polish, were "one-shot" offerings and did not become permanent additions to Lancôme's cosmetics line. Lancôme advertised Juicy Tubes Pop, but not the other two products.

Lancôme ordered full United States trademark searches for these three marks in early October 2003. The searches again identified the marks Juicy Couture and Juicy Jeans. The search also identified a new mark for Couture: Juicy Girl. According to the report, Travis Jeans filed on February 28, 2002 to register Juicy Couture and Juicy Jeans in eleven classes of goods, including cosmetics and perfume; they were published for opposition on August 12 and September 2, 2003, respectively. It reflected a March 17, 2003 filing for the mark Juicy Girl in connection with two classes of goods, including cosmetics and perfume. As with the other reports, the words Juice or Juicy appeared in several registered marks for cosmetics, and in many more applications for registration.

**\*7** Lancôme applied for trademarks for Juicy Crayon and Juicy Vernis on November 17, 2003, and for Juicy Tubes Pop on June 16, 2004. Lancôme had applied in France for registration of Juicy Tubes Pop on January 29, 2004.

H. The Juicy Pop Promotion

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Lancôme introduced Juicy Tubes Pop into the United States market beginning in May 2004 through a promotional campaign called Juicy Pop. A press release sent to beauty editors began, "a new juicy bunch bursts onto the 'pop' scene. Lancôme introduces the juiciest news yet .... new Juicy Tubes Pop...."

During the in-store Juicy Pop event makeup artists determined the consumer's "color scope" for Juicy Tubes Pop, Juicy Vernis and Juicy Crayon. A store participated for one to two weeks during a period that ran from May 21 to July 22. During that time, customers were offered a "Gift of Fun," which included a striped beach bag, flip-flops, and Lancôme products. Lancôme also sold a fragrance called Lôlli Pop in conjunction with this promotion.

At least some stores ran radio ads in connection with the Juicy Pop event. A typical radio advertisement began, "For Lancôme, this is Juicy Pop Spring 2004 gift-to-fund radio." It continued, "are your lips ready for a tingly burst of icy shine? Introducing Juicy Tubes Pop from Lancôme, a new collection of ultra shiny cooling lip gloss that will keep you looking hot and feeling cool all summer." During the ad, besides repeating the event name Juicy Pop several times, the word juicy was used as an adjective, as in, "Try a new look for summer with a juicy make-over", and come in and receive "our gift of the juicy summer tote filled with everything from makeup to bronzer, even a matching pair of flip flops."

Lancôme developed in-store signs and displays prominently featuring the words Juicy Pop in pink and orange to accompany the event. [FN9] Lancôme also developed a circular plastic display disc for the counter-top on which to set the Juicy Tubes Pop, Juicy Vernis and Juicy Crayon products. It was called the play-station, and remained on the counter for a few months after a store's two-week Juicy Pop promotional event. (The play-station is described in more detail later in the Opinion.) During the period immediately following the Juicy Pop event, Lancôme also introduced its newest Juicy product, Juicy Wear. At least at some stores, the Juicy Wear products were displayed near the play-station so that consumers could easily look at the entire family of Juicy cosmetics. Lancôme considered the Juicy Pop promotion, and the play-station, a success.

FN9. Couture complains that the Juicy Pop display made it seem like Couture was "having a party" at the Lancôme counter.

Although admitting that it has no rights in any color or color combinations, it argues that the use of pink and orange was offensive because they are colors that Couture also uses.

I. Juicy Wear

Lancôme's United States marketing team developed the concept for what became Juicy Wear in early 2003, when it conceived of a 2-step lipstick that includes a lipstick base and a clear, shiny gloss overlay in a tube. Lancôme debated the best name for the product. The company wanted to express long lasting wear and a shiny effect, but at least one key executive was concerned that the name Juicy was becoming banal. She noted that Lancôme's affiliate L'Oreal was launching a product called Color Juice. The company identified factors in favor of the name Juicy Wear, such as its ability to capitalize upon the "strong appeal of the juicy franchise," including the opportunity to "keep the edge of the juicy franchise on shine" while adding the concept of "long wear." The identified risks in this name choice were the risk "of confusion within the most successful franchise." There was a fear that the sales of Juicy Wear would cannibalize the sales of JUICY ROUGE and would conflict with the strategy of selling Juicy products at a lower price range. [FN10] One United States executive observed that in this country Juicy "represents" shine and not sheer. She wanted to choose a name that would convey "[a] full burst of rich wear proof Juicy Color sealed with Juicy shine that lets you kiss, smile and seduce indefinitely."

FN10. JUICY TUBES and JUICY ROUGE sold at $15.50 and $20, respectively, while the company intended to sell Juicy Wear at $24.

*8 Besides the name Juicy Wear, Lancôme considered Rouge Fusion, Vinyl Fixx, Vinyl Wear, Tatoo'n Shine, and Glossy Tatoo. In addition to the reference to L'Oreal during this discussion, there was a reference to Estée Lauder. In none of this internal debate is there any reference to Juicy Couture or its products. Simply put, Lancôme did not consider its competition to include any clothing manufacturer, and its product development and marketing teams focused exclusively on the trends within the cosmetics market and the competition it faced within that market.

Ultimately, Lancôme developed, and tested in October 2003, two 2-step products, one of which was

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

called Juicy Wear, and the other of which was called Rouge Fusion. The Juicy Wear product outperformed its rival in staying power and name. An internal memo reports, "Juicy Wear as a name communicates a very unique and strong concept, with a formula that delivers on *long wear* and *high shine.* It significantly outperformed Rouge Fusion, both on concept (uniqueness, overall liking, key attributes) and use (on wear and shine)."

The United States Lancôme team recommended the adoption of Juicy Wear as part of the "Juicy franchise". It considered it "the perfect opportunity to recruit women (core target 25-35 yo) who expect *long wear* and *shine.* It would fit within our geography, briniging [sic] an additional benefit to an additional core target vs. Juicy Tubes and Juicy Rouge, while capitalizing on the strong awareness of Juicy, preventing competitors from copying us and keeping the edge."

Lancôme applied to the PTO for a trademark for Juicy Wear on January 21, 2004. Lancôme did not conduct a trademark search before doing so.

The product was launched in July 2004, but was not fully distributed until some weeks later. An April 2004 press release sent to beauty editors to inform them of this new product reads: "Lancôme unveils the first long-lasting lip colour that's sealed in super-juicy shine. Introducing new Juicy Wear, ultra-lasting full colour and shine lip duo." In its text, the press release uses such phrases as "Juicy dreams do come true," and "Juicy proof ... say good-bye to dry!" Referring to its other Juicy products, the release trumpets that "Lancôme, who first started the 'Juicy' phenomenon with Juicy Tubes and Juicy Rouge, adds a high-tech duo to its 'Juicy Dream Team.'"

The largest visual used at the Lancôme counter for Juicy Wear was a close-up of a woman's open mouth and a dark red apple. The lips have a luscious, high sheen appearance from the lipstick, and the implied message is that the lipstick, which has a color as dark and rich as the apple's, will even survive the act of eating an apple.

Lancôme's sales data through August 2005 indicated that Juicy Wear was most popular in the age group thirty-five to forty-four, while JUICY TUBES and Juicy Tubes Pop were most popular among those twenty-five to thirty-four. This analysis must have been disappointing to Lancôme since one of the principal aims of the development of the Juicy product line was to attract younger women between the ages twenty-five and thirty-five, and even those as young as fifteen, to Lancôme products.

**\*9** The term "wear" is commonly used in connection with lip products. Estée Lauder has a Double-Wear duo lip product; Clinique Laboratories, Inc. has Glosswear For Lips; Avon has Glazewear Liquid Lip Color and Perfect Wear All-Day Comfort Lipstick; Covergirl has Smoothwear Liptints; and L'Oreal has Wear Infinite.

J. Lancôme's Other Trademark Applications for Juicy Products

In addition to the marks just discussed, between May and September 2003, Lancôme applied to register the marks Juicy & Fresh, Juicy Touch, Juicy, Juicy Stay, Juicy Last, and Juicy Style. In December 2003, it filed to register Juicy Kisses. Between April and August 2004, it filed to register Juicyful, Juicy Juice, Juicy Crush, Juicy Dessert, Juicy Drops, and Juicy Macaron. All of these applications were for cosmetics, except Juicy Crush, which was for a hair product.

K. Marketing

Lancôme strictly controls its marketing and advertising of its products. This central control of its image extends even to the countertop displays at Lancôme counters. In recent years it has even provided its retail locations with a calendar to show which products and lines should be featured each month.

While Lancôme refers internally to its Juicy franchise, it rarely uses that term, or synonyms such as the Juicy collection or family, in advertising. Its advertising typically refers to each product by its own name.

As with JUICY TUBES, JUICY ROUGE, and Juicy Tubes Pop, Lancôme supported Juicy Wear with print advertising, principally in women's magazines, and promotions. All of the advertising prominently featured the Lancôme name and its rose. Between 2002 and 2004, Lancôme spent almost 30% of its advertising budget in the United States on its Juicy products.

L. Lancôme's Sales

Lancôme's sales of Juicy products peaked in 2003 and 2004. JUICY TUBES and JUICY ROUGE achieved their largest sales in 2003; Juicy Wear had

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

its largest sales in 2004, the year it was launched. The sales for all three products fell off considerably in 2005. Lancôme experienced losses on Juicy Wear in both 2004 and 2005 at the marketing contribution and operating profit levels. The sales of Juicy Wear have made a significantly lower contribution to profitability than the sales of Lancôme's other Juicy products.

M. Lancôme's Knowledge of Juicy Couture

Rosen, who invented the name "Juicy Tubes" for Lancôme in France in 1999, did not know of Juicy Couture until 2002. Roujol learned of Juicy Couture in January 2004 during a trip to Miami, when she noticed someone wearing a Juicy Couture jogging suit. Lancôme executive Marie Cesbron, who was involved with the selection of the Juicy Wear name, however, was familiar with Juicy Couture clothing before the launch of Juicy Wear.

*Juicy Couture*

N. Juicy Couture's Business

Taylor and Pamela Skaist-Levy founded Travis Jeans, Inc. in 1989 with $200. Initially, it designed, manufactured and sold maternity clothing under the name Travis Jeans. In 1994, it moved into general apparel by adding t-shirts. Couture describes itself as the company that "transform[ed] the t-shirt into an alluring fashion item." Although it began with a V-neck t-shirt in a one-size-fits-all, the company was selling a t-shirt in three sizes by late 1997.

**\*10** In 1996, during the period it was selling t-shirts, Travis Jeans began to use the mark JUICY on its clothing labels. Couture's two founders chose the name Juicy because they intended to convey that their clothes were, in their words, about California, glamour, and happiness.

In 1997, the company changed its hang-tags and labels to JUICY COUTURE. Over the years, as it added other lines of clothing, its clothing has been sold with other marks such as Juicy Girl and Juicy Baby. Since June 2002, JUICY COUTURE garments are sold with at least two hang-tags, one that says JUICY COUTURE and another that says CHOOSE JUICY.

Also by 1997, Travis Jeans was selling Juicy-branded clothing in high-end department stores such as Bloomingdale's and Nordstroms. Within two years, or by 1999, its wholesale sales amounted to

approximately $11 million and its products were being sold in 800 stores.

Couture expanded into denim in 1999 with a JUICY JEANS line. As of 2000, 70% of its sales were of t-shirts and 30% were of jeans. In 2001, it added track suits and sweaters. According to Couture, "[u]sing the t-shirt as its core product, Juicy [ ] developed its collection to include a full range of coordinated tops and bottoms, including its signature tracksuits, in a variety of styles and fabrics, such as cotton, terry cloth, velour and linen."

In 2002, the company added a children's line and men's line. The company described its business in this way in 2002. "Over the past five years, the Company has built a collection of t-shirts, tracksuits, jeans and other items that are coveted by fashion-forward customers for their close and sexy fits, premium fabrics, simple and direct detailing, and dramatic, tasteful colors." At that time, Couture considered that its competitors were contemporary fashion designers such as Marc Jacobs and Michael Stars, and denim companies such as Seven and Diesel. In that year, the company's sales essentially tripled, going from $14 million in 2001 to $46 million. This reflected sales in over 1000 locations.

In 2003, Couture added flip flops and outerwear. By 2003, its products were sold in over 1100 locations, and its wholesale sales were over $92 million. In 2004, after its acquisition by Liz Claiborne, its wholesale sales were over $170 million. That year, it added socks and swimwear, and accessories like handbags, totes, and jewelry. In 2005, sometimes through co-branding agreements, it added Barbie dolls, glasses, shoes, pet products and T-Mobile Sidekicks. The Juicy Couture Barbie comes in a box bearing the crest that Couture uses on many of its products. The dolls in the box wear a t-shirt that says "Viva La Juicy" and a scarf that says Juicy Couture.

The target customer for Couture is an "affluent, fashion-conscious woman between the ages of 18 and 45." A Spring 2005 effort to conceptualize the Couture brand, suggested that the company should move from a brand that was "100% girlie" to a brand that would be a celebration of self. The workshop observed that the "Juicy Couture brand, as we know it, right now, has lost momentum," and required a repositioning.

**\*11** As of today, Couture's products continue to be sold in high-end department stores and specialty fashion boutiques. Unwanted inventory is sold in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

discount stores.

O. Couture's Promotion

Juicy does not engage in traditional advertising. It attempts to secure celebrity patrons and favorable mention in magazines and other media. Beginning in 2000, Juicy began to maintain a collection of magazine articles in which Couture clothing is pictured or discussed. Very few articles are from the period before 2002. [FN11] Beginning in 2003, Couture began to get significant press coverage. In October 2003, the two founders appeared on the television program "Oprah."

> FN11. Couture initially offered five large volumes of magazine material, none of it indexed, much of it undated, and some of it untranslated foreign language articles. Frequently, the coverage features a celebrity wearing an article of clothing that is apparently sold by Couture, but only a person already familiar with the company's clothing would discern that fact since there is no discussion of Couture in the article and no logo visible. Couture later offered a much reduced selection of press coverage, including only articles that bore a date, magazine name, and some observable reference to Couture or its products. It included in this revised offer, however, articles that picture a person wearing Couture clothing identified as such solely by the presence of what it calls a "J-pull" on the zipper.

Taylor considers a seven page article in the April 2003 issue of *Vogue* to be among the most significant pieces of press coverage ever received by her company. As Liz Claiborne was acquiring Couture, a *Vogue* reporter invited the two founders of Couture to Paris to observe their first Paris fashion shows. The article begins with a full page picture of the founders and the text, "The haute tracksuit company from the Valley just may be the future of fashion. So the California girls behind the label decided to check out fashion's present." The article recounts visits with prestigious designers to whom they gave customized t-shirts. Karl Lagerfeld's read "rebel couture." Interspersed with a recounting of their meetings with the French designers, there is a brief history of the two women and their company. Among the article's observations are, "A craze is upon us, one that validates the lifestyle of the yoga-practicing, self-employed, cheerful, rock-'n'-roll soccer mom," and,

"What makes Juicy special is that, although the clothes are not fashion, they are the perfect complement to fashion. They are worn by, and made by, women who follow the trends, the couture, the whole deal, and who know the difference between a silhouette or fabric that works, and one that just gets you by."

Couture has a Vice President who is responsible for placing its products with celebrities to be worn in their personal lives or when they appear on television, in movies or in music videos. Couture has provided its products for use on television programs since 2001, including programs like "Sex and the City," "Friends," and "Buffy the Vampire Slayer." The programs usually request the products and pay wholesale prices for those items they use, returning the rest. Upon request, it has supplied its products to Britney Spears, Jennifer Aniston, Gwyneth Paltrow, Jennifer Lopez, Cameron Diaz, Julia Roberts, Sarah Jessica Parker, and Halle Berry, among other celebrities. In 2001, Couture provided Madonna with a track suit monogrammed with the name Madge, which is Madonna's nickname in England. She was frequently photographed in it while on tour in Europe. It has supplied its products for use in motion pictures, including "Kill Bill Volume 2," "War of the Worlds," and "Mean Girls."

*12 Couture has not conducted any consumer surveys to determine the extent to which consumers are aware of its brands. Couture continues to rely on the talents of its two founders for its creative direction.

P. Couture's Registration of Trademarks

When Couture executives decide that they wish to use a word or a phrase as a trademark, they send a request to their attorneys to initiate the process to get trademark protection. The only marks for which Couture has sought protection are JUICY, JUICY COUTURE, Juicy Girl, Juicy Baby, JUICY COUTURE BABY, Juicy Jeans, Extra Juicy and CHOOSE JUICY.

Working through outside counsel, Couture made its first application to register a mark on December 13, 1994. It abandoned this initial application for the mark Juicy in connection with clothing. Its second application, filed on August 18, 1998, was also for the mark JUICY in connection with clothing, and resulted in a registration on October 12, 1999. It reflected a first use date of September 15, 1996.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 10
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

As of August 17, 1999, when Lancôme did its trademark search for JUICY TUBES, Couture had filed four applications for trademarks for clothing, including the two just discussed. None of Couture's applications had resulted in a registration as of that time. The applications were for Juicy, Juicy Girl, and Juicy Couture. [FN12]

FN12. A notice of allowance of Juicy Girl in connection with clothing issued on March 7, 2000. A notice of allowance essentially allows an applicant six months, with opportunities for extensions, to file a Statement that the mark has been used in commerce. No registration issues without such a filing. On July 2, 1999, Travis Jeans applied to register JUICY COUTURE in connection with women's clothing, claiming a first use date of June 1997. It was registered on May 9, 2000.

As of June 27, 2002, when Lancôme did its trademark search for JUICY ROUGE, Couture had filed twelve trademark applications, ten of which were exclusively for clothing marks. [FN13] As of that date, it had obtained registration of the marks JUICY, JUICY COUTURE, and JUICY JEANS for clothing. Two of the applications were for multiple classes of goods, including cosmetics and perfumery. As indicated above during the discussion of Lancôme's search report, on February 28, 2002, Couture had applied to register the marks Juicy Couture and Juicy Jeans in multiple categories. [FN14] As of today, neither mark has been registered through that application.

FN13. Couture filed for registration of JUICY JEANS on November 22, 1999 (for girls' and womens' clothing), claiming a first use date of March 1, 1997. It was registered on September 19, 2000. On January 3, 2002, Couture filed four applications for registration. It sought to register the mark JUICY for knapsacks and luggage, claiming a first use date of June 1997. It was registered on January 3, 2006. It filed to register JUICY COUTURE for luggage and bags, including tote bags, with a first use date of March 2000. It was registered on September 7, 2004. It sought registration for CHOOSE JUICY for clothing, reflecting a first use date of June 2002. It was registered on September 7, 2004. It sought registration for JUICY in connection with luggage and bags, reflecting a first use date of February

2004. It was registered on September 13, 2005. On February 28, 2002, it filed to register JUICY COUTURE for jewelry and clothing, reflecting first use dates of February 2004 and June 1997, respectively. The registration issued on July 26, 2005.

FN14. A notice of allowance was issued on November 4, 2003, for the mark Juicy Couture in connection with soaps, cosmetics, perfumery, candles, eyeglasses, craft paper, leather goods, kitchen utensils, textiles, clothing, and retail stores. A similar notice of allowance for Juicy Jeans was issued on November 25, 2003. Two notices of allowance were issued on November 4 and 11, 2003 for Juicy Baby in connection with clothing. An application to register JUICY COUTURE BABY (for clothing) was filed on January 3, 2004, reflecting a first use date of March 2002. It was registered on September 13, 2005. A notice of allowance issued on August 3, 2004, for Juicy Girl in connection with cosmetics, handbags, and women's and girls' clothing. A notice of allowance was issued on September 21, 2004, for Extra Juicy in connection with clothing.

Q. Juicy Pop Princess and Wear Juicy

Although Couture continued to apply for trademark registrations after June of 2002, it has never applied to register as a mark any of the logos for which Couture seeks common law protection in this lawsuit. Specifically, it never applied to register the phrases Wear Juicy, Be Juicy, The Joy of Juicy, Juicy Girls Rule, or Juicy Pop Princess. This is compelling evidence that Couture never considered its use of these phrases to be a trademark use.

Couture bases its claims in this lawsuit largely on the assertion that it had common law trademark rights in two slogans, Juicy Pop Princess and Wear Juicy. Specifically, Couture complains that Lancôme used the phrase Juicy Pop to describe a promotion that ran during the period May through July 2004 and introduced the lipstick product Juicy Tubes Pop. Couture asserts that this was wrongful because Couture had used a Juicy Pop Princess logo on t-shirts. Couture did not submit documentary evidence to show when, where, or how many of such shirts it sold, although it did offer a 2003 style sheet that shows it as one of several logos.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
(Cite as: 2006 WL 1012939 (S.D.N.Y.))

**\*13** Couture also points to Lancôme's introduction in July 2004 of its Juicy Wear lipstick, asserting that it followed Couture's sale of shirts that bore the logo Wear Juicy. Again, Couture has provided no sales figures, and no documents to show when or where any such shirt sales took place.

R. Liz Claiborne Buys Couture

In early 2002, Couture decided to seek a purchaser and engaged the investment banking firm Sage Co. By the summer of 2002, it had begun discussions with Liz Claiborne. During their meetings, Couture and Liz Claiborne discussed Lancôme's marketing of JUICY TUBES and its impact of the value of Couture's trademarks. On the eve of acquisition, as described below, Couture took its first action to assert trademark rights against Lancôme.

In April 2003, Travis Jeans, Inc. was sold to Liz Claiborne, Inc. for $53 million in cash and a stream of future payments. Liz Claiborne acquires roughly three companies a year, and chose to acquire Couture because it believed it had terrific potential to grow. It was impressed with the vision and energy of Couture's founders. Shortly after the acquisition, Couture changed its corporate name to Juicy Couture, Inc. One of the effects of the acquisition is that Couture no longer relies on a small factory base, but has expanded its manufacturing and distribution system significantly and professionalized its back-office operations.

S. Couture's Efforts to Police its Marks in the United States

Beginning in February 2002, Couture took its first steps to police its marks. Two months later, Jacobson, who is Taylor's sister, joined the company and assumed personal responsibility for protecting Couture's intellectual property rights. Jacobson has an MBA and experience in the clothing industry. Significantly, until it filed this lawsuit in 2004, Couture did not oppose any Lancôme trademark application filed in the United States, or object to any promotional activities, including either the Juicy Gossip or Juicy Pop promotions.

Perhaps as early as 2000, but certainly by 2001, Taylor was aware of Lancôme's JUICY TUBES. Taylor decided that no action was necessary since in her view Lancôme's use of the word Juicy for a specific product name did not threaten Couture's interests. Couture was also aware of Lancôme's introduction of JUICY ROUGE in 2003, and again

took no action. Instead, its policing activities during 2002 and 2003 were focused almost exclusively on protecting its marks in connection with uses on clothing.

During 2002, outside counsel Irell & Manella LLP, a Los Angeles law firm, sent four letters to entities that had filed trademark applications for Super Juicy, Juicy Mama's, or 99percentjuicy for clothing, and for Slipi Juici for body lotions. Irell also sent letters regarding the word Juicy appearing on a t-shirt offered at Bergdorf Goodman, and an advertisement for a knock-off jogging set.

In January 2003, Buchalter Nemer Fields & Younger, another Los Angeles law firm acting for Couture, sent a letter protesting the use of the word The juicystore on clothing. In March 2003, Skadden, Arps, Slate, Meagher & Flom, the law firm representing Couture in connection with its acquisition by Liz Claiborne, sent a letter protesting the use of the mark Juicy Couture on t-shirts. After the acquisition, Kramer Levin Naftalis & Frankel began to represent Couture. That law firm sent its first letter in June 2003, protesting the attempt to register the mark Jewcy for clothing. In October 2003, it sent a letter protesting the application to register the mark Juicy for candles. [FN15] The policing activities in the United States between January and July 2004 consisted of an e-mail and a letter protesting sales of counterfeit clothing.

FN15. Couture asserted that its February 28, 2002 application to register Juicy Couture for candles had priority.

**\*14** Couture did not file any opposition to Lancôme's applications to register Juicy marks in the United States until after the breakdown of negotiations over European trademark disputes in 2004, which is described next. At trial, Taylor asserted that Lancôme's adoption of the mark Juicy Wear for its lipstick products made her fear that Lancôme intended to extend its business into clothing. There is absolutely no basis in the evidence presented at trial to support that belief. She also asserted that Lancôme had entered "our world."

Couture filed its first opposition in the United States to Lancôme trademark applications on July 21, 2004, when it opposed Lancôme's applications to register both Juicy Stay and Juicy Last in the class for cosmetics. Since that time, Couture has opposed fifteen more PTO applications by Lancôme in the United States.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 12
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

T. Battle Beginning in February 2003 to Control the Juicy Mark in Europe

Despite the fact that Couture only recently entered the European market, Europe was the first battleground between Couture and Lancôme over trademark rights. Couture began selling its products to major accounts in France and Britain in late 2001 or so. Approximately two years later, on the eve of its acquisition by Liz Claiborne, Couture acted to oppose a Lancôme trademark application.

On February 28, 2003, Couture opposed Lancôme's application to register the word Juicy alone in France in the class for cosmetics. [FN16] Jacobson ordered Couture's French counsel to take this action because the application was for the single word Juicy, as opposed to the word Juicy in combination with another word. Given the imminent merger with Liz Claiborne and the hope that this merger would permit Couture to expand its business significantly, Couture executives believed that it was important to protect their ability to develop a Juicy Couture perfume and cosmetics line.

    FN16. Couture has not offered its opposition into evidence, but the filing of the opposition is undisputed.

Lancôme wrote immediately to demand that Couture withdraw its opposition, asserting that Lancôme had priority of rights through its French registrations of the JUICY TUBES and JUICY ROUGE marks for cosmetics. Those marks were registered on September 9, 1999, and June 21, 2002, respectively.

After consultation with its counsel, Couture decided that it would instead try to work out a co-existence agreement with Lancôme. On June 13, Couture's European counsel wrote to Lancôme, acknowledging that Couture had not opposed several of Lancôme's applications in the United States and Europe to register marks containing the word Juicy for cosmetics, and that "a large number of third parties use the name JUICY" in combination with other words for cosmetics "due to the fact that the word 'juicy' evokes hydration." It proposed that both companies agree that they could each use marks containing the word Juicy in the class of goods that included perfume and cosmetics so long as neither of them would attempt to use the word alone. Lancôme did not reply to the letter, or to a follow-up letter of July 10, or to telephone calls in August.

*15 On October 1, 2003, Couture filed a second opposition in France, this time to Lancôme's application to register Juicy Wear in connection with cosmetics. Between October 6, 2003, and May 28, 2004, Couture filed four oppositions with the European Community Trademark Office ("CTM") to Lancôme's applications to register the marks Juicy, Juicy Touch, Juicy & Fresh, and Juicy Style, all of which Lancôme had filed in the class for cosmetics.

On February 9, 2004, the French Intellectual Property Office issued a preliminary or "draft" ruling in Couture's favor on its opposition to Lancôme's application to register Juicy Wear in France in connection with cosmetics and makeup products. In issuing this ruling, the trademark office attorney relied on the fact that Couture had already registered the mark JUICY COUTURE for cosmetics and makeup. France apparently does not require proof of a use in commerce in order to register a mark.

In May 2004, Couture's European counsel again sought a meeting with Lancôme's representatives. In preparation for a settlement meeting that occurred in July 2004, Couture sent Lancôme a proposal for settling all outstanding disputes and a document outlining its view of its European rights. The latter document listed each companies' registrations with the CTM and in France, and threatened action to oppose or cancel Lancôme's CTM and French registrations if a settlement were not reached. It asserted that Couture had the ability to restrict Lancôme's use and registration of Juicy to France alone. Couture does not assert rights in the United States in the document.

The proposed global settlement would allow Couture to sell cosmetics under the names Juicy Baby, Juicy Couture, Juicy Girl, and the word Juicy with another word that unequivocally designates apparel products. Couture would not use the mark Juicy alone. Lancôme was permitted to use sixteen different brand names using the word Juicy and to create new combination marks, but could not use the mark Juicy alone or in combination with a term that was described as a generic name of a product. Six examples were given for the latter class of forbidden names, including Juicy Wear. No settlement was reached.

Following the failed settlement meeting, Couture filed an action to cancel Lancôme's French trademark JUICY TUBES. Beginning in September 2004, Couture opposed thirty-eight more applications by Lancôme that were pending before the CTM.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 13
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

U. Couture's Plans to Expand into Cosmetics

Couture's founders hope to create a "life-style brand" that will include all consumer products, even automobiles. When seeking a buyer for the company in 2002, they described their expansion plans more modestly as follows: "The Company believes the Juicy Couture brand could be an effective vehicle for a complete line of coordinated accessories, including bags, belts, casual footwear, swimwear, eyewear, and other fashion-oriented items."

**\*16** Among many other things, they hope to add a line of fragrances with some associated cosmetics. Indeed, when talking with Liz Claiborne in 2002 about a proposed acquisition of their company, the owners of Couture expressed that very desire to Liz Claiborne executives but as already noted, disclosed that Lancôme was already using the brand name JUICY TUBES on a lip gloss. After the acquisition, Liz Claiborne explored adding a line of Couture cosmetics through licensing arrangements with other companies such as Estée Lauder and L'Oreal. None of those efforts bore fruit.

It is not uncommon for successful clothing manufacturers to develop fragrance lines. All of Couture's efforts to find a licensing partner, however, have met with disappointment. Liz Claiborne is now developing a Juicy Couture fragrance internally and hopes to begin selling it in 2006. [FN17]

> FN17. Couture had hoped to begin sales of a line of fragrances in 2005.

While successful clothing companies develop fragrance lines with some frequency, it is far less common for them to succeed in adding a line of women's cosmetics. The plaintiffs have been able to identify only a few companies which have done so, each of which uses the name of the celebrity who was the designer of its clothing line, such as Chanel, as its brand name.

*Conclusions of Law*

Couture brings claims for trademark infringement of its registered marks under Section 32 of the Lanham Act, 15 U.S.C. § 1114 ("Section 32") and for infringement of its unregistered and common law marks under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) ("Section 43(a)") and New York common law. At their core, the claims are premised on an extraordinary view of the breadth and strength of Couture's rights in the word juicy which cannot be sustained factually or legally. Because Couture has not met its burden and proved that Lancôme's uses of the word in connection with cosmetics are likely to cause confusion with Couture's marks, Couture's claims are rejected.

As already described, Couture has significantly reduced its claims in the course of this litigation. Its thinking about the trademark issues that form the heart of this case nonetheless remains confused. Its goal, as articulated at the time of the trial, is to co-exist in the cosmetics market with Lancôme. On the one hand, it wants to be able to use the word Juicy in marketing its own line of cosmetics, but does not seek to prevent Lancôme from using the brand names JUICY TUBES, JUICY ROUGE or Juicy Tubes Pop. In spite of that concession, however, it does object to Lancôme's use of the brand name Juicy Wear. Precisely what principle would permit this line to be drawn is hard to discern. This litigation is not the occasion to determine whether Couture's entry into the cosmetics field with brand names using the word Juicy would infringe on Lancôme's trademark rights, or even to determine the extent to which Lancôme has trademark rights in its entire Juicy line. All that must be determined is whether Lancôme's use of the brand name Juicy Wear and two promotional campaigns have infringed Couture's trademark rights.

*I. Lanham Act*

**\*17** To sustain a claim for trademark infringement under Sections 32 or 43(a) a plaintiff must show that its mark is entitled to protection and that the defendant's use of the mark is likely to cause confusion. Time, Inc. v. Petersen Publ'g. Co. LLC, 173 F.3d 113, 117 (2d Cir.1999). Couture has not shown that it has rights in any unregistered mark.

A. Rights in Mark

In this lawsuit, Couture asserts rights in its registered trademarks JUICY, CHOOSE JUICY and JUICY COUTURE, each of which was issued in connection with women's clothing ("Registered Marks"). [FN18] Couture also claims that its t-shirt slogans Wear Juicy, Juicy Pop Princess, Be Juicy, Juicy Girls Rule, and the Joy of Juicy (the "Slogans") are marks entitled to protection as common law marks.

> FN18. JUICY and JUICY COUTURE are also registered for one or more of the following: knapsacks, luggage, bags, and jewelry.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Registration of a trademark allows the owner to sue an infringer under Section 32 and creates a presumption that the mark is valid. *See* 15 U.S.C. § 1057; *see also Wal-Mart Stores, Inc. v.. Samara Bros., Inc.,* 529 U.S. 205, 209 (2000). Lancôme does not contest Couture's rights in the Registered Marks.

Couture asserts rights in its five Slogans. [FN19] "An unregistered mark is entitled to protection under the Lanham Act if it would qualify for registration as a trademark." *Star Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 381 (2d Cir.2005). A mark is protectible if it is sufficiently distinctive either through acquired distinctiveness or its inherent distinctiveness to distinguish the plaintiff's goods from those of others. *Id.* Of course, no mark is entitled to protection if a company's "competitors must be able to use [it] in order to effectively communicate information regarding their products to consumers." *Id.* at 382.

> FN19. Although Couture asserts claims based on the Slogans it does not address either the legal or factual basis for these claims in its trial memoranda or its Findings of Fact and Conclusions of Law. It has left it to the Court to search the record to locate any evidence that might support the existence of these claims, and to gather any legal authority that might support its assertion.

[A] mark is inherently distinctive if its intrinsic nature serves to identify a particular source. In the context of word marks, courts have applied the now-classic test originally formulated by Judge Friendly, in which word marks that are "arbitrary" ("Camel" cigarettes), "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry detergent) are held to be inherently distinctive.

*Wal-Mart Stores,* 529 U.S. at 210-11 (citation omitted). Inherently distinctive marks "almost *automatically* tell a customer that they refer to a brand." *Qualitex Co. v. Jacobson Prod. Co.,* 514 U.S. 159, 162-63 (1995). Descriptive marks are those marks that "describe a product or its qualities, ingredients or characteristics." *Playtex Prods., Inc. v. Georgia Pacific Corp .,* 390 F.3d 158, 163 (2d Cir.2004) (citation omitted). Descriptive marks are only entitled to protection if they acquire secondary meaning. *Id.* Secondary meaning exists where "the public is moved in any degree to buy an article because of its source." *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 143 n. 4 (2d Cir.1997) (citation omitted). Factors that are considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." *Id.* (citation omitted). "A design used in conjunction with other marks is separately protectible in its own right if it creates a separate and distinct impression from the impression created by the other marks." *Star Indus,* 412 F.3d at 382.

**\*18** Couture has not shown why any one of the Slogans would be perceived as an indicator of source. T-shirts are a particularly ineffective medium through which to establish an inherently distinctive mark. In our culture, t-shirts often serve as personal billboards, carrying phrases that convey meanings that can range from the entirely personal to political to humorous.

The only evidence presented to establish secondary meaning in the Slogans was testimony that photographs of then-pop princess Britney Spears wearing a t-shirt bearing the Slogan Juicy Pop Princess appeared in the press. The probative value of that testimony is significantly weakened by the failure of Couture to provide even one piece of documentary evidence of that media coverage. Couture also failed to provide any evidence of its actual sales of clothing bearing any of the Slogans. There is, therefore, no evidence of when t-shirts bearing the Slogans were sold, how many were sold, or where they were sold.

Couture's failure to show that it has trademark rights in the Slogans is not surprising. When Couture identified a word or phrase as a mark that it wished to use as a source identifier, it took steps to register the mark. It never considered any of the five Slogans as any more distinctive than the myriad of other slogans it adopted for a season and then abandoned. The remainder of this Opinion will therefore address Couture's claims that Lancôme infringed the Registered Marks.

B. Likelihood of Confusion

Couture brings two Lanham Act claims concerning its Registered Marks. It asserts (1) that Lancôme's sales beginning in 2004 of the lipstick duo Juicy Wear infringed these marks and (2) that the 2003 Juicy Gossip and 2004 Juicy Pop promotions infringed its marks, although the sales of Lancôme's Juicy products that accompanied these promotions

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

were not infringing. The latter claim will be addressed after a discussion of the Juicy Wear claim.

Couture claims infringement of its Registered Marks despite the fact that none of those marks are for cosmetics. The various protections that are created by a registered trademark are generally limited to the use of the mark "in connection with the goods or services specified in the certificate...." 15 U.S.C. § 1057(b). Nonetheless, a trademark owner has "rights against use on related, non-competing products ... in accord with the realities of mass media salesmanship and the purchasing behavior of consumers." *Scarves by Vera, Inc. v. Todo Imps. Ltd. (Inc.),* 544 F.2d 1167, 1172 (2d Cir.1976). The extension of trademark protection to related products guards against improper restraints on the "possible expansion of the senior user's market, including consumer confusion, tarnishment of the senior user's reputation, and unjust enrichment of the infringer." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d Cir.1987). The market for cosmetics is sufficiently related to the field of women's clothing to merit an inquiry into whether Lancôme's products are likely to cause confusion with Couture's marks. See *Scarves by Vera,* 544 F.2d at 1174.

**\*19** To establish that Lancôme's sale of Juicy Wear is likely to cause confusion with the Registered Marks, Couture must show that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Playtex,* 390 F.3d at 161 (citation omitted). Confusion giving rise to a claim of trademark infringement includes confusion as to "source, sponsorship, affiliation, connection, or identification." *Star Indus.,* 412 F.3d at 383 (citation omitted). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id. at 384* (citation omitted). Affiliation confusion exists where use of a "unique and recognizable identifier" could lead consumers to "infer a relationship" between the trademark owner and the new product. *Id.* (citation omitted). Couture's trademark claims are premised on a theory of affiliation confusion.

The determination of whether a plaintiff has established likelihood of confusion is guided by the eight-factor balancing test introduced by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.1961). The eight factors are: 1) strength of the trademark; 2) similarity of the marks; 3) proximity of the products; 4) evidence that the

senior user may "bridge the gap" into the market occupied by the alleged infringer's product; 5) evidence of actual confusion; 6) evidence that the junior mark was adopted in bad faith; 7) respective quality of the products; and 8) sophistication of consumers in the relevant market. *Star Indus.,* 412 F.3d at 384. "No single factor is dispositive, nor is a court limited to consideration of only these factors." *Brennan's, Inc. v. Brennan's Rest., LLC,* 360 F.3d 125, 130 (2d Cir.2004). Each factor is considered in the context of how it fits into the ultimate question of the likelihood of confusion. *Id.* The analysis is not "mechanical" but should look at products "in their totality." *Star Indus.,* 412 F.3d at 384.

*Juicy Wear*

1) Strength of the Trademark

The strength of a mark is a measurement of its "ability to identify the source of the goods being sold under its aegis." *Brennan's,* 360 F.3d at 130. There are "two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Id.* at 130-31.

The measurement of a mark's inherent strength draws on the same classification system used in deciding whether a mark qualifies for trademark protection at all. Again, "[m]arks are classified, in ascending order of strength, as 1) generic; 2) descriptive; 3) suggestive; or 4) arbitrary or fanciful." *Star Indus.,* 412 F.3d at 384-85 (citation omitted). A "term may shift from one category to another in light of differences in usage through time, because a term may have one meaning to one group of users and a different one to others, and because the same term may be put to different uses with respect to a single product." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *see also Genesee Brewing,* 124 F.3d at 147.

**\*20** Arbitrary or fanciful marks are accorded "broad, muscular protection" under the law. *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 147 (2d Cir.2003). Suggestive marks are "at best moderately strong" and are afforded less protection in the absence of secondary meaning. *Star Indus.,* 412 F.3d at 385. Differentiating between the different types of marks serves to enhance market efficiency in two important ways. First, by reserving the strongest protection for arbitrary and fanciful marks, trademark law allows producers to protect the goodwill they establish for their products without depriving consumers and producers of a full range of discourse about other

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 16
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

goods offered in the marketplace. *Virgin Enters.,* 335 F.3d at 147. Second, by protecting more arbitrary marks, there is a greater chance that all the goods offered under that mark will come from a single source, thereby avoiding potential confusion. *Id.* at 148. The more unusual a mark, the less likely it is that two independent entities would choose it. *Id.* For example, "[c]onsumers who see the word *delicious* used on two or more food products are less likely to draw the inference that they must all come from the same producer." *Id.*

 Couture's Registered Marks are descriptive and not inherently distinctive. Juicy has several distinct meanings including "full of or abounding in juice; succulent" and "[s]uggestive, [especially] in a sexual way; piquant, racy, sensational." *Oxford English Dictionary* (2d Ed.1989). [FN20] It does not take any imaginative leap to connect Couture's "close and sexy fits" to the latter definition. Couture prides itself on designing women's clothing that is sexy, even racy, and its brand names underscore that identity.

>       FN20. Juicy has also been used to signify "[h]aving rich colouring suggestive of a moist surface" although this definition, which was used in art criticism in the late 19th century, is somewhat antiquated. *Oxford English Dictionary* (2d Ed.1989).

 Similarly, juicy is either descriptive or at best suggestive when applied to cosmetics. When juicy is defined as succulent, it takes little imagination to make a connection between the term and a product that would be applied to the lips. Lancôme's use of juicy is built on this connection. Its advertisements for its Juicy products refer to "mouth watering shine" and "just picked juicy sweetness." When used to convey shine, which is its principal use by Lancôme in the United States, juicy is barely suggestive in the world of cosmetics and not entitled to strong protection based on inherent distinctiveness.

 A trademark's strength is also measured by "fame or acquired distinctiveness." *Id.* (citation omitted). "If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use." *Id.* The factors that are considered in assessing a mark's secondary meaning were listed above.

 Couture's primary evidence of secondary meaning is derived from its unique approach to the promotion of its marks. Couture eschews traditional advertising. Instead it directs its attention toward winning

celebrity endorsements and inviting attention by the mass media. The evidence is mixed as to whether this marketing strategy has contributed in any significant way to brand awareness. The media coverage of celebrities wearing Couture brands, whether on television, in movies, or in their personal lives, rarely includes any mention of the words Juicy or Juicy Couture. The products themselves are generally unmarked. At some point in time which it has failed to identify, Couture adopted a "J-pull", a small zipper pull shaped in a J, for garments with a zipper. This is too small a detail to be noticeable in ordinary media coverage. [FN21] Thus, for the most part, in order to recognize the clothes and to associate those clothes with Couture, or with one its marks such as JUICY, a viewer already would have to be familiar with Couture's products. Nonetheless, by at least 2003, Couture was receiving significant media attention in magazines that specifically identified its clothing, on occasion as it was being worn by a celebrity.

>       FN21. Couture has also failed to show that the J-pull has any secondary meaning to consumers.

 **\*21** While Couture's sales grew steadily between 1999 and 2002, Couture has not shown what percentage of those sales were associated with one of the several Couture labels in any given year. It was only with its acquisition by Liz Claiborne in 2003 that Couture's sales first approached $100 million. In 2004, the year Lancôme's Juicy Wear appeared on the market, Couture's wholesale sales were over $170 million. While Couture has not pointed to record evidence of the extent to which the 2003 and 2004 sales were in the United States or were for products other than clothing, it appears fair to conclude that a significant percentage reflects United States sales, and that the largest source of revenue remained women's clothing sales. These are significant sales and reflect brand awareness.

 Couture has not sold any cosmetics or fragrance. Couture has done no studies to measure consumer awareness of its Registered Marks. There is modest evidence of efforts to plagiarize Couture's marks. As for length and exclusivity of the mark, the Registered Marks are relatively young marks.

 To summarize, whatever strength adheres to the Registered Marks, it is limited to women's clothing. [FN22] The Registered Marks are descriptive when applied to clothing. Strength of mark favors Couture, but not overwhelmingly so.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 17
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
(Cite as: 2006 WL 1012939 (S.D.N.Y.))

FN22. While Couture sells men's clothing, baby clothes, and clothing accessories, it has not argued or presented accessible evidence that its Registered Marks have acquired secondary meaning in such categories.

2) Similarity

When the secondary user's mark "is not identical but merely similar to the plaintiff's mark, it is important to assess the degree of similarity between them." *Virgin Enters.*, 335 F.3d at 149. In making that assessment "courts look to the overall impression created by the logos and the context in which they are found and consider the totality of the factors that could cause confusion among prospective purchasers." *Star Indus.*, 412 F.3d at 386 (citation omitted). The Second Circuit has "repeatedly found that the presence of a distinct brand name may weigh against a finding of confusing similarity." *Playtex*, 390 F.3d at 164 (collecting cases). Nonetheless, in some circumstances, "the addition of a trade name does not necessarily alleviate the problem of confusion of marks, and indeed, can aggravate it, as a purchaser could well think plaintiff had licensed defendant as a second user." *Id.* at 165 (citation omitted). This is particularly true if the parties are competitors. See *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir.1972); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir.1970). Where the junior and senior marks are not identical, however, the presence of a brand name "will tend to militate *against* a finding of confusion." *Playtex*, 390 F.3d at 165.

When viewed as a whole and in context, there is little similarity between Lancôme's and Couture's uses of Juicy. Lancôme does not use the Registered Marks JUICY COUTURE or CHOOSE JUICY. Lancôme's Juicy Wear lipstick does have as its first word of the product name, a word that is identical to Couture's Registered Mark JUICY. The similarity of the marks ends there. Couture uses its Registered Marks on clothing labels, hang tags, and occasionally to decorate items of clothing. It has not identified any stylization of its mark that is similar to Lancôme's mark.

**\*22** As will be discussed in more detail below, Lancôme uses the product name Juicy Wear on its packaging and lipstick product in a way that is entirely consistent with the packaging and naming of every Lancôme cosmetics product. Lancôme does not sell clothing or use this mark in connection with clothing. The packaging for Juicy Wear and the

product itself prominently display the Lancôme name and Lancôme's rose design. Considering the context in which a consumer purchases Lancôme's Juicy Wear, it is significant that Lancôme products, including Juicy Wear, are sold exclusively at Lancôme counters or sections of stores (or through a Lancôme website), where the most prominent mark is the house brand Lancôme, reinforcing the message that the source of Juicy Wear is Lancôme.

It is also unlikely that a consumer would mistakenly believe that Lancôme's use of the mark Juicy Wear indicates a co-branding relationship. Couture does not use the mark Juicy Wear. Couture has not shown that cosmetics and women's apparel are so closely related that a likelihood of confusion is enhanced. Indeed, its expert Johnson opined that clothing and cosmetics are *not* related other than by the fact that both products are sold in department stores. Only a handful of the thousands of clothing companies have been able to maintain a presence in both markets, usually clothiers that have built a housemark based on a designer's famous name, for example Dior. If this were a co-branding venture, a consumer would expect Lancôme to more clearly and explicitly link Juicy Wear to Couture in order to derive the presumed benefits of the endorsement. Instead, the natural association and apparent link is with Lancôme's established line of Juicy cosmetics, each of which uses the word Juicy as the first word of a two or three word product name. Again, there is no claim here that the sale of any of the five Lancôme Juicy products that preceded Juicy Wear infringed the Registered Marks.

The nature of Couture's mark JUICY also undercuts any impression of co-branding. [FN23] Juicy is an adjective with strong descriptive elements when applied to either clothing or cosmetics. For Couture, Juicy describes the sexy styling of its clothing. For Lancôme, Juicy evokes moistness and shine, which may be attractive qualities for a lipstick. Lancôme has combined the word "Juicy" with the word "Wear", another term with an independent meaning for cosmetics; it conveys the message that this is also a long-lasting lipstick. Lancôme's choice of the word Juicy for a product name is thus utterly unremarkable and would not be likely to suggest co-branding. In contrast, if Couture had chosen an arbitrary mark, or one that had no utility in describing the quality of a lipstick, then Couture's co-branding argument would have more force.

FN23. When Couture engages in co-branding, it leaves the consumer in little

Not Reported in F.Supp.2d                                                                                                  Page 18
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

doubt as to its involvement. This practice stands in sharp contrast to the impression created by Lancôme's product Juicy Wear.

 In sum, Couture's Registered Mark JUICY is one of the two words in Lancôme's product name Juicy Wear. Given the prominent display of Lancôme's house brand on the product and in the locations where Juicy Wear is sold, and the consistent use of Lancôme's trade dress for all of its products, as well as the distance between the markets for cosmetics and women's clothing and Lancôme's established line of Juicy cosmetics, the similarity of the marks factor strongly favors Lancôme.

 3) Proximity

 **\*23** Proximity evaluates the "proximity of the products being sold by the plaintiff and defendant under identical (or similar) marks." *Virgin Enters.,* *335 F.3d at 149.* The inquiry includes both market and geographic proximity. *Brennan's,* *360 F.3d at* *134.* Market proximity asks "whether the two products are in related areas of commerce" while geographic proximity looks to "geographic separation of the products." *Id.* "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id.*

 Lancôme's Juicy Wear and Couture's clothing are sold in similar stores and target similar consumers. Lancôme's products are primarily sold in high-end department stores and in stores that specialize in cosmetics. Couture also sells it products in high-end department stores, although department stores account for less that one third of the locations in which its products are sold. Couture's products are largely sold at clothing boutiques. While Lancôme's average customer, including those purchasing Juicy Wear, is very likely older than Couture's, both companies seek to attract the younger woman. [FN24] While both Couture and Lancôme sell their products in the United States, there has been little or no evidence of the depth of those sales in any region or state. Given that an overlap in both the stores where their products are sold and in the customer bases increases the likelihood of confusion, proximity favors Couture.

>        FN24. Couture has not pointed to any figures identifying the percentage of its sales attributable to department store sales or younger customers.

 4) Bridging the gap

 " 'Bridging the gap' " refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.,* 412 F.3d at 387. "This factor is designed to protect the senior user's interest in being able to enter a related field at some future time." *Savin Corp. v. Savin Group,* 391 F.3d 439, 459-60 (2d Cir.2004) (citation omitted).

 Couture is the senior user of the mark Juicy. It began using the mark in 1996, and achieved registration of the mark in 1999. Lancôme sold its first Juicy product--JUICY TUBES--in 2000, and registered that mark in 2001. Couture has shown that it would *like* to enter the cosmetics market but has not shown that it is *likely* to enter the cosmetics market. Couture already attempted to add a cosmetics line through a licensing arrangement with an established cosmetics producer but was unable to find a willing partner. [FN25] Given the rarity with which clothing companies create cosmetics lines, consumers would likely perceive that Couture might be able to enter that business, but would have little expectation that Couture would actually do so. Likelihood of "bridging the gap" favors Couture, but only marginally.

>        FN25. Even Couture's entry into the fragrance market has been delayed. It is now slated to happen later this year.

 5) Actual Confusion

 Actual confusion need not be shown to prevail under the Lanham Act "since actual confusion is very difficult to prove and the [Lanham] Act requires only a likelihood of confusion as to source." *Id.* at 459 (citation omitted). Although it is not a requirement, "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *Virgin Enters.* 335 F.3d at 151. Evidence of actual confusion is particularly relevant to the *Polaroid* inquiry. *Id.* Couture principally seeks to show actual confusion through a survey done by Johnson. [FN26]

>        FN26. Couture has identified two emails that it received asking for information on cosmetics. One was apparently in response to a radio advertisement in 2004; the other was in response to a television advertisement in March 2005 about an "all day lip gloss." There has been no evidence

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

of any television advertising by Lancôme. Given the volume of Lancôme's sales, these two emails are the sort of *de minimis* anecdotal evidence that will not support a finding of actual confusion. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 124 (2d Cir.2001). *But see Virgin Enters.,* 335 F.3d at 151 (finding that affidavit recounting customer inquiries weighed in favor of preliminary injunciton). Couture points to *Morningside Group Ltd. v. Morningside Capital Group LLC,* 182 F.3d 133, 141 (2d Cir.1999), as offering further support for the proposition that misdirected communication can support a finding of actual confusion, but there the evidence of misdirected telephone calls and inquiries was "extensive."

**\*24** Couture asked Johnson in May 2005 to design and conduct a consumer study to measure the extent to which consumers, when exposed to either the name Juicy or Juicy Wear in the context of shopping for makeup, may believe that the makeup products come from or are associated with Couture. To do so, Johnson created three 8 1/2 by 11 inch laminated cards bearing the words Juicy, Juicy Wear, or Glossy Wear. In September 2005, each of these three cards was separately shown in a shopping mall to over 200 teenage and adult females between the ages of sixteen and thirty-nine [FN27] who since June 2005 had purchased both a cosmetics item that costs over $15 and an item of clothing that costs $50 or more, and who had shopped at a major department store. Altogether, 613 interviews were conducted.

> FN27. Johnson instructed the company that executed the survey that two-thirds of the respondents were to be between twenty-five and thirty-nine.

After surviving initial screening questions, the respondents were told, "Here is something that you might see if you were shopping for makeup and cosmetics in a department store." The respondents were then asked, "If you were shopping for makeup and cosmetics in a department store and encountered a product called [Juicy Wear/Juicy/Glossy Wear] do you or you do not have a belief about who or what company or companies makes or puts out [Juicy Wear/Juicy/Glossy Wear]?" Additional questions probed the understanding of those who answered yes. 28%, 37%, and 19% of the respondents said that they had a belief regarding sponsorship of Juicy Wear, Juicy, and Glossy Wear, respectively. [FN28] When

asked to identify the source, 18% of the respondents shown the Juicy Wear card identified Couture, and 2% identified Lancôme. 19% shown the Juicy card identified Couture, and 8% identified Lancôme. 1% shown the Glossy Wear card identified Couture, and 2% identified Lancôme. When the responses to two additional questions [FN29] that were also posed are added to these responses, Johnson computes that 22% identified Juicy Wear cosmetics as coming from Couture, 27% identified Juicy cosmetics as coming from Couture, and only 1% identified Glossy Wear cosmetics as coming from Couture.

> FN28. Johnson contends that the statistical error rate for the study falls into the range of plus or minus 5.5%.

> FN29. The additional questions were "And, if you encountered a makeup or cosmetic product called [ ] do you or do you not know of any other product or products made or put out by whoever makes or puts out [ ]?", and "Do you believe that whoever makes or puts out [ ] is or is not related to, sponsored by, or associated with any other company or source?".

Johnson concludes from these results that "it is clear" that the use of the names Juicy Wear or Juicy "to promote" cosmetics and makeup products causes "a significant likelihood of confusion such that consumers who encounter such products, either post-sale or point-of-sale, falsely believe that these cosmetic and makeup products come from Juicy Couture, or are put out in association with Juicy Couture." Johnson contends that his conclusions are valid for and can be extrapolated to the combination of the word Juicy with any other brand name used by Lancôme, such as Juicy Tubes and Juicy Vernis, and that combining the term Wear in particular with the term Juicy does not increase the likelihood of confusion.

While Lancôme's motion to strike this testimony pursuant to Rules 702 and 403, Fed.R.Evid., was denied, the arguments Lancôme made in support of that motion are largely valid. Survey evidence is generally admissible to establish actual confusion in cases alleging violations of the Lanham Act. *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 227-28 (2d Cir.1999). To be probative a survey must be "directed to the relevant issues." *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir.1994) (citation omitted). When survey evidence is used to prove the state of mind of a prospective purchaser "the closer

Not Reported in F.Supp.2d                                                                   Page 20
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:163 (4th ed.2006); *see also Am. Footwear Corp. v. Gen. Footwear Co. Ltd.,* 609 F.2d 655, 660 n. 4 (2d Cir.1979). The fact that a senior user has yet to produce a competing product does not excuse a survey's failure to present the junior user's product "under actual marketing conditions." *Am. Footwear Corp.,* 609 F.2d at 660 n. 4.

 **\*25** The Johnson survey has no value on the issue of actual confusion because of fundamental flaws in its design. Most significantly, the survey did not replicate the marketplace conditions in which consumers encounter Lancôme's products. Lancôme's cosmetics are sold at Lancôme counters or department store sections, or over websites, with prominent signage identifying Lancôme as the seller, and the products as Lancôme products. Lancôme products are also packaged in both boxes and a product container that identify them as Lancôme products. The failure to replicate marketplace conditions is particularly troubling since Johnson has designed over 300 likelihood of confusion surveys, and this is the only such survey conducted with face-to-face interviews in which he did not show the product to the respondents, either through a picture or display. Essentially, the survey was a word association test, in which respondents were shown a card with the word Juicy and repeatedly asked questions in which the word Juicy appeared, often not just once but twice in the same question. *See Playtex,* 390 F.3d at 168 (rejecting index card survey that failed to display products as they are "presented and packaged").

 Johnson justified his decision not to show the Lancôme products to respondents with the assertion that showing the actual products, which of course bear the name Lancôme and Lancôme's rose design, would "mask confusion." He feared that respondents, reading the word of a well-known brand like Lancôme on the product, would identify Lancôme as the source of the product. This is essentially an admission that someone viewing the actual Lancôme product would not be confused as to source.

 Johnson further explained that his design was driven by the fact that Couture and Lancôme are not competitors: Couture does not sell cosmetics, and cosmetics and clothing are in his view "not related". Because they are not competitors he believed that he

had to measure something he called subliminal or inchoate confusion instead of using customary survey design to measure "classic" confusion. As a consequence, he designed a study to measure consumer reaction to a list of terms, either Juicy alone or Juicy in combination with another word. Johnson may have been misled in this regard by judicial criticism of his other surveys. [FN30]

> FN30. In *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.,* 875 F.Supp. 966 (E.D.N.Y.1994), Johnson conducted two surveys for a defendant that were intended to measure actual confusion in a claim of trademark infringement brought by the owner of the mark BOAR'S HEAD for deli meats against a brewer of a beer marketed as "Boar's Head Red". One survey was a national telephone survey that asked questions about "Boar's Head Red Beer." The second survey was conducted in-person. *Id.* at 973- 74. Both of Johnson's surveys were severely criticized by the well-respected District Judge, *id.* at 980-82, but it was only the telephone survey that was criticized for failing to measure "subjective and inchoate" confusion. *Id.* at 980. It is unnecessary to attempt to discern what implications that criticism might have here since there is no telephone survey in this case. Here, for entirely separate reasons, Johnson utterly failed to conduct a survey that reliably measures any relevant issue.

 The bias created by this faulty design was exacerbated by the choice of the universe of respondents. The pool of respondents was skewed towards a younger population to obtain a higher proportion of respondents who are familiar with Couture, as opposed to choosing a universe that mirrors Lancôme's customers generally or even the purchasers of its Juicy cosmetics or Juicy Wear. For instance, one-third of the survey respondents were between the ages sixteen and twenty-four. When it comes to Juicy Wear, almost three-quarters of Lancôme's customers who purchase that product are over the age of thirty-four.

 **\*26** Also, by asking an introductory question about clothing, which Johnson admits was unnecessary, there was a not so subtle suggestion that the survey was connected to clothing in some way. Since Johnson included a screening question at the end of the survey to learn whether anyone in the respondent's household worked for a manufacturer,

Not Reported in F.Supp.2d                                                                 Page 21
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

distributor or retailer of clothing, there was no need to include the introductory question except to plant a suggestion about clothing.

It is particularly remarkable that Johnson included no control for testing the word Juicy alone. It is unnecessary, however, to dwell on the implications of this design error since Lancôme does not use the word Juicy alone on its products and this portion of the survey is essentially irrelevant.

Although Johnson contends that his survey was a test of post-sale confusion, and is a reliable measure as well of point-of-sale, pre-sale, and initial interest confusion, dilution, and co-branding, the survey actually measures none of these categories. Post-sale confusion results when other consumers observe the defendant's products being used after sale and associate those products with the plaintiff. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872-73 (2d Cir.1986); *see also Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 218 (2d Cir.1999). Although Johnson contends that the survey was designed as a test of post-sale confusion, it in fact begins with the statement "Here is something that you might see if you were shopping

```
LANCÔME
  PARIS
[rose design]

 JUICY WEAR

Seal and Shine
  Top Coat


 Top Coat
Film Miroir
```

The Lancôme name is in the largest letters; the brand name Juicy Wear is in the second largest type. The back of the tube has the name Lancôme appearing twice, although not prominently, and no reference to the product name.

While there were other problems with the Johnson survey, the issues already discussed prevent the survey from contributing any meaningful information about the likelihood of actual confusion from Lancôme's use of the name Juicy Wear for a lipstick. This survey is so fundamentally flawed, that it would have been excluded from evidence at a jury trial.

**\*27** There is a second survey that was offered into

for makeup and cosmetics in a department store." [FN31] The respondents were asked, therefore, to consider this a point-of-sale survey, and yet the survey design did nothing to replicate the point-of-sale experience.

> FN31. Of course, this statement was false, particularly when the card shown the respondent contained just the word Juicy. Lancôme does not have a product bearing the name Juicy alone.

The survey says as little about post-sale confusion. As noted, there is no Lancôme product with the brand name Juicy. In a post-sale context a potential customer observing someone using Lancôme's Juicy Wear product would see two items, each clearly identifying the product as Lancôme's. The lipstick unit comes in Lancôme's signature silver metal tube with the rose design on its side and the name Lancôme embossed twice on the top of the slender tube. The name Juicy Wear appears in infinitesimally small script on the bottom of the tube. The top coat comes in a clear plastic tube with a dark grey cap. The front of the tube reads

evidence. Lancôme chose a renowned expert to design its study. Jacoby designed a survey for Lancôme to test the extent to which use of the word Juicy in connection with Lancôme products was likely to cause confusion as to the origin of the products. Over 200 respondents who were at least twenty-five years old in this shopping mall survey were shown an array of six Lancôme products from the Juicy line in their Lancôme boxes and asked to treat the experience "as if you were shopping for a lip or nail care product and came across these items." [FN32] The respondents were invited to handle the boxes and examine the products if they wished to do so. The products were then covered, and the respondents were asked a series of questions. Approximately 2% of the respondents exhibited any confusion, and only in response to an

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 22
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
(Cite as: 2006 WL 1012939 (S.D.N.Y.))

exhaustive list of questions at the end of the survey that sought to tease out any impression of co-branding. 98% did not mention Juicy in answer to any of the questions that were asked.

> FN32. The products were Juicy Tubes, Juicy Rouge, Juicy Vernis, Juicy Crayon, Juicy Wear and Juicy Tubes Pop. At the time of the survey, Couture was still contending that Lancôme's sale of each of these products infringed its rights.

The Jacoby survey has a singular advantage over the Johnson survey. The Jacoby survey actually sought to replicate the shopping experience and test whether consumers were confused by Lancôme's product names. It found negligible, if any, evidence of confusion. [FN33]

> FN33. It is unnecessary to spend time addressing Couture's attacks on the Jacoby survey since Couture has failed to show any actual confusion and it carries the burden to do so. Suffice it to say that the attacks on Jacoby's well-designed survey were strained and unpersuasive.

Couture has failed to show the existence of actual confusion from Lancôme's sale of Juicy Wear. The actual confusion factor favors Lancôme.

6) Bad Faith

The inquiry into willfulness or bad faith "considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." *Savin Corp.,* 391 F.3d at 460 (citation omitted). The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith, even in the total absence of a trademark search," although bad faith "may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Star Indus.,* 412 F.3d at 388-89. Where there is evidence of a junior user's knowledge of an earlier mark, courts have, on occasion found good faith "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation." *Id.* at 388. Some of the actions by a defendant that are considered affirmative evidence of good faith are "selection of a mark that reflects the product's characteristics, request for a trademark search and reliance on advice of counsel." *Id.*

Couture has not established that Lancôme acted in bad faith. Indeed, faced with overwhelming evidence that Lancôme adopted the mark Juicy in absolute ignorance of Couture's business or name, and in utter good faith, Couture finally admitted during summation that Lancôme

had acted in good faith through the year 2003. Given Lancôme's considerable investment in its Juicy franchise for the five years from 1999 through 2003, and its good faith development of the five Juicy products that preceded the introduction of Juicy Wear, Couture is confronted with the difficult task of explaining why Lancôme, in adopting the mark Juicy Wear in the sixth year for a sixth Juicy product, was suddenly motivated to capitalize on Couture's reputation.

**\*28** Couture argues that the term "Juicy Wear" is materially different from the other Juicy products because the term wear connotes clothing. But wear is also commonly used with cosmetics to describe products that are long-lasting, which is the quality that Lancôme hoped to convey by naming its product Juicy Wear. Lancôme only adopted the name Juicy Wear after research confirming its meaning for consumers. In addition, because the word wear accurately reflects a characteristic of the product in question, it actually serves as affirmative evidence of Lancôme's good faith. *See id.* Even Couture's survey expert took the view that the word Wear when combined with Juicy added no additional likelihood of confusion.

Couture has no trademark rights in the word wear [FN34] and has not introduced any evidence that suggests wear was chosen with an intent to connote clothing, or more specifically to try to exploit any goodwill associated with Couture's Registered Marks. While Couture points to evidence that by 2004 it was achieving significant sales and publicity, it has not shown that Lancôme ever focused on Couture's growing popularity or considered that it would be of assistance to Lancôme to ride the coattails of that phenomenon. Lancôme studies cosmetics trends and its competitors within the cosmetics industry intently; there is not a whiff of evidence that it considers clothing companies to be its competitors or to be brands from which it could obtain value.

> FN34. As already discussed, Couture's occasional use of the slogan "Wear Juicy" on a t-shirt did not create trademark rights in the slogan.

Couture also points to Lancôme's failure to run a trademark search before applying to register the name Juicy Wear with the PTO. Lancôme ran trademark searches for the first five of its Juicy products. The last three of those searches occurred in October 2003; Lancôme applied to register Juicy Wear in January 2004. By that time, Lancôme had successfully registered JUICY TUBES without opposition from the plaintiffs, and Lancôme's application to register the mark JUICY ROUGE had been published for opposition in November

Not Reported in F.Supp.2d                                                                                    Page 23
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

2003 without the PTO citing any conflicting marks.

 Failure to perform a trademark search, standing alone, does not prove bad faith, even where a defendant is aware of other products using similar names. *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 746 (2d Cir.1998). Given its earlier searches and its experiences with its applications to register JUICY TUBES and JUICY ROUGE, the failure to conduct a sixth search does not give rise to any inference of bad faith.

 From the search conducted for JUICY ROUGE in June 2003, Lancôme was aware that Couture had applied to register the Juicy Couture and Juicy Jeans marks in eleven classes of goods, including cosmetics. [FN35] A desire to enter the field of cosmetics is an entirely different phenomenon than actually entering the field, as Couture has certainly learned. Lancôme was entitled to consider Couture's failure in 2001 to oppose its application to register JUICY TUBES, and its failure in 2003 to object to the introduction of JUICY ROUGE through the Juicy Gossip promotional campaign. Even "[f]ull knowledge of a prior use of a protected mark is not necessarily inconsistent with a finding of good faith, particularly where the alleged infringer is unsure as to the scope of protection." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 483 (2d Cir.1996).

> FN35. The European battle to control the mark Juicy will be discussed in connection with Lancôme's affirmative defense of laches. Suffice it to say that that battle does not support an inference of bad faith.

 **\*29** Couture has failed to show Lancôme's bad faith in the adoption of the mark Juicy Wear. This factor strongly favors Lancôme.

7) Quality of the Products

 A difference in the quality of the infringed and accused goods goes more to the harm that confusion can cause to plaintiff's mark than it does to the likelihood of confusion. *Virgin Enters.,* 335 F.3d at 152. A marked difference in quality would "militate against finding a likelihood of confusion" as customers are less likely to assume a high quality senior user would produce low-quality products. *Star Indus.,* 412 F.3d at 389. The parties agree that Lancôme's products are of good quality. This factor favors Couture.

8) Sophistication of Consumers

 The inquiry into consumer sophistication "considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Id.* at 390 (citation omitted). Consumer sophistication has to be analyzed in relationship to the type of confusion being asserted by the plaintiffs. *See id.* In evaluating an action for trademark infringement brought by a vodka maker against a competitor using a similar trademark for rum, the Second Circuit noted that the question of sophistication did not go to "whether consumers are capable of distinguishing rum from vodka" but that they were sophisticated enough to understand that a similar stylized "O" on the bottle of two different brands of alcohol was "not indicative of a licensing or sponsorship agreement" between the brands. *Id.*

 Because Couture's claims are premised on confusion through co-branding, the relevant consumers would have to be familiar with Couture. Consumers who are aware of Couture are fashion conscious. Such consumers are likely to be relatively sophisticated shoppers. Similarly, consumers of cosmetics and in particular purchasers of lipstick, are likely to examine with care the products they apply to their skin and lips. The sophistication of customers and the attention they pay to the cosmetics they purchase make it less likely that those familiar with the Couture brand would think that Lancôme's Juicy Wear was the product of a co-branding relationship between Couture and Lancôme. The fashion-conscious shopper that is the target of Couture's marketing efforts would be unlikely to connect the up-and-coming California clothing company known for its t-shirts, jeans and tracksuits with the elegant sensuality of the French cosmetics giant because Lancôme named its product Juicy Wear. Sophistication of consumers favors Lancôme.

 To summarize, several of the eight Polaroid factors favor Couture. Most significantly, however, the lack of similarity in the marks as they are presented in the marketplace and the absence of bad faith, strongly favor Lancôme. Based on an analysis of all the relevant evidence, there is no basis to find that the product name Juicy Wear is likely to cause confusion with Couture's Registered Marks.

*Lancôme's Juicy Promotions*

 **\*30** In addition to its claim based on Lancôme's use of the mark Juicy Wear, Couture asserts that Lancôme infringed its rights by using the words juicy, Juicy Gossip and Juicy Pop in advertising and promotions in mid-2003 and mid-2004, in connection with two in-store promotions of Lancôme products. The 2003 Juicy Gossip promotion introduced JUICY ROUGE; the 2004 Juicy Pop

Not Reported in F.Supp.2d                                                                                                   Page 24
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

promotion introduced Juicy Tubes Pop, and offered one-shot items Juicy Vernis, Juicy Crayon and Lôlli Pop. Couture has withdrawn its claims that the use of the marks JUICY ROUGE, Juicy Tubes Pop, Juicy Vernis, Juicy Crayon or Lôlli Pop, or that the sale of products bearing those marks, violated its rights.

Although Couture complains that scripts for radio advertising and mailings to consumers, both of which were undertaken through a co-op advertising program, and in-store promotional materials connected with the two promotions, infringed its trademark rights, the precise theory on which Couture is proceeding is hard to discern. It has disclaimed any interest in pursuing a false advertising claim, *see Avis Rent A Car System, Inc. v. Hertz Corp., 782 F.2d 381, 386 (2d Cir.1982)* (requiring evidence of actual confusion to support an implicit false advertising claim), and as noted, has explicitly withdrawn any claim that the sales of the products associated with either promotion infringed its rights. With respect to 2003, in particular, it also explicitly withdrew, in its summation, any contention that Lancôme acted in bad faith.

When asked to present authority for the proposition that a promotion is actionable in the absence of a false advertising claim or a claim that the sale of the goods associated with the promotion was a violation of the plaintiff's rights, Couture essentially side-stepped the question and re-characterized it as a request for law supporting the unremarkable proposition that point-of-sale materials may infringe a plaintiff's rights when the mark on the goods does not. [FN36] It then cited Section 45 of the Lanham Act, 15 U.S.C. § 1127, for the proposition that a mark is deemed to be used in commerce when it is placed on displays associated with goods sold in commerce, and *Major League Baseball Properties, Inc. V. Sed Olet Denarius, Ltd.,* No. 90 Civ. 2170(KMW), 1990 WL 151094 (S.D.N .Y. Oct. 5, 1990). *Major League Baseball* held that there was venue in this district over a Lanham Act action brought against a bar in Brooklyn named the Dodger Sports Bar, concluding that the defendant's advertising, which allegedly constituted "passing off", was a tort committed in this district even though the sale of goods associated with the advertising occurred in a neighboring district. *Id.* at *3. These references do not address, however, how advertising can be actionable when there is no claim that it is false advertising or that the sale of goods (or services) associated with the advertising is actionable.

FN36. Essentially, what has happened here is that Couture's two promotion claims lost their mooring when Couture abandoned its claims that the products sold through these promotions

violated its rights.

In any event, for many of the reasons already explained, Couture has not shown any infringement of its rights through these two Lancôme promotions. Couture has not shown that it has any rights in any mark apart from its Registered Marks. Therefore, to the extent that it complains that the use of phrase Juicy Pop in the campaign undertaken to introduce Lancôme's product Juicy Tubes Pop violated Couture's trademark rights in the mark Juicy Pop Princess, Couture has failed to show that it has any such rights.

**\*31** Couture's claims regarding these promotions essentially hinge on the fact that Lancôme used the word juicy as an adjective in promotional materials, and as part of the name of the two promotions . [FN37] For instance, radio ads spoke of a "juicy make-over" and "juicy summer totes". The names of the campaigns were Juicy Gossip and Juicy Pop, even though Lancôme had no product with either name. The discussion of the Polaroid factors as applied to the claims concerning Juicy Wear is in large part relevant here as well.

FN37. As Lancôme emphasizes, Couture has not shown that press releases sent to beauty editors had any impact on consumers.

In terms of the similarity of the marks, Couture has not shown that the use of the word juicy, when heard or viewed in the totality of a radio ad, brochure, or counter display, was likely to cause confusion. For many reasons, the use of the word juicy in the context of these two promotions would have seemed utterly unexceptional. First, Couture concedes that Lancôme was entitled to sell five products with the name Juicy, including each of the products sold with these two promotions. Second, the word juicy is an apt adjective for cosmetics, connoting both moistness and shine. Third, every piece of promotional material made prominent use of the housemark Lancôme and the Juicy product name. The printed materials mailed to consumers used the Lancôme rose as well. The counter displays for these promotions, while vibrant and eye-catching, were exhibited in space clearly dedicated to Lancôme products and no other company's products. Every product displayed on the counters and in the displays had the Lancôme name on it and the brand name to which Couture makes no objection.

Couture also complains that Lancôme aimed these promotions at younger customers, by using bright colors like pink and orange, and referring to Hollywood divas as sources of makeup tips. Couture has not shown that Lancôme violated its rights by engaging in an effort to attract young consumers as new and loyal Lancôme

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

customers. Lancôme was engaged in that marketing effort long before 2003 and long before it learned of the existence of Couture. Indeed, it introduced JUICY TUBES to the market in 2000 as part of the effort, initially with the Pollen seasonal collection, which emphasized the color orange, and in 2001 with Pinksplash, which as its name denotes, emphasized pink. It is not open to debate that orange and pink are traditional lipstick colors. Lancôme, like many consumer-oriented companies in America, also values its association with celebrities. Couture has no monopoly on the youth market, the colors orange and pink, or Hollywood stars. While it certainly does have a right to make sure that Lancôme does not infringe Couture's rights in marketing Lancôme products to young women (or any woman), Couture has not shown that Lancôme acted with an intent to trade off Couture's reputation, or did so even unwittingly, in either promotion. An effort to create a youthful ambience in advertising or at sales counters is not a violation of Couture's rights, even when combined with the use of the word juicy.

**\*32** It is unclear whether Couture continues to assert that the fact Lancôme gave away flip-flops and tote bags as part of the two-week Juicy Pop in-store promotion increased the likelihood of confusion. To the extent it does, that assertion can be swiftly rejected. It is uncontested that every gift associated with every in-store promotion comes in a bag. The flip-flops Lancôme included with this bag did not bear the word juicy, and there was nothing to suggest that they were a Couture product. No consumer familiar with Couture's flip-flops would have believed that these were Couture's footwear. Gift-with-Purchase programs have existed for years, and are used by Lancôme in many promotions that have nothing to do with its Juicy products. The fact that a summer promotion included flip-flops and a tote bag would not have led consumers to believe that Couture was a co-sponsor of either the promotional event or the products being sold with the event. [FN38]

> **FN38.** Again, it is important to observe that Couture no longer contends that the sale of the Juicy products associated with the two promotions violated its rights.

There is one residual issue concerning the promotions. Some of the promotional materials for the Juicy Pop event remained on the counter for a few months after the promotion ended, and therefore during the time that Juicy Wear was introduced. The Juicy Pop promotion included the display on countertops of a play-station, and of a Juicy Pop sign for the shelves below the counters. The play-station was a plastic wheel, with holes to display Juicy products. In the center of the wheel, and visible when

products were not lying on it, was the logo Juicy Pop. The name Lancôme was written on its front face. Behind and above the play-station, and next to the below-counter Juicy Pop signs, was a large picture of a woman's face with the word Lancôme prominently inscribed across it. Thus, the Lancôme house brand was prominently displayed with the play-station and the Juicy Pop signage. The use of these promotional materials in connection with the sale of Juicy Wear does not alter the conclusion that Couture has failed to show that the sale of Juicy Wear infringed its rights.

### II. Common Law Claims

Claims for trademark infringement and unfair competition under New York common law, "share[ ] many common elements with the Lanham Act claims of false designation of origin and trademark infringement, including proof of actual confusion to recover damages, and proof of likelihood of confusion for equitable relief." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993) (citation omitted). Under New York common law, an action for trademark infringement as well as an action for unfair competition "both require a showing that the public is likely to confuse the defendant's product or service with that of the plaintiff." *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y.2d 538, 543 (N.Y.1977). Under New York common law, the "essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 408 (2d Cir.1997) (citation omitted). Because Couture has failed to establish either likelihood of confusion or Lancôme's willfulness, its state law claims are rejected.

### III. Lancôme's Affirmative Defenses

**\*33** Lancôme asserts three affirmative defenses: laches, equitable estoppel and waiver. Given Couture's failure to prevail on its claims, it is unnecessary to reach any of these affirmative defenses. Nonetheless, Lancôme's affirmative defenses, particularly its laches defense, bring into focus important factual, legal and procedural issues in this case, and thus a discussion of those defenses is appropriate.

The first of these defenses is asserted as to the claims Couture pressed at trial. The latter two are asserted as to the claims Couture has recently abandoned. [FN39]

> **FN39.** At summation, Lancôme requested that the defenses of equitable estoppel and waiver be considered as to the abandoned claims unless those claims were found to be barred by the doctrine of res judicata. The parties have not

briefed the issue of res judicata, and in any event it is premature to address the res judicata effect of any judgment entered in this action.

A. Laches

Laches is a defense that bars a plaintiff's claim in equity "where he is guilty of unreasonable and inexcusable delay that resulted in prejudice to the defendant." *Ikelionwu v. U.S.,* 150 F.3d 233, 237 (2d Cir.1998) (citation omitted). "A party asserting a defense of laches must establish that: (1) the plaintiff knew of defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Id.* The equitable defense of laches does not apply to an action at law. *County of Oneida, N.Y. v. Oneida Indian Nation of N.Y.,* 470 U.S. 226, 244 n. 16 (1985); *Ivani Contracting Co. v. City of New York,* 103 F.3d 257, 260 (2d Cir.1997). This defense is considered solely, therefore, with respect to Couture's request for a permanent injunction.

For equitable claims brought under the Lanham Act, where no limitations period is provided by the statute, courts look to the state statute of limitations to determine which party "possesses the burden of proving or rebutting the defense." *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191 (2d Cir.1996). When a suit is brought prior to the running of that statute of limitations there is no presumption of laches and the burden remains on the defendant to prove the defense. *Id.* Once the statute of limitations has run, however, the burden shifts to the plaintiff to show why laches should not be applied. *Id.* Courts have consistently held that the six year fraud statute, N.Y.C.P.L.R. 213(8), is the applicable state statute of limitations for Lanham Act claims brought in New York. *Id.*

Lancôme launched Juicy Wear in 2004 and the promotions to which Couture objects took place in 2003 and 2004. Couture's complaint was filed on September 9, 2004. Because Couture's claims are brought within the statute of limitations, the burden is on Lancôme to prove the three elements of laches. Lancôme has proved each element.

Because Juicy Wear is the sixth Juicy product Lancôme has introduced into the marketplace, and because Couture owns rights to the word JUICY but not to the word Wear, it is appropriate to consider the issue of laches against the backdrop of Lancôme's line of Juicy products. Couture argues that because the only claims it continues to press involve actions taken by Lancôme in 2003 and 2004 it has not delayed in asserting its rights. Couture has failed to explain, however, why the harm done to Couture's JUICY mark by Lancôme's use of Juicy Wear was different from

any harm done by the use of Juicy for its other products. In fact at trial, Couture admitted that Juicy Wear was no more damaging to Couture's mark than JUICY ROUGE. Having failed to establish why the recent uses of Juicy are different, the only reasonable conclusion is that Couture's delay is properly measured from the time when it first became aware of JUICY TUBES, which was at least 2001, the second year Lancôme sold JUICY TUBES.

**\*34** In analyzing the reasons behind Couture's failure to act until September 2004, "it is the reasonableness of the delay rather than the number of years that elapse which is the focus of inquiry." *Stone v. Williams,* 873 F.2d 620, 624 (2d Cir.1989). Couture has failed to present a tenable explanation for why it made no objection, either formal or informal, as Lancôme systematically developed its line of Juicy products. Taylor and Jacobson essentially conceded that Couture decided quite consciously not to object to Lancôme's use of the word Juicy for product names. While there was some reference to Couture's desire to use its financial resources to grow instead of paying litigation costs, Couture presented no evidence that it was unable to afford counsel. Indeed, it had outside trademark counsel who were acting on its behalf since 1994, and working actively since 1998. In any event, a lack of finances alone cannot excuse a failure to object. *Frank F. Smith Hardware Co. v. S.H. Pomeroy Co.,* 299 F. 544, 547 (2d Cir.1924); *see also Leggett v. Standard Oil Co.,* 149 U.S. 287, 294 (1893). By April 2003, of course, Couture had been purchased by a giant in the clothing industry and it still failed to act in the United States, for instance, choosing not to oppose the registration of JUICY ROUGE in late 2003.

Lancôme has clearly established that it has been prejudiced by Couture's delay. *See Scarves By Vera,* 544 F.2d at 1173 (noting that it is appropriate to consider equities in junior user's favor in considering injunction against non-competitive product). It has made a substantial commitment of corporate talent and money to the development of its Juicy line of products, including Juicy Wear. It has spent substantial sums advertising JUICY TUBES, JUICY ROUGE, Juicy Tubes Pop and Juicy Wear. These efforts would be severely compromised by a decision granting Couture the relief it seeks.

Couture cannot, and does not contest that it sat on its rights in the United States. Instead, it argues that its failure to act before late 2004 is mitigated by the actions it took in Europe in 2003 and in early 2004.

Couture's actions in Europe are of minimal relevance to the question of laches. Trademark rights are territorial, *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103 (2d Cir.1998),

Not Reported in F.Supp.2d                                                                                          Page 27
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

and therefore even decisions rendered by foreign courts are generally irrelevant and inadmissible in trademark actions in the United States. *McGraw-Hill Cos., Inc. v. Ingenium Tech. Corp.,* 375 F.Supp.2d 252, 255 (S.D.N.Y.2005); *see also Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 639 (2d Cir.1956). [FN40]

> FN40. Here there has been no final decision by any foreign court, only a "draft" opinion by an official in the French Trademrk Office regarding Lancôme's application to register the mark Juicy for cosmetics. That initial decision by the French Trademark Office turned on a prior registration, not based on use, that Couture had received for JUICY COUTURE for cosmetics. As this example illustrates, the standards governing trademark issues can differ substantially from one jurisdiction to another.

Couture emphasizes that in February 2003 it opposed Lancôme's application to register Juicy in France for cosmetics. This was Lancôme's first application to register the word Juicy by itself. Lancôme immediately protested that it had priority given its registrations for JUICY TUBES and JUICY ROUGE in France. Couture then wrote a letter in June 2003 which essentially acknowledged that it had not opposed Lancôme's United States trademark applications and that the word juicy has utility in describing the quality of cosmetics. This is hardly notice to Lancôme that Couture would seek to limit Lancôme's rights to use Juicy in the United States market. Lancôme ignored Couture's overtures to engage in negotiations that would allow Couture to enter the cosmetics market. Then, late in 2003, Couture let Lancôme obtain registration for JUICY ROUGE in the United States without any opposition. There is nothing from these events in 2003 that permits Couture to roll back the clock and claim that it adequately asserted its rights that year.

**\*35** Finally, Couture's pursuit of a global settlement with Lancôme in July 2004 was not an assertion of rights in the United States. The discussions were preceded by a letter asserting rights solely in Europe, where the parties had already been in active dispute. More importantly, in the letter Couture did not even represent that it had superior rights to the word "juicy" in cosmetics.

Lancôme has proved each of the three elements necessary to establish its affirmative defense of laches. If this Court were to find a likelihood of confusion, Lancôme's affirmative defense would still bar Couture's claim for injunctive relief. [FN41]

> FN41. Even with a finding of infringement not

barred by laches, the requested injunction would be far too broad, as well as being too vague.

**B. Equitable Estoppel and Waiver**

The doctrine of equitable estoppel "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Veltri v. Bldg. Serv. 32B-J Pension Fund,* 393 F.3d 318, 326 (2d Cir.2004) (citation omitted). The three elements Lancôme must establish to invoke equitable estoppel are: "1) a misrepresentation by the plaintiff, 2) reasonable reliance by the defendant, and 3) prejudice." *Id.*

Waiver under federal law will be recognized where "parties were aware of their rights and made the conscious choice, for whatever reason, to waive them." *Mooney v. City of New York,* 219 F.3d 123, 131 (2d Cir.2000) (citation omitted). The conduct constituting waiver must be "clear and unequivocal" and a party asserting an implied waiver bears the burden of proving that the requirements for waiver have been met. *Id.* Waiver under New York law does not differ "in practical effect" from waiver under federal law. *Id.* "Under New York law, a claim of waiver requires proof of an intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *Capitol Records, Inc. v. Naxos of Am., Inc.,* 372 F.3d 471, 482 (2d Cir.2004) (citation omitted).

Lancôme has shown that it is entitled under the doctrine of waiver to a judgment in its favor with regard to all claims brought by Couture based on Lancôme's use of the product names JUICY TUBES, JUICY ROUGE, Juicy Tubes Pop, Juicy Vernis, and Juicy Crayon. Couture asserted claims based on these marks, both fact and expert discovery proceeded on these marks, and Couture explicitly withdrew its claims regarding them on the eve of trial. In reliance on that abandonment, Lancôme did not try these claims. Lancôme has not shown any misrepresentation by Couture and therefore is not entitled to a judgment based on equitable estoppel.

*Conclusion*

Couture has failed to carry its burden on any of its claims. Lancôme shall submit a proposed judgment by May 5, 2006; Couture shall respond by May 12.

SO ORDERED:

Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 28
Not Reported in F.Supp.2d, 2006 WL 1012939 (S.D.N.Y.)
**(Cite as: 2006 WL 1012939 (S.D.N.Y.))**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE 2007 U.S. DIST. LEXIS 57320



Cited
As of: Oct 15, 2007

**KARGO GLOBAL, INC., Plaintiff, v. ADVANCE MAGAZINE PUBLISHERS, INC., Defendant.**

**06 Civ. 550 (JFK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 57320*

**August 6, 2007, Decided
August 6, 2007, Filed**

**COUNSEL:** [*1] For Plaintiff Kargo Global, Inc.: DANGEL & MATTCHEN, LLP, Boston, MA, Of Counsel: Edward T. Dangel, III, Esq.

For Defendant Advance Magazine Publishers, Inc.: FITZPATRICK, CELLA, HARPER & SCINTO, New York, NY, Of Counsel: Edward E. Vassallo, Esq. Robert H. Fischer, Esq. JOHN F. KEENAN, United States District Judge.

**OPINION BY:** JOHN F. KEENAN

**OPINION**

**OPINION & ORDER.**

    **JOHN F. KEENAN, United States District Judge:**

    BACKGROUND

    This action stems from the claim of Plaintiff Kargo Global, Inc. ("Kargo") that its "KARGO" trademark was infringed by Defendant Advance Magazine Publishers, Inc.'s ("Advance's") publication of the now-defunct Cargo magazine. This Opinion addresses (1) Advance's motion to preclude the consumer confusion survey and testimony of Kargo's expert, Dr. Jacob Jacoby; (2)

Advance's motions to preclude the reports and accompanying testimony of Kargo's damages experts, Thomas Nelson and Gary Singer; (3) Advance's motion to preclude the "rebuttal" reports and accompanying testimony of Plaintiff's experts Russell Winer, who defends Jacoby's opinion, and Leon Kaplan, who defends Singer's opinion; (4) Advance's motion to preclude Kargo from introducing certain damages evidence as a sanction for Kargo's [*2] alleged discovery violations; and (5) Kargo's motion to preclude portions of the report and testimony of Advance's expert, Itamar Simonson, regarding the purported bias of Kargo's experts and the results of a study conducted by Advance that shows that there is no awareness of Kargo's brand among consumers.

    For the following reasons, Advance's motion to preclude the consumer confusion survey and testimony of Dr. Jacoby is granted. Advance's motions to preclude the reports and testimony of Kargo's damages experts, Thomas Nelson and Gary Singer, are also granted. Advance's motion to preclude the reports and testimony of Kargo's "rebuttal" experts is dismissed as moot. Advance's motion to preclude Kargo from offering certain damages evidence is in part granted, in part denied, and in part dismissed as moot. Kargo's motion to preclude portions of the testimony of Advance's expert, Itamar Simonson, is in part dismissed as moot and in part

denied.

Plaintiff Kargo is a distributor of online content to wireless devices. Kargo's direct customers are wireless carriers and publishers of online content who use Kargo's services and software to deliver wireless features, such as magazine text, ringtones, [*3] and video games, to cellphones, pagers, and other personal wireless electronic devices. Kargo's mark frequently appears alongside the brand of the wireless carrier or publisher (in the form, for example, of "[magazine title] POWERED BY KARGO") when an individual downloads content into his or her cellphone or other wireless device.

Defendant Advance (d/b/a Condé Nast) publishes numerous well-known print magazines. Advance launched Cargo and its companion website, cargomag.com, in March 2004. Cargo was essentially a men's shopping magazine, targeted toward males aged 20-45. Cargo reviewed and promoted clothes, cars, electronic gadgets, and other luxury items which presumably were of interest to its target audience. Although Cargo occasionally reviewed or promoted wireless devices and features, the magazine devoted only a small percentage of its overall content to coverage of wireless goods and services. Cargo had a relatively short life span of twenty issues. The last issue (listed as the May 2006 issue) appeared in April 2006 and the website was shut down in July 2006.

Kargo commenced this action on January 24, 2006, asserting causes of action for false designations of origin, [*4] false descriptions and representations, and trademark infringement in violation of the Trademark Act of 1946 ("Lanham Act"), *15 U.S.C. §§ 1114, 1125(a)*, and for related state and common law claims. In its Complaint, Kargo alleged that Advance's use of the "cargo" name in Cargo magazine and on the cargomag.com website infringed on Kargo's registered "KARGO" trademark. [1] Kargo sought injunctive relief, damages for corrective advertising, Advance's profits from its infringement, compensatory damages (as treble damages pursuant to the Trademark Act), and punitive damages, and demanded a jury trial.

> 1    For purposes of the instant motions, it is undisputed that Kargo holds a valid, registered mark and is the senior user. The KARGO mark is actually owned by ACK Ventures, a company owned by Kargo's CEO, Harry Kargman. ACK Ventures licenses the exclusive use of the

KARGO mark to Kargo. The license is renewed on a yearly basis.

Pursuant to a stipulation between the parties, Advance ceased publication of Cargo after the appearance of the May 2006 issue and shut down the companion website in July 2006, thus rendering moot Kargo's claim for injunctive relief. In addition, Kargo evidently has relinquished [*5] its claim for Advance's profits, because, as Advance disclosed in discovery, Advance realized no profits but rather incurred losses of over $ 30 million in connection with the promotion and publication of Cargo.

Kargo's claims of liability are based on the theory of "reverse" confusion, in which a second comer, who is better known than the senior user, infringes on the senior user's mark, resulting in the mistaken belief among consumers that the senior user's goods or services are produced by the second comer. Thus, Kargo claims that the existence of Cargo magazine and its website caused prospective end users of products distributed by Kargo to believe that Kargo's offerings actually were produced by Cargo magazine. Although Kargo's Complaint alleged anecdotal confusion among Kargo's existing and prospective direct business-to-business customers, Kargo's claims now appear to be based solely on allegations of "reverse" confusion among individual end users. Kargo's theory of harm is that individuals who downloaded content into their personal wireless devices experienced "negative" confusion as a result of Cargo's infringement; therefore, those end users were and will continue to be less [*6] likely to use Kargo's services in downloading wireless content. In turn, Kargo contends, Kargo's direct business-to-business customers will be less likely to partner with Kargo. The sole evidence of actual confusion among end users that Kargo has offered is the consumer confusion survey that was designed by Kargo's expert, Dr. Jacob Jacoby (the "Jacoby Survey"), the results of which are described and analyzed in Jacoby's expert report (the "Jacoby Report").

Kargo contends that, as a result of the confusion caused by the existence of the Cargo magazine and website during the magazine's twenty-issue run, Kargo's brand suffered a loss in value of $ 5.02 million and that an award of $ 8.17 million is required to fund an extensive corrective advertising campaign to repair the damage caused by the confusion. [2]

> 2    Kargo's claim for compensatory damages of $

8.17 million is based on the theory of "prospective corrective advertising". Under this legal theory, damages may be awarded to a plaintiff even absent any evidence that a plaintiff made corrective advertising expenditures to remedy the harm caused by a defendant's trademark infringement. To recover under a claim for "prospective corrective [*7] advertising", a plaintiff "must show that it was financially incapable of undertaking effective concurrent corrective advertising measures to counteract" the trademark infringement." *Playtex Prods. v. Procter & Gamble Co., No. 02 Civ. 8046 (WHP), 2003 U.S. Dist. LEXIS 8913, at *23-24 (S.D.N.Y. May 28, 2003).* The Southern District has characterized prospective corrective advertising as "an extraordinary remedy," *Lurzer GmbH v. American Showcase, Inc., 75 F. Supp. 2d 98, 101 (S.D.N.Y. 1998),* and no court in this Circuit has ever awarded damages under that theory.

To place Kargo's multi-million dollar damages claim in perspective, it is worth noting that in 2005, Kargo's most profitable year, Kargo stated on its federal tax return that the company's collective assets were worth $ 435,931. (Mem. in Support of Def. Mot. to Exclude the Testimony of Pl.'s Expert Gary Singer, Ex. N.)

The instant motions were fully briefed and filed with the Court on April 27, 2007, and the Court heard oral argument on June 5, 2007.

## DISCUSSION

### I. Advance's Motion to Preclude the Consumer Confusion Survey and Report of Dr. Jacob Jacoby

Advance has moved pursuant to *Rules 702* and *403 of the Federal Rules of Evidence* [*8] to preclude the Jacoby Survey and Jacoby's accompanying testimony. The Jacoby Survey purports to show the existence of "reverse" confusion among prospective end users of wireless features offered by Kargo. Advance contends that the survey's methodology is so flawed as to render the survey, and Jacoby's proposed testimony regarding the survey, inadmissible.

### A. The Jacoby Survey

#### (i) Dr. Jacoby's Qualifications

Although Advance's memorandum of law cites a number of cases in which Jacoby's surveys were criticized, and although Kargo, in its opposition brief, hotly defends Jacoby's renown as a survey expert and cites numerous cases in which courts have praised Jacoby's surveys, there is no real dispute regarding Jacoby's qualifications as an expert witness. Since 1973, Jacoby has designed and administered over 500 consumer confusion surveys and has qualified as an expert on survey research in over 150 cases. Citations to his scholarship on consumer surveys are sprinkled liberally throughout McCarthy on Trademarks and Unfair Competition, a leading treatise on trademark law. Jacoby is clearly a qualified expert on consumer confusion surveys.

#### (ii) Survey Methodology and Results

Jacoby was retained [*9] by Kargo in April 2006. He conducted two surveys on the likelihood of "reverse" confusion resulting from Advance's use of the "cargo" mark in connection with the publication of Cargo magazine and its companion website. One survey consisted of participants from the defendant's universe of prospective consumers (that is, prospective readers of Cargo magazine), and one consisted of participants from the plaintiff's universe of prospective consumers (that is, prospective end users of wireless features offered by Kargo).

Here, because Kargo is claiming that "reverse" confusion exists, the relevant survey for purposes of demonstrating actual consumer confusion is that of Kargo's universe of prospective purchasers. When "the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers." *Sterling Drug v. Bayer AG, 14 F.3d 733, 741 (2d Cir. 1994).* Thus, only Jacoby's survey of Kargo's prospective universe of customers is relevant to show consumer confusion. [3]

      [3]  The survey of the defendant's universe of prospective consumers was conducted at the behest of Kargo's damages expert, [*10] Gary Singer. The results of that survey were incorporated in Singer's expert report to help prove damages but are not relevant to Kargo's attempt to prove actual consumer confusion.

The Jacoby Survey purports to show that 15.5% of

prospective consumers of wireless features offered by Kargo were "confused" in their belief that Kargo is sourced by or related to Cargo magazine. The survey was conducted as follows.

At Jacoby's direction, an internet survey firm invited some of its panel members to participate in the survey. For the survey of Kargo's universe, participants were required to be males, aged 17 to 45, who resided in the United States. In addition, participants who worked in advertising, marketing, or for a company that offered wireless cell phone services were excluded. Participants who did not read or skim a magazine at least once per month or did not own a cell phone or plan to buy a cell phone within the next year were also excluded. Further, participants who did not currently have or would not consider obtaining within the next year various wireless products for their cell phones (for example, ringtones, video games, music videos, and magazine content) were also excluded.

The [*11] qualifying participants were then permitted to take a multi-question internet survey, which took approximately seven minutes to complete. [4]

> 4  Respondents who completed the survey were given a monetary reward.

The initial phase of the survey consisted of showing the respondents materials from Cargo magazine. Each respondent was first informed that he would be shown a cover of a magazine and then a representative page of that magazine. The respondent was then shown the cover from the September 2005 issue of Cargo, which displayed, among other things, the "CARGO" logo, a picture of the tennis player Andy Roddick, and several large-font "headlines" that announced the issue's contents (for example, "THE TOP CARS OF 2006"). Included on the cover was a prominently displayed picture of a cell phone, to the side of which was printed the headline "World's Most Distinctive Cell Phone". (Def. Mem. in Support of Def. Mot. to Exclude the Testimony of Pl.'s Survey Expert Dr. Jacob Jacoby ("Def. Mem. Exclude Jacoby"), Ex. C.)

Each participant was then shown a page from the interior of the September 2005 issue of Cargo that contained promotional features relating to the magazine's companion website. The [*12] page included the "CARGO" logo and the "cargomag.com" logo, above which was printed the heading "MORE AMAZING

FEATURES AND PRODUCT REVIEWS ONLINE." The page also contained a promotional paragraph entitled "Cargo-to-Go", which displayed a picture of a Blackberry cellphone, and advertised the website's "Instant Replay" feature, which allowed visitors to cargomag.com to download content from Cargo, such as product reviews, into their cellphones. (Id., Ex. D.) Respondents were allowed to take as much time as they wished to examine the Cargo materials.

The next phase of the survey consisted of three short "distractor" questions, in which respondents were asked about their television viewing habits, attendance at sporting events, and the number of adults living in their households. According to Jacoby, the "distractor" questions were designed to be answered in 30 to 45 seconds.

The next phase consisted of showing the participants materials that contained the "KARGO" mark. Each participant was first informed that he would next be viewing a "magazine ad that appeared in Premiere magazine." (Id., Ex. B at 26, P 44.) The respondent was then shown an advertisement for "Premiere Mobile", a service [*13] which allows cellphone customers to download Premiere's content onto their cellphones. The advertisement included the words "Powered by KARGO", with Kargo's logo prominently displayed in large font. (Id., Ex. E.)

Each respondent was then informed that the "next ad you will see is for a service available for cell phone users." (Id., Ex. B at 26, P 45.) The respondent was then shown a blown-up picture of a Blackberry cellphone, with the "KARGO" logo displayed in large font above the picture. (Id., Ex. F.) Respondents were given as much time as they wished to examine the Kargo materials.

Each respondent then was asked a series of multiple choice questions designed to ascertain whether he believed there was any connection regarding source, business relationship, or sponsorship between the company that produced the materials for Cargo magazine and the company that produced the "ads" that displayed the "KARGO" logo. First, each respondent was asked a question intended to detect "source confusion":

> Q4. If you have any thoughts about it, do you think these ads from Premiere Magazine and for the cell phone service you just saw...?

do come from the same company that put out the magazine you looked [*14] at earlier in the survey

do not come from the company that put out the magazine you looked at earlier in the survey

Don't know. 5

(Id., Ex. B at 27, P 47.)

5    The order of the "do" and "do not" answer choices was rotated from respondent to respondent.

Respondents who answered that they thought the "ads" came from the same company that produced the magazine (i.e., Cargo) were then asked to state "what makes you say that these ads come from the same company that put out the magazine you looked at earlier?" (Id.)

Respondents who did not answer that they believed that the Cargo and KARGO materials came from the same source were given the following "relationship confusion" question:

If you have any thoughts about it, do you think the ad from Premiere Magazine and the cell phone service you just saw

come from a company that does have a business connection or relationship with the company that put out the magazine you looked at earlier in this survey

come from a company that does not have a business connection or relationship with the company that put out the magazine you looked at earlier in this survey

Don't know. 6

(Id., Ex. B at 27, P 48.)

6    As with the answers for the previous question involving [*15] "source confusion", the order of the answer choices for this question also was rotated from respondent to respondent.

Respondents who answered that they thought there was a connection between the company that produced the "ads" and the company that put out the magazine were then asked to state why they thought that a connection existed.

Respondents who answered that they did not believe there was a connection between the companies were then asked two "sponsorship confusion" questions. First, respondents were asked whether they thought that "the company that offers the cell phone service you just saw and placed the ad in Premiere Magazine" needed to get permission from another company in order to use the name that the "ad" companies used. (Id., Ex. B at 28, P 49.) Respondents who answered that they believed the company that put out the "ads" needed to get permission to use the name in the "ads" were then asked to state the name of the company from which permission was needed. Finally, the respondents were asked to state why they believed that permission was required from the company they had named. 7

7    The Jacoby Survey included an additional three questions which are not relevant to the [*16] instant motion.

The survey also was administered to a group of "control" respondents. The "control" survey was identical to the survey described above, except that everywhere the word "CARGO" appeared on the cover page and interior magazine page, it was replaced by the word "CARRY".

The Jacoby Survey utilized a two-pronged test to determine whether a respondent could be counted as "confused". In order to be counted as "confused", a respondent first had to answer one of the three initial multiple choice questions affirmatively, indicating that he believed that the Kargo "ads" either (1) came from the same source as the Cargo or Carry magazine that was displayed; (2) came from a company that had a business connection with Cargo or Carry magazine; or (3) came from a source that was required to obtain permission from Cargo or Carry magazine. Next, when asked to state the reason for his answer as to the initial multiple choice questions, the respondent "had to give an answer that referred to the names Cargo (Carry) and Kargo or the equivalent." (Id., Ex. B at 33, P 56(b)). Thus, a participant who indicated that he believed there was a connection as to source, relationship, or sponsorship [*17] between the Cargo (or Carry) materials and the Kargo materials, but who then did not refer to the

similarity of the companies' names when asked why he thought there was a connection, would not be counted as "confused" in the final tally.

Of the 328 participants who took the test survey (i.e., who were shown the Cargo and Kargo materials), 17.7% were tallied as "confused". Of the 230 participants who took the control survey (i.e., who were shown the Carry and Kargo materials), 2.2% were tallied as "confused". The Jacoby Report states that the net confusion, calculated as the difference between the confusion among participants in the test survey minus the confusion of the participants in the control survey, was 15.5%. [8] In addition, although not stated in the Jacoby Report, 80% of respondents in the control group answered one of the initial multiple choice questions affirmatively, thus demonstrating that they believed there was a connection as to source, business relationship, or sponsorship between the companies that produced the Carry and Kargo materials.

> [8] The percentage of confusion occurring among participants in the control group is subtracted from the percentage of confused participants [*18] in the test group, pursuant to standard protocol, as "noise" that should be discarded. "In an experiment or statistical study, the 'noise' is the variation in the data being collected that is not believed to be caused by the variables being tested." *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 483 n.13 (S.D.N.Y. 2002).*

*B. Analysis*

*Federal Rule of Evidence 702* provides that expert testimony concerning technical or specialized knowledge is admissible to assist the trier of fact if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Fed. R. Evid. 702.* To be admissible, expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).*

Survey evidence is generally admissible to establish actual confusion in cases alleging violations of the Lanham Act. *Schering Corp. v. Pfizer Inc., 189 F.3d 218, 227-28 (2d Cir. 1999).* To be probative of confusion "the

survey must. . . have been fairly prepared and its results directed to the [*19] relevant issues." *Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 118 (2d Cir. 1984).* Although defects in survey methodology usually go to weight of the evidence rather than its admissibility, a survey should be excluded under *Federal Rule of Evidence 403* when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury. *Schering, 189 F.3d at 228;* see, e.g., *Starter Corp. v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999).* "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under *Rule 403* . . . exercises more control over experts than over lay witnesses." *Daubert, 509 U.S. at 595;* see also *Mastercard Int'l, Inc. v. First Nat'l Bank of Omaha, Inc., Nos. 02 Civ. 3691 (DLC), 03 Civ. 7070 (DLC), 2004 U.S. Dist. LEXIS 2485 (S.D.N.Y. Feb. 23, 2004).* Courts have precluded surveys after finding that flaws in methodology are so severe that the survey's probative value is substantially outweighed by its potential for unfair prejudice and confusion. See *Vista Food Exch., Inc. v. Vistar Corp., No. 03 Civ. 5203, 2005 U.S. Dist. LEXIS 42541, at *13-15 (E.D.N.Y. Sept. 25, 2005)* [*20] (collecting cases).

The Jacoby Survey is so flawed that its probative value is substantially outweighed by its potential for unfair prejudice and the likelihood that it will confuse or mislead the jury. Two major defects strip the Jacoby Survey of probative value. Specifically, the survey (1) employed a format that failed to approximate real world conditions and was impermissibly leading, and (2) used improper stimuli.

The Jacoby Survey's failure to approximate real world conditions severely limits its probative value. "Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions." *WE Media v. GE, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002);* see also *Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357, 361 (2d Cir. 1983);* 3 McCarthy on Trademarks § 23:2.1, at 23-13 (4th ed. 2002) ("While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion."). A survey's failure to approximate marketplace conditions can provide grounds for the

survey's exclusion. See, e.g., *American Footwear Corp. v. General Footwear Co. Ltd., 609 F.2d 655, 660 (2d Cir. 1979)* [*21] (approving lower court's finding that survey was defective "for failure to conduct it under actual marketing conditions"); *Vista Food Exch., Inc. v. Vistar Corp., 2005 U.S. Dist. LEXIS 42541* (finding significant reduction in survey's probative value where survey failed to replicate actual marketing conditions).

Here, the back-to-back, or seriatim, display of the Cargo and Kargo marks did not approximate conditions that consumers would encounter in the marketplace. The products at issue (Kargo's wireless services and Advance's mens shopping magazine, respectively) were not competing. Although some overlap existed in the demographic makeup of both Kargo's and Cargo's target audiences, the companies were engaged in different businesses. Kargo provides content-distribution services to publishers of online content and wireless carriers. Its customers are the businesses that choose to engage Kargo to help in the distribution of downloadable, wireless content. Advance published a mens' shopping magazine. Its customers were its readers and visitors to the cargomag.com website. As Advance points out, Kargo has offered no data or other evidence to support the proposition that prospective consumers [*22] were likely to encounter Kargo's trademark a short time after seeing Cargo magazine. Despite Jacoby's speculation at his deposition that "under some circumstances there is this opportunity for people to see the two [marks] in close temporal proximity," the Court doubts that a non-negligible number of prospective consumers of Kargo's products would see Cargo magazine, followed a minute or less later, by the KARGO logo. (Def. Mem. Preclude Jacoby, Ex. A at 210-11.) The likelihood that a significant number of consumers would encounter the marks in close proximity is rendered even more remote by the fact that Cargo ran for only twenty issues and is no longer published.

Although the Jacoby Survey's seriatim display of the non-competing marks does not alone render the survey inadmissible, it does substantially detract from the survey's capacity to prove a likelihood of consumer confusion. The back-to-back display of parties' products has been characterized as a "major flaw" in survey methodology. *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002)*. As another court has stated, "The proper test for likelihood of confusion is not whether consumers

[*23] would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar to some extent with the one party's mark, is presented with the other party's goods alone." *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L., 673 F. Supp. 1238, 1248 (S.D.N.Y. 1987)*. Here, where Kargo has alleged that "reverse" confusion has occurred because of the infringing use by the better-known Cargo magazine of the lesser-known senior user's (Kargo's) name, it would have been far more replicative of actual marketplace conditions to have displayed only Kargo's materials and then asked the respondents open-ended questions regarding their beliefs about the source, business relationship, or sponsorship of the Kargo materials. This is known as the "Eveready" format. See *Union Carbide Corp. V. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976)*; 5 McCarthy on Trademarks and Unfair Competition, § 32:174 at 32-290, 291 (4th ed. 2002) ("A now-standard survey format used to prove likelihood of confusion in cases where plaintiff makes some products which defendant does not is the Eveready format."). A survey that utilizes the "Eveready" format, by displaying only [*24] a single party's mark and attempting to discern whether respondents are confused as to the source of the mark, "is much more reliable because it more accurately approximates actual market conditions" by ensuring that respondents are not made "artificially aware" of the other party's trademark. *Nat'l Distillers, 198 F. Supp. 2d at 484*. Here, the Jacoby Survey's artificial, seriatim presentation of non-competing marks bears so little resemblance to the actual experience of consumers, that the confusion the survey purports to show has very little probative value.

In addition to failing to approximate actual marketplace conditions, the survey's back-to-back design was impermissibly leading. After viewing the seriatim display of non-competing products that few if any respondents actually would have encountered in close physical or temporal proximity in real life, the respondents were given multiple choice questions in which they were asked whether they believed a connection, as to source, business relationship, or sponsorship, existed between the companies whose marks the respondents had just seen. Rather than measure any actual confusion, however, these questions were far more likely to [*25] generate "demand effects" by suggesting the existence of a connection between the products that the respondents would not have made on their own. As one court has explained, "[t]he question about whether

Case 5:07-cv-00347-D     Document 112-2     Filed 10/15/2007     Page 53 of 169

Page 8
2007 U.S. Dist. LEXIS 57320, *25

the two [non-competing] items are put out by the same or a related source is likely to generate so-called 'demand effects' that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Simon Prop. Group L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1048 (D. Ind. 2000); see also Gov't Employees Ins. Co. v. Google, Inc., No. 1:04 Civ. 507, 2005 U.S. Dist. LEXIS 18642 (D. Va. Aug. 8, 2005)* ("[D]emand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants."). In other words, the mere putting of a question creates the impression of a relationship.

Here, although the survey questions did not refer [*26] to the actual names "cargo" and "kargo", there exists a great likelihood that the back-to-back presentation of the parties' marks, followed by questions that asked respondents if they believed the marks are related, suggested to respondents that they should believe that a connection existed between the companies' marks. Certainly, in light of the non-competing nature of the products at issue, the multiple choice questions that immediately followed the display of the marks implied connections or associations that otherwise would not have occurred to the respondents. Under such circumstances, the respondents who later stated that they believed that there was a connection between Cargo and Kargo due to the similarity of the names, and thus were tallied as "confused", were demonstrating merely that they had read the names "cargo" and "kargo" in artificially close proximity. "Surveys which do nothing more than demonstrate the respondents ability to read are not always probative on the issue of likelihood of confusion." *Franklin Resources v. Franklin Credit Mgmt. Corp., 988 F. Supp. 322, 335 (S.D.N.Y. 1997)*; see also *Universal City Studios, Inc., 746 F.2d at 118; Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 450 (S.D.N.Y. 1982)* [*27] (finding that survey did not establish "meaningful evidence of actual confusion" because question asking respondents whether there was a business connection between companies with similar names "establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption, that, in the absence of any other information, two companies with similar names are likely to have a business connection").

The leading nature of the survey's design is clearly evidenced by the control group's response to the Jacoby Survey. In a consumer confusion survey, the control group is shown "a non-infringing product which is similar to the products at issue." *Nabisco v. Warner-Lambert Co., 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999)*. The Jacoby Survey's control group was shown pages of a magazine that replaced the name Cargo with the name Carry. Although the name "Carry" is obviously dissimilar from "Kargo" and thus clearly non-infringing, 80% of the control group respondents indicated in their responses to the initial multiple choice questions that they believed there was some connection [*28] involving source, business relationship, or sponsorship between Kargo's "ads" and the pages of Carry magazine. The only plausible explanation for this statistic, which Jacoby did not include in his report, is that the Jacoby Survey was designed (successfully) to lead its respondents to infer that a connection existed between the parties' products. As Advance's expert, Itamar Simonson, stated in his report with unassailable common sense:

> It appears safe to assume that there should not be any marketplace confusion between a men's shopping magazine called 'Carry' and the plaintiff in this case, Kargo. Accordingly, unless the Jacoby Survey procedure and questions were flawed (e.g. leading) we would expect the 'confusion' estimate in the 'Carry' control group to be not much higher than 10%. . . . Thus, even though there was no reason to expect confusion between the 'Carry' men's magazine and the 'Kargo' service, 80[]% of the respondents in the Jacoby Survey control group said that Carry and Kargo came from the same source, had a business connection, or Kargo received permission from Carry. These results reflect the extremely leading survey methodology employed in the Jacoby Survey.

(Def. [*29] Mem. Preclude Jacoby Survey, Ex. P, at 50, PP 119-20.) [9] The Court agrees with Advance's expert that the control group's response to the initial multiple choice questions is strong if not dispositive proof that the survey was designed to lead respondents to conclude that

the parties' products were related.

    9  Although Kargo has filed a motion to preclude portions of Simonson's proposed testimony, Kargo has not challenged the admissibility of Simonson's conclusions regarding the statisical results of the Jacoby Survey.

Kargo argues that the high incidence of "confused" responses to the multiple choice questions among test group respondents is irrelevant. Kargo contends that the only respondents who can be counted as "confused" are those who, first, answered one of the multiple choice questions affirmatively and, second, referred to the similarity between the names of the marks. Thus, Kargo argues, a respondent who merely answered one of the multiple choice questions in the affirmative cannot be counted as "confused" and the percentage of respondents who gave affirmative answers to the initial multiple choice questions has no relevance to the issue of whether consumer confusion exists as [*30] to the names "cargo" and "kargo".

Kargo misses the point. Although Advance uses the word "confusion" in connection with its discussion of the responses provided by 80% of the test group, Advance does not, and cannot, claim that the test group's response to the survey's initial multiple choice questions demonstrates a likelihood of consumer confusion sufficient to support a claim for monetary damages under the Lanham Act. In other words, Advance does not cite the 80% statistic insofar as it relates to legal confusion. Rather, Advance simply contends, and the Court agrees, that the 80% statistic demonstrates that the Jacoby Survey was effectively constructed to lead respondents to conclude that the marks that were displayed came from related sources.

The Jacoby Survey's use of improper and unrepresentative stimuli also detracts substantially from its probative value. "Typically, trademark infringement surveys use stimuli, such as pictures, advertisements or clothing, that directly expose potential consumers to the products or the marks in question." *Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001). To be probative of actual confusion, a survey must use stimuli "that approximate [*31] what a potential customer would encounter in making" purchasing decisions. *WE Media,* 218 F. Supp. 2d at 474. A survey that uses stimuli that differ from what a consumer is actually likely to see in the marketplace does not accurately test for actual

consumer confusion and thus lacks probative value. See *Conopco, Inc. v. Cosmair, Inc.,* 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999).

Here, the Jacoby Survey displayed to respondents a purported "ad" for Kargo, in the form of a blown-up photo of a Blackberry cellphone that prominently featured the KARGO logo. That "ad", however, was not an actual advertisement that a prospective user of Kargo's products would ever encounter but rather was a page prepared by Kargo as promotional material, designed for viewing by Kargo's direct, business-to-business customers. Advance points out that, in real life, an end user would see the KARGO mark only on the small screen of his wireless device, in a size substantially smaller than the KARGO mark displayed in the "ad" used in the Jacoby Survey. Although Kargo insists that the "ad" was "an authentic page taken from Kargo's promotional materials," it is undisputed that the "ad" would never be encountered by Kargo's [*32] prospective end users, who were the respondents of the Jacoby Survey. (Pl. Opp. to Def. Mot. Exclude Jacoby Survey at 11.) Thus, because Kargo's "mark was not shown as it is used in commerce," *Vista Food Exch., Inc., 2005 U.S. Dist. LEXIS 42541 at *15,* its use in the survey was improper and further detracts from the survey's probative value.

In addition, the pages of Cargo magazine were not sufficiently representative of Cargo's product. Both the cover and interior page prominently displayed large photos of cellphones. In addition, the interior page was devoted entirely to promotional content relating to the cargomag.com website, and included a promotional paragraph about Cargo's "Instant Replay" feature. The Court agrees with Advance that the content displayed on the cover and interior page "give[s] an unfair representation of the editorial content of the 20 issues of Cargo Magazine." (Def. Mem. Exclude Jacoby Survey at 9.) Although the pages were taken from an actual issue of Cargo, a respondent, viewing the Cargo cover and interior page, would be highly likely to believe that Cargo was involved in the same line of business as the company that produced the Kargo "ads", namely, providing [*33] wireless or web-related products and services, when in fact, Cargo devoted only a small percentage of its overall content to such products and services.

Because the seriatim display of the products did not approximate marketplace conditions and rendered the

survey questions impermissibly leading, and because the survey used improper or unrepresentative stimuli, the Jacoby Survey has very limited probative value. In light of the severely diminished probative value of the Jacoby Survey, the danger of unfair prejudice looms large. Trial courts are accorded "wide latitude in excluding evidence that possesses an undue risk of prejudice or confusion of the issues, or is found to be marginally relevant to the issues in the case." *Starter Corp., 170 F.3d at 296* (internal quotation marks and citation omitted). Where a trademark action contemplates a jury trial, rather than a bench trial, the court should scrutinize survey evidence with particular care. As one court has stated:

> The vast majority of reported cases dealing with problematic survey evidence have involved injunction hearings or bench trials. In such cases, the safest course for the trial judge is to admit the evidence and to treat [*34] the criticisms as going to the weight of the evidence. . . . This case is scheduled for a jury trial. The court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time-consuming, as this survey evidence would be, when it offers essentially nothing of real probative value. *Rule 403* was written for just this sort of case.

*Simon Prop. Group L.P., 104 F. Supp. 2d at 1040.*

A jury trial, rather than a bench trial, is contemplated in this case. The live testimony of Kargo's highly seasoned and impressively credentialed consumer confusion expert, regarding the results of the deeply flawed Jacoby Survey, would prove to be "both powerful and quite misleading." *Daubert, 509 U.S. at 595.* The application of *Rule 403* is clearly warranted in this case. See *Schering, 189 F.3d at 228* (survey subject to "*Rule 403*'s more general prohibition against evidence that is less probative than prejudicial or confusing"); *Starter Corp., 170 F.3d at 297* (finding that "district court did not abuse its discretion [in excluding survey] because it found the probative value of the survey so slight that it was easily [*35] outweighed, under a *Rule 403* analysis, by the danger of confusion of the issues"); see also *Universal City Studios, 746 F.2d at 118* (finding survey "so badly flawed that it cannot be used to demonstrate the

existence of a question of fact on the likelihood of consumer confusion"); *Vista Food Exch., Inc., 2005 U.S. Dist. LEXIS 42541, at *21-22* (excluding survey on *Rule 403* grounds because it was "flawed to the point that its probative value is substantially outweighed by the survey's potential for unfair prejudice and confusion"); *Revlon Consumer Prods Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 1276 (S.D.N.Y. 1994)* (finding survey "so unreliable that it is entitled to no weight"); *Exxon Corp. v. Xoil Energy Resourcess, Inc., 552 F. Supp. 1008, 1021 (S.D.N.Y. 1981)* (affording survey no weight because survey, among other things, was not "taken under market conditions"). Accordingly, because the Jacoby Survey is so flawed that its probative value is substantially outweighed by the risk of unfair prejudice and the potential that the jury will be misled or confused, the Jacoby Survey and the accompanying testimony of Jacoby are excluded as inadmissible under *Rule 403*.

II.  [*36] *Advance's Motion to Preclude Reports and Testimony of Kargo's Damages Experts*

Advance seeks to preclude the expert reports and testimony of Kargo's damages experts, Thomas Nelson ("Nelson") and Gary Singer ("Singer"). Nelson and Singer are employees of Interbrand, Inc., a brand valuation firm. Kargo engaged Nelson and Singer as experts on damages caused to Kargo's brand by Advance's allegedly infringing activities. Nelson designed five "bolt on" questions that were added to the end of the Jacoby Survey. The "bolt on" questions were intended "to assess the impacts of any proven confusion on Kargo's current and future business outcomes and identify strategy elements for eliminating or mitigating that confusion through future Kargo brand-building efforts." (Def. Mem. Exclude Jacoby, Ex. B., at 12, P 23.). Nelson's expert report (the "Nelson Report") describes and analyzes the answers given by respondents in the defendant's universe of prospective consumers the "bolt on" questions. In addition, the Nelson Report provides a brief and favorable review of the methodology of the Jacoby Survey.

Singer's expert report (the "Singer Report") provides a calculation of the damage that was inflicted [*37] on Kargo's brand value by Advance's allegedly infringing conduct. The Singer Report also calculates the cost of the massive media campaign that Singer believes will be necessary to counteract the damage caused by the

infringement. The Singer Report's damages calculations are based on the results of the Jacoby Survey, showing the existence of marketplace confusion among prospective end users of products offered by Kargo. The Singer Report also relies on the Nelson Report's findings regarding the extent to which consumer confusion impacted the value of Kargo's brand.

The findings of Kargo's damages experts relate only to proof of damages and are predicated entirely on the existence of consumer confusion as demonstrated by the Jacoby Survey. Because the Jacoby Survey and Jacoby's accompanying testimony have been held to be inadmissible under *Rule 403*, the Nelson Report and Singer Report have been rendered irrelevant and thus inadmissible. Accordingly, Advance's motions to preclude the reports and accompanying testimony of Nelson and Singer are granted.

### III. Reports of Kargo's "Rebuttal" Experts

Advance seeks to preclude the "rebuttal" reports and accompanying testimony of Russell Winer [*38] and Leon Kaplan, which support the findings and opinions of, respectively, Kargo's experts Jacoby and Singer. Because the reports and accompanying testimony of Jacoby and Singer have been ruled to be inadmissible, Advance's motion to dismiss any "rebuttal" testimony regarding those reports is moot.

### IV. Advance's Motion to Preclude Certain Damages Evidence as a Sanction for Kargo's Failure to Provide Timely Discovery

Advance has moved, pursuant to Federal *Rules 37(b)(2)(B)* and *37(c)(1)*, to preclude Kargo from offering the following categories of damages evidence: (i) damages evidence based upon factual assertions that are contained in the Singer Report but were not disclosed to Advance prior to the close of fact discovery; (ii) any evidence of damages in excess of $ 10,400, the value of Kargo's collective assets as stated in a December 2004 appraisal; (iii) any evidence relating to damages that were caused by Advance's ceasing to publish Cargo magazine; and (iv) any evidence that Kargo lost customers as a result of Advance's alleged infringement.

Under Federal *Rule 26(a)(1)*, a party seeking damages must provide the opposing party with a computation of the damages sought and "the documents [*39] or other evidentiary material . . . on which such

computation is based . . . ." This requirement is effective even if the opposing party does not specifically request this material. See *Fed. R. Civ. P. 26(a)(1)*. Further, under *Rule 26(e)*, a party seeking damages is required to provide supplementing responses to the other party's document demands and interrogatories.

Under Federal *Rule 37*, a court may impose sanctions against a party for failing to meet the obligations of *Rule 26*. Specifically, under *Rule 37(b)(2)*, a court may impose sanctions for failure "to obey an order to provide or permit discovery . . . ." *Fed. R. Civ. P. 37(b)(2)*. Sanctions may include an order prohibiting the sanctioned party "from introducing designated matters into evidence." *Rule 37(b)(2)(B)*. "Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose *Rule 37(b)* sanctions for noncompliance with that order." *Daval Steel Products v. M/V Fakredine, 951 F.2d 1357, 1363 (2d Cir. 1991)*. In addition, *Rule 37(c)(1)* provides that "[a] party that without substantial justification fails to disclose information required by *Rule 26(a)* or [*40] *26(e)(1)*, or to amend a response to discovery as required by *Rule 26(e)(2)*, is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." *Fed. R. Civ. P. 37(c)(1)*. "The rules are designed to avoid surprise or trial by ambush." *American Stock Exchange, LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002)* (internal quotation marks and citation omitted). Preclusion of evidence is considered to be a drastic remedy and "is generally a disfavored action." *American Stock Exchange, LLC, 215 F.R.D. at 93.*

#### (i) Preclusion of Damages Evidence Based on Assertions Contained in the Singer Report

Advance seeks to preclude Kargo from introducing certain factual assertions that were contained in the Singer Report but that Kargo allegedly failed to provide to Advance prior to the close of fact discovery. Because the Singer Report and Singer's accompanying testimony are precluded, however, Advance's application to bar Kargo from offering assertions contained in the Singer Report has been rendered moot.

#### (ii) Preclusion of Evidence of Damages in Excess of $ 10,400

Advance argues that as a matter of law, a plaintiff [*41] cannot recover compensatory damages that are

greater than the value of the allegedly damaged asset. Therefore, Advance contends that Kargo's claim for compensatory damages should be limited to $ 10,400, the value of Kargo's collective assets as stated in a December 2004 appraisal. The appraisal appears to have been conducted for tax purposes, when Kargo's assets were transferred from Kargo's predecessor to ACK Ventures, the company owned by the family of Kargo's CEO, Harry Kargman, and the licensor of the "KARGO" mark.

Kargo argues that the viability of Kargo's legal theory of damages does not present a discovery issue that may be resolved on a *Rule 37* motion. The Court agrees. Advance has identified no relevant discovery violation and has cited no authority for the proposition that, under *Rule 37*, Kargo should be precluded from seeking damages in excess of the valuation of the company's assets as listed in a December 2004 appraisal that was conducted for tax purposes. Although Advance may ultimately prove to be correct in asserting that Kargo's claim for damages under its theory of "prospective corrective advertising" cannot survive as a matter of law, that issue is appropriately decided [*42] on a motion for summary judgment, not on a motion to preclude evidence as a sanction for discovery violations. Accordingly, Advance's application to preclude evidence of damages in excess of $ 10,400 is denied.

*(iii) PrecY of Evidence of Damages Based on Advance's Cessation of Publication of Cargo*

Advance argues that Kargo should be precluded from arguing that Advance's shutting down of Cargo magazine and the cargomag.com website caused Kargo to suffer damages. Advance contends that there simply is no support in law for the proposition that the "cessation of an act of alleged infringement -- i.e., compliance with plaintiff's prayer for relief -- is itself grounds for monetary relief." (Def. Mem. Preclude at 10.)

Again, Advance has failed to identify any discovery violation that warrants preclusion of evidence under *Rule 37*. Whether Cargo's cessation is a factor that may be considered in determining the extent of Kargo's damages may prove to be a contested issue at the summary judgment stage, but Advance has not shown that Kargo failed to make timely disclosure to Advance of any fact or set of facts relating to Cargo's cessation. Advance's motion to preclude Kargo from offering evidence [*43] of Cargo's cessation as a contributing factor to consumer confusion is therefore denied.

*(iv) Preclusion of Evidence of Lost Customers as a Result of Advance's Infringement*

Advance seeks to preclude Kargo from offering any evidence of lost direct customers as a result of confusion caused by Advance's alleged trademark infringement. According to Advance, Kargo has provided no discovery to show that Kargo lost any wireless carriers or any other direct customers as a result of Advance's alleged infringement. Rather, Kargo's damages claims are based on survey evidence showing confusion among "young males attracted to Cargo Magazine and its website's offerings and those interested in obtaining mobile content from magazines and websites through Kargo."(Pl. Further Opp. to Def. Mot. to Preclude, Ex. 1, at 5.) Kargo does not oppose Advance's application. Thus, because Kargo has not alleged the loss of direct business-to-busines customers, has provided no discovery regarding the loss of such customers, and does not oppose Advance's application, Kargo is precluded from offering at trial evidence of lost direct customers.

*V. Kargo's Motion to Preclude Portions of the Report and Accompanying Testimony* [*44] *of Advance's Expert, Itamar Simonson*

Kargo has moved, pursuant to *Rules 403* and *702*, to preclude Advance's expert Itamar Simonson ("Simonson") from testifying about (1) purported bias on the part of Kargo's experts as shown by internal documents exchanged between Kargo's experts, attorneys, and management; and (2) results of a research study that tend to show there is zero awareness of Kargo among both Cargo's and Kargo's target audiences.

Kargo's application to preclude Simonson from testifying about the purported bias of Kargo's experts, as revealed in various documents exchanged among Kargo's experts, attorneys, and management, is moot, because the reports and accompanying testimony of the experts at issue (namely, Jacoby, Nelson, and Singer) have been ruled inadmissible.

Kargo also has moved to preclude Simonson from testifying that there is no awareness of Kargo's brand among consumers. Simonson's conclusion is based on a research survey conducted by the Opinion Research Center ("ORC", the "ORC Survey"). The ORC Survey was conducted over the telephone among two pools of respondents, who were varied in age, sex, employment status and other demographic attributes. In the first pool,

[*45] 231 respondents were asked whether they associated the name "KARGO" (spoken as "Kargo" and then spelled out) with any products or services. Nineteen respondents replied "yes" to the question. The name "KARGO" was then spelled out again for those nineteen respondents, and they were asked to state with what products or services they associated the name "KARGO". None of the respondents replied that they associated KARGO with cellphones, wireless products, or any other service or product remotely associated with Kargo's business. [10]

> 10 Not surprisingly, the nineteen respondents tended to associate the name "KARGO" with clothing and shipping.

The second pool consisted of 246 respondents. The respondents first were asked whether they associated the phrase "Powered by Kargo" with any products or services. Thirteen respondents replied affirmatively. The thirteen respondents were then asked to state with what products or services they associated the phrase "Powered by Kargo." Again, none of the respondents replied that they associated the phrase with cellphones, wireless products, or other services or products with which Kargo is involved. Based on the results of the ORC Survey, Simonson concluded [*46] that there was no awareness of Kargo among the population.

Kargo argues that the survey's results are inadmissible because only eight of the respondents who initially replied that they associated the name "Kargo" or the phrase "Powered by Kargo" with particular products or services were members of Kargo's target audience of 18-44 year olds. Kargo contends that this number constitutes far too small a sample from which to form any meaningful conclusion about consumer awareness of the Kargo brand. Kargo concedes that questions about insufficient sample size generally goes to weight rather than admissibility.

Not surprisingly, the nineteen respondents tended to Nevertheless, Kargo maintains that "it makes a mockery of *Rule 403* and *Rule 702* to allow [Simonson] to opine that Kargo was unknown among its target demographic audience on such an exceedingly slim reed." (Pl. Mem. Exclude Simonson at 17.)

Advance counters that the two pools of respondents included a total of 255 respondents who were between the ages of 18 and 44, and that none of the 255 responded

that they associated either "Kargo" or "Powered by Kargo" with products or services that Kargo actually offers. Advance claims that this [*47] sample size of the relevant demographic is more than sufficient for Simonson to conclude that there is zero consumer awareness of the Kargo brand.

There is no allegation that the survey questions were improperly designed, impermissibly leading, or that the methodology was otherwise flawed. As both parties concede, Kargo's sole objection, regarding sample size, is a matter of weight rather than admissibility. See *U.S. Info. Sys. v. IBEW Local Union No. 3, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004)*. In any event, the fact that more than 250 people aged 18-44 did not associate the name "Kargo" or the phrase "Powered by Kargo" with the goods or services that Kargo actually offers is clearly sufficient for Simonson to draw conclusions regarding the extent of consumers' awareness of Kargo's brand.

Accordingly, Kargo's application to preclude Simonson from testifying about the results of the ORC Survey is denied.

**CONCLUSION**

For the foregoing reasons, Advance's motion to preclude the Jacoby Survey and accompanying testimony of Dr. Jacoby is GRANTED.

Advance's motions to preclude the reports and accompanying testimony of Nelson and Singer are GRANTED.

Advance's motion to [*48] preclude the testimony of Kargo's "rebuttal" experts, Winer and Kaplan, is DISMISSED AS MOOT.

Advance's motion to preclude Kargo from offering evidence of damages based on certain factual assertions contained in the Singer Report but not timely disclosed to Advance is DISMISSED AS MOOT. Advance's motion to preclude Kargo from offering evidence of damages in excess of $ 10,400 is DENIED. Advance's motion to preclude Kargo from offering evidence that the cessation of Cargo magazine contributed to Kargo's damages is DENIED. Advance's motion to preclude Kargo from offering damages evidence of lost direct customers is GRANTED.

Kargo's motion to preclude Simonson from testifying

2007 U.S. Dist. LEXIS 57320, *48

regarding the purported bias of Kargo's confusion and damages experts is DISMISSED AS MOOT. Kargo's motion to preclude Simonson from testifying regarding the results of the ORC Survey is DENIED.

The parties are directed to appear before the Court for a status conference on August 21, 2007, at 9:45 am.

**SO ORDERED.**

**Dated: New York, New York**

**August 6, 2007 `**

JOHN F. KEENAN

United States District Judge

LEXSEE 2005 U.S. DIST. LEXIS 23563



Cited
As of: Oct 15, 2007

**M.D. ON-LINE, INC., Plaintiff, v. WebMD CORPORATION, t/a EMDEON CORPORATION, EMDEON BUSINESS SERVICES, and EMDEON PRACTICE SERVICES, Defendants.**

**05-CV-4081 (WJM)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2005 U.S. Dist. LEXIS 23563*

**October 6, 2005, Decided
October 6, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a software solutions company, filed a motion for a preliminary injunction seeking to enjoin the use of the service mark "emdeon" by defendant, an electronic service provider to the healthcare industry. Plaintiff brought a trademark infringement suit, asserting that defendant's mark violated federal and trademark law, constituted unfair competition under federal and state law, and caused it irreparable harm.

**OVERVIEW:** The parties directly competed against each other with regard to providing insurance information to healthcare providers electronically. Defendant sold only one product that competed with plaintiff's products, called WebMD Office. It was the marketing and advertising of that product under the "emdeon" mark that led to the lawsuit as plaintiff asserted it infringed on their mark of "M.D. ON-LINE." The court considered numerous factors and held that no similarity in appearance between the two marks existed. To the contrary, the court found the marks visually distinct since plaintiff's mark was two words, including two periods and one hyphen, while defendant's mark was one word without punctuation. The court also found that the two

marks did not share a similar meaning as "M.D. ON-LINE" described a service involving doctors on the internet, while "Emdeon" was a fanciful term that had no apparent meaning. The court also found no evidence of bad faith on the part of defendant in adopting its mark and, ultimately, the balance of the factors considered weighed heavily in favor of defendant.

**OUTCOME:** The court denied plaintiff's motion for preliminary injunction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN1] A preliminary injunction is an extraordinary form of relief that should be granted in limited circumstances. A preliminary injunction should issue only when the moving party establishes each of the following four factors: (1) that the moving party has a reasonable probability of success on the merits; (2) that the moving party will be irreparably harmed if denied relief; (3) that the non-moving party will not be harmed to a greater

2005 U.S. Dist. LEXIS 23563, *

extent if relief is granted; and, (4) granting preliminary relief will be in the public interest. If the moving party is unable to show any of those factors, preliminary relief should be denied.

***Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions***
[HN2] In order to show a reasonable probability of success on the merits in seeking a preliminary injunction, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits of the claim. To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark must show that a defendant's use of a similar mark for its goods causes a likelihood of confusion.

***Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions***
[HN3] A court must consider the following factors when analyzing likelihood of confusion. Those factors are: the degree of similarity between the owner's mark and the alleged infringing mark; the strength of the owner's mark; the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; the length of time the defendant has used the mark without evidence of actual confusion arising; the intent of the defendant in adopting the mark; the evidence of actual confusion; whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; the extent to which the targets of the parties' sales efforts are the same; the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market. None of the factors alone determines whether there is a likelihood of confusion. A court must consider all of these factors and give them the weight appropriate under the particular circumstances before the court.

***Trademark Law > Infringement Actions > Determinations***

***Trademark Law > Infringement Actions > Determinations***
[HN4] The single most important factor in determining likelihood of confusion is mark similarity. Marks are confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship. The proper test is not side-by-side comparison but whether the labels create the same overall impression when viewed separately. Courts should compare the appearance, sound, and meaning of the marks in assessing their similarity.

***Trademark Law > Infringement Actions > Determinations***
[HN5] The proper legal test is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks, viewed in their entirety, are confusingly similar.

***Trademark Law > Infringement Actions > Determinations***
[HN6] A court must consider both the conceptual and commercial strength of the owner's mark. The conceptual strength of a mark looks to its inherent features. Marks are classified into four categories of descending conceptual strength: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. Arbitrary and fanciful marks are the strongest marks entitled to the greatest protection; generic marks are the weakest marks entitled to no protection.

***Trademark Law > Infringement Actions > Determinations***
[HN7] The marketplace recognition of a mark determines its commercial strength.

***Trademark Law > Infringement Actions > Determinations***
[HN8] The factor of the care and attention expected of consumers with regard to a trademark weighs against finding a likelihood of confusion when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions.

***Trademark Law > Infringement Actions > Determinations***
[HN9] With regard to the factor in a trademark infringement case as to the length of time a defendant's mark has been used without confusion or evidence of

actual confusion, the parties' concurrent use of similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products allows an inference that future consumers will not be confused either.

*Trademark Law > Infringement Actions > Determinations*

[HN10] Survey evidence can sometimes demonstrate evidence of actual confusion but only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion.

*Trademark Law > Infringement Actions > Determinations*

[HN11] Evidence that a defendant willfully adopted a mark closely similar to an existing mark weighs strongly in favor of finding a likelihood of confusion. The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant.

*Trademark Law > Infringement Actions > Determinations*

[HN12] The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. That inquiry requires a court to examine the media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers.

*Trademark Law > Infringement Actions > Determinations*

[HN13] The closer the relationship between the products, the greater the likelihood of confusion. The relevant question is how closely related are the products? That question seeks to determine whether it would be reasonable for consumers to associate the products or see them as related.

*Trademark Law > Infringement Actions > Determinations*

[HN14] The factor in a trademark infringement case as to other facts suggesting the public might expect the prior owner to manufacture both products allows courts to consider the nature of the products or the relevant market,

the practices of the other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source.

COUNSEL: [*1] Jonathan D. Clemente, Clemente, Mueller & Tobia, P.A., Morristown, New Jersey; Sean D. Garrison, Jennifer Anne Van Kirk, Shane E. Olafson, Lewis and Roca, LLP, Phoenix, Arizona, for Plaintiff.

David J. Sheehan, James M. Lee, E. Evans Wohlforth, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, New Jersey; Pasquale A. Razzano, Nina Shreve, James M. Gibson, Fitzpatrick, Cella, Harper & Scinto, New York, New York, for Defendants.

For M.D. ON-LINE, INC., A NEW JERSEY CORPORATION, Plaintiff: JONATHAN D. CLEMENTE, CLEMENTE, MUELLER & TOBIA P.A., MORRISTOWN, NJ.

For WEBMD CORPORATION, t/a EMDEON CORPORATION, EMDEON BUSINESS SERVICES, AND EMDEON PRACTICE SERVICES, Defendant: DAVID J. SHEEHAN, ERIC EVANS WOHLFORTH, JAMES M. LEE, LAN HOANG, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ.

For WEBMD CORPORATION, t/a EMDEON CORPORATION, EMDEON BUSINESS SERVICES, AND EMDEON PRACTICE SERVICES, Counter Claimant: LAN HOANG, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ.

For M.D. ON-LINE, INC., A NEW JERSEY CORPORATION, Counter Defendant: JONATHAN D. CLEMENTE, CLEMENTE, MUELLER & TOBIA P.A., MORRISTOWN, NJ.

JUDGES: MARTINI, U.S.D.J.

OPINION BY: William [*2] J. Martini

OPINION

OPINION

MARTINI, U.S.D.J.:

This matter comes before the Court on plaintiff M.D. On-Line, Inc.'s ("M.D. On-Line's") motion for a preliminary injunction to enjoin defendants from using the service mark "emdeon." Plaintiff's mark "M.D. ON-LINE" is a federally registered service mark for the field of "electronic data submission services required for electronic processing of claims in the healthcare industry." (Compl. Ex. A). Plaintiff alleges that defendants use of the "emdeon" mark in the healthcare industry violates federal and state trademark law, constitutes unfair competition under federal and state law, and is causing it irreparable harm. For the reasons set forth below, plaintiff's motion for preliminary injunction is **DENIED.**

## BACKGROUND

Plaintiff provides software solutions for healthcare providers. Its three software packages, WebLINK, WinLINK and ClaimLink 1500, allow healthcare providers to "electronically submit claims to insurance companies for payment." (Compl. P 1). Its software also allows healthcare providers to verify electronically in real-time the "eligibility of insurance coverage when patients seek healthcare services [*3] from providers." (Compl. P 17).

Defendants, formerly known as WebMD, now trading as some variation of Emdeon, perform many services and provide many products to the healthcare industry. Emdeon Corporation ("Emdeon") is the parent company; it is composed of four business units: Emdeon Business Services, Emdeon Practice Services, WebMD Health, and Porex. Emdeon's core businesses are dedicated to electronically connecting "healthcare providers, payers, employers, physicians, and patients, to simplify the healthcare business process, to provide needed information at the right time and place, and to improve healthcare quality." (Defs.' Opp'n Br. at 2). Emdeon provides the "largest single electronic clearinghouse for healthcare claims in the U.S." (Compl. P 3). Emdeon processes the electronic claims submitted by providers and from intermediaries such as M.D. On-Line. (*Id.*). Currently, plaintiff and Emdeon have a contractual relationship whereby plaintiff processes claims through Emdeon's clearinghouse and Emdeon provides plaintiff with rebates for those transactions based on volume. (*Id.* at P 30). This relationship accounted for approximately 40% of plaintiff's revenue in 2004. [*4] (Defs.' Opp'n Br. at 5).

Emdeon Business Services ("EBS") is the business entity that competes directly with plaintiff. (*Id.* at 5). EBS "offers healthcare providers reimbursement services, allowing them to interact electronically with healthcare payers." (*Id.* at 3). EBS sells only one product that competes with plaintiff's products -- WebMD Office. (*Id.* at 5). It is the marketing and advertising of that product under the emdeon mark that lead plaintiff to file suit and seek an injunction.

## ANALYSIS

[HN1] A preliminary injunction is an extraordinary form of relief that should be granted in limited circumstances. *NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999).* A preliminary injunction should issue only when the moving party establishes each of the following four factors: (1) that the moving party has a reasonable probability of success on the merits; (2) that the moving party will be irreparably harmed if denied relief; (3) that the non-moving party will not be harmed to a greater extent if relief is granted; and (4) granting preliminary relief will be in the public interest. *Id.* If the moving party is unable to show *any* of those [*5] factors, preliminary relief should be denied. *Id.*

## I. Likelihood of Success on the Merits

[HN2] In order to show a reasonable probability of success on the merits, "the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits" of the claim. *Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).* "To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark . . . must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'" *Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004).*

The Third Circuit has devised a nonexclusive list offactors, referred to as the *Lapp* factors, [1] that [HN3] the Court must consider when analyzing likelihood of confusion. These factors are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;

2005 U.S. Dist. LEXIS 23563, *5

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of [*6] time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Kos Pharms., 369 F.3d at 709* (quoting *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 215 (3d Cir. 2000)).* None of these factors alone determines whether there is a likelihood of confusion. Rather, the Court must consider all of these factors and give them the weight appropriate under the particular circumstances [*7] before the Court. *Id.*

1    *See Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).*

Plaintiff argues that it is likely to succeed at trial because its M.D. ON-LINE mark is valid and legally enforceable, and defendant's use of the emdeon mark is

likely to cause confusion. Defendants respond by arguing that plaintiff's mark is not enforceable, and even if it is, there is no likelihood of confusion between the marks M.D. ON-LINE and emdeon. The fact that M.D. ON-LINE is a federally registered mark, see Fed. Reg. No. 2,274,698, constitutes *prima facie* evidence of the mark's validity. *See 15 U.S.C. § 1115(a).* Thus, for purposes of this motion, the Court will assume plaintiff's mark is valid and enforceable. As a result, in order to resolve this dispute, the Court must weigh and balance the *Lapp* factors.

**1. Degree of Similarity Between the Marks**

[HN4] "The single most important factor in determining likelihood of confusion is mark similarity." [*8] *A&H, 237 F.3d at 216.* Marks "are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 477 (3d Cir. 1994).* The proper test is "not side-by-side comparison" but "whether the labels create the 'same overall impression' when viewed separately." *Id.* (quoting *Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 492 (2d Cir. 1988)).* Courts should "compare the appearance, sound, and meaning of the marks" in assessing their similarity. *Kos Pharms., 369 F.3d at 713.*

The Court finds there is no similarity in appearance between "M.D. ON-LINE" and "emdeon". Indeed, they are visually distinct. Plaintiff's mark is two words, including two periods and one hyphen; defendant's mark is one word without punctuation. They are spelled differently. They differ in length (six versus eight letters). They begin and end with different letters. M.D. ON-LINE consists of all uppercase letters, emdeon contains none. Further, M. D. ON-LINE often appears on two separate lines, M.D. over ON-LINE, whereas emdeon does not.

[*9] The Court finds that the two marks do not have a similar meaning. M.D. ON-LINE describes a service involving doctors on the internet. Emdeon is a fanciful term that has no apparent meaning. Plaintiff argues that emdeon has a similar meaning, relying in part on a script that was generated for WebMD Business Services. In that script, Emdeon states that its new name "suggests a grounding in e-healthcare." (O'Sullivan Cert. at Ex. A). However, that script is inapposite. First, the script details a branding effort by Emdeon in which it seeks to imbue a

certain meaning into the otherwise meaningless term "Emdeon." Second, plaintiff takes the quote out of context in order to establish some small degree of similarity. When the meaning suggested by the script is looked at as a whole, there could be no confusion between the two marks:

> Our new name, Emdeon, references our history as WebMD and formerly, Healtheon. It also suggests a grounding in e-healthcare and denotes a solid organization focused on improving healthcare and exceeding the expectations of its business partners.

(*Id.*).

Plaintiff essentially argues that any differences in appearance and meaning should be trumped [*10] by the marks' phonetic similarity. Plaintiff bases this argument on the fact that the allegedly most significant form of marketing performed by the parties is telemarketing. Plaintiff also argues that word-of-mouth is critical to its products' success. However, in making these arguments, plaintiff appears to ignore the commercial reality of how these software products are marketed. There is no dispute that plaintiff's LINK products, as well as defendant's WebMD Office, are used only over the internet, no physical documentation is involved. Therefore, in order to market these products, the parties would need to provide the website address from which customers could read about, and potentially register to use their products. [2] Thus, the appearance of the marks plays a role in the commercial setting, thereby greatly diminishing the affect that sound alone may have on consumers.

> 2    It is worth noting that the Uniform Resource Locators ("URL's") for their websites are distinct: www.mdon-line.com versus www.emdeon.com.

[*11] Furthermore, the Court disagrees with plaintiff's underlying premise that the marks are confusingly similar. Although plaintiff is correct that the first three syllables of each mark are pronounced similarly, by focusing on only the first three syllables, plaintiff takes its whole mark out of context. *See Kos Pharms., 369 F.3d at 713* ("But [HN5] the proper legal test is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks, '*viewed in their entirety,*' are

confusingly similar.") (emphasis in original) (quoting *A&H, 237 F.3d at 216*). Its mark is M.D. ON-LINE, not "M.D. ON". When the marks are heard in their entirety, they are not confusingly similar. Plaintiff's mark contains four syllables, emdeon contains only three. M.D. ON-LINE is spoken as two separate letters and a two syllable word, whereas emdeon is spoken as one word. Significantly, the fourth syllable of plaintiff's mark -- the word "LINE" -- makes plaintiff's mark end in a different sound. The Court believes that that different sound makes the two marks sound dissimilar.

In short, when the marks are viewed in their entirety in the proper commercial [*12] setting, this factor favors defendants.

## 2. Strength of the Owner's Mark

[HN6] A Court must consider both the conceptual and commercial strength of the owner's mark. *Kos Pharms., 369 F.3d at 715*. The conceptual strength of a mark looks to its inherent features. *A&H, 273 F.3d at 221*. Marks are classified into four categories of descending conceptual strength: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Id.* Arbitrary and fanciful marks are the strongest marks entitled to the greatest protection; generic marks are the weakest marks entitled to no protection.

The Court believes that M.D. ON-LINE is either a descriptive or suggestive mark. M.D. ON-LINE is descriptive to the extent it refers to products that place medical doctors on-line. *See J&J Snack Foods Corp. v. Nestle USA, Inc., 149 F. Supp. 2d 136, 147 (D.N.J. 2001)* (A descriptive mark describes "the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product."). The mark is suggestive to the extent it takes some imagination to determine that M.D. ON-LINE provides software for electronically processing medical doctors' [*13] claims over the internet. *See A&H, 237 F.3d at 221-22* (suggestive marks require the consumer to exercise "imagination, thought, or perception" to ascertain the nature of the product or service). In any event, plaintiff's mark is conceptually weak because of the ubiquity of its constituents. There is no dispute that "M.D." is a term widely used in the healthcare field to refer to medical doctors. (*See* Pl.'s Reply Br. at 6). Nor is there any dispute that "on-line" is a term widely used to describe products offered over the internet. (*See id.*). That being the case, consumers are less likely to assume that

products made by a similar mark came from the same source. *See A&H, 237 F.3d at 223* (stating that extensive use of a term, even in other markets, may have a "weakening effect on the strength of the mark").

[HN7] The marketplace recognition of a mark determines its commercial strength. *A&H, 237 F.3d at 221*. The evidence appears to demonstrate that plaintiff's mark has moderate commercial strength. Plaintiff has used the name M.D. ON-LINE in the same industry for over ten years, including the mark on all company advertising and promotional materials during that [*14] time period. The mark is featured on its website, as well as on co-branded websites, i.e., websites of other companies that promote M.D. On-Line's products. (Compl. P 24; Bartzak Cert. PP 16-17). Mr. Patrick Kennedy, a consultant for plaintiff who specializes in the field of electronic communications between healthcare payers and providers and has over twenty years of experience in the field, certified that plaintiff is positively and widely recognized by healthcare payers throughout the country for providing electronic claim submission products and services. (Kennedy Cert. PP 1-2, 8-9). Although plaintiff allegedly "spends an enormous portion of its annual budget developing and promoting its products and services offered under the M.D.ON-LINE(R) mark", [3] plaintiff did not submit evidence demonstrating how much it spends on marketing and advertising. That lack of evidence, however, does not undercut the other evidence before the Court.

3   (Compl. P 23).

In sum, because plaintiff's mark has weak conceptual strength [*15] and moderate commercial strength, the Court finds that this factor slightly favors plaintiff.

**3. Factors Indicative of the Care and Attention Expected of Consumers**

[HN8] This factor "weighs against finding a likelihood of confusion 'when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions.'" *Kos Pharms., 369 F.3d at 715* (quoting *Checkpoint Sys., Inc. v. Checkpoint Software Techs., Inc., 269 F.3d 270, 284 (3d Cir. 2001))*. The parties consider the consumers to be healthcare providers and payers who use the internet to process their claims. (*See* Pl.'s Br. at 6; Defs.' Opp'n Br. at 21). More specifically, they appear to be the "office manager" or

"billing administrator" in the doctor's office who uses a particular piece of software to process patients' claims. (*See, e.g.,* Sept. 22, 2005 Hearing Tr. ("Tr.") at 16:17-20). Plaintiff acknowledges that the consumers are "arguably sophisticated." (Pl.'s Br. at 13). Plaintiff's President and CEO agreed in his deposition that the selection of an electronic billing service by an officer manager is probably one of the more important tasks that person performs. (*See* Bartzak [*16] Dep. at 73-74). He also agreed that the officer manager would exercise some amount of due diligence in performing that task. (*See id.*). Therefore, the Court finds that the relevant consumers are knowledgeable professionals -- office managers or billing administrators -- who would exercise heightened care before selecting an electronic claims processing service. (*See* Tr. at 43:11-16 (acknowledging that the relevant universe of consumers is a "sophisticated group")); *see also Checkpoint, 269 F.3d at 285* ("Many cases state that where the relevant buyer is composed of professionals or commercial buyers familiar with the field, they are sophisticated enough not to be confused.").

Plaintiff argues that defendants have a "well-known history of growth through acquisition of competitors", [4] which would likely lead consumers to believe that Emdeon acquired plaintiff. However, this argument is unsubstantiated and, therefore, without any merit.

4   (Pl.'s Br. at 14).

Accordingly, this factor favors defendants.

[*17]   **4./6. Length of Time Defendants' Mark Has Been Used Without Confusion / Evidence of Actual Confusion**

[HN9] With regard to the fourth factor, the parties' "concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future consumers will not be confused either.'" *Kos Pharms., 369 F.3d at 717* (quoting *Fisons, 30 F.3d at 476*). Factor six considers evidence of actual confusion. *Id.*

Defendants began using their emdeon mark on August 4, 2005. (*See* Defs.' Br. at 7). As a result, the parties have used the marks concurrently for approximately two months. This amount of time appears to be too small to drawn any meaningful inferences regarding whether the marks are confusingly similar.

Moreover, there is no evidence of actual confusion. Plaintiff claims that after defendants publicly announced the name change in August, "M.D. On-Line immediately began receiving communications from industry insiders inquiring about the name change and expressing their belief that confusion is likely to result." (Pl.'s Br. at 14). However, this argument is meritless. Plaintiff does not identify [*18] who these "industry insiders" are, except that the Court is left with the impression that they are not consumers. And, more importantly, the legal opinions of industry insiders, that confusion is "likely to result," are entitled to no weight. Neither is plaintiff's self-serving and unsupported statement that "several third party payers . . . expressed concern with the confusion they believe is created by Defendant's rebranding." (Pl.'s Br. at 8). For purposes of actual confusion, these opinions and concerns are irrelevant.

Plaintiff also submitted a survey to show actual confusion. The survey was conducted by Mr. Kenneth Hollander, who has conducted or critiqued a vast number of intellectual property surveys. The survey was of 302 people who were employed by personal care physicians, their employment involved submission of medical claims to insurance companies, and the submission of those claims was done or prospectively would be done over the internet. The test group was composed of 202 people, and the remaining 100 people composed the control group. [5]

> 5 The purpose of the control group is to account for "noise," that is, any external factors that may improperly influence participants' opinions. In order to account for noise, the survey questioned participants in the control group about the association between plaintiff's mark and a "fictitious mark, 'ProxyMed.'" (Hollander Cert., Ex. A P 16). Any confusion that the control group had would be considered noise because the comparison mark was presumably fictitious, and thus must be attributable to other factors. However, it came to light during the hearing on plaintiff's motion that ProxyMed is not a fictitious name; it is an actual company that provides electronic claims to healthcare providers. (*See* Tr. at 38:9-39:6). This obviously casts tremendous doubt on the survey's ability to account for noise.

[*19] The survey was conducted by telephone. The interviewer began by asking the test group:

> [Question] 1. One of the electronic claims processing companies is named (EMDEON (EM-DEE-ON) . . .). The second company is M.D. On-line. . . . If you have an opinion, other than the fact that they are in the same business, do you think that these two companies are associated with each other, or that they are not associated with each other?

(Pl.'s Ex. 2, Questionnaire). If the participant answered that they are associated, he or she was then asked, "Why do you say that? Why else?" (*Id.*). Then the interviewer asked:

> [Question] 3. And if you have an opinion, do you think that one of these companies is sponsored or endorsed by the other company, or do you think that neither company is sponsored or endorsed by the other?

(*Id.*). If the participant answered that one company is sponsored or endorsed by the other, he or she was asked to explain why. Lastly, the interviewer asked:

> [Question] 5. Finally, do you think that one of these companies had to get permission from the other company, or that neither company had to get permission from the other?

[*20] (*Id.*). If the participant answered that one of the companies had to get permission, he or she was asked to explain why.

After tallying the responses and contrasting the test group with the control group, [6] Mr. Hollander estimates that approximately 25.7% of the participants expressed that they "thought that the two names . . .were affiliated or connected in some way because of their same or similar name." (Hollander Cert. P 5). However, this survey is both procedurally and substantively flawed. First, plaintiff introduced the survey in its reply brief, not its moving brief. This maneuver deprived the defendants of a meaningful opportunity to respond within the normal course. As such, the Court will disregard this "newly minted" evidence. *See Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001), aff'd, 301 F.3d 1306 (3d Cir. 2002)* (striking portions of reply brief which raised new issues for the first time).

6 Not surprisingly, no one in the control group believed that M.D. On-Line and ProxyMed were affiliated or connected to each other. (*See* Hollander Cert. P 5).

[*21] Second, even if the Court were to consider the survey, it appears to suffer several flaws that render it unreliable, two of which the Court will address at this time. [HN10] "Survey evidence can sometimes demonstrate evidence of actual confusion but only to the extent 'that the survey mirrors the real world setting which can create an instance of actual confusion.'" *Harlem Wizards Entm't Basketball, Inc. v. NBA Properties, Inc., 952 F. Supp. 1084, 1098 (D.N.J. 1997)* (quoting 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23.01 3a)). Here, plaintiff's survey does not mirror the "real world setting." The marks in question identify the sources of web-based programs. And yet, this survey was done over the telephone, participants were not shown the marks, nor were they directed to websites that contained the marks. Thus, any alleged association the participants found between the marks was based on sound alone, and does not address how the marks might be viewed in a commercial setting. By removing the marks from their proper commercial setting, plaintiff unjustifiably skewed the results.

Moreover, it is unclear whether any association between the marks was actually based [*22] on aural similarity or due to the leading nature of the questions asked. This Court finds Questions 1, 3 and 5 were leading questions. As Mr. Hollander is well aware, and as he has represented to at least one other district court, the probative value of leading questions is essentially nil. *IDV North Am., Inc. v. S & M Brands, Inc., 26 F. Supp. 2d 815, 830 (E.D. Va. 1998)* ("According to Mr. Hollander, the probative value of the survey is of virtually no utility on that issue because Question Numbers 7 and 10 are leading questions which invite answers that tend to suggest a likelihood of confusion where none may exist."). Here, the questions undisputedly asked participants whether there is an association between plaintiff's mark and defendants' mark. This line of questioning has been rejected as leading and suggestive and, therefore, improper. *Id.* ("Thus, a question which asks survey participants whether they believe that there is a connection between the plaintiff's and defendant's goods and services has been rejected as an improper leading question which lacks probative value and which prejudices the reliability

of the survey."). Consequently, the Court concludes that plaintiff's [*23] survey is entitled to little, if any, weight. *See Prince Mfg., Inc. v. Bard International Associates, Inc., 1988 U.S. Dist. LEXIS 15031, No. 88-3816, 1988 WL 142407, *7-*8 (D.N.J. Dec. 22, 1988)* (giving scant weight to a survey that found 39.5% confusion rate because, in part, the survey did not focus on how the mark was used on defendant's products and asked a leading question).

In short, this factor favors neither party.

## 5. Defendants' Intent in Adopting Mark

[HN11] Evidence that a defendant willfully adopted a mark closely similar to an existing mark "weighs strongly in favor of finding a likelihood of confusion." *Checkpoint, 269 F.3d at 286.* "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant." *Kos Pharms., 369 F.3d at 721.*

The evidence before the Court indicates an absence of bad faith in adopting the emdeon mark. In 2004, WebMD Corporation ("WebMD"), a publicly traded company, announced that its subsidiary, WebMD Health, was going public. In an effort to avoid confusion in the investing public between the two companies, WebMD [*24] sought to adopt a new public identity for itself and its subsidiaries WebMD Business Services and WebMD Practice Services because it believed WebMD Health was more closely associated with the WebMD name. WebMD then hired Landor Associates, an outside naming firm, to devise a new corporate name. Landor Associates was not aware of plaintiff's M.D. ON-LINE mark. Following the parameters WebMD gave them, Landor Associates, on the second attempt, offered WebMD a list of ten potential names, one of them being the name "Emdeon." WebMD personnel found the Emdeon name appealing. A trademark clearance search was performed and plaintiff's M.D. ON-LINE mark was not reported.

Plaintiff responds that WebMD acted in bad faith when it adopted the emdeon mark because it knew of plaintiff's M.D. ON-LINE mark. However, "mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." *NEC Elecs., Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861, 866 (D. Mass. 1989)* (citing *Ziebart Int'l Corp. v. After Market Associates, Inc., 802 F.2d 220, 227 (7th Cir. 1986)).*

Thus, given the undisputed history, the fact that WebMD had knowledge of plaintiff's mark is insufficient [*25] evidence to support a finding of bad faith.

Moreover, the Court seriously questions plaintiff's underlying premise that WebMD would seek to adopt a mark confusingly similar to M.D. ON-LINE. Although M.D. On-Line as a company may have established good will and a positive reputation in its business, it only operates within a very small niche of the healthcare industry. Defendants, however, provide services and products that extend far beyond that small niche, canvassing the healthcare industry. In fact, defendants derive approximately 99% of their revenue from businesses that do not compete with plaintiff. It would appear, without more, to strain credulity that defendants would hope to, or even could, trade off of plaintiff's niche good will in such a wide range of unrelated businesses. Thus, plaintiff has failed to proffer any evidence demonstrating that defendants adopted the emdeon mark in bad faith.

Accordingly, this factor weighs in favor of defendants.

## 7. Whether Products Are Marketed Through the Same Channels of Trade and Advertised in the Same Media

[HN12] "The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." [*26] *Checkpoint, 269 F.3d at 288-89* (quoting *Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478, 502 (D. Del. 1998))*. This inquiry requires the Court to examine the "media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." *Id. at 289*.

Defendants acknowledge that they use similar methods of marketing and advertising, but argue that they emphasize visual marketing techniques, e.g., via its website, whereas plaintiff emphasizes phonetic marketing, e.g., telemarketing. (Defs.' Opp'n Br. at 23-24; Smith Cert. P 33). Although defendants' argument may diminish the weight given to this factor in the Court's analysis, the extent to which defendants use one form of marketing over another does not alter the fact that the parties use the same methods. Defendants and plaintiff market their products and services through websites, resellers, trade shows, direct mail, provider referrals and telemarketing. (*See* Smith Cert. P 33; Bartzak Cert. PP 17-19). Consequently, this factor favors plaintiff.

## 8. Extent to which Targets of the Parties' Sales Efforts Are the Same

The targets of the [*27] parties' sales efforts are the same to the extent the focus is limited to selling electronic claims processing software. Both parties target the same consumers - office managers or billing administrators. *See* Factor 3 discussed above. Accordingly, this factor favors plaintiff.

## 9. Relationship of the Goods

[HN13] "The closer the relationship between the products, . . . the greater the likelihood of confusion." *Lapp, 721 F.2d at 462*. The relevant question is - how closely related are the products? *Kos Pharms., 369 F.3d at 722-23*. This question seeks to determine "whether it would be reasonable for consumers to associate [the products] or see them as related." *Id.*

Here, the products are of the same type and function similarly. They enable the electronic processing of healthcare claims. Any differences in functionality - the speed with which plaintiff's consumers may begin using its software or the number of options defendants' software provides - do not detract from their overall similarity. *See Kos Pharms., 369 F.3d at 723* ("The question is not whether it is possible to distinguish between the products but whether, and to what extent, the products seem [*28] related, 'whether because of [their] near-identity, . . . or similarity of function, or other factors.'") (quoting *A&H, 237 F.3d at 215*). Accordingly, this factor favors plaintiff.

## 10. Other Facts Suggesting the Public Might Expect the Prior Owner to Manufacture Both Products

[HN14] This factor allows courts to consider "the nature of the products or the relevant market, the practices of the other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source." *Kos Pharms., 369 F.3d at 724*.

Unlike in *Kos Pharmaceuticals,* where consumers could expect the maker of one drug to make the other because it was complimentary and could be viewed as a

natural brand extension, [7] there is nothing in the record to suggest that consumers would expect Emdeon's software, which directly competes against plaintiff's, to be an extension of plaintiff's LINE products. Indeed, although the parties sell their products under their respective marks, the products themselves have very distinct names. Emdeon's product is called WebMD Office. Plaintiff's products are called WebLINK, ClaimLink 1500 and [*29] WinLINK. These different product names further distinguish the sources of the software and make it unlikely that consumers would believe that Emdeon's software is an extension of the LINK products.

7  *See Kos Pharms., 369 F.2d at 724.*

In sum, the tenth factor favors defendants.

## II. Weighing the *Lapp* Factors

This case essentially comes down to whether a mark that sounds arguably similar to another mark, but is otherwise distinguishable, should be enjoined from use. In order to place this issue in context, it is necessary to take a step back in time when plaintiff's mark was M.D. ON-LINE and defendants' mark was WebMD. Notably, if the *Lapp* factor analysis conducted above had been applied to these two marks, every factor would be supported by the same facts but for the first - similarity of the marks. Under that factor, the marks would appear different, sound different, but have a similar meaning. Apparently, when the WebMD mark was used, consumers were not confused. But [*30] because defendants changed their mark to emdeon, which appears different, means something different, but arguably sounds similar, plaintiff argues that is sufficient to enjoin its use. This Court disagrees.

Similarity of the marks - the most important factor - weighs in favor of defendants. As articulated above, the marks appear different, mean something different, and sound different. Further, consumers are sophisticated and exercise a heightened degree of care before purchasing the products at issue. In addition, the defendants adopted the emdeon mark in good faith. Taking these factors together, the Court finds they outweigh the factors favoring plaintiff. The dissimilarity in the marks combined with consumer sophistication and care make it unlikely that consumers will be confused even though the parties' products are marketed through the same channels of trade, are targeted at the same consumers, and function similarly. These products are used over the internet. Any marketing done by the parties would, of necessity, direct consumers to the appropriate website. As a result, the sophisticated consumers will be able to readily and easily distinguish between the parties' products. [*31] The plaintiff's weak-to-moderate strength in its mark does not alter this conclusion.

Accordingly, because a balance of the factors tips heavily in favor of defendants, the Court finds that plaintiff has not demonstrated that it has a reasonable likelihood of success of demonstrating there exists a likelihood of confusion.

## III. Irreparable Harm / Balancing of Equities / Public Interest

Since there is no reasonable likelihood of success on the merits, there can be no irreparable harm. *See Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 580 (E.D.N.Y. 1999)*; *Microware Sys. Corp. v. Apple Computer, Inc., 126 F. Supp. 2d 1207, 1218 (S.D. Iowa 2000)*. As a result, the final two preliminary injunction factors favor defendants as well. Clearly, absent a showing of likelihood of confusion and irreparable harm, the balancing of the equities and public interest require that plaintiff's motion be denied.

## CONCLUSION

For the aforesaid reasons, plaintiff's motion for preliminary injunction is denied.

**Dated:** October 6, 2005

s/ William J. Martini

**William J. Martini, U.S.D.J.**

## ORDER

This matter having come before the Court [*32] on plaintiff's motion for preliminary injunction, and the Court having considered the parties' submissions and having heard oral argument, and for the reasons stated in the accompanying Opinion, and for good cause shown

IT IS on this 6th day of October 2005, hereby

**ORDERED** that plaintiff's motion for preliminary injunction is **DENIED.**

s/ William J. Martini

2005 U.S. Dist. LEXIS 23563, *32

**William J. Martini, U.S.D.J.**



United States District Court, D. New Jersey.
PRINCE MANUFACTURING, INC., Plaintiff,
v.
BARD INTERNATIONAL ASSOCIATES, INC.,
Defendant.
**CIV. No. 88-3816 (CSF).**

Dec. 22, 1988.

*OPINION*

CLARKSON S. FISHER, District Judge.

**\*1** Plaintiff, Prince Manufacturing, Inc., ("Prince") is the maker of tennis racquets and other sporting goods which bear the trademark PRINCE. Defendant, Bard International Associates, Inc., ("Bard") also manufactures tennis racquets and sporting goods. Prince contends that its good name has been appropriated by defendant's new tennis racquet, the Bard Princess, and seeks a preliminary injunction. Before addressing the merits of plaintiff's motion, the court must first address the jurisdiction and venue issues raised by Bard.

Bard has moved for dismissal on the ground that it lacks sufficient "minimum contacts" with New Jersey "such that the maintenance of the suit ... offend[s] 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). Bard has moved in the alternative for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(3), and 28 U.S.C. sections 1391(b) and (c). Bard has also moved for transfer of venue pursuant to 28 U.S.C. section 1404(a).

The court will first address defendant's motion to dismiss for lack of personal jurisdiction and improper venue. It is fundamental that defendant may waive even valid personal jurisdiction and venue defenses. *See e.g., Hoffman v. Blaski,* 363 U.S. 335, 343 (1960); *Wyrough & Loser v. Pelmore Labs., Inc.,* 376 F.2d 543, 547 (3d Cir.1967). Prior to the commencement of this action, Prince entered into a settlement negotiation with Bard on the condition that Bard was "not to object to jurisdiction and venue." Letter of Mr. Mark N. Mutterperl, Esq., dated October 7, 1988. Bard claims, however, that its waiver was conditioned on Prince's promise to

negotiate in good faith, and that Prince has not done so. *Id.* Yet Bard's own brief in support of its motion to dismiss concedes that Prince did not "in any way act [ ] unethically in forming its negotiating strategy." Brief in Reply (Motion to Dismiss), p. 5. If there is a more open (if grudging) denial of bad faith, the court is unaware of it. Upon examining the parties' negotiating records, the court concludes that Bard's claim of "bad faith" amounts to no more than a claim that Prince's settlement offer was unacceptable. Prince's evaluation of its own injuries cannot vitiate Bard's waiver.

"But the power of a District Court under [section] 1404(a) to transfer an action to another district is [not] made to depend ... upon the wish or waiver of the defendant." *Hoffman,* 363 U.S. at 343. Section 1404(a) allows the court to transfer this action to another court "[f]or the convenience of the parties and witnesses, [and] in the interest of justice." 28 U.S.C. section 1404(a). The facts presented by Bard, however apposite they may be to an argument under sections 1391(b) and (c), demonstrate that a transfer of venue would merely shift the balance of hardships from plaintiff to Bard. This is not enough to overcome section 1404(a)'s "paramount" consideration, namely plaintiff's choice of forum. *Lieb v. American Pacific Int'l., Inc.,* 489 F.Supp. 690, 697 (E.D.Pa.1980) (holding that mere shifting of inconvenience will not warrant transfer); *Smithkline Corp. v. Sterling Drug, Inc.,* 406 F.Supp. 52, 54 (D.Del.1975) (stating that plaintiff's choice of forum is the paramount consideration in ruling on a transfer motion). The court, therefore, has acquired personal jurisdiction and venue on consent of defendant.

**\*2** At this point the court grants plaintiff's motion to strike Bard's offer of judgment, filed with the court as part of the latter's Brief in Opposition. Such offers are not to be filed with the court prior to judgment, Fed.R.Civ.P. 68, and are inadmissible to evaluate the validity of plaintiff's claims. Fed.R.Evid. 408.

The court now turns to plaintiff's request for a preliminary injunction. One of the most crucial elements necessary to an injunction is the likelihood that plaintiff will succeed on the merits. *Constructors Ass'n. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978); *Educational Testing Serv. v. Katzman,* 626 F.Supp. 527, 528 (D.N.J.1985) *mod. on other grounds,* 793 F.2d 533 (3d Cir.1986). The keystone

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1988 WL 142407                                                                    Page 2
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
(Cite as: 1988 WL 142407 (D.N.J.))

of plaintiff's complaint  [FN1] is Bard's use of the words BARD PRINCESS on its new racquets. Prince claims that Bard's mark confuses customers, or potential customers, concerning the racquets' origin or sponsorship.    Therefore, the court will evaluate the merits of Prince's "likelihood of confusion" claims;  if it is likely that Bard's products confuse potential Prince buyers, then Prince is likely to prevail on its claims.    *See* *SK & F Co. v. Premo Pharmaceutical Labs. Inc.,* 625 F.2d 1055, 1065-67 (3d Cir.1980);   *Schering Corp. v. Schering Aktiengesellschaft,* 667 F.Supp. 175, 187 (D.N.J.1987);   *New York Giants National Football League Properties, Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 516 (D.N.J.1986) (all three cases discussing the central requirement of confusion for federal trademark infringement, unfair competition, and New Jersey actions).

 Both parties have devoted much argument to their "right" to use their respective, registered marks. [FN2]   Federal trademark law, however, does not confer an absolute "right" to use a tradename.   *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97-101 (1918).    Rather, it seeks to protect the public from confusion as to the source of competing goods engendered by one producer's appropriation of another's goodwill through use of the latter's mark. *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 129 (1947);   *Delaware & Hudson Canal Co. v. Clark,* 80 U.S. (13 Wall.) 311, 322 (1871);   *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978);   *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462 (3d Cir.1968),  *cert. denied* 393 U.S. 934 (1968). Therefore, although a producer has a duty to select a non-confusing mark,  *National Auto Club v. National Auto Club, Inc.,* 365 F.Supp. 879, 882 (S.D.N.Y.1973),  *aff'd.* 502 F.2d 1162 (2d Cir.1974), and acts at his peril in the face of an established name,  *Villager, Inc. v. Dial Shoe Co.,* 256 F.Supp. 694, 701 (E.D.Pa.1966), he is not liable unless his mark can actually confuse the public.    *See Litton Indus., Inc. v. Litronix, Inc.,* 577 F.2d 709, 711 (C.C.P.A.1978) *quoting Myrurgia S.A. v. Competior de la Parfumerie, S.A. Ancienne Maison Tschanz,* 441 F.2d 673, 675 (C.C.P.A.1978) (both cases holding that trademark law is concerned solely with public confusion).

 *3 It is not surprising, therefore, that the Third Circuit's most recent opinion regarding trademark infringement focuses exclusively on the ability of competing marks to confuse the public.   In *Interpace Corp. v. Lapp,* 721 F.2d 460, 462-63 (3d Cir.1983),

Judge Hunter set forth a three-step inquiry for evaluating whether an injunction should issue in a trademark case.   First, the court must determine if "the trademark owner and the alleged infringer deal in competing goods or services."    If the parties so deal, the court then examines plaintiff's mark to determine whether it is "inherently distinctive," and then compares it to the allegedly-infringing mark. Only if plaintiff's mark is not inherently distinctive will the court conduct a full-scale inquiry into secondary meaning or likelihood of confusion. [FN3] *Id.* at 462.

 Bard and Prince deal in competing goods, namely tennis racquets.   Therefore the court will examine Prince's registered mark, PRINCE, to determine whether it is "inherently distinctive" under *Interpace.* A name is simply a word routinely applied to a something or someone;  if a word is "inherently distinctive" it needs nothing but the act of its pronunciation in order to communicate a unique meaning.   The word "prince" does not possess this ability--indeed, the word is generic in its connotations.    It may refer to anything from hamburgers to members of the deposed Romanoff dynasty;   it does not automatically connote tennis racquets.     Therefore, the dissimilar BARD PRINCESS does not patently infringe on plaintiff's mark.

 Consequently the court must conduct *Interpace*'s dual "likelihood of confusion/secondary meaning" inquiry.    If this inquiry reveals a likelihood of confusion, the court must issue an injunction.   *Id.* at 464-65.   This test, initially described in *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra,* contains ten elements.    Rather than list them here, the court will proceed through them *seriatim,* discussing the evidence and parties' arguments as they become relevant.

   1. *The Degree of Similarity Between the Marks*
 Plaintiff's mark is PRINCE, while defendant's is BARD PRINCESS.    Plaintiff argues that Bard's mark "incorporates" the entire PRINCE mark, and is PRINCE's natural feminine form.    Plaintiff cites authorities which have considered these facts to pose a high degree of similarity.   *See, e.g., Myrurgia S.A.,* 441 F.2d 673 (Ct.Cl.1971) (holding "SI SENOR" and "SENORITA" similar);   *Guess ? Inc. v. Mai-Tai Boutique,* 7 U.S.P.Q.2d 1387 (S.D.N.Y.1988) (finding that "GUESS?" and "GUESSES?" are similar).

 Defendant points out that the word "princess" is

1988 WL 142407                                                                                Page 3
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
**(Cite as: 1988 WL 142407 (D.N.J.))**

widely used in the sale of sporting goods, [FN4] and also cites authority that the employment of the word BARD in the mark and on the product prohibits confusion. *See e.g., McGregor-Doniger, Inc. v. Drizzle, Inc., 202 U.S.P.Q. 81 (2d Cir.1979); Daggett & Ramsdell, Inc. v. I. Posner, Inc., 277 F.2d 952, 953 (C.C.P.A.1960)* (both cases considering addition of producer's name to weigh against likelihood of confusion).

**\*4** In addressing the degree of similarity, the court must take into account the marks' pronunciation, appearance and suggestiveness. *Schmid Labs. v. Youngs Drug Prods. Corp., 482 F.Supp. 14, 17 (D.N.J.1979).* Obviously, "BARD PRINCESS" has a much different pronunciation than "PRINCE." Further, the Bard Princess is styled in a bright pink-blue-white color scheme, and contains the word BARD no less than nine times across its grip and frame. The allegedly-offending racquet places four of these "BARDs" in exactly the same place as plaintiff places its house-mark, thereby suggesting that the racquet is manufactured by one other than plaintiff. [FN5] Virtually all of Prince's racquets are a uniform white, black or grey. The Bard Princess employs a relatively square design, while the PRINCE is round. Although "BARD PRINCESS" employs the feminine form of plaintiff's PRINCE, defendant adds another word not present in plaintiff's mark. The court concludes that the degree of similarity between the marks PRINCE and BARD PRINCESS is slight.

### 2. The Strength of Plaintiff's Mark [FN6]

A mark is "strong" if the public "has already been educated to accept it as the hallmark of a particular source." *Alfred Dunhill v. Kasser Dist. Prod. Corp., 350 F.Supp. 1341, 1357 (E.D.Pa.1972) aff'd. 480 F.2d 917 (3d Cir.1973)* (quoting 3 Callman, Unfair Competition, Trademarks and Monopolies, section 82.1(1), pp. 755-56 (3d Ed.)). [FN7] It follows that degree of advertising and use are important determinants of a mark's "strength." *Id.* Prince has been advertising its mark for over eighteen years on a vast array of tennis and sporting-goods products including racquets, ball-throwing machines, racquet string and athletic shoes. Since 1978 plaintiff has spent, on the average, $6.4 million dollars per year in advertising these products. A fair number of professional and amateur players are provided, or are paid to use, Prince racquets and products in order to strengthen the mark in the public mind. [FN8] PRINCE is, therefore, a "strong" mark which, at least based on its advertising expenditures, enjoys an appreciable degree of consumer recognition.

### 3. Degree of Consumers' Care and Attention in Buying the Particular Products.

The degree to which the products' targeted buying public discerns, or may be said to discern, the difference between marks is highly relevant to a "likelihood of confusion" inquiry. *Dresser Indus., 395 F.2d at 462; Reedco, Inc. v. Hoffman-LaRoche, Inc., 667 F.Supp. 1072, 1079 (D.N.J.1987); LeBow Bros., Inc. v. Lebole Euroconf, Sp.A., 503 F.Supp. 209, 210-11 (E.D.Pa.1980); Motor Masters Prods. Corp. v. Motor Masters Warehouse, Inc., 463 F.Supp. 232, 239 (E.D.Pa.1978).* In regard to this criterion the parties presented two expert witnesses who, not surprisingly, differ as to their evaluations of average consumer care. Before discussing their testimony, the court notes that the Bard Princess retails for $130.00.

**\*5** Plaintiff produced Mr. Sivertson, a tennis professional and sports director at the Westwood Country Club in Austin, Texas. Sivertson is the current Vice-President of the United States Professional Tennis Association ("USPTA"), and as director of that body's education committee. Sivertson testified that one of his responsibilities is teaching professionals to increase profits at their shops. He stated that, in his experience, persons frequently buy racquets without regard to trademarks, because of the racquets' color, or because the customer's favorite stars play with the same brand of racquet. Sivertson also testified that sales assistance in "pro shops" is generally inexperienced, and that tennis professionals spend more time giving lessons than in attending to their outlets. Sivertson also testified that he was familiar with between 200-300 stores.

Defendant's chief witness was Mr. Fred Drilling, the owner of a large tennis specialty store in Washington, D.C. Drilling has been a nationally-ranked tennis professional in every competitive age bracket, and has been involved in the retail tennis goods trade for thirteen years. Drilling stated that purchasers of racquets costing over one hundred dollars are generally discerning about the quality and manufacturer of the product. He testified that most tennis specialty stores and pro shops allow prospective customers to either hit with the racquet at a special "hitting lane" inside the store, or to take the racquet with them and play with it for several days. [FN9] Drilling stated that he was familiar with roughly 1,000 stores.

The court was presented with letters from customers

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1988 WL 142407                                                    Page 4
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
**(Cite as: 1988 WL 142407 (D.N.J.))**

to Bard.    These spoke of being assisted by "knowledgeable" salespersons, and of hearing praise directed at the Bard product over other brands.

 Upon considering this evidence the court thinks the degree of care employed by purchasers of racquets such as those involved here is high.    The Bard Princess retails at $130.00, plus the cost of stringing the racquet.    Although here the testimony differed, the court thinks that the Bard Princess is targeted at girls or petite women (and not, as Sivertson testified, at both male and female players).   The racquet is one inch shorter than most racquets, and is styled in magenta.    Further, Mr. Mitchell Lombard, defendant's Chief Executive Officer, testified that the Bard Princess was designed for this range of players. The court concludes that the Bard Princess is an expensive specialty racquet which would be bought after such a degree of consideration that confusion would be unlikely. [FN10]

### 4. The Length of Time Bard Has Used "BARD PRINCESS" without Evidence of Actual Confusion Arising.

The BARD PRINCESS mark was issued on March 12, 1988.    Plaintiff's proffered evidence of actual confusion (a statistical survey) was gathered in October of 1988, roughly five months later.    So short a period has been considered of little probative value. See *Tree Tavern Prods., Inc. v. Conagra, Inc.*, 640 F.Supp. 1263, 1271 (D.Del.1986) (holding that five months was too short a period within which to provide truly probative evidence).

### 5. The Intent of Bard in Adopting the BARD PRINCESS Mark.

 **\*6** Lombard testified that the adoption of the BARD PRINCESS mark was part of an advertising scheme whereby Bard products would be given a "royal" aura. Bard already markets the BARD KING and BARD QUEEN, and has prepared and circulated advertisements displaying these racquets with such imperial regalia as crowns.    Lombard further stated that defendant has always sought independent recognition of its product line (ranked by some industry surveys as being of high quality).   As an example, Lombard testified that defendant had the opportunity to become the "official racquet" of the 1985 Orange Bowl tennis tournament.   Lombard, upon noting that most of the tournament's players were using Prince racquets, declined, and arranged for Bard to be designated the "official string" of that tournament.    Lombard also testified that the possibility of confusion between Bard and Prince racquets did not enter his mind when he decided to produce the Bard Princess.

 In addition, defendant has run an advertisement of its racquets under the caption "Move Over Prince, Here Comes The King--BARD KING."    Plaintiff argues that this advertisement demonstrates Bard's bad faith, and its conscious attempt to confuse the public about the source of these tennis racquets.   As the Eastern District of Pennsylvania stated when it confronted an analogous contention:

 The gravamen of plaintiff's argument seems to be based more on competition than on unfairness. Advertisements which compare 'theirs' to 'ours' are commonplace in the retail field.

 *Smithkline Beckman Corp. v. Pennex Prods. Co.*, 605 F.Supp. 746, 751 (E.D.Pa.1985).    This advertisement merely highlighted Bard's racquet, and described its superiority over a comparable Prince product.    The court is of the opinion that this advertisement demonstrates Bard's conscious attempt to build an independent name among tennis consumers.

 Finally, it should be noted that Bard encourages the display and sale of its racquets to be accompanied by a large, stylized "B" stencilled on the strings. Bard furnishes retail outlets with stencils and paint, and prominently displays the "B" logo on the racquets used in its advertising and promotional materials. The evidence on this point is convincing that Bard had, nor has, any intention of confusing its products with plaintiff's.    Indeed, the record amply demonstrates Bard's intent to distinguish its products from those of its competitors.    The court observes that evidence of intent is considered important evidence on the issue of likelihood of confusion. *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1015 & n. 8 (E.D.Pa.1976).

### 6. The Evidence of Actual Confusion.

 Prince presented the court with two pieces of evidence which, it contends, warrants a finding that actual confusion exists.    The first is a telephone call placed to a store called "La Mirage" in Miami, Florida by Mr. Robert Long, Director of Racquet Sports at Prince.    Long asked the woman who answered his call whether "La Mirage" carried the Bard Princess racquet.    She responded that the store did not carry "that Prince racquet."   Long did not provide information concerning this woman's position with the store, and conceded that the possibility existed that she did not understand his request.    The court finds this single event more than

1988 WL 142407                                                                                    Page 5
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
(Cite as: 1988 WL 142407 (D.N.J.))

counterbalanced by the high degree of awareness presented by the correspondents in Bard's exhibit of consumer letters.

*7 Plaintiff's only other evidence of actual confusion is the statistical study referred to in part 4 of this opinion. The study was conducted by Guideline Research Corporation ("GRC"), which conducts surveys of popular reaction to various marketing enterprises. Mr. Norman Passman, President of GRC, designed the survey himself, and testified as to its accuracy in gauging market confusion over the BARD PRINCESS and PRINCE. The study concluded that roughly 39.5% of the buying public are confused by the two marks.

Statistical surveys are to be scrutinized to determine their probative value. Passman testified that this "non-probability" study was performed at eight shopping malls in various parts of the nation, although he had no knowledge of whether such malls contained the types of stores in which the parties claimed to sell their racquets. He further testified that the "relevant universe" (i.e., those types of persons to be interviewed) included "adults 16 to 54 years of age who indicated that they had played tennis within the past 12 months." Plaintiff's Exhibit # 10, p. 6. The "universe" included more men than women.

Those interviewed were shown three pairs of tennis-related items. The first two pairs included two head-bands manufactured by different companies, and two cans of tennis balls of disparate origin. The third pair included an unstrung Bard Princess and a Prince "Spectrum 90" racquet, which Passman had selected with the assistance of plaintiff's counsel. According to Passman, an interviewer would display these three pairs (in rotation, to prevent suggestiveness) and ask respondents: "Do you think that these two products are made by the same company or different companies?" If the answer was "the same company," the interviewer then asked the respondents why they thought so. The interviewer was under strict instructions to avoid probing, and to record the answers received verbatim.

If, at the end of this triune procedure, the respondent had indicated his feelings that the Bard Princess and Spectrum 90 racquets were "made by the same company," or if he had said that he didn't know who made them, the interviewer was to again display the racquets to him. Then, the interviewer was to ask:

Earlier when I showed you these two tennis racquets

you indicated that these two tennis racquets were made by different companies. [FN11] You may or may not have noticed that this brand is called "Princess" (POINT) while the other brand uses the name "Prince" (POINT). Did either company have to get permission from the other to use the Prince or Princess name?

If the respondent chose a manufacturer who, he assumed, was required to have permission, the interviewer would ask "Why do you say that?" If the respondent stated that he did not know, the interview was ended.

The court finds that this survey is to be given little weight in determining "actual confusion" for several reasons. First, the GRC study is ill-tailored to a "likelihood of confusion" inquiry. Such a test first focuses on the marks themselves and as they are used on the product, which in this case were PRINCE and BARD PRINCESS--not merely "Princess." In addition, the court cannot consider the GRC survey to have canvassed the Bard Princess's "niche market," namely girls or small women who would buy a $130.00 racquet, or those willing to buy it for them. A group of persons, mostly male, who had played tennis once in the previous year is hardly likely to comprise a significant number of such persons.

*8 In addition the question quoted above is leading in both its wording and its context. The two racquets were singled out as the purpose of the interview. Respondents were informed that the products were, in fact, made by different companies; that the name "Prince" and "Princess" was significant in this determination (thereby encouraging this answer on the "why" part of the interview); and that one company may have had to acquire permission from the other. Passman himself indicated at least the possibility that the question was leading; the court considers it more than a possibility. [FN12]

Further, many of the statements given to Passman as to why respondents thought the products were of common origin went to their trade dress; only 8.5% of the respondents referred to the names of the two products. In this regard the court notes that Bard introduced photographs of various competing racquets. These racquets were white, as was the Spectrum 90 used in the GRC survey. As noted above, however, the Bard Princess is bright pink, with less than half of its surface area being white. Passman acknowledged that the study might well have turned out differently had one or two of these white racquets been included in the sample shown to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1988 WL 142407                                                                                                      Page 6
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
(Cite as: 1988 WL 142407 (D.N.J.))

the respondents.

   "While non-probability survey results may be admissible, they are weak evidence of behavior patterns in the test universe." *American Home Products Corp. v. Barr Labs., Inc.,* 656 F.Supp. 1058, 1070 (D.N.J.1987), *aff'd.* 834 F.2d 368 (3d Cir.1987). The weaknesses of the GRC survey described above are not cured by that study's use of leading questions, a virtually irrelevant "universe," and its failure to focus on defendant's entire mark as used on its products. Consequently the court will allow the GRC survey only scant weight.

### 7. *Whether the Goods, though Not Competing, Are Marketed through the Same Channels of Trade and Advertised through the Same Media.*

 This factor is not particularly implicated by the facts of this case, since as was discussed above, the racquets manufactured by the parties are competing items. Relevant marketing techniques are discussed, however, in the court's evaluation of factor three, "Degree of Consumers' Care and Attention in Buying the Particular Products."

 But there is one item which renders this factor relevant. Long testified in January of 1988 plaintiff introduced a line of "Princess" sports luggage, which may not be said to "compete" with Bard's tennis racquet. Since, however, Prince has offered no evidence concerning the marketing or advertising of its luggage except for a company brochure describing the new line the court finds this factor to weigh in favor of Bard.

### 8. *The Extent to Which the Targets of the Parties' Sales Efforts Are the Same.*

 In a larger sense, the "targets" of plaintiff's and defendant's sales efforts are identical; both manufacturers seek the business of those for whom tennis is either a job or a diversion. But in a narrower, more relevant sense Bard "targets" girls or petite women for the Bard Princess, while Prince does not offer a racquet designed specifically for this market. On this score the court is presented with Long's testimony. Initially he indicated that the Bard Princess competed for young players with Prince's "Power Pro," "Graphite Pro," "Spectrum," and "Response" racquets. Yet Long also indicated that none of Prince's racquets are specifically directed at women, as are Bard's. Of the four racquets mentioned by Long, none are pink, nor do any bear a feminine name. In this connection Lombard testified that defendant's introduction of the Bard Princess was

specifically targeted to either young or small women. The court finds that Bard's "target market" is distinct from Prince's.

### 9. *The Relationship of the Goods in the Minds of Consumers Because of the Similarity of Function.*

 **\*9** Both the Bard Princess and plaintiff's racquets perform an identical function. But the mere fact that two competing products perform an identical function will not cause consumers in the $130.00 range to identify the products at issue here. Indeed, plaintiff has presented no evidence that customers in this price range identify the parties' racquets.

### 10. *Other Facts Suggesting that the Consuming Public Might Expect the Prior Owner to Manufacture a Product in the Defendant's Market, or that He Is Likely To Expand into that Market.*

 Though generally appropriate only to non-competing goods cases, *Interpace,* 721 F.2d at 464, this factor is relevant here because Bard targets a particular type of buyer not currently catered-to by plaintiff. Aside from the fact that Prince enjoys a reputation for manufacturing a wide array of tennis racquets, the parties have pointed out nothing which suggests either that the particular targeted "consuming public" would expect Prince to manufacture a girls' or small women's racquet, or that Prince currently plans to do so. [FN13]

 On balance, Prince has failed to demonstrate a likelihood that it will succeed in satisfying the *Interpace* test. Consequently it has failed to demonstrate a likelihood of confusion between its products and the Bard Princess. Therefore, it has failed to demonstrate a likelihood of success as to any of its claims, for the injuries alleged under them rest solely on the damage done to plaintiff by Bard's selling an allegedly-confusing racquet. [FN14]

 Because of this determination plaintiff is also unable to demonstrate irreparable injury. Without a likelihood of success in showing that Bard's mark infringes its own, plaintiff cannot point to anything in the record which would indicate a threat of irremediable harm. At the hearing held on this motion Bard presented evidence that it has, to date, sold roughly 200 of the allegedly-offending racquets nationwide. Sixteen of these items, amounting to eight percent of Bard's total sales, were purchased by plaintiff for the GRC survey. The court cannot say that plaintiffs are threatened by irreparable harm.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1988 WL 142407                                                    Page 7
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
**(Cite as: 1988 WL 142407 (D.N.J.))**

Nor can plaintiff demonstrate that an injunction is in the public interest. Because, at least at this point, there is no likelihood of confusion between "BARD PRINCESS" and "PRINCE," the public interest is not endangered by Bard's continued marketing of its product. *See Scarves By Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1173 (2d Cir.1976) (holding that the likelihood of confusion inquiry determines the public's interest in stopping production under the infringing mark).

Finally the court notes that the balance of hardships weighs in favor of Bard. Given the slight amount of Bard Princess sales (when one discounts the employment of plaintiff's purchasing power) and the unlikelihood of confusion, the court concludes that an injunction would, at this point, harm Bard more than it would help plaintiff. Plaintiff's motion for a preliminary injunction is, therefore, denied.

**\*10** As a final matter the court must address defendant's motion to dismiss Prince's claim for "dilution." Plaintiff has stated a claim under New Jersey's unfair competition law, which provides that:

No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals.

N.J.S.A. 56:4-1. Generally, the rights and remedies afforded by this statute are those available under the New Jersey common law of unfair competition. *Columbia Broadcast System v. Melody Recordings, Inc.,* 134 N.J.Super. 368, 375 (App.Div.1975). Defendant cites the court's *Schering* opinion for the proposition that Prince may maintain a dilution claim only if the goods involved are "dissimilar." *Schering,* 667 F.Supp. at 188.

But *Schering* indicated that "dissimilarity" may mean quality, as well as the competitive nature of the goods. *Id.* Indeed, New Jersey recognizes that its statute will provide a remedy if defendant's goods are similar, but presented to the public in such a way as to sap the strength of plaintiff's mark. *See Chanel, Inc. v. Casa Flora Co.,* 100 N.J.Super. 19, 24-25 (App.Div.1968), *cert. denied* 51 N.J. 577 (1968) (holding that "dilution" could be found if the same perfume was sold in such a way as to confuse the buying public into mistaking it for that of the mark's owner); *accord, Clairol, Inc. v. Cosmetics Plus,* 130

N.J.Super. 81, 88 (Ch.Div.1974) (stating that plaintiff could make out a claim if it could show that its own products' value was depreciated through defendant's method of sale).

Consequently plaintiff's "dilution" claim, which is really nothing more than one of many theories which may be asserted under N.J.S.A. 56:4-1, is properly before the court. Defendant's motion to dismiss this claim is denied.

*ORDER*

This matter having come before the court on plaintiff's motion for a preliminary injunction and motion to strike defendant's offer of judgment; defendant's motion to dismiss for lack of personal jurisdiction; defendant's motion to dismiss for improper venue; defendant's motion to transfer venue; and defendant's motion to dismiss for failure to state a claim upon which relief may be granted, and the court having considered the written submissions and oral argument of counsel, as well as the evidence presented, and good cause appearing,

It is this 22nd day of December, 1988

ORDERED that defendant's motions to dismiss for lack of personal jurisdiction or improper venue, its motion to transfer venue, and its motion to dismiss for failure to state a claim upon which relief may be granted be and hereby are denied, and it is further

ORDERED that plaintiff's motion to strike defendant's offer of judgment be and hereby is granted, and it is further

ORDERED that plaintiff's motion for a preliminary injunction be and hereby is denied. An opinion accompanies this order. No costs.

FN1. Plaintiff has set forth several claims for trademark infringement, under 15 U.S.C. Section 1114(1), false description of origin and false description or representation under 15 U.S.C. 1125(a); unfair competition under N.J.S.A. 56:4-1; and New Jersey common-law.

FN2. Prince owns the following registered marks, all of which are stylistic variations on the word "PRINCE":

| Mark | Registration Number | Date of Issue |
|------|---------------------|---------------|
| PRINCE | Reg. No. 1,030,917 | January 20, 1976 |

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1988 WL 142407                                                                                        Page 8
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
(Cite as: 1988 WL 142407 (D.N.J.))

```
"      "              Reg. No. 1,049,720    October 5, 1976
"      "              Reg. No. 1,074,654    October 4, 1977
"      "              Reg. No. 1,103,956    October 10, 1978
"      "              Reg. No. 1,111,008    January 9, 1979
"      "              Reg. No. 1,233,680    April 5, 1983
"      "              Reg. No. 1,284,452    July 3, 1984
"      "              Reg. No. 1,290,202    August 14, 1984
"      "              Reg. No. 1,290,217    August 14, 1984
"      "              Reg. No. 1,352,974    August 6, 1985
"      "              Reg. No. 1,462,052    October 20, 1987
The disputed Bard mark is also registered:
BARD PRINCESS        Reg. No. 1,324,759    March 12, 1985
```

FN3. *Interpace* also stated that the tests for likelihood of confusion and secondary meaning are "virtually indistinguishable," and that satisfaction of the one is fulfillment of the other. *Interpace,* 721 F.2d at 462.

FN4. For example, a selection of unexpired registered trademarks employing the word PRINCESS reveals the following uses:

```
Name                      Number             Product
PRINCESS                  Reg. No. 1,015,881  Golf Clubs
PRINCESS  BARBELLES       Reg. No. 1,050,780  Weights
PRINCESS  SMART BELLES    Reg. No. 972,273    Weights
PRINCESS  CAT             Reg. No. 1,198,863  Sport Shoes
```

FN5. In contrast, plaintiff has suggested that this placement is a tacit admission by Bard that its racquet infringes plaintiff's mark. An examination of Bard's other racquets, however, reveals that placement of the trademark in the "Y"-shaped area between grip and head is not unique to Prince, but followed throughout the industry. *See e.g.,* Affidavit of Mr. Robert S. Long, Exhibits # 1, and # 2; Defendants' Exhibits # 1, # 8 and # # 22. (all exhibits containing photographs of racquets with trademarks in the "Y-zone.") Thus, the placement of the word "BARD" is a positive factor for defendants, for this "Y-zone" appear to be a customary and known place to distinguish between house marks on the product.

FN6. Apparently, *Interpace* would not have the court compare the strengths of plaintiff's mark with those of defendants. Therefore the court will not do so.

FN7. In contrast, *Interpace*'s "inherently distinctive" test is aptly described by the same authority:
Then, too, a mark can be distinctive ... because it is unique, that is, distinctive in itself....
*Alfred Dunhill,* 350 F.Supp. at 1357 (*quoting* 3

Callman, Unfair Competition, Trademarks and Monopolies, section 82.1(1), pp. 755-56 (3d Ed.1969)).

FN8. Prince submits that "[e]ven consumers who have never played tennis or would never purchase tennis products for themselves or others recognize the PRINCE marks." The court was presented with no seriously probative evidence that this is the case, and observes that since statistical surveys are considered admissible to prove actual confusion, they are admissible for this purpose as well.

FN9. Mr. Sivertson's testimony brought out the same point, although with less emphasis on the widespread nature of this practice.

FN10. The court notes here that Mr. Sivertson's testimony generally directed itself to the point that buyers either did not pay any attention to brand name, or meticulously observed the brands used by their idols. In the latter case the degree of care may be characterized as great, while the former hardly goes to buyer confusion.

FN11. If the respondent had replied that he did not know whether the racquets were made by

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1988 WL 142407                                                                              Page 9
Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419
**(Cite as: 1988 WL 142407 (D.N.J.))**

different companies, this sentence would read "Earlier when I showed you these two tennis racquets you said you didn't know if they were made by the same company or different companies. You may or may not have noticed...."

FN12. In this regard the court finds it significant that over half of the respondents were male. They were shown a smaller, pink racquet called "Princess," and then asked whether its manufacturer had to get permission from "Prince." These applicants' answers may indicate cultural bias, or they may indicate confusion. Nonetheless, the court may not say that one explanation predominates over the other.

FN13. Such evidence could be provided by showing, for example, that other racquet manufacturers regularly engage in "niche marketing." *Interpace, 721 F.2d at 464* (holding evidence that other producers also carried lines of similar products probative of this issue). Plaintiffs, however, have brought no such evidence to the court's attention.

FN14. Plaintiff does attempt to make out a claim for "dilution," which applies when goods of inferior quality are passed off as another's. Although the court will address this claim at more length in considering Bard's motion to dismiss for failure to state a claim, it should be noted that "dilution" cannot occur if customers are unlikely to be confused as to the manufacturer of the purchased goods.

 Not Reported in F.Supp., 1988 WL 142407 (D.N.J.), 11 U.S.P.Q.2d 1419

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
THE PROCTER & GAMBLE COMPANY, Plaintiff,
v.
COLGATE-PALMOLIVE COMPANY, Young &
Rubicam Inc., and Dentsu, Young & Rubicam, a
partnership, Defendants.
**No. 96 Civ. 9123(RPP).**

Nov. 9, 1998.

Kramer Levin Naftalis & Frankel LLP, New York, NY, By: Harold P. Weinberger, Jonathan M. Wagner, Dinsmore & Shohl, Cincinnati, Ohio, By: Lynda E. Roesch, for Plaintiff the Procter & Gamble Company.

Darby & Darby P.C., New York, NY, By: Ethan Horowitz, Amy J. Benjamin, for Defendant Colgate-Palmolive Company.

Cleary, Gottlieb, Steen & Hamilton, New York, NY, By: Lawrence B. Friedman, for Defendants Young & Rubicam Inc. and Dentsu Young & Rubicam.

OPINION FINDINGS OF FACT AND
CONCLUSIONS OF LAW

PATTERSON, J.

**\*1** This action was commenced on December 4, 1996. The amended complaint, filed by The Proctor & Gamble Company ("P & G") on December 13, 1996, seeks damages and injunctive relief against Colgate-Palmolive Company ("Colgate"), Young & Rubicam Inc. ("Y & R"), and Dentsu Young & Rubicam ("Dentsu" or "DY & R") for copyright infringement under 17 U.S.C. § 101, et seq., unfair competition under the Lanham Act, 15 U.S.C. § 1125, violations of New York General Business Law § 349, common law misappropriation and copyright infringement under Chinese copyright law.

On September 29, 1997, the third, fourth and fifth claims were dismissed with prejudice by order of the Court. P & G's motion for a preliminary injunction was consolidated by the Court with a trial on liability and whether a permanent injunction and declaratory relief should be granted. Plaintiff's claims were tried to the Court on October 6, 1997 through October 21,

1997. Summations were heard on November 5, 1997. For the reasons that follow, plaintiff's claims under the Copyright Act and the Lanham Act are dismissed with prejudice.

*STIPULATED FACTS*
The following facts are stipulated by the parties:

1. Plaintiff P & G is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

2. P & G engages in the manufacture and sale of personal care products, including a variety of oral care products.

3. P & G sells toothpaste under the CREST name in twenty-three countries around the world, and under the names BLEND-A-MED in parts of Europe, IPANA in Turkey and BLENDAX in Russia.

4. Procter & Gamble China is a joint venture between P & G, Hutchinson, Ltd., Procter & Gamble (Guangzhou) Ltd., Guangzhou Soap Factory, and Guangzhou Economic and Technological. This joint venture was formed in 1988, and has its principal place of business in Guangzhou, China.

5. P & G advertises and promotes its toothpaste brands through various means, including television advertising.

6. Defendant Colgate is a New York corporation with its principal place of business in New York, New York.

7. Colgate engages in the manufacture and sale of personal care products, including a variety of oral care products.

8. Colgate markets fluoride toothpaste internationally as COLGATE brand toothpaste.

9. Colgate sells its COLGATE toothpaste in over 200 countries around the world.

10. Colgate advertises and promotes its toothpaste brand through various means, including television advertising.

11. COLGATE toothpaste is sold in China through a joint venture between a Colgate entity in China and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

Page 2

Guangzhou Jie Yin Daily Chemical Factory, which is owned and controlled by the Chinese government.

12. Defendant Y & R is a New York corporation with its principal place of business in New York, New York.

13. Y & R is a full-service advertising agency which creates advertising campaigns, including television commercials.

14. Y & R is one of Colgate's global advertising agencies for oral care products.

**\*2** 15. DY & R is not a legal entity. Y & R and Dentsu of Japan, together with one or more separate business entities in some instances, have invested in entities that use the DY & R name in the locations in which each entity is based, *e.g.*, DY & R-China.

16. DY & R is one of Colgate's Chinese advertising agencies for oral care products in Asia.

17. P & G and Colgate have engaged in numerous legal disputes with each other.

18. During the 1970's, Colgate developed consumer television advertising for toothpaste, for airing in the United States, incorporating a visualization of an eggshell demonstration (the "eggshell visual"). This advertising was tested by Colgate.

19. In 1989, Leo Burnett Chile, an advertising agency working for P & G, filmed a television commercial entitled "Huevo Nuevo" incorporating an eggshell visual.

20. P & G aired "Huevo Nuevo" in Chile from February 19, 1989 until February 5, 1990.

21. Since the airing of "Huevo Nuevo" in Chile, P & G has aired commercials containing various executions of an eggshell visual in the following countries:

| Country | Air Dates |
| --- | --- |
| Canada | 1992-1994 |
| Chile | 1989-1994 |
| China | 1996-present |
| Colombia | 1994-1995 |
| Croatia | 1997-present |
| Czech Republic | 1992-1994 |
| Dominican Republic | 1989-1991 |
| Egypt | 1990-1994 |
| Germany | 1991-1993 |
| Greece | 1991-1992 |
| Guatemala | 1991-1993 |
| Hungary | 1991-1996 |
| Latvia | 1995-present |

Not Reported in F.Supp.2d                                                          Page 3
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
Lebanon               1991-present

Mexico                1992

Peru                  1989-1992

Poland                1992-1994


Romania               1993-1994

Russia                1995-present

Saudi Arabia          1990-1993

Slovak Republic       1992-1994

Spain                 1992-1993

Turkey                1991-1996

United States         1989-1993, 1993-1994

Venezuela             1989-1990, 1992

Vietnam               1994-1995
```

Colgate challenged the eggshell visual commercials in several countries in Latin America and Europe.

22. P & G applied for and received the following copyright registrations for commercials containing an eggshell visual:

| Name | Registration Number | Date |
| ------------------- | ------------------- | ---------------- |
| Huevo Nuevo | PaU-2-086-173 | November 18, 1996 |
| Crest Egg | PaU-2-086-176 | November 22, 1996 |
| Family Egg | PaU-2-086-174 | November 18, 1996 |
| Demo Huevo | PaU-2-086-175 | November 22, 1996 |
| Inside Out | PaU-2-086-172 | December 2, 1996 |
| Endorsement | PaU-2-086-177 | December 4, 1996 |
| Hungarian Presenter | PaU-2-086-178 | December 4, 1996 |

23. In early 1996, Colgate had two versions of a visualization of a seashell demonstration filmed in Chicago, Illinois by Big Deahl Productions, one using a conch seashell and the other using a cowrie seashell (the "seashell visual"). Defendants incorporated these visuals into television commercials to promote COLGATE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

toothpaste.

24. In China, Colgate first aired television commercials incorporating the seashell visual on February 18, 1996.

**\*3** 25. As of the present date, Colgate has aired television commercials incorporating the seashell visual in Australia, Brazil, China, Denmark, the French Territories, Hong Kong, Kenya, Lebanon, Malaysia, Morocco, New Zealand, Norway, Pakistan, Philippines, Singapore, South Africa, Taiwan, Tanzania, Thailand, Uruguay, Vietnam, Zambia and Zimbabwe.

26. P & G aired television commercials in China entitled "Endorsement" and "Inside Out" which incorporated an eggshell visual promoting P & G's CREST brand. "Endorsement" first aired on June 16, 1996, and "Inside Out" first aired on July 3, 1996.

27. Darcy Masius Benton & Bowles, Hong Kong, created "Endorsement" and "Inside Out" for P & G.

28. P & G filed a proceeding against Colgate on June 20, 1996 before the National Copyright Administration in China alleging violations of Chinese copyright law. P & G has not commenced any legal proceedings against any of Colgate's commercials containing the seashell visual other than its proceeding in China and this lawsuit.

*ADDITIONAL FINDINGS OF FACT RELATED TO THE LITIGATIONS AS A WHOLE*
The following are additional findings of fact by the Court which relate to the litigation as a whole:

1. P & G's Chinese joint venture partner for the sale of CREST toothpaste is the Chinese government's Bureau of Light Industry. Beausejour Dep. at 181-82. [FN1]

> FN1. References to deposition transcripts are to the designated portions of such transcripts submitted herewith. Reference to the trial transcript are designated "Tr." followed by the relevant page and line number, and the name of the witness in parentheses.

2. Colgate's business in China is conducted through a joint venture called Colgate Guangzhou Company Limited ("Colgate Guangzhou"). Colgate's joint venture partner is Jie Yin Daily Chemical Factory, a unit of the Chinese Bureau of Light Industry, a Chinese government agency. Colgate Guangzhou is a Chinese legal entity that manufactures and distributes COLGATE toothpaste in China. Jie Yin Daily Chemical Factory has two directors on the board of directors of Colgate Guangzhou, and these directors and their management team are involved in the day-to-day business of Colgate Guangzhou. Colgate, the entity that is a defendant in this litigation, does not sell toothpaste or advertise in China. Tr. 1398:8--1399:12 (Fong).

3. DY & R serves Colgate in China through an office located in Guangzhou. Tr. 1491:4-15 (Tonogbanua).

4. P & G considers Colgate to be its biggest competitor worldwide in marketing toothpaste. Tr. 66:2-4 (Panayotopoulos). P & G and Colgate have a long history of litigation concerning their product claims, advertising and promotions. Tr. 1698:21--1699:16, 1702:18--1703:21 (Roskothen).

*THE COPYRIGHT CLAIM: ADDITIONAL FINDINGS OF FACT*
I. *P & G'S COPYRIGHTED TELEVISION COMMERCIALS*

In its U.S. copyright law claim, P & G alleges that Colgate and Y & R infringed copyrights covering television commercials copyrighted by and assigned to P & G. Ex. YC (Amended Complaint) ¶ ¶ 47-51. With respect to two of these copyrighted television commercials, PAU-2-086-172 and PAU-2-086-177, because they were first published in June and July 1996, after defendants' publication of the commercials in controversy, the Court granted defendants' motion for judgment as a matter of law at the close of P & G's case. Tr. 796:13--798:4. Remaining in this action are the following five copyright registrations:

| Registration Date | Name | Country | Copyright Registration Number | Exhibit Number | Video Exhibit Number | Date of Use |
|---|---|---|---|---|---|---|
| 11/11/96 | Crest Huevo Nuevo | Chile | Pau2-086-173 | 73 | 295-A | 1989-94 |
| 11/18/96 | Crest | U.S. (Hi- | Pau2-086-174 | 72 | 295-B | 1989-93 |

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page 5
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

| | Family Egg | spanic Market-) | | | | | 1993--94 |
|---|---|---|---|---|---|---|---|
| 11/22/96 | Crest Egg | Canada | Pau2-086-176 | 75 | | 295-C | 1992-94 |
| 12/4/96 | Hungarian Present-er | Germany/-Hungary | Pau 2-086-178 | 80 | | 295-D | 1991-93 |
| 11/22/96 | Demo Huevo | Peru | Pau2-086-175 | 74 | | 295-F | 1989-92 |

**\*4** These commercials contain advertising demonstrations, which visually illustrate to the consumer what the benefits of a product are. Tr. 67:23--68:4 (Panayotopoulos). Visual demonstrations are "worth a thousand words." Tr. 67:23--68:4 (Panayotopoulos). One reason is that viewers will receive the message regardless of whether they are listening to the commercial. Tr. 1369:5- 8 (Deahl). For products which lend themselves to selling by demonstration, the use of demonstrations in television advertising is an effective way to illustrate to the consumer the benefits of using a particular product. Tr. 1190:17-24 (James). For commercials containing demonstrations, such as P & G's egg or Colgate's seashell demonstration, the effectiveness of the advertising depends heavily on the story surrounding the demonstration. It is the integration of the demonstration with the surrounding thematic content that is "critical" to the commercials, according to Dimitri Panayotopoulos, the President of P & G-China. Tr. 99:14-19, 1889:11-15 (Panayotopoulos); *see also* Tr. 1839:16-25 (Zhong); 1849:18--1850:16 (Bachman); 1862:10--1863:11, 1865:12-- 1866:2 (Wu).

John Pepper, Chief Executive Officer of P & G, testified that the egg demo in a very short space of time communicates "a story that is both compelling and credible and memorable" in that "it's provided a means of describing what fluoride does for teeth." Tr. 347:2-3, 18-19 (Pepper). Colgate's witnesses have acknowledged that P & G's egg demo is successful, Tr. 861:15-25 (Loten), and that P & G's commercials containing the egg demo have a distinctive look and feel. Tr. 1202:3--1203:11 (James), and that they are an effective marketing tool, Estella Dep. at 70.

The various executions of the egg demonstration, as it has been aired by P & G worldwide, share many common elements, including the division of an egg into two parts marked by a line; the designation, by a marking, of one side to be brushed with CREST; the brushing of that side using a toothbrush; the egg's insertion into and removal from a container of clear liquid; and the tapping of each side of the egg with a metal instrument, showing one side denting and the other remaining hard. For example, the specific execution in the Canadian eggshell visual includes the following sequence of visual cues:

• a white eggshell appears, held by a hand on the left side of the screen;
• the shell appears with a black dotted line dividing the shell into two halves;
• toothpaste is placed on the right side of the shell and brushed with a toothbrush;
• the word "Crest" appears on the right half of the shell that was treated with toothpaste;
• the shell is held by wire tongs and placed in an unmarked laboratory-style glass beaker filled with a clear acid solution;
• the shell is removed from the acid with the tongs;
• the shell is tapped with a metal rod on each side of the dotted black line; and
**\*5** • the untreated side (left half) of the shell is dented after being tapped while the treated side (right half) remains hard.
Ex. 295-C; Tr. 82 (Panayotopoulos).

Although each of the copyright registrations incorporated versions of P & G's eggshell visual, that is, a demonstration of an experiment with an egg showing how fluoride protects tooth enamel from cavities caused by mouth acids, Ex. YC (Amended Complaint) ¶ ¶ 21-22, the specific copyright registrations differ in the manner of execution of, and film footage surrounding, the egg demonstration.

U.S. Copyright Registration No. PaU-2-086-173, created in Chile, introduces the egg visual by having a dentist explain that an egg is like a tooth in that they both contain calcium, and it then presents the egg demonstration to communicate the effectiveness of CREST. Ex. 295-A.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

U.S. Copyright Registration No. PaU-2-086-174, which aired in the United States from 1989-93 and 1993-94, begins by showing people at a birthday party enjoying themselves with a voiceover stating "What nice smiles!" The voiceover then raises the problem of cavities attacking their teeth. A dentist in a laboratory setting appears and introduces the egg and explains that "the shell of an egg, like teeth, has calcium." At that point, the egg visual demonstration is presented as the focal point of the commercial to illustrate the effectiveness of CREST toothpaste. At its end, the commercial briefly again shows the smiling people at the birthday party. Ex. 295-B.

U.S. Copyright Registration No. PaU-2-086-175, aired in Peru from 1989-92, presents a dentist explaining that an egg is like a tooth in that they both contain calcium, and it then shows the egg visual to communicate the effectiveness of CREST. Ex. 295-F.

U.S. Copyright Registration No. PaU-2-086-176 was filmed in 1992 and aired in Canada from 1992-94, and in Vietnam during 1994 and 1995 with Vietnamese voiceovers and supers. The egg visual demonstration is presented by interspersing the demonstration with four screens which have written text on top of a plain background. Ex. 295-C (Canada); Ex. 71, commercial 47 (Vietnam).

U.S. Copyright Registration No. PaU-2-086-178, which aired in Germany from 1991-93, begins with a dentist in a dental office explaining the importance of protecting teeth from cavities. The dentist then picks up an egg and explains that "an important component of healthy tooth enamel is calcium, exactly like this eggshell." He then presents the egg visual to communicate the effectiveness of using BLEND-A-MED. Ex. 295-D. [FN2]

FN2. The two CREST commercials that were aired in China beginning in June 1996, after the airing of Colgate's seashell visual commercials in China, also received U.S. Copyright Registrations. "Inside Out," which surrounds an eggshell visual, adapted from the Canadian eggshell visual, with a storyline about a grandfather and granddaughter later seen with her own daughter, and "Endorsement" which surrounds the same eggshell visual with a depiction of an endorsement from China's National Committee on Oral Health, received Registration Nos. PaU-2-086-172 and PaU-2-086-177 on December 2 and December 4, 1996, respectively. Ex. 71, commercials 6 and 7.

P & G contends that Colgate knowingly and willfully created television commercials which contain a visual demonstration that was "directly copied" from P & G's copyrighted works. Ex. YC (Amended Complaint) ¶ 36. Colgate's version of this experiment is the "seashell demonstration." Specifically, P & G alleges:

[D]efendants have authorized and directed from the United States reproduction and international distribution of the Infringing Works which contain the following elements that copy plaintiff's egg visual:
**6** 1. egg-shaped and egg colored shell (eggshell);
2. hand from left side of screen holding shell with no other face or body parts shown;
3. black line dividing the shell into two halves;
4. red marking on the right half of the shell;
5. toothbrush brushing toothpaste on the marked side of the shell;
6. placing the shell, with thin wire tongs, in a glass beaker filled with a clear acid solution;
7. removing the shell from the acid;
8. tapping the shell with a metal rod on each side of the black line; [and]
9. visual effect that the untreated side (left half) of the shell has become dented or perforated while the treated side (right half) remains hard.
Ex. YC (Amended Complaint) ¶ 37.

P & G launched CREST in China and first aired a television commercial containing an egg demonstration in China in June 1996. Tr. 1890:10--11, 1891:15; *see also supra* p. 6 (Stipulated Facts ¶ 26). P & G's first airing of the egg demonstration commercial in China was four months after Colgate's first airing of its seashell demonstration in China. *See supra* p. 6 (Stipulated Facts ¶ ¶ 24). As of May 1997, P & G had spent approximately U.S. $15-16 million to air its egg demonstration commercials in China. Tr. 1843:11- 1844:5 (Zhong).

## II. *THE GENESIS OF THE EGG DEMONSTRATION*

Egg experiments have been used by government health agencies, schools and fluoride toothpaste manufacturers to show the cavity prevention efficacy of fluorides in toothpaste. [FN3] P & G's former Managing Director of Strategic Planning for Oral Care stated that he first saw this experiment when he was in third grade, before the 1960's. Dias Dep. at 170. Long-time P & G employee Robert Faller, who is one of the persons identified by P & G in its interrogatory responses as most knowledgeable about P & G's creation of its egg demonstration, Ex. YA (P & G interrogatory responses), recalled a demonstration used in school programs from before 1980 that involved treating half of an egg with stannous fluoride, rinsing it off, placing it into a beaker of acid and testing both halves. Faller Dep. at 10-12. As early as the 1960's, the American Dental Association and numerous state dental societies and state Departments of Health and Education

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

published dental educational materials for schools describing egg demonstrations that could teach children the benefit of fluoride in preventing cavities. The basic experiment in the egg demonstration shows the ability of fluoride to protect an egg from an acid attack similar to that sustained by tooth enamel. Exs. VB, VC, VD, VE, VF, VG, VH, VR, VS, VU, VV, VX, ZY, ZX, ZW, ZV, ZT, ZS, OG (school materials). The American Dental Association published a brochure in 1970 entitled "Dental Health Facts for Teachers," which describes an experiment in which an egg is placed in a fluoride solution and then exposed to a weak acid solution. The treated egg is protected from acid attack. Ex. VF.

> FN3. Fluoride's beneficial effect on preventing cavities was established during the 1950's. Fluoride toothpaste followed.

 *7 Health authorities in Europe as well as the United States have published educational materials describing various dental education activities for children which include the egg demonstration. Tr. 1681:11--1683:1 (Roskothen). For example, a 1983 publication from the United Kingdom entitled "Practical Dental Health Education" describes an experiment in which half of an egg is initially covered with toothpaste. The treated and untreated portions of the egg are identified with an "x." After 24 hours, the toothpaste is removed and the egg is placed into a weak acid bath. The untreated side of the egg is attacked by the acid (as evidenced by bubbles) while the treated side is protected from acid attack. The author indicates that he learned of the egg experiment from "numerous sources." Ex. VW.

 In addition to local, national and international dental societies, P & G and Colgate also have published educational materials as part of their school programs. Many of these educational materials describe and/or depict egg demonstrations which contain some of the same executional elements that are present in the versions of the egg demonstration shown in P & G television commercials, in which P & G claims exclusive rights. Exs. ZZ, VI, VA, (P & G school materials); AO, AP, AQ, VC (Colgate school materials).  [FN4] As part of its school dental education program, beginning in 1994 Colgate published a Teacher's Guide containing various experiments for children, including the egg demonstration. In this version of the demonstration one egg is soaked in a fluoride rinse overnight. The treated egg and an untreated egg are then placed in vinegar. The next day the hardness of the eggshells is compared. Tr. 1677:20--1679:24 (Roskothen); Exs. VC, AO, AP, AQ, (Colgate school materials). The egg demonstration has been a part of Colgate's oral health awareness program since before 1994, and has been distributed to about 40 million children in about 50 markets worldwide in eight to ten different languages, including English, Spanish, Russian, Chinese, Portuguese, French, Greek and Italian. Tr. 1677:2--1679:18 (Roskothen); Exs. VC, AO, AP, AQ (Colgate school materials). P & G learned of Colgate's use of the egg demonstration in school program materials in 1993, and has never complained about that use. Ex. FK (P & G internal report).

> FN4. Several of these school materials, including those of P & G, were published without a copyright notice. Exs. ZZ, VI, VA.

 In 1970, the Ted Bates Advertising Agency ("Ted Bates"), Colgate's advertising agency for oral care products at the time, was experimenting with various calcium-containing substances to use in a demonstration intended to show the benefits of COLGATE. In these experiments, conducted by Howard Kaminsky of Ted Bates, chalk, seashells, pearls, chicken bones and an egg were all tested. Tr. 1556:21--1557:13 (Kaminsky). Kaminsky experimented with the egg by brushing COLGATE toothpaste on half an egg and placing the egg into a vinegar bath. Tr. 1560:23--1561:12 (Kaminsky); Ex. VO (Ted Bates internal memorandum). In the mid-1970's, the creative group at Ted Bates asked Kaminsky and his science group to continue their work on the egg demonstration. As part of this work, other toothpastes were compared with COLGATE toothpaste using the egg demonstration protocol. Tr. 1562:5--1563:20 (Kaminsky); Ex. VL (Ted Bates internal memorandum). As part of his work, Kaminsky performed variations of this experiment; one variation involved using a toothbrush to brush half of an egg with toothpaste, soaking the egg in a beaker of acid, removing the egg, and then tapping both the treated and untreated halves of the egg with a dental instrument or a pencil. Tr. 1564:16--1565:14 (Kaminsky); Exs. VT, VO (Ted Bates internal memorandum and photographs).

 *8 In 1979, Colgate decided to film a television commercial using the egg demonstration developed by the science group at Ted Bates. Kaminsky and the science group repeated the experiments that were filmed during the commercial. Storyboards were produced for each commercial. Tr. 1565:5--1566:7 (Kaminsky); Exs. ZL, ZJ, ZI, ZG and ZH (Ted Bates story boards). Two commercials, "Daisy" and "Coloring Book," were filmed by Ted Bates in New York using the COLGATE egg demonstration. Exs. 100, 101 (1979 COLGATE commercial with an egg demonstration); *see also supra* p. 3 (Stipulated Facts ¶ 18). Both contained Colgate's egg demonstration as part of the 30 second television commercial. As filmed, the egg was placed to make certain that the bubbling sequence, that is, the acid attacking the shell, was a fair representation. Tr. 1567:21-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 8
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

-1568:5 (Kaminsky). The COLGATE egg demonstration in these two commercials illustrated by analogy how the fluoride in COLGATE toothpaste protects teeth from acid in the mouth. These commercials were tested but not adopted for the merchandising of COLGATE toothpaste. *See supra* p. 3 (Stipulated Facts ¶ 18).

Since 1979, other toothpaste manufacturers have also used egg demonstrations in television advertising. For example, with P & G's knowledge and without P & G's complaint, Elmex has used an egg demonstration in its toothpaste television advertising in Germany and Israel for many years. Exs. VY (videotapes), YJ (translations), AS, AT, IT, AR (Elmex storyboards); Dias Dep. at 95-96 (evidencing P & G's awareness of Elmex's use of the egg demonstration in advertising); Tr. 1683:10--1685:13 (Roskothen). Egg demonstrations have even appeared in the mass media in cartoon form. Ex. GU (comic).

### III. *THE DEVELOPMENT OF P & G'S EGG DEMONSTRATION COMMERCIAL*

In 1986, P & G began developing an egg demonstration for use in a television commercial for CREST. Michael Zbuchalski, an entry-level engineer at P & G, was assigned to the project. Tr. 1615:5--1617:15 (Zbuchalski); Zbuchalski Dep. at 25-26; Exs. AI, AJ (letters regarding egg demonstration).

In the initial stages, P & G began looking at substances which contained calcium and which would work visually in a commercial. The first materials considered were items that were known to contain calcium carbonate, such as oyster shells, limestone, eggs, chalk and granite. Tr. 1617:18-22 (Zbuchalski); Zbuchalski Dep. at 29-37. Each item was tested for suitability in performing the experiment, Zbuchalski Dep. at 34-37, and the egg was found to be have the greatest visual impact because bubbles formed on the surface of the untreated side. Zbuchalski Dep. at 40. Michael Zbuchalski, P & G's "developer" of the egg demonstration commercial, recalls being provided with prior works concerning eggs and fluoride in connection with his experimentation, but cannot recall whether or not the prior works were developed by P & G. Tr. 1620:8--1621:22 (Zbuchalski); Zbuchalski Dep. at 85-86, 88-89 (admitting that he adapted work that had been done in the past on eggs and fluoride); Ex. KX (P & G internal memorandum stating that following Mr. Zbuchalski's experimentation in the United States, an unnamed "outside consultant in Chile picked up this project and expanded upon it to show that when an egg is brushed with toothpaste, that side would stay hard while the unprotected side became soft").

**\*9** P & G first aired an egg demonstration in a television commercial in Chile in February 1989. *See supra* p. 4 (Stipulated Facts ¶ 20).

### IV. *COPYRIGHT REGISTRATION OF THE FIRST P & G EGG DEMONSTRATION COMMERCIAL*

P & G's initial egg demonstration commercial that it aired in Chile--entitled "Huevo Nuevo"--is the egg demonstration commercial from which all of the other P & G egg demonstration commercials are derived. P & G presented no evidence that the publication of this initial Chilean television commercial containing an egg demonstration--in early 1989, before the United States signed the Berne Convention--was done using copyrighted notices. Indeed, the evidence indicates the contrary:

• The videotape of the Chilean commercial does not reveal any copyright notice. Ex. 71 (P & G videotape, commercial 3) and P & G has presented no evidence that it was aired under restrictive conditions or with a copyright notice. Tr. 1579:10--1581:3 (Cassis).

• Jorge Cassis, the Managing Director of Leo Burnett-Chile, P & G's advertising agency, and the only person identified by P & G as having knowledge of any restrictive conditions, Ex. YA (P & G Responses to Colgate's First Set of Interrogatories, Response No. 7), testified that he knew of no restrictive conditions, and that it was "not a habitual practice" of Leo Burnett-Chile to take affirmative steps to protect copyrights. Cassis Dep. at 76, 79-80.

• Mr. Cassis could not recall whether the commercial aired on one or both of Chile's principal television channels. Cassis Dep. at 62.

• Mr. Cassis could not recall how often the commercial aired, except that, as a general rule, new advertisements for a product launch were aired frequently. Cassis Dep. at 63-64. P & G cites to one document which purports to be a list of air dates, in support of its argument that there was only limited publication before March 4, 1989. Ex. 13. This shows that the commercial was scheduled to air on 35 spots on a single channel before 3/1/89 (35 out of 236 spots aired during the year February 1989--February 1990). This document purported to include all airings of the first commercial in Chile. The document reveals a substantial number of airings of the commercial. The fact that the airings occurred from February 19, 1989--February 5, 1990 is inconsistent with test airing.

• Mr. Cassis had no knowledge as to whether the tape of the commercial was ever returned to P & G or to Leo Burnett-Chile by the television stations. Cassis Dep. at 77.

• P & G's initial copyright application was rejected by the U.S. Copyright Office on the ground that the work was published prior to March 1, 1989 without a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

copyright notice. Ex. YV (P & G Copyright Office correspondence). P & G filed new copyright applications for each of its egg demonstration commercials. Each of these applications fails to state a date of first publication. Ex. YV. (P & G Copyright Office correspondence). [FN5]

FN5. By letter dated December 12, 1996, P & G's lawyers attached a new application for "Huevo Nuevo," leaving out the date of first publication and stating that there had only been a limited publication of the work "Huevo Nuevo" because the work had been distributed under restrictive conditions. P & G presented no evidence at trial or to the Copyright Office of such restrictive conditions.

V. *VARIATIONS IN THE P & G EGG DEMONSTRATION COMMERCIALS*

**\*10** P & G has presented egg demonstrations in television commercials with substantial variations from the list of executional elements that P & G included in paragraph 37 of its Amended Complaint:

---

1. "Hand from left side of screen holding [egg] shell with no other face or body parts shown"

---

| Hand holds egg from left side of screen: | Hand holds egg from center or bottom of screen: |
|---|---|
| . Canada "Crest Egg" | . Chile "Crest Huevo Nuevo" |
| . China "Endorsement" | . Colombia "Egg" |
| . China "Inside Out" | . Egypt "Father & Son" |
| . Turkey "Father & Son" | . Lebanon "Father & Son" |
| . Vietnam "Egg: 30" | . Mexico "Egg Demo" |
| | |
| | . Peru "Demo Huevo" |
| | . Poland "Presenter" |
| | . Russia "Blendax-1" |
| | . Turkey "Mother & Daughter" |
| | . U.S. "Family Egg" |

---

| Hand enters from right side of screen: | No hand shown at all: |
|---|---|
| . Germany "Hungarian Presenter" | . Spain "Egg" |
| . Hungary "Hungarian Presenter" | . Venezuela "Huevo 1" |
| . Lebanon "X-Ray" | . Venezuela "Huevo Consultorio" |
| . U.S. "Eggberto" | |
| . U.S. "Egg-Speriment" | |

---

| Torso shown: | Head and torso shown: |
|---|---|
| . Chile "Crest Huevo Nuevo" | . Greece "Devastating" |
| . Colombia "Egg" | . Lebanon "X-Ray" |
| . Peru "Demo Huevo" | . U.S. "Eggsperiment" |
| . U.S. "Family Egg" | . U.S. "Eggberto" |

---

---

2. "Black line dividing the shell into two halves"

---

Solid red line on short axis:    Dotted black line on short axis:

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                        Page 10
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
. Chile "Crest Huevo Nuevo"        . Canada "Crest Egg"
. Colombia "Egg"                   . China "Endorsement"
. Egypt "Father & Son"             . China "Inside Out"
. Germany "Hungarian Presenter"    . Lebanon "X-Ray"
. Greece "Devastating"             . U.S. "Eggberto"
. Hungary "Hungarian Presenter"    . U.S. "Egg-Speriment"
. Lebanon "Father & Son"           . Vietnam "Egg: 30"
. Mexico "Egg Demo"
. Peru "Demo Huevo"
. Poland "Presenter"
. Russia "Blendax 1"
. U.S. "Family Egg"
---------------------------------------------------------------
Solid red line on long axis:    Solid black line on short axis:


. Venezuela "Huevo 1"              . Turkey "Mother & Daughter"
. Venezuela "Huevo Consultorio"
---------------------------------------------------------------
Red slash on one side only:     Solid blue line on short axis:

. Turkey "Father & Son"            . Spain "Egg"
---------------------------------------------------------------



----------------------------------------------------------------
       3. "Red marking on the right half of the shell"
----------------------------------------------------------------
Red "x" drawn by hand:          Red PROFIDEN logo:

. Chile "Crest Huevo Huevo"        . Spain "Egg"
. Colombia "Egg"
. Mexico "Egg Demo"
. U.S. "Family Egg"
---------------------------------------------------------------
Large red dot drawn by hand:    Black BLEND-A-MED or

                                BLENDAX logo:
. Turkey "Father & Son"            . Germany "Hungarian Presenter"
                                   . Hungary "Hungarian Presenter"
                                   . Poland "Presenter"
                                   . Russia "Blendax 1"
---------------------------------------------------------------
Multi-colored CREST logo:       Black "Crest" in child's printing:

. Canada "Crest Egg"               . U.S. "Eggberto"
. China "Endorsement"              . U.S. "Egg-Speriment"
. China "Inside Out"
. Lebanon "X-Ray"
. Vietnam "Egg: 30"
---------------------------------------------------------------
Multi-colored "Crest" in child's  "F" on one side, "MFP" on other:
printing:                          . Venezuela "Huevo 1"
. Egypt "Father & Son"
. Lebanon "Father & Son"
---------------------------------------------------------------
IPANA logo:                      "F" on one side, other side blank:
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                          Page 11
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
. Turkey "Mother & Daughter"      . Venezuela "Huevo Consultorio"
-----------------------------------------------------------------
Red "crest" in lower-case type:


. Greece "Devastating"
. Peru "Demo Huevo"
-----------------------------------------------------------------




-------------------------------------------------------------------------
       4. "Toothbrush brushing toothpaste on the marked side of the shell"
-------------------------------------------------------------------------
Toothpaste squeezed directly onto    One side of egg shown completely
egg, then brushed:                   covered in toothpaste; no brushing
                                     shown (toothbrush only shown
. Chile "Crest Huevo Nuevo"          removing toothpaste during rinse):
. Colombia "Egg"
. Germany "Hungarian Presenter"      . Canada "Crest Egg"
. Hungary "Hungarian Presenter"      . China "Inside Out"
. Lebanon "X-Ray"                    . U.S. "Eggberto"
. Mexico "Egg Demo"                  . U.S. "Egg-Speriment"

. Peru "Demo Huevo"
. Poland "Presenter"
. Russia "Blendax 1"
. Vietnam "Egg: 30"
-------------------------------------------------------------------------
Toothpaste squeezed onto toothbrush  One strip of toothpaste shown on
first, then brushed on egg:          egg, no brushing shown:


. Turkey "Father & Son"              . China "Endorsement"
-------------------------------------------------------------------------
No squeezing of toothpaste shown,    CREST toothpaste squeezed directly
only brushing:                       onto side marked "F"; egg flipped
                                     and toothpaste squeezed onto other
. Egypt "Father & Son"               side (brushing shown only during
. Greece "Devastating"               rise):
. Lebanon "Father & Son"
. Spain "Egg"                        . Venezuela "Huevo 1"
. Turkey "Mother & Daughter"         . Venezuela "Huevo Consultorio"
. U.S. "Family-Egg"
-------------------------------------------------------------------------
Unidentified toothpaste squeezed and

then brushed onto unmarked side of
egg, then CREST toothpaste brushed
(but not squeezed) onto marked side:

. Lebanon "X-Ray"
-------------------------------------------------------------------------




---------------------------------------------------------------------------
   5. "Placing the shell, with thin wire tongs, in a glass beaker filled
   with a clear acid solution"
---------------------------------------------------------------------------
Egg placed into container with       Egg placed into container with
laboratory-style pincers:            tweezers:
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
. Chile "Crest Huevo Nuevo"           . Peru "Demo Huevo"
. Colombia "Egg"                      . Spain "Egg"
. Mexico "Egg Demo"
. U.S. "Family Egg"
-----------------------------------------------------------------------------
Egg placed into container with        Egg dropped into container by
                                       hand:
kitchen-style tongs:                  . Egypt "Father & Son"
. Germany "Hungarian Presenter"       . Lebanon "Father & Son"
. Hungary "Hungarian Presenter"       . Turkey "Father & Son"
. Poland "Presenter"                  . Turkey "Mother & Daughter"
. Russia "Blendax 1"                  . U.S. "Egg-Speriment"
-----------------------------------------------------------------------------
Egg placed into container with        Egg not shown being placed into
clamp:                                container at all:

. Canada "Crest Egg"                  . Greece "Devastating"
. China "Endorsement"                 . Lebanon "X-Ray"
. China "Inside Out"
. Vietnam "Egg: 30"
. Venezuela "Huevo 1"
. Venezuela "Huevo Consultorio"
-----------------------------------------------------------------------------
Egg placed into container by hand     Kitchen drinking glass used
                                       instead
and removed with spoon:               of beaker:


. U.S. "Eggberto"                     . Egypt "Father & Son"
                                      . Lebanon "Father & Son"
-----------------------------------------------------------------------------



-------------------------------------------
    6. "Removing the shell from the acid"
-------------------------------------------
Egg not shown being removed from
acid:

. Egypt "Father & Son"
. Greece "Devastating"
. Lebanon "Father & Son"
. Lebanon "X-Ray"
. Turkey "Mother & Daughter"
. U.S. "Egg-Speriment"
-------------------------------------------



-----------------------------------------------------------------------------
    7. "Tapping the shell with a metal rod on each side of the black line"
-----------------------------------------------------------------------------
Plain, straight metal rod used to tap:   Ball-tipped metal rod used to tap:

. Chile "Crest Huevo Nuevo"              . Canada "Crest Egg"
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                        Page 13
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
. Colombia "Egg"                        . China "Endorsement"
. Greece "Devastating"                  . China "Inside Out"
. Germany "Hungarian Presenter"         . Vietnam "Egg: 30"
. Hungary "Hungarian Presenter"
. Lebanon "X-Ray"
. Mexico "Egg Demo"
. Peru "Demo Huevo"
. Poland "Presenter"
. Russia "Blendax 1"
. Spain "Egg"
. Turkey "Father & Son"
. Turkey "Mother & Daughter"
. Venezuela "Huevo 1"
. Venezuela "Huevo Consultorio"
. U.S. "Family Egg"
----------------------------------------------------------------------------

Tapered end of spoon used to tap:      Child's finger used to tap:

. U.S. "Eggberto"                       . Egypt "Father & Son"
. U.S. "Egg-Speriment"                  . Lebanon "Father & Son"
----------------------------------------------------------------------------
```

**\*11** Exs. 71, 71A.

VI. *THE DEVELOPMENT OF COLGATE'S SEASHELL COMMERCIAL; THE "RELAUNCH" PROGRAM*

 In 1994, Colgate planned an anti-cavity "relaunch" of advertising for COLGATE toothpaste around the world in order to keep up to date with consumers, and to develop a new "reason" for consumers to buy COLGATE. Tr. 801:11--802:10 (Loten); Ex. UN (Colgate internal memorandum). COLGATE had last been relaunched in 1991. Tr. 801:21-22 (Loten). The 1994 relaunch plans included plans for new packaging, a new flavor and new advertising. Tr. 801:25--802:6 (Loten); Ex. UN (Colgate internal memorandum).

 Colgate's first step towards developing new advertising for the relaunch was to select an advertising concept, that is, an encapsulation of the main message about the brand: the functional and emotional benefits the product will bring, and the reason why a consumer should buy the product. Tr. 802:2-16 (Loten). Colgate began this process by conducting an historical review of concepts that had been successful in the past. Tr. 803:3-17 (Loten); Exs. UM, UN (Colgate May 1994 memoranda). The "Plaque Acids" concept--the idea that COLGATE fights or resists the plaque acids that normally occur in the mouth and which cause cavities, so that one's teeth will be stronger-- had been tested and "widely appreciated" by consumers in 1993 in the United Kingdom. [FN6] As a result, the "Plaque Acids" concept made it onto the list of a number of possible concepts for the relaunch. Ex. TP; Tr. 803:18-- 804:12 (Loten).

 FN6. P & G never used egg demonstration commercials in the United Kingdom. The egg demonstration commercials also were not used in the Philippines or Australia, two countries heavily involved in the relaunch effort. *See supra* pp. 4-5 (Stipulated Facts ¶ 21).

 In keeping with Colgate's usual practice, geographic subsidiaries were selected to be "lead countries" for development of the relaunch, including the development of advertising. The lead countries were to provide their local point of view on what they thought were the right concepts to pursue. Tr. 804:17-24 (Loten). Colgate's Global Business Development Group ("Colgate GBD") chose Mexico (CP Mexico), the Philippines (CP Philippines), and Australia (CP Australia), as the lead countries because Colgate has a significant business presence in each of them, and the businesses in these countries would thereby have the resources for and the interest in doing the research. Tr. 805:19-- 806:11 (Loten).

 Because of internal concern about changing anything about COLGATE anti-cavity toothpaste, the next step was for Colgate GBD and the lead countries to decide precisely which conceptual platforms would be tested and how the research would be conducted. Tr. 806:18--807:1 (Loten). After much discussion, the concepts were narrowed to seven. Tr. 807:2-21 (Loten). The lead countries then qualitatively tested these seven concepts, including "Plaque Acids," with consumers. These qualitative tests used consumer focus groups to determine

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

which concepts consumers liked best and most understood. Tr. 808:3-16 (Loten); Ex. TP (Colgate internal memorandum). In Mexico and the Philippines, the most successful concepts with consumers were "Plaque Acids" and "Anti-Germs," Exs. SZ (Mexico study), OT (Phillipines study). CP Australia found that "Plaque Acids" and "Natural Fluoride Booster" worked best with consumers. Ex. TA (September 1994 Australia study); Tr. 810:7--812:24 (Loten).

**\*12** Based upon the results of the first round of qualitative testing, a second round of qualitative consumer studies testing the five most successful concepts, including "Plaque Acids," was conducted in each of the three lead countries. Ex. UL (Colgate internal memorandum). Once again, focus groups were used so that consumers could decide which concept was the best for the relaunch. Tr. 812:25--813:5 (Loten). In Mexico, "Plaque Acids" was the "winning concept" along with the "Anti-Germs" concept. Ex. UI (Colgate internal facsimile). In the Philippines, "Plaque Acids" and "Calcium Booster" were the winning concepts. Ex. TK (Colgate October 1994 facsimile). In Australia, "Plaque Acids" and "Natural Fluoride Booster" were the winning concepts. Ex. SL (Colgate internal report). "Plaque Acids" was the most universally well received concept. Tr. 813:6--815:3 (Loten).

 A third quantitative round of tests, consumer surveys, was performed to test the concepts. Tr. 815:4-9, 816:11-20 (Loten). CP Mexico, CP Philippines and CP Australia each conducted local quantitative testing of the "Plaque Acids" concept, comparing it to Colgate's then-current advertising concept in each of these countries. The results of this testing recommended the use of the "Plaque Acids" concept. Accordingly, "Plaque Acids" was chosen as the relaunch concept. Ex. UE (Colgate internal report); Hartman Dep. at 37-38. The "Plaque Acids" concept, as tested in December-January 1995, is found in Ex. UE (Colgate internal report). Tr. 817:2--820:17 (Loten).

 Having decided on the relaunch concept, a creative brief was drafted and sent out to the lead countries for them to develop advertising based on this new concept. [FN7] Tr. 1308:22--1309:3 (Loten); Ex. UB (Colgate global creative brief). The lead countries were expected to each develop one "creative idea" (about the advertisement in which a demonstration could be embedded) and one "demonstration idea" (about how to conduct the demonstration itself). Tr. 821:5--823:6 (Loten). Each lead country then began its own research on creative ideas and demonstration ideas. Tr. 822:21--823:23 (Loten).

> FN7. As is usual, the creative brief described the competitive environment, including a reference

to the commercials of SIGNAL and P & G. However, SIGNAL and P & G commercials were not attached to the creative brief and sent to the lead countries. Tr. 821:23--822:9 (Loten).

 While "Plaque Acids" was found to be the best concept, Colgate also found in June 1995 that Philippine consumers had "no clear understanding of what 'plaque acids' are." Ex. UQ (Colgate internal memorandum). Therefore, it was determined that it was particularly important to insert a demonstration into the COLGATE advertising to make the "Plaque Acids" concept more understandable. Colgate's prior use of demonstrations had been "particularly effective in communicating to a consumer," and the use of a demonstration was also in line with "general marketing principles." Colgate reaffirmed the importance of using a demonstration in June of 1995. Exs. PE (Colgate internal correspondence); Tr. 823:12--824:14 (Loten). [FN8]

> FN8. Television commercial advertising campaigns often create a "donut," namely a story or creative idea (the donut) that permits use of various demonstrations (the hole) within it. This method permits both the use of the same demonstration in different markets, if the company so chooses, and the easy substitution of one demonstration for another within a given advertisement. It also permits the demonstration to be centrally filmed with proper legal and technical support and with proper claim substantiation. Tr. 824:23--825:6 (Loten).

 In June 1995 Mexico (Ex. ABH), Australia (Ex. ABK) and the Philippines (Exs.OW, ABI, ABJ) all developed various demonstrations for the "Plaque Acids" concept. Tr. 825:7--828:16 (Loten). Each of the three Colgate subsidiaries conducted various field study group tests and scientific tests to narrow down the concepts they had developed so that each could propose a single demonstration. Tr. 823:20-23, 830:15--831:9 (Loten); Ex. ABL (Colgate internal facsimile with storyboards). One of the storyboard demonstrations developed by the Philippines for the "Plaque Acids" concept was a seashell demonstration in which a mother and child perform the demonstration. [FN9] A sample creative board shows two seashells, a beaker with a weak acid solution, and dental picks used to test the strength of the seashells by scraping them. After focus group criticism, scraping was changed to tapping. [FN10] Another demonstration was an eggshell demonstration using a mother and child, two eggs and two beakers with a weak acid solution, in which the eggs were pressed together after being removed from the solution to show that the treated egg was hard and the untreated egg was soft. Ex. OW (storyboard); Tr. 827:21--

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 15
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

828:10 (Loten). Based on the results of its testing, CP Australia proposed a chalk demonstration, CP Philippines proposed a seashell demonstration and a chalk demonstration, and CP Mexico proposed a paper demonstration, among others. Tr. 830:25--832:21 (Loten); Ex. ABL. On September 11, 1995, Carl Hartman, account executive for Y & R in New York, proposed further demonstrations: a litmus paper demonstration and another demonstration called "dropping acid." Tr. 833:2-- 834:13 (Loten); Exs. SJ (Y & R internal memorandum), UU (storyboards).

FN9. The Philippines is a country in which P & G has not shown its egg demonstration. Tr. 383:7-11 (Pepper).

FN10. Loney, of Y & R Australia, testified that she reviewed the demo boards on a frame by frame basis and made improvements (*i.e.,* tapping with a mirror instead of scraping with a dental pick) and had never seen a CREST egg demo and had not discussed the CREST egg demo with Carl Hartman of Y & R. Loney Dep. at 75-76, 81-82, 95, 102; Ex. 166.

*13 Colgate's Research and Development department ("Colgate R & D") in the Philippines conducted feasibility studies on the seashell demonstration to determine if it could be supported scientifically and whether it was making a substantiated claim. Tr. 826:6--827:14 (Loten); Exs. OV (Colgate internal memorandum), OW (storyboards). In September 1995 Colgate R & D substantiated the basic "Plaque Acids" concept, which is that fluoride prevents the tooth decay caused by plaque acids. Colgate's Dr. Mordarski had researched the existing dental literature, and Colgate R & D also did substantial experimentation on this issue, including testing which showed that COLGATE's form of fluoride, MFP, is effective in this regard. Exs. U.S. (Colgate R & D report), UV (Mordarski laboratory notebook); Tr. 893:19--899:2 (Mordarski).

In September 1995, consumer tests of the demonstrations proposed by the various groups were tested against each other, and against Colgate's existing demonstrations. [FN11] The seashell demonstration tested as the best demonstration for a number of reasons. In September and November 1995, seashells were found to be a better analogy to teeth than chalk (one of the other materials used in the tested demonstrations), and the seashell demonstration was found to be the only one that clearly communicated COLGATE's anti-cavity benefit to all consumer types. Tr. 834:24--837:7 (Loten); Exs. TD, TU. The Australian consumers considered the seashell to be hard like a tooth, as well as an appropriate aesthetic

representation of a tooth. The demonstration was found to be more contemporary and entertaining than the existing chalk demonstration, despite CP Australia's expectation to the contrary. Ex. OX (Haxworth memorandum).

FN11. Also, in September 1995 Colgate formed a task force to recommend better processes and better ways of writing advertising demonstrations for Colgate. This task force was created for all products of the company--not merely for dentifrices--and was created because Colgate perceived that demonstrations were a key element of its advertising. The "Plaque Acids" demonstrations were to have been the first pilot study for the task force. The task force itself did not develop demonstrations at any point in time. Tr. 1688:3--22 (Roskothen); Ex. RL (task force research) at CP-1229.

Meanwhile, Colgate's joint venture in China determined that it wished to preempt CREST's marketing strategy in China. On October 24, 1995, Mr. Fogarty, Vice President of Marketing of Colgate's Asia Pacific Division, notified Michael Roskothen, Colgate's President of Oral Care, that Colgate Quang Zhou Company Limited had developed a plan to preempt CREST by producing a COLGATE egg demo spot. He stated, however:

I went through with Steve Lister [head of Colgate's Asia Pacific Division] the Crest Defense Plan which Chester [Fong, Colgate's General Manager in China] and team took him through last week in Hong Kong and which you are reviewing this week. I also saw his suggestion to preempt Crest by producing a CDC [Colgate] egg demo spot. Knowing that use of egg demo is a contentious issue, let me raise another alternative. Australia has gotten very positive feedback on the sea shell demos developed for the plaque acids story. I understand documentation on this is forthcoming, but why not use this demo in China in our existing commercial or shoot a new one? The basic idea of Colgate toughening a surface is comparable to egg shell and would significantly reduce the impact of egg shell were P & G to use it.

Ex. 128; Tr. 1224-26 (Fogarty).

*14 Chester Fong, of Colgate Quang Zhou, testified that the use of the seashell demo was intended to reduce the likely impact of the anticavity message of CREST's eggshell demo. Tr. 1418:21--1419:4 (Fong). Colgate planned other preemptive moves such as obtaining official endorsements and using consumer promotions to create consumer overstocking. Tr. 1425:7-15 (Fong). Fong and others testified that the seashell demo was intended to preempt CREST's egg demo. Tr. 1477:7-- 1478:11 (Fong), 1531:6--1532:15 (Tonogbanua, Group

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                           Page 16
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

Account Director of Y & R Phillipines and DY & R-China), 1337:12-25 (Hartman); Exs. 145, 150, 165.

 Colgate decided to use a seashell demonstration based on its own development and consumer research, with knowledge of the public versions of the egg demonstration in school materials around the world, and of P & G's egg commercials, but the evidence does not demonstrate that Colgate determined to copy P & G's egg commercials. Ex. TD.

 During the November 1995 testing in the Philippines, consumers were skeptical as to whether the two seashells on the early storyboards for the seashell demonstration were of equal thickness, and thus whether the cracking of the untreated seashell was genuinely attributable to the absence of treatment with COLGATE toothpaste, or instead to the differences in the seashells. Exs. TE (Hartman memorandum), RR (Colgate internal memorandum). In November 1995, Colgate Guangzhou also tested in China its two-seashell storyboards against P & G's egg commercial as shown in Vietnam. Both tests led defendants to conclude that the demonstration would be more credible to consumers if it were performed on a single seashell--divided between treated and untreated surfaces--rather than on two seashells. Ex. RR (Colgate internal memorandum); Tr. 837:4-5, 837:23--839:12 (Loten), 1310:14-23 (Hartman).

 After Colgate decided to use a single seashell experiment, Edward Pollack, Y & R's International Creative Director for the Colgate international account and the Producer of the filming of the seashell demonstration, also independently concluded, based upon his own experience and expertise in producing television commercials, that it would be preferable to conduct and depict the demonstration using a single seashell rather than two seashells. Pollack's conclusion was based upon the very short amount of time available in the commercial for depicting the demonstration, the fact that performing the demonstration with two seashells would require more time than with one seashell, the fact that Pollack wanted to shoot the demonstration with as tight a close-up perspective as possible for a clearer, more effective communication, and the fact that additional objects and actions would need to be photographed if two seashells were used. Tr. 945:19--946:6, 972:9--973:10 (Pollack), 1310:24--1311:8, 1314:12-21 (Hartman).

 David Deahl, President of Big Deahl Productions, the Chicago production company which filmed the COLGATE seashell demonstration, and the Director of the filming of the seashell demonstration, agreed with Pollack's conclusion that it was preferable to conduct and depict the demonstration using a single seashell rather

than two seashells. Deahl concluded that a single seashell demonstration was more credible than a two seashell demonstration. Deahl also preferred a single seashell demonstration because it permitted a tight close-up of the demonstration; using two seashells would reduce by half the degree of closeness that could be obtained, and he believed this would in turn diminish the graphic and visual impact by half. Tr. 1356:24--1358:6 (Deahl).

 *15 The decision by Colgate and Y & R to use one seashell as opposed to two was grounded upon consumer research in the Philippines, confirmed by consumer research in China, and also based upon the independent judgment of the Producer and of the Director of the commercial. There was no showing that it was based on a desire to copy P & G's use of a single egg in its commercials, although Y & R advertising executives acknowledge comparing the COLGATE storyboard to the CREST egg demo as aired in Vietnam and Romania. Tr. 1319:11--1320:4 (Hartman), 1539:18--1541:15 (Tonogbanua); Ex. 165 at YR 4163.

 The Philippine consumer research also indicated that the acid bath in the demonstration had to be labeled with a "super" because consumers did not understand what it was, and that tapping the seashells was perceived by consumers a sign of strength, while scraping--shown on early storyboards as the means of showing the difference between treated and untreated surfaces exposed to acid--was a sign of cleaning, not of strength. Ex. RR; Tr. 837:5-6, 840:7- 23 (Loten). Colgate chose to use tapping based on consumer testing, its long history of using tapping in its commercials, [FN12] and the long history in the industry of using tapping as a method of indicating to consumers the strength of the surface of a tooth or of the proxy for a tooth. There is no showing that Colgate chose to use tapping based on a desire to copy the tapping in P & G's commercials. [FN13]

     FN12. Colgate has previously used tapping in its
     commercials. Exs. ZB (various Colgate
     commercials showing tapping as sign of
     strength), ZC (various Colgate "Gardol"
     commercials showing tapping--including tapping
     of teeth with a dental mirror--as sign of
     strength); Tr. 840:24--842:12 (Loten).

     FN13. Further substantiating the conclusion that
     there was no intentional copying of the tapping
     element, the tapping in the COLGATE seashell
     commercials conveys the message that without
     COLGATE's fluoride the acids would cause the
     tooth enamel to be weak enough to break,
     whereas, in contrast, the P & G eggshell
     commercials convey the message that without

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                  Page 17
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

CREST's fluoride the acids would cause the tooth enamel to become soft.

Colgate R & D in New York started research to confirm the finding of Colgate R & D in the Philippines that the seashell demonstration was scientifically sound. Exs. UV (Mordarski laboratory notebook), UW (Colgate internal report). The initial studies were performed with two seashells--one treated and one untreated--using sand dollar and scallop seashells, both of which worked successfully. Ex. UV; Tr. 900:18--904:19 (Mordarski). When it was decided to use a single seashell, Dr. Mordarski, a scientist at Colgate's Research Center in Piscataway, New Jersey, scientifically tested seashells for their suitability in a single seashell demonstration. To collect seashells for the experiment, Dr. Mordarski went to a retail seashell store and viewed a variety of different types and colors of seashells. Tr. 903:5-11 (Mordarski); Ex. QO (photo of array of shells). She then chose and purchased a number of different types of white seashells including snail seashells, ovula ovum (cowrie) seashells, and small cowrie seashells. Tr. 902:13--903:18 (Mordarski). She was specifically looking for white seashells because it was her understanding that Colgate wanted to use a seashell that would resemble a tooth in color. Tr. 903:12-18 (Mordarski). Dr. Mordarski tested a variety of seashells, including a sand dollar, a cowrie seashell, a snail shell, a clam shell and a cockle shell, using the experiment protocol. In these single seashell experimental tests, Dr. Mordarski found that only the cowrie seashell was technically suitable for demonstrating COLGATE's protection against acid attack. The other seashells were unsuitable because they were too thick or asymmetrical, or because they failed to show differences between the treated and untreated surfaces. Ex. RW (Colgate internal memorandum); Tr. 902:13--911:12 (Mordarski). [FN14]

FN14. Dr. Mordarski also found that the cowrie seashell would not work in a two seashell experiment because she could not determine whether two cowrie shells were similar enough to one another to conduct a two seashell experiment. As Dr. Mordarski explained, the cowrie is a very complex seashell and it is impossible to measure or predict the equal thickness of any two shells that might be used in a test. Tr. 934:16-- 935:18, 937:17--25 (Mordarski).

**\*16** Pollack and Deahl also independently tested different seashells. When Pollack learned that Colgate had hired Y & R to produce the COLGATE seashell demonstration for insertion into COLGATE commercials, Pollack asked Big Deahl to purchase a variety of different types of seashells

to determine which, if any, could be used in a filmed demonstration. Tr. 947:23--951:12 (Pollack), 1351:2--1353:8 (Deahl). Big Deahl ordered a variety of different types of seashells through the Chicago branch of a New York-based seashell retailer and wholesaler known as The Shell Cellar. The Shell Cellar sent Deahl a collection of different inexpensive seashells, including cowrie and conch seashells. Tr. 947:23--951:12 (Pollack), 1351:2--1353:8 (Deahl). Big Deahl and Pollack considered for use in the seashell demonstration approximately thirteen different types of seashells received from The Shell Cellar. They initially excluded certain seashells because they were not white or were inappropriately shaped. They tested the remaining seashells according to the experiment protocol provided by Colgate. Exs. PH, PI, PJ, PK, PL, PM, PN, PO, PP, PQ, PR, PS, PT (pictures of seashells received from The Shell Cellar and tested by Big Deahl and Pollack). In these experiments only the cowrie and conch seashells visibly and reliably yielded the desired result, namely that the untreated portion of the seashell cracked when tapped after exposure to acid, while the treated portion of the seashell remained intact when tapped. Tr. 947:23-- 951:12 (Pollack), 1351:2--1353:8 (Deahl). They achieved more consistent results with the cowrie seashell than with the conch seashell. Tr. 1355:1-16 (Deahl).

Colgate R & D continued development of its own protocol for the seashell demonstration. In doing so, Colgate R & D optimized different variables such as pre-incubation time for the seashells and consistency of the COLGATE toothpaste slurry solution. Tr. 935:19--937:11 (Mordarski). Other procedural elements of the protocol were developed, such as how to divide the seashell between treated and untreated sides. Ex. RA (Mordarski memorandum). Big Deahl and Y & R asked Dr. Mordarski to look at other seashells to see if they could be used. Specifically, Dr. Mordarski was asked to determine whether the single seashell protocol would work on a scallop shell and a conch shell. Dr. Mordarski found that the experiment did indeed work using a conch shell, but did not work on a scallop shell. Tr. 910:23--911:10 (Mordarski); Ex. UV (Mordarski laboratory notebook). Of all the seashells tested by Dr. Mordarski, she concluded that the cowrie and conch seashells were the only seashells that worked properly in a one seashell demonstration. Tr. 911:5--912:21 (Mordarski); Ex. UV (Mordarski laboratory notebook). As between the two seashells, the cowrie seashell tested better technically due to its greater symmetry and uniformity of thickness in comparison to the conch shell. Ex. UV. After both the cowrie and conch seashells were found to be technically and scientifically suitable under the scientific protocol for the COLGATE seashell demonstration, defendants decided to film the COLGATE seashell demonstration

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

with both cowrie and conch seashells so as to avoid incurring further production expense and additional delay if for any reason Colgate later decided that it preferred, in one market or in all markets, to use one seashell instead of the other. Tr. 844:22--845:13 (Loten), 951:11--952:1 (Pollack).

**\*17** Upon learning of the selection of the cowrie and conch seashells for the COLGATE seashell demonstration, but before the demonstration was filmed, Y & R and Colgate personnel in New York and in local markets discussed which of the two was visually better for inclusion in COLGATE toothpaste commercials. Certain markets preferred one seashell over the other based upon such factors as (1) which looked more akin to seashells that are indigenous to those markets and thus more familiar to television viewers, and (2) which type of seashell subjectively appeared to more closely resemble a human tooth. Tr. 844:22-- 845:13, 848:9--20 (Loten), 1314:22--1315:16 (Hartman).

Colgate, Y & R, and their production company, Big Deahl Productions, met on January 19, 1996 before the first shoot of the demonstration. The meeting covered in detail important topics ranging from the production schedule to the demonstration protocol. Ex. SW (pre-production meeting booklet); Tr. 847:16-23 (Loten), 962:12--963:25 (Pollack). The demonstration protocol which was finalized during the January 19, 1996 meeting included the following steps:

a. The seashell was to be divided into two parts using a solid black line to clearly differentiate the treated and untreated sides of the seashell. This was deemed necessary to clearly convey the message that the treated side is different from the untreated side. Defendants experimented with different methods of dividing the shell. For example, defendants tried using red nail polish to draw the dividing line because of Colgate's identification with the color red, but the polish came off when the seashell was soaked in acid. Using a dotted line to divide the seashell was also considered, but it was decided that the amount of time and effort necessary to apply such a dividing line to the many shells being prepared for the shoot made this impractical. It was finally decided to use a strip of black adhesive tape which was available at the studio. Tr. 976:22--977:16 (Pollack), 1364:14--1365:20 (Deahl). The unrebutted testimony was that the use of a dividing line, and the specific type of dividing line used, was independently developed. There was no evidence that the use of the dividing line was deliberately copied from P & G.

b. The treated side of the seashell was to be marked with a red "C" in the distinctive COLGATE brand logotype and color. Marking was chosen to identify the

treated side of the seashell and the specific mark was chosen to introduce additional COLGATE branding to the demonstration. The entire red COLGATE logo did not fit onto the treated half of the cowrie seashell when the seashell was divided along its longer axis, which is why a "C" was used. Tr. 979:20--981:4, 981:12-15, 1040:25--1041:8 (Pollack), 1366:3--1368:15 (Deahl). The unrebutted testimony was that the concept of marking, and the specific type of marking used, were independently developed and were not copied from P & G.

c. A slurry solution comprised of COLGATE toothpaste and water was to be applied to the treated side of the seashell using a red diamond-head COLGATE toothbrush. A toothbrush was chosen because it would reaffirm to the consumer the believability of the seashell as a proxy for a tooth and because consumers would expect toothpaste to be applied using a toothbrush. The use of a red diamond-head COLGATE toothbrush was chosen to help strengthen brand recognition. Tr. 983:12--984:23 (Pollack), 1368:16--1370:20 (Deahl). The unrebutted testimony was that the use of a toothbrush to brush on toothpaste and the specific toothbrush used were independently chosen. There is no evidence that the use of the toothbrush was deliberately copied from P & G.

**\*18** d. Tongs were to be used to place the seashell in the container of acid. Tongs were chosen because they were the most obvious functional tool that would not distract the viewer from the metaphor of the seashell as a tooth. Tongs also were chosen because they lent an image of scientific credibility to the demonstration. Furthermore, tongs allowed for quick and controlled immersion of the seashell into the container and removal of the seashell from the container, and tongs did not cover so much of the seashell's surface as to obscure the seashell from the camera. Tr. 985:21--987:14 (Pollack), 1371:4-25 (Deahl). The unrebutted testimony was that tongs were independently chosen, and there is no evidence that the tongs were chosen to copy the wire tongs in P & G's commercials.

e. A plain beaker without volumetric markings was to hold the acid bath in which the seashell would be placed. The plain beaker was chosen because there was no more appropriate container which would satisfy a number of important criteria. The container needed to be clear and also had to be large enough to hold the acid and the seashell, but at the same time small enough to maintain appropriate proportions and visibility for the camera. The container would lend an image of scientific credibility to the demonstration without the overly clinical image that would have been created by using a beaker with volumetric markings. Tr. 988:8-24 (Pollack), 1373:14--1374:2 (Deahl). The unrebutted testimony was that a plain beaker was independently

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

Page 19

chosen, and there was no evidence that the beaker was intentionally copied from P & G's commercials, which used a beaker with markings.

f. The seashell was to be removed from the acid in order to stop the corrosive effect of the acid on the seashell. This was the logical next step in the depiction of the experiment, and moreover, it was impossible to administer the physical tapping challenge effectively while the seashell was in the beaker full of acid. [FN15] The decision to visually depict the removal eliminated the need for having a jump cut from the seashell immersed in the beaker to the seashell outside of the beaker or bowl, which could have interrupted the visual continuity of the demonstration. Tr. 989:23--990:14 (Pollack), 1375:3-11 (Deahl). The unrebutted testimony was that the removal of the seashell from the acid was independently developed, and there was no evidence that this removal of the seashell was copied from the removal procedures used in P & G's commercials.

FN15. While this removal scene was filmed, approximately half of the Colgate commercials do not actually use this removal scene. Ex. YD (compilation of COLGATE seashell demonstration commercials).

g. To test the treated and untreated sides of the seashell, each side was to be tapped. Tr. 1376:7-22 (Deahl). In focus group research, consumers had indicated that tapping was a sign of strength, and Colgate had historically used tapping as a test of strength. Ex. RR (Colgate internal memorandum). Finally, tapping seemed to be the most visually appropriate way of administering the challenge, given that tapping allowed for a quick and dramatic visual presentation. Tr. 991:10--992:6 (Pollack), 1376:7-22 (Deahl). The unrebutted testimony was that tapping was independently chosen, and there was no evidence that the tapping was copied from P & G.

*19 h. When the untreated portion of the seashell was tapped, the surface of the seashell was to crack, creating a hole through to the interior of the seashell. Y & R and Big Deahl experimented extensively with different seashells and different ways of tapping the treated and untreated surfaces to yield holes in the untreated surface that would be sufficiently large for effective communication, without being so large as to startle or frighten consumers. Tr. 993:4-17 (Pollack), Ex. AAF (seashell demonstration test footage). The unrebutted testimony was that using tapping to create a hole in the seashell was independently developed, and there was no evidence that the tapping or the creation of the hole in the seashell was copied from P & G. P & G commercials did not show a hole in the eggshell, but only a softness in the eggshell.

i. Tapping the seashell with a dental mirror was chosen to portray the differing strength of the treated and untreated surfaces of the seashell because Colgate and Y & R found this to be the most dramatic and visually appropriate way of showing the strength of the surface. A dental mirror historically has been used in toothpaste commercials because it fosters the image of a tooth and tapping with the mirror reminds people of the tapping a dentist does on their teeth during an examination. Tr. 994:5-24 (Pollack), 1376:23--1377:23 (Deahl), 1694:17--1695:7 (Roskothen). The unrebutted testimony was that tapping with a dental mirror was independently chosen, and there was no evidence that the tapping with a dental mirror was copied from P & G.

All of these decisions were made during meetings, with the input of various people, after experimenting with different approaches and with consideration of the concerns of the people at the meetings. Tr. 1377:19--1380:24 (Deahl).

Pollack and Deahl did view a reel of competitive commercials for other toothpastes before filming the seashell demonstration. This is standard advertising practice done to understand what is being done in the marketplace. Tr. 964:11--965:2 (Pollack). A P & G egg demonstration commercial was among these competitive commercials. Pollack and Deahl testified that this was the first time either of them had seen a P & G commercial with an egg demonstration, and both stated they did not take any notes on the P & G commercial. Tr. 964:7--965:5 (Pollack), 1353:9--1354:4 (Deahl). Upon viewing the P & G egg demonstration, Pollack did determine to use different lighting and camera angles to avoid the "flat" look of P & G's egg demonstration. Tr. 965:6-19, 996:2-24 (Pollack).

The filming of the first version of the Colgate seashell demonstration took place in January 1996. Tr. 969:3-5 (Pollack). Pollack and Deahl documented on videotape the pre-treatment of the seashells and also shot test footage of various seashells. They depicted the many different ways they had tested for the cowrie and conch seashells to be immersed in acid. Tr. 953:2--955:24 (Pollack). Footage of the videotapes of the cowrie or conch seashells was distributed to the three lead countries for their input. Colgate's Australian subsidiary, which had originally preferred the conch shell, changed its mind after the shooting because the cowrie shell looked more like a tooth and the conch shell looked too "spiky." Tr. 848:9-20 (Loten); Loney Dep. at 84-86, 121- 22. After the filming, there was some discussion of which seashell to use in which countries. Tr. 1706:7-22 (Roskothen). Colgate concluded that while the cowrie footage

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

Page 20

presented its message most effectively, the conch would also be effective. Tr. 1706:16-22 (Roskothen). Prior to receiving P & G's complaint, there was some discussion that, in view of the history of conflict between Colgate and P & G, Tr. 1698:21--1699:16 (Roskothen), it might be preferable not to use the cowrie seashell in markets in which P & G had already used the egg demonstration commercials, so as not to antagonize P & G unduly. Tr. 1321:22-- 1323:2 (Hartman), 1706:23--1708:3 (Roskothen). However, no decision to distinguish between the markets in this fashion had been made when Colgate received P & G's complaint in April 1996, after the seashell demonstration had already aired in China. Only after receipt of that complaint did Colgate decide, in some instances, to air the conch seashell demonstration in markets in which P & G had already aired egg demonstration commercials. This was done to avoid "hassle" from P & G in other markets. Tr. 1706:23--1708:3 (Roskothen).

**\*20** As soon as the first cuts came in from the first shoot in January 1996, Colgate decided to do a reshoot of the seashell demonstration. Tr. 1712:7-25 (Roskothen). Colgate wanted to depict smaller holes in the untreated side of the seashells, in light of the concern that the holes in the original version were too large and might startle or frighten viewers. Tr. 997:19--998:4 (Pollack), 1324:14--1325:5 (Hartman). Defendants also wished to re-shoot the demonstration with better and more contemporaneously documented technical substantiation for the actual conduct of the experiment in the production studio, in the event that the demonstration were later challenged for lack of substantiation. Tr. 1325:7-18 (Hartman), 1712:20-25 (Roskothen). Colgate and Y & R planned a re-shot version of the seashell demonstration before they received the infringement complaint from P & G on April 4, 1996. Tr. 1050:3-18 (Pollack), 1324:14--1325:5 (Hartman). After P & G made its infringement complaint to Colgate in China, additional modifications were made to the demonstration, and to the way in which it would be filmed in the re-shoot, in order to establish greater differentiation and dissimilarity between the P & G egg demonstration and the COLGATE seashell demonstration. Tr. 1325:6-21 (Hartman). Colgate and Y & R did not believe that the original demonstration infringed any of P & G's rights, but hoped that the additional modifications to the re-shot version would satisfy P & G and avoid any dispute. Tr. 1323:4--9 (Hartman), 1713:1--1715:23 (Roskothen).

Because some countries require advertising demonstrations to be supported by independent testing and substantiation, Colgate arranged for Dr. LeGeros of New York University to independently test the seashell demonstration protocol in order to substantiate the studies done by Colgate. Tr. 911:13-25 (Mordarski). Dr. LeGeros' first study, summarized in a report dated April 5, 1996, found that the cowrie seashell demonstration was 100% reproducible. Ex. RE (independent report of cowrie study). The second study, using the conch seashell, found that the conch seashell demonstration was reproducible but not 100% reproducible. Ex. 320. Two reports by Dr. LeGeros, dated April 5 and May 31, 1996, summarize these results. Exs. 320, RE.

Prior to filming the re-shoot, Pollack and Deahl experimented with alternatives to the dental mirror. For example, they designed a miniature ball peen hammer to tap the seashell, but it was unwieldy and did not work as well as the dental mirror. Tr. 1006:17--1007:12 (Pollack), 1379:7-10 (Deahl); Ex. AAK (test footage). Colgate also tried using a number of utensils to immerse and remove the seashell from the acid solution, but none worked as well as tongs. Tr. 1715:24--1716:15 (Roskothen).

The seashell demonstration was reshot in May 1996. Tr. 998:19--999:5 (Pollack); Ex. SD (reshoot pre-production meeting booklet). The changes in the seashell demonstration included: (1) changing the color of the background to blue; (2) turning the cowrie seashell over at the beginning of the demonstration so that consumers could see the lip in the seashell, and would have no question, if they were not listening to the commercial, that it was a seashell; (3) dividing the seashell along the short axis so as to correspond better to the seashell's axis of symmetry, which also allowed the treated side to be identified with the trademark "COLGATE"; (4) using a bowl instead of a beaker for the immersion of the seashell, which also was consistent with Colgate's desire to bring greater branding to the demonstration because the bowl was of the same type used in the prior Colgate chalk dip demonstration; and (5) creating a smaller hole in the untreated side when the seashell was tapped with the dental mirror. Tr. 997:19--1005:6 (Pollack), 1381:1--1385:7 (Deahl). The re-shoot was monitored by Colgate's R & D department to ensure that the experiment was properly done and to avoid any claim that the experiment was not properly substantiated. Tr. 924:14-23 (Mordarski). A change in the camera angle was discussed, but it was decided that the camera angle of the original shot should be kept. Tr. 1715:9-23, 1716:5-8 (Roskothen). The re-shot version of the seashell demonstration using the cowrie seashell is the version that Colgate is currently airing in its television commercials in China and elsewhere. Tr. 1716:20-24 (Roskothen).

**\*21** P & G argues that Colgate's development of the seashell demonstration changed when Colgate decided to use the seashell demonstration in China in order to preempt P & G. According to this theory, what had been

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

Page 21

until then an independent process of development changed to copying. P & G has not submitted any evidence to support this theory. P & G has not shown that Colgate made any decisions regarding the seashell demonstration, other than the decision to speed up production, based on the expected use of the seashell demonstration in China to preempt any use by P & G of its eggshell demo in China.

## VII. *THE MARKETING OF COLGATE IN CHINA*

In 1992, Colgate began selling COLGATE toothpaste in Guangdong Province in southern China. Tr. 1396:24--1397:5 (Fong). At that time, COLGATE was the only international brand of toothpaste manufactured in China. As of 1993, 90% of Colgate's sales of toothpaste in China were within Guangdong Province. There were some sales outside Guangdong Province, but these sales were small and opportunistic, meaning that if a wholesaler or distributor placed an order, Colgate would fill the order. Colgate had no sales or marketing activities outside Guangdong Province. Tr. 1397:2-22 (Fong). COLGATE was marketed as an anti-cavity fluoride toothpaste product in China. Tr. 1401:17-21 (Fong). Local Chinese brands of toothpaste, with few exceptions, did not contain fluoride. The local Chinese brands are divided into two main categories: cosmetic, which provides very basic cleaning and breath freshening; and herbal, which uses Chinese herbs for curative benefit. Exs. YP, YR, VZ, YO. Although they cleaned teeth and freshened breath, these brands did not fight cavities in the way that a fluoride toothpaste like COLGATE could. None of the local Chinese brands had the same anti-cavity product positioning as COLGATE. Tr. 1400:7--1401:25 (Fong).

In 1994, Colgate decided to expand its sale of COLGATE toothpaste to China nationally. The expansion was to begin first along the Yangtze River. Tr. 1402:1-10 (Fong). As part of its expanded distribution in China, Colgate wanted to establish itself as the first of the international brands to enter the Chinese national market, and to use an effective television commercial to communicate to Chinese consumers the fact that COLGATE toothpaste provided the anti-cavity protection of fluoride. Tr. 1215:8-25, 1216:1-5 (Fogarty), 1412:8-13, 1413:10-14 (Fong). The second foreign company to sell an international brand of toothpaste in China was Unilever. Unilever launched the toothpaste brand SIGNAL in April 1995 and introduced the CLOSE-UP brand of toothpaste about one year later. Tr. 1402:11--1404:1 (Fong). As of late 1995, Unilever's SIGNAL toothpaste product was not readily accepted by the Chinese market; it is estimated that Unilever had less than a 1% value share of the Chinese market. Unilever's CLOSE-UP product is a cosmetic brand and is not positioned as an anti-cavity brand like COLGATE. For these reasons, towards the end of 1995, Colgate did not consider Unilever to be a serious competitive threat. Tr. 1404:7-24, 1412:15--1413:4 (Fong).

**\*22** Colgate heard rumors that P & G was preparing to launch CREST in China. P & G sponsored a group of dental professionals from China to attend the FDI dental conference in Hong Kong. In September 1995, P & G was one of the co-sponsors of Oral Health Day in China, and P & G distributed Oral Health Day posters bearing the CREST logo. P & G was also testing its school materials in about 15 cities in China and had obtained the endorsement of the National Committee for Oral Health. Colgate concluded, from P & G's activities in China, that P & G was about to launch CREST in China. Tr. 1213:15--1214:8 (Fogarty), 1407:1--1408:21 (Fong); Ex 331 (e-mail regarding clinical brochure). Colgate determined to "prempt" P & G by selling and advertising COLGATE on an expanded basis in China before P & G launched CREST, to be the first nationally available toothpaste to communicate the anti-cavity effect of its toothpaste, and to do it with the strongest possible advertising. Tr. 1214:12--1216:15 (Fogarty), 1408:22--1409:5, 1418:13--1419:11 (Fong). Around this same time, in October 1995, the local Colgate management in China was informed that Colgate had just gone through a long development process to devise a new advertising campaign that communicated the anti-cavity benefit of COLGATE toothpaste, and that this advertising campaign had performed well in tests, including tests comparing its effect to that of Colgate's existing advertising. Tr. 1222:1-- 1223:10 (Fogarty); Ex 128 (Colgate internal memorandum).

As a result, the seashell demonstration advertising campaign using the seashell storyboards was tested in China. Tr. 1503:3-9 (Tonogbanua); Ex. TR. This research showed that the seashell demonstration would be effective in the expansion campaign and that it tested well against a version of P & G's egg demonstration commercial. Tr. 1532:21--1534:6 (Tonogbanua). This research also confirmed the earlier finding in the Philippines that consumers were skeptical of the seashell demonstration when two seashells were used, and that a one seashell format would deliver a more credible message. Tr. 1534:1--1535:25 (Tonogbanua).

The shooting schedule of the seashell demonstration was developed to ensure that the commercial was available in China in time for Colgate's expansion plans. Tr. 1532:3-15 (Tonogbanua); Ex. UZ. In February 1996, Colgate China expanded its sale of COLGATE and aired the first seashell demonstration commercial in China. By May 1997, Colgate had spent approximately $7 million

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 22
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

showing the seashell demonstration in China. Tr. 1446:1-17 (Fong). At the same time, Colgate offered consumer promotions such as discounts to make it attractive for consumers to stock up on COLGATE. Colgate also stepped up activities directed at dental professionals including the FDI World Dental Congress, obtained the endorsement of the National Education Commission, and ran public service advertising to educate consumers about the anti-cavity effects of fluoride toothpaste. Tr. 1424:22--1426:11 (Fong).

 **\*23** Shortly after Colgate first aired a commercial containing the seashell demonstration, DY & R's media manager in China, Norman Luo, received a telephone call from D'Arcy Masius Benton & Bowles, Inc. ("DMB & B"), P & G's advertising agency in China, indicating that P & G was very upset by Colgate's airing of the seashell demonstration. Tr. 1506:11-22 (Tonogbanua); Ex. 239 (facsimile message). The telephone call to Norman Luo was followed by a letter dated April 4, 1996 from Denis Beausejour, General Manager of P & G China, to Chester Fong, General Manager of Colgate China, requesting that Colgate immediately remove the seashell demonstration advertising from the air. Tr. 161:21--162:21 (Beausejour); Ex. 265A (Beausejour letter). Messrs. Fong and Beausejour discussed P & G's claim that the seashell demonstration commercial infringed P & G's rights. Tr. 1432:5--1435:25, 1437:11--1438:5 (Fong). Following their discussions, Mr. Fong informed Mr. Beausejour in a letter dated April 18, 1996 that Colgate did not agree with P & G's suggestion that it discontinue commercials containing the COLGATE seashell demonstration. Tr. 165:12-23 (Beausejour), 1438:12-19 (Fong).

 On June 20, 1996, P & G filed a complaint with the National Copyright Administration of China (the "NCAC") requesting that the NCAC find that Colgate's seashell demonstration infringed P & G's egg demonstration under Chinese copyright law. Tr. 1439:4-11 (Fong); Ex. ABN. The NCAC wrote to the parties on May 19, 1997, informing them that the action was dismissed, specifically that the NCAC "would no longer handle this case." Ex. BK; Tr. 1441:4-14 (Fong). On June 23, 1997, P & G advised Colgate that it was, inter alia, dropping Count V in this action, which is the claim for infringement of P & G's rights under Chinese copyright law. Pretrial Order ¶ 2. P & G has not filed any claim against Colgate's commercials containing the seashell demonstration under any Chinese trademark, unfair competition or advertising law. P & G has not rebutted Colgate's expert testimony that P & G has no cognizable claim against Colgate under any Chinese trademark, unfair competition or advertising law. Tr. 497:9--503:21 (Wheare).

 Colgate continued to air the original version of the seashell demonstration in China even after it had replaced the original version with the re-shot version in other markets. Colgate claims that it was concerned that changing the demonstration in China might be misunderstood to suggest that Colgate withdrew the original commercial believing it had infringed P & G's rights. After the NCAC informed the parties that it was dismissing P & G's complaint, Colgate concluded that it no longer had reason to be concerned about such a negative inference being drawn. Colgate therefore ceased airing the original version of the seashell demonstration in China and replaced it with the preferred re-shot version, as it previously had done in other markets. Tr. 1722:6--1723:20 (Roskothen).

 **\*24** The Colgate entity that is selling COLGATE and airing the commercials at issue in this case in China is a Chinese-based joint venture, not a U.S. company. Tr. 1398:8--1399:12 (Fong). Chinese television stations are empowered to remove television commercials from the air, or refuse to run them at all. Tr. 1721:10--1722:1 (Roskothen). Several Chinese government authorities are also empowered to remove television commercials from the air if they are deemed to violate Chinese law. Tr. 1437:11-18 (Fong). To date, no Chinese government authority or television station has caused any Colgate commercial containing the seashell demonstration to be removed from the air, nor has any Chinese television station refused to air any Colgate commercial containing the seashell demonstration. Tr. 1445:18-25 (Fong).

 VIII. *THE EXECUTIONAL ELEMENTS OF THE COLGATE SEASHELL DEMONSTRATION*

 The evidence shows that the executional elements of the Colgate commercial are all required to demonstrate the experiment, and are all important to the viability of executing the commercial within a short time span. Thus, the selection by Colgate of a seashell for its visual experiment was a logical choice because the similarly high calcium content of teeth and seashells (as well as eggshells) lent consumer credibility to the commercial. The choice of a white seashell reinforces the similarity of the seashell to a tooth. The choice of a cowrie seashell was logical since it most completely satisfied the scientific protocols, it is a familiar seashell to Asian consumers, Tr. 845:5- 6 (Loten), and it was shaped for easy display and comparison of the treated side and untreated side. A single seashell commercial was chosen to enhance the credibility of the advertisement with consumers, who might doubt the results of a two-object demonstration on the grounds that the two objects might be dissimilar or exposed to different solutions of acid. Treating the seashell with a toothbrush reminds the

Not Reported in F.Supp.2d                                                                                      Page 23
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

consumer of teeth and toothpaste. The use of a dividing line is necessary in a single object experiment, as is a designation of the treated and untreated side of the seashell, since without each, the viewer would not know which side was treated with the toothpaste. Holding the seashell in the demonstrator's hand is an ordinary act; placing the seashell into a clear beaker or bowl is a necessary to visualize the immersion in acid; and the use of tongs is not an unusual method to place items in a beaker or bowl of acid. Tapping the seashell, or pushing the softened shell of the egg, to show the weakness and strength of the respective sides, is a necessary element of demonstrating the results of the experiment. The use of dental mirror to do the tapping is unique to Colgate.

IX. *EXAMINATION OF THE DIFFERENCES IN THE PARTIES' COMMERCIALS*

 The overall impression created by Colgate's seashell demonstration differs from that created by P & G's egg demonstration because of numerous differences between the two commercials. Colgate has made creative and distinctive use of camera angles, distances and lighting, and its re-shot commercial uses a unique blue background. Ex. 71; Zhong Dep. at 373-376; Sherman Dep. at 187-189; Wu Dep. at 251-252; Ex. CX at DM-1720. Additionally, both commercials are well branded and the audio effects are different. *Compare* Ex. 71, commercials 1-8, *with* Ex. 71, commercials 9-11, 13.

 **\*25** A step-by step comparison of the egg demonstration in the five P & G copyrighted commercials (Exs. 295 A-D, F) with the seashell demonstration in Colgate's original version (Ex. 295-I) and reshot version (Ex. YD, commercial 8), reveals considerable differences:

 A. *P & G "Huevo Nuevo" (Exhibit 295-A) v. Colgate Commercials*

  1. SET UP

```
P & G (Ex. 295-A)                Colgate

        NONE.        Original Version (Ex. 295-I)
                     1.  Setup shot of seashell, unmarked
                         beaker and box of COLGATE
                         toothpaste on table. Beaker is set
                         down with an audible tap.
                     2.  Table top demonstration.
                     Reshot Version (Ex. YD, commercial 8)
                     1.  Seashell is held in hand to reveal
                         slotted opening on its underside,
                         then turned over.
                     2.  Blue background.
```

 P & G begins the demonstration with no set-up scene, while Colgate has a scene introducing the experiment. As shown below, P & G later interrupts the demonstration to show a dentist and a tube of CREST.

  2. MARKING

```
        P & G (Ex. 295-A)                        Colgate


1.   Open with close-up of egg held       Original Version (Ex. 295-I)
     vertically in left hand, and right
     hand drawing a red line around the   1.  Seashell is divided off screen
                                               with
     egg horizontally, on its short axis.     solid black line on long axis.
     Dentist's lab coat is in the         2.  Seashell is marked off screen
                                               wit h
     background.                              red Colgate logotype "C."
2.   Cut to dentist wearing lab coat in
     dental office, holding egg.          Reshot Version (Ex. YD, commercial
                                              8)
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                         Page 24
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

3.  Cut to close-up of egg in vertical
    position held in dentist's left hand
    while he draws "X" in red on the
    upper portion of the egg with his
    right hand.
4.  Cut to close-up of toothpaste tube
    showing only the word "Fluoristat®"

    (P & G's word mark for its fluoride
    formulation).

1.  Seashell is divided off screen
    with
    solid black line on short axi
    s.
2.  Seashell is marked off scree n
    with
    red COLGATE logo.

 There is no similarity here. P & G has an elaborate marking scene, while all of Colgate's marking is done off screen. P & G twice interrupts the flow of the demonstration--with a scene of the dentist and a scene of the FLUORISTAT mark. Colgate shows the demonstration with no interruptions.

3. APPLYING TOOTHPASTE

|           P & G (Ex. 295-A) |           Colgate |
| --- | --- |
| 1.  Camera pans (moves across the scene from left to right) with dentist's lab coat in background as one strip of toothpaste is applied from CREST toothpaste tube to top of egg, which is being held in right hand. | Original Version (Ex. 295-I)<br>1.  Left hand holds seashell while COLGATE red Diamond Head toothbrush, held in right hand, brushes toothpaste slurry onto seashell. |
| 2.  Camera cuts and pans left to right again as toothpaste is brushed onto already lathered egg, which is being held in left hand. | 2.  No application of toothpaste from tube is shown on screen.<br><br>(Toothpaste is applied to toothbrush prior to tabletop demonstration.) |
| 3.  Cut to close-up of egg being held in right hand and rinsed by small stream of water from dental water jet held in left hand. | 3.  No rinsing of toothpast e from seashell is shown on screen.<br>4.  Table top demonstration.<br>5.  No camera pan.<br>Reshot version (Ex. YD, commercial 8)<br>  No change. |

 **\*26** Other than the use of a toothbrush, these scenes are different. P & G shows camera movement (pans), whereas Colgate does not. P & G show the application of toothpaste, the brushing and the rinsing in three separate scenes, with cuts between them, and with the egg being held in different hands. Colgate has only one scene of the brushing, and no movement of the seashell, no application of toothpaste, and no rinsing. P & G's seashell is held in a hand, without a table top in the background, and its lighting is different from that in Colgate's table top

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 25
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

demonstration.

### 4. SOAKING IN ACID

| P & G (Ex. 295-A) | Colgate |
|---|---|
| | **Original Version (Ex. 295-I)** |
| 1. Medium shot of tabletop, on which beaker marked with volumetric gradations, CREST toothpaste tube and dental mirror are placed. | 1. Tongs hold seashell on long axis with tapered, scrolled ends of the seashell extending and visible throug h the holes in the tongs. Camera angle is a "look-up shot." Seashell is placed in unmarked beaker. No zoom-in or camera position changes. Table top demonstration. |
| 2. As egg, held by thin tongs on its short axis, is immersed into beaker, the camera zooms into close-up of only egg in beaker. | |
| 3. Tongs release egg in beaker onto a clear block. Black vertical line moves across scene to suggest time lapse. Bubbling is shown on untreated half of egg. | 2. Different side shot of shell [-F-N-1-6] being held by tongs and removed from beaker. No time lapse, just a different angle of shot. |
| 4. Tongs are reinserted into beaker and grab egg by short axis to remove it. | **Reshot Version (Ex. YD, commercial 8)** |
| | 1. Bowl is used instead of beaker. |
| | 2. Slotted opening in base of shell is visible. |

FN16. This scene was filmed, but is not used in many of the Colgate commercials using the demonstration.

  The camera action is different. P & G's camera zooms into a close-up, whereas Colgate's does not move. Colgate uses tongs, holding the seashell by its tapered ends, never letting go of the seashell; P & G holds the egg by the short axis, puts the egg into the beaker and lets go of it onto a clear block. P & G shows a time lapse with a vertical line moving across the screen. Colgate simply shifts to a different camera angle between the immersion and removal scenes.

### 5. TESTING

| P & G (Ex. 295-A) | Colgate |
|---|---|
| 1. Cut to egg, held on short axis in left hand from right side of | **Original Version (Ex. 295-I)** |

Not Reported in F.Supp.2d                                                Page 26
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
        screen, with
        dentist tapping treated side
          first with
        metal rod.
2.      Dentist then pushes untreated
          side
        with metal rod. Egg dents.
3.      Cut to dentist holding CREST
        package.
4.      Hand-held demonstration.
```

```
1.  With seashell resting on table,

    dental mirror taps untreated side
    first--it cracks and form s a hole

    opening into interior of seashell;
    turntable then rotates to face treated
    side of seashell toward camera.
2.  Dental mirror taps treated side--it
    remains strong; turntable continues
    rotating.
3.  Dental mirror taps on COLGATE
    box on table.
4.  Table top demonstration.
5.  Super at lower right identifies
    COLGATE as product with which
    seashell was treated.
Reshot Version (Ex. YD, commercial 8)
1.  No super at lower right indicating

    COLGATE as product with which
    seashell is treated, but shell remains
    marked with word COLGATE.
```

**\*27** In a hand held shot, P & G shows the egg held by a left hand by its short axis, then shows the tapping of the treated side and the pushing of the untreated side with a metal rod. P & G depicts the untreated side denting. There is no rotation. In contrast, Colgate uses a table top shot in which the untreated side is tapped with a dental mirror so that it breaks; the table then rotates, and the treated side is tapped with the dental mirror. As stated by the Executive Director of P & G's worldwide advertising agency with responsibility for CREST, P & G's metal rod looks nothing like a dental mirror. Sherman Dep. at 84-5.

6. STYLE

```
        P & G (Ex. 295-A)

1.      Demonstration filmed with both
        hand held and table top components.
2.      Hand held portions are not back-lit.

        Dentist's lab coat is background;
        gives feeling of shallow lighting.

3.      Flow of demonstration is by shots of

        dentist.

4.      Significant camera angle changes
        throughout.
5.      Changes give impression of quick

        cutting, and objects tend to move
        around in the scene.
```

```
                Colgate

Original Version (Ex. 295-I)

1.  All of demonstration is done as
      a

    table top demonstration.
2.  Close-up; fewer camera
    movements.
3.  Low angle shot of the shell
      entering
    liquid dramatizes the
      demonstration.

Reshot Version (Ex. YD, commercial
  8)

    No change.
```

The Colgate demonstration is filmed in close-up, whereas the P & G demonstration varies from close-up to medium shots. The Colgate demonstration is done in one camera position, whereas the P & G camera position changes with pans and close-ups. All of Colgate's demonstration is presenting using a table top format,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 27
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

whereas P & G's demonstration format varies from hand held to table top. Colgate's low angle shot dramatizes the demonstration, whereas P & G's changes in the position of the egg and quick cuts give an impression of movement.

**B.** *P & G U.S. "Crest Family Egg" (Exhibit 295-B) v. Colgate Commercials*

1. SET UP

| P & G (Ex. 295-B) | Colgate |
|---|---|
| | Original Version (Ex. 295-I) |
| 1.  Lab scientist is shown standing behind lab counter with eggs in holder on counter. | 1.  Setup shot of seashell, unmarked beaker and box of COLGATE toothpaste on table. Beaker is set down with an audible tap. |
| 2.  Camera pans right and then zooms in on scientist's right hand holding package of CREST. | 2.  Table top demonstration. |
| 3.  Cut to medium shot of scientist removing one of the eggs from the counter. | Reshot Version (Ex. YD, commercial 8) |
| | 1.  Seashell is held in hand to reveal slotted opening on its underside, then turned over. |
| | 2.  Blue background. |

   The method by which each of these demonstrations is introduced is significantly different. In the P & G commercial, a lab scientist appears in a lab with eggs on a table, and then he introduces the experiment by first holding a package of CREST, and then removing one of the eggs from the counter. In the Colgate commercial, there is a shot of the seashell, the beaker and the box of COLGATE, and the beaker is set down with an audible tap. P & G's commercial has camera movement, with a pan and a zoom-in; the Colgate commercial has no camera movement.

2. MARKING

| P & G (Ex. 295-B) | Colgate |
|---|---|
| 1.  Cut to close-up of egg held vertically in scientist's left hand; egg is already divided horizontally by a red line. | Original Version (Ex. 295-I) |
| | 1.  Seashell is divided with solid black line on long axis. |
| 2.  Scientist's right hand marks upper portion of egg with red "x" while egg is held in scientist's left hand. | 2.  Seashell is marked off screen with red Colgate logotype "C." |
| 3.  Hand held demonstration; scientist's lab coat is background. | Reshot Version (Ex. YD, commercial 8) |
| | 1.  Seashell is divided with solid black line on short axis. |
| | 2.  Seashell is marked off screen with red COLGATE logo. |

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                              Page 28
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

**\*28** Colgate shows no marking shot whatsoever, whereas the P & G commercial highlights the marking of the "x" on the egg with an elaborate scene.

### 3. APPLYING TOOTHPASTE

```
         P & G (Ex. 295-B)                         Colgate

1.    Camera pans (moves across the      Original Version (Ex. 295-I)
      scene from left to right).
      Toothpaste is brushed onto upper   1.  Left hand holds seashell whil e

      portion of egg, which is being         COLGATE red Diamond Head
        held
      in scientist's left hand.              toothbrush, held in right hand,
2.    Cut to close-up of egg being          brushes toothpaste slurry onto
        held in
      scientist's right hand and             seashell.
        rinsed by
      small stream of water from         2.  No application of toothpast e from
        dentist
      water jet in scientist's left          tube is shown on screen.
        hand.
3.    Hand held demonstration against       (Toothpaste is applied to
                                              toothbrush
      scientist's lab coat as                prior to tabletop demonstration.)
        background.
                                         3.  No rinsing of toothpaste from
                                             seashell is shown on screen.
                                         4.  Table top demonstration.
                                         5.  No camera pan.
                                         Reshot version (Ex. YD, commercial 8)
                                             No change.
```

The P & G commercial has an elaborate scene showing the application of the toothpaste. The toothpaste is first brushed onto the egg and then rinsed off with a small stream of water from a dental hose. The Colgate commercial has only one shot of toothpaste being brushed onto the seashell. The P & G commercial utilizes a hand held demonstration with the scientist's coat as a background, and features lighting appropriate for a hand held demonstration; Colgate's commercial is a table top demonstration with the lighting appropriate for a table top demonstration. P & G's camera moves, while there is no movement of the camera in the Colgate commercial.

### 4. SOAKING IN ACID

```
         P & G (Ex. 295-B)                         Colgate

1.    Medium shot of beaker, CREST       Original Version (Ex. 295-I)
      toothpaste tube and dental
        mirror on
      table. Egg, held by thin          1.  Tongs hold seashell on lon g axis
        pincers on                           with
      its short axis, is immersed           tapered, scrolled ends of the
        into                                  seashell

      unmarked beaker.                       extending and visible through the
2.    Camera zooms into close-up of         holes in the tongs. Camera angle is a
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                   Page 29
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
        only                              "look-up shot". Seashell is placed in
        egg in beaker, and pincers        unmarked beaker. No zoom-in or
        release
        egg in beaker onto a clear        camera position changes. Table top
        block.
3.      Time lapse is shown by black      demonstration.
        vertical
        line moving across the scene. 2.  Different side shot of shell being
4.      Pincers reenter beaker, grab      held
        egg by                            by tongs and removed from beaker.
        short axis and remove it.
        Table top                         No time lapse, just a different angle
        demonstration.                    of shot.
                                      Reshot Version (Ex. YD, commercial 8)
                                      1.  Bowl is used instead of beaker.
                                      2.  Slotted opening in base of shell is
                                          visible.
```

  **\*29** In the P & G commercial, there is a medium shot of the beaker, the CREST package and the dental mirror on the table, and then the camera zooms into a close-up after the egg is immersed. In the Colgate demonstration, there is no zoom or close-up. The P & G commercial uses a set of thin pincers to hold the egg by its short axis and release the egg onto a clear block on the bottom of the beaker. The pincers are removed and later reinserted to grab the egg and remove it. By contrast, in the Colgate commercial the scrolled, tapered ends of the seashells visibly extend through the holes in the tongs. The shell is put in the beaker--or, in the reshot version, a bowl--and the tongs never let go of the seashell. The seashell is never shown resting in the beaker or bowl. The time lapse is shown in the P & G commercial by a black vertical line moving across the screen, whereas there is no time lapse shown in the Colgate commercial.

  5. TESTING

```
        P & G (Ex. 295-B)                        Colgate

1.      Cut to egg held on short axis Original Version (Ex. 295-I)
        in left
        hand. Metal rod taps treated
        side.

2.      Scientist then pushes         1.  With seashell resting o n table,
        untreated side
        with metal rod. Egg dents.        dental mirror taps untreated sid e
        Hand
        held demonstration with lab       first--it cracks and forms a hole
        coat in
        background.                        opening into interior of seashell;
3.      Cut to scientist holding          turntable then rotates to face treated
        package of
        CREST.                            side of seashell toward camera.
                                      2.  Dental mirror taps treated side--it
                                          remains strong; turntable continues
                                          to rotate.
                                      3.  Dental mirror taps on COLGATE
                                          box on table.
                                      4.  Table top demonstration.
                                      5.  Super at lower right identifies
                                          COLGATE as product with which
                                          seashell is treated.
                                      Reshot Version (Ex. YD, commercial 8)
                                      1.  No super at lower right indicating
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 30
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

COLGATE as product with which seashell is treated, but shell remains marked with word COLGATE.

In P & G's hand held demonstration, the egg is held on its short axis, tapped on the treated side and dented on the untreated side, and then there is a scene of the scientist holding a package of CREST. In the Colgate commercial, a table top demonstration, the seashell is on a rotating table. A dental mirror taps the untreated side which breaks, the table then rotates, and a dental mirror is shown tapping the treated side which remains strong. As stated by P & G's witness, the metal rod looks nothing like a dental instrument. Sherman Dep. 84- 5.

6. STYLE

### P & G (Ex. 295-B)

1. Demonstration filmed with both hand held and table top components.
2. Flow of demonstration is broken up by introduction of spokesperson.
3. Significant changes in lighting between hand held and table top portions of demonstration.
4. Changes give impression of quick cutting, and objects tend to move around in the scene.

### Colgate

Original Version (Ex. 295-I)

1. All of demonstration is done as a table top demonstration.
2. Close-up; fewer camera movements.
3. Low angle shot of shell entering liquid dramatizes the demonstration.

Reshot Version (Ex. YD, commercial 8)
No change.

**\*30** The P & G demonstration is broken up by the introduction of the scientist and by shots of the egg in different positions with close-ups and pans, and it features many more scenes than the Colgate commercial. The quick cuts in the P & G commercial give a distinct impression, and the objects tend to move around in the scene. The Colgate commercial is filmed entirely in close-up with no camera movements, and it shows the experiment without interruption. P & G's demonstration takes advantage of both table top and hand held formats, whereas Colgate's demonstration is performed entirely as a table top demonstration, and a low-angle shot is used to dramatize the demonstration of the seashell entering the liquid.

C. *P & G "Crest Egg" (Exhibit 295-C) v. Colgate Commercials*

1. SET UP

### P & G (Ex. 295-C)

1. Full-screen super: "Did you know...."
2. Fade into close-up of unmarked egg held in left hand.
3. Camera pans right to close-up of unmarked egg tapping against denture mold.
4. Cut to full-screen super: "A Demonstration."

### Colgate

Original Version (Ex. 295-I)

1. Setup shot of seashell, unmarked beaker and box of COLGATE toothpaste on table. Beaker i s set down with an audible tap.
2. Table top demonstration.

Reshot Version (Ex. YD, commercial 8)
1. Seashell is held in hand to reveal slotted opening on its underside,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 31
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
                              then turned over.
                          2.   Blue background.
```

P & G's commercial begins with three scenes. It starts with a full-screen super: "Did you know ..." The egg is then tapped against a denture mold to help consumers identify the egg as a metaphor for teeth. The commercial then cuts to a second full-screen super: "A Demonstration." The set up of the Colgate demonstration, in contrast, has one scene: a shot of a seashell, a beaker and a box of COLGATE toothpaste. In the P & G demonstration, there is a camera pan and a fade in, whereas in the Colgate demonstration there is no camera movement.

2. MARKING

```
        P & G (Ex. 295-C)                    Colgate

1.   Egg reappears in horizontal posi   Original Version (Ex. 295-I)
       tion
     already marked off screen with
     vertical black dotted dividing      1.   Seashell is divided off screen with
       line
     along short axis.                        solid black line on long axis.
2.   No CREST side of egg until after    2.   Seashell is marked off screen with
     brushing, when it is revealed            red Colgate logotype "C."
       letter
     by letter as thumb moves across

     egg.                                Reshot Version (Ex. YD, commercial 8)
                                         1.   Seashell is divided off screen with
                                              solid black line on short axis.
                                         2.   Seashell is marked off screen with
                                              red COLGATE logo.
```

In the P & G commercial, the CREST logo appears after the application of the toothpaste, as if applied by a thumb moving across the egg; the Colgate demonstration has the red Colgate logo-type "C" (original) or COLGATE (reshoot) pre-applied off screen.

3. APPLYING TOOTHPASTE

```
        P & G (Ex. 295-C)                    Colgate

1.   Fade into close-up of egg held      Original Version (Ex. 295-I)
     horizontally in left hand.
2.   One strip of toothpaste from CREST  1.   Left hand holds seashell while
     toothpaste tube is applied to right      COLGATE red Diamond Head
     side of egg, from dotted line in         toothbrush, held in right
                                                hand,
     center to apex, while egg is held in     brushes toothpaste slurry onto

     left hand.                               seashell.
3.   Quick fade into right side of egg   2.   No application of toothpaste
                                                from
     shown entirely covered by "corn         tube is shown on screen.
     rows" of toothpaste.                     (Toothpaste is applied to
                                                toothbrush
                                              prior to tabletop
4.   Egg is moved into large "faucet-like"   demonstration.)
                                         3.   No rinsing of toothpaste from
     stream as toothpaste is rinsed.          seashell is shown on screen.
     Toothbrush simultaneously brushes   4.   Table top demonstration.
     toothpaste off of egg.
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                          Page 32
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
5.    Quick fade into close-up of egg, in          5.   No camera pan.
      which multi-colored CREST logo
      appears on right half of egg as          Reshot version (Ex. YD, commercial
                                                   8)
      thumb moves across egg.                      No change.
```

**\*31** The P & G commercial has a series of scenes which fade one to another, whereas the Colgate demonstration features only one scene. The P & G commercial shows toothpaste being applied to the egg in a very dramatic way, ending with the egg being covered by "corn rows" of toothpaste; the Colgate commercial shows no application of toothpaste to the seashell. In the P & G commercial, the egg is moved to a large faucet-like stream where the toothpaste is rinsed with water and the toothpaste is brushed *off* of the egg. In the Colgate demonstration there is no rinsing--there is only a toothbrush brushing the

toothpaste slurry *onto* the egg. The brushing scene in the P & G commercial displays no background, whereas the Colgate demonstration involves a table top demonstration with the table top as background. The CREST logo appears after the rinsing, dramatically revealed by the movement of a thumb across the egg, whereas Colgate's seashell is pre-marked with a "C" (original) or COLGATE (reshoot) off screen.

4. SOAKING IN ACID

```
              P & G (Ex. 295-C)                                Colgate

                                              Original Version (Ex. 295-I)
1.    Metal egg holder holds egg
      horizontally from above and
      below                               1.   Tongs hold seashell on long axis
      egg as it is inserted into                with
      beaker.                                  tapered, scrolled ends of the
2.    Egg remains in egg holder while          seashell
                                              extending and visible throug h the
      bubbles appear on untreated
      side of                                 holes in the tongs. Camera angle is
      egg.                                      a
                                              "look-up shot." Seashell is placed
3.    Time lapse is conveyed by cut            in
      to full-screen                          unmarked beaker. No zoom-in or
      screen super: "The Result (9
      Hours                                   camera position changes. Table top
      Later)."                                demonstration.
4.    Fade into close-up of egg in
      beaker                              2.   Different side shot of shell being
      still being held in egg holder           held
      from                                    by tongs and removed from beaker.
      above and below.                        No time lapse, just a different
5.    Egg is removed from beaker                angle
      while                                   of shot.
      still being held in egg holder
      from                                Reshot Version (Ex. YD, commercial 8)
      above and below.                    1.   Bowl is used instead of beaker.
                                          2.   Slotted opening in base of shell is

                                              visible.
```

The P & G demonstration uses an egg holder encircling the top and bottom of the egg, and the clamp stays with the egg while it rests in the acid. The Colgate demonstration uses tongs and the seashell is shown entering the acid but not actually resting in the acid. The

metal egg holder which inserts the egg in the beaker in the P & G demonstration is visibly different from the tongs which are used by Colgate. The time lapse in the P & G commercial is shown with a super reading "The Result (9 Hours Later)." There is no time lapse highlighted by the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 33
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

Colgate commercial.

5. TESTING

```
         P & G (Ex. 295-C)                        Colgate

1.    Fade into egg still held in     Original Version (Ex. 295-I)
      clamp
      from above and below.
2.    Treated side is tapped first    1.  With seashell resting on table,
      with ball
      at end of metal rod.                dental mirror taps untreated side
3.    Untreated side is then pushed       first--it cracks and forms a hole
      by
      ball at end of metal rod and        opening into interior of seashell;
      egg
      dents. Acid drips from egg.         turntable then rotates to face treated
4.    Full-screen super: "The             side of seashell toward camera.
      Conclusion."                    2.  Dental mirror taps treated side--it
5.    Fade into divided egg with          remains strong; turntable continues
      CREST
      logo on right side and dent         rotating.
      on left
      side. Right side, with CREST    3.  Dental mirror taps on COLGATE
      logo,
      is tapped against denture           box on table.
      mold
      (reprise of opening).          4.  Table top demonstration.
                                     5.  Super at lower right identifies
                                         COLGATE as product with which
                                         seashell is treated.
                                     Reshot Version (Ex. YD, commercial 8)
                                     1.  No super at lower right indicating
                                         COLGATE as product with which

                                         seashell is treated, but shell remains
                                         marked with word COLGATE.
```

**\*32** In the P & G commercial, the removal of the egg from the acid quickly fades into a shot of the egg being held by the same egg holder, in the same position, as when it was inserted into and taken out of the acid. In the P & G commercial, the egg is held in a clamp in one place during testing, whereas in the Colgate commercial the shell rests on a rotating table rather than being held. P & G shows the CREST side of the egg being tapped first, and the untreated side is then pushed and dented. Colgate shows the untreated side being tapped first and breaking; the table then rotates, and the treated side is tapped to show that it remains strong. P & G uses a ball-tipped metal rod to accomplish the tapping, whereas Colgate uses a mirror. The metal rod looks nothing like the dental mirror. Sherman Dep. at 84-5. Again, the P & G demonstration has no background, whereas the Colgate demonstration not only uses a table top format, but also actively involves a rotating table top. Last, the P & G commercial concludes by fading into a scene of the egg tapping a denture mold. There is no equivalent Colgate scene.

6. STYLE

```
         P & G (Ex. 295-C)                        Colgate


1.    No story surrounding            Original Version (Ex. 295-I)
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 34
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
                demonstration.
2.      Frequent use of full screen supers    1.   All of demonstration i s done as
          as                                          a
        individual scenes throughout             table top demonstration.
        commercial.                           2.   Close-up; no camera movements.
3.      Voiceover announcer instead of        3.   Low angle shot of shell entering
        on-camera spokesperson.                      liquid dramatizes the
                                                     demonstration.
4.      Distinctive, unusual background
        music.                                Reshot Version (Ex. YD, commercial 8)
                                                 No Change.
```

The P & G commercial features frequent full-screen
"supers" as individual scenes, a voice-over, nd distinctive,
unusual background music, none of which the Colgate
commercial shares. The Colgate commercial uses low-
angle shots of the seashell entering the liquid to dramatize
the demonstration, whereas the P & G commercial uses
no low-angle shots. Last, the Colgate commercial is
filmed in a table top format, whereas the P & G

commercial has no real background.

D. *P & G "Crest Hungarian Presenter" (Exhibit 295-D)
v. Colgate Commercials*

1. SET UP

```
          P & G (Ex. 295-D)                              Colgate

1.      Model of tooth is tapped with de    Original Version (Ex. 295-I)
          ntal
        mirror.                             1.   Setup shot of seashell, unmarked
2.      Cut to unmarked egg held in left           beaker and box of COLGATE
        hand being tapped with dental              toothpaste on table. Beaker is set
        mirror.                                    down with an audible tap.
                                            2.   Table top demonstration.
                                            Reshot Version (Ex. YD, commercial 8)
                                            1.   Seashell is held in hand to reveal
                                                   slotted opening on its underside,
                                                   then turned over.
                                            2.   Blue background.
```

**\*33** In two separate scenes, P & G taps a tooth model
and then an egg to help explain that the egg is a proxy for
a tooth. Colgate uses one scene to show the seashell,
beaker and box of COLGATE toothpaste.

2. MARKING

```
          P & G (Ex. 295-D)                              Colgate

1.      Pan right to shot of egg held       Original Version (Ex. 295-I)
        vertically. BLEND-A-MED logo is
        written in black on upper half of   1.   Seashell is divided off screen
                                                   with
        egg by right hand entering from           solid black line on long axis.
        right side of screen. Egg is        1.   Seashell is marked off screen
          pre-marked                                with
        with a red, horizontal                    red Colgate logotype "C."
        dividing line.
2.      Cut to freeze frame of              Reshot Version (Ex. YD, commercial
                                              8)
        FLUORISTAT® label against plain
        background.                          1.   Seashell is divided off screen
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 35
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

3.    Hand held demonstration.

                        with
                        solid black line on short axis.
                   2.   Seashell is marked off screen

                        with
                        red COLGATE logo.

  Colgate does all its marking off screen. P & G pans into
an elaborate shot showing the writing of the BLEND-A-
MED logo, followed by a shot of the FLUORISTAT®
label.

### 3. APPLYING TOOTHPASTE

           P & G  (Ex. 295-D)                          Colgate

1.    Jump cut to freeze-frame close-up     Original Version (Ex. 295-I)
      of upper portion of egg with one
      strip of toothpaste being applied.    1.    Left hand holds seashell
                                                  while
2.    Toothpaste is then brushed onto the         COLGATE red Diamond Head
      egg as camera zooms out. White              toothbrush, held in right
                                                  hand,
      band appears below egg with super:          brushes toothpaste slurry ont
                                                  o
      "Pre-treated with Fluoristat and            seashell.
      brushed for 5 minutes." Egg is held   2.    No application of toothpaste

                                                  from
      vertically in hand entering from            tube is shown on screen.
      bottom of screen as it is brushed           (Toothpaste applied to
                                                  toothbrush
      with right hand.                            prior to tabletop
                                                  demonstration.)
3.    Jump cut to egg, held in left hand,   3.    No rinsing of toothpaste from
      entering from left side at angle and        seashell is shown on screen.
      being rinsed with thin stream of      4.    Table top demonstration.
      water which moves left to right       5.    No camera pan.
      across egg. Hand held
      demonstration.                        Reshot version (Ex. YD, commercial
                                               8)
                                                  No change.

  In a hand held demonstration involving three scenes, P     camera remains still.
& G applies toothpaste (in a freeze frame) and then cuts
to brushing, followed by rinsing. Colgate has a table top    ### 4. SOAKING IN ACID
demonstration with only one brushing scene, no
application of toothpaste, no rinsing, and no freeze frame.
P & G's camera zooms out at one point, whereas Colgate's

           P & G  (Ex. 295-D)                          Colgate

1.    Jump cut to triangular tongs hol      Original Version (Ex. 295-I)
      ding
      egg on short axis on front and
      back.                                 1.    Tongs hold seashell on long axis
      Shot shows length of tongs at an            with
                                                  tapered, scrolled ends of the
      angle to the egg. As egg is placed

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                        Page 36
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

| P & G | Colgate |
|---|---|
| into beaker with volumetric markings and dropped onto a clear block inside beaker, camera zooms in. Sound effect of egg hitting side of beaker. BLEND-A-MED toothpaste tube is shown on table. | seashell extending and visible through the holes in the tongs. Camera angle is a "look-up shot." Seashell placed in unmarked beaker. No zoom-i n or camera position changes. Table to p demonstration. |
| 2.  Green line moves in a clockwise are across screen to suggest time lapse. | 2.  Different side shot of shell being held by tongs and removed from beaker. No time lapse, just a different angle of shot. |
| 3.  Triangular tongs re-enter beaker, grab egg and remove it; sound effect of tongs hitting side of beaker. | |
| 4.  Table top demonstration. | Reshot Version (Ex. YD, commercial 8) 1.  Bowl is used instead of beaker. 2.  Slotted opening in base of shell is visible. |

**\*34** P & G's egg is put into a beaker with tongs holding it by its short axis on its front and back surfaces. The scene shows the length of the tongs at an angle to the egg. In contrast, Colgate's tongs hold the seashell by the long axis rather than be the short axis. The P & G commercial twice uses sound effects of the beaker being tapped during the immersion and removal processes, whereas the Colgate commercial has no such sound effect. P & G's tongs release the egg onto a clear block, exit the picture, and then reenter the beaker to grab and remove the egg.

Colgate's tongs never release the seashell. The P & G commercial uses a zoom in, while there is no camera movement in the Colgate commercial. P & G suggests a time lapse by showing a green line moving across the screen like the hand of a clock; Colgate does not show a time lapse.

5. TESTING

| P & G (Ex. 295-D) | Colgate |
|---|---|
| 1. | Egg is held horizontally in right hand. Untreated (left) side is pushed first with metal rod, and egg dents. | Original Version (Ex. 295-I) 1.    With seashell resting on table, dental mirror taps untreated side first--it cracks and forms a hole |
| 2.  BLEND-A-MED side is then tapped with metal rod. | opening into interior of seashell; turntable then rotates to face treated |
| 3.  Cut to shot of dentist holding BLEND-A-MED package | side of seashell toward camera. |

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 37
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
            in left
            hand, which he taps     2.              Dental mirror taps treate d side--it
              with right index
            finger.                                 remains strong; turntable continues
4.          Cut to tooth model                      rotating.
              tapped with
            dental mirror.          3.              Dental mirror taps on COLGATE
5.          Hand held                               box on table.
              demonstration.
                                    4.              Table top demonstration.
                                    5.              Super at lower right identifies
                                                    COLGATE as product with which
                                                    seashell is treated.
                                    Reshot Version (Ex. YD, commercial 8)
                                    1.              No super at lower right indicating

                                                    COLGATE as product with which
                                                    seashell is treated, but shell
                                                      remains
                                                    marked with word COLGATE.
```

In a hand held demonstration, P & G's egg is pushed on the untreated side which dents, and then tapped on the treated side, which remains strong; there is no movement of the egg. In a table top demonstration, Colgate taps the untreated side of the seashell which breaks; the table top with the seashell is then rotated and the treated side is tapped. P & G uses a rod, whereas Colgate uses a dental mirror. As stated by the Executive Director of P & G's worldwide advertising agency with responsibility for

CREST, P & G's metal rod looks nothing like Colgate's dental mirror. Sherman Dep. at 84-5. P & G reminds consumers that the egg is a proxy for a tooth by tapping on a model of a tooth with a dental mirror; Colgate has a dental mirror tapping the product box.

6. STYLE

```
            P & G (Ex. 295-D)                               Colgate

1.          Frequent camera movement.       Original Version (Ex. 295-I)
2.          Demonstration filmed with both

            hand held and table top          1.   All of demonstration is done as a
              components.
3.          Flow of demonstration broken up       table top demonstration.
              by
            shot of FLUORISTAT label.        2.   Close-up; no camera movements.
4.          Use of freeze frame shots.       3.   Low angle shot of shell entering
                                                  liquid dramatizes the
                                                    demonstration.
                                             Reshot Version (Ex. YD, commercial 8)
                                                No Change.
```

**\*35** P & G has many more scenes in its demonstration, with camera movement and varying shots (*i.e.,* a freeze frame, a zoom in), and mixed demonstration styles (hand held and table top). Colgate has fewer scenes, no camera movement, and the seashell demonstration is depicted entirely as a table top demonstration. P & G breaks up its demonstration, while Colgate does not. Colgate has a low angle shot, but P & G does not.

E. *P & G "Demo Huevo" (Exhibit 295-F) v. Colgate Commercials*

1. SET UP

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                 Page 38
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
P & G (Ex. 295-F)                        Colgate


        NONE.            Original Version (Ex. 295-I)
                         1.   Setup shot of seashell, unmarked
                              beaker and box of COLGATE
                              toothpaste on table. Beaker is set
                              down with an audible tap.
                         2.   Table top demonstration.
                         Reshot Version (Ex. YD, commercial 8)
                         1.   Seashell is held in hand to reveal
                              slotted opening on its underside,
                              then turned over.
                         2.   Blue background.
```

  P & G has no set-up scene, whereas Colgate has a scene with the beaker (or the bowl in the reshot version), a seashell and a COLGATE box.

## 2. MARKING

```
        P & G (Ex. 295-F)                            Colgate


1.   Close-up of egg held vertically in   Original Version (Ex. 295-I)
     left hand as right hand draws red

     dividing line horizontally across    1.   Seashell is divided off screen
                                               with
     short axis of egg. Hands are              solid black line on long axis.
     prominently shown. Lab coat is       2.   Seashell is marked off screen
                                               with
     portrayed in background.                  red Colgate logotype "C."
2.   Cut to CREST being written on
     upper half of egg in red print.      Reshot Version (Ex. YD, commercial 8)
3.   Hand held demonstration.
4.   A tube of CREST is shown; camera     1.   Seashell is divided off screen
                                               with
     pans tube from left to right.             solid black line on short axis.
                                          2.   Seashell is marked off screen
                                               with
                                               red COLGATE logo.
```

  All of Colgate's marking is done off-screen, while in a hand held demonstration, P & G draws a red dividing line and then cuts to a scene where CREST is being written on the egg. P & G then interrupts the flow of the demonstration by showing a tube of CREST, panning from left to right, after the egg is marked. Colgate introduces no similar interruption.

## 3. APPLYING TOOTHPASTE

```
        P & G (Ex. 295-F)                            Colgate


1.   Cut to close-up of upper portion of  Original Version (Ex. 295-I)
     egg with one strip of toothpaste
     being applied from toothpaste tube.   1.   Left hand holds seashell
                                               while
     Egg is held vertically, with only         COLGATE red Diamond Head
     top
     half visible. Lab coat is displayed       toothpaste, held in right
                                               hand,
```

Not Reported in F.Supp.2d                                                    Page 39
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

in background.

2.    Fade in and slight pan left to toothbrush brushing top of egg.

3.    Fade into egg being held by hand in a horizontal position while

      "CREST" half, on left side of egg,

      is rinsed by stream of water from dental jet. Hand holds egg from right.

4.    Hand held demonstration with lab coat as background.

brushes toothpaste slurry onto seashell.

2.    No application of toothpaste from tube is shown on screen. (Toothpaste applied to toothbrush prior to tabletop demonstration.)

3.    No rinsing of toothpaste from seashell is shown on screen.

4.    Table top demonstration.

5.    No camera pan.

Reshot version (Ex. YD, commercial 8)

      No change.

   **\*36** Colgate has one table top scene in which the seashell is brushed; there is no application of toothpaste and no rinsing. In a hand held demonstration, P & G has three scenes in which the toothpaste is applied, brushed and rinsed off. The Colgate commercial has no camera movements, whereas the P & G commercial uses cuts, fades and panning shots.

### 4. SOAKING IN ACID

| P & G (Ex. 295-F) | Colgate |
| --- | --- |
| | Original Version (Ex. 295-I) |

1.    Large tweezers hold egg in a horizontal position, with CREST half

      on the right, and insert egg into

      unmarked beaker. CREST toothpaste

      tube and dental mirror are shown in

      background and foreground.

1.    Tongs hold seashell on long axis with tapered, scrolled ends of the seashell extending and visible throug h the holes in the tongs. Camera angle is a "look-up shot." Seashell placed in unmarked beaker. No zoom-in or camer a position changes. Table top demonstration.

2.    Camera zooms in as tweezers release

      egg onto clear block and are removed
      from beaker. CREST toothpaste tube remains in background.

2.    Different side shot of shell being held by tongs and removed from beaker. No time lapse, just a different angle of shot.

3.    Time lapse shown by vertical line

      crossing screen from left to right with
      super moving left to right underneath:
      "After nine hours."

4.    Tweezers reenter beaker, grab egg and
      remove it. Table top demonstration.

Reshot Version (Ex. YD, commercial 8)

1.    Bowl is used instead of beaker.

2.    Slotted opening in base of shell

Not Reported in F.Supp.2d                                                                                                   Page 40
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
                                                is
                                                visible.
```

   The P & G demonstration features tweezers which insert and release the egg onto a clear block, and later return to grab the egg and remove it. The Colgate demonstration uses tongs, the seashell is never released, and there is no showing of the seashell resting in the acid. P & G has a zoom-in and a time lapse, whereas Colgate has no camera

movement and no time lapse.

   5. TESTING

```
         P & G (Ex. 295-F)                                   Colgate

1.     Egg held at 45° angle in      Original Version (Ex. 295-I)
         left hand.
       Treated side is tapped first
         with metal
       rod. Lab coat is featured as  1.  With seashell resting on table, dental
         back-
       ground.                           mirror taps untreated side first--it
2.     Untreated side is pushed          cracks and forms a hole opening into
         with metal
       rod. Egg dents.                    interior of seashell; turntable then
3.     Cut to close-up of CREST          rotates to face treated side of
         product                         seashell
       shot; zoom in on FLUORISTAT       toward camera.
       label, pointed to by finger  2.  Dental mirror taps treated side--it
         which
       enters from right side of         remains strong; turntable continues
         screen.
4.     Cut to egg standing               rotating.
         vertically and
       being tapped on CREST side.  3.  Dental mirror taps on COLGATE
       CREST toothpaste tube            box on table.
         appears to
       the right of egg.            4.  Table top demonstration.
5.     Hand-held demonstration.     5.  Super at lower right identifies

                                         COLGATE as product with which
                                         seashell is treated.
                                    Reshot Version (Ex. YD, commercial 8)
                                    1.  No super at lower right indicating
                                         Colgate as product with which
                                         seashell is treated, but shell remains
                                         marked with word COLGATE.
```

   **\*37** In a hand held demonstration, P & G holds the egg at a 45° angle, taps the CREST side, which is strong, and pushes the untreated side, which dents; there is no rotation of the egg. In a table top demonstration, Colgate taps the untreated side of the seashell, which breaks. The table rotates and the treated side is tapped. P & G cuts to a product shot and then taps the egg again, whereas Colgate has no such scene. P & G utilizes camera cuts, whereas Colgate has no camera movement. As stated by the

Executive Director of P & G's worldwide advertising agency with responsibility for CREST, P & G's metal rod looks nothing like Colgate's dental mirror. Sherman Dep. at 84-5.

   6. STYLE

```
         P & G (Ex. 295-F)                                   Colgate
```

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                  Page 41
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

```
1.   Use of voiceover rather than        Original Version (Ex. 295-I)
        oncamera
     spokesperson.
2.   Demonstration shot with both        1.  All of demonstration is done as a
        hand
     held and table top components.          table top demonstration.
3.   Flow of demonstration is            2.  Close-up; no camera movements.
        interrupted
     by product shot.                    3.  Low angle shot of shell entering
                                             liquid dramatizes the demonstration.
                                         Reshot Version (Ex. YD, commercial 8)
                                             No change.
```

P & G uses a demonstration with hand held and table top components, whereas Colgate relies exclusively on a table top format. P & G has many more scenes, and interrupts the commercial with a product shot. Colgate has fewer scenes and no interruptions. Colgate uses a low angle shot to dramatize its experiment, whereas P & G does not use camera angle to dramatize its demonstration.

*THE COPYRIGHT CLAIM: CONCLUSIONS OF LAW*
I. *ELEMENTS OF COPYRIGHT INFRINGEMENT--OVERVIEW*

To establish copyright infringement, P & G must show that: (a) it is the owner of a valid copyright; (b) its commercials were actually copied by Colgate and Y & R; and (c) the copying constitutes unlawful appropriation because there is substantial similarity between Colgate's commercials and protectable material in P & G's commercials. *See Lone Wolf McQuade Assocs. v. CBS, Inc., 961 F.Supp. 587, 592 (S.D.N.Y.1997)* (citing *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122-23 (2d Cir.1994))*. P & G has failed to establish each of these three elements.

II. *OWNERSHIP OF A VALID COPYRIGHT*

A. *Publication Without Notice and the Evidentiary Weight of P & G's Copyright Registrations*

The Court finds as a threshold matter that P & G does not have a valid copyright interest in any of its five registered egg demonstration commercials. The first registered commercial, "Huevo Nuevo," was published without notice, and is hence incapable of being copyrighted. The four remaining egg demonstration commercials registered by P & G are derivative works based on "Huevo Nuevo" which do not contain any additional protectable material with respect to the egg demonstration.

**\*38** "Huevo Nuevo" fell into the public domain when it was aired in Chile in February 1989 without a copyright notice. *See supra* p. 4 (Stipulated Facts ¶ 20). If a copyright owner fails to place a proper copyright notice on a published work, the work ordinarily falls into the public domain. *17 U.S.C. § 401*; *see also Roy Export Co. Establishment of Vaduz, Liechtenstein v. CBS, Inc., 672 F.2d 1095, 1101 (2d Cir.1982)*. The notice requirement applies to works such as "Huevo Nuevo" which were first published prior to March 4, 1989, when the Berne Implementation Act of 1988 went into effect. Courts have labeled publication without notice in these circumstances as "divestitive" because the "distribution or other occurrence ... has the consequence of leaving [the] author with no copyright protection." *Roy Export, 672 F.2d at 1101*.

A "publication" is defined as follows: "The distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease or lending. Offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication." *17 U.S.C. § 101*.

Case law creates a distinction between a "general" and a "limited" publication, holding that only a general publication leads to divestiture. *See American Vitagraph, Inc. v. Levy, 659 F.2d 1023, 1026-27 (9th Cir.1981)*. A general publication "occurs when by the consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur." 1 M. Nimmer, Nimmer on Copyright § 4.04, at 4-18 (3d ed.1997) (hereinafter Nimmer) (footnotes omitted); *see also American Visuals Corp. v. Holland, 239 F.2d 740, 744 (2d Cir.1956)* (where plaintiff disseminated over 200 copies of his book by placing them in hotel rooms, and distributed them in an effort to get

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

business, such dissemination constituted a general publication, because even though the purpose of the distribution was limited, the "persons" to whom it might be given were unlimited). A "limited publication," in contrast, "communicates the contents of a [work] to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale ... [and therefore] does not result in the loss of the author's common law copyright to his [work]." *White v. Kimmell*, 193 F.2d 744, 746-47 (9th Cir.1952). P & G claims that its first commercial, "Huevo Nuevo," was broadcast in Chile under restrictive conditions which resulted in only a limited publication before March 4, 1989. [FN17] Yet P & G has not established the existence of any restrictions placed on the Chilean television stations which were given copies of "Huevo Nuevo" to air in 1989. In fact, P & G's witness testified that it was "not a habitual practice" of its Chilean advertising agency to take affirmative steps to protect copyright. Cassis Dep. at 79-80. The evidence indicates that "Huevo Nuevo" was not published under restrictive conditions. *See supra* pp. 18-20.

> FN17. Not only is P & G's claim that "Huevo Nuevo" was published under restrictive conditions without support in the record, but it first became a contention only after P & G's original application for "Huevo Nuevo" was rejected by the Copyright Office because it stated, without any reference to restrictive conditions, that the work had been published in February 1989. Ex. YV.

**\*39** "Huevo Nuevo" does not contain a proper copyright notice. *See id.* Therefore, P & G's "Huevo Nuevo" egg demonstration commercial was the subject of general publication without notice, and it has fallen into the public domain.

P & G's copyright registration for "Huevo Nuevo" is not sufficient to establish P & G's copyright in this work. A certificate of registration which is obtained prior to or within five (5) years of the publication of a work without notice can cure the defect in notice. 17 U.S.C. § 405(a)(2) (1994). Registration within five years of first publication is also prima facie evidence that the copyright is valid and owned by the party named in the registration. 17 U.S.C. § 410(c). "The evidentiary weight to be accorded the certificate of registration made thereafter shall be within the discretion of the court." *Id.* The copyright of "Huevo Nuevo" was registered on November 18, 1996, more than five years after its first publication in 1989. Ex. 73. Furthermore, this copyright was obtained by failing to state a date of "first publication" after an application stating that the first publication was in

February 1989 was rejected because publication without notice was prior to March 1989 and registration had not been made within five years to cure this defect. Ex. YV. The prior application is an admission of publication in February 1989, which is confirmed by Ex. 13 (chart of commercial launch dates). Accordingly, the copyright registration is not prima facie evidence of copyrightability and does not cure the failure to publish "Huevo Nuevo" with a copyright notice.

Moreover, there is even a question whether P & G would be the owner of any copyright which did inhere in the "Huevo Nuevo" commercial. An internal P & G memorandum states that an "unnamed outside consultant in Chile" continued the work of the first developer of the egg demonstrations for television commercials in Chile. Ex. KX; *see also supra* p. 18. There is no evidence in the record concerning whether this consultant assigned his rights to P & G or developed the demonstration on the "work for hire" basis described in 17 U.S.C. § 201(b).

The chief obstacle to the copyrightability of the egg demonstration portions of the other four registered commercials is that they are derivative works based on "[p]revious commercials incorporating an eggshell demonstration showing the effect of Crest on teeth" and contain "footage previously registered." Exs. VY (initial copyright registrations), 72, 74, 75, 80 (resubmitted copyright registrations). [FN18] The egg demonstration portions of these commercials do not add sufficient original material to the previously registered egg demonstration footage of "Huevo Nuevo" to merit copyright protection.

> FN18. There is evidence that three of the four remaining commercials do not suffer from a defect in notice because they were published after March 4, 1989, the date on which the Berne Implementation Act became effective, and notice is not a prerequisite for the copyrightability of such works under 17 U.S.C. § 401. Ex. YV (original copyright applications for "Crest Family Egg," "Crest Egg" and "Demo Huevo"). The publication date of the final commercial, "Hungarian Presenter," is not contained in the record.
> There is evidence that one of these four commercials, "Crest Egg," was registered within five years of its first publication, making its registration prima facie evidence of copyrightability. Ex. YV. Two of the four commercials, "Crest Family Egg" and "Demo Huevo," were first published more than five years prior to registration, and their registration is therefore not effective as prima facie evidence

Case 5:07-cv-00347-D    Document 112-2    Filed 10/15/2007    Page 123 of 169

Not Reported in F.Supp.2d                                                                    Page 43
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

of copyrightability. Ex. YV. The gap between first publication and registration for the final commercial, "Hungarian Presenter," is not contained in the record. Irrespective of issues regarding notice and the impact of registration of these four commercials, the egg demonstration portions of these commercials are ineligible for copyright protection because they fail to satisfy the originality requirement for derivative works.

Derivative works must possess substantial originality in order to satisfy the originality requirement of the Copyright Act, 17 U.S.C. § 101. *See Weissmann v. Freeman, 868 F.2d 1313, 1321 (2d Cir.1989).* The Copyright Act explicitly provides that the copyright in a derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. 17 U.S.C. § 103(b); *see also Woods v. Bourne Co., 60 F.3d 978, 990-91 (2d Cir.1995); Lee v. Deck the Walls, Inc., 925 F.Supp. 576, 580-81 (N.D.Ill.1996)* (noting that Congress expressly included an originality requirement in the definition of "derivative work," and that the inquiry should be limited to whether a "new and different original work" is created in relation to the underlying work from which it was derived), *aff'd 125 F.3d 580 (7th Cir.1997).* The fact that the party seeking protection for a derivative work also created the preexisting material is irrelevant to the test of originality. *See Sherry Mfg. Co. v. Towel King of Florida, Inc., 753 F.2d 1565, 1568-69 (11th Cir.1985).*

**\*40** The Second Circuit has established that when a work is similar to pre-existing material, "to support a copyright there must be at least some substantial variation [upon the pre-existing material], not merely a trivial variation." *L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 491 (2d Cir.1976); see also Sherry Mfg. Co., 753 F.2d at 1568* (observing that derivative work must contain "some substantial, and not merely trivial, originality" to merit copyright protection). The *Batlin* standard of substantial originality for derivative works has not been restricted to "works of art." *See, e.g., Woods v. Bourne, 60 F.3d at 990* (relying on *Batlin* as authoritative statement concerning standard of originality in context of case involving musical arrangements, audiovisual works and sound recordings); *Tempo Music, Inc. v. Famous Music Corp., 838 F.Supp. 162, 169-70 (S.D.N.Y.1994)* (applying *Batlin* test to sound recordings).

Courts have consistently rejected attempts to gain copyright protection for allegedly derivative works that are based on trivial changes to preexisting materials, regardless of whether the preexisting materials are in the public domain or protected by copyright. *See, e.g.,*

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211, 1223 (9th Cir.1997), cert. denied, 523 U.S. 1021, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998); Gracen v. Bradford Exch., 698 F.2d 300, 304-05 (7th Cir.1983); Batlin, 536 F.2d at 488-89, 492; EFS Mktg., Inc. v. Russ Berrie & Co., Inc., 836 F.Supp. 128, 133 (S.D.N.Y.1993), aff'd in part, vacated and rev'd in part on other grounds, 76 F.3d 487 (2d Cir.1996); Past Pluto Prods. Corp. v. Dana, 627 F.Supp. 1435, 1437, 1441-42 (S.D.N.Y.1986).*

P & G alleges nine unique elements in its egg demonstrations:

    1. an egg-shaped and egg-colored (i.e.white)  [FN19] shell;

        FN19. Chicken eggs can be, of course, brown, blue or green as well as white. The Amended Complaint presumably uses the phrase "egg-colored" to refer to the color white.

    2. placement of the hand holding the shell on the left side of the screen with no other face or body parts present;
    3. a black line dividing the shell into two halves;
    4. a red marking on the right half (the treated side) of the shell;
    5. use of a toothbrush to brush toothpaste on the marked side of the egg;
    6. placement of the shell with wire tongs in a glass beaker filled with a clear acid solution;
    7. removal of the shell from the acid solution;
    8. tapping each half of the shell with a metal rod; and
    9. a visual effect of the untreated side becoming dented or perforated while the treated side remains hard.
Ex. YC (Amended Complaint) ¶ 37. These elements were contained in "Huevo Nuevo" as well as in the other four registered commercials. The egg demonstration portions of the four remaining commercials do not contain additional original material with respect to the egg demonstration which would warrant their protection as derivative works.

B.  *The Distinction Between Protectable and Nonprotectable Elements*

Even if the Court were to ignore the publication of the "Huevo Nuevo" commercial without notice, which placed the commercial into the public domain, and the minimal original contributions of the other four derivative commercials, the egg demonstration portion of the P & G commercials still would not merit copyright protection. Considered on their own, the nine "unique elements" highlighted by P & G are not copyrightable. First, these elements are unoriginal, as egg demonstrations showing

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

the effect of fluoride on teeth and containing much the same set of elements had been used by various third parties long before P & G produced its egg demonstration. Second, P & G cannot be granted the protection it seeks because such relief would effectively lend P & G a monopoly over certain basic, uncopyrightable ideas about how to illustrate the effect of fluoride on teeth. Third, the elements that P & G attempts to protect are largely functional elements, dictated by the requirements of performing a scientific experiment in a television commercial format, and they are therefore ineligible for copyright protection.

1. *The Originality Requirement*

**\*41** It is a basic tenet of copyright law that protection extends only to expressions that are original. 17 U.S.C. § 102(a); *see also National Basketball Ass'n v. Sports Team Analysis and Tracking Sys., Inc.,* 939 F.Supp. 1071, 1089 (S.D.N.Y.1996) ("The requirement of an original expression is the very 'premise of copyright law.' " (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 347, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)), *aff'd in part, vacated in part on other grounds sub nom. National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841 (2d Cir.1997); *Conan Properties, Inc. v. Mattel, Inc.,* 712 F.Supp. 353, 358 (S.D.N.Y.1989). Thus, copyright protection may extend only to those components of a work that are original to the author. *See Feist,* 499 U.S. at 348; *Harper & Row Publications Inc. v. Nation Enters.,* 471 U.S. 539, 556, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

The evidence shows that the elements of the experiment underlying the egg demonstration portions of the P & G commercials have been included in school materials distributed in the United States, Europe and the Far East since the 1960's. Exs. AO, AP, AQ, VB, VF, VG, VH, VR, VS, VV, VW, VX, ZS, ZT, ZV, ZW, ZX, ZY; Ex. OF at 26. In addition, during the 1970's Colgate's then advertising agency, Ted Bates, developed a protocol for using the experiment in advertising. Tr. 1559:16-20, 1560:23--1561:12 (Kaminsky). In 1979, Colgate filmed at least two commercials containing demonstrations of the same experiment using a single egg. Tr. 1566:8--1567:10 (Kaminsky); Exs. 100, 101. Third parties, such as Elmex, also used an egg demonstration in toothpaste advertising before P & G. Ex. VY. P & G does not dispute that third party written materials were published long before P & G began to show television commercials containing an egg demonstration. *See supra* pp. 14-17. Moreover, Michael Zbuchalski, the "developer" of the egg demonstration for the P & G television commercials, was provided with unidentified prior works concerning egg and fluoride experiments in connection with his own experimentation.

Zbuchalski Dep. at 85-86, 88.

Merely "translating" the work from the medium of school materials to television commercials does not demonstrate sufficient originality. The Second Circuit in *Batlin* ruled that when a work is similar to pre-existing material, "to support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium." *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 491 (2d Cir.1976); *see also Sherry Mfg. Co.,* 753 F.2d at 1568 (observing that derivative work must contain "some substantial and not merely trivial, originality" to merit copyright protection).

All of the nine allegedly unique elements of the P & G egg demonstration are similar to elements of previously published egg demonstration commercials:

1. *An egg-shaped and egg-colored shell*--This element appears in a vast array of school materials used throughout the world. Exs. AO, AP, AQ, VF, VG, VH, VR, VS, VV, VX, ZS, ZT, ZV, ZW, ZX, ZY (sample school materials describing an egg demonstration); Exs. VW at 8-9 (egg demonstration from Great Britain), VB at 4 (egg demonstration from U.S.), OF at 26, ¶ 5 (egg demonstration from Asia). It also appears in Colgate's 1979 commercials and in the commercials produced by Elmex. Exs. 100, 101 (Colgate commercials), VY (Elmex commercials). The use of a white colored proxy for a tooth is hardly original, because the color white encourages consumers to associate the proxy with a tooth and to believe the two are similar.

**\*42** 2. *Placing the egg on the screen in close-up, with no other face or body parts present*--A close-up is a common element in many commercials using demonstrations. Sheila James, qualified as an expert in the production of television commercials, Tr. 1091:23--1092:25, described the close-up in which "[t]here is no extraneous information" as "a fundamental convention of demonstration production." Tr. 1095:21--1096:19 (James). The parties' witnesses testified that the use of just a hand is "conventional" because this type of demonstration is typically filmed using close-ups. Tr. 1358:7-21 (Deahl), 1124:17-25 (James), 1585:12--86:5 (Cassis), 1601:6--1602:4 (Breissinger). Commercials for various products have used the close-up as a convention. Ex. QQ1 (Visine, Palmolive and Antacid commercials). P & G's witnesses agree that use of a close-up is "absolutely" the "standard practice" in demonstrations. Bressinger Dep. at 81-82; Sherman Dep. at 35; Cassis Dep. at 126-28.

3. *Dividing the egg into two halves*--This is found in a number of the school materials, *see, e.g.,* Exs. VW at 8-9, and in Colgate's 1979 commercials, Exs. 100, 101, and the Elmex commercials, Ex. VY. The choice to

Not Reported in F.Supp.2d                                                                 Page 45
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

perform a demonstration on treated and untreated halves of a single subject (rather than on two subjects, one treated and one untreated) is conventional in commercials for various products. Tr. 1109:5-23 (James); Ex. QQ1 (Armor All and cleaning products commercials); Cassis Dep. at 126-27 (stating that "it's a better objective test if the test is done with the same egg"). The use of a dividing line between the treated and untreated halves is "perhaps the most time honored of conventions," Tr. 1109:5--1110:1 (James), and has appeared in commercials for various other products. Ex. QQ1 (Armor All and cleaning products commercials).

4. *Marking on the treated side of the egg*--This is found in the school materials. *See, e.g.,* Ex. VW at 9. It is conventional in demonstration commercials to identify for consumers which side of the subject is the treated side. Tr. 1111:8-20 (James); Ex. QQ1 (commercials for other products).

5. *Using a toothbrush to brush toothpaste on the marked side of the egg*--This process was used by scientists in the 1970's at the Ted Bates agency. Tr. 1559:3-15 (Kaminsky). It is conventional to use toothbrushes (and other props commonly associated with the product, such as dental mirrors) in toothpaste commercials. Tr. 985:18-20 (Pollack), 1106:9--1107:23 (James) (testifying that it is conventional to use the contextually appropriate tool to conduct the demonstration and support the metaphor being employed).

6. *Placing the egg in a clear glass container (including a beaker) to soak in an acid solution*--This element appears in previously published school materials. Exs. VU at 1, VX at 1, ¶ II. It is conventional in demonstration commercials to use laboratory tools, such as beakers and tongs, to lend authority to the demonstration. Tr. 1116:24--1118:20 (James); Ex. QQ1 (commercials using laboratory props such as beakers and laboratory spatulas). P & G witnesses agree that it is conventional to use contextually appropriate tools such as tongs, beakers and acid, that they are required scientifically, and that they are the logical and objective choice. Cassis Dep. at 135-36; Upson Dep. at 60-61, 64-65; Breissinger Dep. at 69-71; Stone Dep. at 91-93; Oxendine Dep. at 235-36; Tr. 985:21--989:19 (Pollack), 1370:21--1375:2 (Deahl), 1114:20--1116:23 (Zbuchalski).

**\*43** 7. *Removing the egg from the acid solution*--This element is found in the work of Ted Bates Agency, Tr. 1565:12-14 (Kaminsky), and in school materials, *see, e.g.,* Ex. VU.

8. *Tapping each half of the egg to show hardness (including tapping with a dental instrument)*--Tapping to show hardness is found in old Colgate commercials. Exs. ZB, ZC (Colgate historical reels). It is conventional, especially in toothpaste commercials, to

use tapping to show strength; it is also conventional to show the strength of a tooth or a tooth proxy by tapping it with a dental mirror. Tr. 1123:2--1124:16 (James) (testifying that tapping is "a conventional part of this kind of a demonstration"); Ex. QQ1 (Maybelline commercial using tapping to demonstrate strength).

9. *A visual effect of the untreated side becoming dented or perforated while the treated side remains hard*--If a demonstration showing the effect of toothpaste a tooth proxy is to be depicted in a television format, it is necessary, rather than original, for there to be a visual effect that the untreated half of the subject has become weak while the treated half has remained hard.

The evidence suggests that these nine elements of the P & G egg demonstration not only lacking in originality, but so conventional, in fact, that they constitute *scenes a faire*. Scenes a faire are "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir.1980). Under the *scenes a faire* doctrine, similarities in sequences of events and settings that necessarily follow from a common theme, or that are standard in the treatment of a given topic or idea, are not entitled to copyright protection. *See id. at 979.*

The *scenes a faire* doctrine applies to more than just those elements of a work that necessarily flow from a given idea; it also applies to elements that are standard to certain situations. *See id.* The *scenes a faire* doctrine is not restricted to literary or film genres, but also encompasses genres of advertising. *See Reed-Union Corp. v. Turtle Wax, Inc.,* 77 F.3d 909, 913 (7th Cir.1996) (television commercials for car polishes constitute a genre with *scenes a faire* including such "hackneyed ideas" as "polishing up old cars, washing the polished cars, [and] claiming the support of lab tests"); *American Direct Mktg., Inc.,* 783 F.Supp. at 95 (direct television marketing of consumer goods is a genre of advertising incorporating *scenes a faire* such as lists of product effects, layouts for comparisons with advertisements of others, and sequencing of events from simulation to product virtues to price comparison to request for a telephone order). As described above, the evidence suggests that P & G followed "fundamental convention[s] of demonstration production," Tr. 1095:21--1096:19 (James), the "standard practice," Bressinger Dep. at 82, and "time honored of conventions," Tr. 1109:5--1110:1 (James). The elements of the egg demonstration that P & G seeks to protect are unoriginal and standard to product demonstrations and toothpaste demonstrations in particular, and are thus ineligible for copyright protection.

**\*44** The stylistic features introduced by P & G in its

version of the egg demonstration (*e.g.,* holding the egg on the left side of the screen, using a black line to divide the egg, using a red mark on the treated half of the egg, using tongs to place the egg in the acid) are nothing more than trivial variations on the preexisting materials or the result of converting the experiment from written materials, such as the school materials, to presentation in a television commercial. Such minor changes are not sufficiently original to warrant copyright protection. *See Sherry Mfg. Co., Inc. v. Towel King of Florida., Inc.,* 753 F.2d 1565, 1568 (11th Cir.1985) (trivial changes to preexisting work do not satisfy originality requirement); *Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 491 (2d Cir.1976) (" '[T]he mere reproduction of a work of art in a different medium should not constitute the required originality .' " (quoting 1 M. Nimmer, The Law of Copyright § 20.2, at 94 (1975))).

 P & G contends that Leo Burnett Chile made "numerous creative decisions" in developing the visual execution, and points to other aspects of the egg demonstration in addition to the nine elements mentioned in paragraph 37 of the Amended Complaint. There is nothing in the record to show that these choices were "creative." In fact, an examination of these allegedly creative choices in light of the evidence presented at trial shows that the decisions of Leo Burnett Chile were not original:

a. *The length of the visual (i.e., 10, 15, 30, 45 or 60 seconds)*--The times indicated as being a creative choice are standard television commercial lengths, and P & G presented no evidence that the length of its Chilean visual is creative in any respect. Moreover, P & G presented no evidence that the length of Colgate's visual was copied from P & G's or that it is even the same length as P & G's visual.

b. *The setting*--P & G's Chilean egg demonstration is set in what appears to be a dentist's office. This is standard in toothpaste commercials. P & G's other egg demonstration commercials are set in a variety of different places. P & G presented no evidence that using a dentist's office, or any of the other settings P & G has used, is creative, or that any of these settings have been copied by Colgate.

c. *The amount of human involvement (i.e., hand holding egg, placement on table)*--In a conventional close-up shot, having a left or right hand hold an egg or object is not creative but generally required. A tabletop placement in and of itself is not creative; its use is so standard that experiments using this format are commonly called "table top demonstrations."

d. *The number of eggs used (i.e., one egg with one half treated, as opposed to two eggs--one treated and one untreated)*--The number of eggs used is not creative. The use of a single egg is dictated by the need to avoid variability among eggs and the fact that viewers will

appreciate the simplicity of using one egg. *See supra* pp. 35-39, 49. Further, the choice is realistically between one egg or two, and a choice between such limited options is not creative.

**\*45** e. *The method of treating the egg with fluoride (i.e., brushing, soaking or using some other method)*--If anything, the testimony shows that using a toothbrush to apply the toothpaste in the commercial is a logical choice, not an original one. The creator of P & G's demonstration agreed that this choice is not creative but "logical." Cassis Dep. at 130-33.

f. *The nature of the marking on the treated part of the egg(s)*--Marking the treated side of an object is conventional, not creative. The creator of P & G's demonstration agreed that this marking is used merely to facilitate understanding of which side is treated. Cassis Dep. at 128.

g. *The type of acid used (i.e., acetic acid, vinegar, soft drink, lemon juice)*--This choice is dictated by the experiment and there is no evidence it is creative. In fact, there is no ability for the commercial viewer to perceive the type of acid used.

h. *The type of container used for the acid (i.e., beaker, bowl, cup, aquarium)*--The use of a beaker is conventional. Tr. 1121:6--1122:11 (James). Its use reflected a "lack of creative and innovative thinking." Sherman Dep. at 253. There is no evidence that the use of a beaker in a scientific demonstration is creative.

i. *The size of the container*--This is dictated by the size of the proxy for the tooth, and there is no evidence that this feature of the commercial is creative.

j. *Whether and how to place the egg in the acid (i.e., using fingers, spoon, tongs, tweezers)*--This choice is dictated by convention and logic. There is no evidence that it involves a creative decision. The creator of P & G's demonstration agreed that using tongs is an objective way to perform the experiment, because it avoids the need to touch the egg, which would "contaminate this part." Cassis Dep. at 135. Other witnesses agree it is an "expected way to run the experiment." Upson Dep. at 64-65; Bressinger Dep. at 69-71.

k. *Whether and how to remove the egg from the acid*--Removing the egg from the acid is practically and scientifically necessary, Stone Dep. at 94; Westendarp Dep. at 98-99, as well as commercially necessary, Sherman Dep. at 256-57; Westendarp Dep. at 99. The creator of P & G's demonstration testified that it was "not feasible" to leave the egg in the acid. Cassis Dep. at 137-38. There is no evidence the choice to remove the egg was creative.

l. *Whether and how to show the effect of the toothpaste on the egg (i.e., using a probe, tapping without instrument, tapping against a table, observing bubbling from the surface of the untreated eggshell)*--The

evidence shows that it is conventional in a toothpaste advertisement to show the effect of the toothpaste in some manner, *see, e.g.*, Ex. ZB (Colgate historical reel), and P & G presented no evidence that their choice in this regard was creative.

m. *The appropriate lighting, backgrounds and camera angles to use to make the visual aesthetically appealing*--P & G submitted no evidence as to what its choices were regarding these elements, let alone whether the choices were creative. Further, P & G submitted no evidence that Colgate's commercials were copied from P & G or that they are substantially similar in this regard.

**\*46** It is noteworthy that Mr. Cassis, the Managing Director of Leo Burnett Chile, and the "father" of P & G's first egg demonstration commercial, "Huevo Nuevo," did not testify at trial. Given the importance of his testimony on the issue of creativity, and the fact that his deposition transcript is devoid of any testimony as to the "creative" choices he supposedly made, the Court has little upon which to rely in determining the elements of creativity in "Huevo Nuevo," beyond the camera angles, lighting, and use of closeups and panning which are evident from the commercial itself, and which were not themselves copied by Colgate.

Because the elements of P & G's egg demonstration commercials are not unique and the choices involved in the execution of the commercials were not creative, P & G's egg demonstration fails to constitute an original work of authorship, and P & G's copyright claim must be rejected, on this basis alone, as the egg demonstration portions of its commercials are not properly subject to copyright protection. *See, e.g., Batlin & Sons. Inc., 536 F.2d at 488-89, 492; Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 910 (2d Cir.1980); Gracen, 698 F.2d at 305; Modern Publ'g v. Landoll, Inc., 849 F.Supp. 22, 24 (S.D.N.Y.1994); Past Pluto Prods. Corp., 627 F.Supp. at 1437, 1441-42.*

2. *The Idea/Expression Distinction*

The experiment that is contained in P & G's various egg demonstration commercials is an "idea, procedure [or] process," and as such is not protectable under copyright law. As a result, the specific executional steps of the experiment are not protectable by P & G. Section 102(b) of the Copyright Act states this general principle:

In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work.

17 U.S.C. § 102(b).

Fundamental to copyright law is the precept that copyright protection extends only to expressions of an idea, and not to the ideas themselves. *See Mazer v. Stein, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954)* (citations omitted); *Judith Ripka Designs, Ltd. v. Preville, 935 F.Supp. 237, 247 (S.D.N.Y.1996)* (citations omitted); *Direct Mktg. of Va., Inc. v. E. Mishan & Sons, Inc., 753 F.Supp. 100, 104 (S.D.N.Y.1990); Conan Properties, Inc. v. Mattel, Inc., 712 F.Supp. 353, 358 (S.D.N.Y.1989).* Accordingly, "if a defendant has not copied something protected by the copyright laws--specifically, the plaintiff's expression of his ideas--then his copying will not subject him to liability." *Judith Ripka Designs, Ltd., 935 F.Supp. at 247* (quoting *Stillman v. Leo Burnett Co., Inc., 720 F.Supp. 1353, 1357 (N.D.Ill.1989)*).

The executional elements of the egg demonstration portions of the P & G commercials are visual depictions of an experiment showing how fluoride protects teeth from cavities caused by mouth acids. Ex. YC (Amended Complaint) ¶ 21; Tr. 68:15-23 (Panayotopoulos). As such, they are not, in and of themselves, protectable under the copyright laws because they constitute scientific facts or processes concerning fluoride, teeth and mouth acids.

**\*47** The P & G egg demonstration centers around the idea of the following scientific experiment:
  a. choosing a scientifically valid calcium based proxy for a tooth;
  b. treating half that proxy with toothpaste; [FN20]

    FN20. This step could utilize two identical proxies and treat one with toothpaste.

  c. soaking the proxy in an acid similar to the acids of the mouth;
  d. removing the proxy from the acid; and
  e. demonstrating that the treated side of the proxy remains hard, while the untreated side becomes soft.
  Exs. AM, GB, GC, GE (various descriptions of P & G's egg demonstration). As stated by Dimitri Panayotopoulos, the President of P & G China, the "essence of the demonstration" comprises "an egg, ... going into a glass of vinegar and then coming out with one side being soft, the side that didn't have the toothpaste put on it, and the other side being hard to make the point that it strengthens your teeth." Tr. 104:15--106:3 (Panayotopoulos). These specific steps comprising the experiment are not protectable and are free for anyone to use. What P & G claims to be protectable is no more than the idea itself, which is ineligible for copyright, coupled with non-original executional elements.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

 Any additional executional elements accompanying the basic idea of the experiment are evaluated by the Court as "merged" with the unprotectable idea itself. Where a given idea is inseparably tied to a particular expression, "rigorously protecting the expression would confer a monopoly over the idea itself, in contravention of the statutory command." 4 Nimmer § 13.03[B][3], at 13-72 (footnotes omitted). Under the merger doctrine, "where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself,' then the expression of the idea is unprotected as well." *Churchill Livingstone, Inc. v. Williams & Wilkins,* 949 F.Supp. 1045, 1051 (S.D.N.Y.1996) (quoting *Kregos v. Associated Press,* 937 F.2d 700, 705 (2d Cir.1991)). The merger doctrine applies to commercial advertising. *See American Direct Marketing, Inc. v. Azad Int'l, Inc.,* 783 F.Supp. 84, 95 (E.D.N.Y.1992) (discussing application of merger doctrine to copyright claim involving similar television commercials used to advertise competing plaque fighting agents).

 The specific executional steps of the demonstration depicted in P & G's television commercials (as well as in the commercials of Colgate and Elmex) are demanded by the experiment itself. It is impossible to perform the experiment (the idea, procedure or process) without following the general sequence of steps (the expression). Therefore, as to the expression there is merger, which means the sequence of steps is not protectable by copyright. [FN21]

 FN21. *Rubin v. Boston Magazine Co.,* 645 F.2d 80 (1st Cir.1981) is distinguishable because here it is impossible, once the choice of a single object rather than two objects is made, to perform the experiment without following the specific sequence.

 P & G's claim is based on the argument that Colgate and Y & R could have expressed the demonstration of the experiment in other ways, and that Colgate and Y & R were required to use those other ways to demonstrate the commercial even if they were impractical or less effective, because P & G has a copyright interest in the most effective way. P & G's Pretrial Mem. at 12. However, competitors should not be prevented from making independent judgments about what sequence makes an effective advertisement so long as those judgments are not based on copying, but are instead based on rational and credible reasons. [FN22]

 FN22. P & G's own witnesses, as well as defendants' expert Sheila James, testified that several of the alternative formats that P & G

suggests Colgate should have adopted do not lead to effective advertising. For example, P & G witnesses testified that "biological materials" such as teeth or bones were not visually appropriate for consumer advertising, Lohrisch Dep. at 167; Dias Dep. at 107-08, and that pushing the shell against a wall, instead of tapping it to show the visual effect of the demonstration "would be silly." Lohrisch Dep. at 168-69.

 **\*48** In determining the range of alternative modes of expression, courts should consider efficiency and utility. If there are other physically possible alternatives, "efficiency concerns may so narrow the practical range of choice as to make only one or two forms of expression workable options." *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 708 (2d Cir.1992) (citing 3 Nimmer § 13.03[F][2], at 13-65 (1991)). Where efficiency considerations limit the range of possible forms of expression, a copyright will not protect the choice of one form over another. *See Productivity Software Int'l Inc. v. Healthcare Techs., Inc.,* 37 U.S.P.Q.2d 1036, 1040 (S.D.N.Y.1995). As P & G's own witnesses and defendants' experts have testified, a practical, efficient television commercial based on the calcium/fluoride demonstration will include: the use of a calcium-based substance as a proxy for a tooth, Stone Dep. at 39, 89; Faller Dep. at 37, 41, 99; Fredricks Dep. at 112-113; Dias Dep. at 107-108; Westendarp Dep. at 82-83; Zbuchalski Dep. at 29-30; Lohrisch Dep. at 166; the use of a single proxy, rather than two proxies, Cassis Dep. at 127; Breissinger Dep. at 60-61; Sherman Dep. at 247; Oxendine Dep. at 228; Tr. 1114:13-19 (James); the division of the proxy with a dark line, Cappabianca Dep. at 107; Sherman Dep. at 251; Oxendine Dep. at 228-29; Upson Dep. at 62-63; Tr. 1109:5- 23 (James); Whan Dep. at 29-30; Breissinger Dep. at 65-66; the use of beakers and tongs as props in the demonstration, Cassis Dep. at 135-37; Upson Dep. at 64-65; Breissinger Dep. at 69-71; Tr. 1114:20--1115:24, 1121:15--1122:11 (James); Dias Dep. at 44-45; and the use of tapping to show the hardness of the treated side of the subject, Tr. 991:13-22 (Pollack), 1376:7-22 (Deahl); Dias Dep. at 49-50; Tr. 1123:5-22 (James). P & G can no more protect these elements necessary for an effective, practical and efficient visual demonstration of the experiment in television advertising than they can protect the underlying idea of the experiment itself.

 The Court notes, additionally, that if trivial variations in expressions of the experiment--the color of the dividing line, the positioning of the egg on the screen, and so on-- were not deemed "merged" with the basic idea of the experiment, the sheer number of egg demonstration

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

Page 49

commercials P & G has aired worldwide, each with minor stylistic modifications, would threaten to effectively grant P & G a monopoly over the idea of the egg demonstration.

 Consider, for example, the dividing line separating the eggs in half (which P & G claims is a protected element). P & G commercials have used a solid line, a dotted line, and a slash instead of a line; they have used a red line and a black line; they have used a thin line and a thick line; they have used a line drawn on camera and a line drawn off camera. *See supra* p. 22. If P & G had chosen, in November 1996, to copyright these versions of its egg demonstration, there would be no reasonable alternatives left and the copyright holder would have control over the idea itself, not just the expression of the idea. The copyright laws were not intended to create such monopolies. *See* Register of Copyright, 87th Cong., 1st Sess., *Copyright Law Revision,* Rep. on the Gen. Revision of the U.S. Copyright Law 6 (H. Jud. Comm. Print 1961) ("[T]he ultimate task of the copyright law is to strike a fair balance between the author's right to control the dissemination of his works and the public interest in fostering their widest dissemination."). Copyright law must not only prevent monopolies over basic ideas, but also avoid the situation whereby a party, "by copyrighting a mere handful of forms, could exhaust all possibilities of future use of the substance." *Morrissey v. Proctor & Gamble Co.,* 379 F.2d 675, 678 (1st Cir.1967).

 **\*49** In comparing Colgate's commercials to its copyrighted works, P & G blurs the lines between its own commercials. That is, P & G takes one element from one commercial and another element from another commercial and puts them together claiming copyright protection for the composite, although no one single work contains all of the claimed elements. Ex. YC (Amended Complaint) ¶ 37. P & G cannot pick one from column A and one from column B. Rather, for there to be a valid claim, each copyright must stand on its own and be valid, copied and substantially similar to Colgate's commercials, in its own right. P & G has failed to demonstrate that this is the case.

 The P & G egg demonstration commercials consist of an unprotectable experiment and executional elements which should be considered merged with the idea of the experiment itself, and P & G's copyright claim could be denied on this ground alone.

 *3. Functionality*

 P & G's egg demonstration also is not protectable because the elements P & G relies on are functional--that is, they are required by scientific aspects of the experiment and/or the need to depict the experiment clearly and in a very short period of time. *See supra* pp. 52-53 (describing logical, functional choices underlying executional elements in defendants' commercials). These elements are ineligible for copyright because "copyright law does not protect ... 'forms of expression dictated solely by functional considerations." ' *Sem-Torq, Inc. v. K Mart Corp.,* 936 F.2d 851, 854-55 (6th Cir.1991) (citations omitted).

 Plaintiff argues that defendants may not rely on a "defense of functionality" because the defense of functionality is only included in the Copyright Act's definition of "pictorial, graphic or sculptural works," and not in the statute's definition of audiovisual works. See Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law at 50 n.21.

 Functional, utilitarian and mechanical aspects of works such as audiovisual works, literary works, sound recordings, derivative works and compilations are not protectable by copyright. Courts have refused to grant copyright protection to functional elements notwithstanding the absence of any express language in the statutory definition of these works similar to the language contained in the statutory definition of "pictorial, graphic and sculptural works." *See, e.g., Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 714 (2d Cir.1992) (no infringement of plaintiff's computer program, considered a literary work under the Copyright Act, because, inter alia, "functional elements and elements taken from the public domain do not qualify for copyright protection"); *Victor Lalli Enters. v. Big Red Apple, Inc.,* 936 F.2d 671, 673 (2d Cir.1991) (holding that district court had "correctly found [that plaintiff] arranges factual data according to 'purely functional grids that offer no opportunity for variation' " and that "[t]he format of the charts is a convention") (citation omitted); *Productivity Software Int'l Inc. v. Healthcare Techs., Inc.,* 37 U.S.P.Q.2d 1036, 1041 (S.D.N.Y.1995) (finding that a feature of plaintiff's computer program "may not be copyright protected since this feature is clearly dictated by requirements of functionality").

 **\*50** In addition, Section 102(b) of the Copyright Act states that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, *process, system, method of operation,* concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (emphasis added). The lack of copyrightability of a "process," "system" or "method of operation" included in a work expresses Congress's intent to deny copyright protection to the functional aspects of a work, such as the nine functional elements of the egg

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 50
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

demonstration. *See Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1524 (9th Cir.1993)* ("The protection established by the Copyright Act for original works of authorship does not extend to the ideas underlying a work or to the functional or factual aspects of the work." (citing 17 U.S.C. § 102(b))).

Plaintiff's position would afford copyrightability to slight, functional variations on a pre-existing work as long as they were not "pictorial, graphic or sculptural works," and is rejected.

The elements within the egg demonstrations which are functional are:

a. *The egg*--Faller Dep. at 99-100; Westendarp Dep. at 85-86 (egg is one of a limited number of scientifically valid substances for the tooth proxy);

b. *One egg*--Cassis Dep. at 127; Tr. 1585:12-19 (Cassis), 1635:20-24 (Sherman), 1597:23--1598:7 (Breissinger), 1782:21--1783:11 (Stone), 972:9--973:10 (Pollack), 1356:24--1358:6 (Deahl) (use of one egg creates a better objective test of the toothpaste, is conventional, logical, and preferable both scientifically and technically);

c. *Use of acid*--Cassis Dep. at 135-36; Stone Dep. at 91-93 (use of acid, level of acidity of the acid, and amount of time proxy is soaked in acid is scientifically mandated);

d. *Removal of the egg*--Stone Dep. at 94; Sherman Dep. at 256-57; Westendarp Dep. at 98-99 (removal of proxy from acid solution is scientifically and commercially required);

e. *Close-up*--Cassis Dep. at 126-28; Breissinger Dep. at 81-82; Sherman Dep. at 33-35; Cappabianca Dep. at 104-05; (close-up is commercially required to focus viewers' attention on small object);

f. *Holding egg in hand*--Tr. 1108:1-14 (James), 1358:7--1359:7 (Deahl) (holding in hand is functional--necessary to hold securely);

g. *Dividing line*--Upson Dep. at 62-63; Whan Dep. at 29-30; Cappabianca Dep. at 105 (dividing line is functional); Oxendine Dep. at 229 (dividing line is "critical" to consumer understanding); Tr. 131:3 (Panayotopoulos) ("You need to have a line");

h. *Marking*--Cassis Dep. at 135; Backman Dep. at 73-74; Whan Dep. at 29-30 (marking on treated side is conventional, logical and functional);

i. *Tongs*--Cassis Dep. at 135 (tongs considered an objective way to put the egg into acid without using a hand, which would "contaminate" the experiment); Tr. 985:21--988:7 (Pollack), 1370:21--1373:13 (Deahl) (tongs do not distract the viewer from the metaphor, are a conventional tool with a scientific connotation, and would allow for quick and controlled immersion and removal), 1114:20--1116:23 (James) (tongs are obvious

choice to do job efficiently without wobbling; nothing else works as well for task);

**\*51** j. *Toothbrush*--Dias Dep. at 130-33; Sherman Dep. at 90-91 (increases believability and clarity of communication of demonstration);

k. *Beaker*--Dias Dep. at 44-45; Sherman Dep. at 254-55; Oxendine Dep. at 234; Upson Dep. at 58, 60-61 (clear container functional for a visible demonstration--the more visible, the better); Zbuchalski Dep. at 133 ("essential" to be able to see subject of experiment); and

l. *Tapping*--Dias Dep. at 133 (appearance alone without tapping does not communicate protection); Westendarp Dep. at 103-04 (tapping necessary to the demonstration to show the "benefit via your eyes and your ears"); Sherman Dep. at 257; Fredricks Dep. at 116-19; Lohrisch Dep. at 169; Tr. 1645:14-22 (Sherman), 1847:12-24 (Backman) (showing difference between treated and untreated sides is critical to consumer understanding), 1777:21--1778:6 (Upson) (unaware of any other way for consumers to understand the demonstration), 1853:4-19 (Lorisch) (unable to think of any significantly different viable alternatives)

These elements of P & G's demonstrations constitute unoriginal, functionally required expressions of a basic idea, and they are therefore ineligible for copyright protection.

## III. *COPYING*

P & G has not only failed to prove ownership of a valid copyright interest in its egg demonstration commercials, but also has failed to prove copying, the second prong of a copyright infringement action. Copying may be inferred in the absence of direct evidence if the plaintiff demonstrates: (a) access by the defendant to the copyrighted work; and (b) "probative similarities" between the two works that suggest copying actually occurred. *See Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir.1992).* A defendant may rebut the inference of copying, despite a showing of access and probative similarities, by providing evidence of independent creation, *Judith Ripka Designs, Ltd., 935 F.Supp. at 247; Direct Mktg. of Va., Inc. v. E. Mishan & Sons, Inc., 753 F.Supp. 100, 104 (S.D.N.Y.1990).* Here, although Colgate had access to the P & G egg demonstration commercials and the two sets of commercials are similar, there is sufficient evidence that the Colgate commercials were based on defendants' independent creative efforts and conventions in television advertising rather than on copying.

The "probative similarities" discussed in this part of the Opinion, which bear on actual copying, should not be confused with the "substantial similarities" discussed in

Not Reported in F.Supp.2d                                                                Page 51
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

the next section of the opinion, which bear on unlawful appropriation. The degree of similarity between the parties' works enters into both stages of a plaintiff's infringement case. However, in the first instance the similarities are considered solely as circumstantial evidence that the defendant's work was the product of imitation, rather than independent creation. In the second instance, only those similarities involving copyrightable aspects of the plaintiff's works are relevant, and the focus is on whether the defendant has appropriated that part of the plaintiff's work which merits copyright protection, such that the appropriation is unlawful and within the scope of concern of the copyright laws. [FN23]

> FN23. In this Circuit, the phrase "substantial similarity" has sometimes been used in the place of "probative similarity," such that the language of "substantial similarity" appears in both the "actual copying" and "unlawful appropriation" prongs of an infringement case. *See, e.g., Laureyssens, 964 F.2d at 139-40; Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 911 (2d Cir.1980); Judith Ripka Designs, Ltd. v. Preville, 935 F.Supp. 237, 246 (S.D.N.Y.1996).* As the Second Circuit has explained:
> The presence of a "substantial similarity" requirement in both prongs of the analysis-- actual copying and whether the copying constitutes an improper appropriation--creates the potential for unnecessary confusion.... Copying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony. If actual copying is established, a plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works.
> *Laureyssens, 964 F.2d at 140.* To avoid unnecessary confusion, it may be useful to use the term "probative similarity" when referring to similarities that constitute indirect proof of copying. *See Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir.1998)* (" '[P]robative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence.").

**\*52** Defendants' access to the P & G egg demonstration is established in this case. There is no question that Colgate, as a competitor, had kept itself aware of the various P & G commercials, including the egg

demonstration commercials, as is customary in the field. Dias Dep. at 69-70; Upson Dep. at 40; Tr. 451:3-25 (Ullman).

There are considerable similarities between the egg demonstration portions of the P & G and Colgate commercials. Of course, there are also many distinctions between the parties' commercials, *see supra* pp. 53-89. Most prominently, the defendants' commercial features a seashell rather than an egg, and the difference between the two objects is quite clear: the odd-shaped, recognizable ends of the seashell protrude through the holes in the tongs in Colgate's commercials, and the slotted opening in the base of the seashell is clearly visible in the reshot version of the Colgate commercial. Ex. 295-I (Colgate original version); Ex. YD, commercial 8 (Colgate reshot version). Additionally, various witnesses, including P & G's own witnesses, have acknowledged that there are differences in the overall feel of the commercials, Tr. 1139:7-- 1140:25, 1144:6-15 (James) (describing the major differences in the scenes of the parties' commercials, including camera angles, lighting, pace and feel); Zhong Dep. at 373-76 (concluding that "the whole tone is quite different" in the parties' commercials); Wu Dep. at 251-52 (observing that "the whole setup is different, the talents are different ... the storyline is different"). Nonetheless, it must be conceded that there is some considerable overlap in the broad aesthetic impression created by the parties' commercials.

The inquiry remains trained, though, on whether this degree of similarity, such as it is, is probative evidence that defendants copied plaintiff's commercials. For several reasons, the Court finds that the similarities are not probative evidence of copying.

First, the evidence of independent creation in this case overwhelms the evidence of access and probative similarity. Colgate's seashell demonstration commercials are the result of a joint effort between Colgate and Y & R to "relaunch" COLGATE anti-cavity toothpaste. The relaunch effort began in 1994 and was to include new packaging, new flavors and new advertising. The relaunch effort is well documented and took two years to develop. The relaunch involved a large number of people in different parts of the world, working to find the best way to persuade the viewer of the cavity-preventing benefits of COLGATE. *See supra* pp. 27-47.

P & G relies on a number of internal Colgate documents that it believes are evidence that defendants copied P & G's eggshell demonstration, but the evidence presented does not support this conclusion. For example, P & G points to internal Colgate documents concerning consumer tests involving both a COLGATE seashell

Not Reported in F.Supp.2d                                                                                                    Page 52
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

demonstration with two seashells and a P & G eggshell demonstration. Exs. 136, 139. P & G argues that these documents are evidence that Colgate's decision to use one seashell instead of two is the result of copying. P & G's witness testified, however, that it is commonplace to consumer test the advertising of competitors, Tr. 451:3-25 (Ullman), and there was a convincing reason for changing to a single seashell format--overcoming viewer suspicion. Furthermore, the evidence does not show that the producer or director of Colgate's seashell demonstration commercial had viewed more than one version of the P & G egg demonstration, or, more specifically, that they viewed the five versions that plaintiff registered in the Fall of 1996. Therefore, the Court does not infer copying from these documents. Similarly, other internal Colgate documents reference supers and markings used by P & G in its egg demonstration commercials. Colgate's witnesses explained these references. The Court finds the testimony to be credible and finds that these documents are not evidence that Colgate intended to copy or did copy P & G's egg demonstration commercial.

**\*53** The specific executional elements in the defendants' egg demonstration that P & G claims were copied do not demonstrate copying because they merely apply conventional methods of portraying the experiment in a television advertising format. *See supra* pp. 98-105. As defendants' expert Sheila James testified, the Colgate commercials use conventional ways of visualizing demonstrations within commercials and the similarities between the parties' commercials should be attributed to use of such conventions. Tr. 1132:23-- 1134:1 (James). Any focus on the similarity between a seashell and an egg as evidence of copying is misplaced. Colgate's choice to use a white colored seashell was dictated not by a desire to copy P & G's egg, but by a desire to choose an object that effectively represents a tooth and proved suitable for the scientific experiment. P & G's own witnesses testified that an egg and a seashell are among the very few options available to use as a tooth proxy which are both scientifically accurate and appropriate for a consumer advertisement. Tr. 1782:5-20 (Stone), 1617:18-23 (Zbuchalski), 1598:13-16 (Breissinger), 1806:2--1808:4 (Westendarp), 1881:3--1883:3 (Faller), 1797:12--1798:18 (Dias), 1852:5-7 (Lohrisch).

Defendants had access to and knowledge of plaintiff's egg demonstration commercials, but the similarities between defendants' and plaintiff's commercials are not probative evidence of actual copying. Any inference of copying is negated by the significant evidence of independent creation, and the likelihood that similarities between the parties' works are the product of conventions in the field of television commercials.

## IV. *UNLAWFUL APPROPRIATION*

In addition to proving the existence of a valid trademark and actual copying by the defendants, a plaintiff must also prove improper or unlawful appropriation by demonstrating that there is substantial similarity between the defendants' work and protected material in the plaintiff's work. *See Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139-40 (2d Cir.1992) ("[A] plaintiff must first show that his work was actually copied.... The plaintiff then must show that the copying amounts to an 'improper' or 'unlawful' appropriation."); *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir.1946), *cert. denied,* 330 U.S. 851 (1947) (same), *abrogated on other grounds as recognized by Denker v. Uhry,* 820 F.Supp. 722, 729 (S.D.N.Y.1992), *aff'd* 996 F.2d 310 (2d Cir.1993).

Thus, before the copyrighted work is compared with the allegedly infringing work for purposes of determining unlawful appropriation, the protectable subject matter in the copyrighted work must be separated from the non-protectable subject matter. *See Knitwaves, Inc. v. Lollytogs, Ltd.,* 71 F.3d 996, 1002 (2d Cir.1995); *Warner Bros., Inc. v. ABC, Inc.,* 720 F.2d 231, 239- 40 (2d Cir.1983); *Folio Impressions, Inc. v. Byer California,* 752 F.Supp. 583, 590 (S.D.N.Y.1990), *aff'd* 937 F.2d 759 (2d Cir.1991); *Gibson v. CBS, Inc.,* 491 F.Supp. 583, 586 (S.D.N.Y.1980). A "general impression of similarity is not sufficient to make out a case of infringement." *Durham,* 630 F.2d at 912; *see also Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Warner Bros.,* 720 F.2d at 239; *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90-91 (2d Cir.1976). To prove infringement a plaintiff cannot simply point to an alleged similarity in "total concept and feel" stemming from a similarity in the use of unprotected material. " 'Courts must pay particular attention ... [when] a plaintiff claims that defendant's work copies the 'total concept and feel' of plaintiff's work. Accepting an overly broad scope for protectable 'total concept and feel' threatens the basic principle of copyright law: that concepts and ideas may not be copyrighted, and that only a particular expression of an idea may be copyrighted." ' *Robinson v. Viacom Int'l, Inc.,* No. 93 Civ. 2539 (RPP), 1995 WL 417076, at *10 (S.D.N.Y. July 13, 1995) (citing *CK Co. v. Burger King Corp.,* No. 92 Civ. 1488 (CSH), 1994 WL 533253 (S.D.N.Y. Sept. 30, 1994)); *see also Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc.,* 777 F.2d 485, 493 (9th Cir.1985); 4 Nimmer § 13.03[A][1][c], at 13-39 ("[T]he touchstone of 'total concept and feel' threatens to subvert the very essence of copyright, namely the protection of original *expression."* ). [FN24]

FN24. In *Alt v. Morello* there was unequivocal evidence of copying and the court found that

Not Reported in F.Supp.2d                                                                                Page 53
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

defendant's claim of independent creation was "not persuasive." 227 U.S.P.Q. 49, 51 (S.D.N.Y.1985). In contrast, defendants' evidence of independent creation is thorough, documented and persuasive.

**\*54** Where a comparison of the works reveals that there is no substantial similarity as to copyrightable elements, there can be no copyright infringement, irrespective of any other issues. Even if the defendant has actually copied the plaintiff's work, liability will not be found unless the copying extends to protected elements. *See Williams v. Crichton,* 84 F.3d 581, 590-91 (2d Cir.1996) (similarities between plaintiff's and defendant's works did not constitute protectable expression since "the similar parts of the parties' works are unprotectable *scenes-a-faire* or trivial, scattered details"); *Ring v. Estee Lauder Inc.,* 874 F.2d 109 (2d Cir.1989); *Walker,* 784 F.2d at 50; *Stillman v. Leo Burnett Co.,* 720 F.Supp. 1353, 1357 (N.D.Ill.1989); *Davis v. United Artists, Inc.,* 547 F.Supp. 722, 726 (S.D.N.Y.1982); *Gibson,* 491 F.Supp. at 586; *Alexander v. Haley,* 460 F.Supp. 40, 44 (S.D.N.Y.1978).

The Second Circuit has held that "numerous differences tend to undercut substantial similarity." *Warner Bros.,* 720 F.2d at 241 (citing *Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.,* 509 F.2d 64, 65-66 (2d Cir.1974)). "[T]he more numerous the differences between two works the less likely it is that they will create the same aesthetic impact so that one will appear to have been appropriated from the other." *Durham,* 630 F.2d at 913; *accord Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 500-01 (2d Cir.1982).

In comparing P & G's egg demonstrations to the original Colgate seashell demonstration and the reshot Colgate seashell demonstration, the differences are apparent once the unprotectable elements are eliminated. Unprotectable elements include the experiment itself, the sequence of steps in the experiment, and the use of the egg, the beaker/bowl, the toothbrush, the tongs, the dividing line, the tapping and the close-up perspective. After these unprotectable elements are removed from consideration, there is little similarity between the commercials. *See supra* pp. 53-89 (examining the differences between the parties' commercials).

V. *CONCLUSION*

P & G has failed to establish each of the three elements of a copyright infringement action. It is not the owner of a valid copyright in the egg demonstration portion of its commercials because: (a) the core elements of P & G's egg demonstration were published without notice when the "Huevo Nuevo" commercial was aired in Chile in

1989, and thereby were stripped of any potential for copyright protection; (b) the elements which P & G claims are copyrightable are derivative of a large number of preexisting materials that have been used around the world for decades, and P & G has not contributed sufficient original material to those preexisting works for the executional elements of its egg demonstration to constitute an original derivative work; (c) the egg demonstration experiment is an unprotectable idea and P & G's expression of the experiment is deemed merged with the underlying idea of the experiment; (d) the executional elements of P & G's egg demonstration are functional and necessary to depict the experiment in a television advertisement format.

**\*55** Nor has P & G proven actual copying. Colgate and Y & R have shown that the seashell demonstration was created using independently performed scientific experiments and consumer research, and was based on defendants' own judgments as to the most practical and persuasive way of demonstrating that fluoride protects tooth enamel from the deleterious effects of acids in the mouth. Not only did defendants use their independent judgment, but witnesses including Ms. James, defendants' expert on the production of television commercials, and P & G's own witnesses, have testified that Colgate's and Y & R's judgments were logical, conventional and dictated by the requirements of effective television advertising.

Finally, P & G has failed to ground a finding of unlawful appropriation by showing substantial similarity between defendants' commercials and protected elements of P & G's works. Any similarity between the parties' commercials is due to the presence of the same unprotectable experiment and same unprotectable *scenes a faire* in both parties' commercials.

In light of the foregoing, P & G's claim under the Copyright Act is dismissed with prejudice.

*THE LANHAM ACT CLAIM: ADDITIONAL FINDINGS OF FACT*

This section incorporates by reference the prior findings of fact, set forth at pages 2 to 89 above, and articulates the following additional findings of fact regarding plaintiff's Lanham Act claim:

I. *TRADEMARK REGISTRATION*

In its unfair competition claim, P & G contends that Colgate has infringed its rights and asks that this Court exercise extraterritorial jurisdiction under the Lanham Act. Ex. YC (Amended Complaint) ¶ ¶ 52-54. P & G's claim is that it has rights to the egg demonstration, and that Colgate's use of its seashell demonstration abroad

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

Page 54

infringes these rights. P & G has not offered any proof that it registered its commercials, any versions of an egg demonstration, or any of the executional elements of an egg demonstration--including any elements on the list of allegedly copied features in paragraph 37 of the Amended Complaint--as trademarks, in any country in the world. Its rights are therefore grounded in its trade dress rights relating to its egg demonstration commercials.

## II. COLGATE'S PREEMPTION AND MONITORING OF P & G

Generally, in marketing and advertising, "preemption" means to "be there first" and engaging in preemption is a common strategy in competitive industries. Tr. 377:21-25 (Pepper); Beausejour Dep. at 195-96; Fredricks Dep. at 100-01; Upson Dep. at 47-48 (P & G Vice President of Worldwide Strategic Planning). P & G executives themselves have admitted that "preemption" is a common strategy underlying advertising campaigns in competitive markets. Zhong Dep. at 104-05; Sherman Dep. at 134-35; Panayotopoulos Dep. at 38-39; Wu Dep. at 244-46. Preemption is an accepted advertising term and certain newspaper advertisements are explicitly called "pre-emptions." Cappabianca Dep. at 97 (describing "pre-emption" as "a common advertising term"); Exs. BW (DMB & B memo about egg demo preemption in Italy by P & G), BY (at DM-209 (P & G newspaper advertisement using title "pre-emption").

**\*56** Here, Colgate wanted to be the first in China to sell fluoride toothpaste and to advertise the theme that fluoride toothpaste protects teeth against cavities. Tr. 1215:8--1216:15 (Fogarty). Colgate employees made a number of statements demonstrating their desire to preempt P & G's egg demonstration. Exs. 128 ("preempt Crest by producing a CDC egg demo spot ... alternative ... sea shell demos"), 165 ("It is therefore strategically important that we pre-empt their egg demo BY LAST WEEK OF JANUARY."), 188 ("[I]t needs to have the executional power to beat the eggs...."), 145 ("Shanahan was most excited about the prospect of pre-empting Crest's egg demo in China.... This has become a VERY IMPORTANT topic at Colgate."), 150 ("Shanahan was adamant about pre-empting Crest's egg demo...."), 154 ("Rationale for this demo = to pre-empt Crest's egg demo."), 331 ("We anticipate P & G will launch Crest during 4th Qtr or latest 1st Qtr 96.").

John Pepper, P & G's Chairman and Chief Executive Officer, agreed that preemption means "moving into a category before someone else." Pepper Dep. at 101-02. Pepper conceded that it is acceptable for a company to attempt to preempt its competitor by expanding into markets before the competitor and using advertising

themes before the competitor, so long as it is done in the right fashion. Tr. 377:19--381:15 (Pepper). Pepper also admitted that he has been involved personally in discussions concerning P & G's attempt to preempt its competitors, and that there is no necessary pejorative connotation to the word "preemption." Tr. 377:19--381:15 (Pepper); Pepper Dep. at 101-03. In addition:

• Another high-level executive at P & G testified about an instance in which P & G became aware of Phillip Morris' business plans and deliberately preempted Phillip Morris' marketing strategy. Upson Dep. at 49-50.

• Another P & G executive testified that he had tried to preempt competitors of CREST and that employees of P & G often used the term "preempt" in an accusatory manner even though they themselves have engaged in preemption. Whan Dep. at 108-09.

• P & G even considered pre-empting COLGATE in China by using a "chalk dip" demonstration, similar to the one aired globally by Colgate. Ex. FW.

P & G monitors its competitors, including Colgate "as closely as possible." Dias Dep. at 69-70; Upson Dep. at 40. Among other things, P & G's monitoring activity includes: (1) monitoring television advertising of its competitors and circulating reels of competitors' television advertisements to P & G divisions around the world, Beausejour Dep. at 197-98; Cappabianca Dep at 60; Zhong Dep. at 110, 397-98; Oxendine Dep. at 111; Prytz Dep. at 202-03, 208-09; Wu Dep. at 95, 97-98, and (2) market testing competitors' products, concepts and advertising, Zhong Dep. at 21-23, 272-73; Panayotopoulos Dep. at 60-61; Oxendine Dep. at 125-27; Ex. IC (P & G analysis of CREST and COLGATE in the United States Hispanic market).

**\*57** Indeed, when it was preparing for the launch of CREST in China, and subsequently, P & G consumer-tested Colgate's products and advertising. The head of P & G China's market research development department admitted conducting approximately 20-25 studies on COLGATE or its advertisements for the Chinese market, Tr. 451:17-25 (Ullman), and P & G testing in China of Colgate television commercials and product samples was done with the knowledge and approval of P & G's Chairman and Chief Executive Officer, John Pepper, Ex. CL at DM-907 (P & G internal facsimile).

On occasion, through the monitoring efforts described above, P & G succeeds in obtaining advance knowledge of what its competitors will do to market their products. Upson Dep. at 40-41; Oxendine Dep. at 120. P & G then adjusts its own business plans to respond to the expected actions of its competitors. Panayotopoulos Dep. at 103 (P & G discusses commercials of the competition and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 55
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

"whether we should, you know, do something more to defend our business"); Oxendine Dep. at 114-15, 135-37 (describing changes made to P & G marketing plans in China as a result of Colgate actions); Wu Dep. at 69.

P & G employs phrases such as "Colgate Super Value Defense Plan" or "Shell Demonstration Defense Plan" to describe its responses to Colgate's anticipated actions. Zhong Dep. at 397; Oxendine Dep. at 136-37; Wu Dep. at 237.

From time to time, P & G incorporates what it learns from its competitors into its own marketing strategies or advertising. Dias Dep. at 148. For example, P & G's studies concluded that Colgate's advertising had greater "consumer likability," in part because of its use of children, Ex. EQ at EN-1203, and recommended "elevating the participation of children in our advertising to increase likability." Tr. 1804:15--1805:19 (Diaz); Ex. EQ at EN-1204; Ex. FP (observing that Colgate's Chinese advertisements, which emphasize calcium and double fluoride, were "simpler and more impressive" than CREST's and recommending that CREST advertising therefore change its message "to incorporate 100% available fluoride (that other toothpastes don't have) to strengthen the calcium in teeth"); Regruth Dep. at 147-48 (P & G's Director of Advertising Development Worldwide acknowledging that P & G circulates, internally, competitors' advertisements that it deems "very, very strong" to examine and learn from them).

III. *PURPORTED EVIDENCE OF COPYING AND INTENT TO CONFUSE*

P & G highlights several documents authored by defendants as evidence of deliberate copying or intent to confuse Chinese consumers. The Court finds that none of these documents indicates such intent. For example, a Y & R internal electronic mail message contains a portion stating that "some consumers might confuse them with us and we could get the benefit of their spending." Ex. 138. The Court has examined the entirety of Ex. 138 and finds that this quotation, seeming to indicate an intent to confuse consumers, cannot be understood divorced from its context. First, the subject of the document is whether Colgate should use endorsements in its advertising and the document has *nothing* to do with the egg or seashell demonstration commercials. Second, the immediately following sentence states that, upon consideration, it is the opinion of the Y & R executive who authored the document that P & G will outspend Colgate in China and that as a result, any confusion caused among consumers would work to the detriment of Colgate. Ex. 138 at YR-3744; Tr. 1323:4-25, 1328:8-14 (Hartman). Accordingly, Exhibit 138 does not support any claim of wrongdoing by

defendants. Furthermore, it confirms defendants' trial testimony that they did not desire to cause consumer confusion in China, and that any such confusion would likely harm Colgate due to P & G's outspending of Colgate to advertise CREST.

**\*58** Several documents authored by Colgate and Y & R executives express a desire to avoid airing the cowrie seashell demonstration in certain markets for legal reasons. Exs. 179 ("Those markets that have already seen Crest's egg demo would have obvious legal problems in showing an egg-like shell."), 193 ("Crest is presently not in the market. Thus, given this, we are opting to use the 'egg-like' seashell demo, considered to be more competitive."), 195 ("The egg cowrie will be used in markets where P & G has not exposed its egg demo, like China.... [The conch shell] will be used in markets where P & G has exposed its egg demo."), 189 ("Eggshell seashell for non-P & G markets ... Crown shell seashell for P & G markets"). These documents do not, however, amount to an admission of illegality, bad faith or confusing similarity between the advertisements.

Rather, these documents reflect the very litigious relationship between P & G and Colgate, and defendants' strategic interest in avoiding advertisements that could be delayed from reaching consumers by regulatory or legal challenges. Tr. 1320:16--1322:21 (Hartman), 1704:24--1707:12 (Roskothen); *see also supra* p. 3 (Stipulated Facts ¶ 17) (acknowledging litigious history between Colgate and P & G). Expecting that any challenge from P & G would come in a market in which P & G had aired an egg demonstration commercial, the view was expressed that Colgate could attempt to avoid such a challenge and any resulting delay by airing the conch seashell demonstration in such markets. Tr. 1706:23--1707:12 (Roskothen), 1322:3-9 (Hartman). Given the numerous prior disputes between P & G and Colgate, and the credible testimony concerning the independent creation of Colgate's seashell demonstration, the Court finds that Colgate's documents do not contain damaging admissions, but only a recognition that Colgate could be injured if the airing of its commercial were delayed by any P & G challenges, regardless of their merits. Tr. 1320:16--1323:5, 1655:1-9 (Hartman). These documents do not represent admissions that defendants violated either the Lanham Act or the Copyright Act.

Other documents created by defendants indicate that one of the bases for defendants' decision to use one seashell instead of two seashells in the COLGATE commercial was consumer testing in China that compared a storyboard of a CREST egg demonstration with a storyboard of the seashell demonstration. Exs. 136 ("We've created two boards--one that reflects the visual

Not Reported in F.Supp.2d                                                                Page 56
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

and copy demonstration of Colgate's 'Seashells', the other that illustrates Crest's 'Eggshell'. I understand these will be tested against each other in China on Monday."), 139 ("Chinese consumers were skeptical of the 'Seashell' demo because it featured two seashells, as opposed to the 'Eggshell' demo that showed a comparison of one side of an egg versus the other. Apparently, consumers felt that the seashells could be different from each other in composition").

**\*59** Consumer testing of competitors' products and advertisements is common to both Colgate and P & G. P & G conducted between 20 and 25 market tests in China on Colgate's product and Colgate's advertising. Tr. 451:17-25 (Ullmann). The purpose of P & G's testing of its competitors' advertisements is to "learn things and try to act on what they learned." Dias Dep. at 148. The defendants' choice of one seashell was based in part on testing involving the P & G egg demonstration, but on other factors as well, namely Colgate's prior testing in both the Philippines and China in which consumers expressed skepticism concerning a two seashell experiment, and the obvious credibility shortcomings of a two seashell format that were expressed by many of defendants' and P & G's witnesses as well as by Messrs. Pollack and Deahl, *see supra* pp. 35-39, 49. In light of the industry practice of comparative testing, and the multiple bases for defendants' decision to use a single shell, the Court finds that defendants' actions do not reflect deliberate copying or intent to confuse.

Similarly, the suggestion by a Colgate executive that Colgate use a "super" similar to one used by P & G because it had already received "legal clearance" from a "scientific experiment standpoint" is not evidence of copying or intent to confuse. Hartman Dep. at 88-89 (testifying that "we wanted to say from a scientific experiment standpoint ... what was in the glass, and I think the statement was made, 'Let's look at the Crest commercial' ' and "Yes, we were going to see what they were saying that worked, from a legal standpoint, and the thinking was if they said it and got it on air, then it's probably something that we could use something similar"); Ex. 197 (handwritten notes suggesting that Colgate "match P & G's super on acid solution"). As Mr. Hartman explained, the explanatory supers that are used in television commercials are not creative, but instead are written to obtain regulatory clearance, quickly and with minimal regulatory delay. Defendants considered language for a super identifying the acid solution in the seashell demonstration that is similar to super language used by P & G because Colgate inferred that this language had already been approved by some of the same regulatory authorities that might need to approve Colgate's advertisements. Tr. 1318:1--1319:6 (Hartman).

The Court does not find damaging the electronic mail message Mr. Tonogbanua wrote to Mr. Hartman which stated "Unlike the Crest egg demo, we don't show Colgate actually being pasted on the shell.... Was it just missed out in the drawing or we're really not showing it?" Ex. 165. As Mr. Tonogbanua explained, he wrote this note concerning the CREST and COLGATE storyboards that were being used in connection with consumer focus group testing in China in December 1995 and, to achieve meaningful results, it was important that the two storyboards to be compared by consumers have "orderly and structured ... narrative flow" so as to compare "apples with apples," particularly because Chinese consumers are very literal and, therefore, they needed each of the storyboard to have the same structure and narrative flow. Tr. 1503:10--1505:17 (Tonogbanua).

**\*60** Another electronic mail message from Mr. Hartman, sent to Michelle Loney of DY & R in Australia, states that the requirement that a red "C" be placed on the treated side of the seashell "probably stems from the Crest egg demo where the Crest side is marked with an 'x'." Ex. 196. Mr. Hartman testified that he referred to CREST, not to indicate that defendants were copying a P & G egg demonstration, but instead to show that they were doing precisely the opposite--defendants believed that P & G's use of an "x" was not effective because it could be interpreted to mean "Brand X," and therefore defendants should be certain to use the opportunity to introduce unambiguous COLGATE branding into the demonstration with a red "C." Tr. 1315:25--1317:18 (Hartman), 1710:23-1712:4 (Roskothen). It does show, of course, that Hartman's group had access to and was comparing the planned seashell commercial with at least one P & G commercial.

Although Colgate executives were intent on embarking on an advertising strategy which would preempt P & G by reducing the effectiveness of P & G's egg demonstration commercial, Colgate did not copy P & G's egg demonstration or develop the seashell demonstration with the intent to create confusion among purchasers of toothpaste. The Colgate commercials are well branded and independently generated; numerous differences between the Colgate and P & G commercials create a distinct overall impressions; and the evidence does not suggest that defendants admitted to, or engaged in, bad faith copying or a deliberate attempt to confuse Chinese consumers.

IV.  *ACTUAL  CONFUSION  AMONG  CHINESE CONSUMERS*

Denis Beausejour, former General Manager for CREST

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

in China, is the person P & G identified in discovery as most knowledgeable of any instances of confusion, of any type and in any marketplace, in connection with plaintiff's advertisements and defendants' advertisements. Ex. YA (P & G interrogatory responses). At his deposition, he testified that he had never heard about anyone in China who was confused between COLGATE and CREST toothpaste. Beausejour Dep. at 87-88. P & G objected to this testimony on the ground that Mr. Beausejour left China in July 1996. Tr. 1890:3--1893:24. No other evidence of confusion in the marketplace was presented by P & G.

P & G has significant experience with surveys, and significant experience with surveys in China in particular. Tr. 213:14-25 (Ullmann). In fact, P & G has done over 1300 consumer studies in China. Tr. 213:18-20 (Ullmann). P & G did not offer a consumer survey in this action.

The only survey conducted in China and submitted to this Court--a survey performed by Wharton School Professor Yoram Wind (the "Wind Survey")--indicates that there is no likelihood of confusion or actual confusion among Chinese consumers attributable to Colgate's seashell demonstration commercials. Ex. QH.

Dr. Wind [FN25] designed the study and prepared the questionnaire, the interviewer instructions, the screening procedures and the quota for interviewees. Tr. 1233:18-24, 1245:4-6 (Wind); Ex. QH (survey report). The survey was conducted in conjunction with Data Development Corporation ("DDC"), a large national marketing research firm based in New York that Dr. Wind has worked with for fifteen to twenty years. Tr. 1233:25--1234:8 (Wind). AMI, a market research firm in China that has worked with DDC on a number of occasions, executed the survey under the supervision of DDC in 1997. Tr. 1246:9--1247:25, 1269:11--1270:20 (Wind). In the Wind Survey, the universe was properly defined, Ex QH; Tr. 1237:7-16, 1289:13--1290:10 (Wind), a representative sample of that universe was selected, Ex. QH; Tr. 1237:7-- 1239:1, 1267:15--1269:10 (Wind), the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, Ex. QH; Tr. 1266:11-- 1267:14 (Wind), the data was analyzed in accordance with accepted statistical principles, and the objectivity of the entire process was assured, Ex. QH; Tr. 1248:1-15, 1269:11--1270:20 (Wind). The Wind Survey was conducted in Mandarin in cities in which consumers speak Mandarin, and in which both P & G and Colgate are airing their demonstration commercials in Mandarin. Tr. 1462:14--1464:7 (Fong). Based on the above, the Wind Survey was valid and its results are sufficient for the survey to be introduced in evidence and for Dr. Wind to give an

opinion, based on the survey, under Rule 702 of the Federal Rules of Evidence.

> FN25. Dr. Wind is the Lauder Professor of Marketing at the Wharton School of the University of Pennsylvania, Tr. 1228:21-25 (Wind), and is the founder of the Wharton International Forum and serves as the chairman of its faculty council. Tr. 1229:16-20 (Wind). This Forum has had programs in China which Dr. Wind helped develop. Tr. 1229:21--1230:8 (Wind). Dr. Wind is an experienced expert in consumer research and is qualified as such. Tr. 1233:11-17 (Wind); Ex. QT (Dr. Wind's resume).

**\*61** The Wind Survey was designed to show whether consumers in China, upon seeing a commercial for COLGATE toothpaste containing a seashell demonstration, would perceive an association between the commercial and P & G or its products due to the demonstration used in the commercial. Tr. 1233:18-22 (Wind). The survey showed consumers in a "Test" cell the Colgate commercial with the seashell demonstration, and showed consumers in a "Control" cell a Colgate commercial without the seashell demonstration. Tr. 1236:4-12 (Wind). Both the Test cell and the Control cell consumers were then asked the following questions:
1. What is the key message or messages of the commercial?
2. What is the name of the product that is advertised in the commercial?
3.(a) Is there anything in the commercial you have just seen that suggests that the product advertised in the commercial is connected or associated with any other toothpaste product?
3.(b) [If yes to Question 3.(a) ], Which toothpaste product is the product advertised in the commercial connected or associated with?
3.(c) What makes you say so?
Ex. QH; Tr. 1249:17--1250:25 (Wind).

The Wind Survey found that consumers do not perceive any association between Colgate and P & G due to Colgate's use of the seashell demonstration. Tr. 1281:13-20 (Wind); Ex. QH. This result is meaningful because at the time of the survey, Chinese consumers had been exposed to P & G's advertising for CREST. [FN26] The conclusion that there was no confusion as to association was based upon the following results of the Wind Survey:

> FN26. The survey was conducted in May 1997, Ex. QH at 5, almost one year after P & G launched CREST in China, *see supra* p. 6 (Stipulated Facts ¶ 26). By May 1997, P & G

Not Reported in F.Supp.2d                                                                                                    Page 58
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

had spent $15-16 million to air its egg demonstration commercials in China, *see supra* p. 13, more than twice the amount Colgate had spent to penetrate the Chinese market, Tr. 1446:1-17 (Fong).

a. There was no reference to the seashell demonstration or to any similarity between Colgate and P & G due to the seashell demonstration in the consumers' answers regarding the key message of the commercial. Ex. QH; Tr. 1281:21-- 1282:1 (Wind).

b. Ninety-nine percent (99%) of the respondents correctly perceived Colgate as the advertiser of the commercial. Only one respondent mentioned CREST as the advertiser and even that respondent did not make any reference to the seashell demonstration. Ex. QH; Tr. 1282:2-8 (Wind).

c. Over seventy percent (70%) of the respondents failed to perceive any connection or association between the advertised product and any other toothpaste. Ex. QH; Tr. 1282:9-13 (Wind).

d. Only six percent (6%) of the respondents in the Test group and four percent (4%) of the respondents in the Control group perceived any association between Colgate and CREST. The two percent (2%) difference between the Test and Control groups is not statistically significant. Ex. QH; Tr. 1282:14-25 (Wind).

e. Of the six percent (6%) of the respondents in the Test group who mentioned CREST as being associated with Colgate, only one respondent mentioned that this was due to the seashell demonstration. One respondent of the four percent (4%) in the Control group mentioned the seashell demonstration as the reason for the association between the two brands. These two persons, out of the 252 persons in the Test and Control groups together, represent a small and insignificant number of consumers. Ex. QH; Tr. 1283:1-14 (Wind).

**\*62** P & G's own informal research confirms that there was "a good awareness of both CREST and Colgate's advertising" in China, which shows that consumers can distinguish the two and are not confused. Sherman Dep. at 198; Beausejour Dep. at 87-88.

P & G has presented neither any expert critique of the Wind Survey nor a consumer confusion study of its own.

Exhibits 370 and 394, which the Court admitted in evidence, reflect the results of Colgate focus group studies conducted among a total of forty Chinese consumers. These focus group studies are not surveys, and may be unreliable predictors of consumer behavior, because the report of the studies "never really says who they were done among and what they asked the people or what they showed them or anything, so there is no way to

evaluate it, unless one just accepts what it says is the gospel truth." Dupont Dep. at 46. Dr. Thomas Dupont, P & G's market research expert, conceded that "some focus groups purposely lead people." Dupont Dep. at 52. He stated that "I can't, obviously, draw quantitative conclusions from them," Dupont Dep. at 47, and that "clearly you cannot interpret findings from a focus group without some understanding of what was done in the focus group." Dupont Dep. at 50.

The head of P & G's market research department for China, Berenike Ullmann, concurred with Dr. Dupont's assessment of focus group results in this context. Ms. Ullmann conceded that "[we] typically don't use focus groups to predict anything ... [b]ecause a focus group is typically done among a small group of respondents and represents qualitative research and we don't use qualitative research to make predictions that need a representative sample of consumers." Ullmann Dep. at 16-17 (attached as Ex. D to the Declaration of Lawrence B. Friedman dated October 13, 1997 in support of an Order Excluding Plaintiff's Hearsay Market Research Evidence).

The results of the focus group studies, and the few summaries of consumer comments contained therein-- such as statements that the CREST television commercial lacks originality and is not unique, Ex. 370 at GO-1782 and GO-1784--do not necessarily evidence confusion, in view of the less carefully constructed methods used by those conducting the focus group studies.

Mr. Tonogbanua suggested that focus group statements that the CREST commercial was "boring," "too localized" or "copying," as reflected in Ex. 394, were unsurprising because, in his experience, Chinese consumers are bored by the "drudgery" reflected in commercials featuring rural Chinese people (such as CREST's "Inside Out" commercial, set on a farm), and prefer "Caucasian talents" or "aspirational" Chinese from Hong Kong. Tr. 1509:8-- 1510:8 (Tonogbanua). This explanation by Mr. Tonogbanua at trial is consistent with his report, in which he wrote that Chinese consumers desire "aspirational appeal." Ex. 394. Some consumers did not consider the CREST commercial original or unique, and thought the egg demonstration was similar to Colgate's seashell demonstration, but consumers did recognize P & G's use of branding in its CREST commercial. Ex. 370 at 1784. Consumers further found that, as compared to COLGATE's commercial, the CREST commercial was "dull, rigid, remote from everyday life." Ex. 370 at 1782; *see also* Ex. 394. Consumers also clearly recognized Colgate's branding in its commercial, just as they recognized the CREST branding. Ex. 370 at 1785.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                         Page 59
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

**\*63** Notwithstanding the similarity between COLGATE's Chinese name "high dew clean" and CREST's Chinese name "best clean soldier," Tr. 1405:8-10, 1460:5-24 (Fong), the comments by some consumers that they believed CREST was made by Colgate may be more attributable to Chinese consumers' perceptions of the global marketplace than to any similarity in the demonstration commercials. Chinese consumers have recently emerged from a non-global, controlled marketplace and may group foreign products together, as evidenced by Unilever's launch of SIGNAL toothpaste in China one year earlier. When exposed to COLGATE and SIGNAL television commercials in a focus group session, Chinese consumers stated that SIGNAL and COLGATE originate from the same source, notwithstanding the lack of any similarity between the COLGATE and SIGNAL commercials. Tr. 1510:13--1512:8 (Tonogbanua); Ex. YG (SIGNAL videotape).

  In addition to the focus group studies, P & G has also introduced various market research reports conducted by an outside agency hired by P & G. Exs. 89, 93, 416, 421, 422. These were offered for their engagingness scores (which measure the percentage of comments such as "it's similar" or "same old thing," Tr. 446:24--447:9 (Ullmann)), and were not offered as evidence of any confusion. Tr. 426:4-24, 436:2-25 (Ullmann). [FN27] Although they are *not,* as P & G concedes, evidence of any confusion between CREST and COLGATE or their advertisements, these engagingness scores conform to Messrs. Fong's and Tonogbanua's testimony that many Chinese consumers view foreign toothpastes, including CREST and SIGNAL as well as CREST and COLGATE as similar. For example, Exhibit 89 records the following comments of Chinese consumers upon viewing CREST advertising, using the abbreviation "comml" for "commercial":

  FN27. P & G's market research reports (the "MRD Reports") based on storyboards prepared by P & G are admitted in evidence. However: (1) there is no testimony as to the qualifications of any persons who supervised the preparation of the other MRD Reports; (2) certain of the MRD Reports, Exhibits 93, 421 and 422 (study 95217), were possibly flawed due to suggestive testing, Tr. 437:20--440:25 (Ullmann); (3) they were "off-air tests" conducted before CREST was launched in the market and not under actual market conditions, Tr. 233:10-19 (Ullmann); and (4) 100% of the respondents were female, which may not be a reasonable cross-section of the Chinese consumers of fluoride toothpaste. Tr. 391:2-6, 405:13-16 (Ullmann).

• "It's imitating Signal's comml" (CI-44T, Resp.70)
• "Other toothpaste has similar commls" (CI-44T, Resp.73)
• "It's the same with other toothpaste commls" (CI-46T, Resp.89)
• "It's not so creative as Signal's conception" (CI-46T, Resp.90)
• "Similar to Signal's" (CI-46T, Resp.92)
• "It's similar to other toothpaste commls" (CI-27T, Resp.109)
• "It's almost the same as Signal" (CI-63T, Resp.111)
• "It's similar with Signal" (CI-65T, Resp.138)
• "[I]s same as Signal comml" (CI-1398T, Resp.322)

  These comments indicate that the low engagingness scores may be a product of Chinese consumers' tendency to group foreign toothpastes together. Additionally, any purported change in the CREST commercials' "engagingness" scores since Colgate aired its seashell demonstration is difficult to measure because the market research study performed *after* Colgate's first commercial aired--reflected in Exhibit 98--did not use the same CREST commercial as the prior market research studies. Tr. 450:9-15 (Ullmann). Given the evidence that the story surrounding the demonstration is an important part of the engagingness of the commercials to consumers, Tr. 150:1-5 (Panayatopoulos), the comparison of engagingness scores between CREST commercials before and after Colgate's airing of the seashell commercials is not a valid basis upon which to draw conclusions. Even among the "same old thing" and "it's similar" comments that name COLGATE, many of them do not necessarily refer to the demonstration portions of Colgate advertisements and, accordingly, the Court cannot attribute much significance to the comments, or to the "engagingness" scores derived from them. Further, other than Exhibit 89, all of the other studies were conducted prior to Colgate's airing of the seashell demonstration in China; the obvious inference is that factors other than Colgate's seashell demonstration commercial influence Chinese consumers' engagement with the P & G commercials.

  **\*64** Among the other purported confusion evidence cited by P & G is a single anecdote of an August 1997 home visit with a Chinese consumer. Ms. Ullmann's recollection of this visit, which is not reflected in her contemporaneous notes, Ex. 18, does indicate reverse confusion among one Chinese consumer, who believed that P & G had imitated Colgate's commercial. Tr. 331:15--332:6 (Ullman). However, it bears emphasizing that P & G had conducted 679,000 consumer interviews between March 1989 and the time of trial, Tr. 213:24-25 (Ullmann), and that Ms. Ullman had participated in "many, many in-home visits in China," Tr. 301:10-11,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 60
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

including visits in February, April, May, June, August and September of 1997. Tr. 302:7-12. A single, isolated remark arising among these interviews does not represent strong evidence of actual confusion.

P & G also offered a purported Chinese newspaper article, Exs. 376 and 377, but provided no evidence as to the identity of the author of the clipping, or whether or not it was merely a letter to the editor of the newspaper, or reflective of the views of the publisher. Tr. 97:17--98:1 (Panayotopoulos). Even if any credence is given to the article, it does not address confusion in any manner, but instead states only that CREST and COLGATE "explain the same benefits of the toothpaste to the health of one's teeth, [using] the same experiment of sinking in acid solution and the same way of striking the specimen object with a small stick to explain the feature of the product." Tr. 95:22--96:2 (Panayotopoulos); Exs. 376 and 377. There is no hint that the author was confused by the advertisements

Given the "branding" of both the CREST and COLGATE commercials, whereby the respective product names are announced and the logos and packaging appear numerous times, including on the CREST egg and on the COLGATE seashell, it is unlikely that a reasonable consumer would confuse the CREST and COLGATE commercials.

P & G's own market research reveals that any confusion which exists might stem from the similarity between the products, not from the commercials. Exs. DD ("Critical Consumer Insight ... Mother[s] believe all toothpaste are the same."), DC ("Critical Consumer Insight ... There are so many kinds of toothpastes in China that claim cavity prevention. Consumers are confused which brand choice they should make."), CM at DM-920-DM-921 (Chinese consumers believe that "[a]ll toothpastes are alike"); Sherman Dep. at 205 (Chinese consumers believe that all cavity prevention toothpastes "seem to be pretty much the same"). Confusion resulting from similarity between products is not uncommon in China. After Colgate began airing its seashell demonstrations in China, Unilever introduced a new commercial for its SIGNAL toothpaste. Tr. 1507:2-6, 1511:21--1512:8 (Tonogbanua). Consumers viewing both the SIGNAL and COLGATE seashell demonstration commercials were confused as to the source or relationship between COLGATE and SIGNAL toothpastes despite the fact that the SIGNAL and COLGATE commercials were entirely dissimilar. Ex. QH. Tr. 1274:2-- 1277:8, 1282:15-25 (Wind). Colgate's consumer research in China suggests that to the extent Chinese consumers suffer from any confusion, it is the result of CREST and COLGATE providing similar product benefits. Ex. QH (Wind survey report).

**\*65** Although Colgate has been airing television commercials containing the seashell demonstration in China continuously since the first such commercial aired in February 1996, there is insufficient evidence of actual confusion. P & G has not shown actual "forward confusion"--that is, facts showing that consumers in any market attribute the Colgate egg demonstration to CREST or P & G. Aside from the single home interview out of 679,000 interviews, there is no evidence of reverse confusion in China--that is, confusion among Chinese consumers who believe that CREST commercials are a product of, or related to, Colgate. Nor has P & G proved that any consumer has been confused in making a purchasing decision based upon any similarities between the P & G egg demonstration and the COLGATE seashell demonstration.

The allegation of reverse confusion must be evaluated in light of the scope of P & G's activities in China. P & G began a national CREST school program in China in 1994, and has reported that its program had been expected to cover twenty-eight cities in China and to reach over one million school children by the end of 1996. Ex. WJ (P & G press release dated Oct. 21, 1996). CREST also enjoys the exclusive official endorsement of China's National Committee on Oral Health (the "NCOH"), Ex. WJ, and P & G emphasizes this endorsement by the NCOH in one of its television commercials airing in China. Ex. 71, commercial 7 (China "Endorsement"). P & G spent between U.S. $15 and $16 million to broadcast CREST television commercials containing the egg demonstration in China from May or June 1996 through June 1997. Zhong Dep. at 140-41; Tr. 119:25--120:12 (Panayotopoulos). In contrast, Colgate spent less than half that amount, or approximately $7.3 million, on all of its television commercials containing the seashell demonstration through May of 1997. Tr. 1446:1-17 (Fong). At time of trial, in the market entry city of Guangzhou, consumer brand awareness of CREST was nearly 100%, Tr. 453:1-8 (Ullmann), and, as of 11 months before trial, it was about 85-90% in Beijing, where P & G had begun marketing CREST earlier. Zhong Dep. at 382- 83.

P & G is a large, well-known multinational corporation with total assets worldwide, as of 1996, of nearly $28 billion, net earnings of over $3 billion and net sales of $35 billion. Ex. WC at 30 (P & G 1996 Annual Report); Ex. WJ (P & G press release dated Oct. 21, 1996); Tr. 66:9-14 (Panayotopoulos). In Asia alone, P & G's net sales for 1996 reached nearly $3.8 billion, a 5ncrease over 1995, when P & G's net sales in Asia increased by 15% over 1994. P & G's net earnings in the region in 1996 were $222 million, and "China led the region's growth,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                   Page 61
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

achieving over 50% unit volume growth while maintaining excellent earnings progress ... reflect[ing] the expansion of geographical coverage and share growth in all categories." Ex. WC at 26 (P & G 1996 Annual Report). This background is relevant to the Court's examination of the evidence of reverse confusion. Given the size, financial strength and presence of P & G in the region, the relative spending levels for CREST and COLGATE advertising in China, the high consumer awareness of the CREST brand and of P & G generally, and the minimal evidence of direct confusion between CREST and COLGATE, reverse confusion also is not found. Tr. 1302:11--1303:23 (Wind).

## V. EFFECT ON UNITED STATES COMMERCE

**\*66** P & G also has not presented any evidence that it has been adversely affected by Colgate's use of the seashell demonstration. United States consumers do not associate the egg demonstration with P & G today. Regruth Dep. at 78. P & G is suffering no direct harm in the United States from Colgate's use of the seashell demonstration. Regruth Dep. at 121. There is no evidence that P & G actually has suffered any adverse effect in the marketplace as a result of Colgate's use of the seashell demonstration, whether in China, the United States or anywhere else.

## THE LANHAM ACT CLAIM: CONCLUSIONS OF LAW
I. EXTRATERRITORIAL APPLICATION OF THE LANHAM ACT

As a threshold matter, the Court finds that even if P & G has protectable, non-abandoned U.S. trademark rights in the egg demonstration, the evidence adduced at trial demonstrates that the Lanham Act should not be applied extraterritorially in this action.

The Lanham Act can be applied to conduct outside the United States in certain circumstances where the conduct causes harm within the United States. In this Circuit, the decision to extend the Act extraterritorially is governed by consideration of three factors: (1) whether the defendant is a U.S. citizen; (2) whether applying the Act to the conduct at issue would create a conflict with trademark rights under foreign law; and (3) whether the allegedly wrongful conduct has a "substantial effect" on U.S. commerce. *See Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 642-43 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); *see also Atlantic Richfield Co. v. Arco Globus Int'l Co.,* 150 F.3d 189, 192 (2d Cir.1998); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1006-07 (2d Cir.1997); *Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824, 830-31 (2d Cir.1994); *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 745-46 (2d. Cir.1994).

The Second Circuit has stated that "the absence of one of the above factors might well be determinative," and that the absence of two factors "is certainly fatal." *Vanity Fair,* 234 F.2d at 643 (denying extraterritorial application when defendant was not U.S. citizen and conflict existed with foreign law); *see also Totalplan,* 14 F.3d at 831 (observing that absence of two of the three factors, citizenship and substantial effect on U.S. commerce, "is fatal to an argument that the conduct is governed by the Lanham Act"). Moreover, this Circuit has recently indicated that a substantial effect on U.S. commerce is a necessary predicate to extraterritorial application of the Act. *See Atlantic Richfield,* 150 F.3d at 192 & n. 4. [FN28]

FN28. The Federal Circuit recently proclaimed "The Second Circuit does not apply its *Vanity Fair Mills* test mechanically.... Accordingly, 'the absence of any one factor is not dispositive." ' *Aerogroup Int'l, Inc. v. Marlboro Footworks,* 152 F.3d 948, Nos. 97-1125, 97-1281, 97-1282, 1998 WL 169251, at \*2 (Fed. Cir. April 13, 1998) (unpublished disposition) (quoting *Calvin Klein Indus., Inc. v. BFK Hong Kong,* 714 F.Supp. 78, 79 (S.D.N.Y.1989)), *cert. denied,* 525 U.S. 948, 119 S.Ct. 373, 142L. Ed.2d 308, 67 U.S.L.W. 3149, 67 U.S.L.W. 3169, 67 U.S .L.W. 326967 U.S.L.W. 3270 (U.S. Oct. 19, 1998). This case preceded *Atlantic Richfield* by three months and does not reflect its holding.

The Court will examine each of the three *Vanity Fair* factors in turn.

### A. Citizenship of Defendants

Defendants Colgate and Y & R are United States companies. *See supra* pp. 2- 3 (Stipulated Facts ¶ ¶ 6, 12). However, P & G seeks to enjoin not only Colgate and Y & R, but also certain Chinese-based entities. The actual Colgate subsidiary that is airing the Chinese advertisement P & G seeks to enjoin is a Chinese-based joint venture with a Chinese governmental entity. *See supra* p. 3 (Stipulated Facts ¶ 11). It is not a U.S. company. [FN29] The actual Y & R joint venture involved in the airing of the Chinese advertisement is the third named defendant, DY & R. It is not a legal entity, but a United States/Japanese joint venture which serves Colgate in China through an office located in Guangzhou. *See supra* pp. 3 (Stipulated Facts ¶ 15), 7-8. While it may sometimes be proper to ignore the foreign citizenship of affiliated parties when the main defendants are United States citizens, *see Scotch Whisky Ass'n v. Barton Distilling Co.,* 489 F.2d 809, 812-13 (7th Cir.1973) (mere

Not Reported in F.Supp.2d                                                                                    Page 62
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

fact that defendant associates itself with foreign licensee, who sells the infringing goods, does not bar extraterritorial application of the Lanham Act); *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.,* 955 F.Supp. 220, 231 (S.D.N.Y.1997) (stating in dicta that foreign citizenship of defendant might appropriately be ignored if defendant was related to one of the other corporate defendants which was a U.S. citizen), *aff'd,* 152 F.3d 948, Nos. 97-1125, 97-1281, 97-1282, 1998 WL 169251 (Fed.Cir. April 13, 1998) (unpublished decision), *cert. denied,* 525 U.S. 948, 119 S.Ct. 373, 142 L.Ed.2d 308, 67 U.S.L.W. 3149, 67 U.S.L.W. 316767 U.S.L.W. 326967 U.S.L.W. 3270 (U.S. Oct. 19, 1998), the fact that Colgate's joint venture partner is a governmental entity does weigh against extraterritorial application of the Lanham Act. *Cf. In re Sealed Case,* 825 F.2d 494, 499 (D.C.Cir.) (invalidating civil contempt order against state-owned bank for lack of jurisdiction, and noting that "[t]hese kinds of concerns bring us very close to the act of state doctrine, which, though it arises in a different context, cautions courts not to 'sit in judgment on the acts of the government of another done within its own territory' " (quoting *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897))), *cert. denied sub. nom Roe v. United States,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987)). Thus, although the named defendants are U.S. entities, the citizenship factor does not tip strongly in favor of applying the Lanham Act in this case.

> FN29. The P & G entity which is airing the egg demonstration in China is also a Chinese-based joint venture with the Chinese government. Beausejour Dep. at 181-82; *see also supra* p. 7.

B. *Conflict with Foreign Law*

**\*67** *Vanity Fair* cautions U.S. courts to avoid imposing American competition standards on conduct overseas. This is based on background considerations such as "the difficulty of obtaining extraterritorial enforcement of domestic law, as well as on considerations of international comity and respect for national integrity." *Vanity Fair,* 234 F.2d at 639.

P & G certainly has not demonstrated harmony between American and Chinese law. Based on the evidence adduced at trial, it does not appear that the P & G egg demonstration commercials qualify for trademark protection under the laws of China. There is no evidence that P & G has applied for or received any trademark registrations for the egg demonstration in China or any other country. Chinese government authorities considered and denied (albeit somewhat equivocally) P & G's request to enjoin the airing of Colgate's seashell demonstration in

China. Ex. BK (Letter from Chinese National Copyright Administration). Further, defendants' expert on Chinese law, Henry Wheare, provided testimony that P & G does not have a protectable rights in the egg demonstration under Chinese trademark or unfair competition law, and that even if it possessed such rights, Colgate's seashell demonstration would not violate them. Tr. 497:5-16 (Wheare). This testimony was challenged on cross-examination but not rebutted by any contrary testimony. *See supra* p. 51.

Although the evidence concerning Chinese law is not conclusive, applying the Lanham Act extraterritorially to Colgate's seashell demonstration in China would appear to lead to an American court declaring that P & G has rights in China that Chinese courts have not afforded P & G under Chinese law. Such a course of action would deprive defendants--as well as the Chinese government, Colgate's joint venture partner in China--of rights that Chinese law apparently affords them to air the seashell demonstration there. Slightly, therefore, this factor weighs against extraterritorial application of the Lanham Act. *Cf. Aerogroup,* 955 F.Supp. at 231 (finding that although unresolved questions about foreign trademark law "are not sufficient by themselves to deny [plaintiff] the protections of the Lanham Act in an action against [defendant], they are sufficient to increase this Court's caution in exercising jurisdiction over matters more appropriately left to [foreign] courts.").

C. *Substantial Effect on U.S. Commerce*

Not every act of wrongdoing can be reached by the Lanham Act. Congress sought to limit extraterritorial application of the Lanham Act to "foreign uses that have significant trademark-impairing effects upon American commerce." *Sterling Drug,* 14 F.3d at 746 (instructing district court, on remand, to craft injunction that prohibits only those uses of mark abroad that have substantial effect on U.S. commerce). Within this Circuit a plaintiff is required to show not only "some effect," but a "substantial effect" on U.S. commerce. *See Totalplan,* 14 F.3d at 830 (distinguishing Second Circuit law from the Fifth Circuit's opinion in *American Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n,* 701 F.2d 408 (5th Cir.1983)).

**\*68** In this case, P & G has presented no evidence that Colgate's showing of the seashell demonstration in China has had *any* effect--much less a substantial effect--on U.S. commerce. *See supra* p. 143. P & G has failed to offer any evidence of a diversion of sales from P & G to Colgate in the United States or anywhere else in the world. The record is also devoid of evidence that the alleged confusion resulting from Colgate's airing of the seashell demonstration in China has caused either

Not Reported in F.Supp.2d                                                                                     Page 63
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

confusion or damage to P & G's reputation in the United States. Indeed, P & G's Director of Advertising Development Worldwide conceded that United States consumers are not likely to associate the egg demonstration with P & G today, and that P & G is suffering no direct harm in the United States because of Colgate's use of the seashell demonstration. Tr.1900:12-1901:11, 1902:7-16 (Regruth). P & G's Chief Executive Officer testified that any recent drop in Crest's domestic sales was not connected to Colgate's seashell advertisement abroad. Tr. 366:9-23 (Pepper). [FN30] The evidence supports a finding that Colgate's alleged wrongdoing in China did not have a substantial effect on U.S. commerce.

> FN30. P & G's Chief Executive Officer did testify about the importance of the China market to P & G's "global leadership." He stated that success in China would lead to sales advantages, increased funds for research and development, enhanced recruitment ability, manufacturing economies of scale, and stronger relationships with global distributors (such as Wal-mart) who look to "global leaders" for business relationships. Tr. 341:4-24 (Pepper). If these indirect consequences of foreign sales could support application of the Lanham Act, United States courts would be evaluating trademark and unfair competition in every country in the world regardless of any direct damage in the United States.

A substantial effect on U.S. commerce is not established by the fact that defendants filmed and reviewed the seashell demonstration in-house within the United States. The Second Circuit has held that the mere packaging and shipment of goods from the United States does not constitute a substantial effect on United States commerce, absent evidence that the infringing goods have re-entered the United States to cause confusion in this country. *See Totalplan, 14 F.3d at 830*. Likewise, the mere preparation of an infringing advertisement within United States borders does not satisfy the substantial effect prong of the *Vanity Fair* test when that advertisement has been shown exclusively abroad. Domestic activity involved in the preparation of defendants' advertisements, even if "essential" to the allegedly infringing activity abroad, is not enough to satisfy this prong of the *Vanity Fair* test. *See Atlantic Richfield, 150 F.3d at 193* (rejecting defendant's argument that "a defendant's domestic activity, even if 'essential' to infringing activity abroad, is alone sufficient to cause a substantial effect on United States commerce"). [FN31]

> FN31. This Court disagrees with the dicta in

*Piccoli A/S v. Calvin Klein Jeanswear Co.,* No. 98 Civ. 0040(LAK), 19 F.Supp.2d 157, at *9- * 10 (S.D.N.Y. Sept. 9, 1998), which views *Atlantic Richfield* as ambiguous on this point. The *Atlantic Richfield* court refused to read the landmark Supreme Court case, *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952), as holding that domestic activity essential to infringing activity abroad was sufficient to ground a finding of substantial effect on U.S. commerce. *See* 150 F.3d at 193. The *Atlantic Richfield* court then stated that "even if *Bulova* is read to indicate that a defendant's infringing extraterritorial conduct has a substantial effect on United States commerce whenever some non-infringing domestic activity is 'essential' to that extraterritorial conduct, none of [defendant's] domestic activities can be deemed essential to its foreign conduct." Id. This additional line of argument does not contradict or obviate the Circuit's first conclusion--that there is no precedent for the view that domestic activities "essential" to infringement abroad are enough to satisfy the "substantial effect on U.S. commerce" test.

In sum, P & G has not shown that defendants' alleged misconduct has had a substantial effect on U.S. commerce. Because the Second Circuit has treated this factor as a necessary feature of any decision to apply the Lanham Act to conduct outside U.S. borders, *see Atlantic Richfield, 150 F.3d at 192 & n. 4*, extraterritorial application of the Lanham Act in this case is improper. Further, even if the three *Vanity Fair* factors were to be weighed in a balance, the balance would tip against application of the Act. Accordingly, P & G's Lanham Act claim must be dismissed.

However, to ensure that a complete record is made for appellate review the Court will assume, arguendo, the existence of Lanham Act jurisdiction for the purpose of making alternative findings with respect to P & G's trademark rights. The Court will first consider whether P & G has abandoned any trademark rights it might have had under U.S. law, and then analyze the merits of P & G's claim under Section 43(a) of the Lanham Act.

II. *ABANDONMENT OF THE MARK WITHIN THE UNITED STATES*

**\*69** The sole commercial airing by P & G of egg demonstration commercials in the United States occurred in the U.S. Hispanic markets in 1989-93 and 1993-94, *see supra* p. 5 (Stipulated Facts ¶ 21); Rings Dep. at 22, and defendants claim that P & G has forfeited any trademark

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                     Page 64
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

rights it might have had by abandoning domestic use of the egg demonstration commercials since 1994. P & G offered no evidence during the trial concerning how often these egg demonstration commercials aired in the United States or the number of consumers reached by these commercials. P & G offered no evidence at trial of any other commercial use of the egg demonstration in the United States, nor has it offered evidence of intent to use the egg demonstration TV advertisement in the United States. It is apparent from the stipulation regarding plaintiff's airing of its egg demonstration commercials in various countries around the world that television commercials are generally shown for a two or three year period and then abandoned. *See supra* p. 5 (Stipulated Facts ¶ 21). Defendants claim, on this basis, that P & G has abandoned any trademark interests it might otherwise have possessed.

The focus of the abandonment inquiry is on abandonment within the United States, for foreign use cannot preserve a parties' rights to its mark. As the Second Circuit noted over twenty years ago, "[i]t is well settled that foreign use is ineffectual to create trademark rights in the United States." *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265, 1270 n. 4 (2d Cir.1974); see also Buti v. Impressa Perosa, S.R.L., 935 F.Supp. 458, 460 (S.D.N.Y.1996)* (defendant did not derive any right to mark in United States from Italian trademark registration or use of mark in Italy), *aff'd, 139 F.3d 98 (2d Cir.1998), cert. denied,* 67 U.S.L.W. 3001, 67 U.S.L.W. 3100, 67 U.S.L.W. 3226, 67 U.S.L.W. 3230 (U.S. Oct. 5, 1998); *Financial Matters, Inc. v. Pepsico, Inc., 806 F.Supp. 480, 485 (S.D.N.Y.1992)* (citing *Jean Patou, 495 F.2d at 1270 n. 4); cf. Vanity Fair, 234 F.2d at 646* (refusing to assert subject matter jurisdiction over "that portion of this action turning on the validity or invalidity of defendant's Canadian trademark"). P & G's U.S. trademark rights in would have to be based solely on P & G's usage of the egg demonstration in the United States. *See, e.g., Scholastic, Inc. v. MacMillan, Inc., 650 F.Supp. 866, 873 n. 6 (S.D.N.Y.1987)* (Lumbard, J.) ("[Plaintiff's] extensive use of the name 'Classroom' in Canada and Australia is, of course, of no relevance to its effort to create trademark rights in the United States."). [FN32]

FN32. The Second Circuit's decision in *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993 (2d Cir.1997),* relied upon by P & G, Pl.'s Supplementary Pretrial Mem. at 8-9, is not to the contrary because the plaintiff in that case was selling its product "Toilet Bank" in the United States and owned United States trademark rights in its product. *See id. at 997.*

The determination of abandonment is governed by

Section 1127 of the Lanham Act, which states, in pertinent part:

A mark shall be deemed to be "abandoned" if ... the following occurs:
(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

*70* 15 U.S.C.A. § 1127 (1998). [FN33] Thus, to establish abandonment, a party must prove: (a) discontinuation or non-use of a trademark; and (b) intent not to resume use of the trademark. *See Silverman v. CBS Inc., 870 F.2d 40, 45 (2d Cir.), cert. denied, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989).* A party is entitled to a rebuttable presumption of abandonment if it can demonstrate nonuse of the trademark for three consecutive years. *Id.*

FN33. The statutory period of nonuse sufficient to constitute a prima facie case of abandonment was increased from two years to three years by the Uruguay Round Agreements Act, Pub.L. No. 103-465, § 521, 108 Stat. 4809, 4981-82 (1994).

Plaintiff does not contest that P & G last aired an egg demonstration commercial in the United States in August 1994, Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law ¶ 143, and that it did not air such a commercial domestically for the three year period leading up to trial in October 1997, *see supra* p. 5 (Stipulated Facts ¶ 21). However, P & G counters that defendants did not plead abandonment as an affirmative defense as required by Rule 8(c) of the Federal Rules of Civil Procedure, and cites *Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037 (2d Cir.1980),* and *Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053 (2d Cir.), cert. denied, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).* Though these two cases do not appear to support plaintiff, plaintiff is correct that abandonment is an affirmative defense. *See Major League Baseball Properties, Inc. v. Sed Non Olet Denarius, Ltd., 817 F.Supp. 1103, 1126 (S.D.N.Y.1993)* ("[A]bandonment is an affirmative defense to trademark infringement." (citing *Roulo v. Russ Berrie & Co., 886 F.2d 931, 935 (7th Cir.1989), cert. denied, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990)))), vacated pursuant to settlement, 859 F.Supp. 80 (S.D.N.Y.1994); Murphy Door Bed Co. v. Interior Sleep Sys., Inc., 687 F.Supp. 754, 760 (E.D.N.Y.1988)* (observing that "abandonment has been interpreted to be an affirmative defense to be established by the party asserting it" (citing

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                            Page 65
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

*Atlas Supply Co. v. Atlas Brake Shops, Inc.,* 360 F.2d 16, 18 (6th Cir.1966))), *aff'd in part, rev'd in part,* 874 F.2d 95 (2d Cir.1989).

Nonetheless, the Court finds that P & G had sufficient notice to require presentation of evidence regarding the issue of abandonment. An affirmative defense omitted from the pleadings need not be considered waived if there is sufficient notice to opposing counsel to prepare a response. Such notice can be provided by inclusion of the affirmative defense in a pretrial order. *See Hargett v. Valley Fed. Sav. Bank,* 60 F.3d 754, 763 (11th Cir.1995) ("[I]f a party omits the defense of statute of limitations in its answer, the defense is not waived if the litigant includes it in the pretrial order."); *Expertise, Inc. v. Aetna Fin. Co.,* 810 F.2d 968, 973 (10th Cir.1987) (permitting statute of limitations defense omitted from answer but included in pretrial order because "[w]hen an issue is set forth in a pretrial order, it is not necessary to amend previously filed pleadings"); *Allied Chem. Corp. v. Mackay,* 695 F.2d 854, 855 (5th Cir.1983) (affirmative defense of usury not waived, despite party's failure to include defense in its pleadings, when it is included in court's pretrial order and therefore "raised in the trial court in a manner that does not result in unfair surprise"); *Frito-Lay, Inc. v. Bachman Co.,* No. 83 Civ. 4484(MGC), 1987 WL 11555, at *3 (S.D.N.Y. May 19, 1987) (considering affirmative defense of acquiescence because "both parties raised the issue of acquiescence in the pretrial order prepared for this trial").

**\*71** In this case, Colgate's Answer to the Amended Complaint notified the plaintiff, in paragraph 111, that it would contest the very existence of P & G's trademark rights, as well as the issue of infringement by stating: "Colgate is entitled to a declaratory judgment that P & G has no protectable rights to the subject works under the Lanham Act or under the New York General Business Law." Defendants more specifically adverted to P & G's failure to show its egg demonstration commercials within the United States in paragraph 9 of their contentions attached to the pretrial order filed two weeks before trial: "This Court has no subject matter jurisdiction over [P & G's] trademark infringement claim. [P & G] is relying entirely upon its alleged foreign trademark rights in its commercials; *it has no such rights in the United States because its commercials are not shown here"* (emphasis added). In paragraph 18 of their contentions, defendants further stated: "Under United States law, the first user of a mark in a specific geographic area is the owner of that mark (assuming the mark qualifies for protection, as the Egg Demonstration does not), *assuming the mark has not been abandoned"* (emphasis added). *See also* Y & R's Pretrial Mem. at 3 n.2 ("With three years of non-use in the U.S. and no plans to air the egg demonstration

commercials in the U.S., P & G has abandoned any U.S. rights it may have had to those commercials."); *id.* at 4 n .3 ("[I]t bears emphasis that P & G's claim suffers from the striking threshold anomaly that P & G is asking the Court to apply the Lanham Act to an alleged trademark right based upon *foreign usage* where any U.S. rights it may have had have been abandoned through non-use."). The Court finds that plaintiff had sufficient notice of the issue of abandonment, and because plaintiff's own records would contain evidence of its use of a commercial, the Court concludes that plaintiff had sufficient time before trial to gather evidence relating to when its egg demonstration commercials aired in the United States and to its intention to resume use of these commercials in the future.

Defendants are entitled to a rebuttable presumption of abandonment because P & G failed to use its mark in the United States for a period exceeding three years. The general principle that foreign use is ineffectual to create trademark rights in the United States, *see supra* p. 151, requires that the words "use" and "non-use" contained in the definition of abandonment in 15 U.S.C. § 1127 be measured according to use within the United States. *See Imperial Tobacco Ltd. v. Phillip Morris, Inc.,* 899 F.2d 1575, 1579 (Fed.Cir.1990) ("The terms 'use' and 'nonuse' mean use and nonuse in the United States."); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.,* 892 F.2d 1021, 1024 (Fed.Cir.1989) (ignoring foreign use of mark in abandonment analysis and drawing inference that trademark was not used domestically during the relevant time period); *Shelby v. Ford Motor Co.,* No. CV 92-2571(CBM) (JGX), 1993 WL 528389, at *5 (C.D.Cal. Jul. 28, 1993) (" 'Use' of the mark means 'use' or 'non-use' in the United States.") (citation omitted). P & G does not dispute that its last aired the egg demonstration commercials in the United States over three years before trial, in August 1994. Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law ¶ 143.

**\*72** P & G's distribution of public domain materials to U.S. schools does not substantiate a finding of continued use. During trial, defendants introduced deposition testimony from Sheila Becker, the P & G employee in charge of the school programs. Tr.1938 (Becker). Ms. Becker testified that during the 1993-94 school year, P & G "appended to [its] animated video the 90- second Egbert commercial that showed visually how to conduct the demo." Tr.1940:14-16 (Becker). *Currently,* however, materials distributed to schools consist solely of "a page in the teacher's guide. It's listed under the science curriculum and it's done in a recipe format in that it lays out the materials needed, the time to do it, and the steps to conduct it." Tr.1939:22-25 (Becker). Nothing else is currently given to teachers in the United States with

respect to the egg experiment. Tr.1940:1-7 (Becker). P & G failed to introduce any evidence at trial that its commercials incorporating the egg demonstration have been used by United States teachers within the last three years.

Even if P & G currently used the egg demonstration video in the United States--which is contrary to the evidence--non-commercial uses of a mark by a profit-seeking entity do not constitute "use" for the purpose of determining whether a party has discontinued its use of a mark. 15 U.S.C. § 1127 (1994) (" 'Use' of a mark means the bona fide use of such mark in the ordinary course of trade ...."); see also Silverman, 870 F.2d at 47-48 (non-commercial uses including, inter alia, defendant's licensing of "programs for limited use in connection with documentary and educational programs," are "not sufficient use to forestall abandonment"). There is no evidence that P & G has a commercial interest in the schools' use of the egg demonstration. To the contrary, Ms. Becker testified that the purpose of the school program is merely "to provide children with complete dental education at an optimal point in their development to influence their hygiene habits for life," Tr.1939:5-7 (Becker), and she explicitly disavowed that the program was intended "to teach [children] about Procter & Gamble's oral care products," Tr.1978:1-6 (Becker). Even if P & G was currently using its advertisements in the schools, such minor, non-commercial uses of its work would not "sufficiently rekindle the public's identification of the mark with the proprietor, which is the essential condition for trademark protection, nor do they establish an intent to resume commercial use." Silverman, 870 F.2d at 48. Therefore defendant is entitled to a rebuttable presumption of abandonment. Given P & G's failure to present evidence of intent to resume use of its egg demonstration commercials, the rebuttable presumption is not overcome in this case.

Even without the rebuttable presumption, defendants would succeed in showing that (a) P & G had discontinued the use of the egg demonstration commercials, and (b) P & G did not intend to resume use of the commercials. When the statutory presumption is not relied on, intent not to resume use of a mark "may be inferred from the circumstances." 15 U.S.C. § 1127; see also Sterling Bank v. Sterling Bank and Trust FSB, No. CV-94-8378-KMW (MCx), 928 F.Supp. 1014, 1996 WL 339849, at *4 (C.D.Cal. May 14, 1996) (finding that plaintiff was not entitled to presumption of abandonment, but that plaintiff had sustained its burden of proving that defendant discontinued use of the mark and did not intend to resume use of the mark), vacated by settlement, 1996 WL 500946 (C.D.Cal. July 5, 1996); Anvil Brand, Inc. v. Consolidated Foods Corp., 464 F.Supp. 474, 481

(S.D.N.Y.1978) (noting that statutory presumption is "by no means the sole criterion for determining intent"). The focus of the inquiry is on whether a trademark holder intends to resume use "within the reasonably foreseeable future." See Silverman, 870 F.2d at 46. Such intent to resume use exists only when a trademark holder has a genuine design to make commercial use of the mark, and should be distinguished from the mere desire to preserve trademark rights. See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 17:21, at 17-32 (4th ed.1998) [hereinafter McCarthy] (" '[U]se' is a commercial level of use, not mere token use to attempt to keep rights in the unused mark."); see also Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 102-103 (5th Cir.1983) ("An 'intent to resume' requires the trademark owner to have plans to resume commercial use of the mark. Stopping at an 'intent not to abandon' tolerates an owner's protecting a mark with neither commercial use nor plans to resume commercial use."); Hiland Potato Chip Co. v. Culbro Snack Foods, Inc., 720 F.2d 981, 984 (8th Cir.1983) (approving of Exxon's distinction between "intent to resume use" and "intent not to abandon"). A sufficient showing of nonuse and absence of intent to resume use can establish a defense of abandonment even if the statutory presumption is not relied upon.

**\*73** In this case, P & G's own records show that P & G does not intend to resume use of the egg demonstration in the United States in the reasonably foreseeable future, if ever. A September 1994 report on the egg demonstration prepared for P & G by CREST's international advertising agency states that "[t]here are no plans to pursue 'egg' [in the United States], even in the Hispanic market." Ex. FT at GO-238. P & G presented no evidence that it has aired egg demonstration commercials in the United States at any time subsequent to this September 1994 report, or that it has an intent to resume use in the reasonably foreseeable future.

Trademark rights exist only as rights appurtenant to an established business, see Buti v. Perosa, S.R.L., 139 F.3d 98, 105 (2d Cir.1998) (citing United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918)), cert. denied, 67 U.S.L.W. 3001, 67 U.S.L.W. 3100, 67 U.S.L.W. 3226, 67 U.S.L.W. 3230 (U.S. Oct. 5, 1998), and as a leading treatise on trademark law advises, "[i]f the mark is no longer associated with the business, in the public mind, then the mark should be regarded as abandoned." 2 McCarthy § 17:13, at 17-15. Thus, " '[t]o satisfy the use requirement, application of the trademark must be sufficient to maintain 'the public's identification of the mark with the proprietor." ' Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 851 (2d Cir.1992) (quoting Silverman, 870 F.2d at 48)). In this case, P & G's use of its mark has dwindled such that the

Not Reported in F.Supp.2d                                                                    Page 67
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

public does not identify the egg demonstration commercial with P & G. Tr.1900:12-1901:11 (Regruth) (P & G's Director of Advertising Development Worldwide conceding that United States consumers no longer associate the egg demonstration with P & G). In view of this deterioration of the mark during its three year period of nonuse, P & G's records from 1994 indicating the absence of plans to resume use, and the lack of testimony presented by P & G about any more recent intent to resume use, the evidence supports a finding of abandonment with or without the statutory presumption.

### III. *ANALYSIS OF INFRINGEMENT UNDER SECTION 43(A) OF THE LANHAM ACT*

Assuming, solely for the purpose of making a complete record for appellate review, that the Lanham Act should be applied extraterritorially in this case and that plaintiff has not abandoned its U.S. trademark rights, the merits of plaintiff's Lanham Act claim will be examined.

To receive protection under Section 43(a) of the Lanham Act, a plaintiff must show that: (a) its trade dress serves a source-identifying function either because it is inherently distinctive or because it has acquired distinctiveness through secondary meaning; and (b) there exists a likelihood of confusion between the plaintiff's trade dress and the defendant's trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)).* P & G has made neither of these required showings.

### A. *Inherent Distinctiveness or Secondary Meaning*

**\*74** A plaintiff may demonstrate that its trade dress or trademark designates a particular source by showing either inherent distinctiveness or secondary meaning. *See Villeroy & Boch Keramische Werke K.G. v. THC Sys., Inc., 999 F.2d 619, 620 (2d Cir.1993).* The relevant test of inherent distinctiveness is whether the trade dress is " 'likely to serve primarily as a designator of origin of the product." ' *Knitwaves, 71 F.3d at 1009* (quoting *Duraco Prods., Inc. v. Joy Plastic Enters. Ltd., 40 F.3d 1431, 1449 (3d Cir.1994)); accord Judith Ripka Designs, Ltd. v. Preville, 935 F.Supp. 237, 257 (S.D.N.Y.1996).*

The elements of P & G's egg demonstration are not inherently distinctive. There are numerous examples of publications, commercials and other materials besides P & G's and defendants' that incorporate similar demonstrations using many of the same elements. The basic experiment underlying both P & G's egg and Colgate's seashell demonstrations has been used for many years by various entities in the United States, such as toothpaste manufacturers (including P & G and Colgate),

government health agencies, newspapers, schools, the American Dental Association and numerous state dental societies. *See supra* pp. 14-17.

The egg demonstration commercials fail the test of secondary meaning as well as that of inherent distinctiveness. Trade dress that is not by its nature so unique as to serve a source-identifying function can acquire such a function over time. The Second Circuit has ruled, however, that " '[t]o establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." ' *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir.1992)* (citation omitted); *accord Villeroy & Boch, 999 F.2d at 620.*

P & G has failed to carry its burden of proving secondary meaning. The Second Circuit has described secondary meaning to be "an essentially factual determination, proof of which " 'entails vigorous evidentiary requirements." " ' *Bristol-Myers Squibb, 973 F.2d at 1041* (citations omitted). The features identified by P & G as elements of its trade dress are features shared in common with demonstrations of this type. There is no persuasive evidence that these features have come to be commonly associated with P & G. Particularly in light of the fact that the most distinctive aspect of the egg and seashell demonstrations is the unprotectable experiment, which exists in the public domain and has been utilized by a wide variety of organizations, it is impossible to conclude that P & G's demonstration commercials serve a source-identifying function. *See Judith Ripka Designs, 935 F.Supp. at 257* (where shared design elements of plaintiff's and defendant's jewelry designs were common in the jewelry trade and not associated with or confined to plaintiff's jewelry designs, no infringement found); *cf. Warner Bros. Inc. v. ABC, Inc., 720 F.2d 231, 246 (2d Cir.1983)* (noting that "the absence of substantial similarity [under copyright law] leaves little basis for asserting a likelihood of confusion or palming off for purposes of a claim under section 43(a) of the Lanham Act").

**\*75** Even if the Lanham Act were to apply here, P & G has no claim because the egg demonstration is not inherently distinctive and has not acquired secondary meaning. [FN34]

> FN34. The Court does not accept defendants' additional argument that even if the mark was distinctive, "P & G still would have no protectable trademark rights in China because Colgate used the seashell demonstration in China before P & G used the egg demonstration there,"

Not Reported in F.Supp.2d                                                                                                    Page 68
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law ¶ 68, because the fact that P & G was not the senior user of the mark in China is irrelevant. The theory behind the *Vanity Fair* line of cases is that the Lanham Act protects domestic trademark interests when they are detrimentally impacted by conduct abroad. *See, e.g.,* *Atlantic Richfield Co. v. Arco Globus Int'l Co.,* 150 F.3d 189, 192 (2d Cir.1998). The relevant inquiry is therefore focused on whether the plaintiff is the senior owner of the trademark within the United States, and whether the plaintiff's domestic interests in the mark are harmed by the defendants' activity abroad. *See* 4 McCarthy § 26.5, at 26-11 ("In using the term 'senior user' it is assumed that ... use and adoption was within the United States, since first use outside the United States does not count."); *see also* 4 id. § 29:2, at 29-6 ("Priority of trademark rights in the United States depends solely upon priority of use in the United States, not priority of use anywhere in the world.").

B. *Likelihood of Confusion*

The Second Circuit has recognized that " 'trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." ' *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 583 (2d Cir.1991) (citations omitted); *see also* *Programmed Tax Sys., Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1132 (S.D.N.Y.1977); *Jim Beam Brands Co. v. Beamish & Crawford, Ltd.,* 852 F.Supp. 196, 199 (S.D.N.Y.1994); *Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 546 (S.D.N.Y.1991); *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 450 (S.D.N.Y.1982). To establish a likelihood of confusion, P & G must show that " 'numerous ordinar[il]y prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." ' *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997) (citation omitted). Properly conducted, the likelihood of confusion analysis "attempt[s] to recreate the conditions under which prospective purchasers make their choices." 3 McCarthy § 23:58, at 23- 129. This requires that the likelihood of confusion be determined in relation to the particular market where the relevant purchasing decisions are made--in this case, China. *See* *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,* 94 F.3d 376, 382 (7th Cir.1996) (analysis should focus on "the confusion of consumers in the market for the particular products at issue").

In the Second Circuit, likelihood of confusion is determined by considering the factors Judge Friendly set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):(a) the strength of the plaintiff's mark, (b) the similarity of the parties' marks, (c) the competitive proximity of the parties' products, (d) the likelihood that the senior trademark owner will "bridge the gap" between the products, (e) the evidence of actual confusion, (f) the defendants' good faith, (g) the quality of the defendants' product, and (h) the sophistication of buyers. *See, e.g.,* *Estee Lauder,* 108 F.3d at 1510; *W.W.W. Pharm. Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993); *Lang,* 949 F.2d at 580. This inquiry is contextual and flexible; no one factor is dispositive, and other factors not enumerated in *Polaroid* may be considered. *See* *Estee Lauder,* 108 F.3d at 1510; *W.W.W.,* 984 F.2d at 572; *Lang,* 949 F.2d at 580. The *Polaroid* test for likelihood of confusion is equally applicable in cases such as this one where the plaintiff alleges reverse confusion. *See* *W.W.W.,* 984 F.2d at 572; *Lang,* 949 F.2d at 580; *Mejia and Assocs., Inc. v. IBM,* 920 F.Supp. 540, 547 (S.D.N.Y.1996).

**\*76** The burden of proof is on the plaintiff, *Jim Beam Brands,* 852 F.Supp. at 199, and the plaintiff must show that confusion is not only possible but probable. *Estee Lauder,* 108 F.3d at 1510. An analysis of this case employing the *Polaroid* factors leads to the conclusion that consumers in China are unlikely to be confused as a result of P & G's and Colgate's respective demonstrations. [FN35]

> FN35. Defendants argue that the doctrine of reverse confusion, on which P & G relies, is inapposite here because the doctrine only applies when a relatively weak senior user is overwhelmed by a larger company with greater financial ability. Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law ¶¶ 96-108. Because the balance of the *Polaroid* factors weighs in favor of the defendants in this case, the Court finds it unnecessary to address this argument.

1. *Strength of the Plaintiff's Mark*

The focus of this prong is on the tendency of the plaintiff's mark to identify its goods as coming from a particular source. *See* *Lang,* 949 F.2d at 581; *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). Strength of the mark can be demonstrated by either inherent distinctiveness or proof that the mark has become distinctive in the market over time, such that consumers associate the mark (however inherently distinctive it might be) with a particular origin. *See* *McGregor,* 599 F.2d at 1131-32; *Mejia,* 920 F.Supp. at

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

540. As stated above, P & G's egg demonstration commercials are not inherently distinctive, nor is there evidence that they have acquired secondary meaning. *See supra* pp. 160-61.

P & G presented no non-conclusory evidence that commercials containing egg demonstrations have been successful advertising for P & G anywhere in the world. Nor did P & G offer persuasive evidence that any consumers associate any version of the egg demonstration, or any of its executional elements, with CREST or any other P & G product. This lack of proof weighs against P & G. *See Pan Am. World Airways, Inc. v. Panamerican Sch. of Travel, Inc.,* 648 F.Supp. 1026, 1035 (S.D.N.Y.) (finding lack of public survey damaging to plaintiff), *aff'd,* 810 F.2d 1160 (2d Cir.1986); *cf. Harlequin Enters. Ltd. v. Gulf & W. Corp.,* 644 F.2d 946, 949-50 (2d Cir.1981) (finding that plaintiff's cover had secondary meaning for romance readers where plaintiff had conducted extensive national advertising in the United States, had phenomenal sales success with mark, and consumer survey demonstrated that romance readers correlated cover with plaintiff). P & G's Director of Advertising Development concedes that consumers in the United States are unlikely today to associate the egg demonstration with CREST. Tr.1900:12--1901:11 (Regruth). P & G also concedes that at the time it launched CREST in China in 1996, CREST was "barely known" and "virtually a non-existent player in the eyes of the Chinese public." P & G's Supplementary Pretrial Mem. at 15. [FN36]

> FN36. One court has suggested that it is more appropriate in a reverse confusion case to analyze the strength of the junior user's mark, not the senior user's mark. *See Sunenblick v. Harrell,* 895 F.Supp. 616, 627-28 (S.D.N.Y.1995) (noting that the Second Circuit has not adopted this approach, and taking guidance from courts outside this Circuit). The Colgate seashell demonstration--to the extent it could be considered a protectable trademark--would constitute a weak trademark for many of the same reasons that P & G's eggshell demonstration is a weak mark. The classic egg demonstration has long been in the public domain and Colgate's products have also received limited exposure in the Chinese marketplace.

2. *Similarity Between the Parties' Marks*

The Second Circuit has instructed that courts considering this factor should "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember." *W.W.W.,* 984 F.2d at 573. However, the Court should abstract from its consideration those elements of P & G's advertisements which are merely functional or are basic, unprotectable ideas. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32, 33 n. 4 (2d Cir.1995). Additionally, the analysis should focus not only on whether defendants' mark is similar to plaintiff's mark, but more specifically on whether the similarity between the two marks is likely to provoke confusion. *See W.W.W.,* 984 F.2d at 573; *McGregor- Doniger,* 599 F.2d at 1133 (" 'Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question." ' (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 82.1(a), at 601-02 (3d ed.1969))). In this case, the resemblance between plaintiff's and defendants' demonstrations does not rise to the level of confusing similarity.

**\*77** It cannot be gainsaid that plaintiff's and defendants' demonstrations bear resemblance to each other. However, the seashell in defendants' demonstration is clearly a seashell rather than an egg, and the features of the commercials surrounding the demonstrations are completely different. *Compare* Ex. YD (videotape compilation of Colgate seashell demonstration commercials) *with* Ex. 71 (videotape compilation of P & G egg demonstration commercials). The Court's analysis of differences among the parties' commercials at issue is set forth above. *See supra* pp. 53-89. In addition to the quantity of differences between the commercials, those elements that are shared in common between the parties' advertisements are largely unprotectable ideas, functional elements, and public domain materials. *See supra* pp. 96-114. The Second Circuit has noted that "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, concept, or a generalized type of appearance." *Jeffrey Milstein,* 58 F.3d at 32. Similarly, " 'functional elements' do not increase the distinctiveness of the trade dress, even considered as a whole." *Id.* at 33 n. 4. When functional elements and basic ideas are removed from the analysis, the similarity between the overall impression of the parties' advertisements is substantially diminished.

Furthermore, the Colgate seashell demonstration is well branded, which weighs against a finding of similarity. Even very similar trade dress may not be confusing when there is a clear designation of source. *See Estee Lauder,* 108 F.3d at 1512 (finding no likelihood of confusion where, inter alia, sources of competing products were expressly identified); *W.W.W.,* 984 F.2d at 573 (that disputed mark on defendant's product was preceded by defendant's well-known brand name and that actors on television commercials spoke the brand name before the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 70
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

disputed mark weighed against a finding of similarity); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992) (prominent display of trade names on packaging "can go far towards eliminating any possible confusion" and "weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging"); *McGregor-Doniger,* 599 F.2d at 1133-34 (frequent use of company name in conjunction with plaintiff's mark mitigates even similarity between marks which "approaches identity"). When the commercials at issue are viewed in their entirety, the repeated and prominent visual uses of the CREST and COLGATE marks, the audible use of the Chinese versions of the parties' marks, and the repeated and prominent depictions of CREST's and COLGATE's distinctive packaging make the commercials unconfusing as to their respective sources. *Compare* Ex. YD (videotape compilation of Colgate seashell demonstration commercials) *with* Ex. 71 (videotape compilation of P & G egg demonstration commercials); *see also* Zhong Dep. at 376-78; Sherman Dep. at 187-90; Wu Dep. at 249-52; Cappabianca Dep. at 64; Panayotopoulos Dep. at 138; Ex. CX at DM-1720. The source designations are featured in the demonstration and non-demonstration portions of each of the commercials at issue, and this heavy branding of the parties' commercials makes confusing similarity less likely.

**\*78** This Court's recent decision in *Telebrands Corp. v. E. Mishan & Sons,* No. 97 Civ. 1414(RPP), 1997 WL 232591, at \*19 (S.D.N.Y. May 7, 1997), relied on by plaintiff, is distinguishable. In *Telebrands,* the defendant was selling an imitation of the plaintiff's allegedly new and unique can opener by using a clear knock-off advertising strategy, which involved mimicking plaintiff's product marketing and packaging in an obvious attempt to capitalize on the heavy TV advertising used by plaintiff to establish its product in the relevant market. *See id.* at \*14,\*20. Like other courts, this Court noted that "[o]ne cannot avoid trade dress infringement simply by placing a trademark on the product." Id. at \*19; *compare, e.g., Bristol-Myers Squibb,* 973 F.2d at 1046 (noting that use of company name "does not in all cases eliminate the possibility of consumer confusion"). In *Telebrands* this Court found not only a "remarkable resemblance" between the parties' trade dresses, id. at \* 19, but "substantial evidence that defendant intentionally copied plaintiff's trade dress," id. at \*20. In light of these facts, this Court concluded that the defendant's use of its logo in commercials "[did] not render the trade dresses of the respective products and commercials dissimilar." Id. at 19.

 The facts here are materially different. First, the differences between plaintiff's and defendants' trade dresses are more significant in this case than in *Telebrands,* and there is no evidence of substantial and deliberate copying as there was in *Telebrands.* Second, in *Telebrands* the defendant's product was called "Perfect Can," a name so reminiscent of the name of and claims for plaintiff's product, "Safety Can," as to neutralize any possible differentiating impact the names might have had. *See id.* at \*1. Third, the products in *Telebrands* were sold primarily through direct marketing on television and not in stores, where they might have been available for close inspection such that differences in trade dress would be more discernible. *See id.* at \*19. In contrast, CREST, COLGATE and other toothpastes are sold on shelves at stores, where customers can easily identify the names, logos and packaging of the products. The use of identifying marks in *Telebrands* amounted to a minuscule difference not likely to negate consumer confusion, *see id.,* while the prominent display of the COLGATE logo and packaging in defendants' commercials more clearly distinguishes its product from the competition. While identifying marks will not always eliminate a likelihood of confusion, the parties' repeated use of such marks in this case makes confusion unlikely. [FN37]

> FN37. To further differentiate the situation in *Telebrands* from the instant case, it should be noted that the *Telebrands* defendant's advertising and packaging claims about its product's safety were false; the defendant's product was cheaper and of a poorer quality than the plaintiff's product; and there was evidence of actual confusion in the marketplace. 1997 WL 232595, at \*8- \*9,\*13- \*14,\*20.

 The Court finds that the commercials containing the Colgate seashell demonstration and the P & G egg demonstration are not similar to a degree likely to provoke confusion. This factor therefore weighs in favor of defendants.

 3. *Proximity of the Parties' Products*

 **\*79** Defendants concede that Colgate's seashell and P & G's egg demonstration commercials advertise products that are in direct competition. Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law ¶ ¶ 142-44. This factor, unlike the first two factors, therefore weighs in favor of P & G.

 4. *Likelihood that the Senior User Will Bridge the Gap Between the Products*

 Because the parties already compete in the same market, there is no bridge to gap. *See Toy Mfrs. of Am., Inc. v. Helmsley-Spear, Inc.,* 960 F.Supp. 673, 681

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                Page 71
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

(S.D.N.Y.1997).

5. *Evidence of Actual Confusion*

 Although evidence of actual confusion is not necessary to support a finding of actual confusion, the absence of such evidence is telling. *See Life Indus. Corp. v. Star Brite Distrib., Inc.,* 31 F.3d 42, 47 (2d Cir.1994); *McGregor-Doniger,* 599 F.2d at 1136; *Judith Ripka Designs, Ltd. v. Preville,* 935 F.Supp. 237, 257 (S.D.N.Y.1996). The Court "may properly infer from the absence of actual confusion that no likelihood of confusion exists." *Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 554 (S.D.N.Y.1991); *see also Essence Communications, Inc. v. Singh Indus., Inc.,* 703 F.Supp. 261, 269 (S.D.N.Y.1988) (noting that "the absence of [actual] confusion to date 'is a strong indicator that the likelihood of confusion is minimal' " (quoting *Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir.1983))). P & G introduced no evidence--first hand or through others--of actual mistaken purchasing decisions based on confusion between COLGATE and CREST. Denis Beausejour, P & G's worldwide Vice President of Advertising and the only person P & G identified during discovery as having knowledge of the confusion that it alleges, Ex. YA at 10 (P & G interrogatory responses), testified that he had never heard that any person in China was confused between CREST and COLGATE for any reason. Tr. 1892:10–1893:24 (Beausejour). The failure to present evidence that real marketplace decisions have been affected by the defendants' seashell demonstration advertisements weighs against a finding of actual confusion. *See, e.g., Merriam-Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 72 (2d Cir.1994), *cert. denied,* 513 U.S. 1190, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995); *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.,* 964 F.Supp. 733, 747 (S.D.N.Y.1997); *Sunenblick v. Harrell,* 895 F.Supp. 616, 632 (S.D.N.Y.1995); *Computer Assocs. Int'l, Inc. v. AJV Computerized Data Management, Inc.,* 889 F.Supp. 630, 637 (E.D.N.Y.1995).

 P & G's evidence of actual confusion consists of (a) P & G market research studies, which were based on storyboards (b) comments from focus group studies conducted for Colgate, (c) one isolated comment during a P & G interview at the home of a Chinese national, and (d) a Chinese newspaper clipping. The deficiencies in these items of evidence have been discussed previously. *See supra* pp. 135-41. As to the P & G market research studies and the focus group study conducted for Colgate, the Court concludes that these are admissible as business records of P & G under Rule 803(6) of the Federal Rules of Evidence, but are not entitled to much weight on the issue of actual confusion for the reasons stated above in

the Court's Findings of Fact, *see supra* pp. 135-39, and because they are not proper surveys under the criteria specified in the Federal Judicial Center's Reference Manual on Scientific Evidence 231-264 (1994).

 **\*80** In any case, P & G's market research reports were offered only for the scores they contained about the "engagingness" of P & G's commercials. Tr. 426:23-25, 436:22-24 (Ullman). Low engagement was associated with comments such as "it's similar" or "same old thing." Tr. 446:24–447:3 (Ullman). Yet this low engagement is not necessarily evidence of actual confusion. Plaintiff does not demonstrate that the scores indicate anything other than viewers' feeling that CREST toothpaste or toothpaste commercials are *similar* to other foreign-made toothpastes or toothpaste commercials. This perception of similarity is documented in other parts of P & G's market research, *see* Exs. DD; DC; CM at DM-921; Sherman Dep. at 205; Wu Dep. at 131-33, but is not tantamount to confusion. The mere fact that a purportedly similar junior user's mark calls to mind the mark of a senior user does not mean that the junior user's mark is likely to cause confusion in purchasing decisions. *See American Home Prods. Corp. v. Barr Labs., Inc.,* 834 F.2d 368, 371 (3d Cir.1987) ("A response that one 'associates' a given product with the name of a competitive product may simply reflect the recognition that the two products are comparable and serve the same purpose."); *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,* 393 F.Supp. 502, 520 (E.D.N.Y.1975) ("[T]he 'fact that one mark may bring another mark to mind does not in itself establish likelihood of confusion as to source.' " (quoting *In re Ferrero,* 479 F.2d 1395, 1397 (C.C.P.A.1973))); 3 McCarthy § 23:9, at 23-24 ("While the junior user's mark may call to mind the senior user's famous mark, this alone is not sufficient for a likelihood of confusion.")

 The focus group studies performed for Colgate and cited by P & G do not meet the evidentiary standards for market studies, but even if admitted, purported statements made during the focus groups would be afforded limited weight because the survey sample was very small and neither the actual declarants nor the survey takers documenting such alleged statements testified at trial. *See Trustees of Columbia University,* 964 F.Supp. at 746-47 (two or three responses in focus group are inadequate to establish confusion); *V. La Rosa & Sons, Inc. v. De Rosa Cheese & Macaroni Co.,* No. CV 85-L-513, 1986 WL 8699, at \*5 (D.Neb. May 22, 1986) (results of fifteen person focus group should not be generalized); *Smithkline Beckman Corp. v.. Proctor & Gamble Co.,* 591 F.Supp. 1229, 1240 (N.D.N.Y.1984) (even if focus group were assumed to recreate atmosphere of marketplace, results "would be particular to that focus group and could not be used to predict the behavior of consumers as a whole"),

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

aff'd, 755 F.2d 914 (2d Cir.1985); *supra* pp. 135-36 (discussing the admissions of P & G witnesses concerning the problems with focus group studies).

 That a few of the forty people in the focus groups, Tr. 1453:17 (Fong), may be mistaken concerning a possible relationship between P & G and Colgate does not constitute evidence of actual confusion--that is, confusion that P & G is the source of Colgate's goods or vice versa. *See Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1077 (2d Cir.1993) (finding that inquiries concerning the possible relationship between the parties' magazines were not evidence of actual confusion); *Lang v. Retirement Living Publ'g Co. .,* 949 F.2d 576, 583 (2d Cir.1991) (affording no weight to evidence that approximately four hundred telephone callers questioned whether two parties were affiliated when such calls did not correspond to plaintiff's theory of reverse confusion).

 **\*81** The isolated comment in a P & G interview in a Chinese home and the newspaper clipping are too fragile a foundation on which to base a finding of actual confusion. As previously discussed, the newspaper article does not even seem to indicate actual confusion. *See supra* p. 140. Such limited samples of evidence are insufficient to prove actual confusion among consumers. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987) (confusion between parties in New York Times and Wall Street Journal and certain responses given by interviewees constitute isolated incidents that do not indicate actual confusion occurred); *Universal Money Ctrs., Inc. v. AT & T Co.,* 22 F.3d 1527, 1535 (10th Cir.) (finding "isolated instances of actual confusion to be *de minimis"* ), *cert. denied,* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 386 (S.D.N.Y.1985) ("Given significant volume of sales over time, isolated instances of actual confusion may be disregarded as *de minimis."* ), *aff'd,* 788 F.2d 3 (2d Cir.1986).

 The only study before the Court that actually focuses on consumer confusion, the Wind survey, suggests a lack of actual confusion. *See supra* pp. 132-35. The Wind survey is admitted because it meets the basic standard of relevance and satisfies the criteria generally used to evaluate survey data. To be admitted to court, a consumer confusion survey must "have been fairly prepared and its results directed to the relevant issues." *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984) (internal quotations omitted); *see also Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir.1994) (reaffirming this standard); *Franklin Resources, Inc. v. Franklin Credit Management Corp.,* No. 95 Civ. 7686(CSH), 1997 WL 543086, at \*5 (S.D.N.Y. Sept. 4,

1997) (surveys that meet the basic standard of relevance are admissible at trial); *Inc. Publ'g,* 616 F.Supp. at 390 (quoting *Universal City Studios* ). A survey is inadmissible only if it is so flawed that it possesses no probative value. *See McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988); *Franklin Resources,* 1997 WL 543086, at \*5 (S.D.N .Y. Sept. 4, 1997).

 The Wind survey is relevant because it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Civ.P. 401. When considering the probative value of a survey, courts should consider factors such as: (a) the purpose and design of the survey, (b) population definition and sampling, (c) survey questions and structure, (d) interviewer selection and training, (e) data entry and grouping of respondents, and (f) disclosure and reporting. *See* Reference Manual on Scientific Evidence 231-66 (1994); *see also* Manual for Complex Litigation, Third § 21.493, at 101-103 (1995) (discussing similar considerations). Dr. Wind's survey meets these criteria. *See supra* pp. 132-33.

 **\*82** At trial, P & G objected to the Wind survey on the ground that Dr. Wind was allegedly unable to lay a proper foundation for the admission of the survey results because the actual survey was conducted in conjunction with the Data Development Corporation and administered by the Chinese market research firm, AMI. Tr. 1233:25-1234:13, 1246:9-1247:11 (Wind); Ex. QH.

 These criticisms go to the weight to be afforded the survey evidence, not its admissibility. Dr. Wind is highly qualified as a market research expert, was very involved in the survey, and actually wrote the survey questionnaire. Tr. 1245:4-6, 1264:22-1266:3 (Wind); Ex. QH. Although the interviewing was conducted by AMI under the supervision of DDC, Tr. 1246:9-1247:11 (Wind), and neither AMI or DDC testified, Dr. Wind testified that he has 15 to 20 years of prior experience with DDC, which in turn has significant experience with AMI, and that he is confident that both followed all appropriate industry guidelines and scientific procedures, as well as the instructions he gave them. Tr. 1234:4-8, 1248:1-15, 1269:11-1270:20 (Wind); Ex. QH. In addition, Dr. Wind independently analyzed the verbatim responses and prepared the survey report. Ex. QH at 6.

 In this case, defendants may rely on the expert testimony of Dr. Wind, the overseer of the survey, without having to present testimony from other persons involved in the details of conducting the survey. *See Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F.2d 925, 931 (7th Cir.1984)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
(Cite as: 1998 WL 788802 (S.D.N.Y.))

Page 73

("[T]he testimony of a survey director alone can establish the foundation for the admission of survey results."); *Franklin Resources, 1997 WL 543086,* at \*7- \*8 (absent evidence of untrustworthiness indicating testimony of others carrying out survey would be necessary, party may rely on expert testimony of designer and author of survey report). The case of *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1203-05 (E.D.N.Y.1983), which excluded a survey because of the lack of circumstantial guarantees of trustworthiness as well as the absence of testimony from persons responsible for the various parts of the survey, is distinguishable. *Toys "R" Us* involved serious questions about the conduct of the survey, not present here, which made the absence of testimony from additional persons unusually problematic. The Court finds that Dr. Wind's survey satisfies Rule 702 of the Federal Rules of Evidence and the general standards which govern the evaluation of such evidence.

While the probative weight of the Wind study is diminished by the fact that it was presented solely through the testimony of Dr. Wind, plaintiff has presented neither an expert critique of the Wind Survey nor a consumer confusion survey of its own. Because the Wind study shows an absence of actual confusion, and the plaintiffs have presented much less probative evidence and no survey which actually focuses on consumer confusion, the factor of actual confusion weighs in defendants' favor. *See Essence Communications, Inc. v. Singh Indus., Inc.,* 703 F.Supp. 261, 269 (S.D.N.Y.1988). [FN38]

> FN38. *Getty Petroleum Corp. v. Island Transportation Corp.,* 878 F.2d 650 (2d Cir.1989), relied upon by P & G, is not to the contrary. In *Getty,* the defendants passed off non-Getty gasoline under the Getty name. *See id.* at 652. Consumers were unable to inspect the gasoline prior to purchasing it. *See id.* at 656. The court found that consumers were therefore "deceived by and unaware of the substitution." *Id.* Under these circumstances, the Second Circuit held that the plaintiff's failure to introduce anecdotal evidence of actual confusion or present a consumer survey was not important because "[c]onsumer witnesses or surveys are not a *sine qua non* of proof of actual confusion in a case where the product falsely presented cannot be meaningfully inspected by the consumer." *Id.* Here, COLGATE and CREST are sold on shelves at stores, where consumers can easily identify their distinctive names, logos and packaging prior to purchase.

\*83 Because P & G's egg demonstration and Colgate's seashell demonstration had been competing head to head

in China for over a year prior to trial, and the parties had spent millions of dollars on television air time to broadcast their respective commercials containing the demonstrations, the absence of any evidence of actual confusion is particularly conspicuous. *See, e.g., Gruner + Jahr USA Publ'g v. Meredith Corp.,* 793 F.Supp. 1222, 1232-33 (S.D.N.Y.1992) (absence of actual confusion evidence weighed strongly against a finding of likelihood of confusion where consumers had heavy exposure to both parties' publications), *aff'd,* 991 F.2d 1072 (2d Cir.1993).

6. *The Defendants' Good Faith*

Under this factor of the *Polaroid* test, a court " 'looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." ' *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 583 (2d Cir.1991) (citation omitted). In this case, Colgate engaged in stiff competition with P & G, but did not in bad faith attempt to profit from consumer confusion or P & G's reputation and goodwill. Colgate did air its seashell demonstration in China in an effort to preempt P & G's use of its eggshell demonstration. Colgate's commercial forced P & G to either (1) use a different type of commercial, or (2) air the commercial knowing that its effect would be undercut by a competing advertisement demonstrating that Colgate, too, protects teeth from the acids that weaken tooth enamel. However, this type of preemption (which both parties admit they regularly engage in, *see supra* pp. 123-27) does not represent unfair competition or bad faith. To promote one's own products and simultaneously dull the impact of a competitor's advertising is hardly an exercise in bad faith; to reach a market first in order to maximize this effect is no more illegitimate a strategy.

It is of no matter that Colgate pursued these strategies by using a commercial containing elements which resemble elements in P & G commercials when the resemblance arises from conventional features and basic ideas about how to demonstrate the effectiveness of fluoride which have existed in the public domain for years. *Compare Bristol-Myers Squibb Co. v. McNeil P.P.C., Inc.,* 973 F.2d 1033, 1044-45 (2d Cir.1992) (bad faith supported by finding that manufacturer of Tylenol PM "intentionally copied" elements of the trade dress of Excedrin PM); *Telebrands Corp. v. E. Mishan & Sons,* No. 97 Civ. 1414 (RPP), 1997 WL 232595, at \*20 (S.D.N.Y. May 7, 1997) (bad faith established by evidence that manufacturer of "Perfect Can" can opener intentionally copied trade dress of "Safety Can" can opener). Furthermore, numerous differences between the commercials and the heavy branding of the commercials, noted in the prior discussion

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 74
Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)
**(Cite as: 1998 WL 788802 (S.D.N.Y.))**

of confusing similarity, *see supra* pp. 165-67, suggest that defendants did not air their advertisement with a bad faith intention to confuse consumers. It is not an indication of bad faith that defendants proceeded with their plans to air the seashell demonstration despite a concern that P & G might mount a legal challenge. *See Procter & Gamble Co. v. Johnson & Johnson Inc., 485 F.Supp. 1185, 1201 (S.D.N.Y.1979)* ("[T]hat defendant was aware of the plaintiff's claims and ... chose to disregard them ... does not mean that the defendant acted in bad faith."), *aff'd, 636 F.2d 1203 (2d Cir.1980); supra* pp. 127-28.

 **\*84** Defendants did not seek to capitalize on the reputation and goodwill connected with P & G's egg demonstration for CREST, nor did they attempt to promote confusion between the products or to deceive the purchasing public. P & G has failed to prove that defendants acted in bad faith. *See W.W.W. Pharm Co. v. Gillette Co., 984 F.2d 567, 575 (2d Cir.1993)* (finding no bad faith when defendant did not attempt to promote confusion between products or appropriate plaintiff's goodwill); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 140-41 (2d Cir.1991)* (rejecting plaintiff's claim "rest[ing] only upon speculation and conjecture" that defendant had deliberately sought to deceive the public). This factor weighs in defendants' favor.

### 7. *Quality of the Defendants' Product*

 The inferior quality of infringing goods may sometimes tarnish the plaintiff's reputation and support a finding in favor of the plaintiff. However, P & G has made no allegation that Colgate's toothpaste is of inferior quality to CREST, and there is thus no discrepancy in quality to support a finding of likelihood of confusion. *See, e.g., W.W.W., 984 F.2d at 575* (plaintiff's failure to allege that defendant's products were of inferior quality weighed in favor of finding that there was no likelihood of confusion).

### 8. *Sophistication of Buyers*

 This factor recognizes the fact that confusion may be more or less likely depending on the composition of the purchasing public. *See McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1137 (2d Cir.1979)* (noting that "every product has its own separate threshold for confusion of origin" ' (citation omitted)). P & G offered no evidence regarding the level of sophistication of Chinese consumers who are buyers of foreign toothpastes such as COLGATE and CREST. Therefore, this factor is not at issue in the present determination.

### 9. *Weighing of the Polaroid Factors*

 In light of the many factors weighing in defendants' favor, the Court concludes that P & G has not shown that the defendants' commercials at issue in this case are likely to cause confusion. While the products are in direct competition, the plaintiff's trade dress does not strongly indicate origin; the commercials, though similar, are well branded and not confusingly similar; the evidence does not establish actual confusion or bad faith; and the quality of Colgate's toothpaste and the sophistication of Chinese consumers are not at issue.

### IV. *CONCLUSION*

 In light of the foregoing, P & G's Lanham Act claim is unsupportable. The Court declines to apply the Act extraterritorially, and notes that even if considered on the merits, P & G's Lanham Act claim would fail. Plaintiff's claims under the Copyright Act and the Lanham Act are both dismissed with prejudice.

 IT IS SO ORDERED.

 Not Reported in F.Supp.2d, 1998 WL 788802 (S.D.N.Y.)

 END OF DOCUMENT

LEXSEE 2004 TTAB LEXIS 180



Analysis
As of: Oct 15, 2007

Jacob Zimmerman v. National Association of Realtors

Cancellation No. 92032360 against Registration No. 0515200

Cancellation No. 92040141 against Registration No. 0519789,

Trademark Trial and Appeal Board

*2004 TTAB LEXIS 180; 70 U.S.P.Q.2D (BNA) 1425*

November 18, 2003, Hearing

March 31, 2004, Decided

**DISPOSITION:**
 [*1]

Decision: The petitions to cancel are denied.

**COUNSEL:**

David Barry of Barry & Associates for Jacob Zimmerman.

Jeffrey A. Handelman and Jerome Gilson of Brinks Hofer Gilson & Lione for National Association of Realtors.

**JUDGES:**

Before Cissel, Bucher and Rogers, Administrative Trademark Judges

**OPINION BY:** BUCHER

**OPINION:**

**THIS DISPOSITION IS CITABLE AS PRECEDENT OF THE TTAB**

Opinion by Bucher, Administrative Trademark Judge:

The registrations involved in these proceedings are for the collective marks REALTOR n1 and REALTORS. n2 The record reveals that the National Association of Realtors (hereinafter "NAR" or "respondent") is the nation's largest professional association, having an affiliation with more than 1500 local and state associations. Additionally, more than 760,000 individual real estate professionals use respondent's registered marks to identify their membership with respondent.

n1 Registration No. 0519789 issued on January 10, 1950, renewed. In the application for this registration, respondent's predecessor indicated that it was exercising legitimate control over use of this mark for the recited services, which read as follows: "brokerage of real estate, industrial brokerage, farm brokerage, mortgage brokerage, in the appraisal of real estate, management of real estate, in the building of structures on real estate, in the subdivision of real estate properties, and in community planning for the development of raw land and slum clearance areas."

[*2]

n2 Registration No. 0515200 issued on September 13, 1949, renewed. The recitation is the same as in Reg. No. 0519789.

Jacob Joseph Zimmerman ("petitioner" herein) seeks cancellation of these two registrations held by NAR based upon his allegations that the registered marks are generic. At the time the record in this case closed, Zimmerman had recently completed his undergraduate degree in the School of Hotel Administration at Cornell University in Ithaca, NY. His business dealings relevant to the current proceeding were directed largely to real estate agents and involved the marketing of domain names and a range of Internet-related services including website design and hosting, providing central databases for real estate listings, offering banner ads and other online advertising, and the like.

The Pleadings

In his petitions for cancellation, petitioner asserts that he is "in the business of buying and selling website addresses containing the word 'realtor' and 'realtors' ..." and that he "owns approximately 1900 web site names incorporating the term 'realtor' and 'realtors' and a geographic designation." (Petitioner's petitions for cancellation, PP6 & 7) He asserts that [*3] respondent's registered marks are generic because, in common parlance, the words "realtor" or "realtors" are synonymous with real estate agent or real estate agents. He alleges that respondent's registrations and trademark policies preclude him from offering his websites to real estate agents:

> Petitioner has been injured in his business by the continuance of the registration of the "realtors" mark. Potential purchasers of petitioner's web site are mainly real estate agents. Many such realty agents are aware of NAR's threats to file suit against any person using the term "realtors" in web site names, and are therefore unwilling to purchase any of petitioner's web site names. In addition, realty agents are unwilling to pay petitioner for placement on such web sites as *bostonrealtors.org* because of the threat by NAR to enjoin the use of such web site names. NAR's continuing registration of the "realtors" mark has severely lowered the demand for petitioner's web site names and petitioner's promotional services.

(Petitioner's petitions for cancellation, P9)

In its answer, respondent denies the essential allegations of the petitions except that it admits that real estate [*4] agents who are members of respondent are authorized to use the "Realtor marks" in accordance with specified terms and conditions, and notes that even members of NAR are subject to respondent's rules and guidance about using its REALTOR marks within Internet domain names.

The Record

The record in the instant case includes the pleadings, the files of the involved registrations, and respondent's notice of reliance on the discovery deposition of Mr. Zimmerman and related exhibits. In addition, the parties have stipulated that the entire record created in connection with two earlier consolidated proceedings (the "Freeman" case) would be included as part of the record in this proceeding. n3 This evidentiary record from the Freeman action includes the deposition testimony of Ms. Freeman, the plaintiff in the prior proceeding; the affidavit of Michael R. Thiel, respondent's Associate Counsel in the Legal Affairs Division, with related exhibits; the affidavit of Nicholas G. De La

Torre, an attorney for respondent, with related exhibits; the affidavit of Clifford D. Niersbach, respondent's Vice President responsible for the Board Policy and Programs Division, with related exhibits; the [*5] discovery deposition of Dr. Michael Sullivan, petitioner's survey expert, with related exhibits including his earlier affidavit in support of the survey; the discovery deposition of Kristin Gismervik (nee Shapiro), who works for Dr. Sullivan; the declaration of Robin McCoy, who also works for Dr. Sullivan; the declaration of David Barry, petitioner's attorney, with extensive exhibits; the declaration of Dr. Ivan Ross, respondent's survey expert, with related exhibits; the declaration of Dr. Jacob Jacoby, another of respondent's survey experts, with related exhibits; and the affidavit of Jon Krehbiel, New York Operation Manager for Electronic Evidence Discovery, Inc.

       n3 Cancellation No. 92028047 against Reg. No. 0515200 and Cancellation No. 92027885 against Reg. No. 0519789, captioned *Arleen Freeman v. National Association of Realtors, 64 USPQ2d 1700 (TTAB 2002)*. These earlier combined proceedings were dismissed with prejudice based upon the doctrine of licensee estoppel.

The issues have been fully briefed by both parties, and both parties were represented at an oral hearing held before the Board. We find that petitioner has failed to show that the [*6] terms "Realtor" and "Realtors" are generic terms for real estate agents.

As a preliminary matter, we find it useful to clarify our understanding of the meaning of the parties' stipulation that "the admissions of the parties [in the previous proceedings] ... shall be binding on the parties in the present proceedings." n4 While any factual admission the previous plaintiff (a real estate agent) may have made about matters relating only to herself clearly would not be admissible or relevant as applied to the current petitioner (an entrepreneur with various business interests on the Internet), it seems clear under this stipulation that any admissions the previous plaintiff made about NAR, the use of the involved terms, and the like, are binding on the current petitioner. Likewise, any admissions NAR made about itself, its operations, its use of the involved terms, etc., in the previous proceeding, are binding upon NAR in this proceeding. This includes admissions of any type, whether they came into the record through the pleadings or as admissions under Rule 36 placed into the record by notices of reliance. See *Fed. R. Civ. P. 36* and *37* [*7] C.F.R. § 2.120(j).

       n4 "5. All of the evidence submitted in Cancellation No. 27,885 and 28,047 shall form part of the record in the present proceedings and the admissions of the parties in Cancellation No. 27,885 and 28,047 shall be binding on the parties in the present proceedings."

       We also note that the same counsel represented the previous plaintiff as well as the current plaintiff.

Summary of Arguments

Petitioner argues that clear and convincing evidence shows that the primary significance of the terms "Realtor" and "Realtors" is as generic terms for real estate agents. In response, respondent contends that its registered collective marks are distinctive, not generic. Respondent contends that petitioner's evidence shows occasional careless misuse of its registered marks in publications, for example, as well as some usages that are ambiguous, but that many more publications show proper use of its collective marks, i.e., the publications recognize the terms as marks.

According to one dictionary entry, the term "Realtor" was coined in 1916 by Mr. Chadbourn, a writer in the National Real Estate Journal. Of course, petitioner's own source shows that Chadbourn, the [*8] first proponent of this term, saw it functioning as a collective mark - in short, a proprietary term to distinguish members of the national real estate association from nonmembers.

In support of petitioner's claim that this term has been generic since the 1920's, petitioner points to Sinclair Lewis' satirical 1922 novel Babbitt, wherein the main character, George F. Babbitt, is a real estate agent who takes the position that the term should be applied generally to members of the real estate profession. Petitioner argues that on the heels of

this widely read novel came decades in which numerous court decisions - published federal court decisions including those of the U.S. Supreme Court - and dozens of general circulation publications used the term generically to refer to real estate agents.

Finally, while petitioner argues that members of the general public make up the relevant universe for our determination, respondent would have us find that real estate professionals are the correct universe for determining customer perceptions.

Decision and Analysis

Under the circumstances, we deem admitted, *inter alia,* the fact that respondent's two registered marks involved herein [*9] are categorized as collective marks. Freeman Response to NAR's Request for Admission No. 23. However, one need not rely on earlier admissions to establish this. In identifying the targeted registrations, the pleadings of the current petitioner also contain allegations that the involved registrations are for collective marks.

Yet in its prosecution of these proceedings, petitioner has largely ignored the fact that these marks are collective marks of any kind. Petitioner's counsel shoehorns these marks into the general category of trademarks, while its survey asks whether consumers view the word "Realtor" as a "brand name."

Respondent quite correctly takes issue with these characterizations by petitioner. On the other hand, respondent has variously referred to its marks as "collective marks," "collective membership marks" and "collective service marks."

We find that respondent is clearly a collective entity, eligible to own a "collective mark" as defined in § 45 of the Lanham Act, *15 U.S.C. § 1127.* Its applications were filed by respondent's predecessor soon after the Lanham Act was enacted (which legislation first permitted registrations by the owners of [*10] collective marks) and asserted that respondent's predecessor was exercising legitimate control over the use of the marks in commerce by its members. n5

> n5 The text of the original application papers claimed that the "NATIONAL ASSOCIATION OF REAL ESTATE BOARDS ... has adopted and is exercising legitimate control over the use of the collective mark shown in the accompanying drawing for [services in connection with] the brokerage ... [management, appraisal and planning services] ... and presents herewith five specimens showing the collective mark as actually used in connection with such services and the advertising thereof by members of such organization: the service mark being used by members of the organization by applying a decalcomania containing the mark to the window or wall of the office in which such service is performed, by placing the mark upon a plaque displayed in said office, by printing the mark on stationery and advertisements of such members, and by wearing a button upon which the mark appears as an indication of membership in such association ...."

In fact, there are indications in this record that respondent has long *considered* these to be collective [*11] *membership* marks. n6 In the context of this collective, the purpose of a collective membership mark would be merely to indicate that the user of the mark is a real estate agent who is a member of the collective organization and who has met NAR's standards for admission. The original specimen in the REALTORS application was a window decal demonstrating that the real estate agent displaying this sign was a member of the "National Association of Real Estate Boards."

[SEE ILLUSTRATION IN ORIGINAL]

> n6 [EDITOR'S NOTE: TEXT WITHIN THESE SYMBOLS [O> <O] IS OVERSTRUCK IN THE SOURCE.]

Collective membership mark[O> s <O] may be owned by collective organizations that never use the

symbols of their organizations in connection with the commercialization of goods or services, such as fraternal benefit societies. *See Ex Parte The Supreme Shrine of the Order of the White Shrine of Jerusalem, 109 USPQ 248* (Comm'r. Pat. 1956).

While our decision herein would be no different even if we were to accept respondent's argument that its mark should be viewed solely as a collective membership mark, the weight of the evidence supports the conclusion that respondent's [*12]  marks are, consistent with the way the United States Patent and Trademark Office have long classified them, collective *service* marks. n7 Beginning with the filing of the original applications for the REALTOR and REALTORS marks, respondent (and its predecessor) have consistently emphasized the brokerage, management, appraisal and planning services offered by its members. This usage demonstrates the availability of real estate services offered by respondent's members, or collective *service* mark usage.

> n7 In its 1989 renewal application, with papers having a prominent heading of "U.S. Class 200" (collective *membership* mark), respondent claimed that "the mark shown in said registration is still used in interstate commerce by members of [the] registrant in connection with brokerage ...." Consistent with its earlier classification, the United States Patent and Trademark Office approval continues to shows this as a collective *service* mark, classified in "International Class 36, U.S. Class 102."

In making a determination on the question of genericness, we are seeking to discover the perceptions of consumers. As Judge Learned Hand observed in  *Bayer Co. v. United Drug Co., 272 F 505, 509 (SDNY 1921),* [*13]  "the question is whether the buyers merely understood that the word 'Aspirin' meant this kind of drug, or whether it meant that and more than that: i.e., that it came from the single, though, if one please anonymous, source from which they had got it before." However, a critical area of disagreement between the parties to these proceedings is defining the "buyers," i.e., the relevant group of purchasers herein. Petitioner, focusing on the services offered by respondent's member agents, considers purchasers of real estate services to be the critical group. Respondent, focusing on use of its marks to indicate membership in respondent, considers real estate agents and brokers to be the critical group.

Clearly, when dealing with ordinary consumer goods or services, the test for genericness is the term's meaning to consumers, not necessarily the professionals in the trade. n8 However, in the instant case, we are not dealing merely with ordinary consumer goods or services. Rather, in this case, the record shows that we are faced with two distinct populations of persons whose perceptions may well be quite different. While any member of the general public who is in the market for real estate [*14]  would be a prospective consumer of the listed "brokerage services," it is also clear that in the context of collective service marks, the members of the real estate profession - i.e., those who are eligible for membership in respondent - are a distinct population whose perceptions also are critical herein.

> n8 Our principal reviewing Court held that under the 1984 amendment to the Lanham Act, the test of whether "touchless" is a trademark for auto washing services or is the generic name of a type of auto wash service is its meaning to consumers who use the services, not solely to operators and manufacturers of auto wash equipment.  *Magic Wand, Inc. v. RDB, Inc., 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991). See also In re Northland Aluminum Products, Inc., 777 F.2d 1556, 227 USPQ 961 (Fed. Cir. 1985)* (when the issue is genericness to the consuming public, evidence that professionals view the term as a trademark is not probative).

The statutory basis for canceling the registration of a generic term is found in § 14(3) of the Lanham Act, *15 USC § 1064(3).* As our principal reviewing court has stated:  [*15]
> ... Determining whether a mark is generic ... involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered ... understood by the relevant public primarily to refer to that genus of goods or services?

*H. Marvin Ginn Corporation v. International Association of Fire Chiefs, Inc., 782 F.2d 987, 990, 228 USPQ 528, 530*

*(Fed. Cir. 1986).* The critical issue (both before and after the 1984 Trademark Clarification Act) in genericness cases is whether members of the relevant public primarily use or understand the term sought to be registered to refer to the genus or category of goods in question. *In re Montrachet S.A., 878 F.2d 375, 376, 11 USPQ2d 1393, 1394 (Fed. Cir. 1989); In re Merrill Lynch, Pierce, Fenner, & Smith, Inc., 828 F.2d 1567, 1570, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987); Dan Robbins & Assocs., Inc. v. Questor Corp., 599 F.2d 1009, 1014, 202 USPQ 100, 105 (CCPA 1979);* and *In re Recorded Books, Inc., 42 USPQ2d 1275 (TTAB 1997).* Evidence of the relevant public's perception of a term may [*16] be obtained from any competent source, including newspapers, magazines, dictionaries, trade journals, catalogs and other publications. *In re Leatherman Tool Group, Inc., 32 USPQ2d 1443, 1449 (TTAB 1994),* citing *In re Northland Aluminum Products, Inc., supra.* Finally, we note that in the context of these *inter partes* proceedings, it is petitioner's burden to prove the genericness of these terms by a preponderance of the evidence. *Magic Wand Inc. v. RDB Inc., supra.*

With respect to the first part of the *Marvin Ginn* inquiry, the genus of services is largely described by respondent's chosen recitation in the context of the original application papers. Accordingly, we find that the genus of services is real estate brokerage, management, appraisal and planning services involving buildings and land, as delivered by members of a professional association.

There was a fairly extensive record developed during these proceedings, and we review the principal categories of evidence offered as probative in answering the second question posed by the *Marvin Ginn* analysis of genericness. n9

        n9 See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12.13 (4th ed. December 2003).
  [*17]

### (1) Uncontested Generic Use By Competitors

The only evidence in this record as to competing associations of real estate professionals is the indication that the National Association of Real Estate Brokers identifies its members as "Realtists."

Moreover, when respondent's member organizations, member agents or member brokers terminate their membership with respondent, they must discontinue any use of the REALTOR marks. To the extent that individuals or local real estate groups misuse these registered terms, the previous litigation with Ms. Freeman illustrates the extent of respondent's policing efforts with respect to such uses, demonstrates that respondent does not permit such uses to go uncontested, and shows that respondent continually takes affirmative steps to emphasize the proprietary status of its collective service marks. In short, the record shows no evidence of generic use of REALTOR or REALTORS by competitors.

### (2) Generic Use By the Trademark Holder

Similarly, in this most extensive record, petitioner has not alleged, nor have we discovered, any instances where respondent has used its claimed identifiers in a generic manner. In fact, in hundreds of pages [*18] of marketing and promotional materials put out by respondent and respondent's member associations, the materials consistently use the marks REALTOR(R) and REALTORS(R) in a manner consistent with the proprietary nature of these marks. Respondent issues guidance containing specific rules for "use of the REALTOR(R) marks and name." This guidance outlines limitations on the use of the REALTOR marks and logo and provides graphic representations of correct and incorrect uses of the logo, in print, in advertisements and on the Internet. For the benefit of its member associations and individual agents and brokers, its webpages contain "Graphics Standards and Style Guidelines." Accordingly, we find no evidence of generic use by respondent.

### (3) Dictionary  Definitions

While petitioner argues that "the Oxford English Dictionary entries [show] historical generic use," respondent points to a long list of dictionary definitions that show the proprietary nature of the term "Realtor": n10

"**Realtor.** Function: *collective mark* - used for a real estate agent who is a member of the National Association of Realtors." Merriam-Webster's Collegiate Dictionary (2001),  [*19] http://www.m-w.com/cgibin/dictionary

"**Realtor** *trademark:* a trademark for a member of the U.S. National Association of Realtors or the Canadian Association of Real Estate Boards." Encarta(R) World English Dictionary [North American Edition] (c) & (P) 2001 Microsoft Corporation. http://dictionary.msn.com/find/entry.asp?search=Realtor.

"**Realtor.** A service mark used for a real-estate agent affiliated with the National Association of Realtors. This service mark often occurs in print in lowercase and in the plural as well: *'The economic aftershocks are already rippling through the area's non-defense businesses, from realtors to pizzerias'* (*New York Times*)." The American Heritage Dictionary of the English Language 1456 (4th ed. 2000).

"**Realtor** TM *n.* A member of the National Association of Realtors who works in the business of selling real estate; a real-estate agent. - *The Realtor showed the couple a nice house in an old neighborhood. I told the Realtor I wanted to buy a five-acre plot by the lake."* NTC's American English Learner's Dictionary 734 (1998).

"**Re.al.tor** *collective mark* - used for a real [*20]  estate agent who is a member of the National Association of Realtors." Webster's Third New International Dictionary 1891 (1993).

"**Re.al.tor** *n.* a realty broker who is a member of the National Association of Real Estate Boards: a trade name. Also re'al.tor." Funk & Wagnalls Standard Dictionary 658 (2nd Ed. 1993).

"**Re.al.tor,** *Trademark,* a person who works in the real-estate business and is a member of the National Association of Real Estate Boards, or one of its constituent boards, and abides-by its Code of Ethics." The Random House Dictionary Of The English Language 1607 (2nd Ed. 1987).

"**Re.al.tor.** A collective mark for a real-estate agent affiliated with the National Association of Realtors." Webster's II New Riverside University Dictionary 980 (1984).

"**Re.al.tor,** [coined by C.N. Chadbourn, of Minneapolis, a member of the National Association of Real Estate Boards, and formally adopted by the Association in 1916.] A broker or other individual in the real estate business who is an active member of the National Association of Real Estate Boards, subject to its rules and regulations. (Trademark.)" New Webster's Dictionary  [*21]   of The English Language 1246 (1981).

"**Re.al.tor** a real estate broker who is a member of the National Association of Real Estate Boards." Webster's New World Dictionary of The American Language with Student Handbook 621 (Concise Ed. 1974).

"**Re.al.tor** *n* (US) person engaged in real estate business who is a member of the National Association of Real Estate Boards and subscribes to its standards of ethical conduct (GB = *estate agent)."* Oxford Advanced Learner's Dictionary of Current English 700 (1974).

As noted earlier, the history of the coinage of the term drawn from the Oxford English Dictionary begins with Mr. Chadbourn's advocacy for making this a proprietary term. n11 In fact, the OED listing placed into the record by petitioner is consistent with the dictionary entries made a part of this record by respondent, reflecting the fact that in the United States, the term "Realtor" is a proprietary term:

2004 TTAB LEXIS 180, *21; 70 U.S.P.Q.2D (BNA) 1425

**Realtor.** *U.S.* Also realtor. [f. REALT(Y + -OR.] A proprietary term in the U.S. for a real-estate agent or broker who belongs to the National Association of Realtors (formerly the National Association of Real Estate [*22] Boards) ...

n10 Affidavit of Nicholas G. De La Torre, Exhibits 71 - 73, 75 - 83.

n11 See also New Webster's Dictionary of The English Language entry above, which goes on to observe that respondent's predecessor formally adopted this term in 1916.

Accordingly, we find that substantially all the dictionary definitions in the record recognize these terms as marks.

**(4) Generic Use in the Media**

In this category, petitioner points to what it characterizes as "overwhelming" evidence of generic usage in books, magazines, newspapers, encyclopedia and in court decisions. Petitioner relies on an exhibit it refers to as its "newspaper survey" of contemporary usage. Petitioner points to uses drawn from a randomly-chosen newspaper from each of twenty-four states: n12

HEADLINE: *"Subdividing property can increase returns"*

...

Once subdivided, you have just increased your tax liability considerably. Now you need to consider if you are going to advertise and market the lot yourself, or are you going to hire a ***realtor*** to market the lots and pay the commission fee.

...

*Daily News-Miner,* Fairbanks, Alaska, February 13, 2000.

HEADLINE: [*23] *"Nothing wrong with **Realtors**"*

I have to admit that I was pretty angry when my friends started kidding me about the comments of my opponent in the city council race this fall. For those who didn't read it firsthand, my opponent made the argument to your newspaper that I have a conflict of interest from serving on the city council because I am a **Realtor** and a lot of real estate zoning and planning issues come before the city council.

... Personally, I was disappointed that more people didn't try to participate in this election. So, whether you're a plumber, a bus salesman, a ***Realtor,*** or a homemaker, be thinking about volunteering your time in a couple of years - and may the best ideas win!

*Log Cabin Democrat,* Conway, Arkansas, July 31, 2000.

HEADLINE: *"Opening Shots"*

...

The Broncos drafted ... during their early years. So, how was it that they made center Roger LeClerc of Trinity College their first draft choice? Dick Lyford, retired Denver ***realtor*** has the answer ...

*The Denver Post,* Denver, Colorado, December 20, 2000.

HEADLINE: *"For the Best Deal, Buy Out of Season"*

...

Julie Garton-Good [*24] is a licensed ***Realtor*** and a real estate educator, lecturer and author ...

2004 TTAB LEXIS 180, *24; 70 U.S.P.Q.2D (BNA) 1425

*The Miami Herald,* Miami, Florida, December 17, 2000.

HEADLINE: *"Bishop's leasehold policies criticized: But estate **Realtor** denies prices are out of line"*

> ...
> While leasehold home values have plunged, that's because Hawaii's leasehold system is working like it's designed to - not because of anything Bishop Estate has done, said **Realtor** Peter Savio, who handles the trust's sale of residential leasehold land.
> ...
> For leases that haven't been renegotiated yet, the estate is getting returns of 1 percent or less from rental income, yet it could be earning far greater returns in other, higher-yielding investments, said Mike Pang, a **Realtor** who specialized in leasehold issues ...

*Star Bulletin,* Honolulu, Hawaii, (undated)

HEADLINE: *"Disabilities Act  addresses 'dignity issues'"*

> ...
> And **Realtor** Charlene Smith noted that a fully accessible home she had listed recently brought two offers - neither from people with disabilities ...

*Herald & Review,* Decatur, Illinois (undated)

HEADLINE: *"Same genes,* [*25]  *same profession"*

> Judi McCoy used to get exasperated with her mother Marjorie Doud, a **Realtor** ...

*Grand Rapids Gazette,* Grand Rapids, Iowa, January 18, 1995.

HEADLINE: *"A little gray hair calls for respect?"*

> ...
> Speaking of old things, a copy of an advertisement came into my possession courtesy of **Realtor** Richard Overby...

*The Gleaner,* Henderson, Kentucky, May 16, 1999.

HEADLINE: *"Millennium memories in Lubec"*

> ...
> Yet having briefly been highlighted on the national map, she says, might have something to do with the fact that real-estate brokers have been getting more calls than usual about properties in town. One **realtor** told Preston that for the first time in 10 years she has run out of residential properties to list...

*Bangor Daily News,* Bangor, Maine, November 29, 2000.

HEADLINE: *"The passion to own a home"*

> ... I call Jones Town Country and make an appointment with **Realtor** Joyce Quinlin to see the house on Sunday...

*Daily Hampshire Gazette,* Northampton, Massachusetts, February 21, 2000.

HEADLINE: *"Hires and Promotions"*

> [Ron] Tondryk [*26]  is a licensed **realtor** with more than 15 years of sales experience ...

*Duluth News-Tribune,* Duluth, Minnesota, December 21, 2000.

HEADLINE: *"PD on TV"*

> KMOV anchor Myriam Wright and Post-Dispatch cultural news editor Robert Duffy explore what was good and what wasn't in St. Louis this year. Their guests are Kenny Buck, a Crossroads School sophomore, and Coldwell Banker **Realtor** Marti Frumhoff on

2004 TTAB LEXIS 180, *26; 70 U.S.P.Q.2D (BNA) 1425

"Imagine St. Louis."
*St. Louis Post Dispatch,* St. Louis, Missouri, December 23, 2000

HEADLINE: *"Sewer problem leads to demonstration"*
...
The only costs will be hooking up electrical pumps. The rest of the material and labor are donated as a chance to provide an educational opportunity for area plumbers, ***Realtors,*** homeowners and the general public...
*Grand Island Daily Independence,* Grand Island, Nebraska, June 4, 2000.

HEADLINE: *"Riding (Most of the Time) Trails Is Mountain of Fun"*
...
... Rounding out the field is Dan Vigneault - whose bike is etched with the scary legend "Downhill Dan" - and Rem Mastin, a ***Realtor*** and snowboard instructor ...
*The Union Leader,* Manchester,  [*27]  New Hampshire, October 10, 1998.

... Keith Coulter, a Vineyard Estates resident and a ***Realtor,*** said he's frustrated with how long it has taken for the plan to be completed...
*Albuquerque Tribune,* Albuquerque, New Mexico, February 29, 2000.

HEADLINE: *"Realtor: There's no place like home"*
...
As a ***Realtor,*** you'd expect Brock to have a lovely home...
*The Herald Sun,* Chapel Hill, North Carolina, August 13, 2000.

HEADLINE: *"Scorcher's plans to replace Corner in downtown Lorain"*
...
The license is for "Kennedy's Broadway Billiards," although the building is still empty and bears a ***realtor's*** sign. The ***realtor*** did not return calls for comment yesterday...
*The Morning Journal,* Lorain, Ohio, December 20, 2000.

HEADLINE: *"Minding the store at St. Helens High means students running 9 businesses"*
... The construction company is scheduled to finish building a 2,800-square-foot, five-bedroom, three-bathroom house in Columbia City by May. ***Realtor*** Molly Womack of Prudential Northwest Properties, who is working with the school, plans to list the house for $ 239,000.  [*28]  Any profits would be used to build the next house...
*The Oregonian,* Portland, Oregon, March 19, 2000.

HEADLINE: *"Library hits the road Sept. 6"*
... The trustees voted unanimously Aug. 9 to lease [Cherry Webb & Touraine] from ***realtor*** Matthew LaCroix for $ 8,000 per month for the duration of the project, which is expected to last about a year...
*The Woonsocket Call,* Woonsocket, Rhode Island, August 22, 2000.

HEADLINE: *"Developer eyes Marr's Beach"*
A purchase contract has been entered into between John Egan, Sioux Falls developer/***realtor,*** and Maurice Beyer, owner of Marr's Beach on Lake Madison...
*Madison Daily Leader,* Madison, South Dakota, July 14, 2000.

HEADLINE: *"Volunteer Center hits right note with Jazz Fest"*

...The high-profile wait staff will include Plano Mayor Jeran Akers and Councilmen Steve Stovall and John Roach Jr.; ... attorney Glenn Callison, *Realtors* Ed Bujko and Steve Russell and the inimitable Johnny Rutledge...

*Plano Star Courier,* Plano, Texas, November 3, 2000.

HEADLINE: *"Buy a house and support an industry"*
   ... So I called our [*29] Realtor and said: "We need to move." ...
*Rutland Herald,* Rutland, Vermont, August 6, 2000.

HEADLINE: *"Municipal League grows desperate for volunteers"*
   ...Of the 39 races county-wide, 26 are split evenly between South County and the Eastside, Culver said every tiny faction already scores candidates: *Realtors,* unions, gun rights advocates, property rights advocates, anti-gun groups, bicyclists and trail users...
*South County Journal,* Seattle, Washington, July 15, 2000.

   ... The proposal was brought by majority landowner Kevin Dittmar, *Realtor* and member of Rubicon Associates, to construct a 122-unit mixed-residential-use subdivision across the highway from Pike Lake State Park...
*Daily Citizen,* Beaver Dam, Wisconsin, November 29, 2000.


   n12 Declaration of David Barry, Tab 41. From an alphabetical listing of the fifty states at NewsDirectory.com, Mr. Barry selected every second state beginning with Alaska (excluding Delaware, which had only two newspapers, but neither of which offered a searchable, online archive). Counsel then chose the third newspaper from the top of each state's listing, linked to that newspaper's homepage and searched the archives of the selected newspaper for stories containing the word "realtor." He then picked one story illustrating the use of the word "realtor." These are the excerpts shown herein.

[*30]

   While one should not place determinative weight upon whether or not the journalists and editors involved in these randomly-selected newspaper articles use an upper-case or lower-case letter "R," we find it instructive that in a majority of these instances, the word "Realtor" is capitalized and used in a manner consistent with respondent's position that this term functions as an identifier for its members - not as a generic designation for all real estate agents. Respondent also points to many instances in the record where newspapers and magazines clearly use the term "Realtor" in a manner consistent with the proprietary nature of the term. n13

   n13 Affidavit of Nicholas G. De La Torre, Exhibit 90.

   Petitioner argues in its brief that "the coinage of [the word] realtor was obvious and probably inevitable." Given the etymology of the word as shown in the Oxford English Dictionary, the word "Realtor" may well have been one of several logical naming choices for the professional involved in "realty." We recognize the aural and visual similarities as well as the etymological links between the ordinary, English-language words "realty" and the term "Realtor." However, notwithstanding [*31] the challenges faced by respondent and its predecessor in fostering recognition of the "Realtor marks," the record suggests that respondent, its affiliated organizations and its individual members have generally succeeded in educating editors, journalists and some portion of the public at large. The evidence establishes aggressive marketing of these marks and constant policing of media usage of these terms, supporting respondent's position that it has preserved for the term no small degree of proprietary meaning, even among general news outlets.

Finally, petitioner places a great deal of emphasis on what appear to be generic uses by federal court judges, including Justices of the Supreme Court. We recognize that among the innumerable reported federal decisions issued over the past eighty-plus years, there are indeed scattered legal opinions, dealing with totally different issues, wherein the term "realtor" appears to be used to refer to real estate agents generally. Nonetheless, we find it plausible that on occasion even federal jurists may have been less than precise in their usage of these collective service marks, particularly when focused on substantive matters unrelated to whether [*32]  these terms are source indicators. Moreover, given their limited circulation among members of the public, unlike the articles of general circulation discussed above, these legal opinions will likely have little impact upon the public's understanding of the "Realtor" or "Realtors" terms.

### (5) Testimony of Persons in the Trade

The uncontroverted affidavits of Michael F. Thiel and Clifford D. Niersbach stand for the proposition that respondent, through its licensing relationships, its bylaws, Code of Ethics, Standards of Practice and other guidance, intends to preserve the proprietary functions of these terms. Petitioner put forward no testimony from other persons involved in the field of real estate to undermine this testimony or otherwise demonstrate the genericness of these terms.

### (6) Consumer Surveys

In the most contentious area of evidence in this record, the parties to these proceedings have each proffered a survey. They appear to reach diametrically opposite results on the question of genericness, and each party has criticized the survey conducted by its opponent.

In short, petitioner points to a telephone brand awareness survey conducted over a two-week period [*33]  in the summer of 1999. The survey targeted individuals who had consulted a real estate agent in the past year or were planning to do so in the coming year, or were planning to buy, sell or rent real estate in the next year. Of the ninety-six individuals surveyed, only ten percent said that "Realtor" was a brand name.

By contrast, respondent's telephone survey targeted real estate brokers and agents. Respondent argues that real estate professionals make up the proper survey universe, as they are actually the purchasers or prospective purchasers of membership in respondent and the services provided by respondent. According to the results of this survey, the primary significance of the term "Realtor" is that of a proprietary term indicating association with respondent - not a generic word. Specifically, when asked whether "Realtor" refers to all real estate agents or only those who are members of respondent or one of its local or state associations, 84.3% of 204 individuals surveyed recognized this term as indicating members of respondent or one of its associations. n14

> n14 Taking the position the respondent was measuring perceptions of this term in the wrong market, petitioner objects to this entire survey and the Ross declaration as irrelevant. However, petitioner does not criticize the methodology of the study, the form of the key question, etc.

[*34]

Moreover, respondent argues that even if we were to determine that the relevant universe must include members of the general public, because the term is such a strong source indicator in the eyes of real estate professionals, this showing is more than sufficient to justify the continued existence of its registrations.

We turn then to a detailed examination of the two proffered surveys.

Petitioner's attorney contacted Dr. Michael Sullivan, a principal with the consulting firm of Freeman & Sullivan, and instructed him to do a "Teflon survey." Although Dr. Sullivan had never before designed a survey for use in trademark litigation, it is clear from the record that he devoted less than six hours to this project over the critical four-month period of this study.

2004 TTAB LEXIS 180, *34; 70 U.S.P.Q.2D (BNA) 1425

Respondent has severely criticized the Sullivan study. Respondent's survey expert, Dr. Jacob Jacoby, drew on his own professional expertise and referred to other academic sources as well as guidance from the *Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 399-403,* in support of his criticisms of petitioner's study. Totally apart from the question of whether petitioner has selected [*35] the proper universe for this survey, we find that many of respondent's criticisms of this survey are valid, including, but not limited to, the following:

. The low response rate ([approximately] 10%) negatively affects the reliability of the survey, as the sample may well no longer be representative of the relevant consuming universe.
. The final number of survey subjects (96) was too low to accord much weight to the study results.
. The gate-keeping queries deviated from the "Teflon" format in ways that render the answers meaningless in ensuring understanding on the part of the survey subjects. n15
. Orienting the survey subjects to the concept of "brand names" and giving them examples of well-known brands and trade names before asking them to categorize a collective mark was misleading.
. The failure to provide survey subjects with a "don't know" option forced guessing or choosing an option by default.

n15 The gate-keeping questions in a genericness survey are designed to determine whether the survey participant understands the difference between "brand names" and "common names."

In this flawed survey, rather than actually testing the survey participant's specific understanding of 'whether Chevrolet is a brand name or a common name?' (the "Teflon" format), after providing some "training," the question asked was "Do you understand the difference between 'brand names' and 'common names?'" According to Dr. Jacoby, this is a leading question calling for a "yea-saying" response and is not a reliable measurement of comprehension. Furthermore, a yes answer to either of two questions qualified one for the survey. Declaration of Jacob Jacoby, Ph.D., P45.

[*36]

Accordingly, given all the deficiencies of petitioner's survey, we accord it very little weight on the question of whether prospective purchasers of a real estate professional's service would view the term "Realtor" as indicating the services were being offered by a real estate association member (even if the association were unknown).

Respondent's counsel retained Dr. Ivan Ross to conduct a survey to determine the significance of the term "Realtor." Dr. Ross determined that the relevant universe for this "double blind" survey was full-time licensed real estate agents or brokers who operate from real estate offices in the continental United States and who had been licensed for at least one year. His rationale for selecting this universe was "that the significance of the term REALTOR is most appropriately measured among individuals who are qualified for membership in professional real estate associations and are 'prospective purchasers' of membership in such associations."

After qualifying the survey subjects, two questions followed and were rotated. The answers to the key question were of primary interest to the survey sponsor while the other question was a control question designed [*37] to eliminate "noise." n16 For the question of primary interest, 86.3% of the survey subjects believed that the term REALTOR refers only to real estate agents who are members of NAR or one of its local or state associations, while 6.4% believed that the term REALTOR refers to all real estate agents.

n16 Because a control question generally has a correct answer, the magnitude of survey participants who fail on a control question (the "noise") will be viewed as evidence of guessing, inattention and/or other extraneous factors, and will be used to adjust the percentages of answers to the key question in order to get an accurate measurement of the "true" beliefs within the population about the key question. Declaration of Ivan Ross, Ph.D., P17.

Other than arguing that the Ross survey measured perceptions of the "Realtor marks" among the wrong population, and arguing that Dr. Jacoby was too "biased" for us to accord his testimony much weight, petitioner has not taken issue with the methodologies employed in the Ross study. Indeed, we find that the Ross survey appears to comport with all the standards for admissibility reflected in the *Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 399-403.* [*38] We find that the results of this survey demonstrate rather convincingly that among real estate professionals, the "Realtor" marks are perceived as strong source indicators.

We need not agree with respondent that real estate professionals are the sole group with whose perceptions we should be concerned in order to accord substantial weight to the results of the Ross survey. For given the circumstances of the use of these collective service marks, we agree with respondent's fallback position that real estate professionals make up a significant subgroup of relevant consumers. Even petitioner's survey expert testified that he presumed that people in the real estate industry would be likely to identify the term "Realtor" as a mark. n17 In fact, the Ross survey confirms that among this key group, an overwhelming majority perceives the term "Realtor" as a strong source identifier.

n17 A review of Ms. Freeman's testimony depositions from the earlier proceedings reveals a number of instances where she too acknowledged the significance of the "Realtor marks" among real estate professionals.

Moreover, respondent argues throughout the prosecution of these proceedings that whether a real [*39] estate agent or broker is a member of respondent is a material issue to other agents or brokers:

As used, the marks serve to distinguish NAR and its member associations from competing service providers and real estate associations that are not affiliated with NAR. Moreover, the marks enable real estate agents and brokers to determine whether their peers, with whom they deal regularly in connection with real estate transactions, are or are not members of NAR. This is important to transactional efficiency and the smooth functioning of the marketplace because ... NAR members are obligated to abide by a Code of Ethics and established rules and regulations that do not apply to non-members.

(Respondent's brief, p. 5)

Hence, in the channels of trade where goods and/or services are directed at the population subset of real estate agents and brokers, it is clear that these terms continue to function as source-identifying indicators.

On the other hand, we agree with petitioner that members of the general public seeking real estate services from an association professional are within the relevant public. The results of petitioner's flawed survey suggest that members of this portion [*40] of the relevant public may perceive the terms involved in these proceedings as generic terms in spite of respondent's best efforts to create perceptions of these terms as source indicators among members of the general public. However, because of the flawed methodology, these results do not factor into our decision. Rather, we find that petitioner has not shown by a preponderance of the evidence, that the terms are perceived as generic by even a significant minority of purchasers of a real estate professional's services.

Had petitioner conducted a proper survey, and obtained similar results, we would clearly face a situation with parallels to the facts of the oft-cited *Bayer* case, *supra* - a case cited with favor by petitioner in its reply brief.

In *Bayer,* Judge Learned Hand observed that case "presents a situation in which ... the trade is divided into two classes, separated by vital differences." n18 Moreover, to the extent some factors in the instant case vary from those in the *Bayer* case, these differences tend to support the position of respondent. For example, while the evidence in the *Bayer* case led the Court to conclude that substantially [*41] all of the general consuming public considered "aspirin" to be a generic designation, we have no reliable evidence showing that such is the case herein. More importantly, while members of the general public in the *Bayer* case had no memorable generic alternative, such is not the case here. The record suggests that "realty agent," "real estate agent" or "real estate broker" are accepted generic alternatives.

Moreover, Bayer's own actions were partly to blame for the state of affairs in the *Bayer* case, while the record herein shows no period of misuse by NAR, the trademark owner. n19

n18 Here, as in the *Bayer* case, a single term may be found to function as a "hybrid," i.e., a trademark and a generic term for the same goods or service, depending upon whether one is a member of the class of knowledgeable intermediaries or a member of the general public. The professional class in the *Bayer* case included retail pharmacists, and it was in these wholesale channels of trade where Bayer was permitted to retain the trademark status of the term "Aspirin."

In the *Bayer* case, ordinary consumers were not free to enter into the marketplace reserved for pharmacists and physicians. Similarly, here, consumers needing the services of a real estate agent or broker are not free to enter into the world of the real estate professional. Like the pharmacists and physicians in *Bayer,* the real estate professionals herein - whether or not they are members of respondent - have at their ready disposal the generic identifier to which they are most accustomed.

*See also* "Distinct Classes of Consumers of a Single Product - Accommodating Competing Perceptions of Genericness of the Same Identification," Jonathan Bersade, *The Trademark Reporter, 86 T.M.R. 56 (1996).*
[*42]

n19 *See* "Distinct Classes of Consumers of a Single Product - Accommodating Competing Perceptions of Genericness of the Same Identification," Jonathan Bersade, *The Trademark Reporter, 86 T.M.R. 56 (1996).*

Finally, in the *Bayer* case, Judge Hand issued a split injunction as a way of accommodating the members of both groups - including the interests of the brand name users. The Board does not issue injunctions, and Board decisions are restricted to the issue of registrability.

Against this backdrop, we find that this record supports a decision protecting the critical interests of the users of these marks within the real estate community. When real estate professionals see and use these identifiers, an entire packet of information is succinctly conveyed among them. Hence, they should be permitted to continue making knowledgeable and informed decisions based on the source-indicating functions of these marks. We find that this result is entirely consistent with the holding in the *Bayer* case. n20 Furthermore, there is insufficient probative evidence in this record on which we could base a finding as to the perceptions of the "Realtor marks" [*43] among members of the general public.

n20 *Id.*

Accordingly, based upon all the evidence in this record, we find that the marks REALTOR and REALTORS continue to function as collective service marks and have not become generic terms.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Trademark LawSpecial MarksCollective MarksTrademark LawSpecial MarksService MarksGeneral OverviewTrademark LawSubject MatterNamesGeneral Overview

**GRAPHIC:**

Picture, no caption